UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
TECOGEN, INC.,                          )
                                        )
        Plaintiff/ Defendant-in-Counterclaim,  )
                                        )
v.                                      )        C.A. No. 05-11823 RCL
                                        )
AEGIS ENERGY SERVICES, INC.,            )
AEGENCO, INC. and                       )
AEGIS GENERATION COMPANY,               )
                                        )
        Defendants/ Plaintiffs-in-Counterclaim.  )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF TECOGEN, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

For over twenty years, defendant Aegis Energy Services, Inc. ("Aegis") served as an authorized sales representative and distributor for Tecogen, Inc. ("Tecogen") in the sale and installation of cogeneration modules designed and manufactured by Tecogen ("Tecogen Modules"). In 2005, however, Tecogen discovered that Aegis secretly had become a direct competitor with a module that Aegis built by knocking off Tecogen's Modules ("Aegen Modules"). After Aegis refused to stop making and selling its own competing modules, Tecogen terminated Aegis as an authorized distributor of Tecogen Modules and filed the instant action.

Defendants have counterclaimed with two counts of tortious interference and one count for unfair competition. The tortious interference counts concern two projects in New York for which Tecogen Modules had long been specified before Aegis entered the picture with its own Aegen Modules and offered them for sale in place of Tecogen Modules. Count I rests on defendants' failed eleventh hour bid to replace Tecogen Modules with Aegen Modules at a

project in Chemung County; Count II rests on defendants' failure to agree in negotiations to terms with Tecogen for the supply of Tecogen Modules to a project in Lakeland, after which defendants summarily offered and sold their Aegen Modules in place of Tecogen Modules. The unfair competition claim in Count III repackages the tortious interference claims and, to the extent it alleges other inchoate violations, the record bears none of them out.

As demonstrated below, Tecogen is entitled to summary judgment on defendants' Counterclaims. On Count I, the evidence uniformly disposes of any connection between Tecogen's conduct and defendants' failed bid to switch the project from Tecogen Modules to Aegen Modules. On Count II, the evidence shows nothing more than a failed negotiation. As a matter of law, moreover, neither count involves improper conduct by Tecogen. Count III fails for similar reasons.

## STATEMENT OF FACTS

A.     Historic Relationship Between Tecogen and Aegis

Tecogen is a leading manufacturer of commercial and industrial cogeneration systems -- systems that produce both electricity and usable heat from one fuel source -- suitable for a variety of applications, including hospitals, nursing homes, and schools. (Statement of Undisputed Material Facts ("SMF"), ¶ 6). These systems represent decades of research, development, and innovation by Tecogen. (SMF, ¶¶ 7-8).

Tecogen sells its cogeneration systems through a network of authorized outside sales representatives and distributors. (SMF, ¶ 9). Aegis began doing business in 1985 as an authorized sales representative of Tecogen. (SMF, ¶¶ 10-11). In 1995, Aegis became Tecogen's exclusive distributor in Massachusetts and Connecticut. (SMF, ¶¶ 12-13). In 2000, Aegis began selling Tecogen Modules in New York City. (SMF, ¶ 18). When Aegis asked

Tecogen to include New York City within its exclusive territory, Tecogen informed it that the size of the New York market demanded multiple sales representatives. (SMF, ¶¶ 19-20). New York remained an open market serviced by a handful of nonexclusive sales representatives, including Aegis. (SMF, ¶¶ 15, 20).

Prior to 2002, Aegis did not manufacture its own cogeneration modules. For twenty years, its business involved designing, installing, and maintaining cogeneration systems that used Tecogen Modules. (SMF, ¶ 14).

B.     Aegis Secretly Develops its Own Module

In 2001, Tecogen's owners organized a sister company called American DG. (SMF, ¶ 22). Unlike Aegis, which sold Tecogen Modules for the customer to own and operate, American DG was to be a "shared energy savings" company, which would own and operate cogeneration systems installed at a customer's facility and then sell the generated energy to the customer at discounted prices. (SMF, ¶ 23). Although Aegis seldom conducted business in the "shared energy savings" market, it viewed American DG as a competitor. (SMF, ¶¶ 27-29). Tecogen kept Aegis informed of the evolving plans for American DG and urged cooperation between the companies. (SMF, ¶¶ 22, 24).

Aegis's response to American DG was to brush off Tecogen's overtures and begin working in 2002 on the development and production of its own cogeneration modules. (SMF, ¶ 31). From 2002 through May 2005, Aegis concealed from Tecogen the development, manufacture, and then sale of these modules. (SMF, ¶ 32). Aegis installed at least two Aegen Modules in Massachusetts, both jobs coming only after getting through the customer's door by first pitching Tecogen Modules, and two more in New York. (SMF, ¶¶ 36-40; 41-43; 44-47; 48-49). Aegis never disclosed any of these efforts to Tecogen. (Id.).

The decision to conceal was deliberate. (SMF, ¶ 33). An open declaration would have spelled the end of Aegis's relationship with Tecogen whose product had sustained its business.

C.     Chemung County

In late 2001, Tecogen learned that Chemung County Health Center ("Chemung") was considering installing a cogeneration system. (SMF, ¶ 50). From early 2002 through approximately mid-2005, Tecogen and a Tecogen sales representative named R.L. Kistler ("Kistler") worked with Chemung's energy savings contractor, Atlantic Energy Services, Inc. ("Atlantic"), to get Tecogen Modules specified for use in the Chemung project by project engineers and approved by the owner, the utility and government entities. (SMF, ¶¶ 51-53, 56, 65).

By no later than March 2004, Chemung officials actively were reviewing Tecogen Modules and Tecogen's maintenance program, and numerous Chemung officials had conducted "successful" field trips to Tecogen installations. (SMF, ¶ 53).

In October 2004, Atlantic's project manager for Chemung, Tim Casabonne, told Tecogen to expect a Spring 2005 order of Tecogen Modules. (SMF, ¶ 55).

On October 21, 2004, Chemung County officials, Atlantic, and Clough Harbour and Associates ("Clough Harbour"), the engineering firm responsible for designing the cogeneration system, participated in a "Project-Kick-Off Meeting." (SMF, ¶ 56-57). The final design plan reviewed at this meeting specified the use of "(4) 75 kW Tecogen units" and Chemung officials asked Atlantic to provide a copy of Tecogen's maintenance agreement. (SMF, ¶ 58). Chemung officials made it clear that the project needed to be completed as scheduled. Robert Page, the director of the Chemung County Health Facility, advised Atlantic "that the project must be completed by April/May 2005 so that the County can realize energy savings." (Tecogen Ex. 27).

4

In 2004 and 2005, all applications for required utility and government approvals stated that Tecogen Modules were being used in the project. In January 2005, for example, Clough Harbour submitted plans, drawings, and specifications for the proposed project to the New York Electric and Gas Corp. ("NYSEG") utility for its review for "interconnection" approval, which is required to allow an independent power generator to connect to the utility. (SMF, ¶ 63). The submission identified Tecogen as the independent power generator, provided detailed information about the Tecogen Module, and attached Tecogen's product brochure and installation manual.[1] (Tecogen Ex. 29).

Between January 2005 and June 2005, Tecogen and its representative, Advanced Comfort, negotiated with Atlantic over terms for the purchase of four Tecogen Modules for Chemung. On January 26, 2005, Advanced Comfort sent an updated price quotation and on March 1, 2005, it sent a revised price quotation. (SMF, ¶ 66-67). Each quotation offered to sell the Tecogen Modules "listed in the specification and drawing documents." (Id.). At around the same time, Atlantic requested and, in May 2005, County officials approved a budget increase to allow the project to proceed as originally planned with the use of Tecogen Modules. (SMF, ¶ 68). On June 6, 2005, Tecogen and Advanced Comfort provided Atlantic with another revised (reduced) price quotation for four Tecogen Modules. (SMF, ¶ 70).

Two hundred miles east of Chemung, Tecogen and Atlantic were also involved in a project that specified use of Tecogen Modules known as the Lakeland Central School District ("Lakeland") project, as discuss *infra* at pages 9 to 12. Unbeknownst to Tecogen, Aegis had just

---

[1] A supplemental application submitted to the NYSEG in February 2005 similarly identified Tecogen as the manufacturer of the "Energy Producing Equipment." (SMF, ¶ 64). Previously in September 2004, Chemung's "Certificate of Need" application for approval of the cogeneration project was filed with New York's Department of Health. That application identified Tecogen as the product manufacturer and included Tecogen's product brochure. (SMF, ¶ 54).

arrived on the scene with Aegen Modules.  On June 13, 2005, Aegis requested a meeting at which it introduced Atlantic to the Aegen Modules.  (SMF, ¶ 71).  At this meeting, Aegis learned of the Chemung project.  The following day, Aegis sent Atlantic its *first* price quote on the Chemung project for the sale of four Aegen Modules.  (SMF, ¶ 72).

Privy to Tecogen's current confidential pricing information on Tecogen Modules, SMF ¶ 122, Aegis's June 14th price quote for Aegen Modules significantly underbid Tecogen's June 6th price quote for Tecogen Modules.  (Compare Tecogen Ex. 35 to Ex. 76).  On June 16, 2005, Atlantic accepted Aegis's lower bid, but conditioned the purchase order "upon the design engineer's approval of the AEGEN unit as an acceptable substitute to the TECOGEN, INC CM-75 Integrated Module listed in the project plans and specifications."  (SMF, ¶ 74).  The purchase order expressly limited "acceptance to the terms stated on the face and back of this form and on any Purchase order supplement attached hereto."  (Id.).  The design engineer never approved the Aegen Module as an acceptable substitute.  (Tecogen Ex. 14, pp. 169-70).

On June 24, 2005, NYSEG notified Clough Harbour that it had completed its preliminary review of Chemung's original proposal based on the use of Tecogen Modules and would initiate the final stage of review upon payment of a mandatory review fee.  (SMF, ¶ 75).  Several days later, Atlantic and Clough Harbour discussed the impact a switch to the Aegen Modules would have on the review process and whether "with a change of this magnitude, the utility may require another full preliminary review and preliminary review fee also."  (SMF, ¶ 76).  Atlantic advised Clough Harbour that it would put off the final stage of NYSEG review until Clough Harbour had evaluated the Aegen Module and its impact on the original project design.  (Id.).

At a project meeting on June 28, 2005, Atlantic announced to Chemung that it was substituting Aegen Modules for Tecogen Modules.  (SMF, ¶ 77).  County officials demanded

that Atlantic hold a follow-up meeting to explain this change. (SMF, ¶ 78). Clough Harbour had similar concerns over the change and presented Atlantic with a list of twelve questions and issues that it had about the Aegen Modules.[2] (SMF, ¶¶ 79-82).

In an email to Atlantic on July 6, 2005, Gary Morenus of Chemung County's Buildings and Grounds Department added his voice to the chorus of concerns buzzing around the late switch to Aegen Modules. The email read, in part:

> I bring to you a concern that I have regarding the cogen project. It was my understanding that the County was adding additional funding to the project so that the project would proceed as originally planned. On 6/28/05 at the job meeting most of us heard for the first time that the supplier for the cogen units had been changed to a manufacturer that has been in business less than a couple of years…
>
> Tecogen has been a major player in co-gen designs for the last 20 years. Are we going to get the same level of support and service with this other manufacturer? How reliable are they compared to the Tecogen units? Did anyone look into references of projects that have used these units? (SMF, ¶ 84; Tecogen Ex. 44).

On July 18, 2005, Tecogen's president and chief operating officer, Bob Panora, sent Chemung a letter comparing the Tecogen and Aegen Modules in two regards. (SMF, ¶ 87). First, Panora compared Tecogen's twenty years of experience in the marketplace and approximately 800 successful installations versus Aegis's "recent" entry into the market and "very limited" track record. Second, he compared the fully certified status of the Tecogen Module with the uncertain certification status of the Aegen Module. Panora wrote that, based on Tecogen's review of the "information available on Aegis's web site" and "the various agency web sites for listed products . . . it would appear doubtful that the Aegis product has any certifications except on the component level (not applicable to the entire unit)." (Id.). None of these statements was false or misleading. (SMF, ¶ 87-89). Aegis has admitted that as of July 18, 2005, the Aegen Module did not have three of the four certifications discussed in Panora's letter.

---

[2] New York's Department of Education also asked questions about Aegen's safety compliance. (SMF, ¶ 85).

[3] (SMF, ¶ 88). As for the certification it does claim -- IEEE P1547 -- Aegis has produced no evidence that as of July 21, 2005 it met this standard.[4]

On the same day, Robert Page chimed in. Emphasizing his earlier concerns over project time constraints, he told Atlantic that "I am particularly concerned that the State Health Dept and NYSERDA approved this project with Tecogen units, and without their approval of the new units we cannot proceed -- otherwise the County risks losing all reimbursement for this project." (SMF, ¶ 91; Tecogen Ex. 48).

Concerns over project delays came to a head at a July 19, 2005 project meeting. (SMF, ¶¶ 92-96; Tecogen Ex. 49). County officials expressed their displeasure over the prospect of having to resubmit their project for review and approval. (SMF, ¶ 94). Clough Harbour voiced a similar "concern about resubmittal to the NYSEG." (SMF, ¶ 95). Faced with the prospect of starting over, the County pointedly asked Atlantic to "justify why we would possibly delay [the] project for [the] Aegis unit." (SMF, ¶ 96). No justification existed. Casabonne's minutes from this meeting reveal that, "Since this meeting, Atlantic has determined that changing cogen units at this stage of the project would cause unnecessary delays and have decided to stay with the Tecogen units." (SMF, ¶ 101).

On July 29, 2005, Atlantic informed Aegis that it would be staying with Tecogen Modules.[5] Atlantic explained in unmistakable terms the reason for this decision:

---

[3] The letter represented that the Tecogen Module had been certified as meeting four standards: the American Gas Association Standard for gas fire engine driven cogeneration compliances; the New York State Interconnect Requirement; the California Electric Rule 21; and IEEE P1547/D07. The IEEE P1547 certification that Aegis does claim as of July 18, 2005 is a component-level certification. (Tecogen Ex. 8 at pp. 151-52).

[4] Tecogen sent an identical letter to Atlantic on July 11, 2005 regarding the proposal to substitute Tecogen Modules with Aegen Modules at the Lakeland project. (SMF, ¶ 142; Tecogen Ex. 81).

[5] Aegis' effort to convert Chemung into an Aegen Module project cost Tecogen dearly. When Atlantic resumed price negotiations with Advanced Comfort and Tecogen for the purchase of Tecogen Modules, Atlantic demanded that Tecogen match Aegis's price for its Aegen Modules. Tecogen ultimately was forced to accept a purchase order for four Tecogen Modules at the reduced price of $55,000 each. (SMF, ¶¶ 98-99).

From day one, the cogeneration component of this project was based on the Tecogen product.  The County visited a [ ] few Tecogen installations, talked to several references and gained a comfort level with the Tecogen product which ultimately helped [Atlantic] sell the project.  In addition, the design, project costs, NYSEG and NYDOH approvals area all based on the Tecogen product.  It has taken 3 years to get to the point where we are ready and able to build the cogen component of this project and the County feels that changing the cogen units at this stage of the project will cause delays and is not acceptable.  (SMF, ¶ 100).

D.    Lakeland Central School District

In late 2003, R.L. Kistler notified Tecogen of another cogeneration project involving the Lakeland Central School District in Westchester County, New York ("Lakeland").  (SMF, ¶ 103).  The project manual, specifications, and drawings prepared for the Lakeland cogeneration project by the design engineer, Energy Concepts, all specified Tecogen Modules.  (SMF, ¶ 106).

In the summer of 2004, Tecogen introduced a new, "integrated" module to Lakeland and Energy Concepts ("Tecogen Integrated Module").  (SMF, ¶ 107).  The Tecogen Integrated Module was shipped from the factory with the cogeneration unit and key components preassembled and packaged together, thus reducing the time and cost of installation in the field. (Id.).  On October 29, 2004, the Lakeland specifications were amended to specify the use of the Tecogen Integrated Module.  (SMF, ¶ 111).

In November 2004 and again in February 2005, Tecogen's sales representative, Advanced Comfort, sent bids for the sale of eleven Tecogen Integrated Modules to J&M Heating and A/C, Inc. ("J&M"), the mechanical contractor at Lakeland.  (SMF, ¶¶ 112, 114).  The February bid built in an 8% sales commission.  (SMF, ¶ 114).  Because New York was a non-exclusive market, Tecogen employed a commission model to cover the presale efforts of other representatives who had worked on a project but did not make the final sale.  (SMF, ¶ 102). Both R.L. Kistler and Advanced Comfort had worked on the Lakeland project.  (SMF, ¶¶ 103-104, 109, 112-114).

After receiving Advanced Comfort's February price quote, J&M reached out to Aegis, fishing for a better quote on Tecogen Modules. On April 18, 2005, Aegis submitted two price quotes to J&M. (SMF, ¶ 115). One quote was for eleven Tecogen Modules at a total cost of $825,000, approximately $50,000 less than the Advanced Comfort quote.[6] (SMF, ¶ 116). Aegis never discussed this price quote with Tecogen before submitting it. (SMF, ¶ 118).

The other price quote to J&M was for eleven *Aegen* Modules for a total price of $770,000. (SMF, ¶ 117). This marked the first time that Aegis had submitted an Aegen Module proposal in direct competition with its own Tecogen Module proposal. (Id.). Aegis did not inform Tecogen that it had made simultaneous proposals for the sale of Tecogen *and* Aegen Modules. (SMF, ¶ 118).

Because Lakeland's "plans and specifications" called for Tecogen modules, J&M accepted Aegis's proposal for the eleven Tecogen Modules. (SMF, ¶ 119).

On May 2, 2005, Aegis sent Tecogen a purchase order for the purchase of twelve Tecogen Modules. (SMF, ¶ 123). The purchase order requested non-integrated modules and did not build in a commission. (Tecogen Ex. 69). This was a large number of units, which would require a significant cash outlay from Tecogen to cover the costs of production. At the time of the order, Aegis was $120,000 in arrears on past orders to Tecogen. (SMF, ¶ 124).

On May 6, 2005, Tecogen responded with a price quote proposing terms consistent with the requirements of the Lakeland project and its own cash flow needs. (SMF, ¶ 125). The quote specified the Tecogen Integrated Module as the module for sale. It also built in the "NY state

---

[6] Aegis's quote did not include a commission to cover Advanced Comfort's work on the project. Nor did it identify whether it was offering the standard Tecogen Module or Integrated Module specified for the project. (Tecogen Ex. 63).

commission." Finally, it established price terms that would Tecogen to manage its cash position vis-à-vis Aegis's large production order.[7] (Tecogen Ex. 71).

Aegis balked at Tecogen's prices and payment terms. On May 17, 2005, Tecogen sent Aegis a renegotiated price quote. (SMF, ¶ 126). Tecogen offered to sell the Tecogen Modules at lower prices to minimize the impact on Aegis of the New York commission. Tecogen also eliminated the 15-day payment term but requested that Aegis make payment by a two-party check "to assure timely payment." (Id.).

Aegis continued to balk at Tecogen's terms. Later that day, Aegis sent a purchase order to Tecogen that rejected the two-party check requirement and New York commission. (SMF, ¶ 127). It also requested the module and components be "shipped loose" rather than integrated at the factory by Tecogen. A handwritten message on the cover page requested "written confirmation of acceptance of this P.O." (Tecogen Ex. 73).

While Tecogen considered the terms of Aegis's May 17th purchase order, it received a jolting fax from one of its other sales representatives. The fax dated May 23, 2005 was a brochure of an Aegen Cogeneration Module. (SMF, ¶¶ 128-29). The fax revealed to Tecogen for the first time that Aegis had been competing against Tecogen with a product of its own. Tecogen took no further action on Aegis's May 17th purchase order as it digested this discovery. (SMF, ¶ 130).

On June 6, 2005, in response to Atlantic's request for a direct price quote from Tecogen, Tecogen sent Atlantic pricing for eleven Tecogen Integrated Modules for use at Lakeland. (SMF, ¶¶ 131-32, 134). On June 13, 2005, Aegis met with Atlantic, introduced Atlantic to the Aegen

---

[7] To encourage timelier payment from Aegis, one payment term gave Aegis better prices if it paid Tecogen within 15 days of receiving shipment rather than the standard 30 days. Another payment term provided that Tecogen would release a maximum of four modules into production at a time until payment on past orders was received. (Id.)

Module, and pitched the Aegen Modules as a cheaper, superior alternative to Tecogen Modules. (SMF, ¶ 135). Atlantic went with the lower quote and engaged in a short round of negotiation with Aegis for the sale of eleven Aegen Modules for use at Lakeland to J&M. (SMF, ¶ 136).

On June 16, 2005, Aegis cancelled its May 17th purchase order to Tecogen purportedly "due to Tecogen's unwillingness to provide written confirmation of our Purchase Order." (SMF, ¶ 137). By that time, however, Aegis was closing in on the sale of its own modules, which Aegis admits provided "an additional reason" for canceling its order. (Id.). On June 17, Aegis, Atlantic and J&M agreed on terms for the sale of eleven Aegen Modules for Lakeland. (SMF, ¶ 138). On June 21, 2005, Tecogen asked Aegis to work cooperatively with Tecogen on the Lakeland project. (SMF, ¶ 139). Aegis refused. (SMF, ¶ 140). With Aegis now openly and unwaveringly declaring itself a direct competitor of Tecogen in the manufacture of cogeneration modules, Tecogen terminated Aegis as an exclusive and authorized sales representative and distributor of Tecogen Modules on June 24, 2005. (SMF, ¶ 141).

## ARGUMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Where, as here, the party that does not have the burden of proof at trial moves for summary judgment by showing that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to show that a genuine issue of material fact exists. Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993). The nonmoving party must then "adduce specific, provable facts which establish that there is a triable issue." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990).

Tecogen is entitled to summary judgment on defendants' tortious interference counterclaims. Defendants carry the burden of proving four elements: (1) that they had a contract with a third party, (2) that Tecogen knew of the contract, (3) that Tecogen interfered with the contract through improper motive and means, and (4) that defendants' harm resulted directly from Tecogen's conduct. See Brewster Wallcovering Co. v. Blue Mountain Wallcovering, Inc., 68 Mass.App.Ct. 582, 608 (2007). There is no genuine dispute that Aegis's failed eleventh hour bid in Chemung "resulted directly" from mounting concerns over project delays, not from Tecogen's conduct. Furthermore, it was not "improper" for Tecogen to encourage Chemung to stay with Tecogen Modules rather than switch to its competitor's modules. It also was not "improper" for Tecogen to negotiate in good faith but ultimately not accept an inadequate purchase order from Aegis in the Lakeland project.

Similarly, Tecogen is entitled to summary judgment on defendants' Chapter 93A counterclaim. The record discloses no evidence of conduct by Tecogen that a reasonable fact finder could find meets the heightened standard of "rascality" applicable to business-to-business disputes under Section 11. Singh v. Blue Cross/Blue Shield of Massachusetts, Inc., 308 F.3d 25, 47 (1st Cir. 2002).

I.    **Because Tecogen Did Not Cause Aegis's Chemung Bid to Fail,
      Summary Judgment Should Enter for Tecogen on Count I**

Count I alleges that Tecogen's July 18th letter to Chemung County interfered with a "valid contract and beneficial business relationship" between Aegis and Atlantic for the sale of Aegen Modules for the Chemung project. The evidence uniformly establishes, however, that Chemung resisted an eleventh hour change in modules for the sole reason that its project had already been designed, specified, and approved using Tecogen Modules, and the project would have been delayed for months to go back and reapprove the project using Aegen Modules. There

is no evidence that the loss of Aegis's expectancy resulted "directly and proximately" from Tecogen's conduct.  Cf. Netherwood v. Am. Fed'n of State, County & Mun. Employees, 53 Mass. App. Ct. 11, 21-22 (2001).[8]

By the time Aegis arrived on the scene in June 2005, the Chemung project had been drawn up using Tecogen Modules (SMF ¶¶ 54, 58), submitted for state and utility review using Tecogen Modules (SMF ¶¶ 63-65), budgeted and re-budgeted using Tecogen Modules (SMF ¶ 68), and was weeks away from receiving preliminary approval from the utility using Tecogen Modules (SMF ¶ 75).  Chemung officials, moreover, had studied the Tecogen Modules, visited them in the field, and grown comfortable with them (SMF, ¶¶ 53, 100).  On June 28, 2005, a month over the deadline Chemung officials had set for the project, Atlantic proposed returning to the starting line with a new and previously unheard of project centerpiece (SMF, ¶ 77).

This proposal understandably met strong resistance.  Chemung officials immediately called on Atlantic to hold a meeting with all parties to discuss their concerns over the late change (SMF, ¶ 78).  By the end of the month, Chemung's design engineer was questioning the Aegen Module's compliance with utility requirements and whether a switch to this module would require resubmission and reapproval of the entire project (SMF, ¶¶ 79-81).  A Chemung official asked Atlantic whether they were not compromising the original design by switching "to a manufacturer that has been in business less than a couple of years."  (SMF, ¶ 84).

Resistance was already brewing when Tecogen sent its July 18th letter to Chemung comparing its modules with Aegis's modules.  Its first point was hardly controversial or lost on Chemung: Tecogen Modules had been around longer than Aegen Modules.  Its second point was

---

[8] No contract existed between Atlantic and Aegis.  Atlantic's purchase order to Aegis was expressly conditioned "upon the design engineer's approval of the AEGEN unit as an acceptable substitute to the TECOGEN, INC CM-75 Integrated Module."  The condition was never satisfied.  Thus, Aegis had no more than an expectancy to sell Aegen Modules to Atlantic.  Aegis has not sued Atlantic for breach of contract.

accurate: Tecogen Modules had the certifications claimed in the letter and public information did not reveal any comparable certifications held by Aegen Modules (SMF, ¶ 87-89).

But more importantly, the letter never even touched on the County's key concern -- Chemung officials were focused on time and project delays, not on IEEE P1547 or California Electric Rule 21. Indeed, at the July 19, 2005 meeting/referendum on the Aegen Module, Chemung officials did not focus on the technical merits of the Aegen Module versus the Tecogen Module. Rather, they asked Atlantic to justify "why we would possibly *delay* [the] project for [the] Aegis unit." (SMF, ¶ 96). For its own part, Atlantic "determined that changing cogen units at this stage of the project would cause unnecessary *delays* and [it] decided to stay with the Tecogen units." (SMF, ¶ 101) (emphasis added). And delay was the sole reason given by Atlantic to Aegis for its decision to stay with Tecogen Modules: "It has taken 3 years to get to the point where we are ready and able to build the cogen component of this project and the County feels that changing the cogen units at this stage of the project will cause *delays* and is not acceptable" (SMF, ¶ 100) (emphasis added).

In conclusion, Aegis's late bid was done in by time, not by Tecogen's letter. "Without evidence of causation, there can be no claim for tortious interference." <u>Medical Air Technology Corp. v. Marwan Investment, Inc.</u>, 303 F.3d 11, 22 (1st Cir. 2002).

## II.    **Because Tecogen Did Nothing Improper in Trying to Hold Onto Chemung, <u>Summary Judgment Should Also Enter for Tecogen on Count I</u>**

Count I fails for the additional reason that it would reward Aegis's own improper acts in trying to convert Chemung into an Aegen Module project.

After devoting more than a year of concerted effort to get its product specified and approved for use at Chemung, Tecogen watched Aegis make a late inning bid to swap out Tecogen's product for its own. The law of tortious interference did not require Tecogen to step

aside and let this happen.  Aegis had no inviolate right to introduce its modules to Chemung.

Atlantic's purchase order was expressly conditioned on the approval of Aegis's product as an

"acceptable substitute" to Tecogen's product, which never occurred.  Given its lengthy

involvement in the project, Tecogen had every right to try to hold onto it for its own modules.

      Defendants must prove, therefore, that Tecogen tried to retain the Chemung project

through "improper motive" or "improper means."  United Truck Leasing Corp. v. Geltman, 406

Mass. 811 (1990).  The evidence shows neither.  Improper motive requires proof of a malignant

purpose "unrelated to *any* legitimate corporate interest."  Boothby v. Texon, Inc., 414 Mass. 468,

487 (1993).  Tecogen did not act from a punitive motive.  It merely pursued the legitimate

interest of trying to retain a job it already had won for its products.  Earnest pursuit of a customer

is an "altogether normal business objective."  See W. Oliver Tripp Co. v. American Hoeschst

Corp., 34 Mass.App.Ct. 744, 752 (1993); see also Natick Auto Sales, Inc. v. Dep't of

Procurement and General Services, 47 Mass.App.Ct. 625, 633 (1999) ("anything that [defendant]

may have done to bring the prize home was a proper motive, not an improper motive.").

      Likewise, Tecogen did not use improper means.  Improper means requires more than

extolling the advantages of one's product over another's.  See W. Oliver Tripp Co., 34

Mass.App.Ct. at 752 (refusing to find improper means where defendant attempted "to persuade

end users to ditch [plaintiff's] chemicals and use [defendant's] chemicals instead.");

Restatement, § 768, cmt. e.  Rather, it requires resort to such illegitimate means of persuasion as

threats, misrepresentations of fact, or defamation.  See United Truck Leasing Corp., 406 Mass. at

817.  Tecogen's July 18th letter was a legitimate effort to promote its product's superior record

of successful installations and certifications.  Defendants have adduced no evidence that any of

its factual representations were false, let alone intentionally false (SMF, ¶ 89).  Nor have they

adduced any evidence that Chemung actually relied on these representations when it decided to stay with Tecogen Modules. See W. Oliver Tripp Co., 34 Mass.App.Ct. at 752 (self-promotion constitutes the "sort of puffery" that "seldom amount[s] to fraudulent misrepresentation.").

### III.    Summary Judgment Should Enter for Tecogen on Count II Because a Failed Negotiation Does Not Rise to Tortious Interference

Count II alleges that Tecogen interfered with a contract between Aegis and J&M for the sale of eleven Tecogen Modules to Lakeland by wrongfully refusing to accept a May 17, 2005 purchase order from Aegis. As of May 17, 2005, however, Tecogen had no malicious incentive to refuse Aegis's purchase order. Aegis had not yet been revealed as a competitor, and the relationship between the two companies had not yet turned from partners to antagonists. Count II rests on an arms-length negotiation in which Aegis obstinately refused to meet Tecogen on reasonable terms.

Tecogen had every reason to close the Lakeland deal with Aegis, but it sought to do so on appropriate terms. These terms were: (1) use of the Tecogen Integrated Module as required by Lakeland's specifications, (2) inclusion of a New York commission in the pricing to cover Tecogen's other representatives that had worked on the project, and (3) reasonable payment terms to ensure timely payment and allow Tecogen to manage a tight cash position. Tecogen twice submitted price quotes with these terms, and Aegis twice rejected them (SMF, ¶¶ 125-27). Aegis's May 17th purchase order requested the non-integrated Tecogen Modules, it made no allowance for the New York commission, and it refused Tecogen's request to make payment by a two party check. (Tecogen Ex. 72). Only after it discovered a week later that Aegis secretly had been competing against it did Tecogen put Aegis's purchase order to rest.

Count II does not allege why it was wrongful for Tecogen to withhold its acceptance of a purchase order that rejected Tecogen's terms, but it suggests two equally exceptional

17

propositions: either that Tecogen had some obligation to accept Aegis's counteroffer before May 23 when it discovered Aegis's clandestine competition; or that Tecogen should have accepted the purchase order notwithstanding that it came from a competitor. The first proposition fails as a matter of basic contract law. Aegis's May 17th purchase order constituted a counteroffer. It rejected the terms of Tecogen's previous price quote and insisted on different ones. See Qureshi v. Fiske Capital Management, Inc., 59 Mass.App.Ct. 463, 467 (2003). Tecogen was "not bound to accept the new terms and did not." Id. On this evidence, defendants cannot get from contractually proper conduct to tortiously improper conduct. See Spencer Companies, Inc. v. Chase Manhattan Bank, 81 B.R. 194, 294 (D.Mass. 1987) ("Mere refusal to deal does not constitute tortious interference.").

As to the second proposition, it should suffice to say that it is not tortiously improper to refuse to deal with a competitor. Once Aegis was exposed as a competitor, Tecogen had no duty of *noblesse oblige* to turn the other cheek. It had every right to try to hold onto Lakeland as a Tecogen Module project. See Restatement, § 768, cmt. b ("One's privilege to engage in business and to compete with others implies a privilege to induce third parties to do their business with him rather than with his competitors.").

Finally, defendants have adduced no evidence of damages. They can only muster, with ostensible chagrin, that Tecogen's inaction forced Aegis to compete against Tecogen in Lakeland. (Counterclaim, ¶ 22). The notion that Tecogen had to twist Aegis's arm into becoming a competitor is simply at odds with the facts. Even before its standoff with Tecogen, Aegis had secretly sold and installed Aegen Modules at other sides. At Lakeland, Aegis already had offered to sell Aegen Modules for use in the project. It took no time for Aegis to revive this offer. Aegis secured the sale of its own modules to Lakeland only a month after its May 17th

purchase order to Tecogen.  Only then did it cancel its order to Tecogen.  Moreover, Aegis's successful sale of eleven Aegen Modules to Lakeland begs the question of injury, of which defendants have provided no evidence.

**IV.  Because There is No Misconduct Rising to the Level of Rascality under M.G.L. c. 93A, § 11, Summary Judgment Should Enter for Tecogen on Count III**

Count III asserts that Tecogen engaged in unfair competition under M.G.L. c. 93A.  This claim involves a business-to-business dispute and is thus governed under the heightened standard of M.G.L. c. 93A, § 11, which requires that the challenged conduct rise to a level "of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." Singh, 308 F.3d at 47.  In other words, the conduct must be "immoral, unethical, oppressive, or unscrupulous."  Cheswell, Inc. v. Premier Homes & Land Corp., 319 F. Supp. 2d 135, 142 (D.Mass. 2004).  None of the conduct challenged in Count III rises to this level.

First, Count III purports to challenge the certification letters sent by Tecogen to Chemung and to Atlantic in connection with Lakeland.  (Counterclaim, ¶ 30).  As discussed above, these letters were fair, accurate, and legitimate efforts to persuade customers of the advantages of the Tecogen Module.  Moreover, as far as the "Chemung" letter, there is no evidence that Chemung officials relied on the letter in deciding to keep its project on track with the Tecogen Modules. As far as the "Lakeland" letter, it had no effect on Atlantic.  Atlantic ultimately purchased eleven Aegen Modules from Aegis.

Count III also asserts Tecogen's conduct "undermined" the distributor relationship with Aegis.  (Counterclaim, ¶ 31).  Tecogen only terminated this relationship after it discovered that Aegis secretly had begun making and selling its own cogeneration modules in competition with, and in place of, the very Tecogen Modules that an authorized Tecogen distributor is supposed to be selling on Tecogen's behalf.  Aegis would not have deliberately concealed its competing

module from Tecogen had it believed this competition was somehow consistent with its obligations as an authorized Tecogen distributor.

Third, Count III purports to challenge Tecogen's offer to sell an "Aegis Energy customer" -- Atlantic -- twenty Tecogen Modules in competition with Aegis.  (Counterclaim, ¶ 31).  Aegis has no axe to grind here (nor damages).  Aegis sold eleven Aegen Modules to Atlantic for use at Lakeland; Tecogen sold none.  Moreover, Tecogen only engaged in legitimate efforts to hold onto a project for which its product had been specified for over a year.  It would be an "extravagant rule of law" to hold that § 11 bars a party "from competing for a business advantage because he is made aware that another has been exerting himself to the same end." Doliner v. Brown, 21 Mass.App.Ct. 692, 698 (1986).[9]

Finally, to the extent the remainder of Count III (Answer, ¶ 32) merely repackages defendants' tortious interference claims, it fails for the same reasons discussed above.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment dismissing the entirety of defendants' Counterclaim.

TECOGEN, INC.,
By its attorneys,

/s/ Derek B. Domian
Julie A. Frohlich (BBO# 554707)
Derek B. Domian (BBO# 660568)
Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, MA  02110-3333
(617) 482-1776

Dated:  July 14, 2008

---

[9] Count III also alleges Tecogen "used confidential customer contacts established by Aegis Energy."  The evidence shows Tecogen had been working with Atlantic long before Aegis made its first offer on either the Chemung or Lakeland projects.  (SMF, ¶¶ 52, 55, 61-62, 65-67, 108-109, 112-114).

## Certificate of Service

I, Derek Domian, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


   /s/ Derek Domian