UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————
                                                    )
TECOGEN, INC.,                                      )
                                                    )
        Plaintiff/ Defendant-in-Counterclaim,       )
                                                    )
v.                                                  )        C.A. No. 05-11823 RCL
                                                    )
AEGIS ENERGY SERVICES, INC.,                        )
AEGENCO, INC. and                                   )
AEGIS GENERATION COMPANY,                           )
                                                    )
        Defendants/ Plaintiffs-in-Counterclaim.     )
—————————————————————)

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF TECOGEN, INC. MOTION FOR PARTIAL SUMMARY JUDGMENT

        Plaintiff/Counterclaim Defendant Tecogen, Inc. ("Tecogen") respectfully submits the

following Statement of Undisputed Material Facts in Support of its Motion For Summary

Judgment on the Counterclaims brought by Defendants, Aegis Energy Services, Inc. ("Aegis")

and Aegenco, Inc. ("Aegenco"):

**The Historic Relationship Between Tecogen and Aegis.**

        1.      Tecogen, is a corporation organized under the laws of the State of Delaware with

a principal place of business located at 45 First Avenue, Waltham, Massachusetts, 02451.

Supporting Evidence:  Aegis' Answer and Counterclaims ("Answer") (Tecogen Ex. 1)[1] at

Counterclaim ¶ 3.

_____

[1]      "Tecogen Ex." means an exhibit filed in support of Tecogen, Inc.'s Motion for Partial Summary
Judgment.

2.      Aegis is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business at all relevant times located at 2097 Riverdale Street, Springfield, Massachusetts, 01089.

Supporting Evidence:  Answer (Tecogen Ex. 1) at Counterclaim ¶ 1.

3.      Aegenco is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business at all relevant times located at 2085 Riverdale Street, Springfield, Massachusetts, 01089.

Supporting Evidence:  Answer (Tecogen Ex. 1) at Counterclaim, ¶ 2.

4.      For ease of reference, Aegis and Aegenco shall be referred to collectively as "Aegis", unless otherwise indicated.

5.      Cogeneration refers to the process by which one fuel source, such as natural gas, is used to produce both electricity and thermal energy (heat).  "Distributed generation" refers to the dispersion of the generation of electricity by use of efficient on-site power producers instead of by a single central power station.

Supporting Evidence:  Complaint (Tecogen Ex. 2) at ¶ 9; Answer (Tecogen Ex. 1) at ¶ 9.

6.      Tecogen operates in the distributed generation market and is a leading manufacturer of natural gas, engine-driven commercial and industrial cogeneration systems suitable for a variety of applications, including hospitals, nursing homes, and schools.  Key features of Tecogen equipment include its heat recovery capability, a low-emission engine that meets all current environmental standards in the U.S., and numerous safety certifications confirmed through testing by a nationally recognized independent testing lab.

Supporting Evidence:  Tecogen Product Brochure (Tecogen Ex. 3); Tecogen Cogeneration

Module Installation Manual dated February 2005 (Tecogen Ex. 4); Answer (Tecogen Ex. 1) at

Exhibit D thereto.

      7.     As part of its cogeneration business, Tecogen designs, manufacturers, sells and

services the TECOGEN® Cogeneration Module CM-75 Standard and the CM-75 Low Emissions

models (collectively, the "Tecogen Modules").

Supporting Evidence:  Tecogen Product Brochure (Tecogen Ex. 3); Excerpts from Tecogen

Cogeneration Module Installation Manual dated February 2005 (Tecogen Ex. 4).

      8.     The Tecogen Modules are the product of years of research, development and

innovation by Tecogen that began in 1977.  Since 1992, Tecogen has focused its cogeneration

product development and manufacturing efforts exclusively on the 75 kW Tecogen Modules and

the similar 60 kW product line.

Supporting Evidence:  Tecogen Cogeneration Product Development Timeline (Tecogen Ex. 5).

      9.     Tecogen sells its cogeneration modules through outside authorized sales

representatives.

Supporting Evidence:  Deposition Transcript of Robert Panora ("Panora Depo. Trans.")

(Tecogen Ex. 6) at 118; Deposition Transcript of Jeff Glick ("Glick Depo. Trans.") (Tecogen Ex.

7) at 13-17.

      10.    Aegis was founded in 1985 by Spiro Vardakas, who still is the company's CEO,

CFO and Chairman.  His son, Lee Vardakas, also is a longtime executive with Aegis.

Supporting Evidence:  Deposition Transcript of Spiro Vardakas ("S. Vardakas Depo. Trans.")

(Tecogen Ex. 8) at 8; Deposition Transcript of Lee Vardakas ("L. Vardakas Depo. Trans.")

(Tecogen Ex. 16) at 10.

11.     In 1985, Aegis began doing business with Tecogen as an authorized sales representative and installer of Tecogen Modules.

<u>Supporting Evidence:</u>  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 10, 14-15).

12.     In the early 1990's, most of Aegis' business was conducted in Connecticut and Massachusetts.  In 1995, Tecogen asked Aegis to handle all aspects of selling Tecogen's cogeneration equipment.  After 1995, Tecogen would send any leads that it received for Tecogen sales in Connecticut and Massachusetts to Aegis for its follow up.

<u>Supporting Evidence:</u>  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 16-17; Answer (Tecogen Ex. 1) at ¶ 13.

13.     From approximately 1995 until June 24, 2005, Aegis was Tecogen's exclusive distributor for Tecogen Modules in Massachusetts and Connecticut.

<u>Supporting Evidence:</u>  Answer (Tecogen Ex. 1) at ¶ 13; S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 18; L. Vardakas Depo. Trans. (Tecogen Ex. 16) at 12.

14.     Prior to 2002, Aegis did not manufacture its own cogeneration modules.  Rather, for 20 years, its business involved designing, installing, maintaining, and operating modular cogeneration systems that used cogeneration modules manufactured by Tecogen.

<u>Supporting Evidence:</u>  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 32; Answer (Tecogen Ex. 1) at ¶ 13.

15.     Prior to June 24, 2005, neither Aegis nor Aegenco was an exclusive distributor for Tecogen Modules in the State of New York.  Rather, New York was serviced for Tecogen by several non-exclusive sales representatives including Advanced Comfort Systems ("Advanced Comfort"), R.L. Kistler, All Systems Cogeneration, Aegis, AES-NJ Cogen Co., Inc., and

American DG Energy ("American DG"), which is an affiliate of Tecogen through common ownership.

Supporting Evidence:  Complaint (Tecogen Ex. 2) at ¶ 14; Answer (Tecogen Ex. 1) at ¶ 14; L. Vardakas Depo. Trans. (Tecogen Ex. 16) at 14.

**Course of Dealing Between Tecogen and Aegis With Respect to Competing Modules**

16.     Aegis had a longstanding understanding that its responsibilities as a Tecogen sales representative included promoting the sale of Tecogen Modules and using its best efforts to promote the maximum number of sales of Tecogen products in Massachusetts and Connecticut.

Supporting Evidence:  L. Vardakas Depo. Trans. (Tecogen Ex. 16) at 15-16 and 33.

17.     In 1993, Tecogen sent Aegis a written Sales Rep Agreement dated September 7, 1993.  This agreement contained a provision stating that the sales representative shall not sell, distribute, advertise or deal in any products that are, in Tecogen's opinion, competitive with Tecogen's cogeneration modules.  The parties never signed this agreement.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 18-20; September 7, 1993 Unsigned Sales Rep Agreement (Tecogen Ex. 9) at 8 and 9.

18.     In 2000, Aegis began selling Tecogen Modules in the New York City area for the first time.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 31-33.

19.     In late 2002 and early 2003, Aegis asked Tecogen to make the New York City area part of Aegis' exclusive territory.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 34-36.

20.     In response to Aegis' inquiries about New York City, Tecogen sent Aegis a letter dated April 3, 2003, which enclosed a proposed sales rep agreement.  The letter informed Aegis

5

that Tecogen "cannot include exclusivity in the New York City area and the surrounding area" because that market is "too large and we feel it needs to be addressed as a nonexclusive territory."

Supporting Evidence:  Letter dated April 3, 2003, from Tecogen to Aegis (Tecogen Ex. 10) at 1.

21.     Like the 1993 proposed agreement, this 2003 agreement contained a provision addressing "Competing Products", which states that "Representative will not represent other manufacturer's products that, in the opinion of TECOGEN, are competitive with TECOGEN's products"

Supporting Evidence:  Letter dated April 3, 2003, from Tecogen to Aegis (Tecogen Ex. 10) at 2.

22.     The letter also stated that Tecogen wanted Aegis "to develop a working relationship with American DG."  American DG is a Delaware corporation that was incorporated in 2001 by Tecogen's owners.

Supporting Evidence:  Letter dated April 3, 2003, from Tecogen to Aegis (Tecogen Ex. 10) at 1; Panora Depo. Trans. (Tecogen Ex. 6) at 120-121.

23.     American DG was created to be a "shared energy savings" company, meaning it would own and operate cogeneration systems installed on-site at a customer's facility and sell the energy produced by that system to the customer at costs lower than what the customer would pay to a utility.

Supporting Evidence:  Panora Depo. Trans. (Tecogen Ex. 6) at 122-123.

24.     Tecogen kept Aegis informed of the creation of American DG and plans for the company as they began to evolve.  Spiro Vardakas admits that in late 2001, Aegis had been informed about American DG and that, by the end of 2002, "we really got the sense of where

they were going" with American DG through "a number of discussions with Tecogen regarding Aegis and [American DG]."

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 42.

25.     Spiro Vardakas also admits that Aegis "learned quite a bit about American DG during the end of '02 in discussions with Tecogen and its principals."

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 38.

26.     Moreover, in a press release dated November 20, 2002, American DG publicly announced entering into its first agreement for a project.

Supporting Evidence:  American DG Press Release (Tecogen Ex. 11).

27.     Spiro Vardakas testified in this action that Aegis saw American DG "as a serious competitor that raised serious concerns."

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 43.

28.     Contemporaneous statements made by Spiro Vardakas, however, establish that shared energy savings arrangements were not, in fact, a substantial part of Aegis' business.  In this regard, Spiro Vardakas drafted and sent a letter dated August 1, 2002 to the Massachusetts Department of Telecommunications and Energy ("DTE"), which states in relevant part, "Aegis Energy Services, Inc. has been in the business of developing and operating small cogeneration systems throughout New England for the past 17 years.  We provide economic analyses, engineering, system installation, service, and _occasionally_ ownership with shared savings agreements as a financing vehicle."  (emphasis added)

Supporting Evidence:  Vardakas Letter to DTE (Tecogen Ex. 12) at 1; S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 110-111.

29.     Similarly, in written direct testimony dated March 16, 2004, which Spiro Vardakas prepared and submitted to the DTE, Mr. Vardakas said "We develop, install, service and sometimes own through a shared savings program, small, modular, combined heat and power systems (CHP)."

Supporting Evidence:  Prefiled Direct Testimony of S. Vardakas to Mass. DTE (Tecogen Ex. 13) at 3; S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 111-112.

30.     Spiro Vardakas admits that Aegis' "biggest concern was in the New York area was [sic] competing against other dealers who were also supplying Tecogens."

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 50.

**Aegis' Development of its own Cogeneration Modules**

31.     Aegis' response to the announcement of American DG was to begin working in 2002 on the development and production of its own cogeneration modules (the "Aegen Modules").  Aegis "got serious" about this development effort after the meetings Aegis had with Tecogen and American DG beginning in 2003.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 143-144.

32.     At no time from 2002 through 2005 did Aegis ever tell anyone at Tecogen that it was developing and then selling and installing Aegen Modules.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 145.

33.     Spiro Vardakas has testified that Aegis consciously made the decision not to tell Tecogen about its development and sale of the Aegen Modules.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 84-85.

34.     A comparison of the two product lines indicates that the Aegis Modules are virtually identical to the Tecogen Modules in terms of appearance, specifications and cost. Among other things:

- The Aegen Modules are about the same dimensions and weight as the Tecogen Modules' platform;

- The major components in the Aegen Modules, such as the engine and generator, are painted the same distinctive blue color as the Tecogen Modules' major components;

- The general specifications for the product lines are almost identical;

- Additionally, the Aegen Modules use the exact same or a substantially similar General Motors engine, as well as the same model generator made by Marathon Electric;

- It also appears that Tecogen designed components – specifically the special oil pan and proprietary exhaust manifold castings designed by Tecogen and manufactured by a third party – are likewise part of the Aegen Modules.

Supporting Evidence:  Deposition Transcript of Timothy Casabonne ("Casabonne Depo. Trans.") (Tecogen Ex. 14) at 11; *generally compare* Excerpts from Tecogen Cogeneration Module Installation Manual dated February 2005 (Tecogen Ex. 4) *with* Excerpts from Aegen Cogeneration Module Installation Manual dated June 2005 (Tecogen Ex. 15); Panora Depo. Trans. (Tecogen Ex. 6) at 125-130.

35.     By June of 2004, Aegis had prepared several documents that compare Tecogen and Aegen Modules.  These comparisons even have extensive side by side photos comparing the two companies' modules, many of which are date stamped "6-14-04."

Supporting Evidence:  L. Vardakas Depo. Trans. (Tecogen Ex. 16) at 156-159; Aegis Prepared

Product Comparisons (Tecogen Ex. 17).

**Aegis' Secret Sales of Aegen Modules**

     **A.**     **JML**

36.     In 2004 or early 2005, Aegis sold an Aegen Module to JML Care Center Skilled

Nursing facility ("JML"), which is located in Falmouth, Massachusetts.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 59.

37.     By way of background to this sale, in August, 2004, Aegis sent a sales proposal

letter to JML Care Center Skilled Nursing facility ("JML"), which included a diagram of a

Tecogen Module prepared by Tecogen.

Supporting Evidence:  Sales Proposal Letter from Aegis to JML (Tecogen Ex. 18), at 4; S.

Vardakas Depo. Trans. (Tecogen Ex. 8) at 65-66.

38.     An Aegis salesman made an initial presentation to JML that "probably" discussed

only the Tecogen Module.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 62 and 71-72.

39.     JML and Aegis signed a Purchase and Installation Agreement dated August 27,

2004.  This agreement does not identify the manufacturer of the cogeneration module by name.

Supporting Evidence:  Purchase and Installation Agreement between Aegis and JML (Tecogen

Ex. 19).

40.     Prior to this lawsuit, Aegis never disclosed to Tecogen that it had sold an Aegen

Module to JML.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 82-83 and 145.

### B.    Whitney Place

41.    In 2004, Aegis installed an Aegen Module at Whitney Place ("Whitney Place"), located in Natick, Massachusetts.

Supporting Evidence:  L. Vardakas Depo. Trans. (Tecogen Ex. 16) at 142-144.

42.    During the period Aegis was trying to talk Whitney Place into installing a cogeneration system at its facility, the Aegis salesman used the Tecogen Module to pitch the idea.  Shortly before the agreement was to be signed, at the instruction of either Spiro or Lee Vardakas, the Aegis salesman switched the module on Whitney Place and told them Aegis was going to install an Aegen Module at Whitney Place.

Supporting Evidence:  Deposition Transcript of Robert Olmstead ("Olmstead Depo. Trans.") (Tecogen Ex. 20) at 20-22.

43.    Prior to this lawsuit, Tecogen had not known that Aegis had developed and installed an Aegen Module at Whitney Place.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 145; Glick Depo. Trans. (Tecogen Ex. 7) at 39-44.

### C.    Augustana Lutheran Home

44.    In 2004, Aegis also sold an Aegen Module to Augustana Lutheran Home ("Augustana"), which is located in Brooklyn, New York.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 67.

45.    This was the first Aegen Module sold by Aegis.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 76.

46.    Aegis began discussing a cogeneration system with Augustana in the beginning of 2004 and signed an agreement with Augustana in the Spring of 2004.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 68.

47.    Prior to this lawsuit, Aegis did not disclose this sale to Tecogen.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 68 and 145.

### D.    Muhlenberg Medical Center

48.    Lastly, in 2004 or early 2005, Aegis also sold an Aegen Module to Muhlenberg Medical Center, which is located in Brooklyn, New York.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 159-161.

49.    Prior to this lawsuit, Tecogen had not known about the sale of an Aegen Module to Muhlenberg.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 145; Glick Depo. Trans. (Tecogen Ex. 7) at 39-44.


## Aegis' "Open" Sales of Aegen Modules in Direct Competition with Tecogen Modules

### A.    Chemung

50.    By late 2001, Tecogen learned that Chemung County Health Center ("Chemung" or "County") was considering installing a cogeneration system in its facility.  Chemung County Health Center is located in Elmira, New York, which was in the territory of Tecogen's sales representative named R.L. Kistler.  Mr. Ray Hickey was the R.L. Kistler employee working on the Chemung sale.

Supporting Evidence:  *See generally* January 9, 2002 Fax from Glick to Hickey at R.L. Kistler (Tecogen Ex. 21); January 25, 2002 Fax from Glick to Hickey at R.L. Kistler (Tecogen Ex. 22); February 19, 2002 R.L. Kistler Price Quote to Atlantic for Chemung (Tecogen Ex. 23).

51.    By January 2002, Tecogen had prepared a Cogeneration Savings Analysis for Chemung and sent it to R.L. Kistler to assist it in trying to get Tecogen Modules specified for the Chemung project.

Supporting Evidence:  January 9, 2002 Fax from Glick to Hickey at R.L. Kistler (Tecogen Ex. 21); January 25, 2002 Fax from Glick to Hickey at R.L. Kistler (Tecogen Ex. 22).

52.    Atlantic Energy Services, Inc. ("Atlantic") was the shared energy savings consultant working with Chemung County.  In February 2002, R.L. Kistler sent a price quote to Atlantic dated February 19, 2002 for Chemung.

Supporting Evidence:  February 19, 2002 R.L. Kistler Price Quote to Atlantic for Chemung (Tecogen Ex. 23).

53.    The Chemung Project was relatively quiet through 2003 but by March 2004, the project had become more active.  By that time, Atlantic was answering Chemung's questions about the project, including providing Chemung County officials with information they had requested about the Tecogen Modules, and numerous Chemung County officials had conducted successful field trips of Tecogen installations at two facilities.

Supporting Evidence:  March 3, 2004 Atlantic Letter to Chemung with project information discussing Tecogen units (Tecogen Ex. 24), generally and specifically at 4, 6, and 9-13; Casabonne Depo. Trans. (Tecogen Ex. 14) at 116-117.

54.    In September, 2004, a Certificate of Need Application was filed with New York State's Department of Health for the Chemung project.  This application stated that Tecogen Modules were being used in the project.

<u>Supporting Evidence:</u>  Certificate of Need Application to N.Y. State Department of Health for Chemung (Tecogen Ex. 25), generally and specifically at 11-14; Casabonne Depo. Trans. (Tecogen Ex. 14) at 175-176.

55.    In early October 2004, Jeff Glick Spoke with Tim Casabonne, who was Atlantic's project manager for Chemung.  Casabonne told Glick to expect a spring 2005 order of Tecogen Modules for the Chemung project.

<u>Supporting Evidence:</u>  Transmittal of Tecogen Maintenance Agreement, Glick to Atlantic (Tecogen Ex. 26).

56.    On October 21, 2004, a "Project Kick-Off Meeting" was held for the purpose of: identifying the project team; introducing County officials to Clough Harbour and Associates ("Clough Harbour"), which was the engineering firm Atlantic hired to design the cogeneration system at the Chemung County Health Center; talking about the project scope; addressing any questions the County had; and starting the coordination of the project.

<u>Supporting Evidence:</u>  Casabonne Depo. Trans. (Tecogen Ex. 14) at 118.

57.    The October 21, 2004, meeting was attended by Casabonne, Clough Harbour employees and six Chemung County officials, including its president, Robert Page, and Gary Morenus from the Chemung County Building and Grounds Department.

<u>Supporting Evidence:</u>  Chemung Project Kick-Off Meeting Minutes dated October 21, 2004 (Tecogen Ex. 27), at 1; Casabonne Depo. Trans. (Tecogen Ex. 14) at 118.

58.    At this meeting, the parties discussed that "[t]he cogeneration scope of work includes four 75 kilowatt Tecogen units…"

<u>Supporting Evidence:</u>  Chemung Project Kick-Off Meeting Minutes dated October 21, 2004 (Tecogen Ex. 27), at 2; Casabonne Depo. Trans. (Tecogen Ex. 14) at 119-120.

59.     Atlantic also was tasked with providing the County with the Tecogen Module maintenance agreement because the County wanted to understand what was required of them as part of maintaining the cogeneration equipment.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 120-121.

60.     On October 26, 2004, Casabonne faxed the February 2002 R.L. Kistler price quote to Clough Harbour for its reference.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 114.

61.     On October 27, 2004, Casabonne asked Tecogen to provide him with information about Tecogen's maintenance agreement being proposed for Chemung.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 121-122.

62.     On December 6, 2004, Glick emailed to Casabonne the proposed Tecogen Maintenance Agreement for Chemung (as well as the Lakeland project, which is discussed below).

Supporting Evidence:  12-6-04 email, Glick to Casabonne at Atlantic transmitting Lakeland and Chemung Maintenance Agreements (Tecogen Ex. 28).

63.     Before any cogeneration system may be connected into a utility's systems, the proposed cogeneration system must first be reviewed and approved by that utility.  Chemung's proposed system needed to be reviewed and approved by New York State Electric and Gas ("NYSEG").  On or about January 24, 2005, a large packet of documents concerning the Chemung project was sent to NYSEG as part of its preliminary review of the Chemung project. This documentation stated that Tecogen Modules would be used in the Chemung project and there was extensive discussion of the Tecogen Modules in these materials.

Supporting Evidence:  Excerpts from 1-24-05 Preliminary Review Package sent to NYSEG for Chemung (Tecogen Ex. 29), at 6, 8-32; Casabonne Depo. Trans. (Tecogen Ex. 14) at 172-173.

64.    Other required documentation provided to NYSEG reflected that Tecogen Modules would be used in the project.

Supporting Evidence:  2-3-05 Appendix C, N.Y. State Standardized Application for Attachment of Parallel Generation  identifying Tecogen Modules (Tecogen Ex. 30), at 1; Casabonne Depo. Trans. (Tecogen Ex. 14) at 174.

65.    From October 2004 through at least March 2005, Tecogen assisted Atlantic and the project engineer with technical and engineering questions they had about Tecogen Modules and with securing the various approvals required from government agencies and NYSEG for the project based on the use of Tecogen Modules.

Supporting Evidence:  *See generally* Tecogen Ex. 31 consisting of 10-25-04 Transmittal, Glick to Clough Harbour of Tecogen Module Literature and Installation Manual, 11-10-04 emails, between Glick and Clough Harbour re specs for Chemung, 12-10-04 letter from Chemung to NYSEG answering questions about project and Tecogen units proposed for project; Tecogen Ex. 30.

66.    By January 2005, Ray Hickey had left R.L. Kistler and was working for another Tecogen sales representative - Advanced Comfort.  In January 2005, Hickey sent Casabonne an updated price quote from Advanced Comfort dated January 26, 2005.  The specifications and drawings for Chemung called for use of Tecogen Integrated Cogeneration Modules.  Therefore, the quote offered to sell 4 Tecogen Integrated Cogeneration Modules to Atlantic for use at Chemung for $86,165 per module.  The quote included an attached drawing of the Tecogen Integrated Cogeneration Module.

Supporting Evidence:  1-26-05 Price Quote, Hickey at Advanced Comfort to Casabonne at Atlantic, Chemung (Tecogen Ex. 32); Casabonne Depo. Trans. (Tecogen Ex. 14) at 122-124.

67.     In March 2005, Ray Hickey of Advanced Comfort sent Casabonne a revised price quote dated March 1, 2005, which lowered the price for each Tecogen Integrated Cogeneration Module.

Supporting Evidence:  3-1-05 Price Quote from Advanced Comfort to Atlantic, with Casabonne's Handwritten Price Change on 8-1-05 (Tecogen E. 33); Casabonne Depo. Trans. (Tecogen Ex. 14) at 125-126.

68.     In April and May 2005, Atlantic and Chemung worked on the budget for the project.  By June 3, 2005, the County's budget for the project had been increased to allow for the purchase of the then current Tecogen Integrated Cogeneration Modules and the project was approved to proceed.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 126-134; Tecogen Ex. 34 consisting of 4-12-05 Email from Casabonne to Chemung re: budget overrun, NYSEG requirements5-19-05 letter, and 6-3-05 Handwritten Notes, noting project budget increased for cogen units.

69.     In early June 2005, Tecogen employees met with Atlantic employees and discussed various Atlantic projects, including the Chemung project.

Supporting Evidence:  Glick Depo. Trans. (Tecogen Ex. 7) at 113-118.

70.     In a detailed email with attached price quotes sent on June 6, 2005, as requested by Atlantic, Tecogen directly provided Atlantic with a price quote for the sale and maintenance of 25 Tecogen Modules, including the 4 Chemung project modules.

Supporting Evidence:  Glick Depo. Trans. (Tecogen Ex. 7) at 113-118; 6-6-05 email from Glick

to Brock and Casabonne at Atlantic regarding pricing for 25 Integrated Modules for Lakeland,

Chemung, Auburn and Maintenance at projects (Tecogen Ex. 35).

71.    On June 13, 2005, Lee Vardakas of Aegis met with Tim Casabonne and several

other Atlantic employees.  Mr. Vardakas requested this meeting.  At it, he made a presentation to

the Atlantic employees about the Aegen Modules.  Prior to this meeting, Casabonne never had

heard of the Aegen Modules.  In the meeting, the parties discussed Aegis' sale of Aegen

Modules to Atlantic for use in the Chemung project.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 94-96.

72.    The day after this meeting, Aegis sent a Price Quote to Atlantic with proposed

prices for the sale of 4 Aegen Modules for use at Chemung.  This was the first price quote

Atlantic received from Aegis in connection with the Chemung project, and the first price quote

on Aegen Modules for that project.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 133; 6-14-05 Price Quote,

Aegis to Atlantic (Tecogen Ex. 36).

73.    On or about June 13, 2005, Aegenco was incorporated.  On June 16, 2005, instead

of Aegis sending a price quote, Aegenco sent a price quote to Atlantic with prices for 4 Aegen

Modules for Chemung and 5 Aegen Modules for additional projects (including Lakeland,

discussed below).

Supporting Evidence:  Answer (Tecogen Ex. 1) at ¶ 16; 6-16-05 Price Quote from Aegis to

Atlantic, Chemung and Additional Projects (Tecogen Ex. 37).

74.    Atlantic sent back a purchase order to Aegis ordering 4 Aegean Modules for the

Chemung project.  This purchase order expressly stated that it "is contingent upon the design

engineer's approval of an Aegen unit as an acceptable substitute to the Tecogen, Inc. CM-75 integrated module listed in the plans and specifications."  It also said "This order expressly limits acceptance to the terms stated on the face and the back of this form and on any purchase order supplement attached hereto."  As discussed below, the design engineer never gave this approval.

Supporting Evidence:  6-16-05 Atlantic P.O. to Aegis (Tecogen Ex. 38); Casabonne Depo. Trans. (Tecogen Ex. 14) at 169-170.

75.     In a letter dated June 24, 2005, the utility, NYSEG, notified the Chemung project engineers that its review of the Chemung project application, based on use of Tecogen Modules, was complete and NYSEG was ready to move on to the next stage of review, once NYSEG received the $5,000 review fee.

Supporting Evidence:  6-24-05 NYSEG Letter giving notice of Preliminary Review approval of Chemung project using Tecogen cogen units (Tecogen Ex. 39); Casabonne Depo. Trans. (Tecogen Ex. 14) at 136.

76.     In a June 27th email exchange discussing this letter, Clough Harbour and Atlantic discussed the impact a change to Aegen Modules would have on NYSEG review, and whether "with a change of this magnitude the utility may require another full preliminary review and preliminary review fee also."  The engineer at Clough Harbour also advised Casabonne that "We are currently reviewing the Aegenco technical information to gauge the impact on our original design that has been approved by the utility preliminary review."

Supporting Evidence:  6-27-05 Email thread between Clough Harbour and Atlantic re: impact change to Aegen units will have on NYSEG review (Tecogen Ex. 40), at 1; Casabonne Depo. Trans. (Tecogen Ex. 14) at 136-138.

77.    A Chemung Project Meeting was held on June 28, 2005.  Seven Chemung County officials attend this meeting, including Gary Morenus from the County's Building and Grounds Department.  At this meeting, Atlantic advised the Chemung officials, for the first time, that Atlantic was substituting Aegen Modules for the originally specified Tecogen Modules and had issued a purchase order for Aegen Modules.  Atlantic also advised the Chemung officials that Clough Harbour was reviewing technical information submitted about the Aegen Modules and would advise of any potential issues or if modifications to the design would be required.

Supporting Evidence:  6-28-05 Chemung Project Meeting Minutes advising of change in cogen units and handwritten notes of 6-28-05 Chemung Project Meeting (Tecogen Ex. 41), at 1; Casabonne Depo. Trans. (Tecogen Ex. 14) at 140-143.

78.    In this June 28th meeting, County officials, including Gary Morenus, expressed concerns with Atlantic's decision to make this change and asked that Atlantic hold a meeting with all parties to discuss the decision.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 16 and 159.

79.    Two days later, in a June 30, 2005 email to Atlantic, Clough Harbour presented a list of 12 issues and questions it had regarding the Aegen Modules.

Supporting Evidence:  6-30-05 email from Clough Harbour to Atlantic listing issues/questions re: Aegen units (Tecogen Ex. 42); Casabonne Depo. Trans. (Tecogen Ex. 14) at 143-144.

80.    One item in the email states: "There is no statement of compliance with IEEE 1547.  This is important as it covers issues such as grounding, effects on utility distribution systems, reconnection, monitoring, voltage and frequency disturbances, feeder re-closing coordination, flicker, harmonics, surge capability, et cetera."

Supporting Evidence:  6-30-05 email from Clough Harbour to Atlantic listing issues/questions re: Aegen units (Tecogen Ex. 42), at par. 7.

81.    Another item says: "It's not clear which Beckwith relay is being used.  The labor on the 'typical' control schematic is 'generator protection relay.'  Depending on the exact model, this may not meet the inter-tie requirements.  Additional information is required on the Beckwith relay."

Supporting Evidence:  Id., at par. 9.

82.    Atlantic understood that the engineer's "concern was that they would need to reevaluate the documents that had been submitted to the utility for the interconnect approval" and this would cause a time delay or the documents would not be approved.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 10.

83.    In contrast, the Tecogen Modules had numerous certifications, including a statement of compliance with IEEE 1547, and all the other certifications required by the project specifications.

Supporting Evidence:  Tecogen Ex. 43 consisting of ITS Certification Letter for Tecogen Cogen Units; List of NYS Certified Interconnection Equipment, at "001808".

84.    In a July 6, 2005, email sent to Atlantic, the County's Gary Morenus raised numerous questions and concerns about the eleventh hour change in modules.  Among other things, he said:  "I bring to you a concern that I have regarding the cogen project.  It was my understanding that the County was adding additional funding to the project so that the project would proceed as originally planned.  On 6/28/05 at the job meeting most of us heard for the first time that the supplier for the cogen units had been changed to a manufacturer that has been in business less than a couple of years."

Supporting Evidence:  7-6-05 email from Chemung with questions, concerns re: Aegen units (Tecogen Ex. 44), at 2; Casabonne Depo. Trans. (Tecogen Ex. 14), at 148-150.

85.    By July 11, 2005, New York's Department of Education was raising its own questions and concerns about the switch to Aegen Modules, including whether those modules had required safety certifications.

Supporting Evidence:  7-11-05 emails, between Cafer at Energy Concepts, Casabonne at Atlantic, architect and NYSED re Aegen Module Certifications (Tecogen Ex. 45).

86.    After asking Aegis for references, Lee Vardakas sent a July 11, 2005 email to Atlantic in which he provided references for the only two sites at which Aegen Modules had been installed and were operating as of that date (JML and Augustana Lutheran Home for the Aged).

Supporting Evidence:  7-11-05 email from Aegis to Atlantic with 2 site references where Aegen units installed (JML, Augustana Lutheran Home for the Aged) (Tecogen Ex. 46), at 1; Casabonne Depo. Trans. (Tecogen Ex. 14), at 155-156.

87.    On July 18, 2005, Tecogen added its voice to the chorus of concerns already buzzing around the eleventh hour switch from Tecogen Modules to Aegen Modules.  In this regard, Tecogen sent a letter to Chemung dated July 18, 2005, which discussed the Tecogen Integrated Modules' compliance with the project specifications and compared the certifications held by Tecogen's Modules to the publicly available information about the Aegen Module's certifications.

Supporting Evidence:  7-18-05 email from Panora to Chemung and Panora letter to Chemung dated 7-18-05 (Tecogen Ex. 47).

88.    None of this letter's factual statements about the Aegen Module's certifications are false, incomplete or misleading.  For example, Tecogen checked web sites of Aegis, UL and various government agencies to see if Aegen Modules were listed as certified and found no such certifications listings.  Moreover, Aegis admits that its modules were not as of July 2005 certified as a unit by a nationally recognized testing laboratory to meet: the American Gas Association ("AGA") standard for gas fire engine driven cogeneration appliances, a standard known as California Electric Rule 21, and the New York State Interconnect Requirement (NYSIR).  In contrast, Tecogen Modules are certified as being in compliance with the standards discussed in Mr. Panora's letter.

Supporting Evidence:  Panora Depo. Trans. (Tecogen Ex. 6), at 68-74, 84-93, 95-100; S. Vardakas Depo. Trans. (Tecogen Ex. 8), at p. 149 and 154; Lee Vardakas Depo. Trans. (Tecogen Ex. 16), at pp. 130-131; Glick Depo. Trans. (Tecogen Ex. 7), at 30-31; Tecogen Cogeneration Module Installation Manual dated February 2005 (Tecogen Ex. 4), at 1 and 6.

89.    No evidence has been produced in this case indicating that as of July 21, 2005, a nationally recognized testing lab had certified the Aegen Module as a unit to meet the IEEE 1547 standard or the New York State Interconnect Requirement.

90.    The County (and others) already had raised serious concerns about the module change before Panora's July 18, 2005, letter.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14), at 16.

91.    In fact, in a July 18, 2005 email to Atlantic, Robert Page noted that the County's Building and Grounds Department already had raised concerns similar to those raised by Tecogen.  Mr. Page also informed Atlantic that he was "particularly concerned that the State Health Department and NYSERDA approved this project with Tecogen units."

Supporting Evidence:  7-18-05 email from Chemung to Atlantic (Tecogen Ex. 48).

92.    On July 19, 2005, the project participants held the Chemung Project Meeting requested by County officials at the June 28th meeting.  Lee Vardakas attended and told the group that Aegis been producing its Aegen Modules for three years and its modules had been in operation or in service for two years.  He also said he would provide the group with a list of references for the 12 or so sites where Aegen Modules were in operation.

Supporting Evidence:  7-19-05 Chemung Project Meeting Minutes and handwritten notes of same (Tecogen Ex. 49); Casabonne Depo. Trans. (Tecogen Ex. 14) at 160-162.

93.    In this meeting, Clough Harbour advised that the preliminary review application to NYSEG would need to be resubmitted if Aegen Modules were substituted for Tecogen Modules.

Supporting Evidence:  7-19-05 Chemung Project Meeting Minutes and handwritten notes of same (Tecogen Ex. 49), at par. 5; Casabonne Depo. Trans. (Tecogen Ex. 14) at 13.

94.    The group also discussed the impact that introducing the Aegen Modules would have on the project schedule and there was concern that "going with the Aegen equipment would require additional review time by Clough Harbour, potential resubmissions to the Department of Health, NYSERDA and the utility, NYSEG, which would delay the schedule."

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 14, 162-163; *see also* 7-19-05 Chemung Project Meeting Minutes and handwritten notes of same (Tecogen Ex. 49).

95.    Clough Harbour also had a "concern about resubmittal to NYSEG."

Supporting Evidence:  7-19-05 Chemung Project Meeting Minutes and handwritten notes of same (Tecogen Ex. 49), at par. 12 (handwritten); Casabonne Depo. Trans. (Tecogen Ex. 14) at 164.

96.     Additionally, Clough Harbour noted at the meeting that to meet NYSEG's requirements, they would need documentation from Aegis that its packaged unit was type-tested in New York state.  Lastly, Atlantic was tasked "to justify why [they] could possibly delay [the] project for [the] Aegis unit."

Supporting Evidence:  7-19-05 Chemung Project Meeting Minutes and handwritten notes of same (Tecogen Ex. 49), at par. 10 (handwritten); Casabonne Depo. Trans. (Tecogen Ex. 14) at 15.

97.     The day after this meeting, Casabonne began negotiating again with Ray Hickey at Advance Comfort for the purchase of Tecogen Modules for Chemung.

Supporting Evidence:  Tecogen Ex. 50 consisting of 7-20-05 Fax from Casabonne at Atlantic to Hickey at Advanced Comfort bidding on Chemung and Lakeland, 7-22-05 email thread between Casabonne and Hickey re Chemung, 7-22-05 email from Hickey to Casabonne, 7-26-05 email thread, 7-29-05 Price Quote from Hickey to Casabonne, and 7-27-05 to 7-29-05 email thread between Advanced Comfort and Atlantic negotiating Tecogen unit price.

98.     Aegis' price for the Aegen Modules had worked out to an average of $55,000 per module.  Casabonne demanded that Advance Comfort and Tecogen match that per module price for the Tecogen Modules.  In this regard, on July 27th, he advised Hickey that "AES will not accept the Tecogen offer of sixty-six thousand dollars per unit for the Chemung project.  AES will accept an offer of fifty-five thousand dollars per unit.  If Tecogen cannot meet this price then AES will proceed with installing the Aegen units."  Casabonne used the threat to use Aegis Modules on the project "as a negotiating tool" to get a lower price from Tecogen.

<u>Supporting Evidence:</u>  7-27-05 to 7-29-05 email thread between Advanced Comfort and Atlantic negotiating Tecogen unit price in Tecogen Ex. 50; Casabonne Depo. Trans. (Tecogen Ex. 14) at 22-23.

99.    On August 1, 2005, Atlantic, Advance Comfort and Tecogen agreed that Atlantic would purchase 4 Tecogen Modules through Advance Comfort for a price of $55,000 each for use at Chemung.

<u>Supporting Evidence:</u>  8-1-05 Atlantic P.O. to Hickey at Advanced Comfort (Tecogen Ex. 51).

100.    In an email dated July 29, 2005, from Casabonne to Lee Vardakas, Atlantic informed Aegis that the switch to Aegen units at Chemung would delay the project and, therefore, the Chemung project would proceed using Tecogen Modules.  In relevant part, the letter said:

> From day one, the cogeneration component of this project was based on the Tecogen product.  The County visited a [ ] few Tecogen installations, talked to several references and gained a comfort level with the Tecogen product which ultimately helped [Atlantic] sell the project.  In addition, the design, project costs, NYSEG and NYDOH approvals area all based on the Tecogen product.  It has taken 3 years to get to the point where we are ready and able to build the cogen component of this project and the County feels that changing the cogen units at this stage of the project will cause delays and is not acceptable.

<u>Supporting Evidence:</u>  7-29-05 letter from Atlantic to Aegis (Tecogen Ex. 52).

101.    On August 1, 2005, Casabonne distributed his typed minutes of the July 19, 2005 Chemung Project Meeting.  The minutes state that, "Since this meeting, Atlantic Energy Services, Inc. has determined that changing cogen units at this stage of the project would cause unnecessary delays and have decided to stay with the Tecogen units."

<u>Supporting Evidence:</u>  7-19-05 Chemung Project Meeting Minutes (Tecogen Ex. 49), at para. 7.

B.    **Lakeland**

1.    **Aegis' Actions Cutting Tecogen Modules Out of the Lakeland Project**

102.    As discussed above, at all relevant times, New York state was a non-exclusive territory for Tecogen's sales representatives, which meant that several representatives were located in and/or worked on jobs in that state.  When more than one Tecogen representative was involved in a single project, Tecogen's pricing model required that a sales representative's bids and price quotes include some commissions to cover other reps who also had some involvement in the same project but who did not get the Tecogen Module sale.

Supporting Evidence:  Letter dated April 3, 2003, from Tecogen to Aegis (Tecogen Ex. 10)

103.    A Tecogen sales representative named R.L. Kistler was located in upstate New York.  In late 2003, Kistler notified Tecogen about a cogeneration project involving the Lakeland Central School District ("Lakeland"), in which Kistler expected to be involved.  Kistler learned that Aegis might also be providing a quote on the project and Kistler wanted Tecogen to remind Aegis to build some commissions into its quotes so that Kistler would be protected and receive that commission for its work on the project.

Supporting Evidence:  12-19-03 email from Kistler to Glick re Lakeland (Tecogen Ex. 53).

104.    Jeff Glick at Tecogen subsequently sent Lee Vardakas at Aegis an email, which stated that the Lakeland project would involve a number of Tecogen's sale representatives; the scope of the project would cross into different territories and, therefore, commissions would need to be paid to the involved representatives; and, therefore, the module pricing would have to be determined based on Tecogen's commission sale price model rather than its buy/sell model.  He also expressly stated that commissions would need to be included in the module prices to pay R.L. Kistler ("Engineering credit") and Advance Comfort ("Owner credit").

27

Supporting Evidence:  Tecogen Ex. 54 consisting of 6-30-04 transmittal of Tecogen module info to Atlantic and 6-30-04 email from Glick to L. Vardakas regarding Lakeland pricing and commissions to R.L. Kistler and Advanced Comfort.

105.    Lee Vardakas briefly worked on the Lakeland project by providing Energy Concepts with budget prices for use in its value engineering.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 113.

106.    During 2004, the design engineer on the Lakeland project, Energy Concepts, prepared a project manual, specifications, plans and drawings for the Lakeland cogeneration system.  Those documents all specified Tecogen Modules for the project.

Supporting Evidence:  Tecogen Ex. 55 consisting of Excerpts from Lakeland Project Specifications, and Energy Concepts' Project Manual for Lakeland dated March 17, 2004; and Excerpts from Project Drawings (Tecogen Ex. 56).

107.    By mid-2004, Tecogen had developed a new version of its cogeneration module, called the Tecogen Integrated Module.  With the Integrated Module, Tecogen built the cogeneration unit and connected the catalytic converter, exhaust heat exchanger, silencer and pump/expansion tank to the unit at Tecogen's factory, so that the module would then be shipped to the installation site as a complete, Tecogen factory manufactured package.  With non-integrated Tecogen Modules, Tecogen built the cogeneration unit and then that unit plus the other components mentioned above would be shipped in multiple pieces to the site for assembly in the field by a contractor.

Supporting Evidence:  Glick Depo. Trans. (Tecogen Ex. 7) at 24-27, 88 and 91.

108.    Beginning in June and continuing through at least August 2004, Tecogen was educating Atlantic and the Lakeland engineer about the Tecogen Integrated Modules and talking with them about using those Integrated Modules at Lakeland.

Supporting Evidence:  6-30-04 transmittal of Tecogen module info to Atlantic and 8-24-04 fax, Glick to Cafer at Energy Concepts re Integrated Tecogen Modules (Tecogen Ex. 57).

109.    From at least August 2004 and continuing through March 2005, Tecogen assisted Atlantic and the project engineer with technical and engineering questions they had about Tecogen Modules and with securing the various government and utility approvals required for the project as proposed with Tecogen Modules being used in the project.

Supporting Evidence:  Tecogen Ex. 58 consisting of 9-10-04 fax from Glick to Hickey, 10-04 emails between Glick, Energy Concepts and Advanced Comfort, 12-21-04 email from Energy Concepts to Glick regarding "Appendix C", 12-21-04 Fax from Glick to Narodetsky at Energy Concepts regarding NYSIR review, 1-20-05 Glick email answering NYSED questions regarding Tecogen modules, 2-10-05 email from Energy Concepts to Glick regarding Tecogen installations not needing relay protection, 2-10-05 fax from Glick to Energy Concepts with requested information about Tecogen relay protection, and 3-14-05 emails between Casabonne and Glick and Hickey regarding Tecogen Module information for J&M Heating.

110.    On October 6, 2004, a meeting was held at Lakeland about the project. Casabonne's notes of the meeting include the notation, "Tecogen only acceptable manufacturer." He testified at his deposition that he could not remember if that was a notation of something said at the meeting or his understanding of the specifications.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 54-55.

111.    In October 2004, a Bid Addendum dated October 29, 2004, was issued, which amended the Lakeland specifications to clarify that the Tecogen Integrated Module was the module being specified by the project documents.  In fact, the Addendum included drawings from Appendix 3 of Tecogen's updated Installation Manual, which expressly identify and clearly depict Tecogen's Integrated Module.

Supporting Evidence:  Excerpts from 10-29-04 Bid Addendum for Lakeland (Tecogen Ex. 59), at page 2 of 2; Tecogen Cogeneration Module Installation Manual dated February 2005 (Tecogen Ex. 4); Casabonne Depo. Trans. (Tecogen Ex. 14) at 52-54.

112.    Bids on the Lakeland project were due in early November.  One Tecogen sale representative, Advanced Comfort, submitted a bid to sell 11 Tecogen Integrated Modules for use at Lakeland.  This bid unambiguously described the Tecogen units as the Tecogen Integrated Module and even attached one of the Appendix 3 drawings entitled "Tecogen Integrated Unit Installation."  This bid was consistent with the Tecogen Module described in the October 2004 Bid Addendum.

Supporting Evidence:  11-5-04 Price Quote from Advanced Comfort to J&M Heating (Tecogen Ex. 60); Casabonne Depo. Trans. (Tecogen Ex. 14) at 57-58.

113.    In early February 2005, Tecogen and Advanced Comfort worked on pricing for Advanced Comfort's next quote on the Lakeland project.

Supporting Evidence:  2-10-05 fax from Glick to Hickey regarding Tecogen Module pricing for Lakeland (Tecogen Ex. 61).

114.    J&M Heating and A/C, Inc. ("J&M Heating") was the mechanical contractor responsible for purchasing and installing the cogeneration modules at Lakeland.  Therefore, on or about February 11, 2005, Advanced Comfort sent its next price quote for the Lakeland

30

project's 11 Tecogen Integrated Modules to J&M Heating.  This bid unambiguously described the Tecogen units as the Tecogen Integrated Module, and included a "New York commission" of 8%.

Supporting Evidence:  2-11-05 Price Quote form Advanced Comfort to J&M Heating for Tecogen Integrated Modules at Lakeland (Tecogen Ex. 62).

115.    Before the Lakeland project, Aegis had not known J&M Heating.  Nevertheless, at some point in early 2005, Ed Horvath of J&M called Lee Vardakas at Aegis.  Horvath indicated he did not like the price quotes he was getting from the Tecogen sales representative involved in the Lakeland project (Advanced Comfort) and asked Aegis to give him a price for the 11 Tecogen Modules specified in the project documents.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 114.

116.    On April 18, 2005, Aegis sent a Tecogen Module proposal to J&M Heating.  This proposal identified 11 Tecogen Modules but it did not clearly state that those modules were the Tecogen Integrated Module.

Supporting Evidence:  4-18-05 Tecogen Module Proposal from Aegis to J&M Heating (Tecogen Ex. 63).

117.    Aegis also sent J&M Heating a proposal for the sale of 11 Aegen Modules for use at Lakeland. (Tr. 112).  This was the first time Aegis had knowingly submitted bids for Tecogen Modules on the same project as another Tecogen sales representative.  It also was the first time Aegis had submitted an Aegen Module proposal at the same time as, and in competition with, a Tecogen Module Proposal.

<u>Supporting Evidence:</u>  4-18-05 Aegen Module Proposal from Aegis to J&M Heating (Tecogen Ex. 64); S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 56-57; L. Vardakas Depo. Trans. (Tecogen Ex. 16) at 53-54.

118.    Aegis did not tell Tecogen that it was going to submit this Aegen Module proposal.  Nor did Aegis inform Tecogen at that time that it was bidding on the Lakeland project. <u>Supporting Evidence:</u>  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 120; L. Vardakas Depo. Trans. (Tecogen Ex. 16) at 55-56.

119.    Because Tecogen Modules had been specified for the Lakeland project, J&M Heating sent a purchase order dated April 27, 2005 to Aegis ordering the 11 Tecogen Modules for the total price of $825,000.

<u>Supporting Evidence:</u>  4-27-05 P.O. from J&M Heating to Aegis ordering Tecogen Modules for Lakeland (Tecogen Ex. 65).

120.    Not knowing that Aegis was bidding against it, Advanced Comfort continued communicating with J&M Heating to try to close a sale with J&M Heating.

<u>Supporting Evidence:</u>  5-2-05 fax from Hickey to J&M Heating regarding Tecogen Module Pricing (Tecogen Ex. 66).

121.    At the same time, the cost of materials for Tecogen's Modules had been increasing for quite some time.  Tecogen had been absorbing those costs but by late April 2005, it could no longer do so.  Tecogen issued a memorandum to all Sales Reps and Dealers dated April 28, 2005, notifying them that Tecogen's Module prices would increase effective June 1, 2005.  This was part of a serious effort by Tecogen to better manage its cash position going forward.

Supporting Evidence:  4-28-05 Memorandum from Wes Schuster at Tecogen to Tecogen Sales

Reps and Dealers regarding Tecogen Module Price Increase (Tecogen Ex. 67).

122.    Meanwhile, on or around May 2, 2005, Lee Vardakas of Aegis contacted Jeff

Glick at Tecogen and asked him to provide Aegis with Tecogen's then current confidential

pricing pages for Tecogen's Modules.  Aegis did not inform Tecogen that it had bid on the

Lakeland project nor did it inform Tecogen that Aegis would be using Tecogen's confidential

pricing information for the Lakeland project.  Rather, Aegis only indicated to Tecogen that the

information was needed for Aegis' New York City projects.  Glick sent Tecogen's confidential

pricing information to Vardakas.

Supporting Evidence:  5-2-05 email from Glick to L. Vardakas at Aegis with Confidential Turn-

In Pricing Pages for NYC Projects (Tecogen Ex. 68).

123.    Later in the day on May 2nd, Aegis sent Tecogen a purchase order for 12 Tecogen

non-integrated modules.  Aegis' purchase order only identified the job as "NY".  At some point

between May 2 and May 6, 2005, Tecogen learned that Aegis was seeking to sell Tecogen

Modules for the Lakeland project.

Supporting Evidence:  5-2-05 Aegis P.O. for NY for 12 Tecogen Modules (Tecogen Ex. 69).

124.    A 12 module order was a very large order coming from Aegis.  As of April 25,

2005, Aegis already was months in arrears in paying Tecogen over $120,000 for past purchases.

Supporting Evidence:  Panora Depo. Trans. (Tecogen Ex. 6) at 35-38; 4-25-05 Tecogen

Accounts Receivable Aging Report on Aegis (Tecogen Ex. 70).

125.    Accordingly, the price quotation Tecogen sent Aegis for 11 Tecogen Modules on

May 6, 2005, contained new payment terms, including terms providing that payment was "Net

15 days" instead of Net 30 days and that Tecogen would not put more than 4 modules into

production at a time without full payment for all previous shipments. Tecogen's prices also included the New York territory commission to compensate Advance Comfort for all its presale activity in getting Tecogen Modules specified for the project.

Supporting Evidence: 5-6-05 Price Quotation from Tecogen to Aegis (Tecogen Ex. 71), at "Special Options" and "Pricing and Terms".

126.    On May 17, 2005, Tecogen sent Aegis a price quotation that reverted to the old Net 30 day payment term, but also stated that Tecogen would require Aegis to pay for the modules with a two-party check. Tecogen's price quote explained that "[t]his payment method is to assure timely payment."

Supporting Evidence: 5-17-05 Price Quotation from Tecogen to Aegis (Tecogen Ex. 72), at "Special Options", "Pricing and Terms", and fax coversheet.

127.    Aegis still was not happy with the two-party check proposal. Therefore, later that day, Aegis sent another purchase order to Tecogen, which eliminated the two-party check requirement. This purchase order also expressly required that Tecogen accept the order by sending written confirmation of acceptance.

Supporting Evidence: 5-17-05 Aegis P.O. to Tecogen, fax stamped 5-18-05 (Tecogen Ex. 73).

128.    Between May 17, 2005 and May 23, 2005, Tecogen was internally considering its cash position and payment term options to ensure that the costs Tecogen would incur to produce the modules for Aegis' large order would be paid by Aegis on a timely basis close to Tecogen's module production time so as not to endanger Tecogen's cash flow position.

Supporting Evidence: Glick Depo. Trans. (Tecogen Ex. 7) at 78-81; Panora Depo. Trans. (Tecogen Ex. 6) at 35-47.

129.     On May 23, 2005, a Tecogen sales representative in New York faxed a copy of an Aegen Cogeneration Module Brochure to Tecogen.  This fax was the first time anyone at Tecogen knew that Aegis had been manufacturing its own competing cogeneration modules. This news stunned Tecogen employees, all of whom had no previous knowledge that Aegis had become a direct competitor to Tecogen in the manufacture of cogeneration units.

Supporting Evidence:  Aegen Cogeneration Unit Brochure faxed to Tecogen on May 23, 2005 (Tecogen Ex. 74); Glick Depo. Trans. (Tecogen Ex. 7) at 40-44; Panora Depo. Trans. (Tecogen Ex. 6) at 31-32.

130.     While Tecogen was distilling this news, the company did not take any action on Aegis' May 17th purchase order or its request that Tecogen provide written confirmation of its acceptance of the order.

Supporting Evidence:  Panora Depo. Trans. (Tecogen Ex. 6) at 45-50.

131.     During the week of May 16, 2005, Tecogen and American DG employees had spoken with Atlantic about getting involved in the service/maintenance of the cogeneration modules after their installation at Lakeland.  Following up on that conversation, in a May 23, 2005 email from Glick to Atlantic, Glick proposed a meeting to discuss the service portion of the Lakeland project.

Supporting Evidence:  5-23-05 email from Glick to Atlantic proposing meeting to introduce American DG to Atlantic (Tecogen Ex. 75); Casabonne Depo. Trans. (Tecogen Ex. 14) at 73-75.

132.     Around the same period, Atlantic's president asked Tecogen to give Atlantic prices for Atlantic's direct purchase of a large number of Tecogen Modules.

Supporting Evidence:  Panora Depo. Trans. (Tecogen Ex. 6) at 55.

35

133.    The meeting suggested by Glick subsequently occurred and, in the meeting, Atlantic's president again invited Tecogen to provide Atlantic with direct pricing for Tecogen Modules. From late May through at least the first half of June 2005, in an effort to get a lower price on cogeneration modules, Atlantic's president used some rather aggressive negotiation tactics, including negotiating with both of Tecogen and Aegis.

Supporting Evidence: Casabonne Depo. Trans. (Tecogen Ex. 14) at 87-93.

134.    On June 6, 2005, Tecogen provided Atlantic with prices for Atlantic's direct purchase from Tecogen of 25 Tecogen Integrated Modules for several projects including Atlantic's projects at Lakeland, Chemung and Auburn. Tecogen also provided Atlantic with pricing on maintenance agreements for those projects.

Supporting Evidence: 6-6-05 email from Glick to Brock and Casabonne at Atlantic regarding pricing for 25 Integrated Modules for Lakeland, Chemung, Auburn and Maintenance at projects (Tecogen Ex. 35).

135.    As discussed above, in a June 13, 2005, meeting with Casabonne and other Atlantic employees that was requested by Lee Vardakas of Aegis, Vardakas introduced Atlantic to the Aegen Modules and discussed the sale of Aegean Modules to Atlantic for use in the Lakeland project. For the first time, they also discussed maintenance for the Lakeland project's modules.

Supporting Evidence: Casabonne Depo. Trans. (Tecogen Ex. 14) at 94-96.

136.    The day after this meeting, Aegis sent a price quote to J&M Heating, which quoted the total of $805,000 for 11 Aegen Modules for Lakeland. Aegis and Atlantic then engaged in a short round of negotiations on pricing for the 11 Aegean Modules for the Lakeland project.

<u>Supporting Evidence:</u>  Tecogen Ex. 76 consisting of 6-14-05 emails between Casabonne at Atlantic and L. Vardakas regarding pricing for Aegen Modules for Lakeland, Chemung and other projects, and 6-14-05 Price Quote from Aegis to Atlantic for Lakeland; Casabonne Depo. Trans. (Tecogen Ex. 14) at 133.

137.    On June 16, 2005, Aegis cancelled its May 17, 2005 purchase order to Tecogen for 11 Tecogen Modules for Lakeland.  Lee Vardakas has testified that one of the reasons for cancelling the purchase order was that Aegis had by then secured the sale of Aegen Modules for use at Lakeland.

<u>Supporting Evidence:</u>  6-16-05 letter from L. Vardakas to Glick canceling 5-17-05 P.O. for 11 Tecogen Modules for Lakeland (Tecogen Ex. 77); Tecogen Ex. 16, p. 104.

138.    On June 17, 2005, Aegis sent another price quote to J&M Heating quoting a total cost of $805,000 for 11 Aegen Modules for Lakeland.  J&M Heating sent back a purchase order, which ordered the 11 Aegen Modules at that price and voided the prior June 27, 2005 purchase order for 11 Tecogen Modules.

<u>Supporting Evidence:</u>  6-17-05 Aegis-Aegenco Aegen Module Price Quotation to J&M Heating and 6-17-05 P.O. from J&M Heating to Aegis ordering Aegen Modules for Lakeland and Voiding Prior 4-27-05 P.O. for Tecogen Modules (Tecogen Ex. 78).

139.    After learning that Aegis had offered to sell Aegen Modules for the Lakeland project, on June 21, 2005, Jeff Glick of Tecogen sent a letter to Lee Vardakas.  In relevant part, this letter requested that Aegis "give serious consideration to working with [Tecogen] on this Lakeland order."  The letter also said "[i]t will make it very difficult to patch things up if you decide to compete with us and enter the market with a competitive product."

<u>Supporting Evidence:</u>  6-21-05 letter from Glick to L. Vardakas at Aegis (Tecogen Ex. 79)

140.    On June 22, 2005, Lee Vardakas sent an email respond back to Glick, which stated in relevant part, "After an 18 year relationship, Tecogen and [American]DG decided to compete with Aegis.  We did not issue threats requiring you to stop so as to patch things up.  Our goal was, and is, to survive in a most difficult business."

Supporting Evidence:  6-22-05 email from L. Vardakas to Glick and Schuster at Tecogen (Tecogen Ex. 80).

141.    In light of Aegis' refusal to stop manufacturing and selling cogeneration modules in competition with the Tecogen Modules Aegis was supposed to be selling on Tecogen's behalf, on June 24, 2005, Tecogen notified Aegis that it was terminating Aegis as a Tecogen Module sales representative and exclusive distributor.

Supporting Evidence:  (Tecogen Ex. 1 at Exhibit L thereto).

142.    In July 2005, Tecogen tried to keep Tecogen Modules in the Lakeland project by sending letters to Atlantic and the Lakeland school district.  In relevant part, these letters discussed the Tecogen Integrated Modules' compliance with the project specifications and compared the certifications held by Tecogen's Modules to the publicly available information about the Aegen Module's certifications.

Supporting Evidence:  7-11-05 letter from Panora to Brock at Atlantic (Tecogen Ex. 81) and 7-21-05 letter from Panora to Lakeland Superintendent (Tecogen Ex. 82).

143.    Tecogen's letters had no effect on the outcome of the project.  The Aegen Modules were purchased by J&M for $805,000 and installed at Lakeland.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 138-139.

144.    Casabonne has testified that if Aegen Modules had not been brought to Atlantic's attention in 2005, Tecogen Modules "most likely" would have been used in the Lakeland project.

38

<u>Supporting Evidence:</u>  Casabonne Depo. Trans. (Tecogen Ex. 14) at 98.

TECOGEN, INC.,

By its attorneys,

 /s/ Julie A. Frohlich
Julie A. Frohlich (BBO# 554707)
Derek B. Domian (BBO# 660568)
Goulston & Storrs
A Professional Corporation
400 Atlantic Avenue
Boston, MA  02110-3333
(617) 482-1776
jfrohlich@goulstonstorrs.com
ddomian@goulstonstorrs.com

Dated:  July 14, 2008

## **Certificate of Service**

I, Derek Domian, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

 /s/ Derek Domian

# Tecogen Ex. 1

Tecogen Ex. 1 is the Answer to Complaint, Affirmative Defenses, Counterclaims and Demand for Jury Trial, For Defendants ("Answer") filed in this Action. Pursuant to Paragraph L.3 of the CM/ECF Administrative Procedures for the District of Massachusetts dated January 1, 2006, Tecogen is not filing a copy of the Answer and relies upon the Court's file copy of the same as its Exhibit No. 1.

# Tecogen Ex. 2

Tecogen Ex. 1 is the Complaint filed in this Action. Pursuant to Paragraph L.3 of the CM/ECF Administrative Procedures for the District of Massachusetts dated January 1, 2006, Tecogen is not filing a copy of the Complaint and relies upon the Court's file copy of the same as its Exhibit No. 2.

# Tecogen Ex. 3

# TECOGEN®

## Cogeneration Modules



*We can keep you
in hot water …*

*and electricity too.*

## Cogeneration Applications

Hospitals
Schools & Colleges
Athletic Club/YMCAs
Swimming Pools
Hotels and Motels
Apartments & Condos
Food & Beverage
Laundries
Nursing Homes

## Distributed Generation is the answer...

Shortages in the electricity supply and soaring prices have revived the concept of Distributed Generation -- dispersing the generation of electrical energy to efficient onsite power producers without relying on a central power station. Cogeneration provides the most efficient form of DG by recovering the waste heat. The **TECOGEN®** cogeneration module uses a natural gas-fired internal combustion engine to generate electricity. Since engines produce waste heat at very high temperatures, capturing this heat for hot water provides end-users the opportunity to lower their energy bills by as much as 40%. In sizes of 60 kW and 75 kW, the **TECOGEN®** is available to even the smallest scale commercial, industrial, and institutional energy users, with multiple-unit installations providing the most flexibility to meet varying demands. Equipped with an induction generator and switchgear, the **TECOGEN®** operates in parallel with the utility, simplifying interconnection requirements.

## Over 90% of the fuel is converted to useful energy*...

Electricity 31.4%
Hot Water 60.1%
Losses 8.5%
*Based on LHV

Simply defined, cogeneration is the process whereby a single fuel source, such as natural gas, is used to produce both electrical and thermal energy. By design, a cogeneration system is inherently more efficient than a central utility power station, since it captures "lost" thermal energy and produces both electrical and thermal energy with less fuel consumption than if they were produced separately. A conventional central utility plant is only about 35% efficient as compared to the 91% efficiency* of the **TECOGEN®**.

## TECOGEN® provides a safeguard against rising energy prices...

Producing electricity onsite with a **TECOGEN®** not only shields an owner against soaring electric rates, but also provides a defense against rising gas prices. This is because the recovered hot water is essentially free since it displaces fuel that would otherwise be burned in a conventional boiler. In effect, an owner is only paying 30% of the cogeneration system's fuel bill. Referring to the graph below, at an electric rate of $0.10/kWH, payback is relatively flat at 3 to 4 years even with gas prices spanning $0.30/therm to $1.00/therm. Conversely, electric rate hikes dramatically improve the **TECOGEN®** payback, far outweighing even substantial increases in gas prices.



Electric Rate $0.08/kWH
$0.10/kWH
see example to right
$0.15/kWH

## Significantly reduce your utility bills ...



BEFORE:
UTILITY BILL
Electricity $123,750
Gas 57,500
$181,250

AFTER:
UTILITY BILL
Electricity $26,250
Gas 92,000
$118,250

$63,000 Savings = 35%!



**Typical TECOGEN Installation Connections**

**Legend**
1 Electricity Out
2 Hot Water Supply
3 Hot Water Return
4 Gas Supply
5 Engine Exhaust

**Specifications:**

| | | |
|---|---|---|
| Electrical Output (kW) | 60 | 75 |
| Thermal Output | 440,000 Btu/hr | 490,000 Btu/hr |
| Gas Input | 760 scfh | 900 scfh |
| Efficiency | | |
| @ LHV of 905 BTU/scf | 93.7% | 91.6% |
| @ HHV of 1020 BTU/scf | 83.1% | 81.3% |
| Required Gas Pressure | 4-14"wc | |
| Hot Water Flow | 22 gpm | |
| Maximum Water Temperature | 230°F | |
| Electrical Service | 208V or 460V, 3PH, 3-wire | |
| Emissions Option | Can meet air quality standards as stringent as Southern California's | |
| Acoustic Level | 70 dBa @ 20' | |
| Dimensions | 6'10"L x 3'8"W x 3'10"H | |
| Weight | 3,000 lbs | |
| Note: | | |
| Above performance data is valid up to 100°F ambient temperature. | | |

## TecoDrive 7400 ... the proven prime mover

The TecoDrive 7400 is a proven eight-cylinder, 454 cubic inch displacement, naturally aspirated, four-stroke, spark-ignited engine, specially developed by Tecogen and the gas industry for efficient natural gas operation. Since first introduced in 1984, more than 1100 natural gas engine-powered cogeneration, chiller, and refrigeration units have amassed more than 15 million hours of dependable service at approximately 650 customer sites across the U.S. and abroad. Individual TecoDrive engines normally operate for about 20,000 hours between overhauls ... the equivalent of one million miles, or 40 times around the earth in vehicle service. The exceptional engine life is due to the inherently clean combustion of natural gas fuel, the de-rating of output to 1800 rpm for cogeneration, as well as a number of customized durability enhancements, including positive valve rotators, improved coolant distribution, and increased oil flow to bearings, camshaft, and cylinder walls.



## TecoNet™ ... a state-of-the-art, microprocessor-based system



The **TecoNet**™ control system has been specially developed for engine control, providing fully automatic operation of the cogeneration module. It monitors the utility, engine, generator, system variables, and faults, allowing for unattended operation. **TecoNet**™ is fully packaged with all of the typically required switchgear, providing the end user with a simple, 3-wire (w/neutral), parallel connection to the utility.

**TecoNet**™ has *Modbus* networking capability for "open protocol" communication with building management systems, programmable controllers, or between multiple **TECOGEN®** units. It is also equipped with a remote telecommunications system that only requires a customer phone line.

## Tecogen ... the industry leader

Tecogen is a national leader in the industry of natural gas engine-driven equipment, bringing over 18 years experience in packaged cogeneration, chillers, and refrigeration systems. With more than 1,100 operating units in the field, we offer a well-established engineering, sales, and service support network. Our equipment features the microprocessor-based **TecoNet**™ control system, customized for engines, with remote monitoring capabilities. We offer compact designs, energy-saving heat recovery, and emission control systems to meet standards in all areas of the country.



TECOGEN Service Centers

## Service....it's our business

Tecogen's extensive network, staffed by our own factory-trained technicians, offers local service for many regions in the United States. Service contracts are based upon a guaranteed price per run hour that covers both scheduled and unscheduled maintenance. With **TECOGEN**®'s proven reliability, comprehensive service contracts, and sole-source responsibility, module downtime is kept to a minimum.

Made in the USA

**TECOGEN, Inc.**
45 First Avenue
Waltham, MA 02451
(781) 622-1400
(781) 622-1002 (fax)
*www.tecogen.com*



TECOGEN® and TecoDrive™ are trademarks of Tecogen    *Rev May '01*

# Tecogen Ex. 4

# TECOGEN®

SJ Ex. 176

# CM-60/CM-75
## Cogeneration Module





*Compliant with the AGA Standard
for Gas-Fired Engine Driven
Cogeneration Appliances (2-89).*

**IEEE P1547/D07**
Compliant

**California Rule 21**
Certified

**NYSIR**
Type Tested
& Approved

# Installation Manual
## February 2005

# TECOGEN, Inc.

# *Directory*

**1** *Module Specifications*

**2** *Installation*

**3** *Maintenance*

**A1** *Emission Control System Option*

**A2** *Power Factor Correction*

**A3** *Integrated Unit*

## *Foreword*

*This manual contains component specifications, installation guidelines, and drawings for the TECOGEN® gas engine-driven cogeneration system. The objective is to assist a third-party design engineer, performance contractor, or mechanical contractor with the application and installation of the module. For further assistance, please contact your local TECOGEN® sales representative or Tecogen, Inc.*

### Disclaimer

Neither Tecogen, nor any person acting on its behalf: (a) makes any warranty or representation, express or implied, with respect to the accuracy, completeness, or usefulness of the information contained in this manual or that the use of any information, apparatus, method, or process disclosed in this manual may not infringe privately owned rights; or (b) assumes any liabilities with respect to the use of, or for damage resulting from the use of, any information, apparatus, method, or process disclosed in this manual. Information is subject to change without notice.

# *Table of Contents*

1. **Module Specifications**................................................................**6**
    1.1  Engine ...............................................................................7
    1.2  Generator ..........................................................................8
    1.3  Electrical Switchgear ........................................................11
    1.4  Control System .................................................................15
         1.4.1  Control Modes .......................................................15
         1.4.2  Display Keypad.......................................................15
         1.4.3  Safeties.................................................................15
         1.4.4  Customer Interface Connections .............................16
         1.4.5  Optional Control Features ......................................17
         1.4.6  RMCS (Remote Monitoring and Control System).............18
         1.4.7  Communications Protocol/Modbus Networking................18
    1.5  Utility Interface.................................................................19
         1.5.1  Interconnect Compliance.........................................19
         1.5.2  Power Factor Correction..........................................19

2. **Installation**............................................................................**20**
    2.1  Unit Delivery & Placement.................................................20
    2.2  Ventilation.......................................................................20
    2.3  Electrical Connections ......................................................21
    2.4  Fuel Supply Piping............................................................21
    2.5  Exhaust Piping.................................................................22
    2.6  External Water Piping For Heat Recovery.............................22
         2.6.1  Design Strategy .....................................................22
         2.6.2  Basic Module Plumbing............................................23
         2.6.3  Pressure Drop and Static Pressure Limitation.................24
         2.6.4  Expansion Tank Sizing.............................................24
         2.6.5  Piping of Multiple TECOGEN® Units ..........................24
         2.6.6  Control Scheme of Multiple TECOGEN® Units................27
         2.6.7  Interfacing With The Building Heating Load ..................27
                2.6.7a  Load Heat Exchanger Sizing.............................27
                2.6.7b  Piping Alternatives to Load Heat Exchanger.........28
                2.6.7c  Single Load—Elements of Design .....................29
                2.6.7d  Multiple Load Systems ...................................30

*Installation Drawings*

Drawing 1a-e   CM-60/CM-75 Installation Drawing *(Standard Unit)* ...........37
Drawing 2       CM-60/CM-75 Ventilation .................................................42
Drawing 3       CM-60/CM-75 Customer Power Connection ......................43
Drawing 4a      CM-60/CM-75 AC Control & Power Wiring Schematic......44

*Installation Drawings (Continued)*

| Drawing 4b | CM-60/CM-75 Customer Control Interface Connections ... 45 |
| Drawing 5 | CM-60/CM-75 Utility Interface and Protection Schematic . 46 |
| Drawing 6 | CM-60/CM-75 Natural Gas Piping ...................................... 47 |
| Drawing 7 | CM-60/CM-75 Exhaust System Piping *(Standard Unit)* ....... 48 |
| Drawing 8 | CM-60/CM-75 Heat Recovery Piping *(Standard Unit)* .......... 49 |

**3. Maintenance** ........................................................................... **50**

**Appendix 1  Emission Control System Option** ......................................... **51**

| A1.1 | General Description ...................................................................... 51 |
| A1.2 | Catalytic Converter ...................................................................... 52 |
| A1.3 | Remote Exhaust Heat Recovery Heat Exchanger ......................... 53 |
| A1.4 | Exhaust Silencer .......................................................................... 55 |
| A1.5 | Exhaust Expansion Joints ............................................................ 56 |

*Emission Control System Option*

| Drawing A1.1a-e | CM-60/CM-75 Installation Drawing .............................. 57 |
| Drawing A1.2 | CM-60/CM-75 Exhaust System Piping ......................... 62 |
| Drawing A1.3 | CM-60/CM-75 Heat Recovery Piping ........................... 63 |

**Appendix 2  Power Factor Correction** ....................................................... **64**

| Drawing A2.1 | Power Factor Correction Wiring ..................................... 65 |

**Appendix 3  Integrated Unit** ...................................................................... **70**

| A3.1 | Heat Recovery Piping ................................................................... 70 |
| A3.2 | Exhaust System Piping ................................................................. 70 |
| A3.3 | Power Factor Correction System .................................................. 70 |

*Integrated Unit Option*

| Drawing A3.1 | Piping Schematic ........................................................... 71 |
| Drawing A3.2a-c | Installation Drawing ................................................... 72 |
| Drawing A3.3 | Exhaust System Piping .................................................. 75 |
| Drawing A3.4 | Utility Interface and Protection Schematic .................. 76 |
| Drawing A3.5 | Power Factor Correction Schematic ............................. 77 |

# 1  Module Specifications

## 1.  Module Specifications

The TECOGEN® is a packaged, indoor, cogeneration module that produces both electricity and hot water. It is available at power outputs of 60 kW and 75 kW. The general specifications are presented below.

The TECOGEN® is available with an emissions control option. Detailed specifications on this option are presented in Appendix 1.

The following sections identify the specifications of the primary components of the TECOGEN®.

### TECOGEN® Cogeneration Module General Specifications

| Model | CM-60 Standard | CM-60 Low Emissions[1] | CM-75 Standard | CM-75 Low Emissions[1] |
|---|---|---|---|---|
| Electrical Output (kW) | 60 kW | | 75 kW | |
| Thermal Output (Btu/hr) | 440,000 | 458,000 | 490,000 | 511,000 |
|   Engine Jacket/Exhaust Manifolds | | 301,000 | | 336,000 |
|   Remote Exhaust Gas Heat Exchanger | | 157,000 | | 175,000 |
| Gas Input | 760 scfh | 782 scfh | 900 scfh | 927 scfh |
| Overall Efficiency | | | | |
|   @LHV of 905 Btu/scf | 93.8% | 93.6% | 91.6% | 91.4% |
|   @HHV of 1020 Btu/scf | 83.2% | 83.1% | 81.3% | 81.1% |
| Required Gas Pressure *(when operating at full load)* | 10-28" wc | 10-28 " wc | 10-28" wc | 10-28 " wc |
| Design Hot Water Flow | 22 gpm  *(24 gpm max)* | | | |
| Maximum Leaving Water Temperature | 230 °F | | | |
| Maximum Entering Water Temperature | 180 °F | | | |
| Electrical Service | 208V/230V/460 V, 3 PH, 3 – wire | | | |
| Acoustic Level | 70 dBa @ 20' | | | |
| Dimensions | 7' 2" L x 3' 8" W x 3' 10"H | | | |
| Weight | 3000 lb | | | |

### Safety Compliance

***ETL Listed***—Labeled for compliance with the AGA Standard for Gas-Fired Engine Driven Cogeneration Appliances (2-89).

***IPX4 Certified***—Control and switchgear enclosures have been certified to IPX4 in accordance with IEC 60529. IPX denotes ingress protection against water. IPX4 rating indicates that the enclosures are protected against water splashed from any direction and water sprayed at an angle up to 60° on either side of the vertical.

### Interconnection Compliance

***IEEE P1547/D07***— Certified by Intertek Testing Services to be in compliance with this Draft Standard for Interconnecting Distributed Resources with Electric Power Systems. See Section 1.5.1 for further information.

***California Rule 21***— Certified to meet the Type Testing and Production Testing requirements of California Rule 21. Also certified as Non-Islanding.

***NYSIR***—Accepted as Type Tested and Approved Equipment by the New York State Public Service Commission Standard Interconnect Requirements.

*Notes*
*1. The Emission Control Option is available to meet air quality standards as stringent as Southern California's. Refer to Appendix 1*
*2. Above performance data is valid up to 100 °F ambient temperature.*
*3. All specifications are +/- 5% and are subject to change without notice.*

# Module Specifications    1

## 1.1    Engine

The TECOGEN® is equipped with one (1) TecoDrive 7400 engine. Table 1.2 presents the detailed engine specifications. The following sections describe the subsystems of the engine.

### 1.1.1    Fuel and Exhaust System

The TECOGEN® natural gas fuel system includes a manual shut-off valve, two(2) electric solenoid shut-off valves for redundant safety, a gas regulator, a carburetor, and a throttle body assembly. For units equipped with emission controls, the engine fuel components are slightly different (refer to Appendix 1).

It is the responsibility of the installing contractor to design and construct a low pressure gas supply line to the TECOGEN®. Tecogen provides recommendations and guidelines in Section 3.4.

The combustion air inlet for the engine is equipped with an air filter. The pressurized gas is mixed with the naturally aspirated – filtered air within the carburetor. The TECOGEN® precisely controls the engine throttle to modulate the fuel/air flow to the engine cylinders. On standard units, the exhaust from the cylinders is first directed through two water-cooled manifolds, and then through the exhaust gas heat recovery heat exchangers to a common outlet pipe. It is the responsibility of the installing contractor to design and construct an exhaust system from the TECOGEN® unit to the outside. Tecogen provides recommendations and guidelines in Section 2.5.

On units equipped with emission controls, once the exhaust leaves the water-cooled manifolds, it is joined together to a common outlet pipe. The heat recovery for the exhaust must be done remotely after the exhaust is treated through a catalytic converter. The catalytic converter is a factory-supplied component that must be field-installed. The remote exhaust gas heat recovery heat exchanger may also be factory-supplied (or obtained by others), and must be field-installed. Again, it is the responsibility of the installing contractor to design and construct an exhaust system using the recommendations and guidelines provided in Section 2.4.

The engine is also equipped with a Positive Crankcase Ventilation system that removes corrosive gases from the engine crankcase and directs them back into the intake manifold to be burned along with the regular fuel charge.

### Table 1.2    Engine Specifications

| Model | CM-60 | | CM-75 |
|---|---|---|---|
| Type | Spark Ignition, Gaseous Fueled | | |
| Manufacturer | GM, Configuration by Tecogen | | |
| Model | TecoDrive 7400 | | |
| Nominal Rated RPM | 1820 | | |
| BHP at Rated RPM | 85 | | 108 |
| Aspiration | Natural | | |
| Configuration | V-8 (90°) | | |
| Displacement | 454 Cu. Inches | | |
| Bore and Stroke (Inches) | 4.251 x 4.00 | | |
| Compression Ratio | 9.2 to 1 | | |
| Weight | 1100 lbs | | |
| Ignition System | Electronic | | |
| Firing Order | 1-8-4-3-6-5-7-2 | | |
| Air/Fuel Mixture (Std) | 2% Oxygen[1] | | |
| Lubrication System | | | |
| - Type | Full Pressure, Full Flow, Cooled by Engine Coolant | | |
| - Oil Type | ExxonMobil XD-3 SAE 30 (Consult Factory For Substitutes)[2] | | |
| - Oil Capacity | 32 quarts | | |
| Cooling System | | | |
| - Type | Direct Jacket Cooling, Closed Loop | | |
| - Expansion Tank | Precharged Bladder Type , Externally Mounted (provided by others) | | |
| - Cooling Fluid | Water or Propylene Glycol Mixture (Where Required for Freeze Protection) | | |
| Starting System | | | |
| - Type | 12 Volts DC | | |
| - Battery | Delco Freedom II 87a-60 or Equivalent rated to 485 Cold Cranking Amps | | |
| - Starter | Delco Automotive Special Heavy Duty | | |
| - Battery Charger | | | |
| * Type | Electronic - Constant Voltage Supply | | |
| * Rating | 3.5 Amp DC | | |

*Notes:*

*1. Engines equipped with emission control option will operate at approximately 0.5% Oxygen.*

*2. Engines equipped with emission control option use a low ash oil; ExxonMobil Busguard GEO 15W-40.*

# 1 Module Specifications

### 1.1.2 Lubrication System

The lubrication system for the engine includes an internal engine-driven oil pump, an oil pressure regulator, an oil filter, and an oil cooler that rejects heat to the engine coolant. The engine oil pan is enlarged to 32 quarts to lengthen the interval between oil changes to 750 hours.

### 1.1.3 Engine Heat Recovery

The engine rejects waste heat to the coolant system from the engine block and exhaust manifolds. This waste heat is recovered and used by the customer for domestic hot water heating or other process load. It is the responsibility of the installing contractor to provide the customer's load heat exchanger, as well as the design of the piping to and from the cogeneration module. However, Tecogen provides recommendations and guidelines for designing the heat recovery system in Section 2.6.

The coolant system is a pressurized, closed-loop, direct jacket cooling circuit that cools the engine jacket, exhaust manifolds, and engine oil cooler. The coolant fluid is water.

It is the responsibility of the installing contractor to provide one city-water make-up line, regulated to 12 - 15 psig, with a pre-charged bladder-type expansion tank to maintain the coolant system pressure.

## 1.2 Generator

The generator is an 3-phase wye induction generator with two-bearing construction and a drip-proof frame. The windings are all copper and the shaft material is hot rolled steel. The insulation is Class 4 (four dips & bakes of non-hygroscopic varnish with an epoxy over-coat). The bearings are regreasable, double-shielded ball bearings.

The generator is much like the very common squirrel cage motor and requires no excitation system when connected to the utility lines, hence there are no brushes or collector rings. The engine drives the generator slightly above the synchronous speed set by the number of poles and the utility line frequency (1800 rpm in this case), at which point the generator begins to absorb engine power and deliver electricity.

The same generator model is used in both the CM-60 and CM-75. The technical specifications at 60 kW are presented in Table 1.2a and the technical specifications at 75 kW are presented in Figure 1.2b.

The Maximum Available Fault Current is not presented in the generator manufacturer's specification sheets (Figures 1.2a & 1.2 b). Since this question is frequently asked, these values have been determined from calculations and presented below.

| Maximum Available Fault Current [A] | | |
|---|---|---|
| | **CM-60** | **CM-75** |
| **208 V** | 1327 A | 1600 A |
| **230 V** | 1185 A | 1448 A |
| **460 V** | 593 A | 724 A |

# Module Specifications    1

## 1.4  Control System

The TECOGEN® control system, *TecoNet™* has a microprocessor based control system that provides precision PID control of the power output or hot water heat output. It has a pre-programmed operating scheme that monitors the power setpoint or the leaving water temperature and uses this feedback signal to modulate the throttle position of the engine.

The control system includes three cabinet enclosures, as illustrated in Figure 2.1.c; the control submodule, the electrical interface submodule; and the customer control interface box. The control submodule houses the microprocessor board, modem, and display keypad. The electrical interface submodule (also referred to as Switchgear Cabinet) includes the utility interface switchgear (circuit breaker and generator contactor), as well as monitoring devices and safety devices (current transformers, potential transformers, and overload relay). It also contains a 120VAC transformer, module control relays, engine safeties and battery charger. The customer control interface box simply contains a terminal strip for all customer connections.

The control system has a complete safety monitoring and shutdown system including a redundant engine overspeed safety device independent of the microprocessor. It also has a diagnostic mode that allows all output devices (i.e. pumps, solenoids, etc.) to be energized individually when the system is shutdown for the purpose of troubleshooting.

### 1.4.1   Control Modes

There are two basic control modes for the TECOGEN®; Hot Water Mode & Power Mode. Hot Water Mode matches the heat output of the unit with the building's hot water load. If the building is not calling for the heat, the unit unloads, thus also reducing electricity output. This determination is based upon the water temperature leaving the unit. In Power Mode, the controlled output is the kW of electricity. In this case, if the heat output can not be utilized by the building load, it is dumped to a radiator.

In both of these cases, the control setpoint, can be manually entered from the control panel, scheduled via the control panel (Section 1.4.5) or adjusted by an analog signal from an Energy Management System (Section 1.4.4).

An alternative mode, Non-Export Mode, is a control algorithm designed to avoid exporting power, thus avoiding the installation of an expensive reverse power relay system. It requires an input signal from a building wattmeter. If this signal indicates that the import of power to the building is dropping to levels approaching zero, the unit will unload or shutdown. The cogeneration unit will unload, or shutdown, to ensure there is no reverse power flow out to the utility when the building's electric load has dropped off. The non-

export of power will take precedence over any setpoints in either Hot Water Mode or Power Mode.

The *TecoNet™* also has extensive networking capabilities to fully integrate these control modes for multiple cogeneration units. Refer to Section 2.6.6 for "Lead/Lag" control.

### 1.4.2  Display Keypad

The display keypad contains a 40-character alphanumeric display, start/stop keys, status lights, reset buttons, function keys, and an emergency stop pushbutton for operator interface.

Table 1.3 lists the functions available from the display keypad assembly.

**Table 1.3  Display Keypad Functions**

| |
|---|
| Read operating data |
| Read alarms and alarm history |
| Start cogeneration module |
| Stop cogeneration module |
| Change power setpoint |
| Adjust water temperature setpoint |
| Clear alarms |
| Clear prealarms |
| Schedule Start/Stop sequence |
| Schedule power setpoint |
| Calibrate measure line voltages |
| Calibrate measure line currents |
| Calibrate temperature thermistors |
| Calibrate Analog Card |
| Set date and time |

### 1.4.3  Safeties

The *TecoNet™* is designed to provide safeties to protect the equipment, personnel, and the facility's EPS (Electric Power System) in the event of upset conditions. A list of the alarms is presented in Table 1.4.

There are three levels of alarms; Alarms, Prealarms, and Runback Prealarms. Alarms cause the system to shut down. Prealarms are warnings to the operator that the system is experiencing an abnormal condition that should be addressed. With a prealarm condition, the system still continues to operate within its limitations. Runback prealarms actually reduce the power output to help the system recover from a potential alarm condition. Once the parameter that caused the upset is in a safer operating range, the power automatically increases. Runback prealarms are meant to prevent the system form shutting down due to a transient problem. The unit is equipped with the optional feature of restarting after an alarm shutdown. This is activated by a dip-switch (S1-6 in "ON" position) on the Interface Board (control submodule). The unit will wait 5 minutes and then attempt to restart, assuming that the alarm condition is automatically reset. Each alarm has a quantity of resets available within a 1 hour period and these are listed in Table 1.4.

# 1 Module Specifications

**Table 1.4 Alarm List**

| | Alarm Name | Resets Allowed (within 1 hour period) |
|---|---|---|
| 1 | PHASE ANGLE ERROR | 3 |
| 2 | HIGH VOLTAGE | 3 |
| 3 | LOW VOLTAGE | 3 |
| 4 | HIGH FREQUENCY | 3 |
| 5 | LOW FREQUENCY | 3 |
| 6 | CURRENT IMBALANCE | 1 |
| 7 | LOGIC VOLTAGE FAULT | 1 |
| 8 | LOW ENCLOSURE TEMPERATURE | 2 |
| 9 | ESTOP/IGN PWR FAIL | 0 |
| 10 | HIGH WATER PRESSURE | 1 |
| 11 | LOW WATER PRESSURE | 1 |
| 12 | LOW OIL PRESSURE | 1 |
| 13 | LOW OIL LEVEL | 2 |
| 14 | CONTACTOR FAULT | 3 |
| 15 | ANALOG FAULT | 1 |
| 16 | CRANK FAILURE | 0 |
| 17 | STARTING FAILURE | 1 |
| 18 | HIGH CONNECT TIME | 1 |
| 19 | UNDERSPEED | 1 |
| 20 | OVERSPEED | 1 |
| 21 | LOW POWER | 1 |
| 22 | HIGH POWER | 1 |
| 23 | HIGH COOLDOWN TIME | 1 |
| 24 | LOW COOLANT TEMP | 2 |
| 25 | HIGH WATER TEMP | 2 |
| 26 | HIGH COOLANT TEMP | 2 |
| 27 | HIGH OIL TEMP | 2 |
| 28 | HIGH ENCLOSURE TEMP | 1 |
| 29 | LOW OIL TEMP | 2 |
| 30 | HI/LO CATALYST TEMP[1] | 1 |
| 31 | EMISSIONS FAULT[1] | 1 |
| 33 | OIL P SWITCH FAIL | 1 |
| 34 | HI INLET WATER TEMP | 1 |
| **Prealarms** | | |
| 31 | EMISSIONS FAULT[1] | N/A |
| 32 | CHECK_ENGINE[1] | N/A |
| 34 | HI INLET WATER TEMP | N/A |
| **Runback Prealarms** | | |
| 25 | HIGH WATER TEMP | N/A |
| 26 | HIGH COOLANT TEMP | N/A |
| 27 | HIGH OIL TEMP | N/A |
| 28 | HI ENCLOSURE TEMP | N/A |
| 30 | HI CATALYST TEMP[1] | N/A |

## 1.4.4 Customer Interface Connections

### Available Inputs

The customer has the option of providing the inputs that are listed below to the TECOGEN® control system. It is the responsibility of the installing contractor to provide the devices and wiring for these electrical connections. Details on the wiring of these inputs is presented in Figure 2.4c.

### Customer Start

The customer may input a contact switch that will close to initiate the start of the TECOGEN®and open to initiate the shutdown. This input is available on terminal strip TS5 inside the customer control interface box.

### Power Setpoint Input

The customer may input a 0-10 vDC signal to the control submodule so that the power output of the unit may be controlled by a remote energy management system. This input is available on the Interface Board—analog input connector J9.

As an alternative to the analog signal, there are also digital switching inputs available (EMS1 & EMS2) to control power. These are available on the Interface Board—digital input connector J7.

### Temperature Setpoint Input

The customer may input a 0-10 vDC signal to the control submodule so that the hot water temperature leaving the unit may be controlled by a remote energy management system. This input is available on the Interface Board—analog input connector J9.

### Temperature Sensing Thermistors

The customer may input up to eight auxiliary temperature sensing thermistors. These readings can be viewed on the control submodule display. It is necessary to obtain the thermistors from Tecogen. These temperature inputs are available on the Interface Board—analog input connectors J9 and J10.

### Counters

The customer may input a pulsing signal that will be totaled and viewed on the control submodule display. These are typically used for water flow meters and natural gas meters. They are available on the Interface Board-digital input connector J7.

### Customer Voltages

The customer may input up to six 0—10 vDC signals. These readings can be viewed on the control submodule display. Alternatively, the cogeneration unit's software may be customized to calculate a value from the voltage and display it. These voltages are available on the Interface Board-analog input connectors J9 and J10.

### Available Outputs

The customer has the option of utilizing the outputs that are listed below. It is the responsibility of the installing contractor to provide the devices and wiring for these electrical connections. Details on the wiring of these outputs is presented in Figure 2.4b

### Pump Start

An output is available to provide the signal to start the heat recovery water pump. The customer needs to supply 120VAC power to the customer control interface box terminal strip (TS5), as well as the control wires to energize the pump.

### External Ventilation Fan Start

An output is available to provide the signal to start an external ventilation fan if required. The customer needs to supply 120VAC power to the customer control interface box terminal strip (TS5), as well as the control wires to energize the fan.

### Radiator Fan Start

An output is available to provide the signal to start a re-radiator fan, if required. There is a set of dry contacts available on the Interface Board– digital output connector J6, located within the control submodule.

# Module Specifications    1

These contacts are energized based upon the hot water return temperature.

## Alarm Output
The customer has the option of obtaining a remote indication of when the TECOGEN® is in alarm. There is a set of dry contacts available on terminal strip TS5, located within the customer control interface box. This relay does not activate for Prealarms.

## EFLH Meter
A totalizing EFLH (Equivalent Full Load Hours) counter signal is available as an output. It is available on the Interface Board- digital output connector J6, located within the control submodule.

## BTU Meter
A displayed reading of the total heat output (Btu/hr) of the cogeneration unit is available. This requires supplying two temperature inputs for hot water supply and return as well as a pulsing signal from a water flow meter. The thermistors required for the temperature readings must be obtained from Tecogen. They are to be installed by others and wired to the Interface Board- analog input connector J9, located within the control submodule. The flow meter is to be supplied and wired by others to the Interface Board-digital input connector J7. Its signal is calibrated to the cogeneration unit software via the control panel by entering the BTU/°F per pulse of the flowmeter. For water, this is as follows:

$$\frac{Btu/°F}{Pulse} = \frac{gallon}{pulse} \times 8.1 \ (Btu/gal \ °F)$$

## Power Output
A signal indicating the power output of the cogeneration unit is available. It is a 0—10 vDC signal (1 mA max) that corresponds to 0 to 100 kW. It is available on the Interface Board- analog output connector J12, located within the control submodule.

## Water Supply Temperature Output
A signal indicating the water temperature leaving the cogeneration unit is available. It is a 0—10 vDC signal (1 mA max) that corresponds to 0 to 250 °F. It is available on the Interface Board- analog output connector J12, located within the control submodule.

## Manual Customer Output
This is a feature that allows a customer to energize a device remotely via the RMCS. This is offered as a convenience for the customer to allow the use of the cogeneration telecommunications capability to remotely operate a device. It may not even be related to the cogeneration unit. The output is a switched signal available on the Interface Board—digital output connector J6.

## 1.4.5    Optional Control Features
The features listed below are available to a customer by setting a DIP switch on the Processor Board located in the control submodule.

## Setpoint and Run Scheduling
This feature allows the user to program a customized scheme for automatic scheduling of both start/stop sequencing, power setpoint and/or temperature setpoint adjustment. It is a seven-day clock that allows up to 32 independent scheduling points per week.

## Automatic Restart
This feature allows the TECOGEN® to restart automatically 5 minutes after a power outage.

## Auto Alarm Reset
This feature allows the control system to automatically reset pre-selected alarms 5 minutes after the unit is shut down and try to start again. The eligible alarms and the amount of reset occurrences for each alarm is preset at the factory and not adjustable. This information is presented in Table 1.4.

## Cycling
This feature allows the TECOGEN® to automatically shut down after the unit has operated at a reduced power level, due to high inlet water temperature, for more than a preset time (normally 5 minutes. The unit will automatically restart in 30 minutes.

## Idle
This feature allows the TECOGEN® to run for ten minutes without being connected to the grid. This is useful for diagnostics, engine tuning, troubleshooting, etc. No power is produced in this mode.

## Alarm Setpoint and Operational Setpoint Customization
In order to allow a unit's operation to be more closely tailored to the needs of the site and local power utility, various alarm criteria and operational setpoints may be adjusted. Table 1.5 presents some general adjustable alarm parameters and Table 1.6 present those specific to the Voltage/Frequency Trip which are alarms required for interconnection with local utilities. Standard cogeneration units have V/F limits conforming to the interconnect standard IEEE P1547/D07 – *Draft Standard for Interconnecting Distributed Resources with Electric Power Systems* (refer to Section 1.5.1 for details on standard). Units being installed in California conform to California Rule 21. Both of these standards do allow for adjustments and these ranges are presented. A Field Verification test needs to be done to prove the validity of the adjustments. The adjustments can be made either at the keypad display or via the RMCS (Remote Monitoring and Communications System (see Section 1.4.6)

The Adjustable Operational Setpoint Parameters and their limits are presented in Table 1.7.

**Table 1.5    Adjustable Alarm Parameters**

|  | Default | Min | Max |
|---|---|---|---|
| Nominal voltage | 208/480 | 200/300 | 300/508 |
| Delay to phase angle alarm | 10 cycles | 2 cycles | 30 cycles |
| High coolant temperature alarm | 220 °F | 210 °F | 230 °F |

# 1 Module Specifications

**Table 1.6   Voltage/Frequency Trip Setpoints & Adjustments**

| | IEEE P1547 | | | | California Rule 21 | | | | Adjustment Range | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Criteria | Voltage Trip | Voltage Trip | Trip Time (cycles[1]) | Criteria | Voltage Trip | Voltage Trip | Trip Time (cycles[1]) | Setpoint Range | | Trip Time Range (cycles) |
| | | 208 V | 480 V | | | 208 V | 480 V | | 208 V | 480 V | |
| Fast Undervoltage Trip | V < 50% | 104 V | 240 V | 10 | V < 50% | 104 V | 240V | 10 | 93/203 | 240/470 | 2/30 |
| Slow Undervoltage Trip | 50% ≤ V < 88% | 182 V | 423 V | 120 | 50% < V < 88.3% | 182 V | 424 V | 120 | 178/198 | 410/460 | 30/180 |
| Fast Overvoltage Trip | V ≥ 120% | 249 V | 576 V | 10 | V > 137.5% | 286 V | 660 V | 6 | 213/294 | 490/660 | 2/30 |
| Slow Overvoltage Trip | 110% < V <120% | 229 V | 526 V | 60 | 110% < V <137.5% | 229 V | 528 V | 30 | 218/248 | 500/550 | 30/180 |
| Underfrequency | 59.3 Hz | | | 10 | 59.3 Hz | | | 10 | 57/59.5 | | 2/30 |
| Overfrequency | 60.5 Hz | | | 10 | 60.5 Hz | | | 10 | 60.5/63 | | 2/30 |

[1] 1 cycle = 1/60 second

## 1.4.6   RMCS

The Remote Monitoring and Communications System, or RMCS, gives the customer the ability to monitor the TECO-GEN®, as well as have some limited control, from a remote location via a phoneline. It also facilitates factory-reprogramming of the control software for updates or cus-tomizations. The TECOGEN® is equipped with the software and modem. It is the responsibility of the installing contractor to provide a dedicated phoneline to the unit (for multiple unit installations, a telephone line switchbox, for up to 4 units, is available from Tecogen). The customer's remote computer must be an IBM compatible PC running *Windows 95* or higher, or *Windows NT*.

Tecogen strongly recommends that all customers utilize the RMCS. It is valuable to a site because it is an excellent tool for remote site personnel, a local service provider, or Teco-gen factory service support to diagnose problems, as well as download new software. The RMCS can also be set-up to dial-out to a modem or pager to alert off-site personnel of a fault condition.

The features of the RMCS is as follows:

- Review the real-time status of the unit
- Review the alarm history
- Review the load profile of the unit
- Review the current hardware set-up (DIP switch settings) for the various control options.
- Retrieve historical data
- Retrieve data in the minutes preceding an alarm.
- Start and stop the TECOGEN®.
- Change the control setpoint.
- Change the setpoint and run scheduling
- Change either engine's maximum speed setting.
- Clear an Alarm or PreAlarm
- Send a message from remote location to unit display.

### 1.4.7   Communications Protocol / Modbus Networking

The *TecoNet™* uses an 'open' communications protocol that can be interfaced with a site's building automation system. Upon request, Tecogen will make available to the building automation system vendor detailed information about its pro-tocol, including points available, values, etc. In such cases,

**Table 1.7   Adjustable Operational Setpoint Parameters**

| | Default | Min | Max |
|---|---|---|---|
| kW Setpoint | 60/75 | 30/35 | 60/75 |
| kW Setpoint Max | 60/75 | 30/35 | 60/75 |
| kW Setpoint Min | 30/35 | 30/35 | 60/75 |
| kW Setpoint input span | 60/75 | -120 | 120 |
| kW Setpoint offset | 5 | -75 | 150 |
| Present temperature setpoint | 200 °F | 150 °F | 240 °F |
| Minimum temperature setpoint | 180 °F | 150 °F | 240 °F |
| Maximum temperature setpoint | 220 °F | 150 °F | 240 °F |
| Temperature input span | 40 °F | -160 °F | 160 °F |
| Temperature offset | 180 °F | -180 °F | 360 °F |
| Temperature above setpoint to restart | 20 °F | 5 °F | 50 °F |
| Delay to cycle off | 10 min | 1 min | 30 min |
| Temperature above setpoint to cycle off | 5 °F | 1 °F | 20 °F |

development of any required interface software and hardware (e.g., a protocol 'converter' or 'integrator'), is the responsi-bility of others, typically of the building automation system vendor. The hardware connection is available within the con-trol submodule.

The *TecoNet™* is Modbus compatible as well. Modbus is a standard interface used throughout the controls industry to network devices. This networking can be used to interface to building management systems, or programmable controllers, or communicate between multiple cogeneration units if only one RMCS phoneline is desired. However, only one of these alternatives can be utilized; in other words, all of these capa-bilities are not available together.

The Modbus networking can be implemented with RS-232, RS-422, or RS-485 protocol. It will allow the customer-supplied master device to be able to individually start, stop, and change the setpoint of any cogeneration unit installed on the network, as well as read all of its inputs and outputs. For further details on setting up the Modbus networking, refer to the TECOGEN® Cogeneration Module Operation Manual.

The *TecoNet™* also supports the networking of multiple TECOGEN® units and controlling them with a "Lead/Lag" algorithm. Refer to Section 2.6.6.

# Module Specifications    1

## 1.5  Utility Interface

Each local electric utility has different requirements for interconnection. The specifications and documentation that most utilities would require for the TECOGEN equipment can be found in this manual. Section 1.2 contains the generator specifications, Section 1.3 contains the electric switchgear information, and Section 1.4 contains pertinent control system information such as the safeties and the adjustable alarm limits. Figure 2.3 presents the Customer Power Connection Schematic and Figure 2.5 is the Utility Interface and Protection Schematic.

1. In addition to this information, it is important to inform the utility that the TECOGEN cogeneration module is in compliance with IEEE P1547/DO7. This is addressed in more detail in Section 1.5.1.

Also, some utilities may require power factor correction. This is addressed in Section 1.5.2.

### 1.5.1  Interconnect Compliance

At this time, the TECOGEN® cogeneration product line (60 kW and 75 kW) is certified to be in compliance with the following standards:

1. IEEE P1547/DO7- *Draft Standard for Interconnecting Distributed Resources with Electric Power Systems.*

2. California Rule 21– *Generating Facility Interconnections.*

3. NYSIR—*New York State Public Service Commission Standard Interconnect Requirements.*

In order to gain these certifications, the TECOGEN® has been extensively type-tested by a Nationally Recognized Test Laboratory (NRTL): Intertek Testing Services (ITS) ETL Semko.

IEEE P1547 has been developed to address the emergent need to properly integrate distributed resources to the utility electric power systems. The standard focuses on the technical specifications for, and testing of, the interconnection itself. It aims to be technology neutral, applying to all DR technologies, with the intention of being a universal criterion that supercedes local practices and guidelines. It addresses performance, operation, testing, safety considerations, and maintenance of interconnection. ITS ETL Semko, a worldwide accredited testing, inspection, and certification organization, performed the compliance testing and specification review.

Since the TECOGEN® product utilizes an induction generator, it only requires conformance to certain sections of P1547. For some sections, it was necessary to administer a test to a product sample, while other sections required a specification review only. Listed below are the applicable sections of compliance to P1547, as well as the inclusive compliance to other established standards.

**P1547 Applicable Sections of Compliance**

| | |
|---|---|
| 4.1.2 | Integration with Area EPS Grounding |
| 4.1.4 | Distributed Resources on Distribution Secondary Grid and Spot Networks |
| 4.1.5.1 | Inadvertent Energization |
| 4.1.5.2 | Reconnection after Area EPS Outage |
| 4.1.6 | Monitoring |
| 4.1.7 | Isolation Device |
| 4.2.1 | Voltage Disturbances – Tested |
| 4.2.2 | Frequency Disturbances - Tested |
| 4.2.3 | Disconnection for Faults |
| 4.2.5 | Feeder Reclosing Coordination |
| 4.3.2 | Limitation of Voltage Flicker Induced by the DR – Tested to *EN61000-3-3* |
| 4.3.3 | Harmonics – Tested to *EN-61000-3-2* |
| 4.3.4 | Immunity Protection – Tested to *IEEE C37-90.2-1995* |
| 4.3.5 | Surge Capability – Tested to *IEEE C37-90.1-1989 & IEEE 62.41* |

California Rule 21, instituted by the California Energy Commission (CEC), specifies standard interconnection, operating, and metering requirements for DER (Distributed Energy Resources) generators. The equipment has been certified to meet the Type Testing and Production Testing requirements. The Non-islanding certification is in process. The equipment is not certified as Non-Export.

The NYSIR is a standard, specific to the state of New York, that follows much of the same criteria as IEEE P1547.

As part of the interconnect compliance for all of these standards, TECOGEN® units are production line and field-tested to verify trip point for the voltage and frequency alarms. Refer to Section 1.4.4 Optional Control Features—Alarm Setpoint and Operational Setpoint Customization

### 1.5.2  Power Factor Correction

A characteristic of the induction generator is that it absorbs reactive or "imaginary" power (kvar) while supplying "real" power (kW). Despite its "imaginary" label, some utilities will include a surcharge to the monthly customer invoice for reactive power. Also, some major California utilities have recently attached a maximum reactive power draw requirement (i.e., minimum power factor) to the eligibility criteria for their cogeneration rebate program. These issues are incentives for cogeneration suppliers to include capacitors for power-factor correction with the induction generators. Power-correction capacitors are routinely and safely applied to induction generator systems as long as certain basic engineering principles are applied.

Tecogen has a design recommendation for a capacitor system, supplied by the customer, that interconnects with the TECOGEN®. The details are presented in Appendix 2. This design will allow the power factor to be corrected to approximately 95%. The TECOGEN® panel will display the corrected power factor, if the capacitors are wired as described in Appendix 2.

# Appendix 3

# Integrated Unit
## For TECOGEN® CM-60 & CM-75

The Integrated Unit is a TECOGEN® cogeneration module with a fully packaged emission control system, plumbing module for the heat recovery system, and power factor correction capacitors. This purpose of the Integrated unit is to streamline the installation of the modules equipped with the emission control option since this option contains major components, specifically the catalytic converter and exhaust heat exchanger, that are otherwise field-installed.

Referring to the piping schematic presented in Drawing A3.1, the scope of exhaust piping and heat recovery piping that is included with the Integrated Unit is presented inside the dotted box. For comparison, the acoustic enclosure shown around the engine/generator marks the module boundaries. As indicated, the Integrated Unit significantly simplifies the amount of piping done by the installer.

Drawing A3.2 (a-c) presents the Installation Layout of the unit with all of the connection points, their sizes, and locations.

## A3.1    Heat Recovery Piping
The heat recovery piping in the Integrated Unit includes the Basic Module Plumbing discussed in Section 2.6.2; the circulating pump, the thermostatic control valve and bypass, the city water hook-up with backflow preventer, an expansion tank with regulator (*FILL-TROL 111*), air separator, strainer, and shut-off valves. The piping is equipped with two temperature sensors (thermistors) for measuring the water temperature leaving and returning to the Integrated Unit. These sensors are pre-wired to the TECOGEN® control system. The installer just needs to make three (3) connections on the water-side; the city water supply, and the connections to and from the thermal load heat exchanger. For guidelines on the design and installation of the building heat recovery piping system, refer to Section 2.6 External Water Piping For Heat Recovery.

*Note*

*For multiple unit installations, one common make-up line and expansion tank should be used on the building piping (refer to Section 2.6.5). In this case, the Integrated Unit should not be equipped with an individual expansion tank.*

## A3.2    Exhaust System Piping
The exhaust system on the Integrated Unit includes the catalytic converter, the exhaust heat exchanger, and the silencer. All of these components, as well as the piping , are insulated. The thermocouples for the inlet and outlet of the catalytic converter are installed in the piping and pre-wired to the TECOGEN® control system. An exhaust over-temperature switch is installed downstream of the exhaust heat exchanger and wired into the engine safety circuit. This protects the site's exhaust system from high temperatures in the event of heat exchanger degradation or failure.

Drawing A3.3 presents the guidelines for the field-installed piping, by others, downstream of the Integrated Unit.

*Important*

*It is the responsibility of the site and/or installing contractor (and not Tecogen) to determine and obtain any needed air emissions permits from local authorities. Any needed controls equipment fees, coordination, permits, testing , monitoring systems, etc. are not included with the standard TECOGEN® cogeneration module.*

Refer to Appendix A1 for details of the emission control system and the specifications of the components.

## A3.3    Power Factor Correction System
The Integrated Unit is equipped with a Power Factor Correction System. This includes the capacitors along with the contactor, mounted on the frame of the unit, and wired into the TECOGEN® control system. Drawing A3.4 presents the Utility Interface and Protection Schematic that illustrates that these Power Factor Correction components are included in the Integrated Unit's scope. A schematic is presented in Drawing A3.5 that indicates the details of the wiring. The installing contractor is required to bring 120 VAC to the module for powering this system.

Refer to Appendix 2 for detailed specifications on the Power Factor Correction components.

# Appendix 3



**Drawing A3.1    CM-60/CM-75 Integrated Unit — Piping Schematic**

# Appendix 3



FROM DRAWING 210-04-000 REV.C

Drawing A3.2a    CM-60/CM-75 Integrated Unit — Installation Drawing-View 1

# Appendix 3



**Drawing A3.2b    CM-60/CM-75 Integrated Unit — Installation Drawing–View 2**

# Appendix 3



NOTES:

1. APPROXIMATE RIGGING WEIGHT: 4000 lbs. THE BASE OF THE UNIT IS EQUIPPED WITH FORKLIFT ACCESS HOLES.

2. ALLOW 3' CLEARANCE ALL AROUND UNIT FOR ROUTINE MAINTAINANCE. ONE OF THE TWO SHADED AREAS, AS SHOWN IN FIGURE 1, SHOULD ALSO BE LEFT CLEAR IN ORDER TO REMOVE THE ENGINE.

3. MAXIMUM ALLOWABLE ROOM TEMPERATURE 100°F. TECOGEN UNIT HEAT REJECTION TO AMBIENT SPACE= 30,000 BTU/HR. ENCLOSURE VENTILATION TO OUTSIDE IS RECOMMENDED SINCE MOST ROOM VENTILATION IS NOT ADEQUATE. LOUVERS ON ENCLOSURE SHOULD BE REMOVED BEFORE MAKING DUCT CONNECTION.

4. A CONCRETE HOUSEKEEPING PAD IS RECOMMENDED: 6'X 4'X 8'

5. EXPANSION TANK AND MAKE-UP WATER CONNECTIONS ARE NOT INCLUDE ON MULTIPLE UNIT INSTALLATIONS BECAUSE ONE COMMON EXPANSION TANK AND MAKE-UP WATER CONNECTION SHOULD BE USED. REFER TO THE TECOGEN INSTALLATION MANUAL.

| CONN. | CONNECTION TABLE DESCRIPTION | SIZE | TYPE |
|---|---|---|---|
| A | GAS INLET | 1" | FPT |
| B | HOT WATER IN | 1 1/2" | COPPER SWEAT |
| C | HOT WATER OUT | 1 1/2" | COPPER SWEAT |
| D | EXHAUST OUT | 3" | 125/150lb.ANSI FLANGE |
| E(2) | GENERATOR VENTILATION CONNECTIONS (under louver) | 4"X 10" | DUCT |
| F | ELECTRICAL POWER (3-PHASE) | 3" | CONDUIT |
| G | ELECTRICAL CONNECTIONS (CONTROL AND 120 VAC.) | 3/4" | CONDUIT |
| H | ENGINE COOLANT RELIEF VALVE | 3/4" | FPT |
| J | DRIP PAN DRAIN | 1/2" | FPT |
| K | MAKE-UP WATER (SEE NOTE 5) | 1/2" | FPT |

FROM DRAWING 210-04-000 REV.C

FIGURE 1
(SEE NOTE 2)

**Drawing A3.2c   CM-60/CM-75 Integrated Unit — Installation Drawing - View 3**



**Drawing A3.3   CM-60/CM-75 Integrated Unit— Exhaust Piping**

# Appendix 3



**Drawing A3.4    CM-60/CM-75 Integrated Unit — Utility Interface and Protection Schematic**

# Appendix 3



**Drawing A3.5    CM-60/CM-75 Integrated Unit — Power Factor Correction Schematic**

# Tecogen Ex. 5

# TECOGEN® ≡ COGENERATION MODULES

*~ More than 700 TECOGEN® cogeneration modules shipped and installed worldwide ~*

## Pioneers of Proven Technology ...

⇒ **1977:**  Initial design of CM-60, 60kW TECOGEN® unit

⇒ **1978:**  Public Utility Regulatory Policies Act (PURPA) establishes ground rules for cogeneration

⇒ **1979:**  Development of prototype 60kW unit initiated

⇒ **1981:**  First 60kW Tecogen laboratory unit placed on life test

⇒ **1983:**  First commercial sale of unit to Southern California Gas Co.

⇒ **1985:**  Specialized synchronous product developed for US and Japanese Markets
[CM-30S, CM-70S,   CM-200S, CM-280S (diesel), CM-600S, CM-850S (dual fuel)]

⇒ **1986:**  First TECOGEN field unit reached 20,000 hours of operation in field

⇒ **1987:**  First CM-200S, CM-280S, CM-600S units shipped

⇒ **1987:**  1 million total run hours logged on Tecogen units at actual customer sites

⇒ **1988:**  CM-75 High Output unit introduced

⇒ **1990:**  First low-emissions units sold in Southern California

⇒ **1992:**  Tecogen focuses product line exclusively on 60kW and 75kW induction modules to best serve
the cogeneration market up to 700kW, using multiple modules

⇒ **1993:**  First two-stage catalyst units sold in Southern California

## ... Setting The Pace With The Latest Innovations

### State-of-the-Art TecoNet™ Remote Monitoring & Control System Simplifies Building Management System

⇒ **1998:**  Original microprocessor replaced by *TecoNet*™ state-of-the-art control system

⇒ **2001:**  *TecoNet*™ networking capabilities expanded to fully integrate numerous additional
control functions

### Ultra-Clean Emission Control System Meets Most Stringent Air Quality Standards

⇒ **1994-99:** Ultra clean "Level 2" catalyst system developed to meet current SCAQMD standards

⇒ **1999:**  First Level 2 units permitted and source-tested

⇒ **2001:**  "Level 2" emissions controller with remote access and control/diagnostics introduced

### Simplified Interconnection Process Significantly Reduces Complex Review Time

⇒ **2002:**  Cogeneration modules certified by ETL to be in compliance with national
IEEE P1547/D07 standard

⇒ **2002:**  Tecogen units "type-tested and approved" under NY State Interconnection Requirement

⇒ **2002:**  Applied for and completed testing of Rule 21—California type-testing

### New Integrated Packaging Modules and Installation Services

⇒ **2002:**  Innovative "plug-and-play" design reduces complexity of installation

**TECOGEN**

45 First Avenue
Waltham, MA  02451
ph: 781.466.6400
fax: 781.466.6466

www.tecogen.com

*Service locations
throughout the US*

## *Strong Industry Support & Company Background*

The Tecogen distributed generation product line was developed through a series of joint programs with the major natural gas industry research organizations in the United States. These programs were carried out at Tecogen's facility from the years 1981 through 2002 and totaled over $15M in external funds. The most prominent of these are: *The Southern California Gas Co.* (CM-60), *San Diego Gas and Electric Co.* (CM-70S), *Southern California Edison* (CM-225), *The Gas Research Institute* – a consortium of major U.S. natural gas companies, now merged with IGT into the Gas Technology Institute (CM-75, CM-30, CM-600, Level 2 emissions systems, numerous engine and engine product development projects, the latest concluded in May 2002).

⇒ **1981:** Tecogen product developed by Thermo Electron R&D Center as part of GRI-funded research

⇒ **1985:** Tecogen, Inc. formed as a separate subsidiary of Thermo Electron Corporation

⇒ **2000:** Tecogen purchased as a private entity by original founders of Thermo Electron

## *Dedicated Service Organization*

Tecogen's extensive network of factory-trained technicians offers local service for key regions in the United States.

⇒ **1983:** Tecogen Service started as a four-man operation

⇒ **2002:** Service department has expanded to 25+ factory-trained technicians stationed throughout the US

  

## *Specifications*

| | | |
|---|---|---|
| Electrical Output (kW) | 60 | 75 |
| Thermal Output | 440,000 Btu/hr | 490,000 Btu/hr |
| Gas Input: | 760 scfh | 900 scfh |
| Efficiency: | | |
| @ LHV of 905 BTU/scf | 93.7% | 91.6% |
| @ HHV of 1020 BTU/scf | 83.1% | 81.3% |
| Required Gas Pressure | 4-14"wc | |
| Hot Water Flow | 22 gpm | |
| Maximum Water Temperature | 230°F | |
| Electrical Service | 208V or 460V, 3-wire | |
| Emissions Option | Can meet air quality standards as strict as California's | |
| Acoustic Level | 70 dBa @ 20' | |
| Dimensions: | 6'10"L x 3'8"W x 3'10"H | |
| Weight: | 3,000 lbs | |

*Note: Above performance data is valid up to 100°F ambient temperature, for standard units without optional emissions controls*

# Tecogen Ex. 6

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

1           UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

3    ------------------------------------------x

4    TECOGEN, INC.,

5                     Plaintiff,

6    v.                         No. 05-11823 RCL

7    AEGIS ENERGY SERVICES, INC.,

8    AEGENCO, INC. AND AEGIS GENERATION COMPANY,

9                     Defendant.

10   ------------------------------------------x

11

12

13

14           DEPOSITION OF ROBERT PANORA, a witness

15   called on behalf of the Defendant, taken

16   pursuant to the provisions of the

17   Massachusetts Rules of Civil Procedure,

18   before Linda Bernis, a Registered

19   Professional Reporter and Notary Public in

20   and for the Commonwealth of Massachusetts,

21   at the offices of McCarter English, 265

22   Franklin Street, Boston, Massachusetts, on

23   Wednesday, August 29, 2007, commencing at

24   9:40 a.m.

1

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

30

1    Notice of Deposition or the original Notice
2    of Deposition?
3  A.  I believe so.
4  Q.  I call your attention to the list that
5    begins on page 6, numbered one through four,
6    and it continues on through page 9, number
7    36.
8        Are there items or topics
9    identified in this list that you are not
10   prepared to talk to today?
11       (Pause)
12 A.  There are many things in here, I don't
13   understand exactly what the question is.
14   They are very broad. I don't know. I
15   rather not talk about the computer program
16   because I'm not knowledgeable of that
17   directly. I think there are experts at
18   Tecogen that you depose that would be better
19   for that.
20       Again, there are some things in
21   here. I just don't clearly understand what
22   the question is. Very broad sweeping
23   question. I will try to be responsive as
24   best I can.

31

1  Q.  Did you review this list with your attorney?
2  A.  I have reviewed this list, yes.
3  Q.  As we go through them you can answer what
4    you know and we'll go from there.
5  A.  That would be fine.
6  Q.  When did Tecogen first learn that Aegis was
7    developing or had developed its own cogen?
8  A.  To my knowledge, it was a fax we received
9    from our dealer in Long Island that had the
10   marketing material of Aegis. That would
11   have been whatever date was on this
12   document.
13       MR. CURCIO: Let's mark this.
14       (Exhibit 102 marked
15       for identification.)
16 A.  May I look at this?
17 Q.  Yes.
18 A.  This was May 23, 2005 that this fax was
19   received by Tecogen and that would have been
20   the date that I became aware of the
21   competitive product on the market by Aegis.
22 Q.  That's the first date you became aware. Was
23   there any discussion prior to this date that
24   Aegis was developing cogen?

32

1  A.  I think, I heard rumors, but I didn't take
2    any stock in it.
3  Q.  Where did this fax originate, who sent it?
4  A.  I believe it was sent by our dealer in Long
5    Island which would have been All Systems.
6  Q.  To your knowledge, that's the first time All
7    Systems also knew that Aegis was building a
8    cogen?
9  A.  They must have known prior to that date, but
10   I don't know when they became aware of it.
11 Q.  It's the first time they made you aware of
12   it?
13 A.  Correct.
14 Q.  After you received information that Aegis
15   was building its own cogen, what were your
16   actions with that regard?
17 A.  No direct action, but, I believe, the sales
18   group comprised of Jeff Glick and Wes
19   Schuster did take action.
20 Q.  What actions did they take?
21 A.  I believe, they met internally to try to
22   understand what was happening and to plan
23   what to do next.
24 Q.  Did anyone at Tecogen contact Aegis?

33

1  A.  I don't know.
2  Q.  What actions did Mr. Glick and Mr. Schuster
3    determine to take?
4  A.  I believe, they first contacted the people
5    who were involved in the Lakeland project,
6    the purchaser.
7  Q.  Who would that be?
8  A.  It would have been a fellow by the name of
9    Tim Brock, if I recall.
10 Q.  Is that Mr. Tim Brock of Atlantic Energy?
11 A.  Yes.
12 Q.  Do you recall what Tecogen discussed with
13   Mr. Brock?
14 A.  No. I didn't participate. It was a meeting
15   that I wasn't party to, but I think they
16   would have just gone up there to, I think,
17   they visited them personally.
18 Q.  Do you know about when they visited them?
19 A.  It was right after that was received.
20   Within a few days, I think.
21 Q.  Do you recall who went to that meeting?
22 A.  I believe it was Jeff and Wes.
23 Q.  Do you recall if Mr. Barry Sanders was at
24   that meeting?

9 (Pages 30 to 33)

Case 1:05-cv-11823-RCL   Document 43-7   Filed 07/14/2008   Page 4 of 24
Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

**34**

1   A. I don't recall. He might have been. I
2   don't recall.
3   Q. At the time Tecogen received the May 23,
4   2005 fax, which has been marked as
5   Exhibit 102, had Aegis already received a
6   purchase order for the Lakeland project?
7   A. I don't know. I think so.
8   Q. Would Mr. Glick be in a position to know?
9   A. I believe so, yes.
10          We assumed that they had, by the
11   way, received a purchase order, but I don't
12   know that we ever saw one. We were
13   negotiating from the point of view they did
14   because they were trying to issue us a
15   purchase order.
16   Q. Mr. Panora, I'm going to give you what's
17   been previously identified as Exhibit Number
18   74 and ask that you review and identify it
19   for us?
20   A. This is a fax from Jeff Glick to Lee
21   Vardakas concerning the Lakeland project
22   pricing.
23   Q. Did you see this fax?
24   A. I don't think I did at the time. Is that

**35**

1   what you're referring to?
2   Q. Yes.
3   A. I don't think I did.
4   Q. I call your attention to what's marked as
5   page T03027. That's the Bates number at the
6   bottom right hand corner.
7   A. 327?
8   Q. Correct. Lakeland CSD price quotation
9   discounted terms. Do you see that?
10   A. Yes.
11   Q. Call your attention to pricing and terms,
12   number 4. "Payment terms are net 15 days.
13   Tecogen will release for production maximum
14   of four units at a time. If payment terms
15   are not met, prices will revert to the
16   higher post-June 1, 2005 prices."
17          Do you see that?
18   A. Yes.
19   Q. Did I read it correctly?
20   A. Yes.
21   Q. Why was this term put into the pricing
22   scenario by Mr. Glick?
23   A. It was to incentivize Aegis to pay quickly
24   and properly and to reward them for that.

**36**

1   Q. Was this term ever given to any other sales
2   rep of Tecogen?
3   A. Be more specific. Which term? Exactly as
4   written?
5   Q. Yes, number four.
6   A. With the words June 1, 2005, I mean --
7   Q. Let's start with, have you ever required
8   payment terms net 15 days for any other rep?
9   A. We give people discounts if they pay in
10   15 days. That's not unusual.
11   Q. Did you ever state to any other rep that you
12   would not release more than four units into
13   production at a time?
14   A. Not that I'm aware of.
15   Q. I call your attention to Bates stamp T0330.
16   Lakeland CSD price quotation full price
17   terms.
18          Do you see that?
19   A. Yes.
20   Q. Again, I'll call your attention to term
21   number 4. The second sentence reads,
22   "Tecogen will release for production a
23   maximum of two units at a time."
24          Do you see that?

**37**

1   A. Yes.
2   Q. Did I read it correctly?
3   A. Yes.
4   Q. Has Tecogen imposed that term on any other
5   sales rep?
6   A. Not specifically, no.
7   Q. Next sentence reads, "Tecogen will not
8   release additional units for production
9   until all previous shipments have been paid
10   in full."
11          Do you see that sentence?
12   A. Yes.
13   Q. Did I read it correctly?
14   A. Yes.
15   Q. Why did Tecogen state that?
16   A. To manage our cash and because Aegis was
17   paying us so late. They had become very
18   late in paying us so we were concerned about
19   our cash position in the company. So this
20   is to ensure we didn't get too far along as
21   far as cash goes.
22   Q. Tecogen had a long relationship with Aegis,
23   correct?
24   A. Yes.

10 (Pages 34 to 37)

38

1 Q. Throughout the years, has Aegis paid its
2    bills?
3 A. Yes.
4 Q. Did the relationship at any time require
5    Tecogen to impose strict terms on Aegis
6    other than this particular project site to
7    entice Aegis to pay Tecogen sooner?
8 A. I believe there was a lot of discussion with
9    Aegis over the years over prompt payment or
10   lack thereof of prompt payment. There was
11   constant discussion about, are we going to
12   get paid? Why is it so late? This doesn't
13   seem out of the norm that a project that was
14   this big, probably the biggest order that
15   Aegis would have ever given us by far in a
16   long time, being a single project, that we
17   would have been very concerned about the
18   cash and about the terms.
19 Q. Did you know Aegis pricing -- strike that.
20       Do you know how Aegis was going to
21   be paid by the mechanical contractor on the
22   Lakeland project?
23 A. No.
24 Q. Do you know if Aegis could have paid you for

39

1    two units at a time and received that money
2    timely from the mechanical contractor?
3 A. It's possible. I don't know.
4 Q. Did you ask Aegis?
5 A. I would not have been the person talking to
6    Aegis about that so I can't respond to that.
7 Q. Would Mr. Glick be the person?
8 A. It may have been Mr. Glick. It may have
9    been Mr. Schuster. Either one of them.
10 Q. To your knowledge, did Mr. Glick or Mr.
11   Schuster ask Aegis if they could meet these
12   terms and conditions?
13 A. I would suspect there was a lot of
14   discussion about what was reasonable and
15   what wasn't reasonable. It wasn't just
16   something that was dreamed up.
17 Q. I'm going to give you what's been previously
18   marked as Exhibit 75.
19 A. This document doesn't have a mark on it.
20   Should I leave it here?
21 Q. The documents I'm giving you are copies of
22   from before that we had put exhibit stamps
23   on. You can take your counsel and my word
24   that if we say it's Exhibit 75, it's

40

1    Exhibit 75.
2 A. I believe you, I just don't want to lose it.
3 Q. Okay. If it's been previously marked the
4    original markings are here.
5 A. Okay.
6 Q. Could you please review this document and
7    identify it for us?
8 A. This is a fax from Jeffrey Glick again to
9    Mr. Vardakas, Lee Vardakas, with a proposal
10   for terms and conditions of the sale for
11   Lakeland.
12 Q. Did you see this fax on or about the time it
13   was sent?
14 A. No.
15 Q. T0304, the fourth paragraph down states,
16   "Four high voltage units for July 22nd" --
17   strike that.
18       "First three high voltage units:
19   July 22nd. Remaining eight units (four high
20   voltage and low voltage and four low
21   voltage): August 19th."
22       Do you see that?
23 A. Yes.
24 Q. I sort of butchered it so I'm not going to

41

1    ask if I read it correctly.
2       These represent 11 units. Were
3    these 11 units for the Lakeland project?
4 A. I believe so.
5 Q. It states in the next sentence, "To meet
6    these dates, Tecogen would need a purchase
7    order before this Friday, 5/20/05."
8       Do you see that sentence?
9 A. Yes.
10 Q. Did I read it correctly?
11 A. Yes, you did.
12 Q. Is it normal for Tecogen to request a
13   purchase order from its reps before it
14   orders parts for the units it's going to
15   build?
16 A. Yes.
17 Q. Does Tecogen order parts based on a purchase
18   order or based on a verbal request from a
19   sales rep?
20 A. In different situations it can be either.
21   If it's a standard product that we know we
22   will sell later down the road, if the sale
23   falls through, we may accept a verbal. It
24   depends on the size of the order. If it's a

11 (Pages 38 to 41)

Case 1:05-cv-11823-RCL    Document 43-7    Filed 07/14/2008    Page 6 of 24
Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

42

1    huge order, we might be more careful. But,
2    in general, during this period of time for
3    the company we would have been building
4    mostly to orders.
5   Q.   It's not uncommon, you're saying, for
6    Tecogen to request a purchase order on an
7    order this large?
8   A.   Yes, it's not uncommon.
9   Q.   Can I turn your attention to page T0307.
10   This is the price quotation discounted terms
11   page. Do you see that?
12   A.   Yes.
13   Q.   Turn your attention to term number 4.
14   "Payment terms are net 30 days."
15        Do you see that?
16   A.   Yes.
17   Q.   Why was that changed from the original terms
18   that we saw previously in the May 6th fax?
19   A.   Which terms of the May 6th fax?
20   Q.   Let's go to Exhibit 74, T0327.
21   A.   I believe, this change was made as part of
22   negotiations with Lee. It was just
23   clarifying what they would have agreed to on
24   the phone, but I can't say for sure.

43

1   Q.   Would Mr. Glick be the one who did the
2    negotiation?
3   A.   Him or Wes Schuster.
4   Q.   Go back to Exhibit 75. The first page,
5    T0304. It's the 5/17 fax.
6   A.   Yes, I have it.
7   Q.   The fifth paragraph states, second sentence,
8    "In addition, Tecogen will require payment
9    for these units to be made with a two-party
10   check."
11        Do you see that sentence?
12   A.   Yes.
13   Q.   Did I read it correctly?
14   A.   Yes.
15   Q.   Why was Tecogen requiring payment to be made
16   with a two-party check?
17   A.   This would have ensured that we had our cash
18   from the project quickly. In other words,
19   the money for Tecogen using this process.
20   Q.   Have you ever asked, has Tecogen ever asked
21   Aegis to require payment in a two-party
22   check before?
23   A.   Not that I'm aware of.
24   Q.   I'm going to show you what's been previously

44

1    marked as Exhibit 22. I ask you to review
2    it and identify it.
3   A.   This is a fax from Lee Vardakas to Jeff
4    Glick of Tecogen, which is a purchase order
5    for the Lakeland project for 11 units, I
6    believe.
7   Q.   Turning your attention to the second page,
8    T0289. Do you see where it says, "PO number
9    05-475LB revised?"
10   A.   I see that.
11   Q.   Do you know if the revised word was inserted
12   because Aegis was compensating for the
13   additional payments to your other reps on
14   this project?
15   A.   I don't know why that word is there.
16   Q.   Would Jeff Glick be the person most
17   knowledgeable about the revisions of
18   purchase orders on this project?
19   A.   Jeff or Wes Schuster.
20   Q.   I call your attention to the first page,
21   T0290. Do you see where Mr. Vardakas is
22   asking for Tecogen to send written
23   confirmation of acceptance of this PO?
24   A.   I see that.

45

1   Q.   Were there any discussions of Tecogen
2    regarding sending Aegis written confirmation
3    of acceptance of this PO?
4   A.   I believe so.
5   Q.   Were you part of those conversations?
6   A.   I was apprised of the situation.
7   Q.   What were you told?
8   A.   That we had a purchase order and we were
9    questioning if we should accept it or not.
10   If this purchase order was acceptable to us
11   in terms of payment and that sort of thing.
12   Q.   What was decided?
13   A.   At that time, we were still not accepting
14   it.
15   Q.   Why not?
16   A.   Because, I believe, we hadn't gotten
17   confirmation of our payment terms. They
18   were still ambiguous.
19   Q.   Can you please go back to Exhibit 75, page
20   T0307. See term four?
21   A.   Yes.
22   Q.   "Payment terms are net 30 days."
23        Were those the payment terms of
24   this contract?

12 (Pages 42 to 45)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

---

46

1   A.  What contract?
2   Q.  **Of this purchase order.**
3   A.  It says, net 30 days on the purchase order,
4       yes.
5   Q.  **So what were the terms that Tecogen were**
6       **concerned were not being met in relation to**
7       **the revised purchase order sent on May 17th**
8       **from Mr. Vardakas to Mr. Glick?**
9   A.  I'll have to study carefully if you give me
10      a minute.
11  Q.  **Sure.**
12          (Pause)
13  A.  I believe, it may have been a two-party
14      check was not agreed to.
15  Q.  **Is it your understanding that a two-party**
16      **check was still required at the time of the**
17      **May 17, 2005 revised purchase order from Mr.**
18      **Vardakas to Mr. Glick?**
19  A.  I can't say for certain.
20  Q.  **Would Mr. Glick be the one to know that?**
21  A.  He would know, yes.  That's what I see
22      different here that looks significant to me.
23  Q.  **Was that a topic of discussion at Tecogen at**
24      **the time?**

---

47

1   A.  Yes.
2   Q.  **Did you give any instructions to Glick or**
3       **Mr. Schuster regarding the requirement for a**
4       **two-party check?**
5   A.  I did not instruct them.  They just told me
6       they had asked for that as a way of
7       protecting us.  I believe, I heard that
8       Aegis had refused that request.
9           MR. CURCIO:  Before I go further,
10      it's been an hour and 25 minutes, would you
11      like a break?
12          (Short recess taken.)
13  Q.  **Mr. Panora, I'm going to give you what's**
14      **been previously marked as Exhibit Number 78.**
15      **Please review and identify it for us.**
16  A.  This is a fax to Jeff Glick from Lee
17      Vardakas with no message other than it's the
18      bond for the Lakeland project.  It's a copy
19      of the bond, perhaps part of the bond.  I'm
20      not sure it's the whole bond.
21  Q.  **Did Tecogen request that Aegis supply the**
22      **bond for the Lakeland project to them?**
23  A.  This I do know about.  What I felt was that
24      if we couldn't get agreement on the terms,

---

48

1       two-party check, etcetera, that another way
2       of perhaps getting around that log jamb in
3       our discussions was to request the bond,
4       copy of the bond which would give us some
5       assurance that it would be paid.  That was
6       at my instruction.
7   Q.  **Did this meet your requirement?**
8   A.  It did except for one problem.  And the
9       problem was that on the date, two days prior
10      to this or three days prior to this, we
11      became aware that Aegis was a competitor of
12      ours at that point.  That was the change
13      that also occurred at the same time.
14  Q.  **The terms at this point in time as we noted**
15      **before were net 30 days, correct?**
16  A.  And two-party check, yes.
17  Q.  **Two-party check requirement was replaced by**
18      **the request for a bond, correct?**
19  A.  Yes.  I was trying to find a way around our
20      impasse basically.
21  Q.  **Did Aegis satisfy the terms and conditions**
22      **of its purchase order at this point in time?**
23  A.  They provided us a copy of the bond.  To me,
24      that was enough to proceed, but I don't know

---

49

1       if Wes and Jeff were satisfied.  Wes was my
2       boss, you have to understand, at that time.
3   Q.  **At this time, May 25, 2005, you state you**
4       **were already aware that Aegis was developing**
5       **its cogen, correct?**
6   A.  Correct.
7   Q.  **Were there any discussions regarding not**
8       **accepting the Aegis purchase order because**
9       **Aegis was developing its own cogen?**
10  A.  I don't think that was on the table.  I
11      think it was a concern that if we did accept
12      the order that there would be some, that
13      could have been the last time we ever took
14      an order from Aegis.  And if it was a last
15      order ever taken then we could have been
16      harmed in some way.
17          If 10 percent was withheld, for
18      example, if there was any problem at all,
19      we'd have no leverage with Aegis anymore
20      because that was the last order.  That was,
21      I think, my main concern.  We wouldn't get
22      the last 10 percent, or some problem like
23      that would happen.
24  Q.  **Did you discuss that concern with Aegis?**

13 (Pages 46 to 49)

Case 1:05-cv-11823-RCL   Document 43-7   Filed 07/14/2008   Page 8 of 24
Robert Panora 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

**50**

1  A.  I did not discuss anything directly with
2  Aegis that I can recall. I could have, but
3  I don't remember. I think, I basically
4  advised the salespeople.
5  Q.  That would be who, Mr. Glick?
6  A.  Mr. Glick or Wes, yes.
7  Q.  Did Mr. Glick discuss this, to your
8  knowledge, did Mr. Glick discuss this with
9  Aegis?
10  A.  Not to my knowledge. It just gave us
11  definitely cause to pause and be very
12  careful how we proceeded once we knew they
13  were a competitor.
14  Q.  Did Tecogen order parts based on the revised
15  purchase order submitted to Tecogen on
16  May 17th?
17  A.  I don't know on what basis we ordered parts.
18  Q.  Would Mr. Glick be the one to know?
19  A.  He may. He may. It would also have been a
20  manufacturer person that may have made that
21  decision with Jeff. I'm not sure.
22  Q.  We saw something yesterday in Mr. Glick's
23  deposition regarding order entry forms. Mr.
24  Glick had filled one out for the Lakeland

**51**

1  project. Would that be how manufacturing
2  would become aware that parts should be
3  ordered when a sales rep puts in an order
4  entry form?
5  A.  Not when he puts it in, but when it's signed
6  off and fully executed properly.
7  Q.  How is it signed off? Is there a place on
8  the form?
9  A.  I think, there's a place on the form.
10  There's certainly a process of approval that
11  any large order like that or any order
12  should go through.
13  Q.  Who should be the people to approve?
14  A.  Oh, boy. I'm not specifically sure. It
15  would have been a combination of the sales
16  manager, Wes Schuster, and manufacturing or
17  engineering sign off, probably that it was a
18  standard product and that it wasn't
19  something unusual. It would have been that
20  sort of thing.
21  If it was not, if the sales manager
22  felt that there was any reason to be
23  concerned, he would have come to me. That's
24  probably how it happened.

**52**

1  Q.  If parts were ordered, is it safe to assume
2  that approvals must have been given?
3  A.  No.
4  Q.  So it's possible to put an order entry form
5  in and parts ordered without approval?
6  A.  It can happen. Special circumstances.
7  Without written approval.
8  Q.  At the time that the bond was submitted to
9  Tecogen, May 25, 2005, to your knowledge,
10  did Aegis have a purchase order from the
11  mechanical contractor for the Lakeland
12  project?
13  A.  Excuse me.
14  (Cell phone rings.)
15  A.  I was lead to believe that. I have no
16  direct knowledge of that, but I was lead to
17  believe that.
18  Q.  Would Mr. Glick be the one to know that?
19  A.  Or Wes, yes.
20  Q.  I'm going to give you what's been previously
21  marked as Exhibit Number 80. Please review
22  and identify Exhibit Number 80.
23  A.  This is an e-mail from Jeff Glick to Tim
24  Brock of Atlantic Energy Services dated

**53**

1  Monday, June 6th. I believe, it's a
2  follow-up to a meeting that Jeff and Wes and
3  maybe Barry Sanders had with Mr. Brock.
4  Q.  Were you aware of that meeting?
5  A.  Yes, I was.
6  Q.  Do you recall what that meeting was about?
7  A.  I believe it was to discuss maintenance
8  issues and talk about keeping American DG
9  capable to Mr. Brock, introduce him to
10  American DG. That sort of thing.
11  I bet no one had met him
12  face-to-face in our organization.
13  Q.  Was the Lakeland project topic of discussion
14  for that meeting?
15  A.  Maintenance I'm sure was, yes.
16  Q.  Maintenance for the Lakeland project?
17  A.  Yes.
18  Q.  Is maintenance a separate contract under the
19  Lakeland proposal in comparison to the sale
20  of cogens?
21  MS. FROHLICH: Objection.
22  A.  Is it a separate contract? I don't know
23  what you mean exactly by that. Is it sold
24  separately in this contract, is that what

14 (Pages 50 to 53)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

---

**54**

1 you mean?
2 Q. Yes.
3 A. I don't know. In general, it often is.
4 Certainly it can always be changed down the
5 road. If it's a one year contract, if it's
6 a two-year. It's an ongoing thing.
7 Q. To your knowledge, has Aegis offered
8 maintenance and service capability for the
9 cogens that it represents?
10 A. Yes.
11 Q. Was Tecogen offering a maintenance service
12 contract for the Lakeland cogens on or about
13 June 6th?
14 A. I think so, yes.
15 Q. Would that be in competition with Aegis
16 offering its own maintenance and service
17 contract for the Lakeland proposal?
18 A. Yes.
19 Q. Second sentence on page T0401 of Exhibit 80.
20 "Ray Hickey has forwarded your request for
21 equipment quotation that would cover a total
22 of 25 completely integrated Tecogen CM-75
23 modules."
24 Do you see that sentence?

---

**55**

1 A. Yes.
2 Q. Did I read it correctly?
3 A. Yes.
4 Q. Why was Tecogen supplying a quote for 25
5 cogen modules?
6 A. I believe, that upon visiting Mrs. Brock,
7 Mr. Brock brought that up and asked if we
8 would quote the 25 units for projects he
9 had.
10 Q. Did those 25 units include the 11 units at
11 Lakeland?
12 A. Yes, I believe they did.
13 Q. Did they include the cogen units at Chemung
14 County?
15 A. I believe so.
16 Q. Did Tecogen provide a quote for 25 units?
17 A. To Mr. Brock?
18 Q. Yes.
19 A. I believe so. That's what's here, right?
20 Q. Next sentence reads, "If this pricing is
21 acceptable to you, Tecogen would supply the
22 units directly to Atlantic Energy Services
23 based on each project's schedule."
24 Do you see that sentence?

---

**56**

1 A. Yes.
2 Q. Did I read it correctly?
3 A. Yes.
4 Q. What does that mean, Tecogen would supply
5 the units directly to Atlantic?
6 A. It means, to me, that -- I didn't write
7 this. To me it means, we could engage in a
8 direct contract to sell directly to a
9 purchase order from Atlantic and funds from
10 Atlantic directly.
11 Q. That would include the 11 units at Lakeland?
12 A. Yes.
13 Q. It would include the units at Chemung
14 County, correct?
15 A. Yes.
16 Q. And Tecogen had knowledge at the time they
17 were making this offer to Atlantic that
18 Aegis had a PO from the mechanical
19 contractor for the 11 units at Lakeland?
20 MS. FROHLICH: Objection.
21 A. I don't know that we knew exactly what the
22 agreement was. They may have had a PO or
23 not. I think, we assumed that they did. I
24 don't know.

---

**57**

1 Q. Would Mr. Glick be the person to know?
2 A. Yes. And he may have learned something from
3 Mr. Brock that made him believe that it was
4 reversible, but I don't know if there was a
5 PO.
6 Q. Did Atlantic accept Tecogen's proposal for
7 25 units?
8 A. I don't believe they did. I don't believe
9 they did, no.
10 Q. Let me rephrase it.
11 Isn't it true that Atlantic
12 accepted a proposal for Tecogen's 25 units?
13 A. Is it true they did?
14 MS. FROHLICH: Objection.
15 Q. Yes.
16 A. I don't recall. Nothing ever happened from
17 it so I don't recall whether they said it.
18 Q. Would Mr. Glick be in a position to know?
19 A. Yes, he would. Or Wes.
20 Q. Mr. Panora, I'm going to give you what I
21 believe has been previously marked as
22 Exhibit Number 28. I'm going to ask counsel
23 to verify that.
24 MS. FROHLICH: That's correct.

15 (Pages 54 to 57)

Case 1:05-cv-11823-RCL    Document 43-7    Filed 07/14/2008    Page 10 of 24
Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

58

1   A.   This is a letter that Jeff Glick wrote to
2        Lee Vardakas on June 21st pertaining to the
3        Lakeland project and the cancellation of the
4        order by Aegis.
5   Q.   Were you aware of the order cancellation by
6        Aegis?
7   A.   I was in the Far East on vacation when it
8        happened.  I probably saw it in an e-mail,
9        but it may have been three, four, five days
10       after cancellation.  It was not timely, I'm
11       pretty sure.
12  Q.   I call your attention to the second
13       paragraph of that letter.  It reads:
14       "Although we did receive your order
15       cancellation on June 20th, it does present a
16       quandary to us.  I want you to know that the
17       day after we received your order on May 18,
18       2005, we did order material for all 11 units
19       for the Lakeland project to ensure we met
20       your delivery requirements."
21           Do you see those sentences?
22  A.   Yes.
23  Q.   Did I read that correctly?
24  A.   Yes.

59

1   Q.   Did Tecogen accept Aegis' purchase order on
2        May 17th?
3           MS. FROHLICH:  Objection.
4   A.   We accepted it, I believe, at some point.  I
5        don't know what day that was, though.
6   Q.   Did they order parts based on that purchase
7        order?
8   A.   I don't know on what basis they ordered
9        parts.  They may have ordered the parts, as
10       he said here, because there was a high
11       certainty they would get an order, or they
12       may have ordered it based on a purchaser.
13       It's not clear to me why they did that.
14  Q.   Would Mr. Glick be the person to know?
15  A.   He may know, yes.
16  Q.   And the other person who may know?
17  A.   Wes Schuster or whoever was in charge of
18       manufacturing at that time.
19  Q.   Who would that be?
20  A.   A person by the name of Sanjeev Tuludar.
21  Q.   Spell that.
22  A.   S A N J E E V - T U L U D A R.
23  Q.   Did Tecogen have a meeting with Aegis
24       concerning the fall-out of the Lakeland

60

1        project?
2   A.   I'm sorry.
3   Q.   Strike that.  Let me rephrase it.
4           In the June time frame, soon after
5        Aegis cancelled its order, was there a
6        face-to-face meeting with Aegis?
7   A.   I'm only aware of one face-to-face meeting
8        that occurred after this.  I think, that
9        would have been in July.  It was a meeting
10       that we had at a restaurant halfway between
11       where Aegis is located and where Tecogen is
12       located.  The exact date, I'm not sure.  As
13       I was on vacation in the Far East, there may
14       have been a face-to-face that I'm not aware
15       of.
16  Q.   Were you present at the July meeting?
17  A.   If it was July, yes, I was present at that
18       meeting.
19  Q.   What was the topic of discussion of that
20       meeting?
21  A.   I think it was an attempt by Tecogen to ask
22       Aegis to reconsider their, whether or not
23       they should move forward with their own
24       product.  We were trying to make them

61

1        understand that we wanted them to still be
2        part of our team and work with us.
3   Q.   I show you what's been previously marked as
4        Exhibit Number 84.  Can you please review
5        and identify it?
6           (Pause)
7   A.   I believe, it's an e-mail from Wes Schuster
8        to Ray Hickey and Brian Willemsen, two of
9        our reps, about pricing for some of these
10       jobs that related to Atlantic Energy.
11  Q.   Did you see this e-mail?
12  A.   Certainly I must have.  I'm copied on it.
13  Q.   Why was Tecogen trying to get a copy of the
14       Aegis quote?
15  A.   I don't recall exactly what was going on
16       here.  I think it was an attempt to make an
17       extraordinary price concession to the
18       customer so we would get the order.  I think
19       .that's what it was for.
20  Q.   Get which order?
21  A.   I'm not sure which one Harbor is.  It could
22       be Chemung or one of those other jobs.  I
23       don't think it's Lakeland.
24  Q.   I call your attention to the second

16 (Pages 58 to 61)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

62

1 paragraph.
2 A. Honestly, this is not that well written. I
3 can't understand it. I'm reading this as a
4 pricing instruction to get all 25 units
5 perhaps not just the Chemung.
6 Q. That would include Lakeland and Chemung
7 together?
8 A. I think so, yes. Again, this is not a well
9 written document. Out of context, it's hard
10 for me to figure out what it means.
11 Q. At the time of this e-mail, July 22, 2005,
12 was Tecogen aware that Aegis had a purchase
13 order for the Chemung County project?
14 A. I don't recall that I ever heard that. I
15 don't know if Jeff knew or Wes knew, but I
16 don't recall ever knowing that.
17 Q. Would Mr. Glick be in a position to know?
18 A. He might know, yes.
19 In fact, I would say that I didn't
20 think there was one at that time. I think
21 that job was still undecided.
22 Q. What is your basis for that understanding?
23 A. Just my impression.
24 Q. Did you get the impression from someone?

63

1 A. Probably. I thought that project hadn't
2 been decided yet, was still an undecided
3 project.
4 Q. Did you ask if there were any existing or
5 outstanding POs currently issued on either
6 project?
7 A. No, I don't think I ever asked that.
8 Q. I don't recall if this has been marked as an
9 exhibit.
10 MS. FROHLICH: I don't think it
11 has.
12 MR. CURCIO: Mark this.
13 (Exhibit 103 marked
14 for identification.)
15 Q. Mr. Panora, please review what's been marked
16 as Exhibit 103 and identify it for us.
17 A. This would have been a report from our ARP
18 system showing how much money various people
19 owe us and how late overdue that money is.
20 Q. Is this something generated in the regular
21 course of doing business at Tecogen?
22 A. Yes.
23 Q. Does Tecogen rely on this information in its
24 regular course of business?

64

1 A. Yes.
2 Q. Do you see these reports, reports like this
3 print-out of Exhibit 103, on a regular
4 basis?
5 A. Yes.
6 Q. Is this a report in its entirety or just a
7 page of an accounts receivable report?
8 A. Honestly, I don't know, but, I believe, it's
9 just a part of a bigger report.
10 Q. Do you see the handwritten markings at the
11 top, arrows pointing to the Aegis back past
12 due payments?
13 A. Yes.
14 Q. One says, Boots Mill?
15 A. Yes.
16 Q. And point to the 49,901 value, and the other
17 is Boston Home and it points to the 71,282
18 value.
19 Do you see that?
20 A. Yes, I see that.
21 Q. Do you know what that means?
22 A. What does what mean? The handwriting part?
23 Q. Handwriting part.
24 A. Someone has identified the projects

65

1 associated with those overdue invoices,
2 overdue cash.
3 Q. At the time of this printout, on or about
4 April 25, 2005, do you know if Aegis was
5 paid by Boots Mill or Boston Home for the
6 work performed at those sites?
7 A. I have no idea, no. I wouldn't be aware of
8 that.
9 Q. To your knowledge, has Aegis ever received a
10 cogen earlier than the site required for the
11 cogen to be made available?
12 A. Perhaps sure, yes.
13 Q. Why would they do that?
14 A. They may have -- when they order a machine,
15 they are estimating when they need it and we
16 build it to a firm ship date. We may have
17 insisted that they take delivery and begin
18 the payment terms start date. That may have
19 been one reason.
20 We may have asked them to take
21 delivery to help us with, you know, with the
22 revenue target we were trying to hit
23 perhaps. Any of those reasons.
24 Q. It's possible that Aegis took units early

17 (Pages 62 to 65)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

| 66 | 68 |
|---|---|
| 1  for Tecogen to meet its sales quotas? | 1  the two cogens? |
| 2  A. It's possible. I don't know, but it's | 2  A. I assume so, yes. |
| 3  possible. | 3  Q. Was it an attempt to distinguish the two |
| 4  Q. You wouldn't be surprised to find out Aegis | 4  cogens to Tecogen's marketing advantage? |
| 5  did take indeed some units early to meet | 5  A. It was to try to tell the customer factually |
| 6  sales quotes for Tecogen? | 6  what the differences were. A number of |
| 7  A. I think, it's probably more they ordered the | 7  reasons. |
| 8  equipment and said we don't have a project | 8  That, plus we don't want people |
| 9  yet or a project isn't ready for it yet and | 9  putting out product that doesn't perform |
| 10  we would say you got to take it because it's | 10  properly or doesn't meet standards. That |
| 11  done. You ordered it for this date and you | 11  gives the whole industry a bad name. We |
| 12  can't just tell us not to take it. I don't | 12  wanted to make clear there wasn't something |
| 13  know. | 13  the customer didn't know. |
| 14  Q. Do you know if Boots Mill or Boston Home | 14  Q. Did Tecogen feel it had an advantage in |
| 15  were sites where Aegis might have had to | 15  certification of its unit over Aegis? |
| 16  take units early either at Tecogen's request | 16  A. Yes, we did. |
| 17  or otherwise? | 17  Q. Mr. Panora, I'd like to give you what's been |
| 18  A. No. | 18  previously marked as Exhibit 86. Please |
| 19      MS. FROHLICH: Objection. | 19  review and identify this for me. |
| 20  A. No, I don't. No idea. | 20      (Pause) |
| 21  Q. I'm going to give you what's been previously | 21  A. I can identify this as an e-mail from |
| 22  marked as Exhibit Number 85. I ask you to | 22  Jeffrey Glick to John Bailey that attaches a |
| 23  review and identify it. | 23  letter that I wrote to Mr. Garuchio about |
| 24  A. This is two e-mails; one from John Bailey to | 24  the Auburn School. |

| 67 | 69 |
|---|---|
| 1  Brian Willemsen. I believe, they are both | 1  Q. Is this the letter that Mr. Glick was |
| 2  working for R.L. Kistler. And a follow-up | 2  referring to in the previous exhibit? |
| 3  e-mail by Jeff Glick to me and Wes Schuster | 3  A. I believe so, yes. |
| 4  regarding the Auburn High School project. | 4  Q. Go to the letter, page T0121. Last |
| 5  Q. You see the second sentence that Mr. Glick | 5  paragraph on the first page of this letter |
| 6  wrote, "it sounds like we might need to | 6  reads, "The Tecogen CM-75 has also been |
| 7  start sending Mr. Garuchio a few letters | 7  certified for safe interconnection to |
| 8  about the safety issues?" | 8  utility electric system by three standards: |
| 9  A. Yes, I see that. | 9  A; Institute For Electric and Electronic |
| 10  Q. Did I read that correctly? | 10  Engineers (IEEE). P157/D07. B; New York |
| 11  A. Yes. | 11  State interconnect requirement (NYSIR). |
| 12  Q. What were the safety issues? | 12  C; California Electrical Rule 21." |
| 13  A. I don't know what he means specifically. I | 13      Do you see that sentence? |
| 14  can speculate he may not really mean safety, | 14  A. Yes. |
| 15  he may really mean certification issues and | 15  Q. Did I read it correctly? |
| 16  is using clumsy wording. | 16  A. Yes, you did. |
| 17  Q. Were these letters -- strike that. | 17  Q. Is P1547 a requirement for a system or a |
| 18      Why did Mr. Glick recommend sending | 18  component level? |
| 19  letters on safety or certification issues? | 19  A. System. |
| 20  A. I think, he's talking about making the | 20  Q. Can a cogen meet P1547 by using a utility |
| 21  customer aware what the differences are | 21  grade relay in its configuration? |
| 22  between our machine and the Aegis machine | 22  A. I don't believe so. Can't meet the |
| 23  regarding certification. | 23  anti-alanyl requirement. |
| 24  Q. Was this an attempt to distinguish between | 24  Q. Explain what that is. |

18 (Pages 66 to 69)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

70

1  A.  One of the key issues in cogeneration is, if
2      a machine is operating a building, supplying
3      electricity to the building, and it's also
4      sharing the same wiring as the electrical
5      utility that is supplying to a parallel
6      building as well, if there is an outage, the
7      utility wireman had safely disconnected that
8      part of the street from the utility so he
9      could work on that line section. There is a
10     potential for a cogeneration machine to feed
11     electricity to those wires from a different
12     direction, from the building side, and that
13     could cause electrocution hazard to the
14     lineman.
15         To pass 1547, you must meet an
16     anti-alanyl requirement that basically
17     proves that the machine, if it ever gets
18     caught in an idle situation, that it would
19     safely shut down and not impose
20     electrocution hazards to the lineman.
21  Q.  Do you know if the Aegis cogen meets that
22     requirement?
23         MS. FROHLICH: Objection.
24  A.  I don't.

71

1          MS. FROHLICH: Can we get a point
2      in time.
3  Q.  At the time of the writing of this letter,
4      July 21, 2005.
5  A.  I believe it did not.
6  Q.  How did you know that?
7  A.  Because it wasn't listed as being certified
8      on the UL website or any other websites we
9      checked.
10         I believe, I also spoke to UL to
11     see if there was any Aegis machine that
12     hadn't made it to the website that was
13     certified but just hadn't gotten around to
14     it.
15  Q.  The requirement for New York State
16     interconnect, at the time of the writing of
17     this letter, do you know if Aegis met that
18     requirement?
19  A.  I only knew that they were not listed. I
20     didn't know if they were or not, but I
21     suspected they were not, but didn't know for
22     sure.
23  Q.  Is California Electrical Rule 21 a
24     requirement for New York State?

72

1  A.  I believe, if you're certified in California
2      you can use that certification to become
3      certified in UL.
4  Q.  Does New York State require certification
5      under California Rule 21?
6  A.  No. But they say if you're certified under
7      California Rule 21, that's, in essence, good
8      enough for us, we'll accept you.
9  Q.  Second page of the letter, D0122, last
10     paragraph. You state, "I urge the Auburn
11     and large city school districts to be wary
12     of accepting an uncertified appliance for
13     installation into its customers' facilities
14     especially when there is no economic
15     incentive to do so."
16         Do you see that?
17  A.  Yes.
18  Q.  Did I read it correctly?
19  A.  Yes.
20  Q.  What is the uncertified appliance you were
21     referring to?
22  A.  Aegen module.
23  Q.  In what regards was it uncertified?
24  A.  It had no certification for safety by

73

1      nationally recognized to a national standard
2      for a complete appliance.
3          What I'm really saying in this
4      letter is that you should check to see that
5      it is. And they have to do their own due
6      diligence to find out if it is, but they
7      shouldn't accept it if it's not.
8  Q.  If Aegis used a utility grade relay in its
9      configuration, isn't it true it would meet
10     the New York State interconnect requirement
11     specification?
12  A.  I don't know. I don't know.
13  Q.  Before you wrote this letter, did you check
14     to see if Aegis in any way or form could
15     have met the New York State requirement with
16     the public utility grade relay?
17         MS. FROHLICH: Objection.
18  A.  I cannot -- if they met it, it's not the
19     same as having been certified as so. Just
20     to say you could get that certification you
21     wanted is not the same as getting it. Big
22     difference.
23  Q.  Do you know if New York State allows the
24     introduction of a utility grade relay as a

19 (Pages 70 to 73)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

74

1    way to meet that requirement?
2    A.  I don't believe they have any process for
3    doing that. They will only say something is
4    certified. If it's not certified, I think,
5    they don't comment on it.
6    Q.  If the California Electric Rule 21 is not
7    required by New York State, why did you
8    bring it up in your letter?
9    A.  It was one of the certifications we had.
10    And if you actually look at what that means,
11    that means it meets IEEE that I'm
12    referencing as well. It encompasses all
13    those international and national standards
14    that are underneath.
15    Q.  Say the last part again.
16    A.  By saying we are certified under Rule 21,
17    that is also saying that we are certified to
18    all the components of Rule 21, which is all
19    those IEEE standards that you see on the
20    table.
21    Q.  Mr. Panora, I'm going to give you what's
22    been previously marked as Exhibit 87.
23    Please review and identify it.
24    A.  This is a fax from Jeff Glick to Chris Cafer

75

1    of Energy Concepts providing technical
2    detail as to our equipment.
3    Q.  I call your attention to the third paragraph
4    of this fax. "Hopefully this same package
5    will be enough to allow the Lakeland CSD
6    units to be installed without the additional
7    utility relay protection packages."
8        Do you see that sentence?
9    A.  Yes.
10    Q.  Did I read it correctly?
11    A.  Yes.
12    Q.  Why would you want to install a cogen
13    without a utility relay protection?
14    A.  Because it's redundant. It's not necessary.
15    If you're certified, it means you're as good
16    as having that or better. In fact, you're
17    actually better than having the utility
18    relay. Utility relay can be disconnected at
19    any time. If the equipment itself is
20    certified, there's no way of bypassing it.
21    It's always in place forever and ever. The
22    machine will not run without it. Far
23    better, far safer system.
24    Q.  Is it possible to meet the requirements of

76

1    the Lakeland project by having the utility
2    relay protection in the configuration?
3    A.  Which requirement?
4    Q.  Let me rephrase it.
5        What is a utility relay protection?
6    A.  It's designed to protect the utility
7    satisfaction that you will not, your machine
8    will not damage the utility system, the
9    wires and so forth, nor hurt one of the
10    lineman.
11    Q.  Is this requirement done in relation to one
12    of the requirements we spoke about earlier,
13    the NYSIR or the IEEE P1547?
14    A.  Repeat that.
15        MR. CURCIO:  Read it back.
16        (Court Reporter read back
17        last question.)
18    A.  The requirement is for. Utility grade relay
19    is made by the specific utility you're
20    interconnecting to. It has nothing to do
21    necessarily with what the New York State
22    people have on their website that you're
23    certified. The utility has the discretion
24    of saying, if you're certified in New York,

77

1    I will accept your machine as is. Or if
2    they like, if they want, they can ask you to
3    put additional safety protections or
4    redundant safety protection. It's generally
5    their discretion. But by being certified
6    and being listed, many utilities will accept
7    that as sufficient protection.
8    Q.  Was it possible, under the scenario that Mr.
9    Glick was proposing to Mr. Cafer, to use the
10    utility relay in the configuration for
11    Lakeland?
12        MS. FROHLICH:  Objection.
13    A.  Repeat that again.
14        (Court Reporter read back
15        last question.)
16        MS. FROHLICH:  I don't think he is
17    proposing that in this exhibit. That's my
18    objection.
19    Q.  I will rephrase it.
20        Mr. Glick writes that the same
21    package hopefully will be enough to allow
22    the Lakeland units to be installed without
23    the addition of a relay. It appears that a
24    utility relay was originally in the design

20 (Pages 74 to 77)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

78

1    and what is being offered is a way not to
2    have to use a utility relay package.
3        Am I misunderstanding Mr. Glick's
4    letter?
5        MS. FROHLICH:  Objection to the
6    form of the question.
7    A.  I think you may be misunderstanding.
8    Q.  Was Tecogen attempting to not use a utility
9    relay in configuration that it was offering
10    to Mr. Cafer?
11        MS. FROHLICH:  Objection.
12    A.  What we were saying was, if you are in the
13    process of doing the design, I don't think
14    the design is complete at this point, but I
15    may be wrong.  If you're designing with our
16    equipment you don't have to use a utility
17    relay in most cases, but it's still the
18    engineer's responsibility to communicate
19    with the electric utility and determine what
20    they will require.  In general, our
21    equipment they don't require is what Jeff is
22    saying.  You don't have to worry about that.
23    Q.  Other equipment may require?
24    A.  Exactly.

79

1    Q.  When would the other equipment require a
2    utility grade relay?
3    A.  If it was not certified, it would almost
4    certainly require that, I think.
5    Q.  Would an uncertified unit that used utility
6    grade relay meet Mr. Cafer's requirements?
7        MS. FROHLICH:  Objection.
8    A.  It's not Mr. Cafer's requirement, it's the
9    utility requirement.  That's at the
10    discretion of the utility.  They are not
11    consistent always on what they require.  If
12    you have a certified machine that they have
13    seen before, they will probably be
14    consistent.
15    Q.  When you wrote your letter of July 21, 2005
16    to Mr. Garuchio of the Auburn School
17    District, did you mention to Mr. Garuchio
18    that there were other ways to have systems
19    in place and in use safely that did not need
20    to be certified to the requirements you
21    stated in your letter?
22        MS. FROHLICH:  Objection.
23    A.  I did not point that out to them because
24    that's not true.

80

1    Q.  Why is it not true?
2    A.  Because there's not truly a way to be as
3    good as being certified.  You're only
4    talking about one type of certification.
5    You're talking about the electric utility
6    interconnection part, and there's whole
7    safety issue that involves the safety of the
8    machine itself which there's no real
9    substitute to being certified.
10    Q.  Mr. Panora, I'm going to give you what's
11    been previously marked as Exhibit Number 88.
12    A.  This is an e-mail from, begins with Brian --
13    I'm sorry -- from Gary at Chemung to Brian
14    Willemsen our rep asking for a letter that
15    went to Mr. Paige.  Jeff is writing, sorry,
16    Brian is writing to Jeff asking him
17    basically to send a copy of the letter to
18    Gary.  I think that's what it is.
19        After that, Jeff is sending an
20    e-mail to Gary at Chemung saying, here is a
21    copy of the letter, with the letter
22    attached.
23    Q.  And the beginning of page T0197, that would
24    be the referenced letter?

81

1    A.  Yes.
2    Q.  Did you write that letter?
3    A.  Yes, I did.
4    Q.  Isn't this letter similar to the letter
5    written to Mr. Garuchio?
6    A.  Yes.
7    Q.  At the time you wrote this letter, July 18,
8    2005, were you or anyone else at Tecogen
9    aware that Aegis had already received a
10    purchase order for Chemung County?
11    A.  I was not.  I can't speak for others, but I
12    was not.
13    Q.  Was there any knowledge in the company that
14    a purchase order may have already been
15    awarded for that project?
16    A.  I don't know.  I honestly don't know.
17    Q.  Did you ask anyone whether or not a purchase
18    order had already been awarded for that
19    project?
20    A.  I think, I was under the impression, there
21    was no purchase order yet; or if there was,
22    it was not a, no final decision had been
23    made as to who to buy this machine from.
24    Q.  What did you base that assumption on?

21 (Pages 78 to 81)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

**82**

1   A.   The fact that the salesmen, Wes and Jeff,
2        were still involved in pricing negotiations
3        and pricing with the people.
4   Q.   Were Mr. Glick and Mr. Schuster engaged in
5        pricing negotiations for the Lakeland
6        project after there was knowledge that Aegis
7        had a PO for the Lakeland project?
8   A.   I don't know that they had a PO, so I can't
9        answer that. We assumed that they did, but
10       I don't know that they did. I think, it's
11       very likely if they did a PO it was
12       contingent on something to make it real.
13  Q.   Has Aegis ever submitted a purchase order to
14       you without having been awarded a purchase
15       order from a mechanical contractor, to your
16       knowledge?
17  A.   I have no knowledge of that, no.
18  Q.   Does anyone at Tecogen have any knowledge
19       that Aegis had supplied to them a purchase
20       order for purchasing Tecogen cogens that was
21       not predicated on Aegis receiving a purchase
22       order from a mechanical contractor?
23  A.   We have no knowledge of what contracts Aegis
24       has with its customers. We have never seen

**83**

1        them, as far as I know. So that could have
2        been done a lot or never, I have no idea.
3   Q.   Did Tecogen ever request from Aegis
4        confirmation that they had received a
5        purchase order prior to accepting or denying
6        a purchase order from Aegis to Tecogen for
7        cogens?
8   A.   Not to my knowledge.
9   Q.   So you don't know if a purchase order was
10       awarded at either Lakeland or Chemung County
11       when you wrote your letters on
12       certification?
13  A.   I cannot recall. I cannot recall. I may
14       have known or may not have known. If there
15       was a purchase order, I didn't see it. I
16       never saw any documents that Aegis had with
17       its customer. I think, I only considered
18       those projects as being still undecided in
19       terms of what the real situation was.
20       Whether there was a piece of paper between
21       Aegis or not was not really relevant. It
22       was that there was not a final decision made
23       in my opinion. There appeared to be no
24       final decision made.

**84**

1   Q.   These certification letters, the ones
2        written to Mr. Paige of Chemung and Mr.
3        Garuchio, put into question the
4        certification of the Aegis cogens?
5        MS. FROHLICH: Objection.
6   A.   What I did was, I said, these are what my
7        company has done for our product. I was
8        cautioning the Aegis equipment, potential
9        buyers of the Aegis equipment to do their
10       due diligence to determine what Aegis has in
11       way of certifications, if anything. That's
12       what I was basically saying.
13  Q.   You state, "I urge you to be wary of
14       accepting uncertified appliance for
15       installation." Correct?
16  A.   Correct.
17  Q.   Were you implying that the Aegis unit was an
18       uncertified appliance for installation?
19  A.   I was telling the customer to be sure it is
20       before accepting it. And only Aegis could
21       answer that question with 100 percent
22       certainty.
23  Q.   What did the -- strike that.
24       What did Mr. Paige of Chemung

**85**

1        County -- strike that.
2        Did Mr. Paige of Chemung County
3        respond to your letter of July 18th?
4   A.   I don't recall. I honestly do not recall.
5   Q.   Did Mr. Paige or any other representative of
6        Chemung County have further discussion with
7        Tecogen regarding the content of your
8        July 18th letter?
9   A.   I don't recall.
10  Q.   Did Tecogen use this letter as a way to
11       highlight a perceived deficiency in the
12       Aegis cogen to Aegis' prospective customers?
13       MS. FROHLICH: Objection.
14  A.   We were only telling our customer to check
15       to be sure that they were getting equivalent
16       product relevant to certifications. And
17       that, to our knowledge, we had all these
18       certifications and Aegis may or may not have
19       had them, but to definitely check them
20       before you accept that order.
21  Q.   Were you certain about the voracity of all
22       the statements made in your letter to Mr.
23       Paige?
24  A.   Can you be more specific?

22 (Pages 82 to 85)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

|  | 86 |
|---|---|
| 1 | Q.  To your knowledge, are you certain that the |
| 2 | Aegis cogen did not meet the requirement for |
| 3 | IEEE P1547 at the time you wrote the |
| 4 | July 18th letter? |
| 5 | MS. FROHLICH:  Objection.  Is there |
| 6 | a particular sentence that you're looking |
| 7 | at, or are you characterizing the letter |
| 8 | itself? |
| 9 | MR. CURCIO:  That's a good |
| 10 | objection.  I will rephrase and, I think, I |
| 11 | can fix that. |
| 12 | Q.  Mr. Panora, when you urged Mr. Paige of |
| 13 | Chemung County of accepting an uncertified |
| 14 | appliance, were you implying that the Aegis |
| 15 | cogen did not meet IEEE P1547? |
| 16 | MS. FROHLICH:  Objection. |
| 17 | A.  No.  I was implying it may not and they |
| 18 | should check with Aegis to be sure. |
| 19 | Q.  Were you implying when you wrote that |
| 20 | statement that the Aegis cogen may not meet |
| 21 | the New York State interconnect requirement? |
| 22 | A.  I was implying it was not listed and |
| 23 | therefore may not have been properly |
| 24 | processed. |

|  | 87 |
|---|---|
| 1 | Q.  Do you have any knowledge of what Chemung |
| 2 | County did with this information? |
| 3 | A.  Not specifically anymore.  If I did, I don't |
| 4 | recall.  I know we got the order eventually, |
| 5 | but I don't know what the internal process |
| 6 | happened within Chemung's facility. |
| 7 | Q.  Isn't it true that they cancelled the |
| 8 | purchase order to Aegis? |
| 9 | MS. FROHLICH:  Objection. |
| 10 | A.  I don't know.  Again, I don't know if there |
| 11 | was a purchase order, I don't know. |
| 12 | Q.  Are you aware of any meeting that Chemung |
| 13 | County may have had regarding the subject |
| 14 | matter of this letter with any Tecogen |
| 15 | representative? |
| 16 | MS. FROHLICH:  Objection. |
| 17 | A.  I don't recall.  I don't recall. |
| 18 | Q.  Did Tecogen have any further conversations |
| 19 | with Chemung County after July 18, 2005 |
| 20 | regarding the subject content of the |
| 21 | July 18th letter? |
| 22 | A.  I don't recall. |
| 23 | (Exhibit 104 marked |
| 24 | for identification.) |

|  | 88 |
|---|---|
| 1 | MR. CURCIO:  Counsel, this letter |
| 2 | was supplied to us by Tecogen.  If you |
| 3 | notice, there's no Bates number on it.  I |
| 4 | believe, this was supplied in response to an |
| 5 | interrogatory, that's why there's no Bates |
| 6 | number on it. |
| 7 | Q.  Mr. Panora, I'm going to ask you to review |
| 8 | and identify what's been marked as Exhibit |
| 9 | Number 104. |
| 10 | A.  It's a letter to Jean Roy, an engineer at |
| 11 | Tecogen, from Michael Murphy at ITS, |
| 12 | InterTech Services, regarding the services |
| 13 | that are cogeneration products. |
| 14 | Q.  This letter was given to us in response to a |
| 15 | request for information regarding |
| 16 | certifications of Tecogen.  Does this cover |
| 17 | the Tecogen units that were originally bid |
| 18 | for the Lakeland projects? |
| 19 | MS. FROHLICH:  Objection. |
| 20 | Originally bid by whom? |
| 21 | Q.  Let's back up.  Strike that question. |
| 22 | In your letter to Mr. Paige, you |
| 23 | refer to IEEE P 1547, NYSIR and California |
| 24 | Rule 21, correct? |

|  | 89 |
|---|---|
| 1 | A.  Correct. |
| 2 | Q.  Does this letter confirm the certification |
| 3 | of Tecogen cogens to those requirements? |
| 4 | A.  It references them, but I'm not sure what |
| 5 | the real message in this letter is here. |
| 6 | I'm not sure what it means.  It may just be |
| 7 | some sort of modification to our file.  I |
| 8 | don't know what it is exactly.  I don't |
| 9 | know.  Jean Roy would know. |
| 10 | Q.  At the time you wrote the certification |
| 11 | letters, Mr. Paige's letter, Mr. Garuchio's |
| 12 | letter, later on we'll show that you wrote |
| 13 | the same type of letter to Mr. Brock, were |
| 14 | the Tecogen low emissions units certified to |
| 15 | the requirements for P1547 and NYSIR? |
| 16 | A.  I believe so. |
| 17 | Q.  To your knowledge, do you have any |
| 18 | supporting documentation at Tecogen that |
| 19 | would show that the low emission units were |
| 20 | certified as well at the time of the writing |
| 21 | of the letters to Mr. Paige and Mr. |
| 22 | Garuchio? |
| 23 | A.  I'm not sure why there would be a |
| 24 | distinction between low emission and a |

23 (Pages 86 to 89)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

90

1   regular machine as far as these
2   certifications go. I don't think there is,
3   but I don't know.
4   Q.  If there is a distinction and those machines
5       do require separate certification, would
6       Tecogen have documentation to show that?
7   A.  I am quite certain that the Rule 21 was made
8       for low emission machine. It was based on
9       low emission machine. As such, 1547, which
10      is a requirement for Rule 21, would have
11      been based on low emission machines. The
12      whole process was done for a low emissions
13      machine day one. Whether or not there was
14      some paperwork that had to clarify that, I
15      don't know.
16          But the original certification we
17      got for our products was entirely driven by
18      Rule 21 in California and it was entirely
19      100 percent low emission product sold in
20      California. Everything we did regarding
21      certification that would have been the
22      basis. I'm not sure what this paperwork is
23      trying to clarify or straighten out.
24          When I went to California to get

91

1   the certification, it was for a low emission
2   machine. That was my mission and that's
3   what I accomplished.
4   Q.  Just to be clear. That would be for the
5       California Electrical 21?
6   A.  Yes.
7   Q.  What about IEEE P1547?
8   A.  In order to get California Rule 21, a
9       requirement is the P1547. So you do that
10      first then you give that document to the
11      California committee and they give you the
12      Rule 21 certification. So one is a
13      requirement of the other.
14  Q.  What about the NYSIR?
15  A.  I'm not as familiar with that requirement
16      so, I think, Jean Roy would be better to
17      answer that. I am directly involved in the
18      Rule 21 so I know that quite well.
19  Q.  Is it your understanding that Tecogen low
20      emissions were certified for the three
21      requirements we just spoke of?
22  A.  I believe so. I mean, that was the whole
23      way it was done. It was done based on a low
24      emission product being certified in

92

1   California.
2   Q.  What about the AGA standard, was that also
3       -- start again. Strike that.
4           Was the low emissions Tecogen
5       module also certified for the AGA standards?
6   A.  The way AGA standard works is that we went
7       through a very extensive testing in the
8       beginning, for the first product that
9       existed in that era, and then when the
10      product was changed, evolved over time, you
11      would provide documentation to ITS to enable
12      them to certify the next revision of the
13      product. That was a continuous process.
14          As far as where we were in time, I
15      believe, that we never not had product,
16      cogen product leave our factory without that
17      sticker on it, which means we must
18      continuously comply with that, I think. And
19      we were visited every 90 days by these folks
20      and they check to see what's going on to
21      make sure paperwork is being kept up.
22          I believe, that would have been the
23      case. Jean Roy, again, is the expert on
24      that. I know of no product that ever left

93

1   without that sticker.
2   Q.  Isn't it true that AGA standard is obsolete?
3   A.  Currently it is obsolete. But it is still
4       recognized by ITS, and they've told us at
5       some point we'll have to use a newer
6       standard at some point.
7   Q.  Mr. Panora, I'm going to ask you to review
8       and identify what's been previously marked
9       as exhibit -- strike that.
10          (Exhibit 105 marked
11          for identification.)
12  Q.  Mr. Panora, I'm going to ask you that you
13      review what's been identified as
14      Exhibit 105?
15  A.  This is a letter I wrote to Mr. Brock of
16      Atlantic Energy Services about the Tecogen
17      product and its certification.
18  Q.  Is this letter similar to the letter you
19      wrote to Mr. Paige and Mr. Garuchio
20      regarding the certification issues?
21  A.  Yes.
22  Q.  Did you write this letter after Tecogen had
23      proposed 25 units to replace the 11 units at
24      Lakeland and the four units at Chemung

24 (Pages 90 to 93)

Case 1:05-cv-11823-RCL    Document 43-7    Filed 07/14/2008    Page 19 of 24
Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

94

1      **County to Atlantic Energy?**
2              MS. FROHLICH:  Objection.
3      A.  You said after I had.  Do you mean the
4          company Tecogen had?
5      **Q.  Yes.**
6      A.  I'm trying to think of the sequence of
7          events here.  I believe that to be true.
8      **Q.  Did you have any discussions or did anyone**
9          **else -- did you have any discussions with**
10         **Mr. Brock or anyone else at Atlantic Energy**
11         **regarding the contents of your July 11th**
12         **letter?**
13     A.  I don't believe I've ever talked to Mr.
14         Brock.
15     **Q.  To your knowledge, did anyone at Tecogen**
16         **have discussions with Mr. Brock concerning**
17         **the contents of your July 11th letter?**
18     A.  Not to my knowledge.  Could have, but I
19         don't know of anything specific.
20     **Q.  Is Tecogen aware of any response that**
21         **Atlantic Energy took with respect to the**
22         **July 11, 2005 letter?**
23     A.  Response to who?  To Tecogen or third-party?
24     **Q.  To Tecogen.**

95

1      A.  I'm not the best person to answer that.  I
2          am not aware.  Jeff Glick or Wes may know.
3      **Q.  And the follow-up to a third-party?**
4      A.  I'm not aware of anything.  But, again, Jeff
5          Glick or Wes may know something.
6              (Exhibit 106 marked
7              for identification.)
8      **Q.  Mr. Panora, I'm going to ask you to review**
9          **and identify what's been marked as Exhibit**
10         **Number 106.**
11     A.  It's a letter from me to Superintendent
12         Connolly at the Lakeland School District.
13     **Q.  Did you write this letter?**
14     A.  Yes.
15     **Q.  Did you send this letter?**
16         **I call your attention to the third**
17         **paragraph of the letter.  The second**
18         **sentence reads, "I urge you not to accept**
19         **this 11-hour switch to a new uncertified**
20         **product for your school project - one that**
21         **does not meet the approved specification -**
22         **particularly if the major reason is economic**
23         **benefit to the contractor."**
24             **Did I read that correctly?**

96

1      A.  Yes.
2      **Q.  What did you mean by "11-hour switch?"**
3      A.  11-hour switch means that the customer, the
4          project had been worked on for many years by
5          Tecogen, as you may know, and we were
6          specified by the engineering firm as the
7          product to be used by the contractor.  At
8          the very last minute, very late stage in the
9          product, eleventh hour, if you will, the
10         product was switched to something else by
11         the contractor; namely, an Aegen unit.
12         That's what I meant by "11-hour switch."
13     **Q.  At the time you wrote this letter, July 21,**
14         **2005, Tecogen had proposed to Atlantic**
15         **25 units of which 11 included Lakeland and**
16         **four including Chemung County, correct?**
17             MS. FROHLICH:  Objection.
18     A.  I believe that's true.
19     **Q.  Was Tecogen seeking to replace the cogens**
20         **that Aegis was offering for the Lakeland**
21         **project with Tecogen's supplied cogens for**
22         **the Lakeland project?**
23     A.  We were seeking to keep what we had already
24         thought we had, which is a project that we

97

1          worked on for a long time, to establish us
2          for the basis of the project.  And we were
3          trying to maintain that position and not
4          lose it.
5      **Q.  You state in that sentence I read, "A new**
6          **uncertified product for your school**
7          **project."**
8              **What did you mean by "uncertified?"**
9      A.  I think, at the time I wrote this letter, I
10         had done a lot of investigating, not just on
11         the websites, but, as I said, I called the
12         UL folks and talked to the right people and
13         they said there was no application in
14         process by Aegis for a certification to UL
15         1547 or IEEE 1547.
16     **Q.  Did you feel you did enough due diligence to**
17         **call the Aegis cogen uncertified?**
18     A.  Yes.  It's really one person.  UL.
19     **Q.  What did you mean that the Aegen cogen does**
20         **not meet the approved specification?**
21     A.  If you look at the specification, that was
22         provided to the contractor, I didn't believe
23         it met that specification.
24     **Q.  Who determines the specifications for the**

25 (Pages 94 to 97)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

98

1    cogen on the Lakeland project?
2        MS. FROHLICH:  Objection.
3    A.  What do you mean by "determined?"  Who
4    writes it?
5    Q.  Who writes it.
6    A.  I believe, the engineering company writes
7    it.
8    Q.  Would that be Energy Concepts -- I'm not
9    sure where they are?
10   A.  I think, it's Energy Concepts.  They are the
11   engineer on Lakeland.  If that's the name of
12   the company, yes.
13   Q.  Does the name Chris Cafer of Energy Concepts
14   Engineering sound familiar as the engineer
15   for the Lakeland project?
16   A.  Yes.  We have been talking about him today,
17   and, I think, Energy Concepts was the
18   company.  I don't know what he did in the
19   project.  He may have been in another
20   aspect, but yes.
21   Q.  If a product other than what was specified
22   by Energy Concepts is to be used, is it the
23   engineering firm, Energy Concepts, the one
24   who decides whether or not to use that

99

1    project?
2    A.  I can't say because I don't know what the
3    contractual arrangements were between all
4    the parties.  If the engineering company was
5    working directly for the customer then
6    that's possible.  There's no conflict of
7    interest.  But if they had been hired by the
8    Atlantic Energy folks that could be
9    construed as a conflict of interest in that
10   regard.
11       Without knowing how all the
12   parties, who was working for who, it's
13   difficult to say.
14   Q.  Why did you CC Mr. Cafer on this letter?
15   A.  I don't recall.  I think it was just a
16   courtesy, but I don't recall.
17   Q.  Did you have any discussions with Energy
18   Concepts concerning the content of this
19   letter?
20   A.  I don't recall.  I doubt it.  I know I have
21   never spoken to Chris.  I don't recall any
22   conversations I've had with them other than
23   written correspondence that you see here.
24   Jeff Glick may have, but I did not.  And Wes

100

1    may have.
2    Q.  We broke up an exhibit yesterday into two
3    and we'll do the same here.
4        MR. CURCIO:  Counsel, I don't know
5    what exhibit number this is.  Can you please
6    check.  I believe it might be 91 or 92 or
7    93.
8        MS. FROHLICH:  I've got 93.
9        MR. CURCIO:  Okay.
10   Q.  Mr. Panora, I'm going to give you what's
11   been previously marked as Exhibit 93 and ask
12   that you review it and identify it?
13   A.  It's an e-mail from Ray Hickey to Jim
14   Casabonne at Atlantic Energy Services
15   regarding pricing of Tecogen units for
16   Chemung County, I believe.
17   Q.  Did Tecogen receive a copy of this e-mail?
18   A.  Mr. Hickey you mean?
19   Q.  The first question is, did Tecogen receive a
20   copy of this e-mail?
21   A.  I don't know.  I assume we did, but I don't
22   know.
23   Q.  Would Mr. Glick be in a position to know?
24   A.  Of course, yes.

101

1    Q.  Why was Tecogen trying to obtain Aegis'
2    quote for the Chemung County?
3    A.  I wasn't directly involved so I don't know.
4    It appears that we are trying to price it
5    attractively for the customer.  That is part
6    of the data that he's asking for here is
7    what was the scope of what Aegis was
8    supplying and so forth so we can try and
9    better their price, looks like to me.  But,
10   again, this would be Jeff Glick and Wes.
11   Q.  Does Tecogen generally ask for the
12   quotations from its competitors?
13   A.  Generally, I don't know.  I'm sure it
14   happens, but I don't know if it's a general.
15   It could happen, I'm not sure.
16   Q.  Do you know if this was a sealed bid
17   project?
18   A.  No, I don't.
19   Q.  If it was a sealed bid project, would
20   Tecogen have asked for the quotations of its
21   competitors?
22       MS. FROHLICH:  Objection.
23   A.  I have no idea; no idea.
24   Q.  Mr. Panora, I'm going to give you what's

26 (Pages 98 to 101)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

118

1  this directly.
2  Q.  Does Tecogen have a sales representation
3      agreement with their sales reps?
4  A.  Some yes; some no.  You mean formal written
5      agreements?
6  Q.  Yes.
7  A.  Some yes; some no.
8  Q.  I point your attention to paragraph 2.
9      Second sentence.  "Tecogen has offered an
10     exclusive sales representation agreement for
11     Massachusetts and Connecticut."
12         Do you see that?
13  A.  Yes.
14  Q.  Did I read it correctly?
15  A.  Yes.
16  Q.  What does exclusive sales representation
17      agreement mean?
18         MS. FROHLICH:  Can I ask whether
19      you're asking what it means here or if he
20      has a general understanding?
21         MR. CURCIO:  Thank you.  What it
22      means here in this letter.
23  A.  I can't say for certain because I did not
24      write the letter, and I'm looking at it now

119

1  for the first time not recalling it from
2  before.  What I would say is, it means that
3  any machine that would be sold in those
4  states, cogeneration machine, would have to
5  be purchased from Aegis by any customer.  I
6  think that's the meaning of it.
7         MR. CURCIO:  I'm going to ask you
8  to read back the answer.
9         (Court Reporter read back
10         last answer.)
11  Q.  Do you mean purchased from Aegis?
12  A.  Correct.  In other words, if a customer
13      wanted to buy a cogeneration machine, the
14      purchase would be made to Aegis.  We would
15      sell the machine to Aegis and Aegis in turn
16      would resell it.  That's what I think it
17      means.
18  Q.  To your knowledge, did Aegis sign the
19      agreement?
20  A.  I believe they did not.
21  Q.  Does anybody else at Tecogen -- strike that.
22         Does Tecogen keep a copy of the
23      sales representation agreements that are
24      signed?

120

1  A.  Yes, we have.  We do.
2  Q.  If Aegis had signed the agreement, would
3      Tecogen have a copy of it?
4  A.  We should, yes.
5  Q.  Mr. Panora, I'm going to give you what was
6      previously marked as Exhibit Number 7.
7      Please review it and identify it for me.
8  A.  This is a sales rep agreement between
9      Tecogen and Aegis that appears to be dated
10     1993.  It's dated 1993.
11  Q.  Did you ever see this sales representation
12      agreement before?
13  A.  No.  I must say, I haven't.
14  Q.  To your knowledge, did Aegis sign this sales
15      representation agreement?
16  A.  To my knowledge, they did not.
17  Q.  To your knowledge, did Aegis ever sign a
18      sales representation agreement?
19  A.  Not to my knowledge.
20  Q.  Can you identify for us who ADG is?
21  A.  ADG is a company that was started by
22      Tecogen's owners approximately five years
23      ago perhaps, five or six years ago.
24         It was actually, the parent company

121

1  of Tecogen was called American Distributor
2  Generation, Inc.  They bought the company
3  with two operating units; one being Tecogen
4  and one being American DG.
5  Q.  You mentioned that's when this was bought,
6      when Tecogen was bought by American
7      Distributor Generation, Inc. and they bought
8      essentially Tecogen and ADG?
9  A.  Not quite.  They bought Tecogen, then within
10     some time afterwards reorganized it such
11     that it had a parent, a shell called
12     American Distributor Generation.  No
13     employees really.  A few operating units and
14     one of them was this newly formed American
15     DG.
16  Q.  I'm going to refer to the operating unit as
17      ADG.
18  A.  That's fine, sure.
19  Q.  Where is ADG?
20  A.  Where are they incorporated?
21  Q.  Where are they located?
22  A.  They are located at 45 First Ave, Waltham,
23      Mass.
24  Q.  Same building as Tecogen?

31 (Pages 118 to 121)

Case 1:05-cv-11823-RCL    Document 43-7    Filed 07/14/2008    Page 22 of 24
Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

122

1   A.   Same building as Tecogen.
2   Q.   Is there a relationship between Tecogen and
3        ADG that is -- strike that.
4             Does ADG sell cogens?
5   A.   That's not their principal business, no.
6        Their principal business is to sell energy.
7   Q.   Does ADG buy cogens and own and operate them
8        for project sites?
9   A.   Correct, yes.
10  Q.   When did ADG start buying cogens to own and
11       operate them for various project sites?
12  A.   I can't say precisely. Would you like me to
13       just approximate it?
14  Q.   To the extent you have knowledge.
15  A.   I believe, it's probably three years ago,
16       approximately.
17  Q.   Around 2004?
18  A.   Yes, I think that's about right.
19  Q.   To your knowledge, has ADG bought cogens for
20       project sites in New York?
21  A.   New York State or New York City?
22  Q.   New York State.
23  A.   Yes, they have.
24  Q.   Have they done the same for Connecticut?

123

1   A.   Not to my knowledge. I don't think they
2        have in Connecticut, but I could be wrong.
3   Q.   Have they been the same for Massachusetts?
4   A.   I'm not aware of any Massachusetts sites,
5        but I could be wrong. I don't remember any.
6   Q.   Would Mr. Glick be in a position to know if
7        ADG had bought cogens for sites in
8        Connecticut and Massachusetts?
9   A.   Yes.
10  Q.   And New York?
11  A.   And I should go back and say that they have
12       recently bought them in the last few months.
13       I'm aware now that I thought about it. But
14       going back, I'm aware of one or two in
15       Massachusetts that may not have been shipped
16       yet but they were bought.
17  Q.   Are you aware of any efforts on ADG to own
18       and operate cogens for a site called the
19       Falls At Cordingly Damn?
20  A.   That does not ring a bell.
21  Q.   How about for a site called Double Tree in
22       Massachusetts?
23  A.   Yes, I'm aware of that.
24  Q.   How about a site called Haverhill Pentacook

124

1        in Massachusetts?
2   A.   I'm not aware of that.
3   Q.   Would Mr. Glick be the one who would be
4        aware of that?
5   A.   Yes.
6   Q.   Would Mr. Glick be the one to know whether
7        or not ADG had a presence at any other sites
8        in Connecticut or Massachusetts?
9   A.   Him or Wes. And there's also a possibility
10       that sales activity could take place that
11       Jeff would not know about or anyone at
12       Tecogen. Obviously, if a machine was sold
13       and shipped, that's a different story.
14  Q.   Are you aware of the conservative forecast
15       documents that are generated at Tecogen?
16  A.   Yes.
17  Q.   Have you ever received the conservative
18       forecast documents that were generated by
19       Tecogen?
20  A.   Yes.
21  Q.   Have you ever seen ADG listed as a rep on
22       those conservative forecast documents?
23  A.   I've seen them listed, I think, yes.
24  Q.   Are some of those forecasts for sites that

125

1        are not yet 100 percent certain of the sale?
2   A.   Yes.
3   Q.   So Tecogen, at least, lists some ADG sites
4        that are being marketed but not yet
5        completely come to fruition?
6   A.   Yes.
7   Q.   Mr. Panora, in the complaint for this case,
8        Tecogen has claimed in effect that Aegis
9        unfairly competed with Tecogen by building a
10       "knock-off" unit. I'm going to ask you some
11       questions regarding that allegation.
12            Are you aware, first, of the claim?
13  A.   Yes.
14  Q.   To the extent you can explain, what is
15       Tecogen's basis for this claim?
16  A.   Can you be more specific? I'm not sure what
17       you mean. Why do we think that's true?
18  Q.   Exactly.
19  A.   We were able to view the machine,
20       photographs of the machine, I think, from
21       on-line information, but perhaps elsewhere,
22       and see new or similar similarities of the
23       design if not exact duplication of our
24       design.

32 (Pages 122 to 125)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

126

1  Q.  Can you give me some examples?
2  A.  Sure.  Same prime mover.  Same engine
3      exactly.  Same company arrangement to the
4      generator.  Same generator.  Very similar
5      base forklift holes and so forth.  Very
6      similar acoustic enclosure in the engine
7      compartment.  Same exhaust manifolds and
8      exhaust system arrangement.  Same general
9      location of every component on the product,
10     switch gears, controls.  Everything is
11     arranged very similar if not the same.
12 Q.  Let's talk about the engine first on the
13     list.
14         Does Tecogen have a patent on the
15     engine?
16 A.  No.
17 Q.  Did Tecogen purchased the engine from a
18     third-party?
19 A.  Yes.
20 Q.  Can anyone purchase that engine from a
21     third-party?
22 A.  No.
23 Q.  Who can purchase it from that third-party?
24 A.  That's up to General Motors.  I don't know

127

1      how they qualify people to be REM, or
2      whatever you call us.
3  Q.  Third-party qualifiers, they can go to
4      General Motors and purchase the engine?
5  A.  Currently, we can only purchase a particular
6      configuration we have now.  But in the era
7      prior to this year, I think, anybody could
8      purchase.
9  Q.  At the time the complaint was written,
10     which, I believe, was September 1, 2005 or
11     on or about September 1, 2005, could anyone
12     purchase the engine from General Motors?
13 A.  That met the qualifications, yes.
14 Q.  There was no prohibition that Tecogen placed
15     on General Motors for selling that engine,
16     correct?
17 A.  Correct.
18 Q.  Does Tecogen have a patent on coupling
19     arrangement to the generator?
20 A.  No.
21 Q.  Does Tecogen have any trade secrets
22     regarding the coupling arrangement on the
23     generator?
24 A.  I'm not sure how you define trade secrets.

128

1  Q.  Has Tecogen placed any proprietary
2      restrictions on coupling arrangements to the
3      generator?
4          MS. FROHLICH:  Objection.
5  A.  Restrictions on whom?
6  Q.  On anybody trying to copy the coupling
7      arrangement.
8  A.  I don't know what legal restrictions we
9      could put on anybody.  Do you mean is there
10     a secret know-how in how we design that
11     coupling?
12 Q.  Is the specific arrangement at all
13     protected, to your knowledge?
14 A.  Not legally mentioned that Aegis uses the
15     same generator.
16 Q.  Does Tecogen have a patent on the generator?
17 A.  No.
18 Q.  Does Tecogen purchase the generator from a
19     third-party?
20 A.  Yes.
21 Q.  Can anyone purchase that generator from a
22     third-party?
23 A.  I was lead to believe no, but apparently
24     Aegis managed to buy it through a different

129

1      means than we do to get around that.
2  Q.  Does Tecogen have a prohibition on the
3      generator manufacturer for other people
4      purchasing it?
5  A.  We have an agreement with the manufacturer
6      that they would only sell that generator to
7      us in our market.  As far as I know, that's
8      not in writing, but it was how we agreed to
9      do business many years ago.
10 Q.  That's not in writing?
11 A.  Not in writing, no.
12 Q.  Who is the manufacturer?
13 A.  Marithol Electric Company.
14 Q.  You mentioned the base.  Does Tecogen have
15     any intellectual property protection in
16     relation to the base?
17 A.  No.
18 Q.  No patent protection?
19 A.  No.
20 Q.  You mentioned the acoustic enclosure.  Does
21     Tecogen have any protection, intellectual
22     property protection in regard to the
23     acoustic enclosure?
24 A.  No.

33 (Pages 126 to 129)

Robert Panora 8-29-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

130

1   Q.  **Exhaust manifold, does Tecogen have any**
2      **intellectual property protection with**
3      **regards to the exhaust manifold?**
4   A.  It's our exhaust manifold in the sense it
5      has our part name on it. We purchased the
6      mold to make it. As far as I know, it's
7      made exclusively for us, yes.
8         You may be able to purchase one
9      similar from somebody else, but the one that
10     appeared in the photograph, it appeared to
11     be our engine. Like it was our part number
12     on that.
13   Q.  **Who makes the exhaust manifold?**
14   A.  I'm not sure.
15   Q.  **Is it made by Tecogen?**
16   A.  It's made by a third-party for Tecogen, yes.
17   Q.  **Is there any prohibition on that third-party**
18      **from selling the exhaust manifold to anybody**
19      **else?**
20   A.  I believe so.
21   Q.  **Is it in writing?**
22   A.  No, but it's our patent and our forms for
23      doing it so they shouldn't be doing it.
24   Q.  **You mentioned patent?**

131

1   A.  Patent; meaning, the mold so-to-speak that
2      are used to make it.
3   Q.  **Did you patent the mold?**
4   A.  Not legally patent them, no. We own those
5      molds. They belong to Tecogen. We paid for
6      them many years ago. So that vendor
7      shouldn't be casting for anybody else, as
8      far as I know.
9   Q.  **You then mention the same general location.**
10   A.  I will ask you to be more specific. The
11     location of what?
12   Q.  **I'm using your words. You said same general**
13      **location of the cogen.**
14   A.  The components are laid out in a very
15     similar way.
16   Q.  **Is there anything about the component layout**
17      **that would give Tecogen a proprietary**
18      **ownership of that layout?**
19   A.  No.
20   Q.  **Can you identify any trade secrets, if any,**
21      **that Tecogen feels Aegis has compromised?**
22   A.  Trade secrets would mean things we have in
23      our knowledge base that are not patented but
24      are secret to the company, is that what you

132

1      mean?
2   Q.  **Correct.**
3   A.  There could be, but I'm not the best one --
4      not having studied the Aegis product other
5      than the photographs, I can't say. But if I
6      were able to study the machine and look at
7      it more clearly, I may be able to find an
8      instance of that. I can't comment on that.
9   Q.  **Are there any correspondence between Tecogen**
10     **and Aegis over the years that would have**
11     **been stamped confidential?**
12   A.  I don't know.
13   Q.  **Do you know of any specific documents that**
14     **would have been stamped confidential if**
15     **relating to the design of a cogen that would**
16     **have gone from Tecogen to Aegis?**
17   A.  I can't think of any.
18      (Exhibit 110 marked
19      for identification.)
20   Q.  **Mr. Panora, I'm going to ask that you review**
21     **what's been marked as Exhibit 110 and**
22     **identify it for me?**
23   A.  It's a letter from Julie Frohlich to Mr.
24      Edward Horvath, J&M Heating &

133

1      Air-conditioning Company. Notice of cease
2      and desist from the same.
3   Q.  **Did you receive a copy of this letter?**
4   A.  Perhaps, I'm not sure. Probably.
5        Yes, I did.
6   Q.  **I call your attention to the last paragraph**
7      **on the first page. Last sentence, last full**
8      **sentence on that page. "Among other things,**
9      **the Aegen modules are about the same**
10     **dimension in weight as the Tecogen modules."**
11       **Do you see that sentence?**
12   A.  Yes.
13   Q.  **Did I read it correctly?**
14   A.  Yes.
15   Q.  **Does Tecogen have any intellectual property**
16     **protection to the dimensions of its**
17     **cogeneration module?**
18   A.  No.
19   Q.  **How about to the weight to the cogeneration**
20     **module?**
21   A.  No.
22   Q.  **Beginning on the first page and ending on**
23     **the next page. "They sit on what looks to**
24     **be an exact copy of Tecogen's platform right**

34 (Pages 130 to 133)

# Tecogen Ex. 7

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3   ------------------------------------------x

4   TECOGEN, INC.,

5                    Plaintiff,

6   v.                              No. 05-11823 RCL

7   AEGIS ENERGY SERVICES, INC.,

8   AEGENCO, INC. AND AEGIS GENERATION COMPANY,

9                    Defendant.

10  ------------------------------------------x

11

12

13

14        DEPOSITION OF JEFFREY GLICK, a witness

15   called on behalf of the Defendant, taken

16   pursuant to the provisions of the

17   Massachusetts Rules of Civil Procedure,

18   before Linda Bernis, a Registered

19   Professional Reporter and Notary Public in

20   and for the Commonwealth of Massachusetts,

21   at the offices of McCarter & English, 265

22   Franklin Street, Boston, Massachusetts, on

23   Tuesday, August 28, 2007, commencing at 9:30

24   a.m.

1

Case 1:05-cv-11823-RCL    Document 43-2    Filed 07/14/2008    Page 3 of 15
Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

10

1  A.  I've never met them, but they are the
2     architect on this project, Lakeland High
3     School project.
4  Q.  What's the responsibilities of the
5     architect?
6  A.  Not exactly sure. I never interface with
7     them other than receiving a couple of
8     notices. I don't know what they, I suspect
9     they designed the project, but I don't know
10     what their responsibilities actually are.
11  Q.  What is this document?
12  A.  This is an announcement for a bid on a
13     project. It's a notice to all the bidders
14     that there's been a change in the bid
15     documentation. It's notifying all the
16     bidders that they should pay attention to
17     that change.
18  Q.  Do you see where it says to all contractors
19     and it's underlined?
20  A.  Yes.
21  Q.  Is that the bidders or contractors -- when
22     you say bidders, do you mean contractors?
23  A.  Yes. I suspect that's what it is.
24  Q.  The architect would send a bid to the

11

1     contractor. Is that the first step of a
2     project?
3  A.  It's probably one of the, not the first step
4     but it's one of the steps he's asking people
5     to.
6  Q.  What happens after this?
7  A.  Request for bid.
8  Q.  What happens next?
9  A.  They put together a price based on a set of
10     plans.
11  Q.  The set of plans are generated by the
12     architect or received from the architect?
13  A.  I suspect the architect has the plans, but
14     I'm not sure if he comes up with them or an
15     engineer who comes up with them.
16  Q.  Specifically to the Lakeland project, the
17     architect clearly was Dodge Chamberlin. Who
18     were some of the contractors or bidders, to
19     your knowledge?
20  A.  I don't remember who the mechanical
21     contractors were who bid it. I don't have
22     specific names.
23  Q.  You say mechanical contractors, are there
24     any other kinds of contractors that would

12

1     bid it? Is there a difference?
2  A.  In most cases, it's the mechanical
3     contractors bidding it.
4  Q.  The name Atlantic Energy comes up in this
5     contract, Lakeland.
6  A.  Yes.
7  Q.  And the scope of the proposal. Are they
8     considered a contractor or a bidder?
9  A.  No.
10  Q.  What are they?
11  A.  They are a -- I'll call them an ESCO, energy
12     service company.
13  Q.  How does someone like Atlantic get
14     information about this project? Does it
15     come from the mechanical contractor?
16  A.  They are initiating the project. Atlantic
17     is the lead person on the project.
18  Q.  So they are above the architect in that
19     regard?
20  A.  I believe, they probably hired the
21     architect. Not positive, but that's the way
22     I would envision it.
23  Q.  The mechanical contractor then receives
24     request for a bid and they in turn would bid

13

1     on the program and send that back to the
2     architect or back to Atlantic?
3  A.  In this case, I don't know where it was
4     sent. If Dodge Chamberlin is asking for
5     bids, I would suspect it goes back to them.
6     But I'm not positive who was receiving the
7     bids.
8  Q.  Once there's a contractor or bidder
9     selected, then that mechanical contractor
10     goes forward; at that point, they won the
11     contract, what's their next role? How does
12     the cogen come into this?
13  A.  The mechanical contractor's next role would
14     be to buy the equipment; to issue purchase
15     orders for the cogen equipment.
16  Q.  PO for the cogen equipment, for the specs?
17  A.  Yes.
18  Q.  Per the specs?
19  A.  That's correct.
20  Q.  When a mechanical contractor is going to buy
21     the equipment, is this where the Tecogen
22     sales reps come into play at this level?
23  A.  It's prior to that, that they have been
24     involved.

Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

14

1   Q.  Where are they involved, at the architect
2       level?
3   A.  They would be involved in issuing
4       specifications, we call them specs, trying
5       to work with either the architect or the
6       engineer to get a specific piece of
7       equipment specified.
8   Q.  You said engineer. Who is the engineer, is
9       that an engineer/architect firm?
10   A.  Separate firm all together.
11   Q.  They are working in tandem with the
12       architect?
13   A.  That's correct.
14   Q.  That's not Atlantic?
15   A.  No.
16   Q.  Tecogen sales rep would interface with the
17       architect and engineer to try and get
18       specifications in position for what; for
19       bidding?
20   A.  Correct. You want to get your piece of
21       equipment specified to what will be accepted
22       on the project, and so that's where his job
23       is.
24   Q.  Who in this scheme of entities issues the

15

1       purchase order for the cogen?
2   A.  In this scheme, the mechanical contractor
3       actually issues it.
4   Q.  Who was that on the Lakeland project?
5   A.  The selected contractor was a company called
6       J&M mechanical or J&M.
7   Q.  J&M?
8   A.  Yes.
9   Q.  So we're clear. That's J&M out of New
10       Rochelle, New York?
11   A.  Yes.
12   Q.  So J&M receives the award from the
13       mechanical contractor, they look for cogens
14       that will meet the specs, and, I take it,
15       there will be some interface between the
16       sales rep and J&M as well to try to get J&M
17       to select a particular sales rep for the
18       contract?
19   A.  No, that's not how it works. J&M would
20       receive bids from our reps for the
21       equipment.
22   Q.  How do your reps know to send the bids to
23       J&M?
24   A.  Either J&M would contact the reps or our

16

1       reps would get a list of who the contractors
2       are that are bidding and would follow-up
3       with bids to those contractors.
4   Q.  Once J&M receives these bids from reps and
5       other reps, other equipment, perhaps other
6       cogens, J&M then decides which one it wants
7       to go with?
8   A.  That is correct. Based on price, based on
9       what meets specification.
10   Q.  At that point, does J&M issue a PO?
11   A.  That is typically the case, yes.
12   Q.  So now your rep has a PO -- for sake of
13       argument, we'll talk about in general.
14       Strike that. Let's talk specifically about
15       Lakeland.
16           J&M receives the PO -- I'm sorry.
17       J&M issues the PO to your rep. What does
18       your rep do at that point?
19   A.  The rep exposes it to us, exposes it to
20       Tecogen. If it's acceptable to Tecogen, we
21       enter it into our system.
22   Q.  I want to back you up for a minute.
23           When your reps are bidding, sending
24       a bid to J&M, are they working with Tecogen

17

1       on a price?
2   A.  They are absolutely working with Tecogen.
3   Q.  Very closely?
4   A.  Yes.
5   Q.  Are you the person in the case of Lakeland
6       that they would have been working with?
7   A.  Yes.
8   Q.  I'm going to back up even further. In
9       general, what is your sales region?
10   A.  My region is the east coast, Mississippi
11       east and other parts of the country, but
12       mostly Mississippi east.
13   Q.  You would be the Tecogen point man for
14       something like this?
15   A.  That is correct.
16   Q.  You said the rep will expose the Tecogen and
17       if it's acceptable to Tecogen then you will
18       enter it into your system. What does it
19       mean to be acceptable to Tecogen?
20   A.  The price, terms and conditions, scope,
21       delivery schedule, that type of thing.
22       Those four.
23   Q.  Price is pretty much known, though, at this
24       point because they have been working with

5 (Pages 14 to 17)

Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

| 18 | | 20 | |
|---|---|---|---|
| 1 | you; is that correct? | 1 | A. There's no reason why to not think I did. |
| 2 | A. If they have been working with me, yes. | 2 | It did not come directly to me. That is |
| 3 | Q. Would that be the same with terms and | 3 | correct, yes. It came from, one of my reps |
| 4 | conditions? | 4 | faxed it to me on that date. |
| 5 | A. No. Each contractor would have different | 5 | (Exhibit 67 marked |
| 6 | terms and conditions. | 6 | for identification.) |
| 7 | Q. You might not know about during the bidding | 7 | MR. CURCIO: Counselor, there's |
| 8 | process? | 8 | another version marked as Exhibit 10. It's |
| 9 | A. We would want to look at their terms and | 9 | Bates numbers T0088 through T098. |
| 10 | conditions to make sure it's acceptable. | 10 | MS. FROHLICH: Thank you. |
| 11 | Q. The rep receives a PO from the mechanical | 11 | Q. Mr. Glick, have you reviewed this |
| 12 | contractor, gives you the PO, which says, I | 12 | Exhibit 67? Please, identify it for us. |
| 13 | want to buy certain equipment, but you are | 13 | A. This is the mechanical specification for the |
| 14 | looking for the terms and conditions from | 14 | units at Lakeland High School, cogen portion |
| 15 | the mechanical contractor? | 15 | of the specificationS. |
| 16 | A. No, the mechanical contractor's terms, the | 16 | Q. Did you receive this document? |
| 17 | PO terms from our rep. Our rep will give | 17 | A. Yes, I did. |
| 18 | them to us. We don't interface with the | 18 | Q. Do you recall about -- let me ask it this |
| 19 | mechanical contractor directly too often. | 19 | way. |
| 20 | Q. The terms and conditions, are they coming | 20 | On or about March 17, 2004, did you |
| 21 | from the mechanical contractor? | 21 | receive this document? |
| 22 | A. In most cases, it's the mechanical | 22 | A. I don't remember the exact date when I |
| 23 | contractor's terms. When they are buying | 23 | received it, but I suspect I got it within a |
| 24 | it, we are getting a PO from the mechanical | 24 | week of that date. |

| 19 | | 21 | |
|---|---|---|---|
| 1 | contractor. That's in most cases. | 1 | Q. Where did this document come from? |
| 2 | Q. You said scope of work is another area where | 2 | MS. FROHLICH: Objection. |
| 3 | you're concerned with. At this stage when | 3 | A. This document -- |
| 4 | they were working with you to create a bid, | 4 | Q. Do you know where this document originated? |
| 5 | and, for example, Lakeland 11 cogens, so you | 5 | A. I have a pretty good feeling. Energy |
| 6 | have an idea of the scope already. Now you | 6 | Concepts, a company out of Rochester, |
| 7 | receive the PO. Is there anything else to | 7 | prepared it. |
| 8 | the scope that you need to look to or do you | 8 | Q. Can you explain how Energy Concepts fits |
| 9 | already have that? | 9 | into our scheme of the entities involved in |
| 10 | A. No, I want to make sure that the bids, the | 10 | this project? Is Energy Concepts the |
| 11 | POs we're getting matches what we're | 11 | engineer? |
| 12 | bidding, what was in the original | 12 | A. They are the engineer correct. |
| 13 | engineering documents. Making sure we're | 13 | Q. They would work with the architect in |
| 14 | not supplying more than we have to, more | 14 | creating the request for bid for the |
| 15 | than we've agreed to, or, in some cases, | 15 | mechanical contractors? |
| 16 | that we've got all the items that are | 16 | A. That is correct. |
| 17 | required covered. | 17 | Q. To your knowledge, what is the |
| 18 | Q. Last will be the delivery schedule, if that | 18 | responsibility of an engineer like Energy |
| 19 | changes at all you need to see? | 19 | Concepts on this project? |
| 20 | A. Delivery payment, correct. | 20 | A. They are the technical eyes and ears for the |
| 21 | Q. One last thing on Exhibit 66. It's a fax | 21 | ESCO in this project. |
| 22 | dated says November 16, 2004. | 22 | Atlantic needs to hire a |
| 23 | Did you receive this fax on or | 23 | professional engineer to engineer the system |
| 24 | about November 16, 2004? | 24 | and that's who was hired. |

6 (Pages 18 to 21)

Case 1:05-cv-11823-RCL    Document 43-8    Filed 07/14/2008    Page 6 of 15
Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

22

1   Q.  Does this project manual specify the
2       requirements for the deliverable cogen
3       system?
4   A.  At the time, yes.  As of March 17th it did.
5   Q.  Is this document used by the mechanical
6       contractor to create the bid, or does the
7       mechanical contractor create a separate
8       request for bid from this document?
9   A.  The mechanical contractor doesn't go by the
10      spec paragraph by paragraph.  He simply
11      requests from equipment suppliers bids on
12      equipment that meets the specification.
13  Q.  Any deliverable that's required for a cogen
14      system, there's a lot of parts to a cogen
15      system I understand.  Any deliverable, would
16      that come from this document, or would it
17      come from a different document from the
18      mechanical contractor?
19  A.  This would really just be describing the
20      major components, the box.  Not looking at
21      too many of the details within the box.
22      Some of the details.  This is, like you
23      said, the major component.  It's really
24      looking at what the whole box produces.

23

1   Q.  I call your attention to the second page,
2       Bates number T0253.  The Bates numbers are
3       the numbers on the bottom right usually.
4       Paragraph 1.4.  You see where it says
5       submittals?
6   A.  Yes.
7   Q.  Under section A, product data; section B,
8       shop drawings; section C, wiring diagrams.
9       Did I read that correctly?
10  A.  That is correct.
11  Q.  Are those submittals requirements on
12      deliverables that the engineer is
13      requesting?
14  A.  He's requesting with the bid that this
15      information be provided as a minimum.
16  Q.  Is some of this information for submittals
17      A, B, C obtainable from Tecogen's
18      installation manual?
19      MS. FROHLICH:  Objection.
20  Q.  You can answer.
21  A.  All this information is -- well, some of
22      this information is available, not all of
23      it.
24  Q.  Let me ask you a foundational question.

24

1       Are you familiar with Tecogen's
2       manual?
3   A.  Yes, I am.
4   Q.  Have you read it?
5   A.  Many times.
6       (Exhibit 68 marked
7       for identification.)
8   Q.  Mr. Glick, I'm going to ask you to review
9       what we marked as Exhibit 68 and then ask
10      you to identify it.
11  A.  Okay.  Identify it -- it's a fax I sent to
12      the engineer on the project introducing him
13      to a new modification we had done, a new
14      version of our cogen module called the
15      integrated module.
16  Q.  Was this in response to a request from the
17      engineer?
18  A.  I believe it was in response to viewing the
19      drawings, that drawing that is attached
20      here.
21  Q.  When you say reviewing the drawings, let's
22      talk about the drawing here.  Is this a
23      Tecogen drawing that you supplied to Energy
24      Concepts?

25

1   A.  No, it is not.
2   Q.  Is it a Tecogen drawing?
3   A.  It is not a Tecogen drawing, no.
4   Q.  Where did this drawing come from?
5   A.  The engineer, Energy Concepts, using our
6       installation manual came up with this
7       drawing.  Taking bits and pieces from our
8       installation manual.  It wasn't done by
9       Tecogen.
10  Q.  Explain to me a fully integrated Tecogen
11      module as opposed to the non-fully module?
12  A.  Fully integrated incorporates all these
13      components outside the dotted line that was
14      originally there shown on the drawing.
15      There's a dotted line that shows what is
16      supplied by Tecogen in the lower left hand
17      corner.  Everything that is shown in my
18      handwritten dotted line, dash line is
19      something that we now, we, at that time,
20      incorporated into our integrated units as an
21      engineered package for the number of reasons
22      I've stated in the memo.
23      When I was asked to review this
24      drawing by the engineer, I had mentioned to

7 (Pages 22 to 25)

Case 1:05-cv-11823-RCL   Document 43-9   Filed 07/14/2008   Page 7 of 15
Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

| 26 | 28 |
|---|---|
| 1    him that we had this new version we were | 1    pricing for the integrated option. |
| 2    supplying to the west coast working | 2   Q.   Your rep in the Albany area, would that be |
| 3    successfully and I would provide him an | 3    Ray Hickey? |
| 4    explanation as to why this was an advantage. | 4   A.   Correct. |
| 5   Q.   You're essentially saying that the hand | 5   Q.   Of Advanced Comfort Systems? |
| 6    drawn dotted line which includes a number of | 6   A.   That is correct. |
| 7    components would be incorporated into the | 7   Q.   The drawing on page 3, the dash lines drawn |
| 8    dotted line created on the drawing, that | 8    on page 3 match, or at least attempt to |
| 9    would be the Tecogen package? | 9    match the hand drawings dash line of the |
| 10   A.   Correct.  We would supply everything shown | 10    drawing that you sent to the engineer. |
| 11    in the new handwritten dotted line. | 11   A.   That is correct. |
| 12      I should clarify.  Except for the | 12   Q.   Complete outer most dashed line on page 3 |
| 13    items that I point out in the memo.  There's | 13    would be the fully integrated portion that |
| 14    a few items that were not supplied, but I | 14    you're pricing? |
| 15    pointed them out. | 15   A.   That is correct. |
| 16   Q.   Why are you corresponding directly with the | 16   Q.   So by sending the pricing to Ray Hickey, |
| 17    engineer and not through your rep? | 17    what does Ray Hickey do with the pricing at |
| 18   A.   We have a relationship with the engineer. | 18    this point? |
| 19    The rep is, rather than writing to the rep. | 19   A.   He would be supplying the price to the |
| 20    The rep would have to send it over to the | 20    contractors who is bidding the project. |
| 21    engineer, I do it the other way around.  I | 21   Q.   Mechanical contractor? |
| 22    correspond with the engineer, these are the | 22   A.   That is correct. |
| 23    two reps that are involved in the project at | 23   Q.   Ray Hickey is your rep sending a bid to the |
| 24    the time shown in the top right hand corner, | 24    mechanical contractors and that would |

| 27 | 29 |
|---|---|
| 1    with them knowing I'm sending it to them.  I | 1    include the pricing for the fully integrated |
| 2    deal directly with the engineer.  It's a | 2    system, correct? |
| 3    common practice. | 3   A.   Correct.  He is the rep in the Albany area |
| 4   Q.   At this point in time, on or about August | 4    where Atlantic Energy is located.  He is the |
| 5    2004, has the mechanical contractor been | 5    rep who is most involved in this project, to |
| 6    selected? | 6    my knowledge. |
| 7   A.   I can't answer that.  I don't know. | 7   Q.   By sending a bid of the fully integrated |
| 8   Q.   Are you offering the fully integrated | 8    Tecogen system to the mechanical contractor, |
| 9    package as an alternative for the engineer | 9    is your rep, ACS, ACS effectively making a |
| 10    to consider in the specification? | 10    play to bid into this project? |
| 11   A.   That is exactly what I'm doing. | 11   A.   They are indeed, yes. |
| 12      (Exhibit 69 marked | 12   Q.   Would they use your pricing, whatever it was |
| 13      for identification.) | 13    at that time, as the price for the bid or |
| 14   Q.   Mr. Glick, I'm going to ask you to review | 14    would they do something different with that |
| 15    what we marked as Exhibit 69 and identify it | 15    price? |
| 16    for us? | 16   A.   In most cases, word for word dollar for |
| 17      (Pause) | 17    dollar. |
| 18   Q.   Please, identify the document. | 18   Q.   At this point in time, the fully integrated |
| 19   A.   This is a fax I sent to one of our reps in | 19    option is still an alternative.  You're |
| 20    the Albany area, the rep in the Albany area. | 20    noting something, and it's not something the |
| 21    It looks like it came about two weeks after | 21    engineer said, I want to go fully integrated |
| 22    my letter to the engineer, and I come up | 22    option as the only way? |
| 23    with some pricing.  I don't see the pricing | 23   A.   That is correct.  The documentation, |
| 24    here.  It's obviously been removed.  But | 24    October 29th is when the architect is |

8 (Pages 26 to 29)

Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

30

1    changing the specifications to include it.
2    This is one month beforehand, month and a
3    half before.
4  Q.  I'm sorry. I'll ask you to repeat that.
5    I'm not sure I follow that.
6  A.  This memo, this fax went out on
7    September 9th, which is a month and a half
8    before the architect sent the letter to all
9    the contractors that his bid should include
10    the integrated units.
11          (Exhibit 70 marked
12           for identification.)
13  Q.  I'm going to ask you to identify what we've
14    marked as Exhibit Number 70?
15  A.  This is an e-mail from the engineer on the
16    project asking me to provide, I'll call it,
17    value engineering so they can try to keep
18    the project under budget to save some money.
19  Q.  So we understand how he's trying to keep the
20    project under budget, what is he requesting
21    of you?
22  A.  There's a system that we don't provide that
23    the engineer would have to design called
24    relay protection. Utilities require this

31

1    relay protection. However, based on some
2    testing that we have done in New York, and
3    passed this testing, we were approved by the
4    State of New York, a bunch of sites don't
5    need the relay protection, external relay
6    protection that it's trying to emit.
7  Q.  It says, NYS type testing.
8          Do you see that?
9  A.  Yes.
10  Q.  Is that what you're referring to?
11  A.  New York State type testing is a test that
12    we've done on our equipment by approved
13    national testing organizations. Because it
14    has passed, it's listed on a website for the
15    State of New York, Department of Public
16    Utilities, as an approved piece of
17    equipment. And because of that we have been
18    able to install some units in the New York
19    ConEd territory without the relay
20    protection, external relay protection.
21  Q.  If you're not type tested, is it correct to
22    assume you need relay protection?
23  A.  I would assume that, but I can't say with
24    100 percent certainty.

32

1  Q.  How did you respond to Mr. Cafer?
2  A.  I don't know for certain, but, I would
3    assume, I either had him contact people
4    installing equipment in New York that did
5    not put in, did not require external relay
6    protection, or I had him talk to one of our
7    electrical engineers, outside electrical
8    engineers that's been installing our
9    equipment for other people. Getting them
10    approved in ConEd territory. Very familiar
11    with it.
12          (Exhibit 71 marked
13           for identification.)
14  Q.  Mr. Glick, I'm going to ask you to identify
15    what we've marked as Exhibit 71?
16  A.  This is a worksheet that I prepared working
17    with Ray Hickey, our rep in Albany, trying
18    to determine what price to actually bid this
19    equipment at. So it's a worksheet with
20    different prices based on different
21    commissions to representatives.
22  Q.  Does this information help ACS support its
23    bidding process or its bid to the mechanical
24    contractor?

33

1  A.  Absolutely. This is allowing them to make a
2    decision as to what price to bid.
3  Q.  Can you look at the second page, which is
4    Bates stamped T0110. You see the
5    handwriting, it says, submit on 2/11/05 at
6    the top.
7  A.  Yes.
8  Q.  Is that your handwriting?
9  A.  I believe it is, but I'm not positive. This
10    came from my file, I believe. I believe,
11    that is.
12  Q.  What did you mean by that statement?
13  A.  That a decision was made between Ray Hickey
14    and myself that that's what he would bid on.
15    He would submit that bid.
16  Q.  Is this a bid only for an integrated option?
17  A.  Correct.
18  Q.  If you go down that column that you arrowed,
19    under total 78,588. Is that the total for a
20    single cogen for this integrated option, is
21    that what that number means?
22  A.  That is correct. With other options on it.
23  Q.  I guess, you'd say the heat duct?
24  A.  Yes.

9 (Pages 30 to 33)

Case 1:05-cv-11823-RCL    Document 43-8    Filed 07/14/2008    Page 9 of 15
Jeffrey Glick 8/28/2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

34

1   Q.   Start-up and the freight?
2   A.   Yes. And commission for the
3        representatives.
4   Q.   To your knowledge, at this point, you would
5        have a good idea of what Mr. Hickey is going
6        to bid for Lakeland if five cogens or 11
7        cogens, it would be that number times
8        approximately 78,588?
9   A.   Correct.
10  Q.   That would be the entire system that Mr.
11       Hickey would deliver under a purchase order?
12  A.   To a contractor.
13  Q.   To the mechanical contractor?
14  A.   Correct.
15  Q.   This is dated 2/11/2005. At this time in
16       the contract bidding process, are there any
17       other Tecogen reps bidding on Lakeland as
18       well?
19  A.   Not to my knowledge, at this point.
20  Q.   You would be the one to know?
21  A.   The only other reps involved at this point
22       that I know of are the rep in Rochester,
23       which his name is Brian Willemsen. He is at
24       R.L. Kistler. He is the rep in the

35

1        territory where the engineer is located, but
2        he is not going to bid it. He knows Ray
3        Hickey is bidding it so he's not submitting
4        a bid.
5   Q.   To your knowledge, ACS is bidding on this
6        project on 2/11/05 and no other Tecogen rep?
7   A.   Let me try to think about that. Let me step
8        back and think.
9             We knew Aegis was involved. We
10       asked Aegis if, didn't think Aegis was
11       actually going to bid to any contractors
12       because that's not the MO we thought they
13       exhibited in the past. There's been almost
14       like an information blackout so we don't
15       know what Aegis is doing at this time.
16  Q.   You say you knew Aegis was involved. How
17       did you know Aegis was involved?
18  A.   If I remember correctly, there's a couple of
19       e-mails or memos where I had discussions
20       with either of the engineers that they are
21       involved.
22  Q.   By "engineers," do you mean Chris Cafer of
23       Energy Concepts?
24  A.   That company, yes.

36

1   Q.   Anybody else Atlantic Energy Concepts?
2   A.   May have been Bill Cristofaro.
3   Q.   What was the substance of those
4        conversations to let you think that Aegis
5        was involved?
6   A.   I believe, Energy Concepts had talked to
7        Aegis early on to get a feel for what a
8        turnkey price would cost in purely budget
9        estimate purposes or budget estimating
10       purposes.
11  Q.   What's a turnkey price?
12  A.   Turnkey price is a complete installation.
13  Q.   Do you know if the turnkey price discussed
14       would include an integrated system or
15       non-integrated system?
16  A.   Those details probably weren't -- I wasn't
17       privy to those details, but probably a
18       non-integrated system.
19  Q.   You said it would be completely installed.
20       Does that mean Mr. Hickey's bid does not
21       include installation?
22  A.   That is correct.
23  Q.   You mentioned an information blackout. What
24       did you mean by that?

37

1   A.   My reps particularly keep me informed of the
2        projects on a daily/weekly basis.
3        Everything is kept in the open so we know
4        who is talking to who when this comes to
5        mechanical contractor's engineers. That was
6        not the case on this project with Aegis.
7   Q.   So, at this point in time, you only knew
8        Aegis was involved through Energy Concepts?
9   A.   Right. Let me think about that. I don't
10       have the right time line down, but there is
11       an inkling that Aegis may be putting in a
12       bid here, may be talking to a contractor,
13       but I haven't heard any details yet.
14  Q.   What's the inkling?
15  A.   I believe, I read some e-mails that I might
16       have written to Lee Vardakas about pricing
17       and then giving him some pricing
18       information. Off the top of my head, I
19       don't have the times, the dates.
20  Q.   Isn't it true, if Aegis is going to price,
21       more likely than not, they will have to go
22       to Tecogen and get a price from you?
23            MS. FROHLICH: Objection.
24  A.   I know I did provide them pricing. Not on

10 (Pages 34 to 37)

Case 1:05-cv-11823-RCL    Document 43-8    Filed 07/14/2008    Page 10 of 15
Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

38

1    the integrated units, that I can remember,
2    but they had their prices and they'd have to
3    come to me. The specs were pretty -- I
4    mean, based on the specs, if there was
5    something they didn't have the pricing on,
6    he would have to come back to me and ask.
7  Q. A some point in time, you would be aware of
8    their interest?
9  A. If they came and asked for an updated
10    pricing, yes.
11  Q. At this time, 2/11/05, is it safe to say you
12    had knowledge of ACS wanting to bid on this
13    program and an interest by Aegis in this
14    program?
15        MS. FROHLICH: Objection.
16  A. I don't know, I don't know exactly if Aegis,
17    if they were involved at this point in
18    asking for pricing.
19  Q. Is it common or have you ever experienced a
20    project where more than one of your reps are
21    bidding on the same project?
22  A. Extremely rare. To the point where I cannot
23    think of another instance of it ever
24    happening.

39

1  Q. To your knowledge, you have never given out
2    pricing information to two reps on the same
3    project?
4  A. I will sometimes give prices to two reps,
5    but they will work out who is going to do
6    the bidding, who is the lead rep on it.
7    They would never compete, reps wouldn't have
8    competed. They are not going to fight over
9    a project when they are all going to
10    benefit.
11  Q. When you say give prices to more than one
12    rep, are they the same price?
13  A. Yes. They should be the same price if they
14    are aware of what each rep is doing.
15  Q. To your knowledge, when did Tecogen first
16    learn, when did you first learn -- strike
17    that.
18        To your knowledge, when did you
19    first learn that Aegis was involving or had
20    developed its own cogeneration module?
21  A. Exact date -- I looked at it yesterday.
22    Exact date isn't on my mind, but it was the
23    day I got a fax from one of my New York City
24    reps with a picture of their brochure. I'm

40

1    trying to think of the date. I better not
2    say what day it was.
3  Q. How about month and year?
4  A. March '05. I think it was '05, but I can't
5    guarantee. A fax came across my desk
6    showing me it.
7  Q. On or about March '05, safe to say?
8  A. I think that was when -- hold on. Yes,
9    somewhere in there.
10  Q. What did you do with that information?
11  A. I showed it to a couple of people in the
12    company.
13  Q. Who would that be?
14  A. Our president, Robert Panora.
15  Q. Who else?
16  A. Probably a couple of the engineers, John
17    Freeman, Joe Garrett.
18  Q. Did you share that information with anyone
19    else?
20  A. I'm sure probably several others that day.
21    It was a shock so.
22  Q. How about your reps, did you share it with
23    any of your reps?
24  A. Probably to Ray Hickey and Brian Willemsen,

41

1    the Upstate New York reps, within a couple
2    of days.
3  Q. You said you saw a brochure. Can you
4    describe the brochure? Was it for a bid, a
5    proposal?
6  A. No, it was a sales brochure, two-page
7    brochure faxed to me.
8  Q. Were you asked to make that available for
9    discovery in this litigation?
10  A. I believe, that was in the documentation
11    that I gave. I think it was.
12  Q. I probably just didn't see it.
13        What did you and Mr. Panora discuss
14    with regard to the information received that
15    Aegis was building its own cogen?
16  A. I can't tell you specifically what we
17    discussed because I just don't remember, but
18    it was pitney of understanding now what was
19    going on. A wake-up call.
20  Q. Did Tecogen have an idea of how they were
21    going to deal with this information?
22  A. No. Not that day.
23  Q. What actions did you take or were instructed
24    to take based on the information that you

11 (Pages 38 to 41)

Case 1:05-cv-11823-RCL    Document 28-2007    Filed 07/14/2008    Page 11 of 15
Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

**42**

1    now had?
2    A.  Well, I knew at that point that all
3    information, all communication with Aegis
4    whether it be commercial, technical, would
5    stop right then and there.
6    Q.  I want to make sure I'm clear.  All
7    information with Aegis would stop?
8    A.  Right.  I wasn't going to call and give them
9    prices.  We weren't going to talk about
10   business.  All of a sudden, we had a
11   competitor in our neighborhood, in our
12   backyard.
13   Q.  Did you contact Aegis?
14   A.  I believe, I probably did, but I can't tell
15   you for sure.  I probably called and asked
16   him what this is all about.
17   Q.  Do you recall that conversation at all?
18   A.  No.  But, I suspect, I called that day and
19   expressed my shock at what I was seeing.
20   Q.  Were there any subsequent discussions inside
21   Tecogen where you were involved to discuss
22   how to handle the situation of Aegis
23   building its own cogen?
24        MS. FROHLICH:  Let me caution you

**43**

1    that discussions in which an attorney was
2    not only present.
3    A.  I would say, it was the topic of
4    conversation in the company for the next
5    couple of days.  We had to figure out what
6    we were going to do.  This was something we
7    did not anticipate.  It's not like we had
8    planned for this event.  It shocked us.
9    Q.  What were the results of those discussions?
10   A.  Damage control.
11   Q.  Can you explain that?
12   A.  I worked very closely with Lee Vardakas.  He
13   had leads.  He had project names.  He had
14   engineers names.  We had to quickly make
15   sure that none of the projects I was working
16   on with Lee were in jeopardy.
17   Q.  Are you referring to prospective projects or
18   projects where Tecogen was already awarded a
19   cogen contract?
20   A.  Both.  It was both.
21   Q.  Is that what you meant that the information
22   with Aegis would stop?
23   A.  We had a competitor, we weren't going to
24   volunteer.  We couldn't talk pricing

**44**

1    anymore.  Obviously, we weren't going to
2    give them any technical advice.  All of a
3    sudden, when I saw that brochure, we were
4    competitors.
5         (Exhibit 72 marked.
6         for identification.)
7    Q.  Can you review what we've marked as Exhibit
8    Number 72 and identify it for us?
9    A.  I believe, this is Wes Schuster from our
10   office.  It's a note page.  I believe it's
11   his notes.  Let me tell you what this is all
12   about.
13        This is notes that he took during a
14   meeting we had on the Lakeland project
15   discussing an order that had been placed
16   with us by Aegis.  I believe, that's what it
17   was.
18   Q.  Were you present at that meeting?
19   A.  I can't guarantee it, but I suspect if they
20   were talking about Lakeland, I would have
21   been there.
22   Q.  To the best of your knowledge, do you see
23   where it says, "cash position tight,
24   managing more closely."

**45**

1         Did I read that correctly?
2    A.  Yes, I believe that is correct.
3    Q.  What did that refer to?
4    A.  I believe, that has to do with the past
5    projects we had done with Aegis, and the
6    feeling within Tecogen that we were not
7    collecting our money that was due in a
8    timely fashion from Aegis.
9    Q.  How many years did Tecogen work with Aegis?
10   A.  I think, 1991 to the present.  There might
11   have been some dealings before '91 when
12   Spiro worked for the company and before my
13   time in this division, but the current
14   working relationship we had was probably in
15   '91, in that range.
16   Q.  In that time frame, did Aegis pay its bills
17   to Tecogen?
18   A.  Yes.
19   Q.  Did Aegis have a good paying history with
20   Tecogen?
21   A.  I wouldn't consider it good.  They had a
22   paying history, they paid their bills but
23   not based on the terms in most cases.
24   Q.  Any other reps pay their bills not based on

12 (Pages 42 to 45)

Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

78

1   A.  I would assume so.  If they were giving us a
2       purchase order they must have one.
3   Q.  Did you accept this purchase order?
4           MS. FROHLICH:  Objection.
5   A.  No.
6   Q.  To your knowledge, did Tecogen accept this
7       purchase order?
8   A.  Let me say, I believe, we started to order
9       components based on this.  It was entered
10      into our production schedule, so, I believe,
11      we did.  Internally we accepted it.
12  Q.  Did you notify Aegis that you accepted this
13      purchase order?
14  A.  No, I did not.  Not at this time.
15  Q.  Why not?
16  A.  There was an internal debate within Tecogen
17      about accepting it.
18  Q.  Why was that?
19  A.  Terms again.  It was based on the terms.
20  Q.  When you say based on the terms, can you be
21      more specific?
22  A.  Let me step back.  For all intents and
23      purposes, it was accepted.  Sending order
24      confirmations to Aegis was not done on a

79

1       regular basis.  I don't remember ever doing
2       it in the past for Aegis orders.
3           So the request for it, for some
4       reason, I remember not writing one right
5       away, and I don't know why but held off
6       writing it.
7   Q.  It was not common for Tecogen to give a rep
8       the kinds of terms and conditions you gave
9       Aegis, correct?
10  A.  That is correct.  It wasn't standard.
11  Q.  Was it standard to give your rep a request
12      for two-party check?
13  A.  No, not unless the contractor who is buying
14      the equipment had a history.
15  Q.  You say you started ordering parts based on
16      this PO, but you held back telling Aegis
17      that you accepted the PO; is that true?
18  A.  I'm trying, in my own mind, the reason why
19      we didn't send out acceptance letter, and I
20      don't know why it was never sent out.  I
21      know Lee requested it several times after
22      this.  There must have been something
23      happening that we didn't send it out.
24  Q.  Do you have any basis for the inability on

80

1       Tecogen not to accept it in writing?
2           MS. FROHLICH:  Objection.
3   A.  The scope was not what we expected the scope
4       to look like.
5   Q.  Explain.
6   A.  If you remember earlier, we talked about
7       this was going to be a fully integrated
8       unit.  What was being ordered here was not a
9       fully integrated unit.
10  Q.  Before this date, May 17, 2005, did you know
11      the kind of system that Aegis had bid to the
12      mechanical contractor as either an
13      integrated unit or not an integrated unit?
14  A.  No, I did not know that specific, what type
15      of specific system they put in their bid.
16  Q.  Isn't it true that the pricing discussed
17      previously of the POs on May 6, 2005 cogens
18      units are listed as not integrated?
19  A.  Repeat that, please.
20  Q.  Is the system that was listed in the price
21      quotation of May 6, 2005, reflecting an
22      integrated system or non-integrated system?
23  A.  Non integrated.
24  Q.  So you acknowledge, at least as of May 6,

81

1       2005, Aegis was bidding a non-integrated
2       system?
3           MS. FROHLICH:  Objection.
4   A.  Right.
5   Q.  The purchase order on May 17, 2005, which
6       reflected the same non-integrated system of
7       May 6, 2005 was accepted in writing by the
8       purchase order?
9   A.  The scope, as I mentioned earlier, the scope
10      was different than what was supposed to be
11      bid.  We did not want to get into a
12      situation where Aegis provides the equipment
13      and did not meet spec.  He was concerned
14      about that.
15  Q.  Did you relay this to Lee Vardakas or Spiro
16      Vardakas?
17  A.  We had several discussions about why they
18      were buying loose components, emission
19      system.  We were shipping loose.  And,
20      again, we were kept in the dark about the
21      plans, how they were going to work with the
22      contractor.
23  Q.  Did you express your concern to Aegis that
24      perhaps this system might not meet

21 (Pages 78 to 81)

Case 1:05-cv-11823-RCL    Document 43-8  Filed 07/14/2008    Page 13 of 15
Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

82

1    specification?
2    A.  I don't remember if I ever did.
3    Q.  But isn't that the reason for delaying a
4        written acceptance?
5    A.  Something was going on here.  We sensed
6        something was going on here because it went
7        from a 70 something dollar equipment down to
8        the sixties, and our scope was being reduced
9        down, Tecogen's scope was being reduced
10       down, what we had communicated with the
11       engineers about.  We were concerned.
12   Q.  The price for the seven cogen modules in
13       T028961092, does that reflect the most
14       recent price you gave Aegis?
15   A.  Yes, it does.
16   Q.  The price for the four Tecogen cogen
17       modules, 63,759, does that reflect the most
18       recent price you gave Aegis for the cogen
19       modules?
20   A.  Yes, it does.
21   Q.  So you were well aware of the prices that
22       Aegis was asking for the cogen modules when
23       they sent you a purchase order?
24   A.  That is correct, yes.

83

1    Q.  Given the facts of May 6, 2005, you were
2        well aware that Aegis was not bidding a
3        fully integrated system, correct?
4    A.  That was made aware to us, yes.
5    Q.  Did you relay your concerns that it wasn't a
6        fully integrated system to Aegis any time
7        between May 6, 2005 and May 17, 2005?
8            MS. FROHLICH:  Objection.
9    A.  I'm sure I did, but I don't remember the
10       exact conversation.
11   Q.  Do you remember who you talked to?
12   A.  It would have been Lee.
13   Q.  Do you recall if Aegis had a response to
14       your concern?
15   A.  At one point, a response came back from Lee,
16       I don't know if it was specific to this or a
17       couple of days after, that they had options.
18       That's all I was told.  We have options.
19       Read into it what you want.  I didn't
20       understand what he was alluding to.  It was
21       a subtle threat.  We have options.
22   Q.  At this time, May 17, 2005, you have an
23       active valid purchase order in your hands
24       for 11 cogens for the Lakeland project,

84

1    correct?
2            MS. FROHLICH:  Objection.
3    A.  Correct.
4            (Exhibit 76 marked
5            for identification.)
6    Q.  Mr. Glick, I'm going to ask you to review
7        what we marked as Exhibit Number 76 and
8        identify it for us?
9    A.  The first page is my hand scratchings doing
10       some quick calculations, back calculating
11       the 61,092 that we had given Lee that same
12       day.  This might have been actually done
13       prior to the quote to him.
14           The second page is Wes Schuster's
15       handwritten neatening up, for some reason,
16       for his own purposes.  The third page was, I
17       think, simply taking those prices and
18       breaking them out for each of the Lakeland
19       projects.  This page doesn't apply, I don't
20       think.  This third page looks like the 2/11
21       price.  Maybe what I'm doing is showing,
22       based on Ray Hickey's original quote on
23       February 11th -- let me see what that looks
24       like -- comparing it to the prices we were

85

1    discussing on the 17th of May.  I don't even
2    have those.
3    Q.  Let's start with first page, T0105.  To be
4        clear.  You said you believe this is your
5        handwriting and you wrote this page,
6        correct?
7    A.  This is definitely my handwriting, yes.
8    Q.  May 17, 2005, is that when you wrote this
9        page?
10   A.  I suspect so, yes.  I wrote that there.
11   Q.  So you're doing this pricing on the same day
12       that you received a purchase order from
13       Aegis, correct?
14   A.  Correct.
15   Q.  Let's go through this so I understand it
16       better.
17           The first column says, "new price
18       at .64 multiplier."  Do you see that?
19   A.  Yes.
20   Q.  Did I read that correctly?
21   A.  Correct.
22   Q.  What does that mean, new price?
23   A.  That is the post-June prices, delivery of
24       equipment after June 1st or taking orders

22 (Pages 82 to 85)

Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

86

1    after June 1st. That is the price our
2    module is going to sell for if we sold them
3    at the .64 multiplier.
4    Q. Next column would be the cogen, that type of
5    cogen at that price, and then the following
6    column would be the second time?
7    A. High and low voltages. Two different
8    models. Correct.
9    Q. Next row you have correction to pre-June 1st
10   price and you subtract money. Explain that.
11   A. The reason why we were doing that is, the
12   software I'm using has already been updated
13   with the new pricing after June 1st. So to
14   bring it back to pre-June prices, I've got
15   this correction I have to bring in there.
16   That was basically the price increase that
17   appeared occurred on June 1st.
18   Q. The next row, emission control system. Do
19   you see that?
20   A. Yes.
21   Q. What is emission control system?
22   A. Cadilic converters that are required for
23   this project in the State of New York.
24   Q. Was the emission control system something

87

1    that Aegis had ordered as well or was that
2    something left out of the Aegis purchase
3    order?
4    A. That was in the Aegis purchase order.
5    Q. That would fall under emissions control
6    option?
7    A. Yes.
8    Q. Further down, the row entitled three percent
9    discount.
10   A. Yes.
11   Q. What is that for?
12   A. Identify it as a, I called it a quantity
13   discount. I identified it in the May 17th
14   fax to Lee that the discount would be a
15   reduction in the overall price to minimize
16   the impact the commission payment has on
17   Aegis. That was just a give-back from
18   Tecogen to help mitigate the commission
19   payment that was going to be due to the
20   other reps.
21   Q. It says, commission 7.3. And, I believe,
22   that's 7.9 percent. Do you see that?
23   A. Correct.
24   Q. Were those commissions that were paid out to

88

1    the other reps?
2    A. We were not deciding, back calculating what
3    we are going to have to pay the other reps,
4    correct.
5    Q. You come up with the number 61,092, correct?
6    A. That is correct.
7    Q. That matches the number that was on the
8    Aegis purchase order, correct?
9    A. That is correct.
10   Q. Same for the 63,760, I believe that also
11   matches?
12   A. Within a dollar, yes.
13   Q. Second page, you said, was written by Wes
14   Schuster. For my edification, please tell
15   me who Wes Schuster is?
16   A. He was vice president, I believe his title
17   was, of Tecogen and American DG. He carried
18   two titles. He was also sales manager at
19   the time.
20   Q. Let me be clear. He was vice president of
21   Tecogen and American DG?
22   A. Let me clarify that in my own mind.
23       He was vice president of Tecogen --
24   he had two titles. He was sales and

89

1    marketing manager at the time of Tecogen.
2    Q. But he also had some kind of relationship
3    with ADG as well?
4    A. Yes, he did. There was a parent company.
5    Sorry. There was a parent company over
6    Tecogen and American DG. It was called
7    American Distributor Generation. It wasn't
8    nick-named. American Distributor
9    Generation. For a while, they were the
10   umbrella company of both Tecogen and
11   American DG. He had a position in that
12   parent company, but he also had a position
13   as a sales and marketing manager of Tecogen
14   only.
15   Q. So he had a title in the parent company and
16   a title in Tecogen?
17   A. Correct.
18   Q. But not necessarily a title in ADG?
19   A. Right.
20   Q. Is Wes Schuster still with Tecogen?
21   A. Neither company.
22   Q. Either with -- there's America Distributor
23   Generation?
24   A. They don't exist anymore. They got rid of

23 (Pages 86 to 89)

Case 1:05-cv-11823-RCL    Document 43-8    Filed 07/14/2008    Page 15 of 15
Jeffrey Glick 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

90

1    the parent company.
2    Q.  I turn your attention to T0107.  You started
3        to explain, but please explain further what
4        was going on with this.  Strike that.
5            Is this your handwriting?
6    A.  This is my scribbles, yes, it is.
7    Q.  Did you write this page?
8    A.  I did.
9    Q.  You started to explain earlier what this
10       was.  Could you further elaborate what you
11       were trying to do on this page?
12   A.  It might be a little work, but let me try to
13       figure it out myself.
14           This page has nothing to do with
15       the two previous pages.  It was prior to
16       Aegis getting involved in requesting pricing
17       on non-integrated units, this is the pricing
18       for the fully integrated units because the
19       prices are, we're talking 50 and $60,000 per
20       package on the first two pages of this
21       document to 85, 82,000 on the last page.
22   Q.  Do you have any idea when you wrote this
23       page?
24   A.  There's no date, no.

91

1    Q.  Would it be before May 17, 2005?
2    A.  I would think so.
3    Q.  What's the purpose of T10 -- sorry.  What's
4        the purpose of Bates number T0105, to the
5        extent that you had to have done this
6        compilation before you gave Aegis the 61,092
7        and 63,759 numbers?
8    A.  I think this was done prior to the fax on
9        the same day.
10   Q.  From a timing standpoint, you did
11       calculations, you gave the numbers to Aegis,
12       they took those numbers and turned around a
13       purchase order to you?
14           (Exhibit 77 marked
15           for identification.)
16   Q.  Before I get to number 77, Mr. Glick.  One
17       question comes to mind.
18           Do you know where Wes Schuster is
19       now working?
20   A.  He's working, he's a consultant, I believe,
21       to one of the owners of -- to George
22       Hozopolous.  He is an investor in Tecogen.
23       One of the founders of Thermo Electronic.
24       He's working for one of his divisions.  He's

92

1    in the office maybe once every couple of
2    months.  He's working with the European
3    divisions in sales of some sort.
4    Q.  I'm going to ask you to review what's been
5        marked as Exhibit 77 and identify it for us?
6    A.  This is a handwritten order entry form that
7        I prepare it for the manufacturing
8        department before they put it into an access
9        database.  By filling this out, the order is
10       actually being ordered, the equipment is
11       being ordered for these units.  11 units, 11
12       Lakeland units being put into production.
13   Q.  So this goes into a database for
14       manufacturing to start part ordering?
15   A.  Correct.
16   Q.  On the first page, T0291.  Do you see price,
17       PO amount 63,760.  Do you see that amount?
18   A.  Yes.
19   Q.  Does that reflect the prices of one of the
20       sets of cogens that was in Mr. Vardakas'
21       purchase order?
22   A.  It does.
23   Q.  On page T0297, do you see the PO amount,
24       61,092?

93

1    A.  Yes.
2    Q.  At the top, it says, four identical units.
3        Does that reflect the four units requested
4        by Aegis in the PO?
5    A.  Yes, it does.
6    Q.  So these 11 units in total were the 11 units
7        for the Lakeland project, correct?
8    A.  They were.
9    Q.  When you fill out an order entry form and
10       enter it into your system so that
11       manufacturing can start ordering parts, does
12       that mean Tecogen has accepted the purchase
13       order?
14           MS. FROHLICH:  Objection.
15   A.  It means that we are going to go buy the
16       parts like you said.  We are going to start
17       cutting some POs for parts.  For all intents
18       and purposes, we have accepted it.
19   Q.  What were the terms and conditions on
20       payment at the time you entered this order
21       entry form?
22   A.  Net 30.  And we were going to be given a
23       copy of the payment bond from the contractor
24       to the school.  The contractor, J&M, since

24 (Pages 90 to 93)

# Tecogen Ex. 8

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 2 of 65

Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

1

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3      ------------------------------------------x

4      TECOGEN, INC.,

5                        Plaintiff,

6      v.                        No. 05-11823 RCL

7      AEGIS ENERGY SERVICES, INC.,

8      AEGENCO, INC. AND AEGIS GENERATION COMPANY,

9                        Defendants.

10     ------------------------------------------x

11

12

13

14          DEPOSITION OF SPIRO VARDAKAS, a witness

15     called on behalf of the Plaintiff, taken

16     pursuant to the provisions of the

17     Massachusetts Rules of Civil Procedure,

18     before Linda Bernis, a Registered

19     Professional Reporter and Notary Public in

20     and for the Commonwealth of Massachusetts,

21     at the offices of Goulston & Storrs, 400

22     Atlantic Avenue, Boston, Massachusetts, on

23     Thursday, September 6, 2007, commencing at

24     10:00 a.m.

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

8

```
1              frequently refer to Aegis Energy Services,

2              Inc. as Aegis.

3      A.      Certainly.

4      Q.      I invite you to do the same.

5      A.      We will.

6      Q.      Are you the founder of Aegis Energy

7              Services, Inc.?

8      A.      I guess, you could describe me as that, yes.

9      Q.      When was the company established?

10     A.      April 1985.

11     Q.      Were you employed by Aegis as of April 1985?

12     A.      Yes.

13     Q.      What was your title at that time?

14     A.      I was the president.

15     Q.      What are your current job responsibilities?

16     A.      In general, oversee the business operations

17             of the company.  I have full responsibility

18             for the organization.

19     Q.      In April of 1985, did you have the same

20             general set of responsibilities that you

21             have today?

22     A.      The operation at that time was much smaller

23             so I can't say I had the same.  We were

24             installing systems.  Shortly thereafter, we
```

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

9

1        were maintaining systems.  Shortly

2        thereafter, I had other employees.  Probably

3        on a much smaller scale.

4    Q.   Mr. Vardakas, I'm going to show you a

5        document that's been previously marked in

6        this case as Deposition Exhibit Number 35.

7        I'll direct this question to you as well as

8        your attorney.

9            Are there any topics that are

10       listed in Exhibit 5 for which the defendants

11       have not designated you to be a witness?

12            Bob, I would invite you to --

13            MR. CURCIO:  Depends on the detail

14       of your question on the installation manual

15       copyrighting issue.  Short of that, I think,

16       Spiro, correct me if I'm wrong, I think, he

17       is capable of answering questions on all the

18       other topics.  Please review and correct me

19       if I'm wrong.

20            THE WITNESS:  I think that's a fair

21       statement.

22   Q.   In one of your earliest answers, I believe

23       you testified that Aegis in its earlier

24       years was installing systems and maintaining

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

10



```
 1              systems.  What kind of systems were you

 2              referring to?

 3    A.   We were installing a cogen unit with

 4              heating, piping, control valves, heat

 5              exchangers, electrical connections, and all

 6              the paraphernalia related to a, I'll

 7              describe it as a particular cogen system.

 8    Q.   You are familiar with a company named

 9              Tecogen, Incorporated, correct?

10    A.   Yes, I am.

11    Q.   At some point, Aegis began doing business

12              with Tecogen; is that correct?

13    A.   Yes.

14    Q.   When was that?

15    A.   Let me address that question.  I personally

16              did business with Tecogen in 1984.  Aegis

17              began right around April of '85.

18    Q.   With respect to you personally, what did you

19              begin doing with Tecogen in 1984?

20    A.   They engaged me as a contractor to develop

21              the cogen market from Western Massachusetts

22              down to New Jersey.

23    Q.   How long were you engaged as a contractor

24              personally?
```

Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

14

1          you begin installing Tecogen cogeneration

2          units?

3    A.    I would say that I sold just a unit or two

4          without installation.  And then I got

5          engaged in a project in Pittsfield, Mass.

6          where a competitor at the time had submitted

7          a proposal and I pursued that project.

8                MR. CURCIO:  May I interrupt.  The

9          time line you said was December 31, 1984.  I

10         want to make sure he's answering for

11         December 31, 1984.

12   A.    No, I'm answering now for '05.

13   Q.    After, yes, after.

14   A.    January, February, March.

15               MR. CURCIO:  I'm sorry.

16   A.    Up until April 15th, basically.

17               I was successful against the

18         competition and sold a project for that site

19         in Pittsfield.

20   Q.    Did that project include you or Aegis

21         installing the unit itself?

22   A.    I formed Aegis right at the beginning of the

23         project.

24   Q.    Commencing with that project, was Aegis'

Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

15



```
 1              business relationship with Tecogen as a

 2              sales representative and an installer of

 3              Tecogen modules?

 4                    MR. CURCIO:  Objection.

 5        A.    It could be described that way.  The word

 6              sales representative.  I would -- yes, it

 7              could be described that way.  But I was

 8              selling the entire package.  I was not

 9              selling the Tecogen.  Through Tecogen

10              company, I bought the equipment, along with

11              all the other paraphernalia, designed and

12              installed the system.

13        Q.    I show you a document that's been previously

14              marked as Exhibit 6.  Have you seen this

15              document before today?

16        A.    Yes, I have.

17        Q.    Would you please turn to page 11.

18              Specifically, I'm going to point you to

19              paragraph 15.  The first sentence is that

20              allegation, the first sentence of paragraph

21              15 is an allegation that Aegis Energy was an

22              exclusive distributor of Tecogen

23              cogeneration systems and parts for the

24              states of Massachusetts and Connecticut.
```

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 8 of 65
Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

16

1                    Did I read that correctly?

2    A.    Yes, you did.

3    Q.    Now, what facts does Aegis Energy rely upon

4          in alleging that it was an exclusive

5          distributor of Tecogen cogeneration systems

6          and parts for the states of Massachusetts

7          and Connecticut?

8    A.    In the late eighties, early nineties,

9          Tecogen got out of the installation

10         business.  Although we worked at times

11         throughout the Northeast, most of our

12         business was conducted in Connecticut and

13         Massachusetts.

14                    Around the middle of 1995,

15         approximately around that time, Tecogen was

16         heavily involved with the Tecogen product.

17         They asked us if we would handle all aspects

18         of selling their equipment.  We normally

19         only did turnkey installations.  Up until

20         that point, the sales manager at Tecogen

21         would handle an equipment sale perhaps on a

22         lead that they had received.  But after 1995

23         approximately they would send any leads that

24         they received for the Connecticut and

Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

17



1               Massachusetts area to us to follow-up on.

2    Q.    In your answer you used they.  Were there

3          specific people within Tecogen with whom you

4          had any discussions about Aegis being an

5          exclusive distributor for Tecogen

6          cogeneration systems in Massachusetts and

7          Connecticut?

8    A.    I would say, Jeff Glick, Ravi Sakhuja.

9          Prior to that, Tecogen had many people

10         selling Tecogens in Connecticut and

11         Massachusetts.  Many of them failed.  Around

12         that time, we were the only people, the only

13         organization that was installing Tecogens

14         that would continue to operate properly.

15   Q.    Prior to 1995, Tecogen had many people

16         selling Tecogen cogeneration units in

17         Massachusetts and Connecticut?

18   A.    That's right.

19   Q.    After 19895, Tecogen?

20   A.    Around.

21   Q.    Approximately.  Tecogen began sending all

22         leads for Connecticut and Massachusetts to

23         Aegis; is that correct?

24   A.    Right.  We basically did our own marketing,

Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

18

```
 1              our own networking.  When they say they
 2              would send us leads, I would say it was a
 3              matter of a few percent of our total sales
 4              marketing effort.
 5      Q.      When was the last time you spoke with Ravi
 6              Sakhuja?
 7      A.      I spoke with him after he left Tecogen,
 8              probably in 2000.
 9      Q.      Now, for how long -- strike that.
10                      For what years was Aegis an
11              exclusive distributor of Tecogen
12              cogeneration systems and parts in
13              Massachusetts and Connecticut?
14                      MR. CURCIO:  Objection.
15      A.      1995, minus a year or two.  I can't be very
16              precise on that.  Up through to June '05.
17      Q.      Showing you a document that's been
18              previously marked in this case as Deposition
19              Exhibit Number 7.
20                      Have you seen a copy of Exhibit 7
21              prior to today?
22      A.      Yes, I have.
23      Q.      When did you first see this document?
24      A.      I have a recollection that I had seen it
```



Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

19

1           many years ago.

2    Q.     Do you recall who provided you with this

3           document?

4    A.     It may have been Ravi.  I don't recall

5           exactly.  I don't think it was Jeff Glick,

6           though.

7    Q.     If you would look at page 13 of Exhibit 7.

8           That page is entitled, Exhibit D, Territory.

9                   That page references the right to

10          solicit sale of all Tecogen products and

11          services set forth in Exhibit A in the

12          following marketing territory, Connecticut,

13          following counties of Massachusetts;

14          Berkshire, Franklin, Hampton and Hampshire.

15                  Do you recall any discussion, in or

16          around September of 1993, about Aegis having

17          the right to solicit Tecogen products and

18          services in Connecticut and those counties

19          in Massachusetts?

20   A.     I can't say that I recall any discussions on

21          it.  We were promoting in other

22          Massachusetts counties.

23   Q.     If I could direct you, please, to page 9.  I

24          do not see any signatures on this document.

20



1              My question is, did Aegis or

2         Tecogen ever sign this agreement marked as

3         Exhibit 7?

4    A.   Never.

5    Q.   Do you know why the parties did not sign

6         Exhibit 7?

7              MR. CURCIO:   Objection.

8    A.   For myself, I didn't like it at all and it

9         didn't fit my business plans.   Secondly, I

10        really don't think Tecogen wanted anything

11        that locked them in either.

12   Q.   What did you not like --

13   A.   That's my guess on it.

14   Q.   What did you not like about the sales

15        representative agreement marked as

16        Exhibit 7?

17   A.   I don't recall the specifics of it at the

18        time.   Perhaps I found it restrictive.   I

19        can't give you a specific answer on that.

20        There were perhaps a number of items at the

21        time, as I said before, it didn't fit our

22        business plans.

23   Q.   Turn to page 8, please.   At the top of that

24        page, paragraph 12, you see the heading



Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

21

1            competing products?

2    A.     Yes.

3    Q.     Did you and anyone at Tecogen ever discuss

4           that particular section in Exhibit 7?

5    A.     I don't recall ever discussing the subject

6           with Tecogen.  Through the years, we looked

7           at other products as part of good business

8           planning.  We told Tecogen we were looking

9           at other products.  We even shared some of

10          the information we learned about it with, I

11          can remember, for example, with Jeff Glick

12          regarding capsule micro.

13   Q.     So I'm clear.  You and -- strike that.

14                  Aegis and Tecogen never directly

15          discussed whether Aegis could sell competing

16          cogeneration systems at the same time it was

17          selling Tecogen cogeneration systems?

18   A.     That's correct.  I do not recall ever

19          discussing the subject.

20   Q.     At any time prior to June 2005, irrespective

21          of discussions, did you ever have any

22          understanding about Tecogen's views with

23          respect to Aegis selling cogeneration

24          products that competed with Tecogen's

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

22

1          products?

2                    MR. CURCIO:  Objection.

3    A.    Can you repeat the question, please?

4                    MS. FROHLICH:  Please read it back.

5                    (Court Reporter read back

6                    last question.)

7    A.    Our goal was not to sell the most Tecogens

8          possible.  Our goal was to sell systems that

9          involved substantial sums of money.

10                   We, for example, did a number of

11         projects approaching $2 million each that

12         only involved one Tecogen.  It involved

13         total heating systems, cooling systems, and

14         other paraphernalia.  So we were not

15         necessarily Tecogen's best sales

16         organization.  I don't think for the number

17         of units we did buy, which may or may have

18         not been significant to them, I don't think

19         they cared because I cannot recall them

20         expressing any concern of what we did, other

21         than they were not particularly happy with

22         us in that we did our own service and also

23         that we outsourced our own parts.  I can

24         recall them complaining about that.

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

31



1       we saw it as having to fit our business

2       plan.

3   Q.  I give you two documents that have been

4       previously marked as exhibits in this case,

5       Exhibit Numbers 8 and 9.  I ask that you

6       take a look at those.  My first question

7       will concern Exhibit Number 8.  That

8       question is, have you seen this document

9       before today?

10  A.  Yes, I have.

11  Q.  When did you first see Exhibit 8?

12  A.  Probably around the date of its issuance.

13  Q.  So some time around April 3, 2003 you first

14      saw the document that's marked as Exhibit 8?

15  A.  Yes.  Wes Schuster was relatively new with

16      the company.  He came out and visited us a

17      few times.  We shared a lot of information

18      with him in regards to the market; how to

19      sell and how we do our thing.

20          What was also happening was that we

21      had, in early 2000, we had gone into New

22      York.  We were invited in to do a very large

23      project.  We used that opportunity to pursue

24      other projects in New York.  And in this

Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

32

```
 1          period, I believe, we had sold a number of
 2          Tecogens in the New York metropolitan area.
 3          We were competing against a company called
 4          All Systems who used, I'll call it, a
 5          competing product.  Either it was Coast or
 6          Inteligen, I forget what it was.  But they
 7          had been around a few years and selling this
 8          product, installing it, servicing it.  We
 9          competed with them.  I guess, we had some
10          success at it with Tecogens.
11                   As we started to develop the
12          Tecogen market in New York, we also came
13          across several sites where Tecogens had kind
14          of been abandoned from installations by
15          others.  And perhaps in the early nineties.
16          I recall something to the extent that the
17          name wasn't well thought of.
18                   As we developed this market, and
19          one good operating site would lead to
20          another sale, we wanted to handle Tecogen as
21          the same arrangement we had in Connecticut
22          and Massachusetts.  I believe, at the same
23          time, ADG was also in the picture.
24    Q.    So now in early 2000, Aegis entered New
```

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

33



1              York, correct?

2    A.    Uh huh.

3    Q.    And at that time, did Aegis have any

4          discussions with anyone at Tecogen about

5          Aegis' entry into New York?

6    A.    Yes, we certainly did.  We bought products.

7          There was no -- we did not, as I say, we

8          were invited in because of our reputation to

9          do this substantial project.  We had not

10         done any marketing or had exerted any sales

11         efforts in the New York area prior to that

12         period, I'll say, 2000 or so.

13             We bought Techochill.  We bought a

14         Tecogen.  We bought a number of Tecogens.

15         There was no great plan or great entrance.

16         Everything we did, it kind of evolved.

17   Q.    Who invited Aegis to do this substantial

18         project in New York?

19   A.    Energy Spectrum.

20   Q.    When Aegis entered New York, did it

21         encounter any other companies handling

22         Tecogen modules in that state?

23   A.    At that time, in 2000, there was a fellow,

24         Peter Westerhoff, who had some equipment

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 18 of 65

Spiro Vardakas 9-8-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

34



1              systems, New York, New Jersey.

2    Q.    Geographically, New York is a large state,

3           correct?

4    A.    Metropolitan New York.

5    Q.    In 2000, did Aegis start out in the New York

6           City area?

7    A.    Bronx, Queens, Manhattan.

8    Q.    Did Aegis eventually grow the geographic --

9           strike that.

10                 Over time, did Aegis add more parts

11          of New York to the area where it was trying

12          to sell installation projects?

13   A.    Yes.   Little further out in Long Island, we

14          did a project out there.   Of course, we

15          began a marketing effort, I would say, to

16          come up with additional projects.

17   Q.    Let me refer you back specifically to

18          Exhibit Number 8.   The third paragraph, the

19          first sentence of the letter states, "We

20          regret that we cannot include exclusivity in

21          the New York City and the surrounding area

22          however."

23                 Did I read that correctly?

24   A.    Yes, you did.

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 19 of 65
Spiro Vardakas   9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

35



1   Q.   Prior to this letter, had anyone from Aegis

2        had discussions with anyone at Tecogen about

3        New York City and the surrounding area being

4        an exclusive territory for Aegis?

5   A.   Yes.

6   Q.   When did those discussions begin?

7   A.   Obviously, end of '02, early '03.  I believe

8        that's what lead, one of the things that

9        lead to this letter.

10  Q.   Were you personally involved in any

11       discussions with anyone at Tecogen about

12       this exclusivity question?

13            MR. CURCIO:  Objection.

14  A.   To some extent, yes, I was, with Wes

15       Schuster.

16  Q.   What do you recall of your discussions with

17       Wes Schuster about Aegis having New York

18       City and the surrounding area as an

19       exclusive territory?

20            MR. CURCIO:  Objection.

21  A.   To the extent we were re-sorting resources

22       to develop the market down there.  Although

23       Peter Westerhoff was in the area, he was

24       mainly using old Tecogen units that he

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

36

1          bought from abandoned sites.  So he was

2          really not a competitor of ours.  I believe,

3          all his sites were shared savings.

4                    So there was nobody at the time

5          doing anything to develop the cogen market

6          using Tecogens except us.  We wanted it to

7          have the same arrangement that we had in

8          Connecticut and Massachusetts.

9      Q.  Next sentence of Mr. Schuster's letter.

10         This is Exhibit 8.  It states, "This market

11         is too large and we feel it needs to be

12         addressed as a nonexclusive territory."

13                   Do you see that sentence?

14     A.  Sorry.

15     Q.  Third paragraph on the first page of

16         Exhibit 8, second sentence.  Let me ask you

17         this.

18     A.  Yes.  It needs to be addressed as a

19         nonexclusive territory, yes, right.

20     Q.  Did Mr. Schuster ever say to you that New

21         York City and the surrounding area was too

22         large a market for Aegis to try and develop

23         on its own?

24     A.  No, he never said those exact words, to

37



1           develop on its own.

2    Q.    Do you recall what words he did use?

3              MR. CURCIO:   Objection.

4    A.    Basically, as in the letter.   That he

5          thought it was a large market.   What they

6          were doing was reverting back to the

7          practices they had in Connecticut and

8          Massachusetts many years before that, which

9          was very chaotic.

10   Q.    Look at the fifth paragraph on the first

11         page of Exhibit 8.   Do you see the first

12         sentence that begins, "secondly, I want to

13         work with you to develop a working

14         relationship with American DG?"

15   A.    Yes.

16   Q.    As of the date of this letter, what did

17         Aegis know about American DG?

18   A.    It was established to be a shared savings

19         company.

20   Q.    Did Aegis know anything else?

21   A.    They were competing against us.

22   Q.    Did Aegis know anything else about American

23         DG as of April 2003?

24             MR. CURCIO:   Objection.

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 22 of 65

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

38

1    A.    Can you be specific?

2    Q.    I'm just trying to exhaust your memory as to

3          what you knew as of April 2003.

4    A.    You're doing it.

5    Q.    If you know nothing more, you can say.

6    A.    Obviously, I'll tell you what they were.

7          They were -- we learned quite a bit about

8          American DG during the end of '02 in

9          discussions with Tecogen and its principals

10         about buying Aegis.  When that did not

11         happen, we suggested we joint venture

12         instead of forming a competitor, and that

13         was also turned down.

14              We suggested to them that they did

15         not have the experience and skills necessary

16         to form an entity like this and to get it

17         going in an accelerated mode and it would be

18         better to joint venture with Aegis on it.

19              As I said before, that was turned

20         down.  Barry Sanders called us for help on

21         understanding ConEdison rates.  I remember

22         Lee having discussion with him and helping

23         him out on it.  And we bumped into him

24         competitively in Massachusetts, New York.

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

42



```
 1            Lee ever saying that he received anything.
 2    Q.      Before this April 3, 2003 letter marked as
 3            Exhibit 8, were there any discussions inside
 4            Aegis about American DG?
 5    A.      Certainly.
 6    Q.      When did those discussions begin?
 7    A.      They began from the first time it was
 8            announced.  Probably late '01, '02.  First
 9            it was limited information.  I would say it
10            was the end of '02 that we really got the
11            sense of where they were going.
12    Q.      When was American DG first announced?
13                  MR. CURCIO:  Objection.
14    A.      I think, I said just before in my answer, we
15            learned about it in late '01 early '02.  And
16            the latter part of '02 where we had a number
17            of discussions with Tecogen regarding Aegis
18            and ADG where we got most of the
19            information, I would say.
20    Q.      How did Aegis first learn about ADG?
21    A.      Lee picked it up someplace.
22    Q.      Over time, Aegis learned more about American
23            DG after it was first announced, correct?
24    A.      Uh huh.
```

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 24 of 65
Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

43

1   Q.   Did that information come to Aegis from
2        Tecogen?
3   A.   Some of it.  I would say most of it came
4        from Tecogen, yes.
5   Q.   And going back to my questions about
6        discussions inside Aegis about American DG.
7        Before the April 3, 2003 letter, what was
8        the nature of the discussions?
9   A.   Basically, that we saw ADG as a serious
10       competitor that raised serious concern about
11       how we could continue to buy a product and
12       the funds from which would, in turn be used
13       to compete against us.  It's like feeding
14       the dog that's going to bite your hand.
15  Q.   If you would look at the last paragraph on
16       the first page of Exhibit 8.  Just please
17       read to yourself the first three sentences.
18       I'm only going to ask you about the first
19       part of the paragraph.
20  A.   Okay.
21  Q.   Specifically the second sentence.  Was that
22       a true sentence at the time?
23            MR. CURCIO:  Objection.
24  A.   I have no way of knowing.  I think it's

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 25 of 65

Spiro Vardakas  9-5-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

50

1          Tecogen modules to Aegis if Aegis began

2          distributing products that competed with

3          Tecogen cogeneration modules?

4     A.   Would you repeat it, please.  I'm having

5          trouble concentrating on your question.

6                    (Court Reporter read back

7                     last question.)

8     A.   No, not really.

9     Q.   Why not?

10    A.   Well, we weren't particularly -- our biggest

11         concern was in the New York area was

12         competing against other dealers who were

13         also supplying Tecogens.  We might have

14         continued to use Tecogens in Connecticut and

15         Massachusetts, but only use a competing

16         device in the Metropolitan New York area.

17              We had no specific plan to dissolve

18         our relationship with Tecogen.  We had

19         standardized.  It was to our advantage to

20         keep, where we already had many Tecogens

21         installed in Connecticut and Massachusetts,

22         it was to our advantage from a service point

23         of view to keep the same device there; ease

24         of service, things like that.  Our primary

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

56



```
 1    Q.    Why did it believe that?

 2    A.    Because they wanted us to promote their

 3          product.

 4    Q.    Did Aegis believe it had Tecogen's

 5          permission to use Tecogen's product

 6          literature?

 7                    MR. CURCIO:  Objection.

 8    A.    They sent it to us.

 9    Q.    Did Aegis ever use Tecogen's installation

10          manual in Aegis' sales efforts?

11    A.    I never did.  We had our own design

12          practices starting back in 1985 that were

13          different.  I don't recall any of our people

14          saying, you know, I gave him a manual.  I

15          did this.  We had developed our own

16          techniques.  Generally, people wanted a

17          specific answer as opposed to having to read

18          through a book.

19    Q.    Prior to June 24, 2005, did Aegis ever work

20          on the Tecogen module with other Tecogen

21          sales representatives?

22    A.    I can't recall at any time that we did.  I

23          can't think of any reason why we would have.

24          We weren't in Upstate New York, which is
```

57



1             where Kistler was.  I don't think so.

2     Q.    Who was Kistler?

3     A.    He was a rep for Tecogen in Upstate New York

4             who did a pretty good job for them, I guess.

5     Q.    Prior to June 24, 2005, did Aegis ever

6             knowingly submit bids on the same projects

7             as Tecogen's other sales reps?

8     A.    I know we competed with All Systems in the

9             metropolitan down state New York.  But they

10            were also an installing servicing dealer as

11            we were.

12                     Other than the Lakeland situation,

13            I can't recall anything else.

14                     (Exhibit 114 marked

15                     for identification.)

16    Q.    Mr. Vardakas, could you please identify

17            Exhibit 114?

18    A.    It's a printout of our Gold Mine prospect

19            system for tracking sales efforts.

20    Q.    Did Aegis open or create a document like

21            this for every one of its sales efforts?

22    A.    We tried to.

23    Q.    Does it have copies of these types of

24            records for every one of its sales efforts?

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

58



1   A.   In various -- does it have copies, you mean

2        paper copies?

3   Q.   Yes.

4   A.   Sometimes there are paper copies that are

5        printed up and go into a file.

6   Q.   Does Aegis have electronic copies of these

7        records?

8   A.   We've changed systems so I'm not sure what

9        we have these days.

10  Q.   If you would look at the first page, down at

11       the very bottom, the left hand side.  It

12       reads, "printed on June 26, 2007 by John

13       DaSilva."

14            Who is John DaSilva?

15  A.   He is our marketing manager.

16  Q.   Does Mr. DaSilva have the ability to print

17       -- strike that.

18            As of June 26, 2007, did Mr.

19       DaSilva have the ability to print electronic

20       records into hard copy based on this

21       particular type of a record?

22  A.   Anybody could print it up.

23  Q.   Now, this document, Exhibit 114 is for JML

24       Care Center Skilled Nursing, correct?

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

59



```
 1    A.    Yes.

 2    Q.    Aegis installed a cogeneration system at JML

 3          Care Center Skilled facility in

 4          Massachusetts, correct?

 5    A.    Yes.

 6                MS. FROHLICH:  This will be

 7          Exhibit 115.

 8                (Exhibit 115 marked

 9                for identification.)

10    Q.    Mr. Vardakas, have you seen this document

11          before today?

12    A.    Yes.

13    Q.    When did you first see Exhibit 115?

14    A.    I probably saw it before it went out.

15    Q.    Why would you -- why would you probably have

16          seen it before it went out?

17    A.    I'm trying to review all the proposals so

18          that they, number one, I knew to make sure

19          we had the right price with all the right

20          information.  Things of that nature.

21    Q.    If you would turn to the second page of

22          Exhibit 115.  At the very bottom, it states,

23          "sincerely, sales consultant," and there's

24          no name.
```

Spiro Vardakas 10/9/2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

62

```
1            change for each job.

2    Q.      As of the date of Exhibit 115, August 11,

3            2004, was Aegis considering selling an Aegen

4            cogeneration module to JML Care Center?

5    A.      What date was that?

6    Q.      The date of the letter, August 11, 2004.

7    A.      I'm not sure when we introduced the Aegis to

8            that site.  We had, I know Paul had gone to

9            the site and gave them a presentation

10           probably with Tecogen literature, only

11           Tecogen literature.  JML is part of Cape Cod

12           Healthcare.

13                  At some point in the initial stages

14           of selling, we not only had to review what

15           we were thinking of doing and how it would

16           all work with the staff at JML, but we also

17           had to do it with the staff at the Falmouth

18           Hospital which was next door.  Because they

19           had "engineers" and more technical people to

20           evaluate these type of things.

21                  The same staff, I think it might

22           have even been an outside facilities

23           management company with a number of places

24           you use, maintenance people that are subbed
```

Spiro Vardakas 9-5-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

63

1          out to another company.

2                  They also knew something about the

3          Hyannis Hospital and relayed to us that they

4          were concerned about Tecogen products

5          because of a fire at a Techochill at the

6          Hyannis Hospital.  Rather than let that

7          become an obstacle in the process of

8          selling, offered the Aegen.

9     Q.   If I hear correctly, you said a fire

10         involving a Techochill?

11    A.   Yes.

12    Q.   Turn to the third page of Exhibit 115.

13         It's a document entitled Proposal For

14         Cogeneration Services For JML Care Services.

15         It starts on the third page.

16                  Was this proposal prepared by

17         Aegis?

18    A.   Yes.

19    Q.   Would it have been specifically Paul Lopes

20         who prepared this proposal?

21    A.   It could have been several people being

22         involved.  I had a marketing assistant at

23         the time also who helped put this material

24         together.  I think, John DaSilva was with us

Spiro Vardakas  5-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

64

1          at the time, but he would develop this type

2          of thing as well.

3      Q.   As of August 2004, did Aegis believe there

4          was a possibility of selling cogeneration

5          systems to other facilities within the Cape

6          Cod Healthcare System?

7                    MR. CURCIO:  Objection.

8      A.   Yes.

9      Q.   Approximately, how many other facilities did

10          Aegis believe it might be able to sell

11          cogeneration systems to within that system?

12     A.   Three others, perhaps.

13     Q.   When you say three others, do you mean three

14          other possible sites?

15     A.   Yes.

16     Q.   Did Aegis prepare proposals similar to the

17          one that's included within Exhibit 115 and

18          provide that type of proposal to other

19          prospective customers?

20     A.   Certainly -- you mean not to the other Cape

21          Cod healthcare?

22     Q.   No.  As a general matter, was this type of

23          proposal prepared for other customers?

24     A.   Various degrees.  Sometimes you wouldn't put

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

65

```
 1              the presentation.  It various the degrees we

 2              would provide information like this.

 3              Sometimes it would just be typed pages,

 4              energy analysis, things like that.

 5     Q.       How often did Aegis prepare this type of

 6              proposal?  By "this type," I mean the one

 7              that's included within Exhibit 115.

 8     A.       One out of every three or four proposals.

 9              It varied by salesman.  It varied by who

10              might have been involved.  There was no set

11              pattern.

12     Q.       Turn to the next page of Exhibit 115.

13              Bottom right hand corner says, JML 00035.

14                      Do you see the drawing depicted on

15              that page?

16     A.       Yes.

17     Q.       On the left hand side, it reads, "teco-drive

18              engine."

19                      Did that refer to a Tecogen module?

20     A.       It may have, yes.

21     Q.       Did Tecogen modules use an engine known as

22              the teco-drive engine?

23     A.       We never used that particular word.

24     Q.       Do you know who prepared this drawing?
```



Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

66

1    A.    I think it's from Tecogen.

2    Q.    Next, if you would turn to Exhibit 115.   Two

3          pages that are marked in the bottom right

4          hand corner; JML 00048 and 49.

5    A.    Yes.

6    Q.    What is the information that's being

7          conveyed in those pages?

8    A.    Sites that Aegis had installed cogeneration

9          systems.

10   Q.    With respect to each of the sites shown on

11         those two pages, did Aegis install Tecogen

12         cogeneration modules at those sites?

13   A.    Some were systems that we owned and they may

14         have used Tecogens that we bought elsewhere.

15         I would say, everything else, if I recall,

16         they are all Tecogen.

17              MR. CURCIO:  Can I make a

18         clarification.  We're looking at 00048.

19              MS. FROHLICH:  And 49.

20              THE WITNESS:  Yes.

21              MR. CURCIO:  He had not looked at

22         49 yet.

23   A.    I think they are all Tecogen.

24   Q.    My question was intended to encompass the

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 35 of 65
Spiro Vardakas 9-8-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

67



1          next page as well, those sites.  Were those

2          all Tecogens?

3    A.    Augustana is not.

4    Q.    When was that module installed?

5    A.    I believe, in '04.

6    Q.    Who at Aegis worked on the sale to

7          Augustana?

8    A.    I think, I was the primary.

9    Q.    What type of sale was that?  By "type," I

10         mean, was it a sale of a module and a system

11         to Augustana or was it a shared energy?

12   A.    No, it was an installation, purchase and

13         install with modifications to building

14         heating systems also.

15               The reason I was involved was, they

16         had gotten a proposal from All Systems and

17         they were looking for a competing proposal.

18         It had to be done very quickly so I could

19         make all these decisions very quickly.

20   Q.    When did Aegis first begin talking with

21         Augustana?

22   A.    Probably the beginning of '04.

23   Q.    Did Aegis enter into a written purchase and

24         installation agreement with Augustana?

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

68

1    A.    Yes.

2    Q.    When was that signed?

3    A.    I will say, spring of '04.

4    Q.    At any time in 2004, did Aegis tell Tecogen
5          it was in discussions with Augustana to
6          install an Aegen module at that site?

7    A.    No.  I assumed they would get that from All
8          Systems.

9    Q.    Did Aegis provide All Systems with any
10         information about its proposals to
11         Augustana?

12   A.    No.

13   Q.    Did Aegis provide All Systems with a copy of
14         the purchase and installation agreement that
15         Aegis signed with Augustana?

16   A.    No.

17   Q.    Did Aegis provide Tecogen a copy of the
18         purchase and sale agreement that Aegis
19         signed with Augustana?

20   A.    No.

21   Q.    Why didn't Aegis tell Tecogen in 2004 that
22         Aegis had entered into an agreement to
23         install an Aegen module at Augustana?

24   A.    Because, I assume, they would hear it from

69

1        All Systems.  We were successful in getting

2        the project.  Assuming they were a good

3        dealer and good competitor out there, they

4        would have certainly followed up with the

5        customer as to why their proposal wasn't

6        accepted.  That's what good salespeople do.

7        It was no secret.

8               Did they?  Scratch that.

9  Q.    Going back to the two pages in Exhibit 115

10       that lists sites.  Did Aegis require JML to

11       agree in writing to keep the information on

12       those two pages confidential?

13  A.    Talking about the map?

14  Q.    The map at page 00048 and the page after it,

15       49.

16  A.    No, we never asked.

17  Q.    Did Aegis ever provide site lists like those

18       on these two pages to other prospective

19       customers?

20  A.    Many.

21  Q.    Did Aegis ever require any of those other

22       customers to keep this site location

23       information confidential?

24  A.    Never.

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 38 of 65

Spiro Vardakas 9-5-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

70



1           MS. FROHLICH:  This will be

2      Exhibit 116.

3                (Exhibit 116 marked

4                for identification.)

5   Q.   Mr. Vardakas, have you seen a copy of

6      Exhibit 116 before today?

7   A.   Probably back then.

8   Q.   Mr. Vardakas the first line of this e-mail

9      says from and then it has an e-mail address

10      that begins PM Lopes underscored energy pro.

11                Do you see that?

12   A.   Yes.

13   Q.   PM Lopes was Paul Lopes, correct?

14   A.   Right.

15   Q.   Do you know what energy pro refers to in

16      that e-mail address?

17   A.   I assume, it's his e-mail.  I can't say I

18      ever noticed it before.

19   Q.   It doesn't refer to a company, in other

20      words, to your knowledge?

21   A.   I don't think so, no.  I think it refers to

22      Paul.

23   Q.   In the second sentence of the e-mail, Mr.

24      Lopes states that the presentation to JML

Spiro Vardakas 9/6/2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

71

1          Care Center went well.

2                    Do you know who attended that

3          presentation?

4     A.   Paul did.  I believe, I did.  Only because I

5          am quoted as making some suggestions here,

6          yes.  I guess, I did, yes.

7     Q.   What was said at that presentation about

8          cogeneration modules that might be used in

9          the JML project?

10                   MR. CURCIO:  Objection.

11    Q.   Strike that.

12                   Was anything said at that

13         presentation about cogeneration modules that

14         might be used at JML?

15    A.   I don't recall.  It may have been -- I

16         think, we had already talked about the Aegen

17         or the use of the Aegen.  We probably talked

18         about an Aegen module at that time.  I don't

19         think we had literature.  Not to say I

20         didn't show him a photograph or something,

21         but I don't think we had literature or

22         handouts to give out.  I believe, we had

23         already given out literature on our initial

24         presentation, Paul's initial presentation

Spiro Vardakas 5/6/2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

72

```
 1              regarding a Tecogen.

 2    Q.    So, to your knowledge, the presentation

 3          that's referred to in Exhibit 116 was not

 4          the first presentation made by Aegis to JML?

 5    A.    No.   The sales process involved generally

 6          two presentations; one of the technology and

 7          Aegis' track record.   We probably gave them

 8          literature about Tecogen.   When we get their

 9          energy bills, we do a presentation where we

10          get specific about a pricing proposal as we

11          have here on August 11th.

12    Q.    Going back to the Augustana Lutheran Home.

13          Would you have followed the same type of

14          sales procedure with that project?

15    A.    You mean this --

16    Q.    Same two step presentation.

17    A.    Sure.   Sure I did, yes.

18    Q.    Does Aegis have any records that concern the

19          Augustana Lutheran Home project?

20    A.    I would think so, yes.

21                 MS. FROHLICH:   117.

22                 (Exhibit 117 marked

23                 for identification.)

24    Q.    Mr. Vardakas, can you please identify
```



Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

76

```
 1                project to accommodate this process.  Things

 2                were done at different times than we would

 3                normally do it.

 4      Q.        Looking back at the maintenance agreement,

 5                Exhibit 117.  By the time you signed the

 6                maintenance agreement, had the Aegen module

 7                already been installed at JML?

 8      A.        I would think so.

 9      Q.        Was Augustana the first site at which an

10                Aegen module was installed?

11      A.        I think so.  Yes.

12                          (Exhibit 120 marked

13                           for identification.)

14      Q.        Mr. Vardakas, would you please identify

15                Exhibit 120?

16      A.        It's a fax from Aegis to Claire at JML

17                regarding the billing.

18      Q.        If you look at the second page.  Is that an

19                Aegis invoice?

20      A.        Yes, it is.

21      Q.        Does Aegis' accounting records include

22                copies of invoices like this one for all

23                projects?

24      A.        I think so.
```

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

82



```
 1    A.    No.  The way it was said to me, it was the
 2          device itself.
 3    Q.    Who said that to you?
 4    A.    I'm not sure if it was the people at JML or
 5          people down at the hospital where we were
 6          reviewing with them what we were planning to
 7          do.  There were a number of people,
 8          including the executive officer of the
 9          hospital, too.  He oversaw JML as well.  He
10          had to bless the recommendations.
11    Q.    Do you know whether anyone at Tecogen had
12          any knowledge of a fire involving a
13          Techochill machine at the Hyannis facility?
14    A.    I don't.  I would assume they did.
15    Q.    Why would you assume that?
16    A.    I would assume they would have called
17          Tecogen.  Tecogen was servicing the
18          equipment, I would assume.
19    Q.    How do you know that Tecogen was servicing
20          the equipment at Hyannis?
21    A.    I think, I assumed it.
22    Q.    Prior to June 24, 2005, Aegis never
23          disclosed to Tecogen that it had sold an
24          Aegen module to JML, correct?
```



Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

83

```
 1     A.    I don't think we did, no.

 2     Q.    Why did Aegen not disclose that information

 3           -- strike that.

 4                 Why did Aegis not disclose that

 5           information to Tecogen?

 6     A.    There was no particular reason.  Just didn't

 7           get into it.  Our literature afterwards had

 8           JML on there.  Perhaps our maps afterwards.

 9           We promoted the facility.  Tecogen saw our

10           literature from time to time.  There was no

11           secret about it.

12     Q.    Did your literature promoting JML say

13           anything about an Aegen module being

14           developed --

15     A.    No, it didn't.

16     Q.    Why not?

17     A.    We weren't planning to promote the Aegens in

18           Connecticut and Massachusetts.  That was not

19           our goal.

20     Q.    Then why did you sell an Aegen module in

21           Massachusetts?

22     A.    Because the Tecogen product represented an

23           obstacle to the sale of a system.

24     Q.    Aegis felt no obligation, no responsibility
```

1              to represent Tecogen when it came to JML; is

2              that right?

3                          MR. CURCIO:  Objection.

4       A.    I don't know what I felt.  You don't keep

5              these things secret.  They're outside.  As a

6              matter of fact, the JML unit is outside.

7              The Augustana unit is outside.  There's no

8              secret about these things.  Would they find

9              out eventually, we would have expected them

10             to.

11      Q.    Did you consciously make the decision not to

12             tell Tecogen about Aegen modules?

13      A.    No.

14      Q.    Did you consciously --

15      A.    I'm sorry, about the modules?

16      Q.    About Aegen modules.

17      A.    Developing modules?

18      Q.    Yes.

19      A.    Yes.  They made decisions without reviewing

20             them with us either.

21      Q.    What decision?

22      A.    They developed ADG and they didn't ask us

23             about it until it became a fact.  I didn't

24             feel any obligation to inform them about

Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

85



```
 1                  what our business plans are.
 2      Q.    Did Aegis have a written business plan for
 3            the Aegen modules?
 4      A.    No.  I don't think we have ever written a
 5            business plan.  It's a plan that evolves.
 6                  (Exhibit 123 marked
 7                  for identification.)
 8      Q.    Mr. Vardakas, would you please review
 9            Exhibit 123.  When you're finished with your
10            review, please identify this document for
11            us.
12      A.    It's a Gold Mine prospective update for
13            Bradley Home in Meredin, Connecticut.
14      Q.    Did you work on the Bradley Home project?
15      A.    Yes, I did.
16      Q.    If you look on the first page of
17            Exhibit 123, the right hand column at the
18            top, the entry for account manager and the
19            name Bruce Taylor.  Do you see that?
20      A.    Yes.
21      Q.    Was Bruce Taylor an employee of Aegis?
22      A.    Yes, he was.
23      Q.    Is he still with Aegis?
24      A.    No.
```

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

110

1      matter of fact, yes, I have.  I have in

2      Connecticut.

3                 (Exhibits 132-133 marked

4                 for identification.)

5   Q.   Mr. Vardakas, can you identify Exhibit 132?

6   A.   Yes.  It's to the Massachusetts Department

7        of Telecommunications regarding stand-by

8        rates, NStar stand-by rate proposals, I

9        believe.

10  Q.   Turn to the last page of Exhibit 132.  Is

11       that your signature?

12  A.   Yes.

13  Q.   Did you send this letter to Mary Cotrell,

14       the secretary of the Department of Energy?

15  A.   I think so.

16  Q.   Did you draft the letter that's been marked

17       as Exhibit 132?

18  A.   Yes.

19  Q.   What was the purpose of this letter?

20  A.   I think, they were opening up hearings on

21       NStar application for stand-by rates and

22       were inviting introductory comments from

23       parties of interest.  We sent it in so we

24       could become a party to this issue.

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

111

1    Q.    Do you recall how much time you spent

2          drafting this August 1, 2002 letter?

3    A.    Quite a bit probably.

4    Q.    Can you identify Exhibit 133?

5    A.    I may be incorrect on the first one.  Now I

6          know.  I need to correct what I told you

7          before.

8                This had to do, the first one in

9          '02 had to do with, DTE had passed a

10         resolution about establishing uniform

11         interconnect policies for DG to

12         Massachusetts electric utility systems and I

13         wanted to be a player in that.  So this was

14         -- they invited comments from people and I

15         became a player in it.

16   Q.    You're referring to the letter that's

17         Exhibit 132?

18   A.    Yes.  132, August 1, '02.  That was that

19         one.

20               133 had to do with the NStar

21         stand-by rate issue.  I wanted to be a party

22         to that also.

23   Q.    Exhibit 133, in part, identifies the

24         documents as pre-filed direct testimony of

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

112

1        Spiro Vardakas, March 16, 2004.  Did you

2        prepare this document?

3   A.   Yes, I did.

4   Q.   Did you have any assistance from anyone

5        else?

6   A.   With a young lady in my office who follows

7        utility rates and to some extent some of the

8        regulatory ongoings in various states.

9   Q.   On the second page, you identified yourself

10       as the CEO and CFO with Aegis Energy

11       Services, Inc.

12           As of March 16, 2004, were you the

13       CFO of Aegis?

14   A.   Yes, I was and am.

15   Q.   During what periods of time were you CFO of

16       Aegis?

17   A.   I have always been CFO.  I have always been

18       CEO, as the terms are used.

19   Q.   Are you currently president and CFO of

20       Energy Services?

21   A.   Technically, I'm president, I'm chairman of

22       the board, and I am the board.

23   Q.   At present, you are not the CFO of the

24       company?

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

113

1    A.    I would consider myself CFO, yes.  I am
2          responsible for all financial issues.
3    Q.    Now, back on Lakeland.  Did you know what
4          Atlantic's role was on the Lakeland project?
5    A.    I think so.
6    Q.    What was its role?
7    A.    Escrow energy service company to develop a
8          project for the Lakeland schools.  As I
9          described earlier.
10   Q.    When did Aegis first learn about the
11         Lakeland project?
12   A.    Lee had worked with Energy Concepts back in
13         '04 to provide some budget prices, do some
14         value engineering.  My understanding, there
15         was a problem with the cost, whether they
16         were going to be able to go forward.  Asked
17         Lee for some help on it.
18   Q.    Did Lee provide help Energy Concepts?
19   A.    Yes, he did.
20   Q.    What did he do?
21   A.    He prepared some letters, some estimated
22         costs, what the systems might consist of.  I
23         forget all the details of it.  He may have
24         made some suggestions on how to reduce some

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

114

1        costs.  I believe, the concern was that

2        prices on everything was more than what the

3        budget would allow.

4    Q.  I show you two documents that have been

5        marked as Exhibits 14 and 15 in earlier

6        depositions.

7                Have you seen either of these

8        documents before today?

9    A.  I don't recall the documents.  However, I

10       was involved in discussions on these

11       proposals with Lee and with Tecogen.

12   Q.  How many discussions did you have with Lee

13       about these proposals?

14   A.  Several.

15   Q.  How many of those discussions occurred

16       before April 18, 2005?

17   A.  Several.  In that I had forgotten about

18       Lee's activities in the project earlier.  We

19       got a call from J&M Mechanical asking for

20       quote on equipment that he -- we had never

21       heard of him before.  He indicated that he

22       didn't like the Tecogen rep who was involved

23       in the project and didn't want to do

24       business with him and we would give him a



1          Tecogen modules and the other for Aegen

2          modules?

3    A.    There was no other case where we did.  It

4          was one or the other.

5    Q.    Prior to submitting the proposal to supply

6          Aegen cogeneration units for the Lakeland

7          project, did Aegis tell Tecogen that it was

8          going to be submitting that proposal?

9    A.    I don't know.  I never did.  I don't know

10         what Lee did.

11   Q.    Why didn't you tell anyone at Tecogen that

12         Aegis --

13   A.    I wasn't that involved in the project.

14   Q.    Were you involved with Tecogen?

15                   MR. CURCIO:  Objection.

16   A.    I don't recall any activities around that

17         time where I had involvement with Tecogen.

18         Well, I did have some involvement with

19         Tecogen back in '04 in this case.  That

20         would be on Exhibit 133.

21                   In general, Lee took care of the

22         orders with Jeff Glick.

23   Q.    At any time after submitting the Aegen

24         module proposal marked as Exhibit 15, did



```
 1                outdoors, are they installed in any kind of
 2                a structure?
 3       A.       They are in an enclosure.
 4       Q.       The module itself is within the enclosure,
 5                correct?
 6       A.       Correct.
 7       Q.       Does the enclosure have signage on the
 8                outside that identifies the module
 9                manufacturer?
10       A.       No, I don't think so.  I don't think it
11                does.
12       Q.       Are these enclosures typically unlocked?
13       A.       Sometimes.  I can't say they are typically
14                locked or unlocked.
15       Q.       This is an exhibit that's previously been
16                marked as Exhibit 26.  This is a price
17                quotation from Aegis to J&M Heating for the
18                Lakeland project, correct?
19       A.       Yes.
20       Q.       And Exhibit 26 quotes a price of $805,000
21                for 11 Aegen modules, correct?
22       A.       Yes.
23       Q.       Did J&M pay Aegis $805,000 for 11 Aegen
24                modules installed or sold to J&M for the
```

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 53 of 65
Spiro Vardakas 9/6/2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

139



1           Lakeland project?

2    A.     I would assume so, but I don't really know

3           the exact amount.

4    Q.     That's fair.

5    A.     We quoted them that.

6    Q.     This is a document that's previously been

7           marked as Exhibit 30.

8    A.     Okay.

9    Q.     Now, with Exhibit 30 in front of you, and I

10          need you to put Exhibit 26 also in front of

11          you.  Keep both of them in front of you.

12                 Within Exhibit 30, if you would

13          turn to page 38.  Do you see the drawing on

14          page 38 of Exhibit 30?

15   A.     Yes.

16   Q.     Do you see the bullet points on Exhibit 26

17          identifying equipment?

18   A.     Yes.

19   Q.     Are there any items listed in the bullet

20          points on Exhibit 26 that are not shown in

21          the drawing on page 38 of Exhibit 30?

22   A.     This doesn't show switch gear.

23   Q.     Switch gear is not shown in the bullet

24          points or on the drawing?

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 54 of 65
Spiro Vardakas 9-8-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

142



1    long-term planning.  Everything from when we

2    first got started and Tecogen getting

3    involved with the Techochill or they lost a

4    lot of interest in the cogen business.  We

5    sourced just about everything on the device

6    except the microprocessor.  We even came

7    across somebody else's controller or

8    microprocessor that we mounted to a Tecogen

9    at a site we had just to see if it was

10   necessary.  Tecogen decided to drop out of

11   the business and we could access a

12   controller that would run the system.

13   Q.   When was that?

14   A.   Late eighties, early nineties.  We got that

15        from a company that built a couple of their

16        own versions of Tecogens called ICC.  They

17        had talked to some electronics company in

18        the Pennsylvania area.  The company sent us

19        a controller at no cost.

20   Q.   Did you make the decision to actually begin

21        development of an Aegen module?

22   A.   I would say that we were not particularly

23        interested in getting into the manufacturing

24        of the product.  We liked the Tecogen

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

143



1      product.  We had good relations with

2      Tecogen.  Around the time that ADG came

3      about was a time that we thought we should

4      start a little thinking about our own

5      machine.

6  Q.  I believe, you testified earlier that ADG

7      came about in, or you learned about it in

8      2001 or 2002.

9  A.  Somewhere around there.

10  Q.  Are there any records at Aegis that would

11     help you determine whether it was in 2001 or

12     2002 that you began actually doing work on

13     an Aegen module?

14  A.  We hadn't done much work.  In '02, for

15     example, we were looking for possible

16     controllers, microprocessors, whatever you

17     want to call it, to see what was available.

18     Being an induction machine it was not that

19     common a device.  Particular manufacturers

20     of stand-by emergency generators had a

21     different type of controller.

22         But anyway, we went looking for

23     that in the latter part of '02, and I would

24     say we got serious about it after the

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

144



1           meetings we had with Tecogen and ADG

2           beginning in '03.

3    Q.     Now, beginning in '03 when you got serious

4           about it, at that point in time, Aegis did

5           not tell Tecogen that Aegis was getting

6           serious about developing its own

7           cogeneration module, correct?

8    A.     No.

9    Q.     Why not?

10   A.     They didn't tell us about ADG until it

11          became a reality either.

12   Q.     They told you about ADG, correct?

13   A.     After it became a reality.  Barry Sanders

14          was on board.

15   Q.     A beta model of an Aegen cogeneration module

16          was developed, correct?

17                  MR. CURCIO:  Objection.

18   A.     A first model.

19   Q.     When was that?

20   A.     I would say it was worked on during '03.

21          May have started up toward the end of '03.

22   Q.     Was that the first module actually installed

23          at a customer site?

24   A.     No.

Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.



1  Q.   The first production module was installed

2       at, I want to say, Augustana?

3  A.   I think so.

4  Q.   Correct?

5  A.   I think so.

6  Q.   And that was in 2004?

7  A.   Yes.

8  Q.   At no time from 2002 through 2005, did Aegis

9       ever tell anyone at Tecogen that it was

10      developing and then installing Aegen

11      modules, correct?

12 A.   No.  I never did.  I don't think Lee did.

13 Q.   At any point during that time period, from

14      2002 through mid-2005, did you have any

15      concerns about what Tecogen might do if it

16      learned that Aegis was developing and then

17      selling its own competing cogeneration

18      module?

19 A.   I didn't have any particular concerns

20      because we had no specific plans and we were

21      selling Tecogens.  I assumed during all of

22      '04, after Augustana, that Tecogen knew.

23 Q.   Did it surprise you that no one from Tecogen

24      ever asked you about Aegen modules in the

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

149

```
 1                  MS. FROHLICH:  If it's as to form
 2          you will lose it if you don't say it.
 3    Q.    Go ahead and answer.
 4    A.    The only reason for blue is because it was
 5          in our logo for years.  What components were
 6          painted blue, I'm not sure any great
 7          deliberations went on.  The only
 8          deliberations that I can recall is that the
 9          substantial enclosure be a different color.
10    Q.    Switching gears a little bit here.
11                  Are you familiar with a standard
12          called American Gas Association standard for
13          gas fire engine driven cogeneration
14          appliances?
15    A.    Yes, I am.
16    Q.    As of July 21, 2005, was the Aegen TP-75 LE
17          module certified as a unit by a nationally
18          recognized testing laboratory to meet that
19          AGA standard?
20    A.    No, it wasn't.  It wasn't reviewed by any
21          testing laboratory, but it had all the
22          devices on it that the AGA standard
23          required.  So in regards to its operation,
24          if one devices certified and both device is
```

Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

150

1           have the same equipment then they both have

2           the same level of safety.

3      Q.   Just to be clear.

4                As of July 21, 2005, ND TP-75 LE

5           module was not certified as a unit by a

6           nationally recognized testing laboratory to

7           meet the AGA standard, correct?

8      A.   It wasn't tested and reviewed by any outside

9           agency.

10     Q.   It had not been certified by an outside

11          agency to meet the AGA standard?

12     A.   That's right.

13     Q.   Are you familiar with an agency called

14          Institute For Electrical and Electron

15          Engineers P1547- D07?

16     A.   There's a 1547 applicable, referred to as UL

17          1547.  IEEE, I'm not sure is 1547.  What

18          standard does that cover?

19     Q.   Tell you what.  Let's do this.  If we can

20          find Exhibit 6.  Let me direct you to

21          Exhibit D within Exhibit 6.

22               That's a July 18, 2005 letter from

23          Robert Panora at Tecogen to Mr. Robert Paige

24          at Chemung County Health Center, correct?

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

151



1   A.    Right.

2   Q.    Mr. Panora attached two pages to his letter,

3         correct?  I want to point you to the first

4         page of the attachment, which would be the

5         third page of this Exhibit D.  In the table

6         on the left hand column, under

7         interconnection compliance, do you see IEEE

8         P1547-D07?

9   A.    Yes.

10  Q.    Are you familiar with that standard?

11  A.    I think so, yes.

12  Q.    As of July 21, 2005, had an outside testing

13        agency certified the Aegen module to meet

14        that IEEE standard?

15  A.    The relay meets the standard.

16  Q.    I'm not asking about the --

17  A.    It's part of our module.

18  Q.    Had your entire module been certified?

19  A.    Nobody tests the entire module to this

20        standard.  This standard does not include

21        the entire module.  It only includes the

22        protective functions of any device.

23  Q.    So it's your testimony that relay does meet

24        the IEEE 1547 standard?

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

152



1    A.    Yes.  Yes, it does.

2    Q.    Did you actually, as of July 21, 2005, had

3          Aegis submitted its particular module to

4          testing by an outside lab?

5    A.    The relay was purchased as a certified

6          device.

7    Q.    Are you familiar with the New York State

8          interconnect requirements?

9    A.    Yes.

10   Q.    As of July 21, 2005, had a nationally

11         recognized testing lab certified the Aegen

12         module to meet that requirement?

13   A.    Yes.  The Beckwith relay was certified for

14         that purpose.  And it was listed in the New

15         York State list of approved devices.

16   Q.    Glad you brought that up.

17                (Exhibit 135 marked

18                for identification.)

19   Q.    Mr. Vardakas, Exhibit 135 was produced to us

20         by Aegis in this lawsuit or by the

21         defendants in this lawsuit.

22                Have you seen this document before

23         today?

24   A.    Yes, I have.

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

154



```
 1     Q.    I didn't ask you that.

 2     A.    Okay.

 3     Q.    Are you familiar with the standard called

 4           California Electric Rule 21?

 5     A.    I used to be.  I had seen it a long time.

 6     Q.    As of July 21, 2005, had the Aegen module as

 7           a unit been certified to meet that standard?

 8     A.    No.  We never have any interest in

 9           California.

10     Q.    As of July 21, 2005, did Aegis' website

11           state whether the Aegen module TP-75 LE as a

12           unit had been certified by a nationally

13           recognized testing lab to be in compliance

14           with the AGA, IEEE, or any of the other

15           standards?

16     A.    I don't think it says that, does it?

17     Q.    I'm asking you.

18     A.    I don't think so.  It talks about an UL

19           approval.

20     Q.    As of July 18, 2005, did any agency's

21           website state whether the Aegen module as a

22           unit had been certified as meeting any of

23           the four standards we've talked about so

24           far?
```

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 63 of 65

Spiro Vardakas 9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

159



```
 1              was thoroughly tested.  It was run for long
 2              periods of time under various conditions.
 3              It was sold and operated in customer
 4              facilities operating very well.
 5      Q.      Just so I'm clear.
 6                      Other than the sites that we has
 7              discussed so far in this deposition, have
 8              the Aegen unit been placed in any other
 9              third-party location in the market?
10      A.      Mulenberg down in Brooklyn.  At this time,
11              it's operating at JML.  Bradley was not
12              running then.  It had been at Whitney.  And
13              it also had been reviewed by gas companies.
14              It had been reviewed and tested by various
15              electric companies in regards to meeting
16              their standards.
17      Q.      Did I hear correctly that you testified an
18              Aegen unit had been installed in Mulenberg
19              in Brooklyn?
20      A.      Yes.
21      Q.      Is that a different site than Augustana?
22      A.      Yes.
23      Q.      When was an Aegen unit installed in
24              Mulenberg?
```

Case 1:05-cv-11823-RCL    Document 43-9    Filed 07/14/2008    Page 64 of 65

Spiro Vardakas  9-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

160

1     A.    Late in '04, '05.

2     Q.    Who worked on that -- strike that.

3                 Was that a purchase and

4     installation?

5     A.    Yes, it was.

6     Q.    Who worked on that purchase and

7     installation?

8     A.    One of my salesmen and myself.

9     Q.    Who was the salesman?

10    A.    Rick Allain.

11    Q.    How do you spell the last name?

12    A.    A L L A I N.

13    Q.    When did Aegis begin working on the

14    Mulenberg project?

15    A.    Around '04, '05.

16    Q.    Did Aegis enter into a written purchase and

17    installation agreement?

18    A.    Yes.

19    Q.    Does Aegis have a copy of that agreement?

20    A.    Probably.

21    Q.    Does Aegis have a file on all of the

22    materials that were exchanged with

23    Mulenberg?

24    A.    Probably.



Spiro Vardakas 5-6-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

161

1    Q.    Does Aegis have a Gold Mine report on

2          Mulenberg?

3    A.    Probably.

4    Q.    Other than the sites that we've discussed so

5          far, Mulenberg, Augustana, JML, Whitney,

6          were there any other locations?

7    A.    I can't think of anything at the moment.

8    Q.    Are there any records at Aegis that you

9          could look at to refresh your memory as to

10         whether there are any other sites where

11         Aegen modules have been installed prior to

12         June 24, 2005?

13   A.    Obviously, there's some records.

14               Statement, second line, third

15         paragraph.  "Gas, electrical appliances for

16         which certification is a fundamental

17         requirement; especially to the public, in a

18         public facility."  I don't know of any

19         specific public record that says that type

20         of thing.

21               We have done public facilities and

22         nobody asked, at no time did anybody ask for

23         certifications other than the utility in

24         regards to the electrical and its

# Tecogen Ex. 9

**TECOGEN INC**

145 First Avenue
P.O. Box 9046
Waltham, MA 02254-9046

(617)622-1400
Fax: (617)622-1359



090793

# TECOGEN INC.

## SALES REPRESENTATIVE AGREEMENT

THIS AGREEMENT made on the 7th day of September, 1993, by and between Tecogen Inc., with its principal office located at 45 First Avenue, Waltham, MA 02254 ("Tecogen") and AEGIS Energy, with an office located at 193 Falley Drive, Westfield, MA 01085 (the "Representative").

### WITNESSETH:

Whereas, Tecogen is engaged in the manufacture and sale of products including industrial equipment and accessories;

Whereas, Representative desires to promote and to solicit the sale of certain of said products;

Now, therefore, in consideration of the premises and for other good and valuable consideration each to the other given, the parties hereto agree as follows:

1.  <u>Rights of the Representative</u>. The Representative shall be an authorized representative of Tecogen with the exclusive right to solicit the sale of Tecogen products and services in accordance with the terms of this Agreement.

2.  <u>Tecogen Policies and Procedures</u>. The Representative shall comply with Tecogen's existing sales, service and service parts policies and procedures, which do not conflict with this agreement. Such policies and procedures which may be ammended, are furnished to the Representative from time to time. Tecogen shall furnish sales materials at no cost to the Representative.

TECOGEN Inc is a subsidiary of Thermo Electron Corporation                    T 1696

3.  <u>List of Products and Services</u>. Tecogen hereby authorizes the Representative to solicit the sale of the products and services set forth on the document marked Exhibit "A" attached hereto and made a part hereof (the "Products"). The Representative agrees that Tecogen may from time to time modify this Agreement by providing to the Representative a mutually agreeable substitute Exhibit "A".

4.  <u>Payment and Equipment Pricing</u>.

A commission shall be paid to the Representative for the sale of all Products listed on Exhibit "A" sold by the Representative within the territory, described in Exhibit "D" (the "Territory") during the term of this Agreement in accordance with Paragraph 5. Par, or standard sales price, to the purchaser of the Products shall be equal to the Par Value Multiplier set forth in Exhibit "B" times the amount at which such Products are then listed on Tecogen's current price list.

5.  <u>Determination and Payment of Commissions To the Representative</u>.

a.  The Representative shall be entitled to full commission on each Order for which all of the following occur in the Territory: (1) Product specification, (2) issuance of an order and (3) installation of a Product. However, when one or more of these three functions occurs in a territory other than the Territory, the commission for all functions shall be distributed as per Exhibit "C" and subject to Section d of this Paragraph 5. The whole commission amount will be computed as follows:

i.   Products sold at par or standard sales price shall return a commission to the Representative of equal to the Par Commission Multiplier set forth in Exhibit "B" times the net sales price (sales price after deducting transportation charges, applicable taxes, design and/or installation consulting fees, startup and/or first year service monies, collection fees, rebates or returns.)

ii.  Products sold above par or standard sales price:  Net overage shall be shared equally by the Representative and Tecogen.

iii. Products sold below par or standard sales price:  Net underage shall be borne equally by the Representative and Tecogen.

iv.  The minimum sale price for Products shall be equal to the Minimum Price Multiplier set forth on Exhibit "B" times the current published list price.

2

T 1697

b.    Commissions on the sale of products shall be paid to the Representative within ten (10) days after full payment of the invoice for such Products by the purchaser of such Products. If for any reason Tecogen does not receive full payment from the customer, the Representative shall receive only his pro rata share of the commission for the portion of the net sales price actually received Tecogen.

c.    It is understood and agreed that all commissions under this paragraph 5 shall be subject to such split commissions policies as Tecogen may from time to time promulgate. The Representative furthermore recognizes that Tecogen, upon agreement with the representative, may change any of the multipliers in Exhibit "B" by giving ninety (90) days prior notice to the Representative.

d.    Notwithstanding anything to the contrary in this Paragraph 5 or elsewhere in this Agreement, commissions shall be due and payable to the Representative only on orders which the Representative has demonstrted reasonable efforts to solicit and procure in accordance with its responsibilities set forth in Paragraph 9.

6.    Product Orders.

a. Product orders submitted by the Representative shall be deemed to be an offer to purchase by the purchaser, and all product orders are subject to final approval and acceptance by Tecogen at its office in Waltham, Massachusetts.

b. Tecogen may designate by written notice to the Representative certain existing customers within the Territory as "Direct Accounts". The Representative will not be paid commissions on sales to a Direct Account which were ordered after notice has been given to the Representative that the customer is a Direct Account. The Representative's responsibilities set forth in Paragraph 9 will not apply to Direct Accounts. At this time there are no existing Direct Accounts within the Territory. Tecogen does not currently anticipate any direct accounts being added in the near future within the Territory.

7.    Price Changes. The Representative recognizes and agrees that Tecogen may change the price of any Product at any time upon ninety (90) days prior written notice to the Representative.

8.    Representative Is Independent Contractor. The Representative shall be an independent contractor. Nothing contained in this Agreement shall be construed to create the

3

T 1698

relationship of employer and employee between Tecogen and the Representative or between Tecogen and any agent or any employee of the Representative. Without limiting the foregoing, the Representative shall have no authority to act for or to bind Tecogen in any way, to alter any of the terms or conditions of any standard forms or other agreements of Tecogen with purchasers of products, to make representations or warranties or to execute agreements on behalf of Tecogen or to represent that Tecogen is in any way responsible for the acts or omissions of the Representative. The Representative shall indemnify and hold Tecogen harmless for any liability, loss or damage (including reasonable attorney's fees) to Tecogen resulting from a violation of this Paragraph 8.

9. <u>Responsibilities of Representative.</u>

    a. The Representative shall promote the sale of the Products set forth on Exhibit "A" and render sales and technical services in the Territory.

    b. The Representative shall not personally or through its employees represent himself, herself or themselves as officers or employees of Tecogen.

    c. It is acknowledged and agreed by the parties that the policy of Tecogen prohibits the payment by any employee or any sales representative of any substantial fee, gift or any other form of compensation as a consideration for or inducement to the obtaining of any contract or order or for the procurement of goods or services on behalf of Tecogen. The Representative shall not make any unlawful payments in order to secure a sale or improve its competitive position, and the Representative shall perform its obligations under this Agreement in accordance with all laws, ordinances, rules and regulations of any and all applicable public authorities.

    d. The Representative shall devote its best efforts to promote the maximum sale of the Products in the Territory and to that end shall be required:

        i. To make personal calls on customers and prospective customers in the Territory as frequently as possible and as required by Tecogen.

        ii. To render sales and technical services to customers and prospective customers, both before and after sale, as required.

T 1699

iii.    To maintain an office equipped with telephone service during business hours to assure rapid communications.

iv.    To maintain a staff adequate to provide sales coverage in the Territory.

v.    To report on calls made to customers and prospective customers at such times as requested by Tecogen. Tecogen will treat this information as proprietary and confidential.

vi.    To furnish Tecogen with copies of all letters and other written information submitted by the Representative to customers and prospective customers. Tecogen will treat this information as proprietary and confidential.

vii.    To assist Tecogen, at the Representative's expense, in presentations at trade shows and in sales promotional campaigns when required by Tecogen.

e.    The Representative shall pay and be responsible for all expenses in connection with the performance of the terms and conditions of this Agreement on its part, including but not limited to rent, light, heat, telephone, telegraph, postage, stationery, office supplies, salaries of all employees and travel and entertainment expense, and Tecogen shall have no responsibility or liability therefor.

f.    The Representative shall, prior to the commencement of each calendar quarter, furnish to Tecogen sales forecasts for the customers in the Territory for such quarter.

g.    The Representative shall maintain customer contacts with respect to such items as drawings, specifications, termination claims, controversial items, and any other transactions directly or incidentally arising from the processing of the business of a customer or prospective customer, or from the initiation, administration or continuation of contacts with that customer.

h.    The Representative shall not receive any funds or enter into any contractual liability on behalf of Tecogen.

i.    The Representative shall report available information as to the credit standing of potential or actual customers to Tecogen.

j.    The Representative shall report to Tecogen any violations of Tecogen's

T 1700

trademarks by other parties of which the Representative becomes aware.

k.  The Representative agrees to indemnify and save harmless Tecogen from all losses and damages (including reasonable attorney's fees) that Tecogen may sustain or become liable for by reason of claims against it resulting from unauthorized acts or statements of the Representative or the Representative's employees, agents or Representatives.   Tecogen agrees to indemnify the Representative for the same including product liability.

l.  The Representative will use its best efforts to assist Tecogen, upon its request, with any collections for Products sold in the Territory, and shall remit to Tecogen any amounts paid to the Representative by a customer for Products, inadvertently or otherwise.

m.  The parties agree to a quarterly review of the Representative's sales and/or promotional performance in accordance with the terms of this Agreement and with the sales quotas set forth in Exhibit "F".

10.  <u>Term and Termination.</u>

a.  The initial term of this Agreement shall commence and be effective as of the date first above written and shall terminate on the second anniversary of such date. Thereafter this Agreement shall be renewed for successive one-year terms unless either party provides to the other party written notice of its intent to terminate, with or without cause, at least sixty (60) days prior to the end of the term. Notwithstanding anything to the contrary in this Section 10.a, this Agreement may be terminated early pursuant to Section b of this Paragraph 10.

b.  This Agreement may be terminated with cause, as defined below, by either party upon thirty (30) days prior written notice to the other party, except that in the event that a party becomes insolvent or seeks to terminate its existence, or in the event that any petition in bankruptcy, either voluntary or involuntary, is filed with respect to the business of a party, the other party may terminate this Agreement effective immediately upon the delivery of written notice.

c.  Upon either receipt of or mailing of notice of termination of this Agreement, the Representative shall, within ten (10) working days, submit to Tecogen at its office in Waltham, Massachusetts a written list of outstanding quotations or pending projects originated by the Representative.   Tecogen shall pay the

T 1701

Representative a portion of the commission described in paragraph 5 for such quotations and/or pending projects for which orders and payment are received after termination resulting in shipments in accordance with the following schedule:

Shipments within 30 days of termination shall result in 60% of the net commission described in paragraph 5 to the Representative.

Shipments within thirty-one (31) to sixty (60) days of termination shall result in 40% of the net commission described in Paragraph 5 to the Representative.

Shipments within sixty-one (61) to ninety (90) days of termination shall result in 20% of the net commission described in Paragraph 5 to the Representative.

    d.   It is understood and agreed that if, upon the date of mailing of notice of termination, the Representative is indebted to Tecogen, such indebtness may be partially or wholly satisfied by offsetting any commissions then due, or thereafter becoming due, to the Representative.

    e.   It is further understood and agreed that the Representative waives any commissions under Section 10.c if, as agent for a competitor of Tecogen, the Representative attempts to secure for such competitor orders for products and services covered by the specific quotation and/or projects referenced in Section 10.b.

    f.   Cause for termination shall mean (a) breach by either party of its obligations under this Agreement or (b) in the case of the Representative, (i) failure to meet any sales quota set forth in Exhibit "F" or (ii) failure to maintain positive working relationships, as demonstrated in the quarterly review of the Representative's performance pursuant to Section m of Paragraph 9, with any, customers or other entities important to Tecogen's business within the Territory.

11.   <u>Marketing Rights</u>.   Tecogen grants the Representative the privilege to solicit exclusively all purchasers in the Territory, subject to the exclusions set forth in Exhibit "E". Subject to the preceding sentence, Tecogen will not sell any Products within the Territory except through the Representative. The Representative recognizes and agrees that Tecogen may change the Territory set forth in Exhibit "D" and the list of "Excluded Customers" in Exhibit "E" by giving thirty (30) days prior written notice thereof to the Representative.

T 1702

12. <u>Competing Products</u>. The Representative has the right to carry and sell products other than and in addition to the Products, provided, however, that unless otherwise agreed by the parties, the Representative shall not sell, distribute, advertise or in any way deal in or with any products, which, in the opinion of Tecogen, are competitive with any of the Products.

13. <u>Confidentiality</u>. The Representative shall maintain the confidentiality of, and not disclose to others, any confidential or proprietary information of Tecogen that it may now have or may hereafter obtain, including without limitation specifications, technical reports, customer lists and product plans relating to Tecogen's business or products.

14. <u>Proprietary Rights; Trademarks</u>. The Representative shall conduct its business under its own name. Neither this Agreement nor any sale of Products under this Agreement shall be construed as granting to the Representative in any license or right in or to any patent, copyright, trademark or other proprietary right of Tecogen. The Representative shall not use any trademarks or tradenames of Tecogen in any manner, except as authorized in writing by Tecogen or in connection with the use of literature supplied by Tecogen. The Representative shall discontinue such usage upon the termination of this Agreement.

15. <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given when delivered in person or, if mailed, when mailed by United States certified or registered mail, postage prepaid, to the parties at the addresses first set forth above or at such other address as may be given in writing by either party to the other in accordance with this Paragraph 15.

16. <u>Assignability</u>. The Representative acknowledges that Tecogen is entering into this Agreement in reliance upon the personal reputation, qualifications and abilities of the present owner or owners of the Representative's business and operations, and accordingly, the Representative may not assign its rights or obligations under this Agreement, either voluntarily or by operation of law, except with the prior written consent of Tecogen. A change in control of the Representative's business shall be deemed to be an assignment for this purpose. For purposes of business realignment,

8

Tecogen will permit assignment to business entity designated by Aegis which possesses above qualification and with indirect control by current Aegis principals.

17. <u>Miscellaneous.</u>

    a.    This Agreement shall be construed according to the laws of the Commonwealth of Massachusetts.

    b.    This Agreement constitutes the entire understanding between the parties relating to the subject matter of this Agreement and supersedes all prior writings, negotiations or understandings with respect thereto. No modification or addition to this Agreement shall have any effect unless it is set forth in writing and signed by both parties.

    c.    The waiver by Tecogen of any breach of any provision of this Agreement shall not be construed as a continuing waiver of such breach or as a waiver of other breaches of the same or of other provisions of this Agreement.

IN WITNESS THEREOF, the parties hereto have duly executed this Agreement to be effective as of the day and year first written above.

Tecogen Inc.
(Tecogen)

(Representative)

By:_____

By:_____

Title:    _____

Title:_____

9

**T 1704**

**EXHIBIT "A" - PRODUCTS**

The Representative shall have the right to solicit the sale of all Tecogen products and services set forth below.

Entire Tecogen cogeneration product line and options having a power output rating of 225 kW or less.

T 1705

**EXHIBIT "B" - MULTIPLIERS**

The parties agree to the multipliers set forth below:

<u>For CM-30 / 60 / 75 / 70s / 225G / 225D and Their Options</u>

| | |
|---|---|
| Par Value Multiplier (PVM) | .75 |
| Par Commission Multiplier (PCM) | .10 |
| Minimum Price Multiplier (MPM) | .68 |

11

T 1706

## EXHIBIT "C" - COMMISSION SPLIT

The following is the commission split, as described in Paragraph 5:

| | | | |
|---|---|---|---|
| (1) | Product Specification | : | 40% |
| (2) | Issuance or Order | : | 40% |
| (3) | Installation of Product | : | 20% |

If there is no representative in any of the territories where the events described in item (1), (2) or (3) above take place, then the payment which would have been made to such representative shall be retained by Tecogen. To eliminate dispute, documents (e.g., quotations, correspondence or specifications) relevant to the sale must promptly be sent to Tecogen to substantiate a claim by the Representative to a share of commission payments.

Tecogen reserves the right, in its sole discretion, to establish, and from time to time to change, its policy for determining what elements will be considered in the division of compensation among representatives and territories and the amount of compensation to be allocated to each. The decision of Tecogen on the application of the above rules or any revised rules to any particular order shall be final and binding on the Representative.

Tecogen shall use its best efforts, prior to or concurrently with the quotation of an order, to notify the Representative that the commissions on such order may be split and to indicate the basis for such split (subject to revision upon the acceptance of the order). In no event shall the total commissions which Tecogen is required to pay on a single order exceed the amount of the commission payable pursuant to Paragraph 5.

T 1707

**EXHIBIT "D" - TERRITORY**

The Representative shall have the right to solicit the sale of all Tecogen products and services set forth in Exhibit "A" in ;the following marketing territory:

Connecticut and

The following Counties of Massachusetts,

Berkshire, Franklin, Hampden and Hampshire

T 1708

## EXHIBIT "E" - EXCLUDED CUSTOMERS

The parties agree to the following list of "Excluded Customers".

Any customer who purchases or installs any cogeneration
equipment for:

(a)  Any Tecogen research and development project.

(b)  Any Tecogen field demonstration unit.

(c)  Any research and development project of a customer of Tecogen.

and was not directly related to an Aegis Energy effort.

T 1709

## EXHIBIT "F" - SALES QUOTAS

Although the performance of the Representative is to be reviewed on a quarterly basis, the sales quotas are to be set for each calendar year.

The sales quota is the value of orders accepted by the Company for products as laid out in Exhibit "A" as sold by the Representative.

The sales quota for the Representative for period ending December 31, 1993 is:

(1)   $200,000

(2)   5 units

(3)   350 kW

Attainment of any two (2) of these quotas shall be deemed as having reached the sales quotas for the year.

15

T 1710

# Tecogen Ex. 10

# TECOGEN

*Natural Gas Engine-Driven Products*

TECOCHILL®
TECOFROST™
COGENERATION

45 First Ave.
Waltham, MA 02451

April 3, 2003

Aegis Energy Services Inc.
PO Box 2511
Springfield, MA 01101-2511
Attn: Mr. Lee Vardakis

Dear Lee:

Thank you for visiting with us on March 13th to discuss our representation agreement and related business matters. Your points were well made and I would like to keep the process moving forward.

I would like to recap some of the issues. Tecogen has offered an exclusive sales representation agreement for Massachusetts and Connecticut. It offers buy/resell pricing, which is the lowest we offer to any dealer. Also, we offer a commission on Plan and Spec Projects. This is a new feature which we have never formalized before.

We regret that we can not include exclusivity in the New York City and the surrounding area, however. This market is too large and we feel it needs to be addressed as a non-exclusive territory. We do recognize your efforts to develop this area and would like to work with you on a way to keep our cooperative efforts moving forward.

First, I would like to suggest we sign the agreement as it has been presented. Of course if there are obvious flaws or corrections needed I would be pleased to correct those. I do this in the spirit of revisiting and potentially amending this agreement at a later date.

Secondly, I want to work with you to develop a working relationship with American DG. I would hope that we could work cooperatively on sales leads and installation projects at competitive prices that will develop a bigger market share for both our companies. If we can move forward on this basis I would certainly be inclined to offer some type of sales development fee for sites in the New York City area (excluding American DG, but including other companies).

Additionally, we discussed the quantity of days in inventory and days receivables for the last couple of years. Especially in the last year, we are running around four months of total inventory and receivables before we receive payment. This is not acceptable and we need to improve this in the future. To improve this we request the following actions.

45 First Avenue
Waltham, MA 02451

- Supply a monthly update of a three month forecast (i.e. the last week of April forecast May, June, July).
- Place purchase orders for the number of units required by specific delivery date and at the correct special dealer price that is $47,100 at this time.
- Tecogen Inc. will offer you special shorter delivery lead-time of 8 weeks ARO. Our normal delivery is 10-12 weeks.

I look forward to your thoughts and comments.

Sincerely,

Wesley Schuster
Executive Vice President
American Distributed Generation Inc.

# TECOGEN
# COGENERATION
*SALES REPRESENTATION AGREEMENT*

**This agreement is between:**

| *"Company"* | *"Representative"* |
|---|---|
| TECOGEN, Inc. | Aegis Energy Services Inc |
| 45 First Avenue | PO Box 2511 |
| Waltham, MA  02451 | Springfield, MA 01101-2511 |
| Ph     781-466-6400 | Ph     413-746-5400 |
| Fax    781-466-6466 | Fax    413-746-3242. |

**a)     Sales & Reporting by Representative**
- Representative will devote its best efforts to promoting the maximum number of sales of listed TECOGEN products within its territory.  Representative will promote the use of TECOGEN products through all types of customers, including facility owners, engineers, contractors, performance contractors, etc.
- Upon request, Representative will furnish TECOGEN detailed information about its marketing activities, quotations, sales prospects/ leads, etc.
- Representative will also provide sales, application, and technical assistance to customers.
- Representative will comply with TECOGEN's sales and service policies and procedures, as such procedures are developed and furnished from time to time to the rep.
- Representative will act as an independent contractor, and not as an employee of TECOGEN.

**b)     Sales Support by TECOGEN**
- In addition to providing equipment for Representative's projects, TECOGEN will furnish Representative sales support, including marketing materials (literature, software, etc.) and assistance, technical and application support, permitting assistance, O&M manuals, etc.

**c)     Listed Products**
- Under this agreement, Representative will represent certain TECOGEN cogeneration products in the territory defined below.  These "listed" products include:
  - TECOGEN CM-60 & CM-75 Cogeneration Modules, plus related options, and accessories.

**d)     Types of Sales**
- Under this agreement, this Representative will normally operate in either of two ways:

   a)     DESIGN/BUILD PROJECTS—For use on its own *Representative-installed "design/build" projects*, Representative will be able to **buy and resell** listed TECOGEN products at special pricing.
          Representative's "buy/resell" pricing will be based on a table of List Prices, times a "Buy/Resell" multiplier.

   b)     PLAN AND SPEC PROJECTS—For "plan and spec" projects, Representative will serve as TECOGEN's exclusive *manufacturer's representative*.
          On such projects, Representative will quote listed TECOGEN products to other installing contractors, and work on a **commission basis**.  Contractors would issue their purchase orders directly to TECOGEN, c/o the Representative, and TECOGEN would pay the Representative a commission once paid in full.

On such projects, Representative will not be bidding on installation to the project owners.

Sell pricing to contractors will again be based on a table of list prices, but in this case times one of a range of sales multipliers. For example, use of a higher sales multiplier will result in a higher sales commission for Representative and a higher net for TECOGEN. Similarly, use of a lower multiplier will result in a lower sales commission for Representative and a lower net for TECOGEN.

e)  **Pricing**
- List pricing and sales multipliers to be used will be furnished to Representative by TECOGEN and updated occasionally.
- Equipment sold to Representative or its customers will be furnished on an "FOB factory" basis.
- TECOGEN's standard Terms & Conditions will apply to all orders. Orders are subject to final approval and acceptance by TECOGEN.
- Representative or its customers' payment terms to TECOGEN will be "net 30" days after shipment, subject to credit approval by TECOGEN.

f)  **Territory**
- Representative will have the right to exclusively represent TECOGEN in the states of Massachusetts and Connecticut.
- This territory may be amended by TECOGEN from time to time, with 30 days written notice to representative.
- **Excluded Projects-** American DG projects are excluded from this agreement

g)  **Term & Cancellation**
- The initial term of this agreement will be one (1) year, with automatic renewal occurring each calendar year thereafter.
- This agreement may be cancelled by either party with 30 days written notice to the other party.
- In the special circumstances of bankruptcy filing by either party, insolvency, or suspension of business operations, cancellation will be immediate upon delivery of written notice to the other party.

h)  **Competing products**
- Representative will not represent other manufacturer's products that, in the opinion of TECOGEN, are competitive with TECOGEN's products.

i)  **Warranty, Service, Start-up, & Service Training**
- Equipment to be furnished for these projects will be covered by TECOGEN's standard Cogeneration Product Warranty.
- Representative will not modify TECOGEN's standard equipment without formal prior written approval from TECOGEN.
- The Representative will offer its own service programs to customers on many if not most of these projects, rather than TECOGEN's standard factory service program.
- Representative may elect to send personnel to TECOGEN's occasional factory cogeneration service training schools, at Representative's expense.

*Agreed To By:*

|  | *"Company"* |  |  | *"Representative"* |
|---|---|---|---|---|
| Signature | _____ | | Signature | _____ |
| Name | _____ | | Name | _____ |
| Title | _____ | | Title | _____ |
| Company | _____ | | Company | _____ |
| Date | _____ | | Date | _____ |

T 1220

# Tecogen Ex. 11

**American DG Energy**
On-Site Utility™

| Home | About | Solutions | Customers | Information | Investors |

Contact
Us



# Information: News

## Literature | **News** | Events | Links

### American DG Energy Marks Entry Into Distributed Generation Market With Agreement To Supply Energy

*American DG Energy Offers Customers Significant Energy Savings with No Capital Investment*

**WALTHAM, Mass. - November 20, 2002**
**American DG Energy today marked its entry** into the market for small-scale, on-site distributed power generation with its first agreement to supply energy through a new business model that will save its customers money with no up-front capital costs.

Under the terms of the agreement, American DG Energy will be the majority owner of a limited liability partnership that has been formed to provide electricity and hot water to the Resort Nursing Home in Arverne, New York. The partnership also includes AES-NJ Cogen Co., Inc., of New Jersey. Located in Queens County, the 280-bed skilled nursing facility will receive a substantial portion of its electricity and hot water directly from a cogeneration facility that American DG Energy will install and operate at Resort.

"We're very pleased to have an agreement with a top-rated nursing facility like Resort," said Barry Sanders, president of American DG Energy. "They will benefit from the energy cost-savings we deliver, right from the first day of service. And our high-quality service will also benefit the whole community, since the energy we provide is very environmentally friendly as well."

Distributed generation refers to the simultaneous production of electricity and hot water at the customer's site, rather than at a central power station. The installation for Resort will feature clean-burning, natural gas-driven cogeneration modules from Tecogen - modules that are known throughout the industry for their reliability and efficiency. In addition, the

Tecogen modules meet the most stringent air-quality standards in the country. And Tecogen is the leading manufacturer of low-emission packaged cogeneration units in the United States, with over 20 million hours of proven field experience.

## About American DG Energy

American DG Energy supplies low-cost energy to its customers through distributed power generating systems using cogeneration, which is also known as combined heat and power (CHP) technology. The company is committed to providing commercial and small industrial facilities with clean, reliable power and hot water at lower costs than local utilities can supply - without any capital or start-up costs to the energy user. American DG Energy is headquartered in Waltham, Massachusetts.

### # #

# Tecogen Ex. 12



**AEGIS ENERGY SERVICES INC.**

413/746-5400 • FAX 413/746-3242
WWW.AEGISENERGYSERVICES.COM

2097 RIVERDALE STREET, WEST SPRINGFIELD, MA 01089 • P.O. BOX 2511, SPRINGFIELD, MA 01101-2511

August 1, 2002

Mary Cotrell
Secretary
Department of Telecommunications and Energy
1 South Station- 2<sup>nd</sup> Floor
Boston, MA   02110

EXHIBIT
# 132
9/6/07   LB

**D.T.E. 02-38**

The following is in response to your request for comments on Docket 02-38, Distributed
Generation NOI.  We welcome the opportunity to participate in this matter.

**Introduction**

Aegis Energy Services, Inc. has been in the business of developing and operating small
cogeneration systems throughout New England for the past 17 years.  We provide economic
analyses, engineering, system installation, service, and occasionally ownership with shared
savings agreements as a financing vehicle.  Aegis primarily uses the Tecogen product,
originally developed by Thermo Electron Corporation of Waltham, MA.

These natural gas fired engine-driven electric generating units have an overall efficiency of
84% and are commonly used to provide heat for space heating, domestic hot water, pools,
and other thermal processes.  When coupled with thermally driven absorption cooling, the
device provides energy free cooling as a byproduct in addition to electricity.  This represents
a double benefit in regards to electrical congestion.

The Tecogen utilizes an induction generator that operates as a slave unit to the utility power
system which controls its voltage and frequency.  It cannot start up or sustain operation
without power for the magnetizing field from the utility.  When operating, its electric
characteristics are similar to an induction motor, as opposed to a synchronous generator
which develops its own magnetic field and is normally used for standby, emergency power
systems, or very large generating systems.

The interconnection is simple in that it is connected directly within the customer's electric
system. There are no transfer switches and we are always in synch with the utility, as well as
being electrically harmless.  Because of its electrical simplicity, the units are easily

1

connected to buildings' electrical systems at various locations and could represent a significant source of power in metropolitan areas with electrical congestion.

Our cogeneration systems (combined heat and power) are typically used in nursing homes, apartment buildings, hospitals, YMCAs, and other facilities where the thermal loads are extensive. These systems are designed primarily for thermal use, but are also able to reject the heat when it is not needed so that electricity can be generated during electrical peaks. The engine turning the generator uses the same fuel that would normally be used in the boilers to only provide heat. These 60 and 75 kW cogenerators are about the size of a large office desk and are typically located deep in the bowels of a building (usually in or near boiler rooms) or on the roof or penthouse facility. They have a 70 decibel sound rating, so noise is not an issue.

## **Interconnection**

In our experience within the Northeast, the most significant problems with utility interconnection requirements are:

- All types and sizes of generator are grouped together

- The utilities have a mindset for synchronous generators and do not understand induction type systems

- Interconnection requirements and standby issues are being used to discourage these systems

Each time a utility adds a requirement, however small it may be, it drives up the cost of a system. For example, NStar has recently required utility grade relay protection for a device which cannot control its own voltage or frequency. The units must operate in a few cycles under the same conditions as a relay device in a utility substation or power plant. They have even withheld net energy billing rates as a means of enforcing these unnecessary requirements. Although previously notified of their installation, the utilities have lost track of the many units already installed with industrial grade relays and operated for years in Nstar's service area without incident.

In some cases, Massachusetts's utilities have informally waived some unnecessary requirements after considerable debate; however, these requirements still remain as part of their documents.

The eastern Massachusetts electrical congestion problem has been further aggravated by Nstar's policy reversal three years ago, denying access for interconnection to the network which serves much of Boston. In prior years (15), interconnection was allowed (Mass. General Hospital, for example). They threatened to shut down any buildings that installed these systems. Installation contracts are now void, and development of new sites has ceased.

2

During this three year period, Nstar has finally completed a test facility utilizing a costly approach to "protect" the network and which was supposed to provide assurance for later installations. However, the parameters to assess this "Beta" test have not been made available. Furthermore, other utilities (Con Ed, NU) allow network interconnection utilizing very basic, realistic protection.

The development of IEEE 1547 has been dominated by utility-related personnel. As such, we believe it represents the "ultimate" in utility system protection, perhaps at the unnecessary expense of DG. It also appears that some of the utilities in New York have neither accepted nor are they utilizing the new interconnection standards developed for that state. We suggest that the DTE consider interconnection standards which meet the needs of Massachusetts.

**Standby Service Rates**

Standby Service, or any type of backup charge, should not apply to small, thermally driven cogeneration units. These 60 and 75 kW cogeneration units typically only supply a small portion of the total building load, leaving a substantial supplementary load still served by the utility. This supplementary load often has the same load curve as other facilities on the same rate without cogeneration. Connecticut's Department of Public Utility Control has ruled in several decisions that because these small QF customers' load curve resembles that of other customers on the same rate, it would be discriminatory to force QF's to take service under different rates. They have taken the position that standby rates are optional and QF customers could take back up service as part of their supplemental service under the usual general service firm rates.

The growth of distributive generation has been limited. Current technology does not have economic application in every building. We do not displace all of the electricity being purchased from the utility, nor is that our goal. The cogenerator's primary function is to provide a balance between heat and electricity. We do not sell power back to the grid, with the exception of a few sites that fall under net energy billing. Perhaps net energy billing should be expanded to larger systems, particularly where power generation is provided in conjunction with recovered heat utilization.

There are senior facilities that keep electric kilns on hand for an occasional day on which they do ceramics crafts. These devices are rarely used, but when they are, they can cause a spike in the peak demand of the customer. However, even though this is similar to the load curve of a customer operating a cogenerator that has a malfunction, the customer occasionally turning on the kiln would never be susceptible to a standby rate. There are a multitude of comparable loads used occasionally that are non-coincidental and melt into the utility's diversity of load, just as the cogeneration load would.

Applying backup charges to these small systems could detrimentally affect the economics and payback of these systems. It appears that Cambridge Light and Electric is currently the only utility in Massachusetts that carries a backup rate. While this rate is obviously intended for larger self generators, if we were to install two 75-kW cogenerators in a facility, we

3

would have to take this rate. Since the customer and administrative charges are so high, it would substantially reduce savings necessary to successfully fund the project. There will be little hope for future small DG systems or cogeneration projects should any backup charge be imposed. Likewise, many developers and potential users will not even consider these systems if there is any uncertainty concerning backup charges.

## DG and Utility Distribution Service

Customers who invest in their own on site generation prolong the useful life of existing utility transmission and distribution systems. This helps reduce utility investment (rate base) for new, larger capacity T&D systems. Therefore, this also results in the lowest possible rates to their customers.

Distributive generation with recovered heat utilization provides real benefits on a continuous basis. It is the most effective means of conservation utilizing heat that central station plants normally discard. Electric conservation funds should become available for these systems with compensation to the electric utility for lost revenues just as they receive with other conservation measures they promote.

A utility typically wants DG used for peak shaving. Small distributive generation without the use of heat recovery, which amortizes the investment, will be difficult to justify. If that is the case, the utility should subsidize this type of installation.

Cogeneration does not add to the gas industry's winter peak since it efficiently provides usable heat. It's summer use as an electric generation unit with an air conditioning byproduct helps utilize surplus gas capacity. However, the capital required for these systems is costly and require financial subsidies for significant growth.

Seasonal use of electric air conditioning exacerbates the problem of transmission and distribution congestion. Central station generation, transmission and distribution capacity must be sized to accommodate high electric demands for a matter of a few hours during a few days of the summer season. Since gas is plentiful during this period, thermally driven absorption and natural gas engine driven cooling should be encouraged by the electric distribution companies. Continued use of conservation rebates for "high efficiency" electric motor driven air conditioning will not help the situation. Perhaps these funds could be allocated to the recommended DG/AC systems.

Enclosed is a current press release from Tecogen relative to the issues. We hope that we have provided some alternative perspectives to some difficult problems the Commonwealth faces.

Sincerely,

Spiro Vardakas
President

4

# Tecogen Ex. 13

COMMONWEALTH OF MASSACHUSETTS

DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY

D.T.E. 03-121

PREFILED DIRECT TESTIMONY OF

SPIRO VARDAKAS

MARCH 16, 2004



EXHIBIT
#133
1/6/07 LB

DIRECT TESTIMONY OF SPIRO VARDAKAS
D.T.E. 03-121

1   **Please state your name, occupation, and business address?**

2   My name is Spiro Vardakas.  I am the CEO & CFO with Aegis Energy Services, Inc.,

3   2097 Riverdale Street, West Springfield, MA  01089.

4

5   **On whose behalf are you testifying in this proceeding?**

6   I am testifying on behalf of Aegis Energy Services, Inc., individually and as a member of

7   the NE DG Coalition.

8

9    **Please describe your qualifications and experience?**

10

11   I am an Engineering graduate of Rensselaer Polytechnic Institute with 20 years of electric

12   and gas utility employment ranging from sales engineering to management and

13   management consulting.

14   In 1985 I established Aegis Energy as a service to conserve energy and reduce cost

15   through cogeneration and other energy conserving services to the medium- size

16   institutional market.  I have also participated as an intervener and as a party in utility rate

17   cases and in regards to the misapplication of standby rates to small cogeneration.

18

19

20   **Please describe the purpose and conclusion of your testimony?**

21   The purpose is to demonstrate the inappropriateness of NSTAR's standby rate for small

22   machines from both the utilities' position and that of the customer.  I conclude that this

23   rate should be rejected and the otherwise applicable tariff should apply..

DIRECT TESTIMONY OF SPIRO VARDAKAS
D.T.E. 03-121

1  **Please describe the nature of your business?**

2

3  We develop, install, service, and sometimes own through a shared savings program,

4  small, modular, combined heat and power systems (CHP). These systems are typically

5  installed in non-profit, state and federally subsidized nursing and housing facilities,

6  hotels, YMCAs, JCCCs, apartments and condominiums, schools and colleges, etc.

7

8  **How many DG systems have you installed since 1985 ?**

9

10  Over the last 19 years, we have installed approximately 85 systems involving 115

11  machines in businesses throughout Massachusetts, Connecticut,

12  and recently in New York.

13

14  **Please describe a typical DG system that you have installed or plan to install?**

15  The typical system consists of one or more hi-efficiency reciprocating engine driven

16  generators.  We recover heat from the engine and exhaust, and the cogenerator is

17  interconnected electrically and thermally to the facility's related systems.

18  Along with the generated electricity, the facility will use the heat for building space

19  heating, domestic hot water, pool heating, and occasionally for air conditioning via

20  absorption chillers, offsetting fuel normally consumed by conventional heating devices.

21

22  **Please describe the operating characteristics of the systems you have installed?**

23

DIRECT TESTIMONY OF SPIRO VARDAKAS
D.T.E. 03-121

1   These units are sized as a balance between heat and electricity and operate as base load

2   units. The facilities purchase additional supplementary electricity from the utility and

3   produce supplemental heat from their conventional heating devices.

4

5   **What are the critical factors that lead a customer to install one of your systems?**

6

7   The same factors used by customers using electric utility conservation programs and

8   funds. It is a discretionary purchase dependant on energy cost savings, return on

9   investment, and conservation. However, there are no electric utility conservation funds

10  available.

11

12  **What percentage of the installations that you have installed are for customers that**

13  **are already connected to the utility distribution system?**

14

15  Ninety-five percent (95%) of our installations are retrofitted into existing facilities.

16  Many are relatively new buildings that had experienced the pressure of high energy

17  operating costs.

18  **Do your customers typically interconnect with NSTAR at the primary distribution**

19  **level or at the secondary distribution level?**

20

21  99% of our customers have primary service to a utility owned transformer on their

22  property with secondary service to their switchgear. The generators are electrically

23  connected downstream of the meter and main switch into the customer's electrical

DIRECT TESTIMONY OF SPIRO VARDAKAS
D.T.E. 03-121

1   distribution systems.  Our systems are applicable on both radial and network distribution

2   systems of any primary and secondary voltage.  NSTAR used to permit interconnection

3   on its network according to written policy in the late 1980s and early 90s.  NSTAR

4   currently restricts us only to radial distribution systems.  Currently we can interconnect

5   on the Con Ed network system.

6

7   **After you install a system, does the typical customer stay connected with the grid?**

8

9   These cogenerators are intended for high efficiency conservation.  They are primarily

10  "heaters" with electricity as a byproduct.  The customer always remains connected to the

11  utility for supplementary power.  We primarily use induction-type generators requiring

12  utility power for magnetization, voltage, and frequency control.  These machines are

13  inoperable without utility power.

14

15

16

17

18  **Have you installed any systems within NSTAR's territory?**

19

20  Yes, since 1990 we have installed twenty-one (21) systems involving twenty-five (25) 60

21  to75 kW machines.

22

23  **Are you currently working to install systems within NSTAR's territory?**

DIRECT TESTIMONY OF SPIRO VARDAKAS
D.T.E. 03-121

1

2    Yes, several projects are ongoing.

3

4    **Are you familiar with NSTAR Electric's proposed standby rates?**

5    Yes, we are.  They are similar to a Connecticut utility United Illuminating's Backup Rate

6    NUS.  We were involved in litigation regarding the imposition of the Back Up rate on

7    one of our projects and there, the application of the standby rate by the utility was

8    rejected by the Connecticut DPUC as inappropriate.  We have attached a copy of the case

9    for your consideration.   [This NSTAR's Standby  rate double-charges the customer in

10   certain circumstances because the supplemental demand reduction credit only applies in

11   circumstances where the DG facility experiences an outage.  The Standby rate assumes

12   that the building  peak billing demand will occur when the DG system goes down.

13   However, because our DG systems  typically comprise a small proportion of the building

14   load, there are times when the peak building demand occurs even while our DG systems

15   are running.  Therefore in circumstances when the maximum building demands occur

16   when the DG facility is operational, the customer does not get a supplemental demand

17   reduction.  Therefore, the customer pays for both the standby charge and the higher

18   demand charge.

19

20   **Can you describe the impact such rates will have on your business?**

21

DIRECT TESTIMONY OF SPIRO VARDAKAS
D.T.E. 03-121

1   These rates will have a significantly negative impact on our business.  Between the

2   additional charges and the complexities of the rate, we believe our prospective customers

3   will be deterred from purchasing a combined heat and power system.

4   The typical mid-size customer does not understand their current billing.  Only some know

5   of demand charges, which are feared because they cannot control their loads, or on and

6   off peak kilowatt-hour charges which usage they cannot do anything about, and other

7   charges that they do not have time to learn about.  The customer pays the monthly

8   invoices, often blindly, with some hope that the invoice, which is beyond their control, is

9   correct.  These Customers and their accounts payable departments will never be able to

10  understand this standby process. *They are not in the power business.*  Thus, the lack of

11  assurance for invoice accuracy that this DG investment now depends upon, will

12  discourage participation in this business.

13          For assurance of correct billing, every 15 minute demand period of the month

14  must be evaluated for both the cogeneration unit power output and the utility measured

15  demand.  Whereas the customer can normally read his own electric meter to verify

16  billing, he would now need 2 sets of 2880 units of data each month to compare for the

17  appropriate billing demand.  Skipped meter readings and estimated bills will further

18  complicate this matter.

19          Costly, complex metering is needed to properly apply this rate to small scale

20  CHP.  No estimated costs have been given.  Furthermore, we believe NSTAR currently

21  charges for the fifteen-minute demand interval data.

22

DIRECT TESTIMONY OF SPIRO VARDAKAS
D.T.E. 03-121

1    Moreover, these systems are capital intensive since recovered heat must be

2    utilized in the various building thermal processes.  The additional charges related to the

3    imposition of the proposed standby rates will deter further investments in CHP systems.

4    The rate of return for the systems must be substantial for a factility to make this

5    discretionary purchase.

6

7    In conclusion, the typical small cogeneration customer does not have the resources to

8    deal with these issues and will avoid conservation through cogeneration.  As a result,

9    customers will pay more for electricity and energy than they should.  The proposed

10   NSTAR rates will deter cost effective DG.

11

12   **How did you reach that conclusion?**

13

14   We reached our conclusion based on our extensive business experience in this area.  It

15   does not take a P.H.D. in economics to understand that higher prices will reduce demand.

16   Moreover, a number of our customers have expressed concern about the imposition of

17   these ratse.  For example, we recently received a letter from the Massachusetts Housing

18   Financing Agency (MHFA), which encourages conservation through cogeneration.  A

19   copy of the letter is attached to our testimony.

20

21   **Do you support NSTAR's proposed standby rates?**

22

DIRECT TESTIMONY OF SPIRO VARDAKAS
D.T.E. 03-121

1    We oppose these rates because they are based on a misunderstanding of how DG

2    systems actually operate.  First, the rates assume that the distribution company will not

3    collect sufficient revenues to cover the costs of service.  *See testimony of Henry*

4    *LaMontagne at 17.*   This is not necessarily true.  Our machines must be shut down for

5    oil changes and other maintenance at least once each month.  Every 31 days, this

6    automotive-type engine has worked the equivalent of 35,000 miles of vehicle travel.  Our

7    customers often incur a  demand charge each month based on the full load of the

8    building, paying more than their "fair share".  Other outages occur from equipment

9    malfunctions, including occasional building heating system problems.

10   Secondly, the rates assume that when the DG systems do go down, it will occur at

11   the time of system peak load.  However, even accounting for scheduled maintenance and

12   unscheduled outages typical systems annually operate 97% of the time.  We further

13   ensure our systems availability by installing heat dissipation units to reject heat during

14   the peak summer periods when thermal loads may be limited.

15   Other general service customers have comparable loads that are sometimes used,

16   causing an occasional increase in their peak demand billing. Those customers are not

17   required to pay a monthly capacity or standby charge. This standby charge now

18   represents a ratcheted demand charge for DG customers and discourages conservation

19   through cogeneration.   The outages of these small machines are the same as adding

20   additional occasional load.  The DTE has disallowed ratcheted demand charges in

21   Massachusetts.

22   Finally, the proposed rates incorrectly assumes all machines will go down on the

23   utility peak day, which occurs on a hot summer day.  During all other periods the

DIRECT TESTIMONY OF SPIRO VARDAKAS
D.T.E. 03-121

1     transmission and distribution systems have substantial excess capacity.  It should be

2     understood DG are not electric air conditioners, all of which are on during hot days

3     causing transmission and distribution peaks.

4          The higher standby charges in the summer are totally without justification.

5     Summer demand charges were established to appropriately charge electric air

6     conditioning summer loads.

7

8     **What is your conclusion regarding NSTAR's proposed standby rates?**

9     They should be rejected because they are unreasonable and not supported by facts or

10    data.

11    **Does this conclude your testimony?**

12    **Yes.**

13

14    Q:\rmf\Standby Rates\direct testimony\Vardakas Testimony Final

15

16

17

18

19

20

21

22

23

24

# Tecogen Ex. 14

**IN THE MATTER OF:**

```
TECOGEN, INC. vs.

AEGIS ENERGY SERVICES, INC. ET AL
```

———————————————————————————

**DEPOSITION OF:**

```
TIM CASABONNE
DATE:   DECEMBER 4, 2007
```

———————————————————————————

## PERLIK and COYLE REPORTING
### *Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

**COMPRESSED TRANSCRIPT & WORD INDEX**

**9**

1  they expressed their preference for the Tecogen
2  equipment during that meeting.
3          I don't recall if it was before or after
4  July 29th.
5          MR. CURCIO: I'm going to mark that
6  as 181.
7          (Defendant's Deposition Exhibit
         No. 181 offered and marked.)
8
9      Q.  (BY MR. CURCIO) I've handed you what's
10  been marked as Exhibit 181. It talks about some
11  issues on the Aegis units with respect to the
12  Chemung County facility.
13         Do you recall seeing this e-mail?
14  (Indicating.)
15     A.  Yes.
16     Q.  Does this help refresh your memory as to
17  what was being discussed in the late June time
18  frame with respect to the Aegis units?
19     A.  Yes.
20     Q.  Can you point to anything in this e-mail
21  that would indicate that the Aegis units were not
22  suitable for Chemung County?
23     A.  The project design engineer Clough
24  Harbour and Associates.

**10**

1      Q.  It appears in the memo to you from Rich
2  Rappa that he is looking for additional info to
3  determine the extent of additional changes. Did
4  you provide this information?
5      A.  I believe information was provided. I
6  don't know if it came from me or directly from
7  Aegis but I believe that information was provided
8  to them.
9      Q.  After the information was provided, did
10  Rich Rappa or anybody else at Clough Harbour have
11  any misgivings about implementing the Aegis units?
12     A.  I believe their concern was that they
13  would need to reevaluate the documents that had
14  been submitted to the utility for the interconnect
15  approval.
16     Q.  Was there a concern of a time delay or a
17  concern that the documents would not be approved?
18     A.  I believe both concerns were brought up.
19         MR. CURCIO: That will be 182.
20         (Defendant's Deposition Exhibit
         No. 182 offered and marked.)
21
22     Q.  (BY MR. CURCIO) I'm going to ask you to
23  review what's been marked as Exhibit 182.
24  (Indicating.)

**11**

1      A.  (Witness examining document.)
2      Q.  Do you recall seeing this e-mail --
3  we'll start with the top e-mail?
4      A.  Yes.
5      Q.  Do you see the second paragraph on the
6  top e-mail, "The Aegen units are almost identical
7  in appearance, specifications and cost to the
8  Tecogen unit"?
9      A.  Yes.
10     Q.  "They will also be equipped with the
11  emissions control equipment required by NYSEG?
12     A.  Mmm-hmm.
13     Q.  Did you write that?
14     A.  Yes.
15     Q.  Was that your opinion at the time,
16  July 8th, 2005, that the Aegen units were almost
17  identical in appearance, specs, and cost?
18     A.  Yes.
19     Q.  At the time, July 8, 2005, was Atlantic
20  still proposing to use the Aegen units in Chemung
21  County?
22     A.  I believe so; yes.
23     Q.  We talked last time about a meeting that
24  you had with Chemung County representatives. I

**12**

1  believe it was July 19, 2005.
2          Do you recall a meeting regarding the
3  Aegis unit -- one of the topics of discussion on
4  or about July 19, 2005?
5      A.  Yes.
6          MR. CURCIO: That will be 183.
7          (Defendant's Deposition Exhibit
         No. 183 offered and marked.)
8
9      Q.  (BY MR. CURCIO) Would you please review
10  what's marked as Exhibit 183? (Indicating.)
11     A.  (Witness examining document.)
12     Q.  Are these the meeting minutes for the
13  meeting which in part discussed the Tecogen units
14  versus the Aegis units for the Chemung County
15  facility?
16     A.  Yes; they're my handwritten notes. I
17  usually type formal minutes and distribute them
18  but these are my notes from that meeting.
19     Q.  The front page has a list of attendees.
20  Are these all the attendees of that meeting that
21  day?
22     A.  Yes.
23     Q.  Did anybody else that's not listed
24  attend?

# TECOGEN, INC. vs. AEGIS ENERGY SERVICES, INC. ET AL

Case 1:05-cv-11823-RCL    Document 43-15    Filed 07/14/2008    Page 4 of 32

## TIM CASABONNE    DECEMBER 4, 2007

**13**

1      A.   Not that I'm aware of.

2      Q.   If I call your attention to page two of

3 this exhibit, you see number one states "Tecogen

4 versus Aegis topic of discussion"?

5      A.   Yes.

6      Q.   Number two, if I read your handwriting

7 correctly, it says, "CHA advised that preliminary

8 App, NYSEG will have to be resubmitted." Did I

9 read that correctly?

10      A.   Yes.

11      Q.   And "CHA" is Clough Harbour?

12      A.   Yes.

13      Q.   Can you read the next note for me? It

14 is your handwriting.

15      A.   "Gary M asked if there's no financial

16 gain with using Aegis then would AES provide

17 Tecogen if requested."

18      Q.   Is "AES" Atlantic or is it Aegis Energy

19 Services?

20      A.   That's at Atlantic Energy Services.

21      Q.   Do you recall if there was a response to

22 that question?

23      A.   I do not.

24      Q.   Was there a financial gain to use Aegis

**14**

1 over Tecogen units?

2      A.   I can't recall.

3      Q.   With your knowledge and experience after

4 having worked at Atlantic for several years, if

5 there was a financial gain for using one unit over

6 the other, would Atlantic prefer to use the lower

7 cost unit?

8      A.   Yes.

9      Q.   Can you read note number five for us?

10      A.   "What is required by New York Department

11 of Health, NYSERDA, NYSEG? Additional review

12 approvals," question mark.

13      Q.   Was this a concern for additional

14 approvals of the Aegis unit?

15      A.   Yes.

16      Q.   Was this question answered at the

17 meeting?

18      A.   I don't recall.

19      Q.   Do you recall who brought the question

20 up?

21      A.   It was raised by the Chemung County.

22 Specifically, I don't know which person.

23      Q.   Note number seven reads -- if I can read

24 your handwriting correctly -- "Aegis

**15**

1 certification"?

2      A.   Yes.

3      Q.   "Need documentation from Aegis, packaged

4 unit must be type-tested in New York State." Did

5 I read it correctly?

6      A.   Yes.

7      Q.   Was this a concern or was this just a

8 statement that there needed to be type testing?

9      A.   I believe it was a statement from Clough

10 Harbour regarding the NYSEG requirements.

11      Q.   Can you read note number ten for us?

12      A.   "AES to provide pros and cons of why

13 Aegis was selected if money is not an issue. Need

14 to justify why we could possibly delay project for

15 Aegis unit.

16      Q.   Did AES provide the pros and cons after

17 this meeting?

18      A.   I don't recall.

19      Q.   Who at AES would have provided the pros

20 and cons?

21      A.   It would have been my responsibility to

22 put together that information.

23      Q.   You don't recall putting together any

24 information on the pros and cons?

**16**

1      A.   Not at this time, I don't.

2      Q.   Why was this meeting -- why did this

3 meeting take place?

4      A.   At a prior meeting Atlantic Energy

5 informed the County that they intended to purchase

6 Aegen units for the County and the County raised

7 concerns with that decision and asked that we hold

8 a meeting with all parties to discuss that

9 decision.

10      Q.   You recall from our prior deposition

11 reviewing a letter sent by Mr. Panora of Tecogen

12 to Chemung County questioning the certifications

13 of the Aegen cogens?

14      A.   Yes.

15      Q.   And that letter came before this

16 meeting, correct?

17      A.   I believe so; yes.

18      Q.   To your knowledge did that letter play a

19 role in initiating the concerns raised in this

20 meeting?

21      MS. FROHLICH: Objection.

22      THE WITNESS: I think the concerns

23 were initiated prior to that letter but that

24 letter maybe substantiated some of those concerns.

17

1    Q.   (BY MR. CURCIO)  Atlantic ultimately
2  went with Tecogen units for Chemung County,
3  correct?
4    A.   Yes.
5    Q.   Before Atlantic went with Tecogen units
6  for Chemung County, Atlantic was given an
7  opportunity or at least it was discussed with
8  Tecogen the opportunity of buying twenty-five
9  units at a much lower cost.  Do you recall that?
10   A.   Yes.
11   Q.   Who initiated that conversation or the
12  conversations that brought into play an offer from
13  Tecogen for twenty-five units at a lower cost?
14   A.   I don't know.
15   Q.   Do you recall discussing the
16  twenty-five-unit bid with Jeffrey Glick of
17  Tecogen?
18   A.   Yes.
19   Q.   Did Mr. Glick initiate conferences with
20  you regarding giving multiple Tecogen units at a
21  lower cost?
22   A.   Yes.
23          MR. CURCIO:  If you could mark this?
24

18

1          (Defendant's Deposition Exhibit
            No. 184 offered and marked.)
2
3    Q.   (BY MR. CURCIO)  Tim, could you look at
4  what's been marked as Exhibit 184? (Indicating.)
5    A.   (Witness examining document.)
6    Q.   Do you recognize this e-mail?
7    A.   Yes.
8    Q.   You see in the first line it says, "I
9  wanted to give you a heads-up that I have been
10  contacted a couple of times by Tecogen and that
11  they have raised some serious concerns about the
12  replacement units that AES has recommended."  Do
13  you see that?
14   A.   Yes.
15   Q.   This is before the July 19th meeting
16  where you discussed the advantage -- the pros and
17  cons, if you will, between Aegis and Tecogen.
18          Is this the only time Bob Page discussed
19  with you the fact that he had been contacted
20  several times by Tecogen regarding the replacement
21  units?
22   A.   I believe so.
23   Q.   Do you recall the letter from
24  Mr. Panora?

19

1          Did Mr. Page ever discuss with you the
2  letter questioning the certification of Aegen
3  cogens by Mr. Panora?
4    A.   Yes.
5    Q.   What did Mr. Page tell you about his --
6  about his understanding of that letter?
7    A.   He was concerned with what Tecogen was
8  stating about the Aegen equipment and was
9  concerned that if we proposed -- if we supplied
10  the Aegen units that it would create problems for
11  the project.
12   Q.   Did you discuss the merits of that
13  letter -- the Robert Panora letter to Mr. Page --
14  with Chris Cafer?
15   A.   I would have to say no.
16   Q.   Did you ever apprise Mr. Cafer that
17  questions were being raised -- I'm sorry, not
18  Mr. Cafer -- Clough Harbour.  Let me rephrase the
19  question.
20          Did you ever discuss the merits of the
21  Bob Panora letter to Mr. Page with Clough Harbour
22  and Associates?
23   A.   I believe it was discussed at the
24  meeting of the nineteenth, so, yes.

20

1    Q.   The Panora letter to Bob Page was a
2  topic of discussion at the July 19th meeting?
3    A.   Yes.
4    Q.   At the July 19th meeting, was Atlantic
5  still offering a proponent of using Aegis cogens
6  in the Chemung County facility?
7    A.   Could you just repeat that, please?
8          (Reporter read back as
            requested.)
9
10         THE WITNESS:  Yes.
11         MR. CURCIO:  That's next.
12         (Defendant's Deposition Exhibit
           No. 185 offered and marked.)
13
14   Q.   (BY MR. CURCIO)  Tim, please review
15  what's been marked as Exhibit Number 185.
16  (Indicating.)
17   A.   (Witness examining document.)
18   Q.   Do you recognize this e-mail?
19   A.   Yes.
20   Q.   Did you receive this e-mail on or about
21  July 18, 2005?
22   A.   Yes.
23   Q.   Is this the letter that Mr. Panora wrote
24  to Mr. Page that became a topic of discussion at

**21**

1 the July 19th meeting?

2     A. Yes.

3     Q. What was your initial impression upon

4 reading this letter?

5     A. I believe I went to Mr. Brock to make

6 sure he was aware of what was going on between

7 Tecogen and Aegen and asked if we should forward

8 this document to our attorney so he could advise

9 us if we should act in any way.

10     Q. Did you talk with Mr. Lee Vardakas at

11 all about the merits of the page letter?

12     A. Yes.

13     Q. Were you satisfied with responses given

14 by Mr. Vardakas concerning the issues brought up

15 in this letter?

16     A. Yes.

17         (Defendant's Deposition Exhibit

        No. 186 offered and marked.)

18

19     Q. (BY MR. CURCIO) Tim, could you review

20 what's been marked as Exhibit 186? (Indicating.)

21     A. (Witness examining document.)

22     Q. Do you recognize this set of e-mails --

23 the two pages of Exhibit Number 186?

24     A. Yes.

**22**

1     Q. Let me call your attention to the fourth

2 e-mail down at the bottom of the first page. It

3 starts out -- it's an e-mail from you to Mr. Ray

4 Hickey. Do you see that?

5     A. Yes.

6     Q. It says, "AES will not accept the

7 Tecogen offer of sixty-six thousand dollars per

8 unit for the Chemung project. AES will accept an

9 offer of fifty-five thousand dollars per unit. If

10 Tecogen cannot meet this price then AES will

11 proceed with installing the Aegen units." Do you

12 see that?

13     A. Yes.

14     Q. This is dated July 27th, which is about

15 eight days after the July 19th meeting, correct?

16     A. Mmm-hmm.

17     Q. At this time it appears Tecogen is --

18 I'm sorry it appears Atlantic is looking for an

19 offer for Tecogen but is still intending to go

20 with Aegis units if Tecogen doesn't meet its

21 price, is that correct?

22     A. Yes.

23     Q. So if Tecogen did not lower its price

24 Atlantic would have installed Aegis cogens for the

**23**

1 Chemung County project?

2         MS. FROHLICH: Objection.

3         THE WITNESS: I think this -- this

4 was being used as a negotiating tool, basically

5 threatening Tecogen to get the price where we

6 needed it to be.

7     Q. (BY MR. CURCIO) If Tecogen did not meet

8 that price did you have any intent to stay with

9 the Aegis cogens?

10     A. That decision would not have been up to

11 me. That would have been a decision between

12 Mr. Brock and Mr. Page.

13     Q. Was price the only issue at this point

14 in time -- July 27, 2005 -- between Tecogen and

15 Aegis?

16     A. No; the other issue was that the Chemung

17 County I believe -- I don't want to say "insisted"

18 but made it clear that they wanted Tecogen

19 equipment installed for the project.

20     Q. That was -- the decision made by Chemung

21 County, was that after the July 19th meeting?

22     A. Yes.

23         (Defendant's Deposition Exhibit

        No. 187 offered and marked.)

24

**24**

1     Q. (BY MR. CURCIO) Tim, I'll ask you to

2 review what's been marked as Exhibit Number 187.

3 (Indicating.)

4     A. (Witness examining document.)

5     Q. Do you recall receiving this e-mail on

6 or about July 22nd from Mr. Hickey?

7     A. Yes.

8     Q. Mr. Hickey is asking for quotations from

9 Aegis.

10     Does Atlantic commonly share that

11 quotation information with competing companies?

12     A. Not commonly; on occasion.

13     Q. What did Mr. Hickey mean by preventing

14 anything foul according to the Robinson-Pattman

15 antitrust law?

16         MS. FROHLICH: Objection.

17         THE WITNESS: I don't know.

18     Q. (BY MR. CURCIO) You see the sentence,

19 "This bidding war started with a total of

20 twenty-five unit for six separate projects"?

21     A. Yes.

22     Q. To your knowledge what did Mr. Hickey

23 mean by the bidding war?

24     A. I believe both Tecogen and Aegis

| 49 | 51 |
|---|---|
| 1 see the reference to Tecogen cogeneration modules? | 1 information on their Website. |
| 2    A.  Yes. | 2       I don't recall the specific content of |
| 3    Q.  Why did Atlantic propose in this | 3 that information. |
| 4 document to use Tecogen cogeneration modules for | 4    Q.  This is a letter of transmittal from |
| 5 the Lakeland project? | 5 Jeff Glick to Timothy Brock, correct? |
| 6    A.  It would be my assumption that the | 6    A.  Yes. |
| 7 salesperson who prepared this proposal was | 7    Q.  At the very bottom of this letter which |
| 8 familiar with Tecogen equipment and saw an | 8 is Exhibit 197 Jeff Glick says, "Wes also |
| 9 opportunity to install that equipment at the | 9 suggested I visit with your group sometime in July |
| 10 Lakeland District. | 10 or August to discuss any future projects you may |
| 11    Q.  As of the date of this document, | 11 be working on." Do you see that? |
| 12 September 17th, 2002, what experience did Atlantic | 12    A.  It's barely legible, yes. I can make it |
| 13 have with Tecogen cogeneration modules? | 13 out, though. |
| 14    A.  I personally had no experience. I don't | 14    Q.  Did Jeff Glick periodically seek to |
| 15 know -- I can't speak for anyone else at Atlantic | 15 visit with you or others at Atlantic to discuss |
| 16 Energy. | 16 potential opportunities for Atlantic and Tecogen |
| 17    Q.  As of the date of Exhibit 144, did you | 17 to work together? |
| 18 have any knowledge about Tecogen cogeneration | 18    A.  I've had many conversations with Jeff |
| 19 modules? | 19 but I don't recall speaking with him in the |
| 20    A.  Bolston Spa School. | 20 June '04 time frame. |
| 21    Q.  Are you referring to Bolston Spa, New | 21    Q.  Without reference to any time frame did |
| 22 York? | 22 he periodically ask to get together with you or |
| 23    A.  Yes. | 23 others at Atlantic to discuss projects? |
| 24    Q.  Was Atlantic involved in that project? | 24    A.  Not with me; he may have had those |

| 50 | 52 |
|---|---|
| 1    A.  No. | 1 conversations with others. |
| 2    Q.  How did you know about that project? | 2    Q.  I'm showing you a copy of Exhibit 66. |
| 3    A.  Several people from Atlantic were | 3 Do you recall seeing this document during the |
| 4 familiar with that project from previous companies | 4 first day of your deposition in this case? |
| 5 that they had worked with. | 5 (Indicating.) |
| 6      MS. FROHLICH: Exhibit 197. | 6    A.  (Witness examining document.) Yes. |
| 7      (Plaintiff's Deposition Exhibit | 7    Q.  On the first day of your deposition you |
|      <u>No. 197 offered and marked.</u>) | 8 were questioned about the last page, specifically |
| 8 | 9 the language under the heading "Mechanical," |
| 9    Q.  (BY MS. FROHLICH) Mr. Casabonne, have | 10 correct? |
| 10 you seen Exhibit Number 197 before today? | 11    A.  Yes. |
| 11 (Indicating.) | 12    Q.  That language refers to attached |
| 12    A.  (Witness examining document.) I don't | 13 sketches, correct? |
| 13 think I've seen this document. | 14    A.  Yes. |
| 14    Q.  In the table in approximately the middle | 15    Q.  But there are no sketches actually |
| 15 of the document, do you see the reference to | 16 attached to Exhibit 66, are there? |
| 16 "photos of recent integrated installation"? | 17    A.  No. |
| 17    A.  Yes. | 18      MS. FROHLICH: Can I have this |
| 18    Q.  In the June 2004 time frame did you see | 19 marked as Exhibit 198? |
| 19 any Tecogen photos of a recent integrated | 20      (Plaintiff's Deposition Exhibit |
| 20 installation? |      <u>No. 198 offered and marked.</u>) |
| 21    A.  I don't recall. | 21 |
| 22    Q.  At any time have you seen Tecogen photos | 22    Q.  (BY MR. CURCIO) Tim, let me show you a |
| 23 of an integrated installation? | 23 different copy of the October 29th, 2004 addendum. |
| 24    A.  I believe I've seen the brochures or | 24 I will tell you that this copy came from |

### 53

1 Atlantic's files.

2     Have you seen this document before
3 today? (Indicating.)

4     A. (Witness examining document.)

5     Q. Let me withdraw that question and be
6 more specific.

7     If you would turn to the orange flag in
8 Exhibit 198 and look at that page as well as the
9 six pages behind it, have you seen those pages
10 before today?

11     A. (Witness examining document.) Yes.

12     Q. When did you first see this October 29,
13 2004 bid addendum in this form?

14     A. I don't recall a specific date.

15     Q. Do you recall generally when you first
16 saw this?

17     A. During the time frame that the State
18 Education Department was reviewing the Lakeland
19 Performance Project.

20     Q. Was that in late 2004 and early 2005?

21     A. Yes.

22     Q. What did you understand the drawings,
23 each of which has Appendix 3 at the top -- what
24 did you understand those to be depicting?

### 54

1     A. These drawings are depicting the Tecogen
2 cogeneration equipment.

3     Q. Within Exhibit 198, the second page
4 after the orange flag and at the bottom it
5 says 202 under the heading "Mechanical"?

6     A. Yes.

7     Q. Do you see the last sentence, "Equipment
8 provided as an integrated unit from Tecogen is the
9 equipment indicated within the, quote, 'by
10 Tecogen,' close quote, boundary"?

11     A. Yes.

12     Q. Now if you turn to drawing A 3.1 which
13 is four pages after that page?

14     A. (Witness complying.)

15     Q. Do you see a dashed line with the word
16 "by Tecogen," in the right-hand corner?

17     A. Yes.

18     Q. Did you understand that to be the
19 Tecogen integrated unit?

20     A. Yes.

21     (Plaintiff's Deposition Exhibit
    No. 199 offered and marked.)

22

23     Q. (BY MS. FROHLICH) Mr. Casabonne, can
24 you please identify what we've marked as

### 55

1 Exhibit 199? (Indicating.)

2     A. (Witness examining document.) These are
3 my notes from a meeting dated October 6, '04 at
4 the Lakeland Central School.

5     Q. Near the top of the page do you see the
6 word "cogen" with an underline?

7     A. Yes.

8     Q. Can you read the language next to that?

9     A. "Tecogen only acceptable manufacturer."

10     Q. What did you mean by that note?

11     A. I don't recall if that's something that
12 was stated at the meeting and I noted it or if
13 that was something that I was -- that was my
14 understanding of the specifications. I'm not
15 certain.

16     Q. Mr. Casabonne, I'm showing you a copy of
17 Exhibit Number 2 and I believe you looked at this
18 during the first day of your deposition but since
19 that was a while ago let me ask you: Have you
20 seen this document before today? (Indicating.)

21     A. Yes.

22     Q. Let me refer you to page seventy within
23 Exhibit 2.

24     Now page seventy at the very top, the

### 56

1 heading is "Appendix 3," do you see that?

2     A. Yes.

3     Q. Underneath that the heading is
4 "Integrated unit for Tecogen CM-60 and CM-75." Do
5 you see that?

6     A. Yes.

7     Q. And then there's text on the remainder
8 of page seventy, correct?

9     A. Yes.

10     Q. If you look at pages seventy-one through
11 seventy-seven there are drawings in the remainder
12 of Appendix 3, correct?

13     A. Yes.

14     Q. Do you recognize any of the drawings in
15 Exhibit 2 as being the same drawings you looked at
16 in Exhibit 198?

17     A. Yes.

18     Q. Prior to today did you ever see the text
19 on page seventy of Exhibit 2?

20     A. I don't recall.

21     Q. Have you ever seen any marketing
22 materials describing the integrated unit from
23 Tecogen?

24     A. I believe I've seen brochures and I've

57

1 been on their Website but I don't recall if
2 there's been specific information related to the
3 integrated unit.
4     Q. I'm going to show you a copy of
5 Exhibit 138.
6        Have you seen this document before
7 today? (Indicating.)
8     A. (Witness examining document.) I don't
9 believe so; yes.
10     Q. Do you know who Advanced Comfort Systems
11 was?
12     A. Yes.
13     Q. Who was Advanced Comfort Systems?
14     A. They're an equipment rep located in
15 Ballston Spa, New York.
16     Q. Prior to the Lakeland project, did
17 Atlantic have any experience with Advanced Comfort
18 Systems on any projects?
19     A. I would have to say yes.
20     Q. Under each of the high school names in
21 Exhibit 138, this document specifies a
22 Tecogen, Inc. integrated model cogeneration unit,
23 correct?
24     A. Yes.

58

1     Q. And then the last page of Exhibit 138 is
2 a drawing entitled "Tecogen Integrated Unit
3 Installation," correct?
4     A. Yes.
5     Q. Are the Tecogen units described in this
6 proposal consistent with your understanding of the
7 Tecogen integrated unit that is described in the
8 October 2004 bid addendum?
9     A. (Witness examining document.) Yes.
10     Q. Understanding you have not seen
11 Exhibit 138 prior to today, entirely separate from
12 the document did you know at any time during the
13 Lakeland project that Advanced Comfort Systems had
14 submitted a bid or a price quote to J & M for
15 Tecogen integrated cogeneration units for Lakeland
16 in November of 2004?
17     A. I know Advanced Comfort submitted
18 pricing to J & M. I'm not certain on the time
19 frame.
20     Q. To the best of your recollection what is
21 the time frame that you recall?
22     A. It was in the spring of -- spring-summer
23 of 2005 when the submittals -- during the
24 submittal process.

59

1     Q. Let me show you Exhibit 139. My first
2 question is: Have you seen a copy -- have you
3 seen Exhibit 139 before today? (Indicating.)
4     A. (Witness examining document.) No.
5     Q. Do you have any recollection of hearing
6 about an Advanced Comfort Systems submittal to
7 J & M Heating in the February 2005 time frame?
8     A. No.
9     Q. Again, under each heading within this
10 price quote -- under each heading for each school
11 in this price quote the equipment that's listed is
12 Tecogen, Inc. integrated model cogen units,
13 correct?
14     A. Yes.
15     Q. Now I'm showing you a copy of
16 Exhibit 137.
17        Have you seen this document before
18 today? (Indicating.)
19     A. Yes.
20     Q. Can you identify this document, please?
21     A. This is a letter of intent from Atlantic
22 Energy to J & M Heating and Air Conditioning for
23 the Lakeland Energy Performance Project.
24     Q. Who made the decision to award the

60

1 mechanical contract to J & M Heating?
2     A. I believe it was a group decision
3 involving Atlantic Energy, the Lakeland School
4 District, their architect, and their construction
5 manager.
6     Q. To your knowledge why did J & M win the
7 contract?
8     A. They had the lowest price.
9     Q. Now earlier today you were shown
10 Exhibit 196 and that's the contract. At the
11 bottom of page seven, Article 7 begins at the
12 bottom of page seven and it continues over to page
13 eight.
14        The first paragraph of Article 7
15 provides that J & M will execute mechanical
16 contract work per the plans and specifications by
17 Energy Concepts and the architect dated March 8th,
18 2005, correct?
19     A. Yes.
20     Q. Do you know whether Atlantic has a copy
21 of the plans and specifications dated March 8,
22 2005?
23     A. I believe -- yes; we do. I believe so.
24

73

1    MS. FROHLICH: Objection.

2    THE WITNESS: I don't recall.

3    MS. FROHLICH: This is a good time

4 to take a lunch break.

5    (A luncheon recess was taken.)

6    MS. FROHLICH: We're on Exhibit 201.

7    (Plaintiff's Deposition Exhibit

    No. 201 offered and marked.)

8

9    Q.   (BY MR. CURCIO) Mr. Casabonne, this is

10 Exhibit 201.

11    Have you seen this document before

12 today? (Indicating.)

13    A.   (Witness examining document.) Yes.

14    Q.   Please identify this document?

15    A.   It's an e-mail dated May 23, 2005 from

16 Jeff Glick to Tim Brock.

17    Q.   You received a copy of this e-mail,

18 correct?

19    A.   Yes.

20    Q.   The first sentence refers to Barry

21 Sanders, John Giattino, and Jeff Glick speaking

22 with you about Lakeland in the week prior to the

23 e-mail, correct?

24    A.   Yes.

74

1    Q.   Do you recall that conversation?

2    A.   Vaguely.

3    Q.   What do you recall about it?

4    A.   That Jeff had a group of people that

5 were experienced with turnkey cogeneration

6 installations and that they were interested in

7 learning or getting involved with the Lakeland

8 project.

9    Q.   Within the e-mail about seven lines up

10 from the bottom Jeff says, "We would like to

11 schedule a meeting in Saratoga Springs to

12 introduce the new AmericanDG and explore business

13 opportunities." Do you see that sentence?

14    A.   Yes.

15    Q.   And below it he says, "Regarding

16 Lakeland, the AmericanDG/Tecogen service group is

17 available to assist with selling the service

18 portion of the job." Did I read that correctly?

19    A.   Yes.

20    Q.   Did you have an understanding as to what

21 the service portion of the job at Lakeland

22 referred to?

23    A.   I'm not certain if this was the

24 understanding at the time but my understanding now

75

1 is that was related to the service of the

2 equipment once it was operational.

3    Q.   Was a meeting scheduled after this

4 e-mail was sent?

5    A.   I don't recall.

6    Q.   Do you recall a meeting in late May or

7 early June of 2005 with anyone from AmericanDG and

8 Tecogen?

9    A.   I don't.

10    MS. FROHLICH: This may be marked

11 but I'm not sure so we'll mark it again.

12    (Plaintiff's Deposition Exhibit

    No. 202 offered and marked.)

13

14    Q.   (BY MS. FROHLICH) Mr. Casabonne,

15 showing you what we've marked as Exhibit 202, this

16 is an e-mail from Jeff Glick to Tim Brock dated

17 June 6th, 2005 and you are shown as one of the

18 recipients who was copied on the e-mail.

19    Have you seen this document before

20 today? (Indicating.)

21    A.   (Witness examining document.) Yes.

22    Q.   In the first sentence of the first

23 paragraph Mr. Glick states "Thanks for the

24 opportunity for allowing Tecogen and our local

76

1 representatives to provide you with direct pricing

2 for your projects."

3    It then goes on to say, "Ray Hickey has

4 forwarded your request for an equipment quotation

5 that would cover a total of twenty-five completely

6 integrated Tecogen CM-75 modules." Did I read

7 that correctly?

8    A.   Yes.

9    Q.   Seeing this e-mail and reading that

10 sentence does it refresh your recollection that

11 between the time of Mr. Glick's May 23rd e-mail

12 requesting a meeting and this June 6th e-mail you

13 and others from Atlantic met with Jeff Glick?

14    A.   I think there was a meeting at the

15 office with Jeff Glick and I think I was not part

16 of that meeting.

17    I just have no recollection of meeting

18 with people from -- physically meeting with people

19 from Tecogen.

20    Q.   Was it possible that Mr. Brock met with

21 people from Tecogen in that same time period?

22    A.   Yes.

23    Q.   The last two pages of this document,

24 Exhibit 202, are Tecogen price quotations,

**77**

1  correct?

2      A.   Yes.

3      Q.   Do you know whether Mr. Brock asked

4  Tecogen to provide Atlantic with those price

5  quotations?

6      A.   By reading the e-mail on the first page

7  I see that there was a request made for pricing to

8  Ray Hickey.

9           Based on that I'm assuming that

10  Mr. Brock requested pricing.

11     Q.   Just so I'm clear in my understanding,

12  other than what you've read you have no

13  independent knowledge of what Mr. Brock may or may

14  not have requested?

15     A.   I do not.

16     Q.   On the first page a little more than

17  halfway down do you see the heading "Maintenance

18  Contract Pricing"?

19     A.   Yes.

20     Q.   In the first sentence, Mr. Glick refers

21  to "previously provided quotations for complete

22  maintenance contracts."  Do you see that?

23     A.   Yes.

24     Q.   Do you recall Tecogen or Jeff Glick

**78**

1  previously providing you with price quotations for

2  maintenance contracts -- relevant to the Lakeland

3  project?

4      A.   No.

5           MS. FROHLICH:  This will be

6  Exhibit 203.

7           (Plaintiff's Deposition Exhibit
           No. 203 offered and marked.)

8

9      Q.   (BY MS. FROHLICH)  Mr. Casabonne, have

10  you seen Exhibit 203 before? (Indicating.)

11     A.   (Witness examining document.)  Yes.

12     Q.   Can you please identify this document?

13     A.   It's an e-mail dated -- well, the first

14  e-mail is dated October 5th from myself to Jeff

15  Glick requesting a copy of Tecogen's standard

16  maintenance contract and a copy of their parts and

17  labor warranty.

18          The second e-mail is dated October

19  first, 2004 from Jeff Glick to myself attaching a

20  letter from Ray Hickey on the proposed first year

21  maintenance contract being offered for the

22  Lakeland cogen project.

23     Q.   If you look at the second page, that's

24  an October first, 2004 letter from Jeff Glick to

**79**

1  you, correct?

2      A.   Yes.

3      Q.   Do you recall receiving that letter?

4      A.   Vaguely.

5      Q.   Do you recall asking Jeff Glick in the

6  October, 2004 time frame to send him Tecogen's

7  special first year maintenance contract offer for

8  Lakeland?

9      A.   I don't.

10          MS. FROHLICH:  Mark this one as 204.

11          (Plaintiff's Deposition Exhibit
           No. 204 offered and marked.)

12

13     Q.   (BY MS. FROHLICH)  Mr. Casabonne, have

14  you seen Exhibit 204 before today? (Indicating.)

15     A.   (Witness examining document.)  Yes.

16     Q.   Did you receive this e-mail from Jeff

17  Glick in or around December 6, 2004?

18     A.   Yes.

19     Q.   Do you recall discussing two contracts

20  with Jeff Glick at that time?

21     A.   Vaguely.

22     Q.   What were you and Mr. Glick discussing

23  in terms of maintenance agreements involving

24  Chemung or Lakeland in the December 2004 time

**80**

1  frame?

2      A.   It would have been related to the

3  pricing to maintain the cogen units that were to

4  be installed for those two projects.

5      Q.   Why were you discussing the pricing with

6  Mr. Glick at that time?

7      A.   I believe Atlantic Energy was interested

8  in providing maintenance for both of those

9  projects -- separate maintenance agreements

10  directly with each customer so we needed to know

11  what the going rate for maintenance was, I

12  believe, and understand what was involved in doing

13  that -- providing that service.

14          (Plaintiff's Deposition Exhibit
           No. 204 offered and marked.)

15

16     Q.   (BY MS. FROHLICH)  Mr. Casabonne, have

17  you seen Exhibit 205 before today? (Indicating.)

18     A.   (Witness examining document.)  Yes.

19     Q.   This is an e-mail from Jeff Glick to you

20  dated May 6, 2005, the subject of which was

21  Extended Maintenance Contract for Lakeland, CSC

22  Tecogen Cogeneration Modules, correct?

23     A.   Yes.

24     Q.   As of May 6, 2005 were you and Mr. Glick

81

1  still discussing maintenance contracts involving
2  Tecogen modules in the Lakeland project?
3      A.  According to this e-mail, yes.
4      Q.  Do you have a memory separate from the
5  e-mail of still discussing maintenance contracts
6  with Mr. Glick at that time?
7      A.  No; I don't.
8      Q.  But you do recall receiving this e-mail,
9  is that correct?
10     A.  Yes.
11     Q.  I'm showing you what we previously
12  marked as Exhibit 11.
13         Have you seen this document before
14  today? (Indicating.)
15     A.  (Witness examining document.)  Yes.
16     Q.  Can you identify Exhibit 11?
17     A.  This is a Guaranteed Savings Agreement
18  between Atlantic Energy and the Lakeland Central
19  School District dated March 31st, 2004.
20     Q.  Would you look at pages seventeen and
21  eighteen?
22     A.  (Witness complying.)
23     Q.  There are no signatures in this
24  particular copy of this agreement, correct?

82

1      A.  Correct.
2      Q.  Do you know whether the Guaranteed
3  Savings Agreement between Atlantic Energy and the
4  Lakeland Central School District was ever signed?
5      A.  Yes.
6      Q.  Was it signed?
7      A.  Yes.
8      Q.  Have you seen the signed agreement?
9      A.  Yes.
10     Q.  Do you know whether Atlantic has a copy
11  of the signed agreement?
12     A.  I'm assuming there's one in the office
13  somewhere; yes.
14         Whether it's in the file or it's
15  somewhere else, I don't know.
16     Q.  Knowing that this is the first time that
17  you're looking at what we've marked as Exhibit 11
18  and you have not had a chance to thoroughly review
19  it, I'm going to ask what may be a bit of an
20  unfair question of you but do you know whether
21  Exhibit 11 is the copy or the version of the
22  Guaranteed Savings Agreement that actually was
23  signed by both of the parties?
24     A.  No; this is not the document.

83

1      Q.  This is not the final agreement?
2      A.  No; there were many revisions that
3  resulted from the SED review process.
4         The final copy was executed sometime in
5  the spring of '05 as well as several amendments to
6  that agreement.
7      Q.  Would you look at page seven, section
8  seven, Procurement of Equipment and Services.
9         Do you know whether the language in that
10  section as you see it in Exhibit 11 is different
11  from the final version?
12     A.  I don't know.
13     Q.  The first sentence in section seven
14  states that "Materials, equipment, supplies, and
15  services procured by AES as part of the services
16  will be procured by AES as agent for the
17  district," correct?
18     A.  Yes.
19     Q.  On page eight in section eleven entitled
20  "Title and Ownership," this version of the
21  Guaranteed Savings Agreement provides that "Upon
22  receipt of final payment Atlantic would deliver
23  title to all equipment and machinery to the
24  district," correct?

84

1      A.  Yes.
2      Q.  Did the final version of this agreement
3  have that provision?
4      A.  I don't know.
5      Q.  If you would look at page ten, section
6  nineteen, "Upgrading Or Altering the Equipment."
7  That section provides that "AES shall at all times
8  have the right to replace, delete or substantially
9  alter any item of equipment, add additional
10  equipment of equal or comparable quality" and all
11  of that subject to the District's prior written
12  approval.
13         Do you know whether the final version of
14  this agreement had that provision?
15     A.  I don't know.
16     Q.  If you would turn to page thirty within
17  Exhibit 11.  This page is entitled "Schedule F,
18  Scope of Work."
19         It provides that "All work will be
20  performed in accordance with the drawings and
21  specifications prepared by Energy Concepts dated
22  February 27, 2004," correct?
23     A.  Yes.
24     Q.  Do you recall whether the final version

# TECOGEN, INC. vs. AEGIS ENERGY SERVICES, INC. ET AL

Case 1:05-cv-11823-RCL   Document 43-15   Filed 07/14/2008   Page 13 of 32

## TIM CASABONNE   DECEMBER 4, 2007

---

**85**

1 of this agreement had a scope of work provision or
2 schedule that included that sentence?
3    A.   Not for certain, I don't.
4    Q.   Let me show you Exhibit 82 which you saw
5 I believe the first day of your deposition and
6 this was remarked with a different number earlier
7 today.
8        Did you actually write this letter,
9 yourself?
10    A.   I physically typed it.
11    Q.   Did anyone else have input into the
12 content of the letter?
13    A.   Yes.
14    Q.   Who else had input into the content?
15    A.   Mr. Brock.
16    Q.   What content did Mr. Brock have input
17 into?
18    A.   I believe the general -- what do you
19 want to call it -- the outline or the intent of
20 the letter was developed by Mr. Brock and I
21 basically put that on paper for his approval.
22    Q.   As of the date of Exhibit 82 which is
23 June 10, 2005, had the Guaranteed Savings
24 Agreement between Atlantic and the Lakeland School

---

**86**

1 District been signed?
2    A.   I'm not certain. I don't know.
3    Q.   Did you review any version of a
4 Guaranteed Savings Agreement with Lakeland in
5 connection with preparation of this letter which
6 is Exhibit 82?
7    A.   No.
8    Q.   Do you know whether Mr. Brock reviewed
9 any version of the Guaranteed Savings Agreement in
10 preparation of Exhibit 82?
11    A.   I don't know.
12    Q.   Do you know whether Mr. Brock consulted
13 with Attorney Berger in connection with the
14 preparation of Exhibit 82?
15    A.   I don't know.
16    Q.   Would you look at the second paragraph,
17 the first sentence.
18        Do you see the reference to schedule of
19 values in that sentence?
20    A.   Yes.
21    Q.   What did you understand that to mean?
22    A.   That is the J & M Mechanical's schedule
23 of values, breaking down all of the costs of their
24 contract.

---

**87**

1    Q.   Is that a document that you had in your
2 possession at the time that you worked on this
3 letter?
4    A.   Yes.
5    Q.   Did the nine-hundred-fifty-five-
6 thousand-dollar figure that you used in your
7 letter come from J & M's schedule of values?
8    A.   Yes.
9    Q.   Whose idea was it to send this letter?
10    A.   Tim Brock's.
11    Q.   Did he tell you why he wanted to send
12 it?
13    A.   I don't think he told me specifically
14 but it was my understanding that Atlantic Energy
15 was negotiating with both Tecogen and Aegis at
16 this time for the project and this was one of the
17 negotiation tactics that he used.
18    Q.   What other tactics did he use?
19    A.   Basically threatening not to issue
20 orders if a certain price wasn't met.
21    Q.   Are there any others that you can think
22 of?
23    A.   No.
24        MS. FROHLICH:   This is 206.

---

**88**

1        (Plaintiff's Deposition Exhibit
            No. 206 offered and marked.)
2
3    Q.   (BY MS. FROHLICH)  Mr. Casabonne, I'm
4 showing you what we've marked as Exhibit 206. Are
5 these your notes? (Indicating.)
6    A.   Yes.
7    Q.   Did you make these notes on June 10th,
8 2005?
9    A.   Yes.
10    Q.   The notes are entitled "Lakeland Cogen
11 Pricing," correct?
12    A.   Yes.
13    Q.   Under that title you've put three
14 underlined headings over columns, correct?
15    A.   Yes.
16    Q.   The first column is titled J plus M,
17 correct?
18    A.   Yes.
19    Q.   What is the rest of that, that comes
20 after J plus M?
21    A.   SOV -- and I believe that's referring to
22 schedule of values.
23    Q.   What information does that column
24 contain?

89

1    A.    It contains their price for the cogen
2  units for each school.
3    Q.    And the total price given in the
4  schedule of values is nine hundred fifty-five
5  thousand dollars, correct?
6    A.    Yes.
7    Q.    Was that figure a component of the
8  three-plus-million-dollar figure of J & M's
9  contract award?
10    A.    Yes.
11    Q.    The column in the middle is titled "ACS
12  bid quote," correct?
13    A.    Yes.
14    Q.    Does ACS stand for Advanced Comfort
15  Systems?
16    A.    Yes.
17    Q.    Underneath that do you see FEB 11?
18    A.    Yes.
19         MS. FROHLICH:  Can we have this
20  marked?
21         (Plaintiff's Deposition Exhibit
           No. 207 offered and marked.)
22
23    Q.    (BY MS. FROHLICH)  I'm showing you what
24  we've marked as Exhibit 207.

90

1         Have you seen this before today?
2  (Indicating.)
3    A.    (Witness examining document.)  I'm not
4  certain.
5         Earlier I think I said I hadn't seen it
6  but I see this copy has what appears to be my
7  handwritten notes on it so I don't know.
8    Q.    Let me ask you:  The handwriting that
9  appears to Exhibit 207, is that your handwriting?
10    A.    Yes.
11    Q.    To the best of your recollection as you
12  sit here today, is this February 11th, 2005
13  document with your handwriting marked as
14  Exhibit 207 the February 11 ACS bid quote
15  referenced in your handwritten notes marked as
16  Exhibit 206?
17    A.    (Witness examining documents.)  Yes.
18    Q.    Do you have Exhibit 138 in front of you?
19    A.    Yes; I do.
20    Q.    Looking at Exhibit 207 -- and that's the
21  February 11th, 2005 ACS quote -- the handwriting
22  on the first page says "original number to J & M,"
23  correct?
24    A.    Yes.

91

1    Q.    And then underneath that there's a line
2  and then the number -- it looks to me like 256038,
3  is that correct?
4    A.    Yes.
5    Q.    If you compare that to Exhibit 138 which
6  is the November 5th, 2004 Advanced Comfort Systems
7  price quote?
8    A.    Yes.
9    Q.    The number in that price quote for
10  Lakeland high school is two hundred fifty-six
11  thousand thirty-eight dollars, correct?
12    A.    Yes.
13    Q.    When you were -- well, strike that.
14  Does your handwriting on Exhibit 207 compared to
15  the numbers in Exhibit 138 suggest that you had
16  Exhibit 138 at the time you were writing the
17  numbers on Exhibit 207?
18    A.    It's possible; it's also possible I was
19  writing those numbers based on a telephone
20  conversation or some other information.  I don't
21  know.
22    Q.    Referring you back to your handwritten
23  notes from June 10th, 2005 -- this is Exhibit 206?
24    A.    Yes.

92

1    Q.    Is the information in the column under
2  ACS bid quote a breakdown of the prices that were
3  quoted in the February 11th price quote from
4  ACS -- and that's Exhibit 207?
5    A.    Yes.
6    Q.    What is the title of the last column on
7  the right side of the page?
8    A.    ACS Special Pricing.
9    Q.    What did that mean?
10    A.    I'm assuming it referred to pricing that
11  Atlantic Energy received directly from Advanced
12  Comfort or Aegen; I'm not certain.
13    Q.    If you look at the middle column do you
14  see the arrow at the bottom that points down to
15  more handwriting?
16    A.    Yes.
17    Q.    Can you read what that says?
18    A.    Eight hundred fifty-three thousand six
19  twenty-eight dollars.  It says final number to
20  J & M by Ray.  Then it says date with question
21  marks.
22    Q.    Do you know what that means?
23    A.    I believe that's my notes questioning if
24  that eight-hundred-fifty-three-thousand-dollar

93

1  figure is the final number that Ray gave to J & M
2  Heating and Cooling -- Ray being Ray Hickey from
3  Advanced Comfort.
4      Q.  Why did you create these notes?
5      A.  I believe it was an exercise to compare
6  the schedule of values that J & M had listed as
7  part of their contract with Atlantic Energy versus
8  the Advanced Comfort price quotes and Atlantic
9  Energy special pricing documents.
10     Q.  Why were you doing that as of June 10th,
11 2005?
12     A.  I believe because Atlantic Energy was
13 considering purchasing and providing cogeneration
14 units for the Lakeland project.
15     Q.  Why was Atlantic Energy considering that
16 as of June 10th, 2005?
17     MR. CURCIO:  Objection.
18     THE WITNESS:  I believe it was to
19 serve two purposes.  One was to ensure that we
20 were getting the best price for the cogen
21 equipment.
22     Two, that we were going to satisfy our
23 requirements with our agreement with the Lakeland
24 School District.

94

1      Q.  (BY MS. FROHLICH) Were there any
2  specific requirements in your agreement with the
3  Lakeland School District that Atlantic was
4  concerned with satisfying?
5      A.  I believe the main -- our main concern
6  was that we were going to achieve the energy
7  savings that was identified in the energy audit
8  which became part of the contract.
9      Q.  Had the energy audit been performed
10 based upon Tecogen modules?
11     A.  I don't know.
12     Q.  Let me show you Exhibit 24 -- and I
13 believe you may have looked at this on the first
14 day of your deposition.  Do you recall that?
15 (Indicating.)
16     A.  (Witness examining document.)  Yes.
17     Q.  These e-mails were sent on June 14th,
18 2005, correct?
19     A.  Yes.
20     Q.  The day before these e-mails you met
21 with Lee Vardakas, correct?
22     A.  Yes.
23     Q.  Tim Brock and Bill Marzano also attended
24 that meeting, correct?

95

1      A.  Yes.
2      Q.  Did anyone else participate in that
3  meeting?
4      A.  I can't recall.
5      Q.  Who proposed the meeting?
6      A.  I think it was Mr. Vardakas.
7      Q.  Did he tell you why he was proposing the
8  meeting?
9      A.  To inform us of the product that his
10 company offered.
11     Q.  What product was that?
12     A.  The Aegen cogeneration unit.
13     Q.  Where did the meeting occur?
14     A.  At our office in Saratoga.
15     Q.  How long did the meeting last?
16     A.  I don't recall.
17     Q.  Had you heard anything about
18 Aegen-manufactured cogeneration units before the
19 meeting?
20     A.  To the best of my knowledge, no.
21     Q.  Was the Lakeland project the first
22 time -- strike that.
23     In this meeting was anything said about
24 Tecogen modules?

96

1      A.  I would have to assume it was.  I don't
2  know for certain but I'm assuming, yes.
3      Q.  Do you have a specific memory?
4      A.  No.
5      Q.  At the meeting was Atlantic's purchase
6  of twenty Aegen modules at sixty-one thousand
7  dollars each discussed?
8      A.  I don't recall if that specific price
9  was discussed but the purchase of their equipment
10 was discussed.
11     Q.  Was there any discussion that you recall
12 about the price of Aegen modules?
13     A.  Again I know we discussed pricing but
14 specifically, I don't recall what price we
15 discussed.
16     Q.  In this e-mail, Exhibit 24, Mr. Vardakas
17 sent a sample Aegis maintenance agreement,
18 correct?
19     A.  Yes.
20     Q.  Was the June 13th meeting with
21 Mr. Vardakas the first time you had discussed
22 maintenance for the Lakeland project with
23 Mr. Vardakas?
24     A.  I'd have to say yes.

97

1    Q.   If you look on the first page of
2   Exhibit 24, near the bottom, do you see the
3   heading "Lakeland"?
4    A.   Yes.
5    Q.   The last item under that reads "excess
6   paid by J & M," do you see that?
7    A.   Yes.
8    Q.   Did you have any understanding as to
9   what that meant?
10    A.   It was part of the formula used to
11   justify pricing for the twenty units to Atlantic
12   Energy.
13        Somehow we were trying to recognize that
14   J & M was actually purchasing eleven of those
15   units that we had talked about with the twenty
16   unit order.  I'd have to spend some time looking
17   at the numbers to figure out exactly what that
18   meant.
19    Q.   Without studying it, it doesn't pop to
20   mind what excess paid by J & M meant?
21    A.   Right now by looking at it it means that
22   J & M was paying more than sixty-one thousand
23   dollars per unit.
24    Q.   Let me move on.  At the June 13th, 2005

98

1   meeting did Mr. Vardakas provide meeting
2   participants with any written materials about
3   Aegen modules?
4    A.   I don't recall.
5    Q.   Do you remember whether he had a
6   PowerPoint presentation that he showed about Aegen
7   modules?
8    A.   I don't recall that.
9    Q.   If Aegen brand cogeneration modules had
10   never been brought to Atlantic's attention, would
11   Atlantic have used Tecogen modules at Lakeland?
12        MR. CURCIO:  Objection.
13        THE WITNESS:  Most likely.
14        MS. FROHLICH:  Let's mark this as
15   208.
16        (Plaintiff's Deposition Exhibit
17        No. 208 offered and marked.)
18    Q.   (BY MS. FROHLICH)  Showing you what
19   we've marked as Exhibit 208, have you seen this
20   before today? (Indicating.)
21    A.   (Witness examining document.)  Yes.
22    Q.   The e-mail at the very top of the first
23   page is from you to Lee Vardakas sent on
24   June 14th, 2005, correct?

99

1    A.   Yes.
2    Q.   Why did you send that e-mail?
3    A.   It was a result of some negotiations
4   that Tim Brock and Ed Horvath had related to the
5   Lakeland project.
6    Q.   Do you know what was said in those
7   negotiations?
8    A.   No.
9    Q.   Was the financial model that you refer
10   to in the first line a written model?
11    A.   No.
12    Q.   What was the financial model -- strike
13   that.
14        Was the financial model anything more
15   than a unit cost of sixty-one thousand dollars per
16   unit for twenty units?
17    A.   Not to my knowledge; it was nothing
18   more.
19    Q.   Showing you what was previously marked
20   as Exhibit 83 -- and I believe we may have
21   actually looked at this earlier today in a
22   collection of documents marked as a new exhibit.
23   I always want to let a witness know and be fair
24   that you may have already seen something; that's

100

1   the only reason why I had that run-up to the
2   question.
3        Whose idea was it to -- strike that.
4   What happened between the time you sent the letter
5   to Ed Horvath rescinding the cogen purchase from
6   his contract and this letter that caused you to
7   send this letter? (Indicating.)
8    A.   (Witness examining document.)
9    Q.   Strike that.  Let me give you an easier
10   question.
11        Why did you send Exhibit 83?
12    A.   Mr. Brock and Mr. Horvath had come to an
13   agreement on who would provide the cogen units and
14   at what price.
15        This letter was to notify Mr. Horvath
16   that he would be providing the cogeneration units
17   as originally agreed and rescinding the letter
18   that we had sent on June 10th.
19    Q.   Did you take part in any of the
20   discussions between Mr. Brock and Mr. Horvath that
21   resulted in this letter being sent?
22    A.   I was probably on speaker phone a few
23   times but I wouldn't say for all of the
24   conversations, no.

### 113

1    Q.   This is from Tecogen to the attention of
2  Tim Carroll, correct?
3    A.   Yes.
4    Q.   As of August 2002, Tim Carroll was an
5  employee at Atlantic, correct?
6    A.   Yes.
7    Q.   Is he still at Atlantic?
8    A.   No.
9    Q.   Have you seen this letter of transmittal
10 before today?
11   A.   To the best of my knowledge, no.
12   Q.   When did you begin working on the
13 Chemung County Nursing Home cogeneration project?
14   A.   I became involved in the fall or winter
15 of 2004.
16   Q.   Do you see the handwriting on
17 Exhibit 213 with the date 10/6/04, "Per Tim
18 Casabonne, expect a spring 2005 order"?
19   A.   Yes.
20   Q.   Do you recall in October of 2004
21 discussing the Chemung project with Jeff Glick of
22 Tecogen?
23   A.   Not specifically; no.
24          MS. FROHLICH:  214.

### 114

1          (Plaintiff's Deposition Exhibit
            No. 214 offered and marked.)
2
3    Q.   (BY MS. FROHLICH)  Exhibit 214 consists
4  of a faxed cover page from you to Richard Rappa
5  dated October 26, 2004, correct?  (Indicating.)
6    A.   Yes.
7    Q.   In that fax transmittal cover sheet, you
8  state "Rich, the attached sheet is the only info
9  from Tecogen that I was able to find in the
10 files."  Do you see that?
11   A.   Yes.
12   Q.   Why did you send this fax to Rich Rappa?
13   A.   Atlantic Energy hired Clough Harbour and
14 Associates of which Rich Rappa is employed by to
15 design the cogeneration system and some other work
16 at the Chemung County Health Center so I believe I
17 was forwarding Rich any information we had in our
18 files about the project.
19   Q.   The attached sheet that you forwarded to
20 Rich Rappa is a February 19, 2002 quotation from
21 R. L. Kistler to Atlantic for five Tecogen
22 cogeneration modules, correct?
23   A.   Yes.
24   Q.   And the reference given on the quote is

### 115

1  Chemung County Nursing, correct?
2    A.   Yes.
3    Q.   How did you find this Kistler quotation?
4    A.   I believe I went into the file cabinet
5  in the Chemung folder and searched for something
6  from Tecogen and this is what I found.
7    Q.   The Kistler quote from 2002 is addressed
8  to the attention of Tim Carroll, correct?
9    A.   Yes.
10   Q.   As of October 2004 was Tim Carroll still
11 an employee of Atlantic?
12   A.   Yes.
13   Q.   In October 2004 did you talk with Tim
14 Carroll about the February 19, 2002 Kistler quote?
15   A.   I don't recall.
16   Q.   Did Rich Rappa ask you to provide any
17 pricing information?
18   A.   I don't recall.
19   Q.   Do you recall what he asked for
20 specifically with respect to the Chemung project
21 in October of 2004?
22   A.   I think he asked for any information we
23 had identified or in our files about the project
24 related to the cogen and the energy generator

### 116

1  work, whether it is quotes from contractors,
2  preliminary proposals, estimates -- any
3  information that would help them establish a file
4  for the project basically.
5    Q.   Do you know why, in 2002, Atlantic
6  received this price quote from Kistler?
7    A.   Tim Carroll was developing the job and
8  he must have asked Kistler to provide a quote for
9  budget purposes so we could come up with a project
10 cost.
11          MS. FROHLICH:  This will be 215.
12          (Plaintiff's Deposition Exhibit
            No. 215 offered and marked.)
13
14   Q.   (BY MS. FROHLICH)  Showing you
15 Exhibit 215, this is a letter dated March 3rd,
16 2004 to Robert Page, nursing home administrator at
17 Chemung from Tim Carroll, correct?  (Indicating.)
18   A.   Yes.
19   Q.   Have you seen this before today?
20   A.   Yes.
21   Q.   What was the purpose of this document?
22   A.   (Witness examining document.)  It
23 appears to be a written response to questions that
24 Bob Page and perhaps other people from Chemung

---

**117**

1 County had related to the energy project that we
2 were proposing.
3    Q.   If you would turn to the fourth page of
4 the letter, without getting into specifics do you
5 see that Tecogen service and cogeneration units
6 are discussed on that page?
7    A.   The third paragraph?
8    Q.   The third paragraph and the last
9 paragraph?
10    A.   Yes.
11    Q.   If you turn to the sixth page in the
12 italicized paragraph under the first question, you
13 see that Tecogen units are discussed in that
14 paragraph as well?
15    A.   Yes.
16    Q.   Please turn back to the third page.  In
17 the first paragraph that's italicized, the last
18 two sentences refer to a "successful field trip
19 with numerous County staff at two facilities."  Do
20 you see that?
21    A.   Yes.
22    Q.   Did you attend that field trip?
23    A.   No.
24    Q.   Do you know who from the County attended

---

**118**

1 the field trip?
2    A.   No.
3          MS. FROHLICH:  216.
4          (Plaintiff's Deposition Exhibit
5          No. 216 offered and marked.)

6    Q.   (BY MS. FROHLICH) Would you please
7 identify Exhibit 216? (Indicating.)
8    A.   This is a copy of meeting minutes dated
9 October 21st, 2004, one prepared by Atlantic
10 Energy and then another document prepared by the
11 Chemung County Health Center of the same date.
12    Q.   Did you prepare the meeting minutes?
13    A.   Yes; on the Atlantic Energy letterhead.
14    Q.   What was the purpose of the project
15 kick-off meeting?
16    A.   I believe it was to identify the project
17 team, introduce Clough Harbour, talk about the
18 project scope, address any questions that the
19 County had, and the start of the coordination of
20 the project.
21    Q.   In looking at the list of attendees, are
22 the first six people listed all Chemung County
23 employees?
24    A.   Yes.

---

**119**

1    Q.   Did all six of those people attend the
2 October 21st, 2004 project kick-off meeting?
3    A.   I'm assuming they did but without a copy
4 of the sign-in sheet I can't confirm that.
5    Q.   When you prepared -- when you prepare
6 minutes for meetings is it your practice to list
7 as attendees people who actually attended meetings
8 that you were at?
9    A.   Yes.
10    Q.   So do you have any reason to believe
11 that the six Chemung County employees shown in the
12 project meeting minutes marked as Exhibit 216 were
13 not at the meeting on that date?
14    A.   No.
15    Q.   If you turn to the second page, item
16 eleven, it states, "The cogeneration scope of work
17 includes four 75 kilowatt Tecogen units, dry
18 coolers, pumps, heat exchangers and associated
19 controls."  Did I read that correctly?
20    A.   Yes.
21    Q.   What scope of work were you referring to
22 in that item?
23    A.   The energy conservation measure that
24 Atlantic Energy identified as the cogeneration

---

**120**

1 plan.
2    Q.   Was that scope of work discussed in the
3 October 21st, 2004 kick-off meeting?
4    A.   Yes.
5    Q.   By the way, did you send a copy of these
6 minutes to each of the attendees listed in the
7 minutes?
8    A.   I typically send them by e-mail and I
9 know I don't have e-mail addresses for Jim
10 MacBlane, Pete Shaffer, Tim Hugg or John Harris so
11 those -- if they received them they would have
12 received them either through Robert Page or Gary
13 Morenus.
14    Q.   Do you see item twelve in the minutes --
15 this is on the second page of Exhibit 216?
16    A.   Yes.
17    Q.   Did that item mean that Atlantic was
18 tasked to provide the County with the Tecogen
19 maintenance agreement?
20    A.   Yes.
21    Q.   Why was that tasked to Atlantic?
22    A.   The County wanted to understand what was
23 required of them as part of maintaining the
24 cogeneration equipment; and because Atlantic

---

**121**

1  Energy was providing the equipment they asked us
2  to provide the maintenance agreement.
3     Q.  If you turn to the third page of
4  Exhibit 216.  This is a document that was prepared
5  by the County, is that correct?
6     A.  Yes.
7     Q.  And this was provided to you by the
8  County, is that correct?
9     A.  Yes.
10    Q.  On the third page under items for
11  follow-up, do you see your name toward the bottom,
12  Tim Casabonne?
13    A.  Yes.
14    Q.  One of the items for follow-up by you
15  was "obtain information on the cogen maintenance
16  services agreement to answer these questions,"
17  correct?
18    A.  Yes.
19    Q.  Is that your handwriting next to that
20  typed sentence?
21    A.  Yes.
22    Q.  Does that say "requested from Tecogen,
23  10/27/04"?
24    A.  Yes.

**122**

1     Q.  Does that mean on October 27th, 2004 you
2  asked Tecogen to provide you with information on
3  its cogeneration maintenance services agreement?
4     A.  That's my understanding; yes.
5     Q.  Do you recall earlier, when we were
6  discussing Lakeland, an e-mail from Jeff Glick to
7  you in early December that had maintenance
8  agreements for Chemung and Lakeland attached to
9  it?
10    A.  December of?
11    Q.  '04.
12    A.  '04?  Yes.
13    Q.  To the best of your recollection did
14  Jeff Glick provide you with a maintenance
15  agreement for Chemung that you then provided to
16  the County?
17    A.  I'm not certain if I provided it to the
18  County.
19       MS. FROHLICH:  217.
20       (Plaintiff's Deposition Exhibit
21       No. 217 offered and marked.)
22    Q.  (BY MS. FROHLICH)  Exhibit 217 is a
23  price quotation dated January 26, 2005 to Atlantic
24  Energy from Advanced Comfort Systems for Chemung

**123**

1  County Nursing Home, correct?
2     A.  Yes.
3     Q.  It's directed to the attention of Tim
4  Casabonne, project manager, correct?
5     A.  Yes.
6     Q.  Do you recall receiving this price
7  quotation directly from Advanced Comfort Systems
8  in January of 2005?
9     A.  Yes.
10    Q.  In this quote, Advanced Comfort Systems
11  offered pricing on four Tecogen integrated cogen
12  modules, correct?
13    A.  Yes.
14    Q.  And those modules were identified as
15  modules listed in the specification and drawing
16  documents as G-1 through G-4, correct?
17    A.  Yes.
18    Q.  The specifications and drawings
19  documents for the Chemung projects specified
20  Tecogen integrated cogeneration modules for use in
21  that project, correct?
22       MR. CURCIO:  Objection.
23       THE WITNESS:  To the best of my
24  knowledge; yes.

**124**

1     Q.  (BY MS. FROHLICH)  Attached to the price
2  quote marked as Exhibit 217 is a drawing that
3  we've seen before entitled "Tecogen Integrated
4  Unit Installation," correct?
5     A.  Yes.
6     Q.  If you look at the second page of this
7  price quote it states, "Tecogen has provided
8  Atlantic Energy an all-inclusive service cost for
9  integrated units in a letter to you dated
10  October 28, 2004 for the first year after
11  start-up."
12       Do you recall receiving a letter dated
13  October 28, 2004 discussing that all-inclusive
14  service cost?
15    A.  I don't recall it; no, but that doesn't
16  mean I did not receive it, obviously.
17       MS. FROHLICH:  218.
18       (Plaintiff's Deposition Exhibit
19       No. 218 offered and marked.)
20    Q.  (BY MS. FROHLICH)  Mr. Casabonne,
21  Exhibit 218 is an e-mail from Michael Conrad to
22  you dated March 1, 2005, correct?
23    A.  Yes.
24    Q.  Was Mr. Conrad an engineer at Clough

---

**125**

1  Harbour?

2     A.   Yes.

3     Q.   Did you actually receive this e-mail

4  from Mr. Conrad?

5     A.   Yes.

6     Q.   As of March first, 2005 were you looking

7  for ways to lower the costs on the Chemung

8  project?

9     A.   Yes.

10     Q.   Did this e-mail contain suggestions for

11  ways to lower those costs?

12     A.   Yes.

13     Q.   Let me show you what's been marked as

14  Exhibit 89 in this lawsuit.

15          This is another price quote from

16  Advanced Comfort Systems to Atlantic involving the

17  Chemung project, correct? (Indicating.)

18     A.   Yes.

19     Q.   This price quote is dated March 1, 2005,

20  correct?

21     A.   Yes.

22     Q.   And this was sent to your attention,

23  correct?

24     A.   Yes.

---

**126**

1     Q.   The handwriting on the first page of

2  this document is your handwriting, correct?

3     A.   Yes.

4     Q.   In between the time of the January 2005

5  price quote that we looked at a few minutes ago

6  and this March price quote, did you ask Advanced

7  Comfort Systems for a lower price on Tecogen

8  integrated modules?

9     A.   I don't recall if I asked for it or if

10  they just provided it without being asked.

11     Q.   Were you -- strike that.  Do you see

12  that both of the price quotations are signed by

13  Ray Hickey on behalf of Advanced Comfort Systems?

14     A.   Yes.

15     Q.   Did you have conversations with Ray

16  Hickey at any time before, say, May 31st of 2005

17  about the Chemung project and his pricing for that

18  project?

19     A.   I must have because I have

20  correspondence from him dated prior to that date.

21     Q.   Do you have a specific memory as you sit

22  here today of any conversations with him?

23     A.   No.

24     Q.   Let me show you Exhibit 164.  You were

---

**127**

1  asked about this exhibit in the first day of your

2  deposition.  I just need a few follow-up

3  questions.

4          This is an April 12, 2005 e-mail from

5  you to Robert Page, correct? (Indicating.)

6     A.   Yes.

7     Q.   Mr. Page was the administrator of the

8  Chemung County nursing facility, correct?

9     A.   Yes.

10     Q.   In the second paragraph of your e-mail

11  from Mr. Page, the second sentence states "The

12  units which are no longer available were

13  field-assembled and did not have any emissions

14  control."

15          What did you mean in that sentence?

16     A.   I meant that the equipment we based our

17  budget on was no longer being offered by Tecogen

18  and that equipment did not have the emissions

19  equipment that was required by the utility in

20  order for the County to meet an exemption on a

21  certain tariff.

22     Q.   Do you see your reference to the New

23  York State -- or NYS regulations/code?

24     A.   Yes.

---

**128**

1     Q.   What regs or code were you referring to?

2     A.   I believe it was regarding emissions.  I

3  don't recall a specific regulation or code.

4     Q.   Do you see your reference to the current

5  quote from Tecogen is eighty-six thousand one

6  hundred sixty-five each?

7     A.   Yes.

8     Q.   What current quote were you referring to

9  in that sentence?

10     A.   Their quote of January 26, '05.

11     Q.   So you were not referring to the March

12  first, 2005 quote from Advanced Comfort Systems?

13     A.   Based on the prices, no.

14     Q.   So if you had referred to the March

15  first, 2005 quote instead of the January quote,

16  the dollar figure for the Tecogen unit would have

17  been lower?

18     A.   I would say yes.

19          MS. FROHLICH:  Let's mark this as

20  219.

21          (Plaintiff's Deposition Exhibit
              No. 219 offered and marked.)

22

23     Q.   (BY MS. FROHLICH)  Showing you what

24  we've marked as Exhibit 219, have you seen this

---

**PERLIK and COYLE REPORTING**

129

1  letter before today? (Indicating.)
2      A.  (Witness examining document.)  Yes.
3      Q.  This letter communicated to Mr. Page
4  that as a result of the utility's tariff
5  requirements the additional cost to provide the
6  required emissions control equipment would be one
7  hundred eighty-one thousand thirty dollars,
8  correct?
9      A.  Yes.
10     Q.  Was that cost figure based upon the
11 Tecogen units used in the Chemung project?
12     A.  I believe so; yes.
13         MS. FROHLICH:  220.
14         (Plaintiff's Deposition Exhibit
               No. 220 offered and marked.)
15
16     Q.  (BY MS. FROHLICH)  Showing you
17 Exhibit 220, are these your handwritten notes?
18 (Indicating.)
19     A.  Yes.
20     Q.  The notes are dated May 31, 2005,
21 correct?
22     A.  Yes.
23     Q.  Did you prepare these notes on that
24 date?

130

1      A.  Yes.
2      Q.  At the top of the page do you see
3  "approved budget," underlined?
4      A.  Yes.
5      Q.  And the number given there is five
6  hundred thirty-four thousand nine hundred dollars,
7  correct?
8      A.  Yes.
9      Q.  What did you mean by that?
10     A.  That's the budgeted -- I believe it is
11 the Atlantic Energy budget for the mechanical work
12 related to the Chemung cogeneration project.
13     Q.  Next to that, do you see "bid,"
14 underlined?
15     A.  Yes.
16     Q.  There's the same dollar figure with the
17 words Kimble Mechanic -- or MEC?
18     A.  Yes.
19     Q.  Is that Kimble Mechanical?
20     A.  Yes.
21     Q.  Who is Kimble Mechanical?
22     A.  They are the mechanical contractor that
23 Atlantic Energy eventually hired to install the
24 cogeneration units.

131

1      Q.  Under that do you see minus ten thousand
2  one hundred forty-two?
3      A.  Yes.
4      Q.  What does it say next to that?
5      A.  Tecogen credit.
6      Q.  What did that mean?
7      A.  I believe the original request for bid
8  asked the mechanical contractors to provide the
9  cogeneration equipment and at some point Atlantic
10 Energy decided that they would provide the
11 equipment.
12         I believe that figure represents the
13 amount of markup that they had for the
14 cogeneration units, therefore we could take that
15 out of their base price.
16     Q.  Had that been -- was that under
17 discussion as of May 31st, 2005 or had it been
18 agreed to at that point?
19     A.  I don't recall.
20         MS. FROHLICH:  221.
21         (Plaintiff's Deposition Exhibit
               No. 221 offered and marked.)
22
23     Q.  (BY MS. FROHLICH)  Mr. Casabonne,
24 Exhibit 221 is a two-page document, handwritten

132

1  notes dated 6/3/05, correct? (Indicating.)
2      A.  Yes.
3      Q.  Is this your handwriting?
4      A.  Yes.
5      Q.  On the first page do you see names at
6  the top of the page?
7      A.  Yes.
8      Q.  Does that mean these notes were taken
9  during a meeting with those people in attendance?
10     A.  Yes.
11     Q.  Do you remember this meeting at Chemung
12 County -- strike that.
13         Do you remember a meeting involving
14 Chemung County on June 3rd, 2005?
15     A.  No.
16     Q.  If you look at item number two, "cogen
17 update," does that say "budget increase approved"?
18     A.  Yes.
19     Q.  Underneath it, "okay to proceed with
20 project"?
21     A.  Yes.
22     Q.  What did that mean?
23     A.  Atlantic Energy submitted a letter which
24 I think was referenced here in Exhibit 219 to

133

1 Mr. Page requesting more funds for the project.
2 In addition to that, Mr. Page had to submit
3 documentation to the Department of Health
4 requesting them to approve more money.
5       I believe the okay to proceed was based
6 on the Department of Health's notification to
7 Mr. Page that the budget increase was accepted.
8       MS. FROHLICH: This will be 222.
9       (Plaintiff's Deposition Exhibit
        No. 222 offered and marked.)
10
11      Q.   (BY MS. FROHLICH) Mr. Casabonne, I'm
12 showing you what has been marked as Exhibit 222.
13 This is a letter from Pat Bonnell, executive vice
14 president, Kimble to you dated June 14th, 2005
15 regarding the Chemung County nursing facility dash
16 Tecogen units, correct?
17      A.   Yes.
18      Q.   As of June 14, 2005 Kimble was the
19 mechanical contractor for the Chemung project,
20 correct?
21      A.   I don't know if we had awarded them the
22 contract at that date but sometime around that
23 date; yes.
24      Q.   Kimble had bid on the project -- strike

134

1 that.
2       Kimble's bid on the project had the
3 purchase of Tecogen cogeneration units included
4 within the spoke of the mechanical work, correct?
5       A.   Yes.
6       Q.   In this letter he was offering to take
7 the purchase of those four Tecogen units out of
8 Kimble's original proposal, correct?
9       A.   Yes.
10      Q.   Did you ask him to make that change?
11      A.   Yes.
12      Q.   Why did you do that?
13      A.   Because Atlantic Energy was interested
14 in providing the units directly for the project.
15      Q.   Why was Atlantic interested in doing
16 that?
17      A.   Because we were able to get the
18 equipment for a better price than Kimble
19 Mechanical.
20      Q.   On the date of this letter from Kimble,
21 which is June 14th, 2005, you had received a price
22 quote sent by Lee Vardakas for Aegen-built
23 cogeneration units for Chemung, correct?
24      A.   What was the date of the Aegen?

135

1       Q.   June 14. I don't believe it's in front
2 of you.
3       A.   I can't confirm the date but if you have
4 the document that states that.
5       Q.   Let me show you Exhibit 31.
6 (Indicating.)
7       A.   (Witness examining document.)
8       Q.   Let me ask you a new question:
9 Exhibit 31 is a June 14th, 2005 price quotation
10 for four Aegen ThermoPower modules for the Chemung
11 County Nursing Home.
12       Was this the first price quote that you
13 received for Chemung County Nursing Home involving
14 Aegen modules?
15      A.   Yes.
16      Q.   Let me also show you Exhibit 32. I
17 think you've looked at these the first day of your
18 deposition.
19       This is a quotation prepared by Lee
20 Vardakas dated June 16th, 2005 which is two days
21 after Exhibit 31. Do you know why this quote was
22 sent to Atlantic? (Indicating.)
23      A.   (Witness examining document.) I'm going
24 to guess it was to correct something that was in

136

1 the previous quotation to make some type of
2 modification but I can't see any pricing
3 information so that would be my guess. It is
4 probably a change of price.
5       Let me -- I see there's a difference in
6 the voltage for the four units. That's more
7 likely the case, correcting the voltage.
8       MS. FROHLICH: Let's mark this as
9 223.
10       (Plaintiff's Deposition Exhibit
        No. 223 offered and marked.)
11
12      Q.   (BY MS. FROHLICH) Mr. Casabonne, would
13 you please identify Exhibit 223? (Indicating.)
14      A.   It's a chain of e-mails between myself
15 and Clough Harbour related to the Chemung project.
16 It looks like they're all dated June 27th, '05.
17      Q.   If you would look at the bottom of the
18 first page, there's an e-mail from Thomas Ferreri
19 to you on June 27th, 2005 at 7:42 a.m.
20       The first sentence says "Attached is a
21 letter from NYSEG faxed to us on 6/24/05." It
22 then goes on to say, "The preliminary review is
23 complete but final review will not be started
24 until NYSEG receives their estimated cost of five

137

1  thousand dollars." Did I read that correctly?
2  A. Yes.
3  Q. What preliminary review had NYSEG
4  conducted on the Chemung project?
5  A. They would have reviewed the
6  preliminary -- the initial application for the
7  cogeneration interconnect -- NYSEG is the utility.
8  Q. Do you recall when that preliminary
9  review began?
10  A. Not specifically but I will estimate
11  Clough Harbour submitted the documents to NYSEG
12  for review sometime in winter or spring of '05.
13  Q. Above that, approximately in the middle
14  of the page there's the second e-mail from Tom to
15  you of that day.
16  The first sentence refers to the new
17  cogen unit, do you see that?
18  A. Yes.
19  Q. Was that the Aegen unit that had been
20  quoted by Aegis in its June 14th and 16th price
21  quotations -- strike that.
22  Let me just ask you simply, was that new
23  cogen unit the Aegen unit?
24  A. Yes.

138

1  Q. In the second sentence Tom states,
2  "Perhaps you may want to hold off on the review
3  fee because with a change of this magnitude the
4  utility may require another full preliminary
5  review and preliminary review fee also."
6  He then states, "We are currently
7  reviewing the Aegenco technical information to
8  gauge the impact on our original design that has
9  been approved by the utility preliminary review."
10  Did I read that correctly?
11  A. Yes.
12  Q. This was on June 27th, 2005, correct?
13  A. Yes.
14  Q. Either before or after that date did you
15  have any conversations with anyone at Clough
16  Harbour about the new Aegen cogeneration unit
17  proposed for the Chemung project?
18  A. Yes.
19  Q. What do you recall of those discussions?
20  A. I don't really recall any specifics but
21  I'm assuming it was related to our intent to
22  provide the Aegen equipment for the project and
23  confirming that they were reviewing the
24  documentation that was provided and confirming

139

1  that they would provide their comments for all to
2  review and consider.
3  Q. When you look at the top e-mail -- or
4  the e-mail at the top of the page on Exhibit 223,
5  you state, "We will hold on the final review fee
6  we receive until further from your office." Did I
7  read that correctly?
8  A. Yes.
9  Q. What did you mean by that?
10  A. I think I had a little dyslexia that day
11  but basically that we would not pay the
12  preliminary review fee until Clough Harbour
13  provided comments on the Aegen equipment.
14  Q. Did Clough Harbour provide comments on
15  the Aegen equipment?
16  A. Yes.
17  Q. When did they do that -- strike that.
18  Did they ever provide any written comments?
19  A. Yes.
20  Q. Do you recall, did they do that more
21  than once?
22  A. I don't know if it was more than once.
23  I know there was definitely one list of questions,
24  concerns, comments that they produced in writing.

140

1  Q. The day after these e-mails that we've
2  looked at in Exhibit 223 there was a project
3  meeting on the Chemung project, correct?
4  A. What was the date?
5  Q. The date of these e-mails was June 27,
6  2005?
7  A. Are you saying June 23rd or
8  February 23rd?
9  Q. No; June 27, 2005.
10  A. Is the date of these e-mails?
11  Q. On Exhibit 223.
12  A. I'm sorry, Exhibit 223. Yes.
13  Q. The day after these e-mails there was a
14  project meeting involving the Chemung project,
15  correct?
16  A. Can you refresh my memory on that one
17  because I don't recall.
18  Q.
19  MS. FROHLICH: I'm going to mark
20  this as 224.
21  (Plaintiff's Deposition Exhibit
     No. 224 offered and marked.)
22
23  Q. (BY MS. FROHLICH) Exhibit 224 are
24  Chemung project kick-off meeting minutes dated

### 141

1  6/28/05, correct? (Indicating.)

2  A.  Yes.

3  Q.  Did you prepare these minutes?

4  A.  Yes.

5  Q.  If you look at the attendees, I don't

6  see the name of Tom Ferreri from Clough Harbour.

7  Was he at that meeting?

8  A.  To the best of my knowledge he was not.

9  Q.  I see that Rich Rappa is listed as a cc

10  on the minutes.  Did he receive a copy of these

11  minutes?

12  A.  I'm assuming I e-mailed it to him but I

13  can't confirm.

14  Q.  Am I correct that seven different people

15  from Clough Harbour are listed as attendees in

16  your minutes from the June 28th, 2005 meeting?

17  A.  There are actually seven people from

18  Chemung.

19  Q.  From Chemung County; that's what I meant

20  to say.  If I said something different I'm getting

21  tired.

22  A.  Yes.

23  Q.  Gary Morenus was one of the employees

24  from Chemung County who was at the meeting?

### 142

1  A.  Yes.

2  Q.  Now the first line of the minutes

3  states, "The purpose of this meeting was to review

4  the project scope, timeline, and logistics prior

5  to the start of work," correct?

6  A.  Yes.

7  Q.  Was there any other purpose for this

8  meeting?

9  A.  To discuss any issues related to the

10  project, get an update from the contractors,

11  address anything else that came up related to the

12  project.

13  Q.  Item two states that, "Tim Casabonne

14  advised that they have issued a purchase order for

15  Aegen ThermoPower 75-LE cogen units."  Did I read

16  that correctly?

17  A.  Yes.

18  Q.  This was the first time that Chemung

19  representatives heard about this change, correct?

20  MR. CURCIO:  Objection.

21  THE WITNESS:  To the best of my

22  knowledge; yes.

23  Q.  (BY MS. FROHLICH) This was a change

24  from the originally specified Tecogen unit,

### 143

1  correct?

2  A.  Yes.

3  Q.  The last sentence in that item states,

4  "Clough Harbour is reviewing the formal submittal

5  and will advise of any potential issues or if

6  modifications to the design are required."  Did I

7  read that correctly?

8  A.  Yes.

9  Q.  To your knowledge what did Clough

10  Harbour review?

11  MR. CURCIO:  Objection.

12  THE WITNESS:  Technical data from

13  Aegen.

14  I believe it was the installation

15  manual -- any technical information they have

16  related to their product.

17  Q.  (BY MS. FROHLICH)  After its

18  preliminary -- strike that.

19  After its review of those materials

20  Clough Harbour had questions and requests for

21  additional information about the Aegen units,

22  correct?

23  MR. CURCIO:  Objection.

24  THE WITNESS:  Yes; they did.

### 144

1  Q.  (BY MS. FROHLICH)  Do you still have

2  Exhibit 181 in front of you -- this is a two-page

3  e-mail.  If you don't, I can give you another

4  copy.

5  A.  Would it be from Bob?

6  Q.  Bob would have put it in.  It came in

7  earlier today.

8  A.  Yes.

9  Q.  The subject of this e-mail is

10  "Preliminary Review of Aegenco Units for Chemung

11  County," correct?

12  A.  Yes.

13  Q.  Rich Rappa, in an e-mail to you sent on

14  June 30th, 2005 at 4:20 in the afternoon presented

15  twelve items in his e-mail, correct?

16  A.  Yes.

17  Q.  And he indicated that the twelve items

18  were coming after a preliminary review of the

19  Aegenco units, correct?

20  A.  Yes.

21  Q.  He also indicated, "The following

22  additional information is required to determine

23  the extent of changes, resubmissions, et cetera,"

24  correct?

145

1    A.   Yes.
2    Q.   Item number seven states, "There is no
3  statement of compliance with IEEE 1547.  This is
4  important as it covers issues such as grounding,
5  effects on utility distribution systems,
6  reconnection, monitoring, voltage and frequency
7  disturbances, feeder re-closing coordination,
8  flicker, harmonics, surge capability, et cetera."
9  Did I read that correctly?
10   A.   Yes.
11   Q.   Did you have any understanding as to
12  whether a statement of compliance with IEEE 1547
13  was important?
14   A.   I gathered by them noting that issue it
15  would have some importance.
16   Q.   Did you discuss that paragraph with
17  Mr. Rappa or anyone else at Clough Harbour?
18   A.   I don't recall.
19   Q.   Did you discuss the issue raised in that
20  paragraph with anyone at Aegis?
21   A.   I don't recall.
22   Q.   If you look at item number nine, it says
23  "It's not clear which Beckwith relay is being
24  used.  The labor on the 'typical' -- in quotes --

146

1  control schematic is, quote, 'generator protection
2  relay,' close quote.  Depending on the exact
3  model, this may not meet the inter-tie
4  requirements.  Additional information is required
5  on the Beckwith relay."
6         Did you discuss that paragraph with
7  Mr. Rappa or anyone at Clough Harbour?
8    A.   I don't recall discussing that
9  specifically.
10   Q.   I notice in the top e-mail, you
11  forwarded Rich Rappa's twelve items in his e-mail
12  to Lee Vardakas, correct?
13   A.   Yes.
14   Q.   You did that on June 30th, 2005,
15  correct?
16   A.   Yes.
17   Q.   You indicated, "for your review/
18  comment," correct?
19   A.   Yes.
20   Q.   Do you recall receiving any comment or
21  information back from Mr. Lee about any of these
22  items?
23   A.   I know that he responded in some
24  fashion.  I don't recall if it was to me or

147

1  directly to Clough Harbour.
2    Q.   Do you have Exhibit 193 in front of you?
3  It's a one-page handwritten document.  These are
4  your handwritten notes of the 6/28/05 Chemung
5  meeting?
6    A.   193?
7    Q.   193.
8    A.   Yes.
9    Q.   Do you see item number thirteen?
10   A.   Yes.
11   Q.   Could you read out loud what that item
12  says?
13   A.   "Dan Cook, price, plan -- parenthesis
14  County -- DOH approval."
15        Then under that I have an asterisk and
16  then it says, "No work until this is approved."
17   Q.   Who is Dan Cook?
18   A.   He was the owner of a company that
19  worked on the project.  The company is called
20  Conservation Solutions.
21        They did some water savings work.  They
22  were replacing toilets and the ozone system for
23  the laundry.
24   Q.   Does item thirteen have anything to do

148

1  with cogeneration units?
2    A.   No.
3    Q.   The last two lines of the page, can you
4  read that writing -- your writing?
5    A.   Under fifteen?
6    Q.   Yes.
7    A.   "Don't have DOH or scope or price.
8  Don't do any work without written approval."
9    Q.   Is that in any way related to item
10  thirteen?
11   A.   No; it is related to pumping work that
12  Dan Cook was doing -- I'm sorry, yes, it is
13  related to item thirteen.
14   Q.   Not related to cogen modules?
15   A.   Yes.
16        MS. FROHLICH:  Can we go off the
17  record for a second?
18        (A recess was taken.)
19   Q.   (BY MS. FROHLICH) Do you have
20  Exhibit 182 in front of you?
21   A.   Yes.
22   Q.   If you look at the very bottom of the
23  first page of Exhibit 182 and then carrying over
24  onto the second page, this is an e-mail from Gary

149

1  Morenus to Bob Page dated July 6, 2005 at 1:29 in
2  the afternoon, correct?
3     A.  Yes.
4     Q.  And Gary Morenus and Bob Page were both
5  Chemung County employees, correct?
6     A.  Yes.
7     Q.  In his e-mail Gary says to Bob, "I bring
8  to you a concern that I have regarding the cogen
9  project. It was my understanding that the County
10  was adding additional funding to the project so
11  that the project would proceed as originally
12  planned. On 6/28/05 at the job meeting most of us
13  heard for the first time that the supplier for the
14  cogen units had been changed to a manufacturer
15  that has been in business less than a couple of
16  years." Did I read that correctly?
17    A.  Yes.
18    Q.  At the 6/28/05 job meeting was there any
19  discussion about the number of years that Aegenco
20  or Aegis had been manufacturing cogeneration
21  units?
22    A.  I don't recall specifically talking
23  about that.
24    Q.  To your knowledge as of July 6, 2005 had

150

1  Aegenco been in the business of manufacturing
2  cogen units for less than a couple of years?
3     A.  Yes.
4     Q.  Do you have any knowledge as to how it
5  is Gary Morenus knew as of July 6, 2005 that
6  Aegenco had been in the business of manufacturing
7  cogen units for less than a couple of years?
8     A.  I believe I was made aware earlier in
9  the deposition that Gary Morenus had been talking
10  with someone from R. L. Kistler regarding Tecogen.
11    Q.  What are you referring to?
12    A.  Someone -- the first --
13    Q.  (Interposing) Do you believe there's a
14  document that shows Gary Morenus talking with
15  R. L. Kistler?
16    A.  I'm remembering something that was
17  either discussed or shown to me at a deposition in
18  Clifton Park several weeks ago that led me to
19  believe that.
20    Q.  Let me ask you: As you sit here today
21  are you aware of any communications between Gary
22  Morenus and anyone at R. L. Kistler or Tecogen
23  about Aegen models as of July 6, 2005?
24    A.  No.

151

1     Q.  Do you see Mr. Morenus' question about
2  getting the same level of support and service with
3  this other manufacturer?
4     A.  Yes.
5     Q.  Did you have any discussions with
6  Mr. Morenus about that?
7     A.  I don't recall speaking specifically
8  with Gary but I believe that was brought up in the
9  meeting at Chemung where Mr. Vardakas attended and
10  they questioned him about his ability to provide
11  service and support.
12    Q.  Do you see Mr. Morenus' question about
13  the reliability of Aegen modules compared to
14  Tecogen units?
15    A.  Yes.
16    Q.  As of July 6th, 2005 did you know
17  anything about the Aegen units' reliability?
18    A.  I believe when we met with Mr. Vardakas
19  in June he mentioned some of the sites where he
20  had the Aegen equipment installed and talked about
21  the operation of those units.
22    Q.  Do you see Mr. Morenus' question, did
23  anyone look into references of projects that have
24  used these units?

152

1     A.  Yes.
2     Q.  As of July 6, 2005 had you checked any
3  references of Aegen modules -- strike that.
4        Had you checked any references of
5  projects that had used Aegen modules?
6     A.  I personally did not check.
7     Q.  If you look at the first page of
8  Exhibit 182 in the e-mail from Bob Page to you --
9  this is approximately in the middle of that first
10  page -- his second paragraph, the first sentence
11  states, "It's also my understanding that the basic
12  new cogen units selected are about the same price
13  as the original Tecogen models and that the
14  emissions controls required by NYSEG are the
15  reason for the higher cost."
16        Did you discuss that sentence with
17  Mr. Page?
18    A.  Yes; at some point we had that
19  conversation.
20    Q.  What did he say and what did you say in
21  that conversation?
22    A.  I believe I confirmed what his
23  understanding was about the price being
24  approximately the same.

TECOGEN, INC. vs. AEGIS ENERGY SERVICES, INC. ET AL

Case 1:05-cv-11823-RGL   Document 43-15   Filed 07/14/2008   Page 27 of 32

TIM CASABONNE                          DECEMBER 4, 2007

153

1    Q.   Lastly, if you look at the top of the
2  first page of Exhibit 182 in your e-mail to Bob,
3  second paragraph, first sentence, you state "The
4  Aegen units are almost identical in appearance,
5  specifications, and costs to the Tecogen unit."
6  Did I read that correctly?
7    A.   Yes.
8    Q.   Why did you say the Aegen units are
9  almost identical in appearance to the Tecogen
10  unit?
11    A.   Because based on the brochures or
12  product information that I had seen, that was the
13  case; that was my observation.
14    Q.   It was your observation that the Aegen
15  units were almost identical in appearance to the
16  Tecogen unit?
17    A.   Yes.
18    Q.   Was it also your observation that the
19  Aegen units are almost identical in specifications
20  to the Tecogen unit?
21    A.   That was my understanding.
22    Q.   What was your understanding based on?
23    A.   The information I learned from Mr. Cafer
24  when he was reviewing their product during the

154

1  Lakeland project.
2             MS. FROHLICH:  This will be 225 I
3  believe.
4             (Plaintiff's Deposition Exhibit
5             No. 225 offered and marked.)
6    Q.   (BY MS. FROHLICH)  Mr. Casabonne, can
7  you please identify Exhibit 225?  (Indicating.)
8    A.   This is a copy of e-mails between myself
9  and John DaSilva of Aegis Energy, July of '05,
10  several dates, regarding the Chemung County
11  project.
12    Q.   On the first page of Exhibit 225 at the
13  bottom there's an e-mail from you to John DaSilva
14  dated July 8, 2005 at 11:44 a.m., correct?
15    A.   Yes.
16    Q.   In that e-mail you said, "I also need a
17  list of sites/references where the units are
18  installed," correct?
19    A.   Yes.
20    Q.   Then above that at 1:02 p.m. on
21  July 8th, you asked again about "the list of sites
22  where the units are currently installed and
23  operating," correct?
24    A.   Yes.

155

1    Q.   Above that there's an e-mail from John
2  to you dated July 11, 2005 sent at 11:21 a.m.,
3  correct?
4    A.   Yes.
5    Q.   And he states, "Below are several
6  references you requested," correct?
7    A.   Yes.
8    Q.   He lists two sites, correct?
9    A.   Yes.
10    Q.   Did you discuss those two sites with
11  anyone at Aegis Energy Services?
12    A.   I don't recall.
13    Q.   What did you understand about those two
14  sites?
15    A.   Those were facilities where the Aegen
16  units were installed and operational.
17    Q.   You asked for the list of sites where
18  the units are currently installed and operating.
19  Was it your understanding that these two sites
20  constituted the list of sites where the units are
21  currently installed and operating?
22             MR. CURCIO:  Objection.
23             THE WITNESS:  Yes.
24    Q.   (BY MS. FROHLICH)  As of July 11th, 2005

156

1  did you understand that Aegen units were installed
2  and operating in only two sites?
3    A.   To the best of my knowledge.
4    Q.   Did you discuss that with anyone at
5  Chemung?
6    A.   I don't recall.
7             MS. FROHLICH:  Let's mark as
8  Exhibit 226.
9             (Plaintiff's Deposition Exhibit
10             No. 226 offered and marked.)
11    Q.   (BY MS. FROHLICH)  Have you seen
12  Exhibit 226 before today? (Indicating.)
13    A.   Yes.
14    Q.   The owner of Aegen Generator Company
15  referred to in your first e-mail at the top of the
16  page was Lee Vardakas, correct?
17    A.   Yes.
18    Q.   In the last sentence of that top
19  e-mail -- strike that.
20       If you look at the e-mail below it's to
21  you from Robert Page dated July 8, 2005 at
22  1:45 p.m., correct?
23    A.   Yes.
24    Q.   Mr. Page says, "I think a conference

157

1 call would be very helpful. Perhaps Gary would
2 like to speak with Clough Harbour to get their
3 input." Did I read that correctly?
4     A. Yes.
5     Q. And then in your e-mail you say, "All
6 questions and concerns regarding the new cogen
7 units can be addressed at this meeting," correct?
8     A. Yes.
9     Q. If you look at the subject line of each
10 of these two e-mails it's "Re cogen project,"
11 correct?
12     A. Yes.
13     Q. And if you look at Exhibit 182 the
14 subject line in all of those e-mails is also "re
15 cogen project," correct?
16     A. Yes.
17     Q. These were printed and produced to us
18 out of your files as separate documents.
19     To your knowledge are these all part of
20 one long e-mail thread that includes both of these
21 exhibits -- 182 and 226?
22     'A. Yes.
23     Q. I don't remember if it was this
24 morning -- well, it must have been, Exhibit 184,

158

1 do you have that in front of you?
2     A. Yes.
3     Q. Also if you've got 185 in front of
4 you -- this is a multiple-page stapled document.
5     A. Here it is.
6     Q. 185 is the July 18, 2005 letter from Bob
7 Panora to Robert Page at Chemung, correct?
8     A. Yes.
9     Q. This was an e-mail to Mr. Page as well
10 as to someone named Troy McClure at Clough Harbour
11 and you at 2:06 on July 18, correct?
12     A. Yes.
13     Q. If you look at Exhibit 184, this is the
14 July 18, 2005 e-mail from Robert Page to you,
15 correct?
16     A. Yes.
17     Q. And this is at 10:54 in the morning,
18 correct?
19     A. Yes.
20     Q. In Mr. Page's e-mail to you in
21 Exhibit 184 he states in the first paragraph that
22 "Tecogen raised some serious concerns about the
23 replacement units that AES has recommended,"
24 correct?

159

1     A. Yes.
2     Q. He also says, "Similar concerns have
3 been raised by the County's Building and Grounds
4 Department, correct?
5     A. Yes.
6     Q. Do you have any personal knowledge as to
7 whether concerns raised by the County's Building
8 and Grounds Department -- strike that. Let me ask
9 it a different way.
10     As of the time of this July 18th, 2005
11 e-mail from Robert Page to you -- Exhibit 184 --
12 what concerns had the County's Building and
13 Grounds Department raised to you?
14     A. I believe in the June 28th meeting that
15 I made them aware that we were going with the
16 Aegen equipment.
17     Gary Morenus, if not others, expressed
18 concern that we were making a change. I believe
19 that was the first time I was aware.
20     Q. In Exhibit 184 Mr. Page states, "I am
21 particularly concerned that the State Health
22 Department and NYSERDA approved this project with
23 Tecogen units."
24     Did he express that concern at the

160

1 June 28th project meeting?
2     A. I can't -- I don't recall.
3     Q. What approval had the State Health
4 Department given as of July 18th, 2005?
5     A. They approved the -- it is called a
6 certificate of need. Basically a scope of work
7 was submitted for their review and they approval
8 that scope of work which allowed the Chemung
9 Health Center to go forward and implement that
10 project.
11     Q. And what approval had NYSERDA given?
12     A. The only portion of the project that
13 NYSERDA had given was to the updated lighting that
14 we did.
15     I don't recall any of their involvement
16 with cogeneration.
17     Q. Who is NYSERDA?
18     A. New York State Energy Research
19 Development Authority. They issue grants for
20 energy reductions -- for kilowatt hour reductions.
21     Q. Do you have Exhibit 183 in front of you?
22 Those are your handwritten notes from the
23 July 19th meeting?
24     A. Yes.

**161**

1    Q. Could you please read your handwriting
2 at note number four?
3    A. "Lee Vardakas gave presentation to
4 group, three years in production, two years in
5 service. Lee to provide list of references for
6 twelve plus or minus sites with Aegen."
7    Q. What does three years in production
8 mean?
9    A. I think that was my note that Lee made a
10 statement that they've been producing their
11 equipment for three years.
12    Q. Do you recall anything else about that
13 note?
14    A. No.
15    Q. What did you mean by two years in
16 service?
17    A. Their equipment has been in operation or
18 in service for two years.
19    Q. That's what he said to the group at the
20 July 19th, 2005 meeting?
21    A. I believe those were bullets from my
22 notes from his presentation.
23    Q. What did you mean by the last line of
24 that item about references?

**162**

1    A. I believe I'm noting that Lee said he
2 would provide a list of references for the twelve
3 or so sites that have Aegis generators -- or cogen
4 units.
5    Q. Did he say at the meeting that Aegen
6 units were installed in twelve sites?
7    MR. CURCIO: Objection.
8    THE WITNESS: I can't confirm
9 exactly what he said.
10    Q. (BY MS. FROHLICH) To the best of your
11 recollection what did he say about twelve sites
12 with Aegen units?
13    MR. CURCIO: Objection.
14    THE WITNESS: That he would provide
15 a list of references for twelve sites where Aegen
16 units were in operation.
17    Q. (BY MS. FROHLICH) What does item eight
18 say?
19    A. "Maintenance costs by Aegen lower than
20 Tecogen. Need language in proposed contract."
21    Q. I'm sorry, item six, what does that say?
22    A. "Project schedule slash time frame,
23 impact," question mark.
24    Q. What did you mean by that?

**163**

1    A. What would introducing the Aegen project
2 to this project do to the schedule time frame --
3 what impact would it have.
4    Q. Was there discussion about that at the
5 July 19th project meeting?
6    A. Yes.
7    Q. What was the discussion?
8    A. That going with the Aegen equipment
9 would require additional review time by Clough
10 Harbour, potential resubmissions to the Department
11 of Health, NYSERDA and the utility, NYSEG, which
12 would delay the schedule.
13    Q. Can you read your handwriting at item
14 nine?
15    A. "If Aegen unit goes down due to utility
16 problem then unit must be manually reset to be
17 brought back on line."
18    Q. Can you read your writing at item
19 eleven?
20    A. "Service by Aegen to come out of
21 Binghamton. Need track record references," dot
22 dot dot dot.
23    Q. Did you get any references?
24    A. I don't recall.

**164**

1    Q. Would you read your writing at item
2 number twelve?
3    A. "CHA -- Clough Harbour and Associates --
4 has concern about resubmittal to NYSEG. CHA to
5 prepare a list of pros and cons."
6    Q. Was that discussed at the July -- strike
7 that.
8    What was discussed about that item at
9 the July 19th, 2005 meeting?
10    A. I believe Clough Harbour discussed the
11 findings of their preliminary review. I was
12 looking for that document to check the dates. I
13 don't seem to see it here.
14    Q. Are you talking about the e-mail with
15 the twelve items?
16    A. Yes. Yes; I believe this was part of
17 the discussion by Clough Harbour.
18    Q. Could you read your handwriting next to
19 item thirteen?
20    A. "AES decision to use Aegen units must
21 meet County's needs, not AES'."
22    Q. What was said about that at the meeting?
23    A. I think that was a comment from someone
24 from the County.

165

1  The decision wasn't ours to make,
2  basically.
3  MS. FROHLICH: 227.
4  (Plaintiff's Deposition Exhibit
No. 227 offered and marked.)
5
6  Q.  (BY MS. FROHLICH) Mr. Casabonne, can
7  you please identify Exhibit 227? (Indicating.)
8  A.  It's a chain of e-mails between myself
9  and Ray Hickey regarding Tecogen pricing.
10  Q.  Ray Hickey was with Advanced Comfort
11  Systems, correct?
12  A.  Yes.
13  Q.  Why were your e-mails with -- strike
14  that.
15  Why were you exchanging e-mails with Ray
16  Hickey about Tecogen unit pricing instead of with
17  Tecogen directly?
18  A.  I believe Ray was acting as Tecogen's
19  sales agent because either Atlantic Energy's
20  office and/or the project location fell within his
21  territory.
22  MS. FROHLICH: Let's mark this 228.
23  (Plaintiff's Deposition Exhibit
No. 228 offered and marked.)
24

166

1  Q.  (BY MS. FROHLICH) Can you identify this
2  document? (Indicating.)
3  A.  (Witness examining document.) It's a
4  copy of an e-mail from Ray Hickey to myself dated
5  August first, 2005.
6  It's got a quote for the Chemung County
7  project attached.
8  Q.  That quote is for four Tecogen
9  integrated units, correct?
10  A.  Yes.
11  Q.  And the amount quoted is two hundred
12  twenty thousand dollars for all four units,
13  correct?
14  A.  Yes.
15  MS. FROHLICH: You can mark this as
16  Exhibit 229.
17  (Plaintiff's Deposition Exhibit
No. 229 offered and marked.)
18
19  Q.  (BY MS. FROHLICH) Within Exhibit 229,
20  can you please identify pages two through five?
21  (Indicating.)
22  A.  It's a fax transmittal from Atlantic
23  Energy -- from myself to Ray Hickey dated August
24  first, '05.

167

1  Included with that fax cover is a
2  purchase order from Atlantic Energy to Tecogen as
3  well as a quote from Advanced Comfort to Atlantic
4  Energy.
5  Q.  Now the quote from Advanced Comfort
6  Systems to Atlantic Energy is dated March 1, 2005,
7  correct?
8  A.  Yes.
9  Q.  On that quote you crossed out the
10  original quote of three hundred thirty-six
11  thousand dollars and wrote in two hundred twenty
12  thousand dollars, correct?
13  A.  Yes.
14  Q.  You wrote your name, Tim Casabonne, and
15  the date, 8/1/05, next to that, correct?
16  A.  Yes.
17  Q.  Why did you do that?
18  A.  To document the price -- the final price
19  that we had agreed to so that could be referenced
20  in the purchase order that was sent to Tecogen.
21  Q.  Why did you do that on the March 1, 2005
22  quote from ACS as opposed to just asking ACS to
23  send you an updated quote?
24  A.  I don't recall.

168

1  MS. FROHLICH: Exhibit 230.
2  (Plaintiff's Deposition Exhibit
No. 230 offered and marked.)
3
4  Q.  (BY MS. FROHLICH) Would you please
5  identify Exhibit 230? (Indicating.)
6  A.  The first one is an e-mail -- it is a
7  copy of an e-mail from myself to Erin Mahoney and
8  the second one is an e-mail from myself to Lee
9  Vardakas dated July 29th, '05.
10  I had forwarded this to Erin because for
11  some reason I couldn't print it from my computer.
12  Q.  Does Erin Mahoney work at Atlantic?
13  A.  Yes.
14  Q.  Looking at your e-mail to Lee Vardakas
15  dated July 29, 2005, would you please read the
16  second paragraph to yourself and indicate when
17  you're finished doing that?
18  A.  (Witness examining document.) Okay.
19  Q.  Were all the statements in that
20  paragraph true?
21  A.  Yes.
22  Q.  I'd like to show you now Exhibit 33. I
23  believe you may have looked at this on the first
24  day of your deposition. (Indicating.)

TECOGEN, INC. vs. AEGIS ENERGY SERVICES, INC. ET AL
TIM CASABONNE      DECEMBER 4, 2007

Case 1:05-cv-11922-RGS   Document 43-15   Filed 07/11/2008   Page 31 of 32

169

1    A.   (Witness examining document.)
2    Q.   This is a purchase order from Atlantic
3  to Aegis Energy dated June 16, 2005 ordering four
4  Aegen units for the Chemung project, correct?
5    A.   Yes.
6    Q.   A little more than halfway down on this
7  page, do you see miscellaneous notes?
8    A.   Yes.
9    Q.   Number two under miscellaneous notes
10 says, "PO is contingent upon the design engineer's
11 approval of an Aegen unit as an acceptable
12 substitute to the Tecogen, Inc. CM-75 integrated
13 module listed in the plans and specifications."
14 Did I read that correctly?
15   A.   Yes.
16   Q.   Did you write that note?
17   A.   Yes.
18   Q.   What did you mean by that?
19   A.   That this order was contingent upon the
20 engineer approving the Aegen equipment as
21 acceptable -- as an acceptable substitute to the
22 Tecogen equipment.
23   ' Q.   To your knowledge did the engineer ever
24 approve the Aegen equipment as a suitable

170

1  substitute for the Tecogen equipment?
2    A.   Not to my knowledge.
3    Q.   If you look below that do you see
4  "note," in all capital letters?
5    A.   Yes.
6    Q.   After that, it says, "This order
7  expressly limits acceptance to the terms stated on
8  the face and the back of this form and on any
9  purchase order supplement attached hereto."
10   A.   Yes.
11   Q.   What were the terms on the back of the
12 purchase order concerning acceptance?
13   A.   I'd have to read -- I don't recall.
14   Q.   Are there terms on the back of
15 Atlantic's orders?
16   A.   Typically, yes.
17        MS. FROHLICH:  Exhibit 231.
18        (Plaintiff's Deposition Exhibit
              No. 231 offered and marked.)
19
20   Q.   (BY MS. FROHLICH) Mr. Casabonne, can
21 you please identify Exhibit 231? (Indicating.)
22   A.   (Witness examining document.)  This is a
23 letter from the Chemung County Health Center to
24 NYSEG dated December 10th, 2004 requesting an

171

1  exemption from their standby service rate number
2  eleven.
3    Q.   Have you seen this letter before today?
4    A.   Yes.
5    Q.   The request in this letter was based
6  upon use of Tecogen cogeneration units in the
7  Chemung project, correct?
8    A.   Yes.
9        MS. FROHLICH:  My notes reflect that
10 this wasn't marked as an exhibit so I'm going to
11 mark it Exhibit 232.
12        (Plaintiff's Deposition Exhibit
              No. 232 offered and marked.)
13
14   Q.   (BY MS. FROHLICH) Mr. Casabonne, would
15 you please identify Exhibit 232? (Indicating.)
16   A.   (Witness examining document.)  This is a
17 copy of an e-mail dated August first, 2005 from
18 myself to a group of people distributing minutes
19 from the 7/19/05 project meeting.
20   Q.   Let's start with the last two pages of
21 Exhibit 232 -- and those are the typed up minutes
22 of the 7/19/05 Chemung project meeting, correct?
23   A.   Yes.
24   Q.   Did you prepare this typed version of

172

1  the minutes?
2    A.   Yes.
3    Q.   In item number seven you state, "Since
4  this meeting Atlantic Energy Services, Inc. has
5  determined that changing cogen units at this stage
6  of the project would cause unnecessary delays and
7  have decided to stay with the Tecogen units."  Did
8  I read that correctly?
9    A.   Yes.
10   Q.   When did you prepare these minutes?
11   A.   Sometime between July 19th and August
12 first.
13   Q.   Directing your attention to item number
14 four of the minutes?
15   A.   Yes.
16   Q.   Was that an accurate summary of the
17 County's concerns that were expressed in the
18 meeting on July 19th, 2005?
19   A.   Yes.
20        MS. FROHLICH:  This will be
21 Exhibit 233.
22        (Plaintiff's Deposition Exhibit
              No. 233 offered and marked.)
23
24   Q.   (BY MS. FROHLICH) Mr. Casabonne, have

---

**173**

1 you seen Exhibit 233 before today? (Indicating.)
2    A.  (Witness examining document.) Yes.
3    Q.  Would you please identify this document?
4    A.  It's a submission of the technical data
5 for the cogen installation at the Chemung County
6 Health Center from Clough Harbour and Associates
7 to NYSEG dated January 24th, 2005.
8    Q.  NYSEG is the utility, is that correct?
9    A.  Yes.
10    Q.  What was the purpose of this submission
11 package?
12    A.  I believe this is follow-up to the
13 initial preliminary package that was submitted.
14 This provides additional documentation on the
15 equipment being installed. I believe there's
16 drawings -- site-specific drawings.
17        The intent is for the utility to review
18 and approve this information so that the Chemung
19 Health Center can put their cogeneration system
20 online.
21    Q.  This package was based upon the use of
22 Tecogen cogeneration units in the Chemung project,
23 is that right?
24    A.  Yes.

---

**174**

1        MS. FROHLICH: 234.
2        (Plaintiff's Deposition Exhibit
       No. 234 offered and marked.)
3
4    Q.  (BY MS. FROHLICH) Would you please
5 identify Exhibit 234? (Indicating.)
6    A.  (Witness examining document.) This is
7 Appendix C of the standard interconnect
8 application submitted by NYSEG to the Chemung
9 County Health Center.
10    Q.  This application was based upon the use
11 of Tecogen units in the Chemung County project,
12 correct?
13    A.  Yes.
14        MS. FROHLICH: 235.
15        (Plaintiff's Deposition Exhibit
       No. 235 offered and marked.)
16
17    Q.  (BY MS. FROHLICH) Would you please
18 identify Exhibit 235? (Indicating.)
19    A.  (Witness examining document.) This is a
20 fax from Bob Page at Chemung County to myself
21 dated June 27th, '05. He's faxed to me a letter
22 from NYSEG.
23        The letter is requesting payment to
24 continue with the technical review of the project.

---

**175**

1    Q.  Do you recall seeing an e-mail earlier
2 in this deposition today referencing NYSEG giving
3 preliminary approval and requesting the payment of
4 the final review fee of five thousand dollars --
5    A.  (Interposing) Yes.
6    Q.  -- in order to go forward?
7    A.  Yes.
8        MS. FROHLICH: This will be
9 Exhibit 236.
10        (Plaintiff's Deposition Exhibit
       No. 236 offered and marked.)
11
12    Q.  (BY MS. FROHLICH) Can you identify
13 Exhibit 236 for us? (Indicating.)
14    A.  This is a document from Atlantic Energy
15 to the New York State Department of Health dated
16 September 20, 2004 regarding the Chemung County
17 Health Center project.
18        Atlantic Energy has provided the
19 Department of Health with information on the
20 project being proposed at the Chemung County
21 Health Center.
22    Q.  Was this in connection with the request
23 for the certificate of need from the Department?
24    A.  Yes.

---

**176**

1    Q.  This information was -- this package was
2 based upon use of Tecogen units in the Chemung
3 project as well, correct?
4    A.  Yes.
5        MS. FROHLICH: This will be 237.
6        (Plaintiff's Deposition Exhibit
       No. 237 offered and marked.)
7
8    Q.  (BY MS. FROHLICH) Mr. Casabonne,
9 Exhibit 237 is a signed proposal and addendum to
10 that proposal involving the Auburn East Middle
11 School cogeneration project, correct?
12 (Indicating.)
13    A.  Yes.
14    Q.  These documents were signed in October
15 of 2004, correct?
16    A.  Yes.
17    Q.  Page one of the proposal, which is the
18 third page of the exhibit, in item two states that
19 "the cogeneration system will consist of one
20 Tecogen model," correct?
21    A.  Yes.
22    Q.  Did Atlantic begin working on the design
23 of a cogen plant for Auburn after the execution of
24 these documents?

---

# Tecogen Ex. 15

# AEGENCO™, INC.
## AEGIS GENERATOR COMPANY

# AEGEN THERMO ⁄ POWER™
## Cogeneration Module





EXHIBIT
#55
8/03/07  CB

# INSTALLATION MANUAL
## June 2005

# FOREWORD

This installation manual is provided to assist designers and contractors in the proper installation of the cogeneration equipment. Responsibility for the actual installation of the cogeneration equipment lies with designer and installation contractor not AEGENCO™, Inc. Although the installation manual includes information, specifications, and drawings covering heat recovery, ventilation, exhaust, electrical controls, design principles, electrical interconnection, etc., only qualified personnel should design and install this equipment. The installing contractor(s) is responsible to make sure that all electrical, mechanical, and plumbing work conforms to all local, state, and national codes.

Note: Information in this manual is subject to change without notice.

T 1632

# TABLE OF CONTENTS

1.0  MODULE SPECIFICATIONS..................................................................................

1.1  ENGINE SPECIFICATIONS ..........................................................................4
1.2  NATURAL GAS AND EXHAUST SYSTEMS.................................................6
1.3  ENGINE LUBRICATION SYSTEM..............................................................7
1.4  ENGINE HEAT RECOVERY SYSTEM .......................................................7
1.5  GENERATOR ...............................................................................................7
1.6  ELECTRICAL SWITCHGEAR .....................................................................8
1.7  MODULE CONTROL SYSTEM.....................................................................9
1.8  MODULE CONTROL MODES.....................................................................12
1.9  CONTROLLER KEYPADS AND DISPLAY ..............................................12
    1.9.1  Screen..................................................................................................13
    1.9.2  Numeric Keypad..................................................................................14
    1.9.3  Screen Keypad.....................................................................................15
    1.9.4  Operations Keypad ..............................................................................15
    1.9.5  Status Lights .......................................................................................16
1.10  ALARMS .....................................................................................................16
1.11  CUSTOMER INTERFACE...........................................................................17
    1.11.1  Inputs.................................................................................................18
    1.11.2  Outputs ..............................................................................................18
    1.11.3  Other Control Features.......................................................................19
1.12  REMOTE COMMUNICATIONS ................................................................19
1.13  COMMUNICATIONS PROTOCOL.............................................................20
1.14  INTERFACING WITH UTILITIES ............................................................20
1.15  POWER FACTOR ........................................................................................20

2.0  INSTALLATION ......................................................................................21

2.1  MODULE DELIVERY AND PLACEMENT..................................................22
2.2  MODULE LOCATION..................................................................................22
2.3  VENTILATION REQUIREMENTS..............................................................23
    2.3.1  Cogenerator Module Ventilation........................................................23
    2.3.2  Room Ventilation................................................................................23
2.4  ELECTRICAL CONNECTIONS...................................................................24
2.5  NATURAL GAS PIPING...............................................................................24
2.6  EXHAUST PIPING........................................................................................24
2.7  HEAT RECOVERY DESIGN STRATEGY ..................................................24
2.8  MODULE PLUMBING .................................................................................25
2.9  PRESSURE LIMITATIONS .........................................................................26
2.10  EXPANSION TANK .....................................................................................26
2.11  PIPING MULTIPLE MODULES..................................................................27
2.12  HEAT EXCHANGER ...................................................................................27
2.13  CONTROL OF MULTIPLE MODULES .....................................................28

3.0  MAINTENANCE ....................................................................................29

..............................................................................................................................30

T 1633

# 1.0   MODULE SPECIFICATIONS

The AEGEN THERMOPOWER™ 75 (TP-75) is a compact, modular combined heat and power (CHP) system simultaneously producing electricity and hot water.  A low emissions model, the TP-75 LE, is available for states with stringent air quality standards.

The cogeneration module has a natural gas-fired reciprocating engine, an induction generator, heat recovery system, a sound attenuating enclosure, electrical switchgear, and solid-state controls for automatic and unattended operation.  High efficiency heat recovery components consist of oil cooler, engine jacket for heat transfer, marine type exhaust gas manifolds and exhaust gas heat exchangers.  The cogeneration module operates in parallel with existing mechanical and electrical systems in the facility.

Specifications for the AEGENCO™ cogeneration modules are presented in Table 1.  Later in this manual, additional specifications are provided.

**Figure 1.  AEGEN TP-75 Cogeneration Module Without Acoustic Enclosure**



T 1834

## Figure 2.  AEGEN TP-75 Cogeneration Module With Acoustic Enclosure



### Table 1.  General Specifications for Cogeneration Module

| Characteristic | AEGEN TP-75 | AEGEN TP-75 LE |
|---|---|---|
| Electrical Power Output | 75 kW | 75 kW |
| Thermal Output | 484,000 Btu/hour | 511,000 Btu/hour |
| Output Voltage | 208V or 460V nominal, 3 phase, 3-wire | 208V or 460V nominal, 3 phase, 3-wire |
| Efficiency | 83.9% at HHV of 1,020 Btu/scf | 81.1% at HHV of 1,020 Btu/scf |
| Gas Input (scfh) | 865 standard cubic feet per hour | 927 standard cubic feet per hour |
| Required Gas Pressure | 6 to 16 inches water column | 10 to 28 inches water column |
| Hot Water Flow | 22 gallons per minute | 22 gallons per minute |
| Max Output Water Temperature | 230 °F | 230 °F |
| Emissions | - | Meets stringent NY air quality standards |
| Acoustic Level (enclosed) | 70 decibels (dBA) @ 20 feet | 70 decibels (dBA) @ 20 feet |
| Suspension | Vibration isolation mounts | Vibration isolation mounts |
| Dimensions | 46" width x 89" length x 49" height | 46" width x 89" length x 49" height |
| Weight | 3,050 pounds | 3,050 pounds |

Note: Specifications are +/- 5%.

T 1635

## 1.1  ENGINE SPECIFICATIONS

The cogeneration module includes a General Motors 454 engine with the valve train configured to AEGENCO™ specifications. Detailed engine specifications are shown in Table 2. The following sections describe the subsystems of the engine.

### Table 2. Engine Specifications

| Type | Spark Ignition/Gaseous Fueled |
|---|---|
| Manufacturer | General Motors |
| Model | 7.4 L |
| Nominal Rated RPM | 1,820 |
| BHP | 108 |
| Aspiration | Natural |
| Configuration | V8 (90°) |
| Displacement | 454 |
| Bore and Stroke (Inches) | 4.251 x 4.00 |
| Compression Ratio | 9.2 TO 1 |
| Weight | 1,100 pounds |
| Ignition System | Electronic |
| Firing Order | 1-8-4-3-6-5-7-2 |
| Air/Fuel Mixture (Std) | 2% Oxygen* |
| Lubrication System | |
| ■  Type | Internal High Volume Pump |
| ■  Oil Type | SAE 30 LOW ASH (consult factory to brands)** |
| ■  Oil Capacity | 32 quarts |
| Cooling System | |
| ■  Type | Direct Jacket Cooling, Closed Loop |
| ■  Expansion Tank | Pre-Charged Bladder (external provided by others) |
| ■  Cooling Fluid | Water or Propylene Glycol Mixture (if required for freeze protection) |
| Starting System | |
| ■  Type | 12 Volt |
| ■  Battery | 12 Volt rated @ 485 Cold Cranking Amps (Group 24) |
| ■  Starter | Delco High Torque Automotive |
| ■  Battery Charger Type | Electronic – Constant Voltage Supply |
| ■  Battery Charger Rating | 3.0 Amps @16V DC |

*   Engines equipped with emission system operate at approximately 0.5 % Oxygen.
**  Engines equipped with emission system use Exxon Mobil Bus-guard GEO 14W-40 low ash or equivalent.

T 1636

## 1.2   NATURAL GAS AND EXHAUST SYSTEMS

The cogeneration module natural gas fuel system consists of a manual shut-off valve located outside the unit, two (2) electric solenoid shut-off valves, a gas regulator, a carburetor/mixer, and a throttle body assembly. Engine fuel components on emission control units are slightly different. A PLC fuel trim valve is installed. It is the responsibility of the installing contractor to design and construct a gas supply line to the cogeneration module in accordance to State and Local Gas Piping Codes capable of supplying 1,000 cubic feet (HHV) per hour.

An air filter is provided for the engine's combustion air inlet. The carburetor/mixer mixes the pressurized gas with the naturally aspirated filtered air. The engine throttle is controlled by the cogeneration module to modulate the fuel/air flow to the engine cylinders. On standard units, the exhaust from the cylinders is passed through two water-cooled manifolds and exhaust gas heat recovery heat exchangers to a common outlet pipe. It is the responsibility of the installing contractor to design and construct an exhaust system from the cogeneration module to the outside. Maximum system backpressure should not exceed 16" W.C. Cogeneration modules need to be sized for exhaust flow rates of: mass flow 700 lbs/hr, 170 scfm, and 225 acfm.

The engine has a positive crankcase ventilation system. This system removes corrosive gases from the engine crankcase and moves them back into the intake manifold to be burned along with the regular fuel charge.

## 1.3   ENGINE LUBRICATION SYSTEM

The engine lubrication system consists of an internal engine-driven oil pump, an oil filter, and an oil cooler that rejects heat to the engine coolant. To increase the interval between oil changes to 750 hours, the engine oil pan has been enlarged to 32 quarts.

## 1.4   ENGINE HEAT RECOVERY SYSTEM

Waste heat from the engine block and exhaust manifolds is rejected to the coolant system. Heat is recovered from the coolant system and used by customers for domestic hot water, comfort space heating, pool heating, absorption cooling, or process heating. The installing contractor is responsible to design and provide the heat exchangers and piping needed for the customer's loads. Recommendations and guidelines for contractors in designing the heat recovery system are presented in Section 2.

The coolant system provides cooling of the engine jacket, exhaust manifolds, and engine oil cooler. The closed-loop and pressurized system normally uses water as the coolant fluid. However, for an outdoor installation, the coolant fluid is a propylene glycol mixture.

The installing contractor is responsible to provide a city water make-up line at 12 - 15 psig and a pre-charged bladder-type expansion tank to maintain the coolant system pressure.

T 1637

## 1.5 GENERATOR

The cogeneration module uses a 3-phase wye induction generator (see Figure 3 for generator specifications) with two-bearing construction and a drip-proof frame. Windings use 100% copper and the shaft is hot rolled steel. The insulation is Class 4. The generators are built with double-shielded ball bearings and grease fittings.

### Figure 3. Generator Specifications (Spec Sheet from Marathon)



A Subsidiary of Regal-Beloit Corporation

**TWO BEARING GENERATOR**
**CERTIFICATION DATA SHEET**

MODEL NO: 404TSTDS18531
CONN. DIAGRAM: A-EE7300T
OUTLINE: B-SS516131-1550

WINDING: T404452-3
ADAPTION #:
WK: 19.0 lb-ft²

#### NAMEPLATE DATA

| KW | PH. | HZ | POLE | SYNC RPM | FL RPM | VOLTS | AMPS | FRAME | ENCLOS |
|----|-----|----|------|----------|--------|-------|------|-------|--------|
| 75 | 3 | 60 | 4 | 1800 | 1820 | 208 | 248 | 404 | ODP |

| DUTY | INSUL | S.F. | AMB (°C) | OVERSPEED RPM | HIGH VOLT. RES. L-L (OHMS) |
|------|-------|------|----------|----------------|----------------------------|
| CONT | F | 1.15 | 40 | 2250 | 0.0165 |

#### LOAD CURVE DATA – BASED ON 208 VOLTS

| LOAD | KW | AMPS | RPM | TQ (ft-lb) | EFF (%) | PF (%) | KVA | KVAR | TEMP RISE (°C) |
|------|----|------|-----|------------|---------|--------|-----|------|----------------|
| NL | 0 | 89.5 | 1800 | 0 | NA | 6.5 | 25.0 | 25.0 | |
| 0.25 | 18.5 | 88.0 | 1805 | 79.0 | 89.5 | 57.0 | 31.7 | 26.0 | |
| 0.50 | 37.5 | 134 | 1810 | 158 | 93.0 | 77.5 | 48.5 | 30.5 | |
| 0.75 | 56.5 | 188 | 1815 | 235 | 93.0 | 89.5 | 67.5 | 37.5 | |
| 1.00 | 75 | 248 | 1820 | 313 | 93.0 | 85.0 | 89.5 | 47.0 | 45 |
| 1.25 | 94 | 305 | 1825 | 390 | 91.7 | 85.0 | 110 | 58.0 | |
| LOCKED ROTOR | | 1400 | 0 | 495 | | 36.0 | | | |
| BREAKAWAY | | 1000 | 1910 | 865 | | 52.0 | | | |

#### EQUIVALENT CIRCUIT REACTANCES (PER UNIT) Zref = 0.535 ohms, TIME CONSTANTS

| Stator Resistance R1 | Rotor Resistance R2 | Stator Reactance X1 | Rotor Reactance X2 | Magnetizing Reactance Xm | Transient Reactance X'd | Sub-Transient Reactance X''d | OPEN CKT T'd0 (sec) | SHORT CKT T'd (sec) |
|----------------------|---------------------|---------------------|--------------------|--------------------------|-------------------------|------------------------------|---------------------|---------------------|
| 0.022 | .0113 | 0.117 | .122 | 3.199 | 0.238 | 0.148 | 0.760 | 0.032 |

The generator is essentially a squirrel cage induction motor and requires no separate excitation other than its three-phase connection to the building. Since it is an induction machine, there are no brushes or collector rings to cause maintenance problems. The engine drives the generator above synchronous speed causing current to flow in the opposite direction (i.e., from the generator to the building circuits). It

T 1638

should be noted, an induction generator is only a current source - it cannot generate voltage or influence frequency.

Generators are sized for each application for maximum efficiency and best power factor. Generators are not de-rated, since de-rating lowers both efficiency and power factor, resulting in decreased savings.

Although the maximum available fault current is not available in the generator manufacturer's specification sheets, these values have been calculated and are presented below.

**Table 3. Maximum Available Fault Current**

| Voltage | Fault Current (Amps) |
|---------|----------------------|
| 208 Volts | 1,600 |
| 460 Volts | 720 |

## 1.6 ELECTRICAL SWITCHGEAR

Electrical switchgear includes contactor, overload relay, circuit breaker, and current transformer. The specifications for the electrical switchgear components are presented below: Table 4 contactor specifications (1 per module), Table 5 overload relay specifications (1 per module), Table 6 circuit breaker specifications (1 per module), and Table 7 current transformer specifications (2 per module).

**Figure 4. Switchgear**



T 1639

**Table 4. Contactor Specifications**

| Characteristic | 208 Volts | 460 Volts |
|---|---|---|
| Manufacturer | Allen-Bradley | Allen-Bradley |
| Model Number | 100-D300 | 100-D300 |
| Maximum Voltage | 600 VAC | 600 VAC |
| Amperage Rating | 450 A | 250 A |
| Available Fault Current | 18,000 A | 8,100 A |

**Table 5. Overload Relay Specifications**

| Characteristic | 208 Volts | 460 Volts |
|---|---|---|
| Manufacturer | Allen-Bradley | Allen-Bradley |
| Model Number | 193-EF | 193-EF1AKP |
| Setting | 248 A | 112 A |
| Adjustment Range | 160 A – 400 A | 20 A – 180 A |
| CT Time/Current | See Curve Below | See Curve Below |

**Table 6. Circuit Breaker Specifications**

| Characteristic | 208 Volts | 460 Volts |
|---|---|---|
| Manufacturer | Allen-Bradley | Allen-Bradley |
| Model Number | 140U-K3D3-D35 | 140U-K3D3-D150 |
| Amperage Rating | 350 A | 150 A |
| Amps Interrupting Current | 65,000 A | 35,000 A |
| Time/Current Curves | See Curve Below | See Curve Below |
| Lockable | Yes in Off Position | Yes in Off Position |

**Table 7. Current Transformers Specifications**

| Characteristic | 208 Volts | 460 Volts |
|---|---|---|
| Manufacturer | CR Magnetics | CR Magnetics |
| Model Number | CR5A-RL-301 | CR2DA-RL-151 |
| Rating | 300/5 A, 12.5 VA, 60 Hz | 150/5A, 4VA, 60 Hz |

T 1640

## Figure 5.  Time Current Curves for Bulletin 140-U-K3/K6
### Thermal-Magnetic Molded Case Circuit Breakers



T 1641

## 1.7  MODULE CONTROL SYSTEM

The cogeneration module control system is based on the Intelisys controller that provides precise proportional, integral, and derivative (PID) control of the power output or discharge water heat content. Standard programs, which can be modified for site-specific conditions, compare output to set point and adjust throttle position to attain the desired result.

All controls, excluding sensors and engine-mounted devices (starter relay, starter motor, etc.) are located in a single cabinet.

The control system has a complete safety monitoring and shut down system including a Beckwith utility grade protection relay. The Beckwith utility grade protection relay is a microprocessor-based unit that provides up to 12 protective relaying functions for intertie protection or up to 11 for cogeneration module protection. This provides protection from electrical faults and out of specification operation.

The cogeneration module has extensive networking capabilities to fully integrate building control loops and multiple cogeneration units.  See Section 2.13 for additional information on networking multiple modules.

### Table 8.  Display Menu

| | |
|---|---|
| ■ Generator Data | ■ Generator Protection Parameters |
| ■ Bus Data | ■ Power Management Settings |
| ■ Synchronizing Data | ■ Processor Analog Input Settings |
| ■ Controller Analog Input Data | ■ Sync/Load Control Settings |
| ■ Digital Input Status | ■ Volt/PF Control Settings |
| ■ Digital Output Status | ■ Load Shedding Parameters |
| ■ Power Management Status | ■ Call Out Settings |
| ■ Analog Module Values | ■ Date/Time |
| ■ Remote Analog Input Status | ■ Analog Module Settings |
| ■ Basic Settings | ■ Remote Analog Module Settings |
| ■ Process Control Parameters | ■ Programmable Function Settings |
| ■ Engine Parameters | ■ History |
| ■ Engine Protection Parameters | |

## 1.8  MODULE CONTROL MODES

There are two basic control modes for the cogeneration module: Temperature Mode & Power Mode. Temperature Mode matches the unit's heat output with the building's hot water load. If the building is not calling for the heat, the unit de-rates (decreases output level) and may shut down if the heat load drops too much.  De-rating is done by reducing the electrical output. This determination is based upon temperature sensor data. The sensor is site selectable.

In Power Mode, the controlled output is the kW of electricity. In this case, if the heat output cannot be utilized by the building load, it is dumped to a radiator. In both of these cases, the control set point, can be manually entered from the control panel, remotely set through a modem, or adjusted by an analog signal from an Energy Management System. Exporting of power is prevented by the Intelisys and by the Beckwith protection relay, thus avoiding the installation of an expensive reverse power relay system. If exported power is detected, the unit will unload and/or shutdown. The non-export of power will take precedence over any set points in either Temperature Mode or Power Mode. The cogeneration module also has extensive networking capabilities to fully integrate these control modes for multiple cogeneration units.

## 1.9   CONTROLLER KEYPADS AND DISPLAY

The Intelisys controller operator interface consists of a backlit display, a screen keypad, a numeric keypad, an operations keypad, and a one-line diagram with status lights.

**Figure 6.  Panel Layout**



T 1643

### 1.9.1  Screen

The screen is divided into three categories: MEASUREMENT, PARAMS, and HISTORY. These categories are found by depressing the MENU button. The categories will then appear at the top of the screen with the selected category being highlighted and with a menu below it. The top item or last selected item in the menu will be highlighted. Additional menu options will appear with a down or up arrow to indicate additional choices that exist off screen. Use the side arrows to scroll from category to category and the up/down arrows to scroll through the menu. Note that the arrows are found on the Screen Keypad.

**Figure 7.  Menu Screen Layout**



**Figure 8.  Generator Screen**



T 1844

Figure 8 shows the Generator screen. The tile on top of the screen shows the Menu item title (i.e., Generator), menu item number, and page number. The right hand corner displays the number of pages in the menu item. Use the left and right arrow buttons in the screen keypad to scroll through pages. Use the up and down buttons in the screen keypad to change to another menu item within the same category.

### 1.9.2  Numeric Keypad

Figure 9 shows the numeric keypad. The +/- button changes the sign of the number. Numbers are positive when typed unless this button is pressed first. The Clear button erases an error. Each time it is pressed, one number will be erased. Holding the button down will erase several numbers sequentially. The Enter button is used to enter a set point. The 0-9 number buttons are used for numeric entries.

**Figure 9.  Numeric Keypad**



### 1.9.3  Screen Keypad

Figure 10 shows the screen keypad. The alarm list appears when The Alarm List button is pressed. All active alarms will be displayed. The Menu button displays the menu items. Arrow buttons are used to move through the menu selections and screens. Pressing Enter will select a menu choice.

**Figure 10.  Screen Keypad**



AEGENCO™, INC. COGENERATION MODULE INSTALLATION MANUAL

T 1845

Green indicates normal operation, Orange/Yellow is for a warning condition, and Red is an alarm condition/shutdown. The first light on the left is not used. From left to right, the lights represent:

1. Parallel Generator – Not used, always off

2. Mains Disconnect – Always Green

3. Mains Voltage – Always Green if mains voltage present

4. Generator Main Contactor (GCB) – Green when contactor closed

5. Generator – Green when running and OK

6. Engine – Green when running above idle speed and OK

The right On/Off button closes the main contactor – not required for normal starting. The left On/Off button is not used.

## 1.10  ALARMS

The cogeneration module is designed for safe operation and for the protection of personnel and equipment. In the event of any out of specification event, the system will either shut down immediately (such as during an emergency stop) or ramp down (as in an over temperature situation). A list of the alarms is presented in Table 9.

There are two levels of alarm: Warning and Alarm. Alarms cause the system to shut or ramp down, as required. Warnings announce the system is experiencing an abnormal condition that should be addressed. A warning allows the system to continue operation within its limitations. In addition, a specified temperature threshold (site specific, if necessary) de-rates (reduces) the power output to help the system recover from a potential alarm condition. Once the de-rating temperature is within tolerances, the power automatically increases to set point. The module is equipped with the optional feature of restarting after an alarm shutdown. The module will wait 5 minutes and then attempt to restart after the alarm condition is automatically reset.

AEGENCO™, INC. COGENERATION MODULE INSTALLATION MANUAL

T 1646

### Table 9.  Events List

| Events Specification | Protection Type | Alarm List | History | Available for Customer Use |
|---|---|---|---|---|
| Analog input - L1 | Warning | YES | YES | NO |
| Analog input - L2 | Configurable | YES | YES | NO |
| Binary input | Configurable | YES | YES | NO |
| Battery voltage <, > | Warning | YES | YES | NO |
| Start | None | NO | YES | NO |
| Stop | None | NO | YES | NO |
| Start | Shut Down | YES | YES | YES |
| GCB on | None | NO | YES | NO |
| GCB off | None | NO | YES | NO |
| MCB on | None | NO | YES | NO |
| MCB off | None | NO | YES | NO |
| OtherGCBtrip | None | YES | YES | NO |
| Synchro | None | NO | YES | NO |
| SyncTimeout | Stop | YES | YES | NO |
| ActCall | None | NO | YES | NO |
| ActCallFail | Warning | YES | YES | NO |
| Watchdog | None | NO | YES | NO |
| CfgLoaded | None | NO | YES | NO |
| FlsLoaded | None | NO | YES | NO |
| PowerOn | None | NO | YES | NO |
| Paramfail | None | NO | YES | NO |
| IntError | None | NO | YES | NO |
| Vgen > | Unload | YES | YES | NO |
| Vgen < | Unload | YES | YES | YES |
| Vgen unbl | Unload | YES | YES | YES |
| Fgen > | Unload | YES | YES | YES |
| Fgen < | Unload | YES | YES | YES |
| fgen unbl | Unload | YES | YES | YES |
| Overload | Unload | YES | YES | YES |
| Pgen reverse | Unload | YES | YES | YES |
| Load shedding | None | NO | YES | YES |
| RPM over | Shut Down | YES | YES | YES |
| RPM under | Shut Down | YES | YES | YES |
| Emergency stop | Shut Down | YES | YES | NO |
| GCB fail | Unload | YES | YES | NO |
| Started | None | NO | YES | NO |
| WaitStop | None | NO | YES | NO |
| Standby | None | NO | YES | NO |
| Unloading | None | NO | YES | YES |
| UniCancel | None | NO | YES | NO |
| Cooling | None | NO | YES | NO |
| Ready | None | NO | YES | YES |
| NotReady | None | NO | YES | YES |
| Running | None | NO | YES | YES |
| TimeStamp | None | NO | YES | NO |
| PasswChanged | None | NO | YES | NO |
| CYl V1 differ | Stop | YES | YES | NO |
| CYl V16 differ | Stop | YES | YES | NO |
| CYl IV1 differ | Stop | YES | YES | NO |
| CYl IV16 differ | Stop | YES | YES | NO |
| PickupFault | Stop | YES | YES | NO |
| PasswEntered | Shut Down | YES | YES | NO |
| RemControlUART | None | NO | YES | NO |
| RemControlMOD | None | NO | YES | NO |
| RemControlSMS | None | NO | YES | NO |
| RemControlCAN | None | NO | YES | NO |
| Mode OFF | None | NO | YES | YES |
| Mode MAN | None | NO | YES | YES |
| Mode SEMI | None | NO | YES | YES |
| Mode AUT | None | NO | YES | YES |
| ActCallCH1-OK | None | NO | YES | YES |
| ActCallCH2-OK | None | NO | YES | NO |
| ActCallCH3-OK | None | NO | YES | NO |
| ActCallCH1-Fail | None | YES | YES | NO |
| ActCallCH2-Fail | None | YES | YES | NO |
| ActCallCH3-Fail | None | YES | YES | NO |
| SprinklerON | None | NO | YES | NO |
| SprinklerOFF | None | NO | YES | NO |
| BusMismatch | Off Load | YES | NO | NO |
| Generator phase sequence OK & Generator phase L1 opposite | Warning | YES | NO | NO |
| Generator phase sequence OK & Generator phase L2 opposite | Warning | YES | NO | NO |
| Generator phase sequence OK & Generator phase L3 opposite | Warning | YES | NO | NO |
| Wrong generator phase sequence & Generator phase L1 opposite | Warning | YES | NO | NO |
| Wrong generator phase sequence & Generator phase L2 opposite | Warning | YES | NO | NO |
| Wrong generator phase sequence & Generator phase L3 opposite | Warning | YES | NO | NO |
| Bus phase sequence OK Bus phase L1 opposite | Warning | YES | NO | NO |
| Bus phase sequence OK Bus phase L2 opposite | Warning | YES | NO | NO |
| Bus phase sequence OK Bus phase L3 opposite | Warning | YES | NO | NO |
| Wrong bus phase sequence & Bus phase L1 opposite | Warning | YES | NO | NO |
| Wrong bus phase sequence & Bus phase L2 opposite | Warning | YES | NO | NO |
| Wrong bus phase sequence & bus phase L3 opposite | Warning | YES | NO | NO |
| SpeedRegLimit | Warning | YES | YES | NO |
| VoltRegLimit | Warning | YES | YES | NO |
| Bus MeasError | Off Load | YES | NO | NO |

## 1.11  CUSTOMER INTERFACE

The Intelisys allows customers to provide various inputs to the cogeneration module.  In addition, various outputs from the Intelisys are available for the customer's use.

### 1.11.1  Inputs

As an option, the customer can provide the following inputs to the cogeneration module control system. The actual devices and wiring connections are the responsibility of the installing contractor.

AEGENCO™, INC. COGENERATION MODULE INSTALLATION MANUAL

T 1647

- **Start/Stop:** The customer may input contacts that will initiate the starting and stopping of the generator. This input is available on terminal strip at the bottom of the control cabinet. Close to start, open to stop. This functions only if the controller is in the Automatic mode.

- **Power Set point Input:** The customer may input a 0 - 7.5 VDC signal to the Load Share input so that the power output of the unit may be controlled by a remote energy management system. This input is available on the Intelisys Controller [LSM (+) / LSM (-) terminals]. The Intelisys must be configured for Load Sharing for this feature.

- **Analog Signals:** The customer may input up to 56 analog signals (up to seven remote analog modules, each with 8 inputs) of various types. Readings of these signals can be viewed on the Intelisys display and can be used for control through site-specific programs. Sensors and signal levels must conform to specifications, which will be supplied as required for each site. Remote modules may be located at key points at site and are connected to the Intelisys through a three-wire communications cable (24V DC power is required for each remote module).

## 1.11.2  Outputs

The customer has the option of utilizing the outputs that are listed below. It is the responsibility of the installing contractor to provide the devices and wiring for these electrical connections.

- **External Ventilation Fan Start:** A 24 VDC output to drive a pilot relay for ventilation fan control is available. The customer supplies a 24 VDC relay and the circuit needed to power the ventilation fan.

- **Manual Customer Inputs and Outputs:** A limited number of digital (i.e., on/off) inputs and outputs may be available for site-specific applications. The customer requirement will have to be reviewed by engineering prior to implementation.

## 1.11.3  Other Control Features

Other features listed below are available as standard, unless otherwise noted.

- **Automatic Restart:** This feature allows the cogeneration module to restart automatically 5 minutes after a power outage. (Available only if running in automatic mode.)

- **Auto Alarm Reset:** This feature allows the control system to automatically reset pre-selected alarms 5 minutes after the unit is shut down and try to start again. Available only if the generator is running in automatic mode.

- **Idle:** This feature allows the cogeneration module to run without being connected to the grid. This is useful for diagnostics, engine tuning, troubleshooting, etc. It is available only if running in the manual mode.

- **Alarm Set point and Operational Set point Customization:** All parameters in the Intelisys controller can be customized for site specific or equipment specific requirements. Three levels of passwords in the Intelisys limit access to parameters. Parameters protected by levels 1 and 2 are generally accessible in the field by technicians or field engineers. Parameters at level 3 are accessible only to factory engineers. See included lists of these parameters.

T 1648

## 1.12  REMOTE COMMUNICATIONS

The cogeneration module is equipped with communications software and a modem.  Once the system is tied into a dedicated phone line (installing contractor responsibility), the Intelisys system provides the user with the ability to remotely monitor and control the module, diagnose problems, and download software updates.  Through the modem or to a pager, the Intelisys controller can also send alerts of any fault conditions.

For installations with more than one cogeneration module, a telephone line switchbox will be needed if the modules are not connected in a network.  The requirements for the remote computer include: IBM compatible PC, *Windows 95* or higher, and have WinEdit.

The remote communications package has the following features:

- Provide real-time status of the module
- Summarize the history of alarms
- Review how some of the module's hardware has been setup or configured
- Provide historical data
- Start and stop the generator
- Reset warnings and alarms
- Change any control set point
- Change any operating or protection parameter (with proper password)
- Download software revisions and updates
- Monitor building control loops

## 1.13  COMMUNICATIONS PROTOCOL

The Intelisys can interface with a building's automation system through its open communications protocol. Detailed information about Intelisys protocol including available points is available to manufacturers of building automation systems if requested.  The actual software or hardware interface to the building automation system is the responsibility of the customer.

The Intelisys is also compatible with Modbus, a controls standard for networking devices. This is useful for networking multiple cogeneration modules or interfacing with programmable controllers. The Intelisys supports controlling multiple cogeneration modules with a priority system.  RS-232, RS-422, or RS-485 protocols are supported.  For further details on setting up the Modbus networking, contact AEGENCO™ engineering department.

## 1.14  INTERFACING WITH UTILITIES

Each electric utility requires a different interconnection application process.  In general the utility should be notified as early as possible during the cogeneration installation process because the utility application process can be lengthy.  Several states including Massachusetts have streamlined the application process to be uniform throughout all utilities.

T 1649

Utilities will request various information pertaining to the generator, relay protection, switchgear, and microprocessor operation. This information can be found within this manual.

Utilities may request power factor correction, and sometimes when no power factor correction is requested the rate structure will dictate that power factor correction is necessary to achieve maximum electric savings.

## 1.15  POWER FACTOR

Power factor is defined as the ratio of working power, KW, to apparent power, KVA. Reactive power, KVAR, is required by the utility to sustain the electromagnetic field. The mathematical relationship between these variables is as follows:

$$\text{Power Factor} = kW/kVA$$

$$KVA^2 = KW^2 + KVAR^2$$

The generator in the AEGENCO™ cogeneration module is an induction generator. Induction generators consume KVARs from the utility while at the same time reducing the kWs consumed from the utility. Power factor will be lowered with the operation of the ™ cogeneration module.

Some utilities charge a penalty for having a peak demand with a power factor below a set threshold. Other utilities may charge for the peak KVA and not the peak KW. For customers in these utility service territories, it may be economically attractive to correct for the low power factor.

Power factor correction capacitors can resolve the low power factor problem. Experts in the field should be contacted for design of power factor correction equipment. Note that some utilities have their own restrictions for power factor correction capacitor installations.

T 1650

# APPENDIX I - MECHANICAL DRAWINGS

Drawing 1.  AEGEN TP-75 Plan View



Drawing 2.  AEGEN TP-75 Elevation - Front



| | TITLE | | |
|---|---|---|---|
| | AEGEN TP-75 ELEVATION-FRONT | | |
| | AEGENCO | | |
| | 2085 RIVERDALE STREET, WEST SPRINGFIELD, MA 01089 | | |
| DRAWN BY  G.A. | SIZE ANSI A | FSCM NO. | DWG NO. | REV |
| | SCALE | | SHEET |

T 1662

## Drawing 3. AEGEN TP-75 Elevation – Driver Side, Enclosure Off



T 1663

Drawing 4.  AEGEN TP-75 Elevation – Passenger Side, Enclosure Off



T 1664

## Drawing 5. Service Clearance Plan View



T 1665

**Drawing 6.  External Enclosure Ventilation Fan**



**Drawing 7.  AEGEN TP-75 LE Heat Recovery Piping**



T 1667

**Drawing 8.  Exhaust Piping**



AEGENCO™, INC. COGENERATION MODULE INSTALLATION MANUAL

T 1668

**Drawing 9. AEGEN With Pump Module and Muffler, Elevation-Passenger Side**



T 1669

**Drawing 10.  AEGEN With Pump Module Frame and Muffler, Elevation-Front**



T 1670

## Drawing 11. AEGEN With Pump Module, Elevation-Front



T 1671

# Tecogen Ex. 16

1              UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3    --------------------------------------------x

4    TECOGEN, INC.,

5                        Plaintiff,

6    v.                        No. 05-11823 RCL

7    AEGIS ENERGY SERVICES, INC.,

8    AEGENCO, INC. AND AEGIS GENERATION COMPANY,

9                        Defendant.

10   --------------------------------------------x

11

12

13

14          DEPOSITION OF LEE VARDAKAS, a witness

15   called on behalf of the Plaintiff, taken

16   pursuant to the provisions of the

17   Massachusetts Rules of Civil Procedure,

18   before Linda Bernis, a Registered

19   Professional Reporter and Notary Public in

20   and for the Commonwealth of Massachusetts,

21   at the offices of Goulston & Storrs, 400

22   Atlantic Avenue, Boston, Massachusetts, on

23   Thursday, August 23, 2007, commencing at

24   10:00 a.m.

Lee Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

10

1    Q.   What is your educational background?
2    A.   I graduated in 1986 from the University of
3         Rochester with a degree in economics and
4         minor in political science.
5    Q.   Are you currently employed?
6    A.   I am.
7    Q.   Who is your employer?
8    A.   Aegis Energy Services.
9    Q.   How long have you been with Aegis Energy
10        Services?
11   A.   Since 1986.
12   Q.   For shorthand, at times I will refer to
13        Aegis Energy Services as simply Aegis.
14             What is your current job title?
15   A.   I'm the general manager.
16   Q.   What are your current job responsibilities,
17        very generally?
18   A.   Overseeing operations.  You might even call
19        me the operations manager.
20   Q.   Have you held past job titles while employed
21        by Aegis?
22   A.   I would say, operations manager and then
23        general manager.
24   Q.   In what year did Aegis get into the

11

1         cogeneration business?
2    A.   1985.
3    Q.   Would you very briefly describe Aegis'
4         business at the time it first began in the
5         cogeneration industry?
6    A.   When it first began in 1985, Aegis was
7         providing market development services for
8         Tecogen placing some new cogeneration
9         modulars along the east coast.  We placed
10        approximately four or five machines.
11   Q.   When you say placing machines, what do you
12        mean by that?
13   A.   Helping to sell; marketing some.
14   Q.   At that time, were there any written
15        agreements between Aegis and Tecogen?
16   A.   Not that I'm aware of.
17   Q.   Are you aware of any oral agreements that
18        exist between Aegis and Tecogen?
19   A.   No.
20             MS. FROHLICH:  Exhibit 6, please.
21             (Exhibit 6 marked
22             for identification.)
23   Q.   Mr. Vardakas, I'm showing you what has been
24        marked as Exhibit 6.  This is the answer in

12

1         counterclaim filed in this lawsuit.
2              Have you seen this document before
3         today?
4    A.   Yes.
5    Q.   You're free to look at any part of it.  I'm
6         going to direct you for the moment to one
7         paragraph.  It's on page 3.  I'm sorry.
8         Page 11, paragraph 15.
9              The first sentence, paragraph 15 on
10        page 11 states, "Aegis Energy was an
11        exclusive distributor of Tecogen
12        cogeneration systems and part for the states
13        of Massachusetts and Connecticut."
14             Did I read that correctly?
15   A.   Yes.
16   Q.   Now, why does Aegis allege in that paragraph
17        that it was an exclusive distributor of
18        Tecogen cogeneration symptoms and parts for
19        the states of Massachusetts and Connecticut?
20   A.   We were exclusive because we had an
21        understanding of, we had been the only
22        supplier of product throughout the years in
23        those two markets.
24   Q.   Was that based on -- strike that.

13

1              Is the allegation in that sentence
2         based on the course of dealings between the
3         parties over the years?
4    A.   Describe what you mean by "course of
5         dealing."
6    Q.   Let me try it differently.
7              Did Aegis and Tecogen ever have a
8         written agreement concerning an exclusive
9         distributorship?
10   A.   No.
11   Q.   To your knowledge, was there ever an oral
12        agreement?
13   A.   No.
14   Q.   For which years was Aegis an exclusive
15        distributor of Tecogen cogeneration systems
16        and parts?
17   A.   I would say, from 1990 through '05.
18   Q.   Did being an exclusive distributor have any
19        value or benefit for Aegis?
20   A.   Yes.
21   Q.   What value or benefit did it have for Aegis?
22   A.   It provided less competition in promoting
23        the product.
24   Q.   Did being an exclusive distributor impose

4 (Pages 10 to 13)

Lee Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

14

1    any obligations or responsibilities on Aegis
2    for Massachusetts or Connecticut?
3  A.  Not that I can think of.
4  Q.  Look at the second sentence in paragraph 15,
5    it refers to a nonexclusive distributorship
6    for the State of New York.
7       Do you see that allegation?
8  A.  Yes.
9  Q.  What does Aegis mean that it was a
10    nonexclusive distributor of Tecogen
11    cogeneration systems and parts for the State
12    of New York?
13  A.  Tecogen had other dealers selling their
14    systems in that market in New York.
15  Q.  So if other -- strike that.
16       If Aegis did not sell a Tecogen
17    system in New York there was a possibility
18    that another distributor would sell a
19    Tecogen module?
20       MR. CURCIO: Objection.
21  A.  Yes.
22       MS. FROHLICH: Mark this.
23       (Exhibit 7 marked
24       for identification.)

15

1  Q.  Mr. Vardakas, did Aegis ever receive a copy
2    of what we have marked as Exhibit 7?
3  A.  I don't believe so.
4  Q.  Have you seen this document before today?
5  A.  No.
6  Q.  If you would look at the first page. Almost
7    exactly in the middle there's a second
8    whereas clause which states, "Whereas,
9    representative desires to promote and to
10    solicit the sale of certain of said
11    products."
12       Do you see that clause?
13  A.  I do.
14  Q.  As of 1993, separate from this document, did
15    Aegis desire to promote and solicit the sale
16    of Tecogen cogeneration modules?
17  A.  We did.
18  Q.  As of September 1993, did Aegis believe its
19    responsibilities as a Tecogen sales
20    representative included promoting the sale
21    of Tecogen cogeneration modules?
22  A.  Yes.
23  Q.  As of September 1993, did Aegis devote its
24    best efforts to promote the maximum sale of

16

1    Tecogen modules?
2  A.  We devoted our efforts to maximize the sale
3    of products to maximize our revenue, not
4    necessarily maximum Tecogen revenue.
5  Q.  To maximize Aegis' revenue, did it devote
6    its best efforts to promoting the sale of
7    Tecogen modules?
8  A.  Ask the question again.
9       MS. FROHLICH: Can you read it
10    back.
11       (Court Reporter read back
12       last question.)
13  A.  Yes.
14  Q.  If you would turn to page 2 of Exhibit 7.
15    Section 5 is entitled Determination and
16    Payment of Commissions to the
17    Representative. I want to direct your
18    attention to the paragraph immediately under
19    that heading. It's got the smaller A in
20    front of it.
21       Do you see that paragraph?
22  A.  I do.
23  Q.  The first sentence references the
24    representatives entitlement to payment of a

17

1    full commission on each order in which three
2    conditions occurred, correct?
3  A.  Okay. Yes.
4  Q.  And the next sentence references a
5    distributed condition when one or more of
6    the three functions occurs in more than one
7    territory, correct?
8       MR. CURCIO: Objection.
9  A.  Yes.
10  Q.  As of September 1993, Tecogen paid a full
11    commission to Aegis when product
12    specification issuance of an order and
13    installation of a product occurred in Aegis'
14    exclusive territory, correct?
15  A.  No.
16  Q.  Let me ask you this. In 1993, were
17    commissions paid by Tecogen to Aegis?
18  A.  No.
19  Q.  In 1993, did Aegis purchase modules from
20    Tecogen?
21  A.  Yes. We did not use a commission schedule
22    for procurement of our equipment.
23  Q.  At any time, did Aegis and Tecogen begin to
24    use a commission schedule?

5 (Pages 14 to 17)

Leo Vrandaikas 8-23-2006
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

30

1  Q.  Between January of 2002 and April 2003, were
2     there any discussions inside Aegis about
3     American DG?
4          MR. CURCIO:  Objection.
5  A.  Yes.
6  Q.  Approximately, how many discussions?
7  A.  Many.  I don't know the number.
8  Q.  Are there any specific discussions that
9     stand out in your mind in that time period?
10 A.  There were numerous discussions that we felt
11    that this was a -- we were concerned about
12    the future of Aegis Energy.  We felt that
13    the actions that Tecogen was taking at this
14    time would be harmful to the future of Aegis
15    Energy and the families that are supported
16    by Aegis Energy.  And we didn't think that
17    we had a future with them as a result of
18    them creating this entity.
19 Q.  Prior to April 2003, did Aegis communicate
20    to Tecogen that Aegis did not think it had a
21    future with Tecogen if Tecogen created
22    American DG?
23 A.  Could you repeat that one more time?
24        MS. FROHLICH:  Can you read it

31

1     back.
2          (Court Reporter read back
3           last question.)
4  A.  Yes.
5  Q.  How many times was that sentiment expressed
6     to Tecogen before April 2003?
7  A.  A handful of times based on meetings that we
8     would have, discussions, phone calls that we
9     would have surrounding the topic.  I can't
10    give you exactly.
11 Q.  Was that sentiment ever expressed to Tecogen
12    after April 2003?
13 A.  Yes.
14 Q.  Approximately, how many times?
15 A.  Many times.
16 Q.  At any time, was there ever any discussion
17    of formally ending the distributorship
18    relationship between Aegis and Tecogen?
19 A.  Discussion between us and Tecogen?
20 Q.  Yes.
21 A.  No.
22        MR. CURCIO:  The time frame you're
23    speaking of is January through April 2003?
24        MS. FROHLICH:  No, this was at any

32

1     time.
2  A.  Prior to these conversations in the
3     nineties, there was conversation about
4     discontinuing a relationship with Tecogen.
5     But related to the 2003 era, no.
6  Q.  If I could have you look at Exhibit 9.  Am I
7     correct that Tecogen and Aegis never signed
8     an agreement that looked like this?
9  A.  Correct.
10 Q.  In fact, Tecogen and Aegis never signed any
11    type of written agreement involving the sale
12    of -- strike that.
13        Tecogen and Aegis never signed any
14    type of sales representation or
15    distributorship agreement, correct?
16 A.  That is correct.
17 Q.  If you look on the first page, do you see
18    the first bullet point under A.  This is
19    under sales and reporting by representative.
20 A.  Yes.
21 Q.  As of April 2003, did Aegis understand its
22    responsibilities as a Tecogen representative
23    included devoting its best efforts to
24    promoting the maximum number of sales of

33

1     Tecogen products within Connecticut and
2     Massachusetts?
3  A.  In the context of this agreement?
4  Q.  Let me ask you -- separate from the
5     agreement, did Aegis understand that its
6     responsibility, as a Tecogen, its
7     responsibilities were to use its best
8     efforts to promote the maximum number of
9     sales of Tecogen products in Massachusetts
10    and Connecticut?
11 A.  Yes.
12 Q.  At all times prior to April 2003, did Aegis
13    actually devote its best efforts to
14    promoting the maximum number of sales of
15    Tecogen modules in Connecticut and
16    Massachusetts?
17        MR. CURCIO:  Objection.
18 A.  Yes.
19 Q.  Between April 2003 and June 24, 2005, did
20    Aegis devote its best efforts to promoting
21    the maximum number of sales of Tecogen
22    modules in Connecticut and Massachusetts?
23        MR. CURCIO:  Objection.
24 A.  Yes.

9 (Pages 30 to 33)

Case 1:05-cv-11823-RCL    Document 43-17    Filed 07/14/2008    Page 6 of 9
Leo Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

50

1    Q.  What was that understanding?
2    A.  That their equipment was specified for this
3        installation.
4            MS. FROHLICH:  Does anyone want a
5        brief break?
6            MR. CURCIO:  Sure.
7            (Short recess taken.)
8            MS. FROHLICH:  Mark this.
9            (Exhibit 13 marked.
10           for identification.)
11   Q.  Mr. Vardakas, have you seen the document
12       that's been marked as Exhibit 13 before
13       today?
14   A.  No.
15   Q.  Mercifully, the questioning will be short on
16       this document.  You can set it aside.
17   A.  We are not a bidder on the project so we
18       would not have received it.
19   Q.  That anticipates my next question.
20           Prior to November 10th --
21   A.  Is that this date?
22   Q.  -- 2004, did Aegis submit any bids on the
23       Lakeland project?
24   A.  No.

51

1    Q.  At that time, did Aegis know whether any of
2        Tecogen's other sales representatives had
3        submitted any bids for the Lakeland project?
4    A.  No.  I was under the impression the project
5        was not moving ahead.
6    Q.  Who had given you that impression?
7    A.  From talking with Energy Concepts and coming
8        over budget, there was no way they were
9        going to do the project with the numbers
10       they had.
11   Q.  At any point in time, did that impression
12       change?
13   A.  For this project, no.  Not until April
14       of '05.  That's where you're headed.  You're
15       supposed to lead and I'm supposed to follow.
16   Q.  If you want to lead, I'll follow.
17           Let's mark this as Exhibit 14.
18           (Exhibits 14-15 marked
19           for identification.)
20   Q.  Mr. Vardakas, I've handed you two documents.
21       Exhibit 14 is an April 18, 2005 proposal
22       with a supply of Tecogen cogeneration units
23       for the Lakeland School District.  That was
24       prepared by Aegis; is that correct?

52

1    A.  That's correct.
2    Q.  And Exhibit 15 is a proposal for the supply
3        of Aegis' ThermoPower cogeneration units for
4        the Lakeland School District dated April 18,
5        2005, correct?
6    A.  That is correct.
7    Q.  Did Aegis submit both of these proposals for
8        the Lakeland project?
9    A.  Yes.
10   Q.  And did it submit the proposals to -- strike
11       that.
12           To whom did Aegis submit these two
13       proposals?
14   A.  To J&M Plumbing & Heating.
15   Q.  Who was J&M Plumbing & Heating?
16   A.  J&M Plumbing & Heating was the mechanical
17       contractor who is bidding the, contacted us
18       through the Internet on our website and was
19       interested in supplying cogeneration,
20       procuring cogeneration systems for his
21       project that he was bidding on.  Because the
22       project had, as I described earlier, the
23       project had come in way over budget and he
24       was about doing value engineering along with

53

1        Energy Concepts to reduce the cost of the
2        project.  They stripped off the cooling
3        components of the project, from what he told
4        me, and they were trying to bring the cost
5        of the project down.  He asked us for
6        pricing on cogeneration systems since he had
7        our website.  I never met him prior to.
8    Q.  When you say him?
9    A.  J&M, Ed Horvath.
10   Q.  Did Aegis submit either of these proposals
11       to anyone other than Mr. Horvath?
12   A.  I don't think so.
13   Q.  J&M Heating was the specific contractor on
14       the Lakeland project that was going to buy
15       and install the cogeneration modules?
16   A.  That was my understanding.
17           It was also my understanding that
18       he was not the selected contractor at the
19       time he was talking to me.  He was trying to
20       become it.
21   Q.  Was this the first project in which Aegis
22       submitted one proposal for specifically
23       Tecogen modules and another proposal
24       specifying Aegis modules?

14 (Pages 50 to 53)

Case 1:05-cv-11823-RCL    Document 43-17    Filed 07/14/2008    Page 7 of 9
Lee Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

54

1  A.  Yes.
2  Q.  If you look at Exhibit 16, it's the Tecogen
3      proposal.
4          MR. CURCIO:  14.
5  Q.  That's right.
6          Exhibit 14 specifies 11 Tecogen
7      units, correct?
8  A.  Exhibit what number?
9  Q.  14.
10 A.  Yes.
11 Q.  The price that was given for those units was
12     $825,000, correct?
13 A.  That's correct.
14 Q.  How did Aegis arrive at that price?
15 A.  The price was derived based on our, at the
16     time, current pricing we were purchasing the
17     units at from Tecogen plus our cost to
18     provide the ancillary product that goes with
19     the actual module.
20 Q.  Did Aegis actually consult with Tecogen in
21     arriving at that price, or did it simply
22     take the current price it had been charged
23     previously and put that into the proposal?
24 A.  We did not consult, we just took the current

55

1      price at that time and we implemented it
2      into the proposal.
3  Q.  Is the proposal for equipment only?
4  A.  It is.  Not just the module.
5  Q.  The proposal does not include maintenance or
6      service of cogeneration equipment, correct?
7  A.  It does not.
8  Q.  Now, looking at Exhibit 15, that proposal
9      specifies 11 agent ThermoPower modules,
10     correct?
11 A.  Yes.
12 Q.  It gives a total cost of $770,000 for those
13     11 Aegis modules, correct?
14 A.  Yes.
15 Q.  How did Aegis arrive at that price?
16 A.  That price was generated based on the cost
17     of our modules plus the anciliary equipment
18     required to integrate it to meet the spec.
19 Q.  Prior to submitting this Aegen module
20     proposal marked as Exhibit 15, did Aegis
21     tell Tecogen it planned to submit this
22     proposal?
23 A.  No.
24 Q.  Why not?

56

1  A.  We did not regularly consult with Tecogen on
2      what projects we bid or didn't bid.
3  Q.  At the time Aegis submitted this proposal to
4      J&M Heating, did Aegis inform Tecogen that
5      Aegis had developed its own cogeneration
6      modules?
7  A.  No.
8  Q.  Why did Aegis not inform Tecogen that it had
9      developed its own modules?
10 A.  We were not sure what we were going to be
11     doing with our cogeneration modules at the
12     time.  We weren't sure if we were going to
13     promote or cogeneration modules.  We were
14     looking to distribute other organizations'
15     products.
16         I went out to Detroit to visit
17     another manufacturer and we were pursuing
18     multiple business strategies to figure out
19     what our future was going to lie with
20     Tecogen, whether it was going to lie with
21     Tecogen.  And this was, the production of
22     our own equipment was only one avenue out of
23     three different strategies.
24 Q.  Why did Aegis decide in or around the

57

1      April 18, 2005 time period to submit two
2      proposals, one for Tecogen modules and one
3      for Aegis modules?
4  A.  Based on a request from J&M.
5  Q.  Did J&M know that Aegis had developed its
6      own modules as of April 18, 2005?
7  A.  I don't think so.  I think, he had asked me
8      what product we could supply for this
9      project and I offered both offerings to him.
10 Q.  Just to be clear.  On or before April 18,
11     2005, had you discussed with Ed Horvath of
12     J&M Heating that Aegis had developed its own
13     modules?
14 A.  Not that we developed our own modules, we
15     just had another product to sell.
16 Q.  On or before April 18, 2005, had Aegis
17     discussed Aegis' modules in connection with
18     the Lakeland project with anyone else
19     involved with that project?
20 A.  Yes.
21 Q.  With whom had Aegis discussed its modules in
22     connection with that project?
23 A.  Energy Concepts.
24 Q.  When did Aegis first discuss Aegis' modules

15 (Pages 54 to 57)

Case 1:05-cv-11823-RCL     Document 43-17     Filed 07/14/2008     Page 8 of 9
Lee Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

| 154 | 156 |
|---|---|

**154**

1    in the first paragraph of a contract or the
2    date the contract was sent out or the last
3    date it was signed?
4 A.  They vary. Most likely, the date of the
5    signature is what we typically would make.
6    Many contracts sat for a long time.
7 Q.  At the top of the page where it says, "Aegis
8    contract dates-Tecogen," does that mean the
9    contracts themselves provided for Tecogen
10    modules to be used at the site?
11 A.  Yes.
12 Q.  Turn to the second page, which is Bates
13    stamped 001357. Do the dates mean the same
14    thing?
15 A.  No. Because these were proposal dates.
16    These were not sales. These were
17    prospective sales.
18 Q.  Okay. Can you explain what the words
19    Tecogen and Aegen with the arrows mean?
20 A.  The first four items are items where we had
21    proposed Tecogens, and the bottom ones were
22    sites we proposed Aegen at.
23 Q.  Were modules actually installed at any of
24    these sites or sold to any of these sites?

**155**

1 A.  A module was sold to Bradley Home and
2    modules were sold to the Seymour Housing
3    Authority. A module was sold to
4    Matchentucket.
5 Q.  Turn to the next page. Are these also
6    contract dates?
7 A.  These were proposal dates. Talking about
8    001358?
9 Q.  Yes.
10 A.  Those are proposal dates. These were all
11    proposal dates on 001359.
12 Q.  On 1360, we're back to contract dates; is
13    that correct?
14 A.  Yes.
15 Q.  On 1361, are we back to proposal dates?
16 A.  Yes.
17 Q.  Same thing for 1362 and 1363?
18 A.  Yes.
19 Q.  Turn to 001365. It's the last page.
20 A.  Yes.
21 Q.  What do these, what does this page mean?
22    What is this showing?
23 A.  These were projects that we used Tecogen on
24    from '03 to '05 that consist of everything

**156**

1    from equipment to turnkey installation to
2    selling to Anesco. They are a performance
3    contractor, as we talked about earlier in
4    the deposition.
5 Q.  I went through all these pages and I could
6    not find Whitney Place or JML. I looked
7    many different times. Do you know why that
8    is?
9 A.  I don't.
10 Q.  Do you know who prepared these lists?
11 A.  I believe, Spiro prepared these lists.
12    MS. FROHLICH: Exhibit 46.
13    (Exhibit 46 marked
14    for identification.)
15 Q.  Mr. Vardakas, can you identify what's been
16    marked as Exhibit 46?
17 A.  Yes. It's an attribute and feature
18    comparison between the Tecogen and the
19    Aegen.
20 Q.  I notice the spelling of Aegen in Exhibit 46
21    is A-GEN just slightly different than in
22    agreements and other places where I have
23    seen it where AEGEN.
24    Was A-GEN a name that was actually

**157**

1    used at any point in time other than in this
2    particular document?
3 A.  No, it's just a typo. We had different
4    people developing these pieces and they
5    weren't all consistent across-the-board.
6 Q.  Who prepared this particular document?
7 A.  I believe this one was done by Steve Zolla
8    and Gennaro Aulessio from Aegis.
9 Q.  Z O L A?
10 A.  Z O L L A.
11 Q.  Gennaro --
12 A.  That's a tough one. G E N N A R O -
13    A U L E S S I O.
14 Q.  Is Steve Zolla an employee of Aegis?
15 A.  He is.
16 Q.  What is his current job title?
17 A.  Electrical engineer.
18 Q.  And Gennaro Aulessio, is he still with the
19    company?
20 A.  He is.
21 Q.  What's his title?
22 A.  Mechanical engineer.
23 Q.  Why was this comparison prepared?
24 A.  To help demonstrate the Aegen over the

40 (Pages 154 to 157)

Case 1:05-cv-11823-RCL    Document 43-17    Filed 07/14/2008    Page 9 of 9
Leo Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

158

1    Tecogen.
2  Q.  When was this prepared?
3  A.  I'm not sure.
4  Q.  Was this comparison provided to anyone
5      outside of Aegis?
6  A.  I've used it from time to time, sure.
7  Q.  Do you keep records of to whom you've shown
8      this comparison?
9  A.  No.
10  Q.  Do you recall who you've shown it to?
11          MR. CURCIO:  Objection.
12  A.  No.
13  Q.  Who took the photos in Exhibit 46?
14  A.  I'm not sure.
15  Q.  It looks to me like all of the photos of the
16      Aegen unit, to the extent they have dates,
17      are dated 6/14/2004.
18          Do you know whether those photos
19      were taken on June 14, 2004?
20  A.  I highly doubt it.  I think, it's just a
21      date stamp of the camera they used.
22  Q.  Do you know whether these were digital
23      photos?
24  A.  I believe some of these are, yes.

159

1  Q.  Does Aegis or Aegen have photocopies of
2      these units?
3  A.  We might.
4  Q.  Do you know whether anyone looked for copies
5      of electronic photos of the product, of
6      Aegen products as part of discovery in this
7      lawsuit?
8  A.  I don't know that.
9  Q.  Just as a point of clarification.  Look at
10      the last page of the document.  Bates stamp,
11      which is the number in the right hand
12      corner, 000 number.  We call that a Bates
13      stamp for short.  It falls in sequence after
14      the first seven pages which are photographic
15      comparison.
16          It wasn't clear to me whether the
17      table was part of the photographic
18      comparison.  Do you know whether it is?
19  A.  I don't think it is.  I think it may have
20      just another document.  I'm not sure it's
21      part of the overall document.
22  Q.  Looking at the last page.  Do you know
23      whether this is a Microsoft Word table or
24      something comparable to that?

160

1  A.  Yes, I'm sure it's in Microsoft product.
2      That's what we have for software.
3  Q.  Do you know who created the table?
4  A.  I don't.
5  Q.  Do you know whether this table is -- strike
6      that.  Let me back up.
7          Does Aegis have a computer network?
8  A.  Server.
9  Q.  Does it have a server that has, for example,
10      network-wide storage for Word documents?
11  A.  Yes, it does.
12  Q.  Do you know whether this table is stored on
13      an Aegis network?
14  A.  I don't.  It had some catastrophic failures
15      and I'm not sure what still exists and what
16      doesn't exist.
17          MS. FROHLICH:  Off the record for a
18      minute.
19          (Short recess taken.)
20          (Exhibit 47 marked
21      for identification.)
22  Q.  On Exhibit 47, it's a two-page document.
23      The bates stamp numbers are consecutive.
24      I'll represent to you, I don't know if these

161

1      came as one document or if it's two separate
2      pages.
3          But I will ask you, do you
4      recognize either of these pages?
5  A.  I do.
6  Q.  Can you tell me, to the best of your
7      knowledge, is this one document?
8  A.  I think this one is one document.
9  Q.  Have you seen Exhibit 47 before today?
10  A.  Yes.
11  Q.  Who prepared -- strike that.
12          Do you know whether the same person
13      prepared both pages?
14  A.  I think so.
15  Q.  Who prepared this document?
16  A.  I think it was a combination of Steven Zolla
17      and Gennaro Aulessio.
18  Q.  Was this comparison prepared for the same
19      reason that you gave for the first one?
20  A.  This one was more for in-house training,
21      understanding some of the electronic
22      differences.
23  Q.  Do you know?
24  A.  More technical in nature.

41 (Pages 158 to 161)

# Tecogen Ex. 17

EXHIBIT
#46
8/23/07
CONFIDENTIAL
ATTORNEYS ONLY

# AEGIS ENERGY SERVICES, INC.
# TECOGEN and A-GEN THERMAL POWER
# COMPARISON




We at Aegis Energy Services have been supplying our customers with CO –GEN systems for over 20 years. Our business has been based on servicing these units. Our relationship with the TECOGEN equipment in New England coupled with our service record with these units have legitimized our standings in the industry.

The following comparison and illustration is characteristic of our efforts to develop a system at Aegis Energy Services that complies with our customer demands.

TECOGEN processor and boards:       A-GEN processor:




 

A-GEN uses the InteliSys® Expandable Controller and Beckwith Circuit protection unit.

The TECOGEN controller has numeric display and coded fault messages.

 

The InteliSys® allow users to brows thru display screen and graphically view all aspects of system operation. Changes can be instituted with password identification to all parameters including building controls.

The TECOGEN electrical panel:          The A-GEN electrical panel:

 

CONFIDENTIAL
ATTORNEYS ONLY

000633




The A-GEN is UL approved and meets all requirements including Beckwith utility recognized circuit protection.

TECOGEN uses a stepper motor and linkages for throttle control.

A-GEN combined unit.







A-GEN uses proven engine intergraded governor system by GOVERNORS AMERICA CORPORATION.

Above photos show the fuel mixers used. The A-GEN use of 425 series fuel mixer allows greater accuracy in air fuel ratio adjustment over the 200 series used by TECOGEN.

CONFIDENTIAL
ATTORNEYS ONLY

000634

Our controller is compatible with many of the standard sensors used in the automotive industry as well as sophisticated scientific sensors. The A-GEN uses GM generic sensors that monitors engine temperature, oil levels, and pressure.




TECOGEN uses an external engine oil pressure regulator.




The A-GEN runs direct and at a higher pressure as in the typical automotive oil heat extraction units.

TECOGEN Exhaust gas heat exchanger Left: A-GEN Heat exchanger Right:




AEGIS-GEN uses larger diameter exchanger allowing a greater volume to extend life of the unit.

CONFIDENTIAL
ATTORNEYS ONLY

000635

CONFIDENTIAL
ATTORNEYS ONLY

TECOGEN UNIT:                    A-GEN UNIT:

    

One of our innovations to balance cylinder head heat is to utilize the manifold's rear passages.

TECOGEN UNIT:                    A-GEN UNIT:

    

Aegis Energy Services has integrated larger gas regulator and control valves in all our units for increase performance at higher output levels.

TECOGEN UNIT:                    A-GEN UNIT

    

Aegis Energy Services has incorporated isolation mounting in all our units.

000636

CONFIDENTIAL
ATTORNEYS ONLY









Aegis Energy Services knows Co-Gen and all aspects of servicing the units thru years of experience. Little details have not been overlooked, things like latches for removing the covers and supports for heat exchanger, and angled viewing screen. All make life a bit more pleasant for the person servicing the units in the field.

Aegis Energy Services has built units with a greater Kilowatt values using GM 8.1 and 8.2 engines.

CONFIDENTIAL
ATTORNEYS ONLY

000638

CONFIDENTIAL
ATTORNEYS ONLY

## COMPARISON OF FEATURES BETWEEN TECOGEN AND AEGEN SYSTEMS

| Features | Tecogen | Aegen | Aegen Benefits |
|---|---|---|---|
| Engine Type | General Motors | General Motors | - |
| Generator Type | Marathon | Marathon | - |
| Controller | Teconet system | InteliSys controller | More features and control capability as shipped from factory |
| Alarms | Machine shuts off on alarms, no warnings | Warnings provided before they become alarms | Less downtime, warnings provide time for preventive measures |
| Display | Numeric data with alarm codes, difficult to read | Digital display with graphics, easy to read | Ergonomic, easy to use |
| Performance History | Available only if connected to remote computer | Available at the machine through display and remotely | Easier and quicker to review performance and diagnose problems |
| Electrical Noise | Unshielded ribbon cables and circuit boards, ferrites added for noise suppression | Shielded cables and circuit boards, ferrites not needed | Eliminates unnecessary shutdowns from noise and false alarms |
| System Programming | Done only by factory | Can be done at machine by trained staff | More and quicker options to make changes |
| Utility Grade Relay | Beckwith is add-on, installed externally | Beckwith is standard equipment, installed internally | Less susceptible to damage and communication problems |
| Load Shedding Capability | Not available | Controller, capable of 60+ sensors through single communications cable, can control building loads | Additional savings opportunities |
| Engine Governing | Uses mechanical linkages with stepper motor | Governors of America integrated and continuous throttle | Better control for improved efficiency and less maintenance issues |
| Sensors | Custom sensors | Standard GM sensors | Easily available if needed and less expensive |
| Engine Oil Pressure | Analog, only readable visually at gauge on unit | Electronic, readable at display and remotely | Diagnose oil problems earlier, less downtime |
| Exhaust Heat Exchanger | Standard fin tube design | Larger diameter, greater fin spacing | Less clogging, more efficiency over time |
| Gas Regulation | Standard | Larger regulator and fuel mixer, integrated components | Better performance at lower gas pressures |
| Vibration Dampening | Solid rubber isolation mounting | Spring dampening isolation mounting | Less floor vibration |
| Engine Cooling | Standard engine cooling | Distributed isothermal cylinder head cooling | Better engine life and efficiency |

000639

EXHIBIT
#47
8/03/07 WB

# Tecogen and Aegen Thermal Power Comparison

TECOGEN processor and boards:

AEGEN processor:with Beckwith relay











The TECOGEN controller has numeric
display and coded fault messages



The InteliSys® allow users to brows thru
display screen and graphically view all
aspects of system operation. Changes can
be instituted with password identification
to all parameters including building
controls.

CONFIDENTIAL
ATTORNEYS ONLY

001326

# Differences Between Aegen and Tecogen Control Systems

<u>Aegen</u>                                    <u>Tecogen</u>

1. base loading and load following are part of standard software package

2. base loading is standard

2. analog inputs expandable to 64 points as standard

2. analog inputs limited to those on board

3. digital I/O expandable to 112 inputs and 56 outputs as standard

3. digital I/O limited to those on board

4. proprietary control boards and firmware in an industrially hardened enclosure

4. proprietart control boards in a commercial enclosure

5. CANBUS and ModBus are standard communications protocols and are open architecture (available to all)

5. proprietary architecture

6. three modes of starting and closing to the bus: manual, semi-auto, and auto

6. essentially one mode of starting - manual

7. temperature controlled start / stop circuit is an integral part of the cogen

7. temperature controlled start is external and not supplied with the cogen

CONFIDENTIAL
ATTORNEYS ONLY

001327

# Tecogen Ex. 18



**AEGIS ENERGY SERVICES INC.**

413/746-5400 • FAX 413/746-3242
WWW.AEGISENERGYSERVICES.COM

*2097 RIVERDALE STREET, WEST SPRINGFIELD, MA 01089 • P.O. BOX 2511, SPRINGFIELD, MA 01101-2511*

11 August 2004

Mr. Bill Monty ~ Director of Maintenance
JML Care Center Skilled Nursing
184 Ter Heun Drive
Falmouth, MA 02540-2503



Dear Mr. Monty:

We have completed our analysis for JML Care Center Skilled Nursing and have developed a proposal to conserve energy as well as reduce your operating costs utilizing cogeneration. This provides an opportunity to substantially reduce energy expenses by simultaneously producing useable heat and electricity, on-site. The cogenerator will displace energy currently being purchased from the utility company. JML Care Center will have substantial savings in operational costs today, and these savings will increase as utility rates continue to escalate.   With the following system, **annual savings** (after all fuel and maintenance) are projected to be **$34,568.**

Since energy costs are very volatile at this time, we used rates and conditions ($1.40 oil/gal and a projected 10% electric rate increase) that we believe will be in effect for the 1st year of operation. Future natural gas availability would enhance the economics.  Furthermore, a generous conservation rebate of $ 24,582.00 from Keyspan Gas for an Aegis high efficiency system may be available. Aegis will apply for and handle the rebate process on behalf of JML Care Center.

**System Description**

We propose to install a complete 75 kW turnkey cogeneration system at JML Care Center - Falmouth for an installed cost $164,950. *

- ❖ One (1) 75kW cogeneration module
- ❖ One (1) Pump module station
- ❖ Pumps, insulated hydronic distribution and interconnecting heat exchangers to boiler plant and domestic hot water heating.
- ❖ Cogen natural gas piping.
- ❖ Cogen insulated exhaust piping.
- ❖ Electrical interface to building power systems and related electrical devices
- ❖ One (1) 8 x 12 outdoor fiberglass enclosure to be located outside next to boiler room wall on concrete pad
- ❖ All related temperature controls and wiring
- ❖ Basic utility interface
- ❖ Heat dissipation unit
- ❖ Other appurtenances to make the system fully operational.
- ❖ System Startup
- ❖ Professionally engineered as built drawings

*Price valid for 3 months from date of proposal
*Excludes any applicable sales & use tax

JML 00032

## Cogeneration Module

The cogenerator is a quiet (70 d.b.a. at 20 feet), highly efficient, American Made, factory produced and tested unit, which when coupled with the Aegis design operates in parallel with JML Care Center's existing mechanical and electrical systems. In this instance, the outside location will further mitigate sound levels.

Relative to your diesel powered emergency generator, the **cogen unit is significantly quieter**. It consists of a naturally aspirated, natural gas fueled, spark ignited reciprocating engine operating at 1800 rpm, an induction generator, heat recovery equipment, sound attenuating enclosure, electrical switchgear, and solid state controls for automatic and unattended operation. Its heat recovery equipment consists of oil cooler, an engine jacket for heat transfer, exhaust gas manifolds and exhaust gas heat exchangers.

Your system, generating over 600,000 kWh annually, will be integrated into the facilities electrical system and will operate in parallel with the NStar power supply. The cogeneration heat will operate in conjunction with the existing heating distribution systems, and water heating equipment. The integrated control system will insure that the recovered thermal energy will be the first source of heat required by your facility. The hot water produced by the this system will be utilized for domestic hot water and space heat, thereby reducing the use of your current boiler system, and its associated costs. In event of any malfunction, NStar will pick up the additional electric load while your boilers will provide back up hot water and space heating. **JML Care Center will not be without electricity, hot water or heat!**

## Cogenerator Maintenance

Aegis Energy Services will monitor the cogeneration system on a 24-hour, 7-day per week basis to assure it is operating properly and provide prompt and effective service by trained service technicians. The system is supplied with an integrally mounted microprocessor-based control system, for automatic, unattended and remote monitoring operation. The microprocessor has the capability to alert our technical staff in the event of a malfunction. Data from JML Care Center is communicated to Aegis Energy Services corporate headquarters for tracking operations, and provides remote troubleshooting capabilities.

Our maintenance plan also includes on-going energy consulting.  We will evaluate and analyze JML Care Center's energy data monthly, including current utility rate schedules and provide annual reports for the facilities utilization and review.

Aegis Energy Services will provide bumper-to-bumper maintenance to your system for $1.10 machine-running time. This includes all scheduled and unscheduled maintenance, all parts, including engine and generator replacement, and all associated labor costs. **There are no hidden costs with this program.** This comprehensive maintenance program places the responsibility for good maintenance with Aegis Energy Services and represents an insurance policy for JML Care against any unforeseen maintenance costs.

## Summary

The facilities long-term savings are directly related to the extensive life of the cogeneration module and Aegis' comprehensive maintenance program. Through our 19 years of operation, every Aegis designed system ever placed in service is still operating and continues to save money year after year. Our results are demonstrated by the repeated customer use of the cogeneration systems we have engineered, installed and maintain for our clients. We invite you to tour one of our installations and look forward to including JML Care Center on our list of satisfied clients.

Sincerely,


Sales Consultant

**JML 00033**

# Proposal for Cogeneration Services for JML Care Services



## Aegis Energy Services, Inc.
### August 2004

JML 00034



JML 00035



Typical Outdoor Enclosure

08/20/2004

JML 00046



# Aegis Energy Services, Inc.

* Elderly Housing
* Hotels
* Extended Care Facilities
* Colleges, JCC's and YMCA's
* Commercial / Industrial

North Adams Housing Authority *

* Crescent Manor Nursing Home
  Bennington Vermont

* Sweetbrook Nursing Home ■
* MA College of Liberal Arts ■
* Pittsfield YMCA
* Crowne Plaza

* Adams Cheshire Regional School District
* Vietnam Veterans Skating Rink
* Francis Cabot Lowell Mills ■
* Hampshire College ■
  Towers at Chestnut Hill ■
  German Centre Extended Care ■
  Springhouse ■
* Sisters of Providence–Mt. St. Vincent
* Holyoke Soldiers Home
* Holyoke Geriatric Authority
  Willowood Health Care Center *
  * Chestnut Knoll at Glenmeadow

Ocean Shores ■
* Kings Beach Towers
* Applewood Place Apartments
  Country Club Heights
Woburn Y ■    * Wingate at Brighton
  * Williams Federal Building
  * Harbor Point
  * Wentworth College
  * Simmons College
  * Brookline Apartments
  Fenno House ■    ■ Marina Point Bay
      ■ Harbor House

* St. Joseph's Residence
  * Vernon Manor
■ Winsted Housing Authority
  Hartford YMCA ■

■ Roncalli–St. Elizabeth Healthcare
■ Roncalli–Cromwell Crest Convalescent

■ 1st Congregational Church Elderly Housing
■ New Haven Jewish Community Center

Wolcott View Manor ■
Waterbury Extended Care ■
Seymour Housing Authority ■    * Masonic-Ashlar of Newton
Danbury Housing Authority ■    Nelac Properties
  Candid Realty ■    * United Church of Christ Elderly Housing
Bridgeport Jewish Community Center ■  Apple Hill ■  Brantford Hills Health Care
3030 Park Retirement & Nursing Center ■   Washington Heights Apartments
Rotary Housing–Sycamore ■
Prudential Learning Center ■  Rotary Housing–Laurelwood
  ■ Pitney Bowes

  ■ Regis Care Center
  * Wedgewood
  * Tudor City
  * Flushing Manor

JML 00048

# Additional Sites

- **Massachusetts**
  - Harvard Business School (Boston)
  - Mission Park (Boston)
  - Hebrew Rehab (2 sites) (Boston)
  - Orchard Cove (Canton)
  - D'Youville Senior Center (Lowell)
  - Riverside (Medford)
  - Mystic Valley Towers (Medford)
  - Pequot Highlands (Salem)
  - Wingate at Sudbury (Sudbury)
  - Notre Dame Du lac Elderly Housing (Worcester)
  - Christopher House (Worcester)
- **New York**
  - Augustana Lutheran Home (Brooklyn)

13

JML 00049

# Tecogen Ex. 19



# AEGIS ENERGY SERVICES, INC.
# PURCHASE AND INSTALLATION AGREEMENT

This agreement dated as of the Twenty-seventh day of August, 2004 for the turnkey installation of a cogeneration system (System), between Aegis Energy Services Inc. (Seller), 2097 Riverdale Street, West Springfield, MA 01089 and JML Care Center Inc. (Buyer), for installation at JML Care Center Inc., 184 Ter-Heun Drive, Falmouth, MA 02540 (Site).

## SCOPE OF WORK
Turnkey installation of a cogeneration system according to Aegis' proposal dated August 11, 2004 including:
- 75 kW cogeneration system integrated with existing boiler plant;
- Engine heat recovery piping system including heat exchangers, circulation pumps and related equipment for existing heating distribution system and existing domestic hot water system;
- Gas and exhaust piping, electrical interface to building electrical distribution, wiring, and controls.

## EQUIPMENT AND SYSTEMS
Subject to the terms and conditions hereof, Seller shall sell to Buyer and Buyer shall purchase from Seller:

One (1) - 75 kW Cogeneration Module(s) providing 470,000 Btuh/each of heat while utilizing 863 SCFH/each of natural gas as specified.

One (1) Electrical system including all necessary wiring, fuse disconnects with adequate fault duty and the standard electrical/utility interface for connection of the cogeneration system in parallel with utility systems. Electrical wiring of new pumps, heat dissipation unit, and controls. All work to be done in accordance with local and national codes.

One (1) Insulated engine heat recovery piping system including heat exchangers, which transfer heat to existing heating distribution system and existing domestic hot water systems. Related equipment to be supplied includes circulation pumps, circuit setters, insulation, instrumentation, controls, piping and control wiring.

One (1) 8'x12' outdoor enclosure to house the cogeneration unit to be located near building wall.

One (1) Heat dissipation unit capable of rejecting full thermal output of cogeneration system.

One (1) Insulated cogeneration exhaust flue pipe system complete with silencer, cutting and flashing.

One (1) Lot of gas piping from the gas meter to the cogeneration module; complete with valves for shut-off and other protective devices to meet local code requirements.

One (1) Complete set of meters and instrumentation to evaluate performance of the system.

One (1) Set of "as built" drawings of mechanical and electrical systems for System upon acceptance.

## APPLICATION SPECIFICATION

Cogeneration equipment will generate electrical and thermal energy, and will be installed as a system with related components supplied by the Seller.

Electrical energy will supplement service purchased from electric utility. Thermal energy will be used in parallel with existing boilers to provide heat for space heating and domestic hot water. The cogenerator(s) will primarily operate as the first heating stage in response to a system call for heat and domestic hot water. Existing boilers will operate in a supplementary and peaking mode.

When facility heating requirements are greater than 470,000 BTUH and the heating medium less than 180 degrees, the installed system will transfer that amount of heat into the heating distribution when generating 75kW to meet equivalent or greater building load. The thermal output of other equipment and supply of utility electricity will be reduced accordingly.

Host Init.
Aegis Init.
001663

### PURCHASE PRICE
The turnkey cogeneration purchase price is $164,950.
a.  $20,000 plus tax upon execution of the agreement.
b.  $15,000 upon acceptance of drawings.
c.  $94,950 plus tax and permitting in proportional payments, based on delivery of equipment and/or progress of System installation, to be billed monthly and payable upon receipt.
d.  $15,000 plus tax upon startup of system.
e.  $20,000 plus tax upon final acceptance.

All amounts are due and payable on demand with 1-1/2% service charge after 30 days.  Payments will be applied first to all outstanding finance charges, taxes and or permit fees, then to the invoice amount.  Buyer will be responsible for all legal fees associated with the collection of any unpaid balances.

### EQUIPMENT LOCATION
System to be located in the outdoor enclosure.

### INSTALLATION
Seller will perform the following tasks:
a.  Obtain all necessary building permits.
b.  Connect the System to the existing mechanical systems in the boiler room and the main electrical system in the electric room.
c.  All tasks will be performed with proper workmanship, using safe practices and performed during normal working hours.
d.  It is assumed that all existing equipment that Aegis interfaces with is in proper working order.  If required, repair by Seller of existing equipment is subject to Buyer review and will be invoiced on a time and material basis.
e.  It is assumed that all existing electrical, mechanical, plumbing, gas and structural work at the Site is in accordance with all applicable codes and standards and has been inspected by the local inspector.  Repair of any existing item found to be in violation of applicable codes and standards is not included in the Purchase Price.  Buyer, in a timely manner, will repair all violations of existing work that affects the startup and/or final acceptance of the cogeneration system.  If requested, repair by Seller is subject to Buyer review and will be invoiced on a time and material basis.

Buyer will perform the following tasks:
a.  Buyer is responsible for any and all asbestos abatement.
b.  Buyer, when necessary, will seek approval from property owner for Seller's access and installation of this system.
c.  Buyer will coordinate and assist Seller in temporarily isolating public areas while work is being performed.
d.  Buyer will assist Seller in obtaining necessary permits and approvals.

General:
All electrical, plumbing, HVAC and mechanical construction shall be in accordance with the following codes and standards, but in no instance shall the standards be less than the requirements set forth herein.
a.  National Electric Code
b.  National Board of Fire-Underwriters
c.  Building Department
d.  State Department of Public Safety
e.  National Plumbing Codes
f.  Local Governing Codes

Specific:
Seller will be responsible for the following:
a.  All design engineering necessary for the project including "as built" record drawings upon completion of work.
b.  Submittal of all plans to Buyer for approvals.
c.  On site supervision during construction as necessary.
d.  All notification of utilities.
e.  Apply for building permit and licenses. (Town/City of Falmouth).
f.  All piping shall be fully insulated with vapor barrier pipe covering.
g.  All cutting and patching is to match existing structures.
h.  Removal of all job related debris from job site.

001664

Host Init.
Aegis Init.

i.   Startup of unit and training of staff to operate it.

### TIME OF INSTALLATION
Based on an August 27, 2004 contract:

a.   Design Engineering will commence no later than the Thirtieth day of August, and be completed within twenty-one
     (21) days; this includes opportunity for Buyer input and preliminary design approval. Final Buyer review and
     approval to be complete within five (5) days.
b.   Allowing nine (9) days for permits, approvals, etc. physical work would commence on the Fourth day of October,
     2004. The system will be operational no later than the Eighteenth day of November. If manageable, Seller will place
     sections of the system into operation on an as available basis.
c.   System will be turnkey operational by the Thirty-first day of December.

However, due to numerous factors, including the fact that installation may require action by governmental entities, the
time of performance of which may be beyond the control of Seller, Seller makes no representation or warranty as to the
date on which installation of the System will be completed. Seller will not be liable for any delay due to strikes, riots,
non-delivery of acceptable material of suppliers, fire, storm accident or any act of God or any other cause beyond the
reasonable control of Seller.

### RISK OF LOSS
Risk of loss shall pass to Buyer upon delivery of the equipment and materials to the job site. The Buyer shall obtain and
maintain insurance covering the equipment, materials, and assembly as of such delivery.

### EXPRESS WARRANTY
Except as hereinafter set forth, the System is warranted by the Seller for a period of twelve (12) months after
completion to be free from defects in material and workmanship. Equipment is warranted by the manufacturers for a
period of one year and the associated piping and electrical systems will be covered by the standard one year
workmanship warranty with the exception of the cogeneration module which is warranted by the Aegis
Comprehensive Maintenance Program. If Buyer within the warranty period notifies Seller in writing of any claimed
defect in the System, and if after appropriate test inspection by Seller, the System is found by Seller to be not in
conformity with this warranty, Seller will at its option either repair the same or provide a replacement therefore.
Seller's liability on its warranty shall under no circumstances exceed its cost in repairing the Equipment or in
providing a replacement. Immediately after any defects in the System requiring correction become known or should
have been known they are to be reported and confirmed in writing by Buyer to Seller or Seller's designated
representative. The foregoing warranty does not cover, and Seller makes no warranty with respect to any defect not
reported to Seller within the warranty period specified above.

The foregoing warranty does not cover, and Seller makes no warranty with respect to any defect or failure resulting in
whole or in part from:
a.   Accident, abuse, improper operation or negligence by Buyer or any person other than Seller.
b.   War, riots, civil commotion, flood, fire, storm, earthquake, volcanic eruption, any act of God or any event beyond the
     control of Seller.
c.   Buyer's failure to provide scheduled maintenance for the System.
d.   Buyer's failure to keep the System protected from the weather or elements.
e.   Any alteration or addition to or substitution or replacement of any part of the equipment not authorized by Seller.

### LIMITATION ON LIABILITY
Seller's obligation with respect to the equipment and this Agreement is limited exclusively and at Seller's option to repair
or replace defective parts and shall in no event exceed refund of the Purchase Price. In no event shall Seller or its
suppliers be liable for indirect, consequential or special damages, including but not limited to loss of anticipated profits.

### TAXES
The Purchase Price does not include taxes or governmental fees applicable to the System, and Buyer shall be responsible
for and pay all recording, stamp, excise, transfer, sales and use taxes arising on or after execution of this Agreement, in
connection with the sale, installation, or use of the System. Applicable sales tax will be charged accordingly unless Buyer
provides Seller a Certificate of Exemption, satisfactory to Seller, with the execution of this agreement.    Seller agrees to
remit such tax to the appropriate governmental authority.

Page 3

**001665**

Host Init.
Aegis Init.

*ACCESS*
Seller shall, for a period of five years from delivery, have access to and may inspect at all reasonable times the System and Buyer's records relating to the System's operation, load profiles and maintenance service. Seller may use all such information for display, advertising and marketing purposes and for further design, engineering and technical development of its HVAC and cogeneration products. Seller shall have the right upon prior notice and at reasonable times to bring guests to view the System and its operation. Purchaser shall obtain such right of access from any subsequent purchaser or user of the Equipment or owner of any premises on which the Equipment may be installed.

*CONFIDENTIALITY*
Any drawings, specifications, prints, or other information provided by Seller to Buyer pertaining to the System as well as the System itself, are strictly confidential. Buyer shall not, without the prior written consent of Seller, which consent shall not be unreasonably withheld, for the period of five (5) years from the date thereof, use any such information for its own benefit other than in connection with the operation of the System by Buyer for the purpose of producing energy or disclose to any third party any of the foregoing. The above limitations on disclosure and use of confidential information shall not apply to the extent that Buyer demonstrates to Seller that such information is already in Buyer's possession or is or becomes public other than through Buyer's wrongful act, or is lawfully obtained from a third party. Buyer shall impose the obligation of confidentiality contained herein in Buyer's agreements with any subsequent purchaser.

*ACCEPTANCE*
Aegis Energy Services Inc.
2097 Riverdale Street
West Springfield, MA 01089

By: *[signature]*

Title: *President*

Date: *Oct 1, 04*

*ACCEPTANCE*
JML Care Center, Inc.
184 Ter-Heun Drive
Falmouth, MA 02540

By: *[signature]*

Title: *PRES/CEO*

Date: *10/1/04*

**001666**

Host Init.
Aegis Init.

# Tecogen Ex. 20

# O'BRIEN & LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

Transcript of the Testimony of:

# Robert Olmstead

# August 24, 2007

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Julie A. Mercier  25454

**18**

1  state, as I recall. Maybe Vermont. I remember
2  going to Vermont once but nothing panned out
3  there.
4      Q.  Anything in New York?
5      A.  No. No, there were other people
6  involved in New York State.
7      Q.  How did you become aware of potential
8  sale opportunities?
9      A.  Through leads and through cold
10  calling and from the existing file base, the
11  previous proposals.
12      Q.  Did you ever receive a lead from a
13  Tecogen employee while you were a salesman for
14  Aegis?
15      A.  Yes.
16      Q.  Who would that be?
17      A.  Jeff Glick.
18      Q.  What leads did you receive?
19      A.  I don't recall.
20      Q.  Was Whitney Place one of those leads?
21      A.  No.
22      Q.  Was Bradley Home one of those leads?
23      A.  No.
24      Q.  When Mr. Glick gave you a lead, how

**19**

1  did he go about doing that?
2      A.  Either by e-mail or verbally. I
3  don't think I ever remember getting faxes from
4  him. Maybe I did.
5      Q.  To your knowledge did any of the
6  leads that Mr. Glick gave you ever come to
7  fruition of a sale of a cogen?
8      A.  I don't recall if any did or not.
9      Q.  About when do you think Mr. Glick
10  gave you a lead? Can you put a date to that?
11      A.  No.
12      Q.  Once you're given a lead, what do you
13  do with it?
14      A.  Qualify it.
15      Q.  What does that mean?
16      A.  Determine whether or not the site has
17  potential for cogeneration.
18      Q.  How do you go about doing that?
19      A.  It's a matter of evaluating the size
20  of the building, type of heating system and
21  electric system installed in it.
22      Q.  So you'll contact a site
23  representative to set up, I'm assuming, a time
24  to go down there and meet with them?

**20**

1      A.  Yes.
2      Q.  Have you ever tried to sell an Aegen
3  module?
4      A.  No.
5      Q.  Were you ever at all responsible for
6  selling Aegen modules?
7      A.  Yes -- no.
8      Q.  Okay. I'm going to get a little
9  deeper into that, make sure I understand what
10  yes, no means.
11      A.  Sure.
12      Q.  It appears you were a salesman for
13  Tecogen modules while you were a representative
14  of Aegis, correct?
15      A.  Yes.
16      Q.  Any time during your tenure at Aegis
17  were you asked to sell an Aegen cogeneration
18  module?
19      A.  No.
20      Q.  Did you ever offer an Aegen
21  cogeneration module at any of the sites where
22  you were a lead salesman or representative?
23      A.  The only experience that I had with
24  the Aegen module in the sales process was with

**21**

1  Whitney Place, but Whitney Place was not a
2  sale.
3      Q.  I'm going to hold the questions for
4  Whitney Place. We're going to get to Whitney
5  Place in more detail later on.
6      A.  Fine.
7      Q.  Any other site you can think of where
8  you had any kind of interaction with the
9  outside world customers in regards to
10  promoting, marketing or selling Aegen modules?
11      A.  No.
12      Q.  So it would just to your knowledge be
13  Whitney Place?
14      A.  Yes.
15      Q.  Did you ever try to sway a customer
16  from buying a Tecogen and buying an Aegen
17  module instead?
18      A.  No. Well, if we're talking about
19  Whitney Place, that would be the instance.
20      Q.  Okay. So at Whitney Place, I don't
21  want to get into it at this point in too much
22  detail, but when I said, try to sway a customer
23  from buying a Tecogen and buying a Aegen
24  instead, could you give me a little more detail

6 (Pages 18 to 21)

Robert Olmstead 8-24-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

22

1  on what you did to sway a customer?
2      A.   By the time the installation for
3  Whitney Place became manifest, Aegis had
4  developed the Aegen module and was at the place
5  where it was ready to place that equipment into
6  service, so at the time of the closing of the
7  contract, I was instructed that we were going
8  to install an Aegen rather than a Tecogen
9  module at that location, and I communicated
10  that information to the client.
11      Q.   Who instructed you?
12      A.   Either Spiro or Lee.
13      Q.   What did you communicate to the
14  client?
15      A.   That Aegis had developed a
16  cogenerator that it was going to install on
17  that site in lieu of the Tecogen module.
18      Q.   Any other instance where you were
19  either instructed or on your own initiative --
20  strike that.
21          Any other instance where you tried
22  to sway a customer from a Tecogen cogen to
23  purchase or otherwise use an Aegen cogeneration
24  module?

23

1      A.   No.
2      Q.   So Whitney Place is the only one to
3  your knowledge?
4      A.   Yes.
5      Q.   About when did this activity take
6  place?  Let me be more specific.  When were you
7  instructed by either Spiro or Lee to replace
8  the Tecogen with the Aegen module for Whitney
9  Place?
10      A.   It was just prior to the closing of
11  the sale.
12      Q.   Did you object in any way?
13      A.   No.
14      Q.   Did you have any misgivings?
15      MR. DOMIAN:  Objection.
16      A.   Yes.
17      Q.   What were they?
18      A.   What I understood was that we were
19  under agreement with Tecogen to represent them,
20  and so it seemed a conflict of interest in some
21  ways to promote the alternate technology.
22      Q.   Did you express this to Spiro or Lee?
23      A.   They understood that.
24      Q.   How did they understand it?

24

1      A.   They were dealing with the same
2  tensions.
3      Q.   Which tensions were those?
4      A.   The tension of developing an
5  alternate cogeneration module while being a
6  representative of Tecogen.
7      Q.   Aside from your sales and marketing
8  efforts, to your knowledge did anyone else at
9  Aegis ever try to deter a prospective customer
10  from purchasing a Tecogen cogen in order to
11  have Aegis offer them a Aegen cogen?
12      A.   There were other installations of the
13  Aegen module subsequent to Whitney Place, but I
14  don't have direct knowledge.
15      Q.   Do you know where those sites were?
16      A.   There was one on Cape Cod, I
17  believe.  I'm not sure about where others were
18  located.  I'm thinking somewhere in New York
19  State maybe, but I don't know.
20      Q.   You wouldn't happen to know the name
21  of the Cape Cod site do you?
22      A.   I think it was JML, called JML.
23      Q.   Did you mention the JML site to
24  Mr. Panora or Mr. Glick in those conversations

25

1  we talked about before where they asked you?
2      A.   I don't recall.  I could have.  I
3  could have.
4      Q.   To your knowledge were there any
5  other sites?
6      A.   To my knowledge were there any other
7  sites that?
8      Q.   That Aegis tried to deter a
9  prospective customer from purchasing a Tecogen
10  and in its place purchasing an Aegen cogen
11  module?
12      A.   I'm not -- I'm not aware.  I kind
13  of -- I object to the word "deter" because I'm
14  not sure that that was the...
15      Q.   Sway was a word you were not
16  objecting to, so I mean the same thing in the
17  sense that they tried to convince a customer
18  not to buy a Tecogen and buy a Aegen instead.
19      A.   Well, the position was that they were
20  selling cogeneration systems, and, I believe,
21  the stand that they were taking was that this
22  is the equipment that we're selling now, so it
23  wasn't as if -- it wasn't any deterrence that
24  was involved.  It was just a shift in what was

7 (Pages 22 to 25)

# Tecogen Ex. 21

# TECOGEN



*The Driving Force in Cooling*

45 First Ave.
PO Box 9046
Waltham, !

**F A ꓘ**                      **T**

| Post-it® Fax Note 7671 | Date | # of pages▶ *12* |
|---|---|---|
| To *Brian Willemsen* | From *Jeff Glick* | |
| Co./Dept. *R.L. Kistler* | Co. | |
| Phone # — | Phone # | |
| Fax # *716 – 436-6606* | Fax # | |

**DATE:**    <u>1/9/02</u>          **FROM:**    **JEFFREY GLICK**

                                      **PHONE:** <u>781-622-1072</u>

**TO:**      **RAY HICKEY**         **FAX:**     <u>781-622-1025</u>

**COMPANY:**   **R.L. KISTLER**       **RE:**      <u>CHEMUNG COUNTY NURSING</u>

**FAX:**     <u>518-884-0614</u>        **CC:**       <u>              </u>

Number of pages including cover sheet: 12

## *Message*

Ray,

**Here it is!!!**

I have finally done it. I looked at various numbers of units installed at the Chemung County Nursing facility. Based on the natural gas usage figures you provided me I have been able to calculate expected operating hours and savings. I have had to make a couple of assumptions that I have listed below.

- Installed turnkey price of $1,800/Kw (real rough guess)
- Dump radiator used
- 1000 therms per month of gas for non hot water use (cooking and drying)
- Demand calculation based on n-1 rule (Murphy's Law – one unit down during peak period)

I have sent you my output for both the 4 module and 5 module cases. Along with the summary sheets I have sent you a cashflow analysis for both of these cases.

I have also attached a simplified spreadsheet output I use when the run hours are known. In this case I ran my more elaborate program to get the 5723 hours per module number.

| CASE | RUN HOURS PER UNIT USING HEAT RECOVERY | RUN HOURS PER UNIT USING DUMP | TOTAL SAVINGS | ESTIMATED INSTALLED COST | PAYBACK YEARS |
|---|---|---|---|---|---|
| 1 Module | 8585 | 0 | $40,951 | $135,000 | 3.3 |
| 2 Modules | 7884 | 701 | $86,718 | $270,000 | 3.1 |
| 3 Modules | 6729 | 1856 | $120,683 | $405,000 | 3.4 |
| 4 Modules | 5723 | 2862 | $147,328 | $540,000 | 3.7 |
| 5 Modules | 4835 | 3750 | $167,893 | $675,000 | 4.0 |
| 6 Modules | 4038 | 4547 | $183,220 | $810,000 | 4.4 |

Give me a call if you have any questions or if you want me to make any changes.

Regards,

Jeff Glick

# TECOGEN COGENERATION

**Facility:** CHEMUNG COUNTY NURSING FACILITY
**Location:** CHEMUNG COUNTY, NY

## INPUT DATA

| MONTH | SEASON | TOTAL GAS THERMS | NON HEATING THERMS | | |
|-------|--------|------------------|--------------------|--|--|
| | | | | TECOGEN CM-30s INSTALLED | 0 |
| | | | | TECOGEN CM-60s INSTALLED | 0 |
| | | | | TECOGEN CM-75s INSTALLED | 4 |
| | | | | TECOGEN CM-225G INSTALLED | 0 |
| JANUARY | W | 30314 | 1000 | TECOGEN CM-225D INSTALLED | 0 |
| FEBRUARY | W | 24648 | 1000 | LOCATION CLIMATE:(WARM=0.1/COOL=0.25) | 25% |
| MARCH | W | 20464 | 1000 | INSTALLED COST (total or - $/kW) | ($1,800) |
| APRIL | S | 16306 | 1000 | BOILER RECOVERY EFFICIENCY | 70% |
| MAY | S | 11512 | 1000 | WATER HEATER RECOVERY EFF. (0 IF NONE) | 0% |
| JUNE | S | 9919 | 1000 | ELECTRIC DEMAND RATE (SUMMER) ($/kW) | $12.00 |
| JULY | S | 9813 | 1000 | ELECTRIC DEMAND RATE (WINTER) ($/kW) | $12.00 |
| AUGUST | S | 9898 | 1000 | ELECTRIC USAGE RATE (SUMMER) ($/kWh) | $0.09800 |
| SEPTEMBER | S | 11803 | 1000 | ELECTRIC USAGE RATE (WINTER) ($/kWh) | $0.09800 |
| OCTOBER | W | 15977 | 1000 | BOILER GAS RATE (SUMMER) ($/THERM) | $0.6100 |
| NOVEMBER | W | 20872 | 1000 | BOILER GAS RATE (WINTER) ($/THERM) | $0.6100 |
| DECEMBER | W | 26000 | 1000 | COGENERATION GAS RATE (SUMMER) ($/THERM) | $0.6100 |
| | | | | COGENERATION GAS RATE (WINTER) ($/THERM) | $0.6100 |
| | | | | STANDBY CHARGE ($/YR) | $0 |
| | | | | DIESEL FUEL RATE ($/GALLON) | $0.00 |
| | | | | DISCOUNT (% OF ELEC RATE) | 0% |
| | | | | DUMP RADIATOR (YES=Y / NO=N) | Y |

## OUTPUT DATA

| ANNUAL REVENUES | | | | | |
|-----------------|--|--|--|--|--|
| | | INSTALLED KW | 300 | | |
| | | ANNUAL SAVINGS | $109,202 | | |
| Hot Water | $62,288 | | | | |
| Heating | $35,463 | OPERATING HOURS | 5723 | Per Module | |
| Electric | $168,261 | | | | |
| | | DEMAND SAVINGS | $32,400 | 225 | kW |
| **ANNUAL COSTS** | | **TOTAL SAVINGS** | $141,602 | | |
| | | HOURLY SAVINGS | $24.74 | | |
| Gas/Diesel | $128,194 | | | | |
| Maint. | $28,616 | INSTALLED COSTS | $540,000 | 1800 | $/kW |
| Standby | $0 | | | | |
| | | SIMPLE PAYBACK (YEARS) | 3.8 | | |

## DUMP RADIATOR OUTPUT DATA

| ANNUAL REVENUES | | | | |
|-----------------|--|--|--|--|
| Electric (Dump Rad) | $84,132 | ANNUAL SAVINGS (Dump) | $5,726 | |
| **ANNUAL COSTS** | | OPERATING HOURS (Dump) | 2862 | |
| Gas (Dump Rad) | $64,098 | | | |
| Maint. (Dump Rad) | $14,308 | SIMPLE PAYBACK (YEARS) | 3.7 | |
| | | (Cogen + Dump) | | |

177,526

T 0225

CHEMUNG COUNTY NURSING FACILITY

| MONTH | COGENERATION MODE OPERATION | | | | | | DUMP MODE OPERATION | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | HOT WATER REVENUE | HEATING REVENUE | ELECTRIC REVENUE | GAS COST | MAINT. COST | COGEN SAVINGS | ELECTRIC REVENUE | GAS COST | MAINT. COST | DUMP SAVINGS |
| JANUARY | $5,788 | $6,666 | $21,436 | $16,332 | $3,646 | $13,912 | $0 | $0 | $0 | $0 |
| FEBRUARY | $5,788 | $5,461 | $19,362 | $14,751 | $3,293 | $12,566 | $0 | $0 | $0 | $0 |
| MARCH | $5,788 | $4,544 | $17,784 | $13,549 | $3,025 | $11,542 | $3,652 | $2,782 | $621 | $249 |
| APRIL | $4,630 | $3,488 | $13,974 | $10,646 | $2,377 | $9,069 | $6,771 | $5,158 | $1,151 | $461 |
| MAY | $4,630 | $827 | $9,393 | $7,157 | $1,598 | $6,096 | $12,043 | $9,175 | $2,048 | $820 |
| JUNE | $4,573 | $0 | $7,871 | $5,997 | $1,339 | $5,108 | $12,873 | $9,808 | $2,189 | $876 |
| JULY | $4,538 | $0 | $7,811 | $5,951 | $1,328 | $5,069 | $13,626 | $10,381 | $2,317 | $927 |
| AUGUST | $4,561 | $0 | $7,851 | $5,982 | $1,335 | $5,095 | $13,585 | $10,350 | $2,310 | $925 |
| SEPTEMBER | $4,630 | $988 | $9,671 | $7,368 | $1,645 | $6,277 | $11,073 | $8,436 | $1,883 | $754 |
| OCTOBER | $5,788 | $2,053 | $13,497 | $10,283 | $2,295 | $8,760 | $7,939 | $6,049 | $1,350 | $540 |
| NOVEMBER | $5,788 | $4,771 | $18,174 | $13,846 | $3,091 | $11,795 | $2,571 | $1,958 | $437 | $175 |
| DECEMBER | $5,788 | $6,666 | $21,436 | $16,332 | $3,646 | $13,912 | $0 | $0 | $0 | $0 |
| | $62,288 | $35,463 | $168,261 | $128,194 | $28,616 | $109,202 | $84,132 | $64,098 | $14,308 | $5,726 |

T 0226

# TECOGEN COGENERATION

## CASHFLOW PROJECTION

Date: 01/09/02
Site Name: CHEMUNG COUNTY NURSING FACILITY
Location: CHEMUNG COUNTY, NY

### ECONOMIC INFORMATION

| Debt | 100% |
|---|---|
| Finance/Discount Rate | 7.25% |
| Loan Term | 7 Years |
| Lease Payment | $8,216 per month |
| Year Installed | 2002 |
| Cogen. Fuel Inflation | 3% |
| Electric Inflation Rate | 4% |
| Maint. Infl. Rate | 3% |
| Displaced Fuel Infl. Rate | 3% |
| State and Federal Taxes | 0% |

| Average Electric Rate: | $0.0980 /kWh |
|---|---|
| SIMPLE PAYBACK | 3.7 Years |
| Model CM-30 #of units: | 0 |
| Model CM-60 #of units: | 0 |
| Model CM-75 #of units: | 4 |
| Total Installed kW: | 300 |
| Total Installed Cost: | $540,000 |

| Year of Operation | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Calendar Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| **ANNUAL REVENUE** | | | | | | | | | | | | | | | |
| Electric Energy | $252,393 | $262,489 | $272,988 | $283,908 | $295,264 | $307,075 | $319,358 | $332,132 | $345,417 | $359,234 | $373,603 | $388,548 | $404,090 | $420,253 | $437,063 |
| Electric Demand | $32,400 | $33,696 | $35,044 | $36,446 | $37,903 | $39,420 | $40,996 | $42,636 | $44,342 | $46,115 | $47,960 | $49,878 | $51,873 | $53,948 | $56,106 |
| Hot Water | $97,752 | $100,684 | $103,705 | $106,816 | $110,020 | $113,321 | $116,720 | $120,222 | $123,829 | $127,544 | $131,370 | $135,311 | $139,370 | $143,551 | $147,858 |
| **ANNUAL COSTS** | | | | | | | | | | | | | | | |
| Fuel Expenses | $192,293 | $198,061 | $204,003 | $210,123 | $216,427 | $222,920 | $229,607 | $236,496 | $243,591 | $250,898 | $258,425 | $266,178 | $274,163 | $282,388 | $290,860 |
| O&M Costs | $42,924 | $44,212 | $45,538 | $46,904 | $48,311 | $49,761 | $51,254 | $52,791 | $54,375 | $56,006 | $57,686 | $59,417 | $61,199 | $63,035 | $64,926 |
| **OPERATING SAVINGS** | $147,328 | $154,596 | $162,196 | $170,142 | $178,449 | $187,135 | $196,214 | $205,704 | $215,622 | $225,989 | $236,822 | $248,142 | $259,971 | $272,329 | $285,241 |
| | | | | | | | | | | | | | | | |
| Loan Principal Begin | $540,000 | $478,540 | $412,473 | $341,454 | $265,111 | $183,046 | $94,829 | | | | | | | | |
| Loan Principal End | $478,540 | $412,473 | $341,454 | $265,111 | $183,046 | $94,829 | $0 | | | | | | | | |
| Principal Payment | $61,460 | $66,067 | $71,019 | $76,343 | $82,065 | $88,217 | $94,829 | | | | | | | | |
| Interest Payment | $37,134 | $32,527 | $27,575 | $22,252 | $16,529 | $10,378 | $3,765 | | | | | | | | |
| Total Loan Payment | $98,594 | $98,594 | $98,594 | $98,594 | $98,594 | $98,594 | $98,594 | | | | | | | | |
| Months on Note | 72 | 60 | 49 | 36 | 24 | 12 | 0 | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Depreciation Allowance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | | | | |
| Pretax Profits | $110,194 | $122,068 | $134,820 | $147,890 | $161,920 | $176,757 | $192,448 | $205,704 | $215,622 | $225,989 | $236,822 | $248,142 | $259,971 | $272,329 | $285,241 |
| Taxes on Profits | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| After Tax Profits | $110,194 | $122,068 | $134,820 | $147,890 | $161,920 | $176,757 | $192,448 | $205,704 | $215,622 | $225,989 | $236,822 | $248,142 | $259,971 | $272,329 | $285,241 |
| | | | | | | | | | | | | | | | |
| Cashflow | $48,734 | $56,001 | $63,601 | $71,547 | $79,855 | $88,540 | $97,619 | $205,704 | $215,622 | $225,989 | $236,822 | $248,142 | $259,971 | $272,329 | $285,241 |
| | | | | | | | | | | | | | | | |
| CUMULATIVE CASHFLOW | $48,734 | $104,735 | $168,336 | $239,883 | $319,739 | $408,279 | $505,898 | $711,602 | $927,224 | $1,153,213 | $1,390,034 | $1,638,176 | $1,898,147 | $2,170,476 | $2,455,718 |

T 0227

# TECOGEN COGENERATION

Facility:   CHEMUNG COUNTY NURSING FACILITY
Location:   CHEMUNG COUNTY, NY

## INPUT DATA

| MONTH | SEASON | TOTAL GAS THERMS | NON HEATING THERMS | | |
|-------|--------|------------------|--------------------|---|---|
| JANUARY | W | 30314 | 1000 | TECOGEN CM-30s INSTALLED | 0 |
| FEBRUARY | W | 24648 | 1000 | TECOGEN CM-60s INSTALLED | 0 |
| MARCH | W | 20464 | 1000 | TECOGEN CM-75s INSTALLED | 5 |
| APRIL | S | 16308 | 1000 | TECOGEN CM-225G INSTALLED | 0 |
| MAY | S | 11512 | 1000 | TECOGEN CM-225D INSTALLED | 0 |
| JUNE | S | 9919 | 1000 | LOCATION CLIMATE:(WARM=0.1/COOL=0.25) | 25% |
| JULY | S | 9813 | 1000 | INSTALLED COST (total or - $/kW) | ($1,800) |
| AUGUST | S | 9898 | 1000 | BOILER RECOVERY EFFICIENCY | 70% |
| SEPTEMBER | S | 11803 | 1000 | WATER HEATER RECOVERY EFF. (0 IF NONE) | 0% |
| OCTOBER | W | 15977 | 1000 | ELECTRIC DEMAND RATE (SUMMER) ($/kW) | $12.00 |
| NOVEMBER | W | 20872 | 1000 | ELECTRIC DEMAND RATE (WINTER) ($/kW) | $12.00 |
| DECEMBER | W | 26000 | 1000 | ELECTRIC USAGE RATE (SUMMER) ($/kWh) | $0.09800 |
| | | | | ELECTRIC USAGE RATE (WINTER) ($/kWh) | $0.09800 |
| | | | | BOILER GAS RATE (SUMMER) ($/THERM) | $0.6100 |
| | | | | BOILER GAS RATE (WINTER) ($/THERM) | $0.6100 |
| | | | | COGENERATION GAS RATE (SUMMER) ($/THERM) | $0.6100 |
| | | | | COGENERATION GAS RATE (WINTER) ($/THERM) | $0.6100 |
| | | | | STANDBY CHARGE ($/YR) | $0 |
| | | | | DIESEL FUEL RATE ($/GALLON) | $0.00 |
| | | | | DISCOUNT (% OF ELEC RATE) | 0% |
| | | | | DUMP RADIATOR (YES=Y / NO=N) | Y |

## OUTPUT DATA

| ANNUAL REVENUES | | | | |
|---|---|---|---|---|
| | | INSTALLED KW | 375 | |
| | | ANNUAL SAVINGS | $115,314 | |
| Hot Water | $62,288 | OPERATING HOURS | 4835 | Per Module |
| Heating | $40,934 | | | |
| Electric | $177,678 | DEMAND SAVINGS | $43,200 | 300 kW |
| | | **TOTAL SAVINGS** | **$158,514** | |
| ANNUAL COSTS | | HOURLY SAVINGS | $32.79 | |
| Gas/Diesel | $135,369 | INSTALLED COSTS | $675,000 | 1800 $/kW |
| Maint. | $30,217 | | | |
| Standby | $0 | SIMPLE PAYBACK (YEARS) | 4.3 | |

## DUMP RADIATOR OUTPUT DATA

| ANNUAL REVENUES | | | | |
|---|---|---|---|---|
| Electric (Dump Rad) | $137,813 | ANNUAL SAVINGS (Dump) | $9,379 | |
| ANNUAL COSTS | | OPERATING HOURS (Dump) | 3750 | |
| Gas (Dump Rad) | $104,997 | | | |
| Maint. (Dump Rad) | $23,438 | SIMPLE PAYBACK (YEARS) | 4.0 | |
| | | (Cogen + Dump) | | |

CHEMUNG COUNTY NURSING FACILITY

| | COGENERATION MODE OPERATION | | | | | | DUMP MODE OPERATION | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| MONTH | HOT WATER REVENUE | HEATING REVENUE | ELECTRIC REVENUE | GAS COST | MAINT. COST | COGEN SAVINGS | ELECTRIC REVENUE | GAS COST | MAINT. COST | DUMP SAVINGS |
| JANUARY | $5,788 | $9,779 | $26,795 | $20,415 | $4,557 | $17,390 | $0 | $0 | $0 | $0 |
| FEBRUARY | $5,788 | $6,867 | $21,782 | $16,595 | $3,704 | $14,137 | $2,420 | $1,844 | $412 | $165 |
| MARCH | $5,788 | $4,544 | $17,784 | $13,549 | $3,025 | $11,542 | $9,011 | $6,865 | $1,532 | $613 |
| APRIL | $4,630 | $3,488 | $13,974 | $10,646 | $2,377 | $9,069 | $11,957 | $9,110 | $2,033 | $814 |
| MAY | $4,630 | $827 | $9,393 | $7,157 | $1,598 | $6,096 | $17,402 | $13,258 | $2,959 | $1,184 |
| JUNE | $4,573 | $0 | $7,871 | $5,997 | $1,339 | $5,108 | $18,060 | $13,759 | $3,071 | $1,229 |
| JULY | $4,538 | $0 | $7,811 | $5,951 | $1,328 | $5,069 | $18,985 | $14,464 | $3,229 | $1,292 |
| AUGUST | $4,561 | $0 | $7,851 | $5,982 | $1,335 | $5,095 | $18,944 | $14,433 | $3,222 | $1,289 |
| SEPTEMBER | $4,630 | $988 | $9,671 | $7,368 | $1,645 | $6,277 | $16,259 | $12,388 | $2,765 | $1,107 |
| OCTOBER | $5,788 | $2,053 | $13,497 | $10,283 | $2,295 | $8,760 | $13,298 | $10,132 | $2,262 | $905 |
| NOVEMBER | $5,788 | $4,771 | $18,174 | $13,846 | $3,091 | $11,795 | $7,757 | $5,910 | $1,319 | $528 |
| DECEMBER | $5,788 | $7,617 | $23,074 | $17,579 | $3,924 | $14,975 | $3,721 | $2,835 | $633 | $253 |
| | $62,288 | $40,934 | $177,678 | $135,369 | $30,217 | $115,314 | $137,813 | $104,997 | $23,438 | $9,379 |

T 0229

# TECOGEN COGENERATION

## CASHFLOW PROJECTION

Date: 01/09/02
Site Name: CHEMUNG COUNTY NURSING FACILITY
Location: CHEMUNG COUNTY, NY

### ECONOMIC INFORMATION

| | |
|---|---|
| Debt | 100% |
| Finance/Discount Rate | 7.25% |
| Loan Term | 7 Years |
| Lease Payment | $10,270 per month |
| Year Installed | 2002 |
| Cogen. Fuel Inflation | 3% |
| Electric Inflation Rate | 4% |
| Maint. Infl. Rate | 3% |
| Displaced Fuel Infl. Rate | 3% |
| State and Federal Taxes | 0% |

| | |
|---|---|
| Average Electric Rate: | $0.0980 /kWh |
| SIMPLE PAYBACK | 4.0 Years |
| Model CM-30 #of units: | 0 |
| Model CM-60 #of units: | 0 |
| Model CM-75 #of units: | 5 |
| Total Installed kW: | 375 |
| Total Installed Cost: | $675,000 |

| Year of Operation | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Calendar Year** | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| **ANNUAL REVENUE** | | | | | | | | | | | | | | | |
| Electric Energy | $315,491 | $328,111 | $341,235 | $354,885 | $369,080 | $383,844 | $399,197 | $415,165 | $431,772 | $449,043 | $467,004 | $485,685 | $505,112 | $525,316 | $546,329 |
| Electric Demand | $43,200 | $44,928 | $46,725 | $48,594 | $50,538 | $52,559 | $54,662 | $56,848 | $59,122 | $61,487 | $63,947 | $66,504 | $69,165 | $71,931 | $74,808 |
| Hot Water | $103,222 | $106,319 | $109,509 | $112,794 | $116,178 | $119,663 | $123,253 | $126,951 | $130,759 | $134,682 | $138,722 | $142,884 | $147,171 | $151,586 | $156,133 |
| **ANNUAL COSTS** | | | | | | | | | | | | | | | |
| Fuel Expenses | $240,366 | $247,577 | $255,004 | $262,654 | $270,534 | $278,650 | $287,009 | $295,620 | $304,488 | $313,623 | $323,032 | $332,723 | $342,704 | $352,985 | $363,575 |
| O&M Costs | $53,655 | $55,265 | $56,923 | $58,630 | $60,389 | $62,201 | $64,067 | $65,989 | $67,969 | $70,008 | $72,108 | $74,271 | $76,499 | $78,794 | $81,158 |
| **OPERATING SAVINGS** | $167,893 | $176,517 | $185,543 | $194,989 | $204,873 | $215,215 | $226,036 | $237,356 | $249,196 | $261,581 | $274,534 | $288,079 | $302,244 | $317,054 | $332,538 |
| Loan Principal Begin | $675,000 | $598,175 | $515,591 | $426,817 | $331,389 | $228,807 | $118,537 | | | | | | | | |
| Loan Principal End | $598,175 | $515,591 | $426,817 | $331,389 | $228,807 | $118,537 | $0 | | | | | | | | |
| Principal Payment | $76,825 | $82,584 | $88,774 | $95,428 | $102,582 | $110,271 | $118,537 | | | | | | | | |
| Interest Payment | $46,418 | $40,659 | $34,469 | $27,815 | $20,661 | $12,972 | $4,706 | | | | | | | | |
| Total Loan Payment | $123,243 | $123,243 | $123,243 | $123,243 | $123,243 | $123,243 | $123,243 | | | | | | | | |
| Months on Note | 72 | 60 | 48 | 36 | 24 | 12 | 0 | | | | | | | | |
| Depreciation Allowance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Pretax Profits | $121,475 | $135,857 | $151,074 | $167,174 | $184,212 | $202,243 | $221,329 | $237,356 | $249,196 | $261,581 | $274,534 | $288,079 | $302,244 | $317,054 | $332,538 |
| Taxes on Profits | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| After Tax Profits | $121,475 | $135,857 | $151,074 | $167,174 | $184,212 | $202,243 | $221,329 | $237,356 | $249,196 | $261,581 | $274,534 | $288,079 | $302,244 | $317,054 | $332,538 |
| Cashflow | $44,650 | $53,274 | $62,300 | $71,746 | $81,630 | $91,972 | $102,793 | $237,356 | $249,196 | $261,581 | $274,534 | $288,079 | $302,244 | $317,054 | $332,538 |
| **CUMULATIVE CASHFLOW** | $44,650 | $97,924 | $160,224 | $231,969 | $313,599 | $405,572 | $508,364 | $745,720 | $994,916 | $1,256,497 | $1,531,031 | $1,819,111 | $2,121,355 | $2,438,408 | $2,770,946 |

# TECOGEN Cogeneration Economic Analysis

**For:**       CHEMUNG COUNTY NURSING FACILITY

**Attn:**      Ray Hickey - R.L. Kistler

**System:**    Four (4) TECOGEN CM-75 Cogeneration Modules

**By:**        Jeffrey Glick
               TECOGEN
               45 First Avenue
               Waltham, MA  02454
               ph: 781-622-1072 / fax: 781-622-1002

**Date:**      1/9/2002

TECOGEN Cogeneration Economic Analysis   OUTPUT    1/9/2002

# REVENUES

## ELECTRIC SAVINGS

**Energy:**

75 kW/module $\times$ 4 module(s) $\times$ 1 net after "parasitics" =

300 net kW output $\times$ $0.0980 /kWh avg displaced energy chg

$/HR $29.40 / hr $\times$ HRS/YR 8585 hrs/yr (total run-time) = $/YR $252,399 /yr

**Demand:**

75 kW/module $\times$ 3 module(s) available $\times$ 1 net after "parasitics" =

225 net kW available for demand savings $\times$ $12.00 /kW-mo $\times$ 12 mos/yr expected =

3.77 / hr $\times$ 8585 hrs/yr = 32,400 /yr

## THERMAL SAVINGS

**Displacing Boiler Gas Use:**

$$\frac{4.90 \ \text{th/hr/ module} \times 4 \ \text{module(s)} \times \$0.61 \text{/th boiler gas rate}}{0.70 \ \text{boiler effy.}}$$

17.08 / hr $\times$ 5723 hrs/yr (when heat used) = 97,749 /yr

**Displacing Electric Chiller with Absorption Chiller(s):**

0 tons cooling (total) $\times$ 0 kW/ton electric chiller efficiency = 0 kW reduction

Energy Revenue: 0 kW $\times$ $0.0980 /kWh $\times$ = n/a / hr $\times$ 0 hrs/yr = n/a /yr

Demand Revenue: 0 kW $\times$ $12.00 /kW-mo $\times$ 0 mos/yr operation expected = n/a / hr $\times$ 0 hrs/yr (running absorbers) = n/a /yr

**TOTAL REVENUES**    $50.25 /hr    $382,548 /yr

T 0232

## COSTS

### FUEL:

9.18 th/hr cogen input  x  4 module(s)  x  $0.61 /th effective cogen gas rate

| | $/HR | x | HRS/YR | | $/YR |
|---|---|---|---|---|---|
| = | $22.40 /hr | x | 8585 hrs/yr | = | $192,297 /yr |

### MAINTENANCE:

On Cogen Module(s):  = 5.00 /hr  x  8585 hrs/yr  =  42,925 /yr
On "System":  = 0.00 /hr  x  8585 hrs/yr  =  0 /yr

### UTILITY CHARGES:

Stand-by Charge:  75 kW/module  x  4 module(s)  x  $0.00 /kW-mo  x  0 mos/yr  =  n/a /hr  x  8585 hrs/yr  =  0 /yr

"CTC" Charge:  75 kW/module  x  4 module(s)  x  $0.0000 /kWh CTC charge  =  0.00 /hr  x  8585 hrs/yr  =  0 /yr
(only if applicable)

**TOTAL COSTS:  $22.40 /hr  =  $235,222 /yr**

T 0233

TECOGEN Cogeneration Economic Analysis   OUTPUT      1/9/2002



**CONCLUSIONS**

**NET SAVINGS** = REVENUES = $382,548 /yr
COSTS = 235,222 /yr
NET ANNUAL SAVINGS = $147,326 /yr

**INSTALLED COST** = $540,000

**SIMPLE PAYBACK** = $540,000 installed cost = 3.7 yrs
$147,326 /yr savings

T 0234

# Tecogen Ex. 22

# TECOGEN

**TECOCHILL** ™
*The Driving Force in Cooling*

45 First Ave.
PO Box 9046
Waltham, MA 02254-9046

**CONFIDENTIAL**

# FAX COVER SHEET

| | | | |
|---|---|---|---|
| **DATE:** | 1/25/02 | **FROM:** | JEFFREY GLICK |
| | | **PHONE:** | 781-622-1072 |
| **TO:** | RAY HICKEY | **FAX:** | 781-622-1025 |
| **COMPANY:** | R.L. KISTLER | **RE:** | CHEMUNG COUNTY NURSING |
| **FAX:** | 518-884-0614 | **CC:** | |

Number of pages including cover sheet: 4

## Message

Ray,

Have revised my cogeneration analysis I put together for the Chemung County Nursing facility. I reduced the annual natural gas consumption by 30,000 therms as you requested. I accomplished this by reducing the gas consumption each month by a total of 2,500 therms. As could be predicted the payback periods have increased except for the single module case. The following table indicated the revised results along with the original payback figures:

| CASE | RUN HOURS PER UNIT USING HEAT RECOVERY | RUN HOURS PER UNIT USING DUMP | TOTAL SAVINGS | ESTIMATED INSTALLED COST | PAYBACK YEARS (OLD GAS USAGE) | PAYBACK YEARS (REVISED GAS USAGE) |
|---|---|---|---|---|---|---|
| 1 Module | 8585 | 0 | $40,951 | $135,000 | 3.3 | 3.3 |
| 2 Modules | 7134 | 1451 | $80,313 | $270,000 | 3.1 | 3.4 |
| 3 Modules | 6011 | 2574 | $111,481 | $405,000 | 3.4 | 3.6 |
| 4 Modules | 5035 | 3550 | $135,576 | $540,000 | 3.7 | 4.0 |
| 5 Modules | 4133 | 4452 | $152,914 | $675,000 | 4.0 | 4.4 |
| 6 Modules | 3444 | 5140 | $168,008 | $810,000 | 4.4 | 4.8 |

Give me a call if you have any questions.

Jeff Glick

*Visit our HomePage at "www.tecogen.com"*

T 0222

# Tecogen Ex. 23



# ATLANTIC ENERGY
### S E R V I C E S ,   I N C .

# FAX TRANSMITTAL

Date: 10/26/04

To: Richard Rappa, P.E., CHA, Fax #: 585-262-2642

**Re: Chemung County Nursing Facility**

From:   Tim Casabonne

Total Number of Pages (including this cover): 2

These are transmitted as checked below:

☒  For your review     ☒  For your use     ☐  As requested     ☐  For approval

**FAXED**

OCT 2 2004

**Notes:**

Rich,

The attached sheet is the only info from Tecogen that I was able to find in the files.

Tim

**Phone (518)587-3252 • 92 Congress Street • Saratoga Springs, NY 12866 • Fax (518) 587-4328**



R. L. Kistler, 251 Fairground Ave.
PO Box 245
Ballston Spa, NY 12020
P: (518) 885-0755
F: (518) 884-0614
www.rlkistler.com

**SPECIALISTS IN:**
- Energy Saving Products
- Precision Air Conditioning
- Humidification/Dehumidification
- Engine Driven Technologies
- Specialty Fans and Blowers
- Refrigeration Technologies

February 19, 2002

Atlantic Energy Services, Inc.
Suite 202
56 Clifton Country Road
Clifton Park, NY 12065

Attention: Tim Carroll

**REFERENCE: CHEMUNG COUNTY NURSING**

QUOTATION: H02008T

R.L. Kistler, Inc,. is pleased to offer the following equipment for use on the above referenced project.

Quantity five (5) *TECOGEN* model CM-75 with silencer
Quantity one (1) *LIEBERT* drycooler model DNT-700

All standard warranty, start-up and calibration for the above equipment is included.

**FOB FACTORY FREIGHT ALLOWED........................$330,000.00**
**Terms Net 30 Days No Taxes Included**

Ray Hickey
Sales Engineer

Service contract with Tecogen Service is the responsibility of Atlantic Energy Services, Inc.

CC: Brian Willemsen – RLK – Rochester
    John Bailey – RLK – Syracuse

*"The pain of poor quality and service is remembered long after the joy of low price is forgotten."*

# Tecogen Ex. 24

# ATLANTIC ENERGY
## SERVICES, INC.

March 3, 2004

Mr. Robert E. Page
Nursing Home Administrator
Chemung County Nursing Facility
103 Washington Steet
Elmira, NY 14901

Dear Bob,

The following are your responses to your recent questions:

**QUESTION**: The cost proposals, energy savings, and project savings numbers need to be reviewed and updated, as the proposal is now 2 years old.

*AES has reviewed the original cost proposals and the energy savings calculations and determined that the original cost and savings estimates for this project are still valid. (Appendix A).*

**QUESTION**: The impact of sharply higher natural gas costs on this project needs to be explained, and there needs to be an explanation on future impact of price increases/decreases of the overall project's estimates. How will determinations be made if natural gas prices make it more economical to turn off co-generation and resume NYSEG service?

*It is an understandable concern to contemplate the future rise in natural gas prices affecting the energy savings in a facility that has co-generation installed. The rise in natural gas will affect the cost to run the generation equipment. Our analysis has shown that the cogeneration system will use approximately twenty five percent more natural gas than the existing facility baseline while providing approximately eighty percent of the electrical usage requirements. Therefore, the facility will be purchasing approximately twenty five percent more gas than before with the benefit of making most of the electrical needs for the entire facility.*

*Natural gas prices do fluctuate from time to time but if we look at the prices over time, the trend will remain relatively constant. It also should be noted that the utility makes a very large amount of its electricity with natural gas and has mechanisms in place to raise the price of electricity to recover the sustained higher prices for natural gas that they will use to produce electricity.*

*AES has prepared two co-generation analysis run models based on our original GSA. The first analysis is performed using $0.655 (cents) per therm. This is the 10-year average cost for natural gas in New York State. The second run considered an unrealistically high average price of $1.00 per therm. Appendix B contains the following items for each gas price:*

# ATLANTIC ENERGY
## SERVICES, INC.



1. *Cash flow based on the co-generation run with a 5.0% bonding interest rate.*
2. *A representation of guaranteed savings agreement cost savings.*
3. *The actual co-generation analysis model.*

*The results of this analysis considering a natural gas price of $0.655 (cents) per therm yields a yearly positive cash flow of $183,574 and a ten-year positive cash flow of $1,509,631. The savings for a $1.00 per therm average natural gas rate will still produce a yearly positive cash flow of $167,484 and a ten-year positive cash flow of $1,333,450.*

*To summarize, the County presently uses so much direct fired natural gas in the facility that approximately 65% of the buildings total energy budget goes to purchasing natural gas. With or without co-generation in place, the energy bills will go up and producing electricity can only benefit the cash flow of this facility.*

**QUESTION:** There is strong support for all facets of the project except co-generation. A great deal of attention must be paid to assurances that energy savings will be realized, that Medicaid reimbursement for the capital cost will be forthcoming.

*The Medicaid portion of this question will be addressed with a letter from Michael J. McCarthy, CPA assuring the County that the entire project will be a candidate for Medicaid reimbursement, including co-generation, and will have a positive effect on any possible sale. Please see Appendix C.*

**QUESTION:** A clear explanation of how the co-generation part of the project will be handled with regard to bidding, installation, cost control, and energy performance.

*AES' project manager, Tim Casabonne, submitted a letter to the County dated February 12, 2004 describing our bidding and contractor selection process for the lighting portion of the project. The process shall be similar for other parts of the project. The letter is included as Appendix D.*

*Cost control, during construction, shall be the responsibility of the AES project manager. Our pricing for the cogeneration project is a "turn-key" price.*

*Energy performance for the cogeneration measure shall be measured, calculated and guaranteed based on units of energy production and consumption.*

**QUESTION:** The Legislature wants to see actual reports on results of co-generation projects completed by AES comparing the project estimates to actual results after years 1 and 2 of project operation. They would like to do reference checks of similar projects that are complete, preferably for a hospital or nursing home.

# ATLANTIC ENERGY
## SERVICES, INC.

*References have been requested for co-generation specific projects installed in similar type facilities. Energy Concepts, P.C. of Rochester, New York has agreed to partner on the Gridley Health Center project, and will be the design consultant and commissioning agent for the project. References to thirty-eight co-generation projects and a full qualification package may be found in Appendix E. It should be noted that a successful field trip with numerous County staff was conducted at two of the facilities that Energy Concepts has designed and commissioned. These are the Clifton Springs Hospital and Clinic with co-generators that have been in operation for over ten years and the Geneva General Hospital that has had co-generation for over thirteen years.*

**QUESTION:** NYSERDA has advised great caution in undertaking a co-generation project, and there is a need to assure that this project can be accomplished successfully without cost overruns and underperformance. Address the concern that the co-generation project is "too good to be true".

*NYSERDA (New York State Energy Research and Development Authority) has proven its commitment to co-generation by funding numerous projects under PON 750 with millions of dollars of incentives. If you have any questions concerning co-generation feel free to Contact Tom Collins at (518) 862-1090, ext. 3250; fax (518) 464-8249; or e-mail tgc@nyserda.org*

**QUESTION:** The process of determining sub-contractors, doing bids for components of the project and selecting vendors needs to be explained—there is a lack of understanding of the role of AES in relation to the County. There is also a concern that AES may make excessive profits if project costs are lower than proposed, especially with the excess capacity and conservative planning that have been incorporated in the proposal. An explanation of the role of an energy performance contractor should be made.

*AES will be contracted to install the energy conservation measures that are presented in the Guaranteed Savings Agreement. This will include the following:*

1. *Design engineering.*
2. *Bidding and bid selection (See referenced letter in Appendix D)*
3. *Project Management*
4. *System commissioning*
5. *Monitoring energy savings and guarantee energy savings*
6. *Certificate of Need (CON) application preparation by Mike McCarthy*
7. *All legal fees*

*The following are excerpts from a letter explaining contract costs faxed to the County dated April 9, 2003. The letter is included as Appendix F..*

*"All prices are fixed. The County will not spend any more than the total amount of the project ($1,646,391). This total includes one year of monitoring services. If the County wants any*

# ATLANTIC ENERGY
## SERVICES, INC.



*additional monitoring services, there will be an annual cost of $15,000 per year as referenced in Section 6.2 (a) of the Guaranteed Savings Agreement. With respect to the contingency, this money will be spent on unforeseen occurrences. Before AES spends any of the money, the County will be informed and included in the decision. Please be aware that AES spends a lot of time receiving vendor quotes and that we are very comfortable with the prices we have given to the County."*

*"There have been discussions that there is excess generator capacity designed into this project. The extra power that will be produced by the Chemung County Nursing Home co-gen plant is a function of redundancy for the co-generation system as a whole. AES has calculated the energy savings using three 75 kW co-generation units at full availability and a fourth 75 kW unit as a back up. The fourth unit will allow any unit to be maintained while still having the three units running to maximize energy savings and efficiencies. The fourth unit will also allow for maintenance to be performed on any unit during normal working hours, without impacting planned operation. Additionally the fourth unit can be available to operate during high electrical and thermal use intervals to provide additional energy cost savings benefit to the facility."*

*"The results of an analysis considering the forth unit to be available 50% of the time and a natural gas price of $ .655 (cents) per therm show a yearly positive cash flow of $190,541 and a ten-year positive cash flow of $1,577,038. This will produce a savings that exceeding our guarantee by $4216. System availability data is included in Appendix G, in a letter from Tecogen service."*

**QUESTION:** There is concern about the "soft" costs and whether there will be hidden costs to be borne by the county. There was also concern raised about the need for an expert "clerk of the works" to monitor construction, performance, quality of materials, adherence to the contract proposal, etc. This is such a complex project that there will be no expert county staff available to do day-to-day monitoring—is there any provision in the project cost for an independent expert to advise the county on project performance? Will there be a need to add county employees to operate the systems?

*AES is contracted to perform all aspects of this performance project. There is no need to add County employees during construction; Energy Concepts P.C. will act as the independent expert for the project.*

*The maintenance agreement for the co-generation equipment is an all-inclusive agreement for the cogeneration units. It will include all preventive maintenance and replacement of parts and equipment associated with the Tecogen units. This agreement will also include any performance adjustments and off site monitoring at the service technician's office to insure that the units are working optimally. In essence, this is a maintenance insurance policy that ensures all co-generation units will be maintained or replaced indefinitely.*



# ATLANTIC ENERGY
### SERVICES, INC.

*AES does not benefit in any way from these types of maintenance agreements; we solicit vendor quotes and present them to the County for review and approval. As the County's energy services company (ESCO) we suggest that you take advantage of the full service agreement.*

*The cost of the maintenance agreement is based on aggregate run hours. The aggregate run hours is the sum of operational hours for all units in the plant. Annual costs for maintenance in the first year are estimated at $30,916. In the event that all four 75kW units are operating at the same time the incremental increase in the amount of maintenance costs will be greatly exceeded by the cost benefits of additional electricity and heat production.*

**QUESTION:** What potential funding may be available to offset the cost of this project in the form of grants, performance awards, and special loan rates?

*AES has researched two NYSERDA programs that we feel will be beneficial to this project. The first program is the Commercial/Industrial Performance Program PON-799. This has been approved for an incentive amount of $43,847. AES will pay $21,923 to Chemung County over two years. This has been included in the cash flow analysis for years one and two, shown in Appendix B.*

*The other NYSERDA program that will apply is called the New York State Loan Fund PON 814. This program reduces the interest rate by 4% for up to ten years. Unfortunately, this program only applies to pre-approved measures. The pre-approved measures in this project are the lighting retrofit and the energy management system for a total construction cost of $277,000. The benefit to the County would be a reduction of loan amount of $64,591. NYSERDA PON 799 application and PON 814 payment and savings calculator may be found as Appendix H.*

**QUESTION:** There is need for Mike McCarthy to make a presentation on the Medicaid reimbursement mechanism, the potential amount of project cost reimbursement, and the duration of such reimbursement. They need a confidence level that this project will be reimbursable to the Nursing Facility and when the reimbursement should be started. Without such reimbursement, at least for the co-gen component, the return in savings is not deemed to justify the cost and potential risk. There seems to be strong support for the lighting, water, laundry, and generator components on their merits as both cost savers and facility improvements in light of the building's age.

**RESPONSE:** *Please see Appendix C.*

**QUESTION:** What is the timeline for this project? How long will it take to be fully operational? What is the approval process required from DOH, NYSERDA or any other agencies?

*The time line will start with the signing of the Guaranteed Savings Agreement. Following this, AES and the design engineers will prepare a construction management plan, with County input, and*



# ATLANTIC ENERGY
## SERVICES, INC.

*submit this to the County for review and approval. The entire process will take approximately nine months. AES and Mike McCarthy will coordinate all required approvals.*

**QUESTION:** Discuss the maintenance agreement contract: what is covered, what will it cost, how long will the co-generation units and other project components operate without need for replacement.

*As discussed above, the co-generation maintenance contract will cover all necessary parts and replacement components for the Tecogen units including repair or replacement of entire engines or generators. Maintenance of typical ancillary equipment, such as standard pumps and motors, shall be maintained under the existing County maintenance plan and procedure.*

*Co-generation maintenance contractors are professionals that specialize in this type of maintenance and are paid by how many hours the machinery runs hence they are financially motivated to keep the machinery running.*

*The rest of the components in the energy performance project have a useful life that can range up to twenty years. It should be noted that some of the proposed equipment that is being replaced is presently at the end of its useful life and without this energy performance project would need to be replaced in the near future regardless.*

**QUESTION:** Under ideal operating conditions with all co-generation units in operation, what is the maximum percentage of facility electricity needs that can be produced through co-generation? If there is excess electricity production, can it be diverted to other county buildings (like the Chalk Pavilion) or could it be sold?

*The maximum percentage of electricity that will be produced is a function of the thermal loads for the domestic hot water and space heating. The system is sized only for Gridley Health Center. If the Center did produce excess electricity the cost to run electrical conduit the distance between the buildings may involve trenching and extensive utility approvals. On the financial side there may be Medicaid reimbursement issues in giving electricity from a Medicaid funded co-generation system to a County building like the Chalk Pavilion.*

**QUESTION:** If the facility has to be sold at some point in the future, how will this project affect the sale price and will the new owner be able to claim reimbursement for the capital costs?

*The Energy Performance Project can only add value to the facility and benefit any future sale price. A letter from Mike McCarthy, CPA addresses the ability to transfer Medicaid reimbursement. The letter is included Appendix C.*

# ATLANTIC ENERGY
### SERVICES, INC.



**QUESTION:** During the recent black out it was evident that the nursing home and the emergency management services located in the county health facility had an unacceptable emergency situation. The services that were lost for the six hours of the power outage left only one elevator working at a slow speed and the emergency management department to have to work with hand held flashlights. How will this new project combat this problem?

*The proposed energy conservation project will reduce the energy consumption throughout the facility and also include a 600-kilowatt emergency back up generator capable of meeting the full electrical demand of the facility. This generator is isolated from the co-generator system discussed above and will feed the entire facility at high voltage in front of the existing transformer. This type of emergency generation will provide all the power needs and act as the utility for the emergency time period with no loss of electrical service to the facility. This type of Co-generation, emergency generation and utility connection will provide a triad of protection in the event that any two of the three components become disabled.*

Bob, I hope I have answered your questions sufficiently. If anyone would like to contact me to clarify any portion of this letter or the Appendices, please feel free to have them call me directly at 518-587-3252 extension 107.

Sincerely,

Timothy M. Carroll, C.E.M.
Engineer

# ATLANTIC ENERGY
## SERVICES, INC.

APPENDIX G



RECEIVED
FEB 1 7 2004

11B Commerce Drive, Ballston Spa, NY 12020
Phone 518-884-8444  Fax 884-8411
www.advancedcomfortsys.com

To:        Tim Carroll              Fax: 518-527-4328

From:      Ray Hickey              Pages: 5

Re:        Tecogen Information

Tim,
Attached is information from Jeff Glick showing the availability of the CM-75 cogen module.
This site has three (3) units and has been in service for several years.
Best regards,

Ray Hickey

**Ray Hickey**

From:          Glick, Jeff [JGlick@tecogen.com]
Sent:          Friday, February 13, 2004 4:19 PM
To:            Ray Hickey (E-mail)
Subject:       Tecogen Cogeneration Availability



Tecogen RMCS.pdf

        Ray,

To answer your question about our cogeneration module availability, I have
attached an RMCS output from a local Massachusetts site.  This site is an
elderly housing facility.  As you can see, the availability is over 99%.
While I wouldn't say this the norm, I would make the statement that if the
site is well installed, 95% plus availability is attainable.

Give me a call if you need any additional information.

Thanks,

Jeffrey Glick
Tecogen
Regional Sales Manager
781-466-6481
781-466-6466 Fax

1

Operating Status from Francis Cabot Lowell Mills: Friday, February 13, 2004

| Site | | | Francis Cabot Lowell Mills | | Operating Mode | Run |
|------|--|--|----------------------------|--|----------------|-----|
| | | | | | Alarm | None |
| Date | | | 02/13/04 | | Prealarm | None |
| Time | | | 15:47:31.10 | | Runback | None |
| | | | | | | |
| RPM | | | 1815 | | Start Flag | ON |
| Throttle (%) | | | 78 | | Cycling Flag | OFF |
| Hourmeter | | | 26926.8 | | Master Start Flag | OFF |
| Starts | | | 927 | | Network Start Flag | OFF |
| KWH | | | 1541712 | | Network Slave Flag | OFF |
| BTU | | | .10907886 | | Temperature Control Flag | OFF |
| Power Setpoint (kW) | | | 60.0 | | PCM Closed Loop Flag | OFF |
| Temp Setpoint (F) | | | 219.0 | | | |
| | | | | | Stepper Phase 1 | ON |
| KW / KVA / KVAR | | 60.2 | 71.3 | 38.2 | Stepper Phase 2 | OFF |
| Frequency (Hz) / PF (%) | | | 60.0 | 84.4 | Stepper Phase 3 | OFF |
| V13 / V23 / V12 / Vavg | 223.5 | 224.8 | 224.0 | 223.8 | Stepper Phase 4 | ON |
| I1 / I2 / I3 / Iavg | 184.3 | 182.2 | 186.3 | 184.2 | Gas & Ignition | ON |
| V23 / V12 Angle (Deg) | | | 60.1 | 60.0 | Starter | OFF |
| I1 / I2 / I3 Angle | | 298.4 | 67.2 | 177.1 | Pump | ON |
| | | | | | Contactor | ON |
| Water In / Out Temp (F) | | | 41.3 | 206.3 | Capacitor | ON |
| Coolant / Oil Temp (F) | | | 183.3 | 171.4 | Alarm Output | OFF |
| Enclosure Temp (F) | | | | 124.7 | Radiator Fan | OFF |
| Customer 1 / 2 Temp (F) | | | 137.3 | 138.3 | Key Up | ON |
| Customer 3 / 4 Temp (F) | | | 135.0 | 137.5 | Fuel Step | OFF |
| Customer 5 / 6 Temp (F) | | | 142.4 | 155.0 | Fuel Open | ON |
| Customer 7 / 8 Temp (F) | | | 149.5 | 19.0 | O2 Heat / Spare | OFF |
| Catalyst In / Out Temp (F) | | | 0 | 0 | EFLH / Spare | OFF |
| | | | | | | |
| Vlogic / Vanalog / Vbat | | 4.966 | 11.707 | 13.926 | Hi Water Press | ON |
| | | | | | Lo Water Press | ON |
| Oxygen Sensor (mV) | | | | 0 | Lo Oil Press | ON |
| LT Block Learn | | | | 0 | Oil Level | ON |
| ST Block Learn | | | | 0 | Ignition Power | ON |
| Fuel Valve (%) | | | | 0 | Unused | OFF |
| MAP ("Hga) | | | | 0.0 | Contactor Aux | ON |
| Barometric Press ("Hga) | | | | 0.0 | Remote Runswitch | ON |
| | | | | | EMS 1 | OFF |
| Customer Analog 1 / 2 (V) | | | 0.000 | 0.000 | EMS 2 | OFF |
| Customer Analog 3 / 4 (V) | | | 0.000 | 0.000 | Temp Control | OFF |
| Customer Analog 5 / 6 (V) | | | 0.000 | 0.000 | Spare Input 1 | OFF |
| Counter 1 / 2 | | | 0 | 0 | Spare Input 2 | OFF |
| Counter 3 / 4 | | | 0 | 0 | Spare Input 3 | OFF |
| Fast Counter | | | | 0 | Spare Input 4 | OFF |
| | | | | | Spare Input 5 | OFF |
| Heat Used | | | | 31.1 | | |
| Total Plant Power | | | | 0 | TCP Information | |
| Units Running | | | | 0 | Master Start Output | OFF |
| Units Ready to Run | | | | 0 | A Loop Run | OFF |
| | | | | | A Loop Heat | OFF |
| PCM DTC 1 | | | 12 - No Trouble Codes | | A Loop Cool | OFF |
| PCM DTC 2 | | | 12 - No Trouble Codes | | B Loop Run | OFF |
| | | | | | B Loop Heat | OFF |
| | | | | | B Loop Cool | OFF |
| | | | | | C Loop Run | OFF |
| | | | | | C Loop Heat / D Run | OFF |
| | | | | | C Loop Cool / E Run | OFF |
| | | | | | | |
| | | | | | A Loop Thermostat | OFF |
| | | | | | B Loop Thermostat | OFF |
| | | | | | C Loop Thermostat | OFF |
| | | | | | D Loop Thermostat | OFF |
| | | | | | E Loop Thermostat | OFF |
| | | | | | A Loop Use Thermostat | OFF |
| | | | | | B Loop Use Thermostat | OFF |
| | | | | | C Loop Use Thermostat | OFF |
| | | | | | D Loop Use Thermostat | OFF |
| | | | | | E Loop Use Thermostat | OFF |
| | | | | | Master Start Input | OFF |
| | | | | | C Loop Modulation Option | OFF |
| | | | | | Radiator Option | OFF |
| | | | | | Prioritization Option | OFF |

Site                                                    Francis Cabot Lowell Mills

| Date | Hours | Starts | KWH | MBTU | | Date | Hours | Starts | KWH | MBTU |
|------|-------|--------|-----|------|---|------|-------|--------|-----|------|
| 02/13 | 15.9 | 0 | 951 | 6624 | | 01/28 | 24.0 | 0 | 1440 | 10032 |
| 02/12 | 24.0 | 0 | 1440 | 10032 | | 01/27 | 24.0 | 0 | 1440 | 10031 |
| 02/11 | 24.0 | 0 | 1440 | 10034 | | 01/26 | 24.0 | 0 | 1440 | 10032 |
| 02/10 | 24.0 | 0 | 1440 | 10032 | | 01/25 | 24.0 | 0 | 1440 | 10032 |
| 02/09 | 24.0 | 0 | 1440 | 10031 | | 01/24 | 24.0 | 0 | 1440 | 10032 |
| 02/08 | 24.0 | 0 | 1440 | 10033 | | 01/23 | 24.0 | 0 | 1440 | 10032 |
| 02/07 | 24.0 | 0 | 1440 | 10032 | | 01/22 | 24.0 | 0 | 1440 | 10033 |
| 02/06 | 24.0 | 0 | 1440 | 10030 | | 01/21 | 24.0 | 0 | 1440 | 10031 |
| 02/05 | 22.4 | 2 | 1336 | 9316 | | 01/20 | 24.0 | 0 | 1440 | 10035 |
| 02/04 | 23.8 | 2 | 1427 | 9942 | | 01/19 | 24.0 | 0 | 1440 | 10032 |
| 02/03 | 23.8 | 1 | 1426 | 9939 | | 01/18 | 24.0 | 0 | 1440 | 10032 |
| 02/02 | 24.0 | 0 | 1439 | 10031 | | 01/17 | 24.0 | 0 | 1440 | 10032 |
| 02/01 | 24.0 | 0 | 1440 | 10031 | | 01/16 | 24.0 | 0 | 1440 | 10033 |
| 01/31 | 24.0 | 0 | 1440 | 10031 | | 01/15 | 24.0 | 0 | 1440 | 10032 |
| 01/30 | 24.0 | 0 | 1440 | 10032 | | 01/14 | 24.0 | 0 | 1440 | 10031 |
| 01/29 | 24.0 | 0 | 1440 | 10032 | | 01/13 | 24.0 | 0 | 1440 | 10032 |

| | | | | |
|------|-------|--------|-----|------|
| Total | 757.9 | 5 | 45459 | 316714 |
| Average | 23.7 | 0.2 | 1420 | 9897 |

Alarm Output from Francis Cabot Lowell Mills: Friday, February 13, 2004

| Site | Francis Cabot Lowell Mills | |
|---|---|---|
| Alarm Name | Date | Time |
| 09 - EStop/Ign Pwr Fail | 02/04 | 09:28 |
| 13 - Low Oil Level | 02/04 | 09:06 |
| 33 - Oil P Switch Fail | 02/04 | 09:01 |
| 09 - EStop/Ign Pwr Fail | 02/04 | 09:01 |
| 10 - High Water Pressure | 01/08 | 07:50 |
| 10 - High Water Pressure | 01/08 | 07:40 |
| 13 - Low Oil Level | 01/06 | 14:37 |
| 09 - EStop/Ign Pwr Fail | 12/22 | 14:10 |
| 09 - EStop/Ign Pwr Fail | 12/09 | 11:09 |
| 09 - EStop/Ign Pwr Fail | 12/09 | 10:38 |
| 09 - EStop/Ign Pwr Fail | 12/09 | 10:24 |
| 09 - EStop/Ign Pwr Fail | 12/09 | 10:19 |
| 21 - Low Power | 12/09 | 09:33 |
| 21 - Low Power | 12/08 | 17:44 |
| 21 - Low Power | 12/08 | 17:34 |
| 09 - EStop/Ign Pwr Fail | 12/08 | 15:57 |
| 18 - High Connect Time | 12/08 | 15:50 |
| 09 - EStop/Ign Pwr Fail | 12/08 | 15:33 |
| Mode at Last Power Loss Shutdown | 02/05 | 09:53 |

Total time controller powered: 27473 hours
Total alarm time: 205 hours
Availability: 99%

# Tecogen Ex. 25

  

# ATLANTIC ENERGY
### SERVICES, INC.

September 20, 2004

Mr. Bruce Donovan
Bureau of Architectural and Engineering Facility Planning
New York State Department of Health
433 River Street, 6<sup>th</sup> Floor
Troy, NY 12180-2299

Re: Limited Review Certificate of Need Project #4456

Dear Mr. Donovan:

Enclosed please find a detailed project narrative, equipment data sheets and conceptual drawings for the Chemung County Nursing Facility Limited Review Certificate of Need Application.

If you have any questions related to this submission, please do not hesitate to contact me at 518-587-3252 x102.

Thank you for your attention and review of this matter.

Sincerely,

Tim Casabonne
Project Manager

Enc.

*92 Congress Street, 2<sup>nd</sup> Floor, Saratoga Springs, New York 12866*
*(518) 587-3252 Phone (518) 587-4328 Fax (877) 237-4524 Toll Free*

## Description of Project

The Chemung County Health Center in Elmira New York operates a 200-bed skilled nursing facility and houses various County Health Department offices. Due to the around-the-clock schedule, energy use is high. The facility is well run and maintained and has installed a variety of energy conservation equipment in the past, including an energy management system and variable speed drives. Some of the lighting has also been upgraded with T-8 systems.

The purpose of this study is to investigate the feasibility of installing three specific energy conservation measures, with the objective of generating a significant reduction in facility energy and water costs. The measures are as follows:

- Installation of an on-the-grid combined heat and power (cogeneration) system;
- Installation of state-of-the-art water conservation systems; and
- Installation of state-of-the-art emergency generator.

## Energy Savings

Table 1 summarizes savings information for the measures.

### Table 1: ECM Savings Summary

| Measure | Electric Savings | | Fuel Savings Therms | Water/Sewer Savings Gallons | Cost Savings |
|---|---|---|---|---|---|
| | kWh | kW | | | |
| Combined 300 kW cogen plant and water treatment and conservation | 2,074,924 | 288.4 | (-80,142) | 6,445,845 | $144,032 |
| Cogen maintenance | | | | | -$32,021 |
| Water Savings | | | | | $16,372 |
| Laundry Labor Savings | | | | | $12,834 |
| Laundry Chemical Savings | | | | | $1,528 |
| Laundry Electrical Savings | 5,229 | | | | $366 |
| Water Softening Salt Savings | | | | | $1,415 |

## FACILITY DESCRIPTION

### General Facility Description

The Chemung County Health center was constructed in 1969. The facility is composed of a six-story building of approximately 100,000 square feet, which is primarily a Nursing Home and combined single story structure of approximately 20,000 square feet housing various other health related departments, kitchen/cafeteria, mechanical equipment, and storage.

The existing structure is reinforced concrete construction with face brick. Roof is reinforced concrete deck with two inches of rigid insulation.

### HVAC Equipment Description

**Heating and Cooling.** The heating is provided by two Power Master 250 horsepower hot water boilers, with provisions for burning either gas or #2 oil. The boilers provide heat for both space heating and domestic hot water production. It appears that the boilers were sized to provide 100% redundancy.

 

*Power Master Boilers*

Three 7½ horsepower hot water pumps distribute hot water to air handling unit (AHU) coils, unit heaters, convectors, reheat coils, baseboard radiation, and radiant ceiling panels located throughout the facility.

Domestic hot water is also supplied to heat exchangers in two domestic hot water storage tanks, one for 110°F DHW and one for 140°F DHW. A third shell and tube heat exchanger uses boiler hot water to generate 180°F DHW for dishwasher final rinse. This system is inefficient during periods when space heating is not required because the large boilers are operating at relatively low loads in order to satisfy the DHW demand.

  

*Domestic Hot Water System*

Cooling for the facility is provided by a single 385 ton Trane Centravac centrifugal water chiller, which was overhauled approximately five years ago. Two 7½ HP chilled water pumps circulate water to AHU coils and ceiling panels located throughout the building. Two new 25 HP Armstrong pumps circulate condenser water for the chiller through a new Evapco cooling tower located outdoors adjacent to the mechanical room.



*Existing New Evapco Cooing Tower*



*Existing Trane Chiller*

**Air Distribution Systems.** Three central station air handlers located on the building roof supply conditioned air to the facility. All three air handlers have chilled water cooling coils and glycol pre-heating coils with hot water to glycol shell and tube heat exchangers for the coil freeze protection. The units are all constant volume, constant discharge temperature however, a variable frequency drive was installed for AHU-2 to manually reduce air flow capacity. A schedule is shown as Table 2.

**Table 2: AHU Schedule**

| Unit No. | CFM | Make | Motor HP | Location | Remarks |
|----------|-----|------|----------|----------|---------|
| AHU-1 | 19,000 | Air Enterprises | 15 | Roof – 146 | Mixed Air |
| AHU-2 | 44,000 | Air Enterprises | 30 | Roof – 474 | 100& O.A., VFD |
| AHU-3 | 14,000 | Air Enterprises | 7.5 | Roof – 227 | 100% O.A. |

Client rooms are typically supplied with conditioned outside air at a neutral temperature from AHU #2 to provide the code requirement for ventilation. Temperature control of these rooms is achieved by a four-pipe hot water/chilled water ceiling mounted radiant panel system. Room pneumatic thermostats control water flow to these panels.

All other air conditioned spaces within the building, such as offices, lobby, kitchen, cafeteria, etc., are supplied by a single duct, constant volume system with zone hot water reheat coils controlled by local pneumatic thermostats.

Several power ventilators located primarily on the building roof provide 58,000 CFM of exhaust air. These units range in size from 100 CFM to 5,675 CFM.

**Comfort Levels and Occupancy**

Client occupancy of the facility is 24 hours per day, 7 days per week. Client rooms have individual temperature control and are not on a temperature setback schedule.

## Utility Information

The Chemung County Health Center receives electric service from New York State Electric and Gas under service class SC-7-2. Gas is purchased from Stand Energy Corporation, Cincinnati, Ohio, and delivered by NYSEG.

Total electric consumption for the year 2000 was 2,117,700 kWh. Peak demand for this period was 504 kW.

Total gas consumption for the year 2000 was 208,511.6 therms. Calculations determined that 27,540 therms were used in direct-fired applications (cooking and clothes drying), the remainder (180,971.6 therms) used by the boilers.

## Current Energy Consumption

The following charts show monthly gas and electric consumption and costs for the year 2000.











## Cogeneration Plant Description

Cogeneration is the simultaneous production of electrical and thermal energy, also called combined heat and power (CHP). Cogeneration is a cost-efficient means of generating both electricity and thermal energy from a single fuel source. By using heat that would otherwise be discarded, cogeneration reduces or eliminates the need to burn fuels for the sole purpose of heating.




*Sample Co-Generation Units*

The proposed cogeneration system for this project is comprised of four, 75 kW spark ignition, natural gas-fueled cogen sets with necessary heat exchangers to capture waste heat from both the engine water jackets and exhausts.

Waste heat recovered from the cogen sets, in the form of hot water, will be added to the existing boiler secondary water heating loop piping via a plate and frame heat exchanger. Excess waste heat from the cogen system, which will occur during warmer weather, will be dissipated ("dumped") to the atmosphere via rooftop dry coolers (radiators).

Due to the high thermal demand of the facility for domestic hot water, waste heat rejected during the warmest months will be relatively small. Calculations revealed that waste heat rejected in June, July and August would only be enough to produce approximately 30 tons of refrigeration, or 8% of the facility requirement, by installing an absorbtion chiller system. Therefore, this option was not investigated any further.




*Plate & Frame Heat Exchanger*          *Usable Heat by Product of
                                         Electricity Generation*

9/17/2004                                                              6

## Water Conservation

Current water consumption at the Chemung County Nursing Facility totals approximately 26.2 million gallons annually. Of this amount, approximately 6.76 million gallons are used for laundry. The current cost of water is $2.54 per 1,000 gallons.

Aqualine Resources, Inc. performed a water reduction and treatment study to provide water related cost savings measures for this facility. The full text of this study appears in Appendix A.

The following table summarizes these measures, which include replacement of existing high volume toilets with new code conforming units, installation of faucet restrictors and installation of an ozone laundry water treatment system. The work area for this measure will include all toilets, sinks and laundry equipment located throughout the facility.



*Existing Laundry System*

### Table 3: Water Conservation Measures

| Measure | Total Installed Cost | Water Savings Gallons | Water Cost Savings | Thermal Cost Savings | Laundry Labor Savings | Chemical Cost Savings | Electric Savings | Water Softening Salt Savings |
|---|---|---|---|---|---|---|---|---|
| Replace 173 toilets, retrofit 5 urinals, install 216 sink faucet aerators | 125,569 | Hot – 1,238,339<br>Cold – 3,517,802<br>Net – 4,756,141 | 12,080 | 3,774 | | | | $1,415 |
| Install EnviroSaver II Ozone Laundry system | 56,976 | Hot – 3,125,952<br>Cold – (1,442,249)<br>Net – 1,683,703 | 4,292 | 14,203 | 12,834 | 1,528 | 366 | |

### Emergency Generator

Presently, the Chemung Nursing Facility and County Health Offices have a limited emergency power supply. During a power outage, only the most critical systems are energized. Considering the present climate, the County Health Offices would like to also be connected onto the emergency power system.

The emergency generator vendor, electrical contractor and AES evaluated a number of possible solutions to allow the entire facility to utilize full emergency power. During our evaluation, it was decided that due to the two different power supplies (208v and 460v) the most practical and cost effective solution would be to install a 600 kW generator to give the entire facility emergency power. AES will also remove the existing emergency generator located adjacent to the existing mechanical room. This will provide storage space to compensate for the loss of storage from the removal of the outdoor storage shed. The demolition of this shed will be required to install the new 600 kW generator set. AES will provide and install a 600 kw, 480 volt, 3-phase emergency generator set to satisfy the entire facilities emergency power needs.

AES would like to note that this ECM has a high priority to the County yet unfortunately will result in no energy savings.

Data sheets for proposed equipment are found in Appendix B.

Conceptual drawings are found in Appendix C.

APPENDIX B

# TECOGEN®

## *Cogeneration Modules*



*We can keep you
in hot water …*

*and electricity too.*

## Cogeneration Applications

Hospitals

Schools & Colleges

Athletic Club/YMCAs

Swimming Pools

Hotels and Motels

Apartments & Condos

Food & Beverage

Laundries

Nursing Homes

## Distributed Generation is the answer...

Shortages in the electricity supply and soaring prices have revived the concept of Distributed Generation – dispersing the generation of electrical energy to efficient onsite power producers without relying on a central power station. Cogeneration provides the most efficient form of DG by recovering the waste heat. The **TECOGEN®** cogeneration module uses a natural gas-fired internal combustion engine to generate electricity. Since engines produce waste heat at very high temperatures, capturing this heat for hot water provides end-users the opportunity to lower their energy bills by as much as 40%. In sizes of 60 kW and 75 kW, the **TECOGEN®** is available to even the smallest scale commercial, industrial, and institutional energy users, with multiple-unit installations providing the most flexibility to meet varying demands. Equipped with an induction generator and switchgear, the **TECOGEN®** operates in parallel with the utility, simplifying interconnection requirements.

Electricity 31.4%   Hot Water 60.1%

Losses 8.5%

*Based on LHV

## Over 90% of the fuel is converted to useful energy*...

Simply defined, cogeneration is the process whereby a single fuel source, such as natural gas, is used to produce both electrical and thermal energy. By design, a cogeneration system is inherently more efficient than a central utility power station, since it captures "lost" thermal energy and produces both electrical and thermal energy with less fuel consumption than if they were produced separately. A conventional central utility plant is only about 35% efficient as compared to the 91% efficiency* of the **TECOGEN®**.

## TECOGEN® provides a safeguard against rising energy prices...

Producing electricity onsite with a **TECOGEN®** not only shields an owner against soaring electric rates, but also provides a defense against rising gas prices. This is because the recovered hot water is essentially free since it displaces fuel that would otherwise be burned in a conventional boiler. In effect, an owner is only paying 30% of the cogeneration system's fuel bill. Referring to the graph below, at an electric rate of $0.10/kWH, payback is relatively flat at 3 to 4 years even with gas prices spanning $0.30/therm to $1.00/therm. Conversely, electric rate hikes dramatically improve the **TECOGEN®** payback, far outweighing even substantial increases in gas prices.



## Significantly reduce your utility bills ...



BEFORE:

UTILITY BILL
Electricity $123,750
Gas          57,500
            $181,250

AFTER:

UTILITY BILL
Electricity $26,250
Gas          92,000
            $118,250

$63,000 Savings = 35%!

## Typical TECOGEN Installation Connections



**Legend**
1 Electricity Out
2 Hot Water Supply
3 Hot Water Return
4 Gas Supply
5 Engine Exhaust

## Specifications:

| | | |
|---|---|---|
| Electrical Output (kW) | 60 | 75 |
| Thermal Output | 440,000 Btu/hr | 490,000 Btu/hr |
| Gas Input | 760 scfh | 900 scfh |
| Efficiency | | |
| @ LHV of 905 BTU/scf | 93.7% | 91.6% |
| @ HHV of 1020 BTU/scf | 83.1% | 81.3% |
| Required Gas Pressure | 4-14"wc | |
| Hot Water Flow | 22 gpm | |
| Maximum Water Temperature | 230°F | |
| Electrical Service | 208V or 460V, 3PH, 3-wire | |
| Emissions Option | Can meet air quality standards as stringent as Southern California's | |
| Acoustic Level | 70 dBa @ 20' | |
| Dimensions | 6'10"L x 3'8"W x 3'10"H | |
| Weight | 3,000 lbs | |

Note:
*Above performance data is valid up to 100°F ambient temperature.*

## TecoDrive 7400 ... the proven prime mover

The TecoDrive 7400 is a proven eight-cylinder, 454 cubic inch displacement, naturally aspirated, four-stroke, spark-ignited engine, specially developed by Tecogen and the gas industry for efficient natural gas operation. Since first introduced in 1984, more than 1100 natural gas engine-powered cogeneration, chiller, and refrigeration units have amassed more than 15 million hours of dependable service at approximately 650 customer sites across the U.S. and abroad. Individual TecoDrive engines normally operate for about 20,000 hours between overhauls ... the equivalent of one million miles, or 40 times around the earth in vehicle service. The exceptional engine life is due to the inherently clean combustion of natural gas fuel, the de-rating of output to 1800 rpm for cogeneration, as well as a number of customized durability enhancements, including positive valve rotators, improved coolant distribution, and increased oil flow to bearings, camshaft, and cylinder walls.



## TecoNet™ ... a state-of-the-art, microprocessor-based system



The **TecoNet**™ control system has been specially developed for engine control, providing fully automatic operation of the cogeneration module. It monitors the utility, engine, generator, system variables, and faults, allowing for unattended operation. **TecoNet**™ is fully packaged with all of the typically required switchgear, providing the end user with a simple, 3-wire (w/neutral), parallel connection to the utility.

**TecoNet**™ has *Modbus* networking capability for "open protocol" communication with building management systems, programmable controllers, or between multiple **TECOGEN®** units. It is also equipped with a remote telecommunications system that only requires a customer phone line.

## Tecogen ... the industry leader

Tecogen is a national leader in the industry of natural gas engine-driven equipment, bringing over 18 years experience in packaged cogeneration, chillers, and refrigeration systems. With more than 1,100 operating units in the field, we offer a well-established engineering, sales, and service support network. Our equipment features the microprocessor-based *TecoNet*™ control system, customized for engines, with remote monitoring capabilities. We offer compact designs, energy-saving heat recovery, and emission control systems to meet standards in all areas of the country.



**TECOGEN Service Centers**

## Service....it's our business

Tecogen's extensive network, staffed by our own factory-trained technicians, offers local service for many regions in the United States. Service contracts are based upon a guaranteed price per run hour that covers both scheduled and unscheduled maintenance. With **TECOGEN**®'s proven reliability, comprehensive service contracts, and sole-source responsibility, module downtime is kept to a minimum.



**Made in the USA**

**TECOGEN, Inc.**
45 First Avenue
Waltham, MA 02451

(781) 622-1400
(781) 622-1002 (fax)
*www.tecogen.com*



TECOGEN® and TecoDrive™ are trademarks of Tecogen    Rev May '01

# Tecogen Ex. 26

# TECOGEN

**TECOCHILL**

*Natural Gas Engine-Driven Products*

TECOFROST

COGENERATION

# LETTER OF TRANSMITTAL

45 First Avenue
WALTHAM, MA 02451
ph: 781.622.1400  fax: 781.622.1002
www.tecogen.com

| DATE | 8/23/02 | JOB NO. | |
|---|---|---|---|
| ATTENTION | Tim Carroll | | |
| RE: | Chemung County Health Center | | |

TO _Atlanta Energy Services, Inc._
_56 Clifton County Road_
_Suite 202_
_Clifton PARK, NY 12065_

**SHIPPING INFO**

| SENT VIA | ☐ Fed Ex | ☐ UPS | ☐ US Mail |
|---|---|---|---|

CHARGE NO:

TRACKING NO:

**WE ARE SENDING YOU**  ☐ Attached  ☐ Under separate cover via _____ the following items:

☐ Shop drawings  ☐ Prints  ☐ Plans  ☐ Samples  ☐ Specifications
☐ Copy of letter  ☐ Change Order  ☐ O & M Manuals  ☐ Sales Literature  ☐ Other _____

| COPIES | DATE | NO. | DESCRIPTION |
|---|---|---|---|
| 1 | | | Tecogen Maintenance Agreement |
| | | | |
| | | | |
| | | | 10/6/04 |
| | | | Per Tim Casabonne |
| | | | expect a spring |
| | | | 2005 order |

**THESE ARE TRANSMITTED as checked below:**

☐ For approval  ☐ Approved as submitted
☐ For your use  ☐ Approved as noted
☐ As requested  ☐ Returned for corrections
☐ For review and comment  ☐ _____
☐ FOR BIDS DUE _____ 20 ___  ☐ PI

REMARKS _Tim_

_Here is a copy of the maintenance agreement for_
_the Chemung County Health Center._

_This agreement is based on the $25/hr rate_
_we spoke about. They are getting a discount_ ...

COPY TO _____   SIGNED: _____

*If enclosures are not as noted, kindly notify us at once.*

T 0215

# Tecogen Ex. 27



# ATLANTIC ENERGY
## SERVICES, INC.



ENERGY STAR
PARTNER

**Chemung County Nursing Facility**
**Energy Performance Project Kick-off Meeting Minutes**
**10/21/04**

**Attendees:**

| | |
|---|---|
| Robert Page | Chemung County Nursing Facility Director (CCNF) |
| Jim MacBlane | CCNF Maintenance Dept. |
| Pete Shaffer | CCNF Maintenance Dept. |
| Tim Hugg | Chemung County Buildings and Grounds (CCBG) |
| Gary Morenus | CCBG |
| John Harris | CCBG |
| Rich Rappa | Clough, Harbour & Associates LLP (CHA) |
| Adam Lawas | CHA |
| Boris Shusteff | CHA |
| Tim Carroll | Consultant |
| Tim Casabonne | Atlantic Energy Services (AES) |

The purpose of this meeting was to introduce the team, review the project scope, discuss the plans and requirements for final design and engineering documents and review the proposed project schedule.

1. CHA advised that the final engineering and construction bid documents would be complete by the end of the year.

2. Bob Page advised that the project must be complete by April/May 2005 so that the County can realize energy savings.

3. In order to meet the April/May 2005 completion, AES will need to order the long lead time equipment prior to completion of final engineering and selection of subcontractors.

4. The County had the understanding that a new storage building was included in the project. AES advised that a storage building was not part of the project. CHA advised that a basic storage shed would cost approximately $30,000. AES will determine if the project can support this cost.

5. The County advised that currently only (1) of the (3) elevators in the building operates on emergency power and that they need all (3) elevators to operate on the new 600 kW emergency generator.

6. The County will advise AES if they intend to relocate/reuse the existing emergency generator. If not it will be removed and disposed as part of the performance project.

*92 Congress Street, 2nd Floor, Saratoga Springs, New York 12866*
*(518) 587-3252 Phone (518) 587-4328 Fax (877) 237-4524 Toll Free*





ATLANTIC ENERGY
SERVICES, INC.

7. The County advised that there is a 6,000 gallon fuel tank that supplies the existing emergency generator.

8. The energy audit report proposed locating the new emergency generator behind the screen wall where the wood storage structure is located. CHA will investigate the proposed location and fuel requirements for the new emergency generator.

9. The County advised that Onan/Cummins is the preferred emergency generator manufacture.

10. The County will provide NYSEG contact info to CHA.

11. The cogeneration scope of work includes (4) 75 kW Tecogen units, dry cooler(s), pumps, heat exchangers and associated controls.

12. AES will provide CCNF with a copy of the Tecogen maintenance agreement.

13. AES will advise CCNF and B&G of the final scope, plans and timeline for the water conservation work.

14. CCNF to provide AES with copies of electric and gas bills for the past (2) years.

15. AES will provide CCNF with projected monthly and annual gas usage upon project completion.

16. Attendees reviewed a list of NYSDOH required documentation for pre-occupancy surveys and determined which items applied to this project.

17. Tim Casabonne of AES will be the point of contact for all project related correspondence.

Included with the minutes are a project contact list and a 2 page list of follow up items as recorded by CCNF.

Respectfully Submitted,

Tim Casabonne
Project Manager

Enc. Project Contact List, CCNF Follow up Items

CC:    Tim Brock, Atlantic Energy Services, Inc.
       Paul Darby, Atlantic Energy Services, Inc.




# CHEMUNG COUNTY HEALTH CENTER

**103 Washington Street**
**Elmira, New York 14901**

Nursing Facility
(607) 737-2001
FAX (607) 734-3021

Health Department
(607) 737-2028
FAX (607) 737-2016

DATE:           October 21, 2004

SUBJECT:      <u>PLANNING MEETING FOR ENERGY PROJECT</u>

PARTICIPANTS:

     Richard Rappa, Boris Shusteff, Adam Lawas—Clough, Harbour
     Tim Carroll, Tim Casabonne—Atlantic Energy Services
     Jim MacBlane, Pete Shaffer—CCNF Maintenance Dept
     Gary Morenus, John Harris, Tim Hugg—County Buildings & Grounds Dept
     Robert Page—Health Center Director

<u>ITEMS FOR FOLLOW-UP:</u>

✓ ***Jim MacBlane*** will get the Schindler Elevator contact person to contact Clough, Harbour to discuss the requirements needed to have the elevators operate on the new emergency generator. **Done on 10/21/04**

✓ ***Bob Page*** will get copies of the electrical and natural gas bills for the past 2 years and provide to Tim Casabonne..

✓ ***Buildings & Grounds Department*** will investigate and decide within 2 weeks whether the old emergency generator should be salvaged for use elsewhere in the county.

✓ ***Bob Page*** will inform Tom Kump, Code Enforcement Officer for county buildings, about the project and the need for him to review the project engineering and electrical generator plans. **Done on 10/22/04—Mr. Kump will handle the code review as county buildings do not require city code enforcement review. He also advised that to his knowledge there are no city code requirements pertaining to noise levels for electrical generators.**

✓ ***Gary Morenus*** will provide the NYSEG contact person to Clough, Harbour. *(AES)*

✓ ***Tim Casabonne*** will obtain information on the co-gen maintenance services agreement to answer these questions: — *Requested from Tangye 10/27/04*

    o  Will the maintenance contract vendor respond automatically to alarms or system problems?
    o  Will routine maintenance service be scheduled on a regular basis by the vendor?

✓ ***Tim Casabonne*** will confer with the water contractor about the plans, timelines, and any assistance needed from county plumbers and advise Buildings & Grounds Dept.

✓ ***Clough, Harbour and Tim Casabonne*** will evaluate cost and design for a proposed storage area adjacent to or connected to the main building to store furniture, beds and other Maintenance supplies in a lighted but not heated/cooled storage room. ***Tim Casabonne*** will determine if cost for such a storage area can be incorporated into overall project cost from contingency allowance. Jim MacBlane suggested an area where a doorway could be cut through exterior wall near Dietary and have storage area connected to the main building so that there would be access from inside the building.

**Suggestion to consider:** Instead of having a metal storage area, would it be cheaper and more esthetic to have a 3-sided cinder block structure attached to the existing cinder block wall?

✓ ***John Harris*** will make inquiry to Cummins about the availability of parts for the existing emergency generator if a decision were made to salvage it for use elsewhere in the county.

✓ ***Bob Page*** will prepare a list of surplus/obsolete property currently stored in the boiler room so that the items may be declared surplus by the Legislature. When the list of items is completed, he will request that Buildings & Grounds Dept remove the equipment for storage off-site to await a future county auction.

 ✓ ***Tim Casabonne*** shall prepare a letter for transmittal to Stand Energy Company on the projected natural gas usage (monthly and annually) once the energy project (especially the co-gen component) is completed and on-line.

## STATE HEALTH DEPARTMENT REQUIREMENTS:

Participants reviewed all the requirements provided by NYSDOH that must be in place and/or provided to them for review before final approval from the Western Regional Office can be given to initiate the project and certify the project for reimbursement. The list of items was marked to exclude those requirements that did not pertain to this particular project. All parties expressed agreement and understanding that the requirements must be completed to the satisfaction of the Regional Office.

# Tecogen Ex. 28

**From:** Glick, Jeffrey
**Sent:** Monday, December 06, 2004 2:18 PM
**To:** 'tcasabonne@atlanticenergyservices.com'
**Subject:** Maintenance Contracts for Chemung County Health Center

Tim,

I was able to locate the two contracts we had spoken about.  I have attached the contracts electronically for your use.

Give me a call if you have any questions.

Regards,

Jeffrey Glick
Tecogen
Regional Sales Manager
781-466-6481
781-466-6466 Fax





Chemung Maintenance         Lakeland Maintenance
    Agreement....                  Agreement...

1

# Tecogen Ex. 29

Case 1:05-cv-11823-RCL    Document 104-4    Filed 05/06/2008    Page 2 of 33

# CLOUGH HARBOUR
# & ASSOCIATES LLP

*"Celebrating 50 Years of Engineering Excellence"*

POWERS BUILDING
16 MAIN STREET WEST • SUITE 830
ROCHESTER, NEW YORK 14614-1607
TEL: 585-262-2640 • FAX: 585-262-2642
www.cloughharbour.com

January 24, 2005

Ms. Carol Muessigbrodt
Project Manager-IPP Interconnections
New York State Electric and Gas Corp.
P.O. Box 5224
Binghamton, N.Y. 13902-5224

RE: **Chemung County Gridley Health Center**
**Cogeneration Installation**
**CHA Project No. 13744**

Dear Ms. Muessigbrodt:

Enclosed for your review is the complete technical submission package for the cogeneration installation at Chemung County Gridley Health Center. Clough, Harbour and Associates LLP is the design engineer of record, and the project is managed by Atlantic Energy Services, Inc.

The proposed CHP plant consists of four 75kW induction generators for standard parallel operation with NYSEG. CHA's design follows IPP requirements per the latest NYSEG Bulletin 86-01, dated November 2004.

The following documents are enclosed:
· Complete Electrical Engineering Drawings
· Supplemental Engineering Package

Please contact Boris Shusteff for technical questions, and me for administrative issues at (585) 262-2640.

We trust the enclosed to be satisfactory for the technical review process to begin. Please contact CHA if you require additional information.

Very truly yours,

**CLOUGH, HARBOUR & ASSOCIATES LLP**

Richard F. Rappa, P.E.
Partner

RFR:ek
Enclosure
Cc:    Tim Casabonne - Atlantic Energy Services, Inc.
       Robert Page - Gridley Health Center
       Jim Fuller - CHA
I:\13744\tech\Utility Submission\NYSEG IPP Cover Letter.doc

*Offices Throughout the United States*

*"Same and Our Clients With Dedicated People Committed to Total Quality."*

# SUPPLEMENTAL ENGINEERING PACKET "A"
# ENGINEERING INFORMATION

## for

## CHEMUNG COUNTY
## GRIDLEY HEALTH CENER

CHA Project No. 13744

Presented to:

**New York State**
**Electric and Gas Corporation**

Prepared by:

**Clough, Harbour & Associates LLP**
16 Main Street West, Suite 830
Rochester, NY  14614

**Atlantic Energy Services, Inc.**
92 Congress Street
Saratoga Springs, NY  12866

**January 24, 2005**

# TABLE OF CONTENTS

ITEM                                                                SECTION

- Introduction & Project Summary                                       1
  (Including NYSE&G form NB-232)

- Description of Cogeneration Operation                                2

- Generator, Exciter & Governor Information Sheets                     3

- Cogeneration Units Data Sheets                                       4

- Interrupting Devices                                                 5
        15kV Disconnect
        Intertie Circuit Breaker
        Generator Circuit Breaker

- Interface / Step-Up Transformer                                     6

- Instrument Transformers                                             7

- Utility Protection Relay                                            8

1

# PART 1 – INTRODUCTION

## INTRODUCTION

As part of a comprehensive energy project, Atlantic Energy, Inc., for Chemung County Gridley Health Center, is planning to add an on site cogeneration plant.

The documents being submitted to NYSE&G for review consist of the following:

1. Engineering drawings
2. Supplemental information packet

Key contacts for the review and processing of the documents are as follows:

1. The Owner:
   Atlantic Energy Services, Inc.
   92 Congress Street
   Saratoga Springs, N.Y. 12866
   Attn: Mr. Tim Casabonne, Project Manager
   Phone: (518) 587-3252 x102
   Fax: (518) 587-4328
2. Plant Designer:
   Clough Harbour & Associates LLP
   18 West Main Street
   Suite 830
   Rochester, N.Y. 14614
   Attn: Mr. Richard Rappa, Partner
   Phone: (585) 262-2640
   Fax: (585) 262-2642
3. The Facility:
   Chemung County Gridley Health Center
   103 Washington Street
   Elmira, N.Y. 14901
   Attn: Mr. Robert Page, Director
   Phone: (607) 737-2068
   Fax: (607) 734-3021

## PROJECT SUMMARY INFORMATION

The on site cogeneration plant will be installed at the Chemung County Gridley Health Center in Elmira, New York, 14901. Minimum facility demand, based on utility bills, is 317kW peak and 264kW off peak.

The cogeneration plant will be designed as an induction type, with operation in parallel with NYSE&G.

# INDEPENDENT POWER PRODUCER GENERATOR NOTICE

**NYSEG**     **Independent Power Producer Generator Notice**

☒ Preliminary    Customer                                         IPP File No. _____

☐ Final          Account No. _01-520-04-005800-06_              Division _____

☐ Revised

Developer Name _ATLANTIC ENERGY SERVICES, INC._

Developer Address _92 CONGRESS STREET SARATOGA SPRINGS, NY 12866_

Telephone No. Primary _(518) 587-3252 x102_     Alternate _(315) 598-8858_

Proposed Generating Facility Location _CHEMUNG COUNTY GRIDLEY HEALTH CENTER_

City/Town/Village _ELMIRA_     County _CHEMUNG_     State _NY_     Zip _14901_

| Service Information | Electrical Location | Rate |
|---|---|---|
| Service Size _400 AMP_ | Substation Source _____ | PSC# _____ |
| Utilization Voltage _12.47 KV_ | Circuit No. _____ | SC# _____ |
| Phase _3_ | Line No. _____ | Rate Code _____ |
| Maximum Demand _509 KW_ | Pole No. _____ | Rev. Class _____ |
| Transformer Size _____ | Voltage & Phase available at nearest | Spec. Prov. _____ |
| Line Ext. Required _____ | connecting primary | Discount _____ |
| Est. Cost to Serve _____ | | |

## Generator Information

Manufacturer _TECOGEN_

Type _INDUCTION (MODEL CM-75)_

Rated Output (KVA) _89 x 4 = 356_

Nameplate Voltage _460_

Power Factor _85 %_

Phase _3_

Disconnect Device _600A, 3P, 15KV, 3 PH._

Prime Mover _NATURAL GAS RECIP. ENGINE_

**Metering Information**

| | NYSEG | Developer |
|---|---|---|
| Type | _____ | _____ |
| Volts | _____ | _____ |
| Phase | _____ | _____ |
| Wire | _____ | _____ |
| KW | _____ | _____ |
| RKVAH | _____ | _____ |

## General Information

Consultant _CLOUGH HARBOUR & ASSOCIATES LLP_     Telephone _(585) 262-2640_

Electrical Contractor _____     Telephone _____

Equipment Supplier _____     Telephone _____

Date Interconnection requested _JUNE 1, 2005_

## Accounting Information

Billing Name _CHEMUNG COUNTY HEALTH CENTER NURSING FACILITY_ MBJO/AE No. _____

Billing Address _103 WASHINGTON ST, ELMIRA, NY 14901_     Account No. _01-520-04-005800-06_

Billing Contact _____     Telephone No. _(607) 737-2001_

## Remarks

Issued By _____     Date Issued _____

Project Manager - IPP Interconnections

2

# TECOGEN®

## Cogeneration Modules



*We can keep you
in hot water …*

*and electricity too.*

## Cogeneration Applications

Hospitals

Schools & Colleges

Athletic Club/YMCAs

Swimming Pools

Hotels and Motels

Apartments & Condos

Food & Beverage

Laundries

Nursing Homes

## Distributed Generation is the answer...

Shortages in the electricity supply and soaring prices have revived the concept of Distributed Generation — dispersing the generation of electrical energy to efficient onsite power producers without relying on a central power station. Cogeneration provides the most efficient form of DG by recovering the waste heat. The **TECOGEN®** cogeneration module uses a natural gas-fired internal combustion engine to generate electricity.  Since engines produce waste heat at very high temperatures, capturing this heat for hot water provides end-users the opportunity to lower their energy bills by as much as 40%. In sizes of 60 kW and 75 kW, the **TECOGEN®** is available to even the smallest scale commercial, industrial, and institutional energy users, with multiple-unit installations providing the most flexibility to meet varying demands. Equipped with an induction generator and switchgear, the **TECOGEN®** operates in parallel with the utility, simplifying interconnection requirements.

Electricity 31.4%

Hot Water 60.1%

Losses 8.5%

*Based on LHV

## Over 90% of the fuel is converted to useful energy*...

Simply defined, cogeneration is the process whereby a single fuel source, such as natural gas, is used to produce both electrical and thermal energy. By design, a cogeneration system is inherently more efficient than a central utility power station, since it captures "lost" thermal energy and produces both electrical and thermal energy with less fuel consumption than if they were produced separately. A conventional central utility plant is only about 35% efficient as compared to the 91% efficiency* of the **TECOGEN®**.

## TECOGEN® provides a safeguard against rising energy prices...

Producing electricity onsite with a **TECOGEN®** not only shields an owner against soaring electric rates, but also provides a defense against rising gas prices. This is because the recovered hot water is essentially free since it displaces fuel that would otherwise be burned in a conventional boiler. In effect, an owner is only paying 30% of the cogeneration system's fuel bill. Referring to the graph below, at an electric rate of $0.10/kWH, payback is relatively flat at 3 to 4 years even with gas prices spanning $0.30/therm to $1.00/therm. Conversely, electric rate hikes dramatically improve the **TECOGEN®** payback, far outweighing even substantial increases in gas prices.



Electric Rate $0.08/kWH

$0.10/kWH

see example to right

$0.15/kWH

Payback [Years]

Gas Price [$/therm]

## Significantly reduce your utility bills ...



BEFORE:                AFTER:

$63,000 Savings = 35%!



## Typical TECOGEN Installation Connections

**Legend**
1. Electricity Out
2. Hot Water Supply
3. Hot Water Return
4. Gas Supply
5. Engine Exhaust

## Specifications:

| | | |
|---|---|---|
| Electrical Output (kW) | 60 | 75 |
| Thermal Output | 440,000 Btu/hr. | 470,000 Btu/hr. |
| Gas Input | 760 cfh | 900 cfh |
| Efficiency | | |
| @ LHV of 905 BTU/cf | 83.7% | 81.2% |
| @ HHV of 1020 BTU/cf | 87.1% | 84.3% |
| Required Gas Pressure | | 4 kw. |
| Hot Water Flow | | 75 gpm |
| Maximum Water Temperature | | 210°F |
| Electrical Service | | 208V or 460V, 3PH, 3-wire |
| Emissions Options | | Catalyst for NOx (CO standard) Nitrogen ... (Emission Catalyst) |
| Acoustic Level | | 70 dB @ 20' |
| Dimensions | | 61"D x 34"W x 81"H |
| Weight | | 3,000 lbs. |

*Above performance data is valid up to 100°F ambient temperature*

## TecoDrive 7400 ... the proven prime mover

The TecoDrive 7400 is a proven eight-cylinder, 454 cubic inch displacement, naturally aspirated, four-stroke, spark-ignited engine, specially developed by Tecogen and the gas industry for efficient natural gas operation. Since first introduced in 1984, more than 1100 natural gas engine-powered cogeneration, chiller, and refrigeration units have amassed more than 15 million hours of dependable service at approximately 650 customer sites across the U.S. and abroad. Individual TecoDrive engines normally operate for about 20,000 hours between overhauls ... the equivalent of one million miles, or 40 times around the earth in vehicle service. The exceptional engine life is due to the inherently clean combustion of natural gas fuel, the de-rating of output to 1800 rpm for cogeneration, as well as a number of customized durability enhancements, including positive valve rotators, improved coolant distribution, and increased oil flow to bearings, camshaft, and cylinder walls.



## TecoNet™ ... a state-of-the-art, microprocessor-based system

The **TecoNet**™ control system has been specially developed for engine control, providing fully automatic operation of the cogeneration module. It monitors the utility, engine, generator, system variables, and faults, allowing for unattended operation. **TecoNet**™ is fully packaged with all of the typically required switchgear, providing the end user with a simple, 3-wire (w/neutral), parallel connection to the utility.

**TecoNet**™ has Modbus networking capability for "open protocol" communication with building management systems, programmable controllers, or between multiple **TECOGEN®** units. It is also equipped with a remote telecommunications system that only requires a customer phone line.

# Tecogen ... the industry leader

Tecogen is a national leader in the industry of natural gas engine-driven equipment, bringing over 18 years experience in packaged cogeneration, chillers, and refrigeration systems. With more than 1,100 operating units in the field, we offer a well-established engineering, sales, and service support network. Our equipment features the microprocessor-based *TecoNet*™ control system, customized for engines, with remote monitoring capabilities. We offer compact designs, energy-saving heat recovery, and emission control systems to meet standards in all areas of the country.



TECOGEN Service Centers



# Service....it's our business

Tecogen's extensive network, staffed by our own factory-trained technicians, offers local service for many regions in the United States. Service contracts are based upon a guaranteed price per run hour that covers both scheduled and unscheduled maintenance. With **TECOGEN**®'s proven reliability, comprehensive service contracts, and sole-source responsibility, module downtime is kept to a minimum.

Made in the USA



**TECOGEN, Inc.**
45 First Avenue
Waltham, MA 02451

(781) 622-1400
(781) 622-1002 (fax)
*www.tecogen.com*



TECOGEN® and TecoDrive™ are trademarks of Tecogen     Rev May '01

# TECOGEN® COGENERATION MODULE
## MODEL CM-75
### MICROPROCESSOR OPERATION

## ANALOG-TO-DIGITAL CONVERSION

The TECOGEN Microprocessor System is based on the Motorola MC6800 Microprocessor Unit (MPU). The MC6800 is a proven reliable device for process and control applications. For the TECOGEN application, the MPU is driven by a 1 MHz two-phase clock and performs seven control operations:

1. Engine Start (On/OFF)
2. Gas Solenoid and Ignition Power (ON/OFF)
3. Generator Contactor (OPEN/CLOSE)
4. Thermal Loop Circulation Pump (ON/OFF)
5. Throttle Control (Stepper Motor — Engine Speed or Power Output, Depending on Mode
6. Power Factor Correction Capacitor, optional (ON/OFF)
7. Unscheduled Shutdown Alarm, optional (ON/OFF)

These seven control functions are updated once every second.

A simple yet effective method of analog-to-digital conversion is utilized in the TECOGEN microprocessor system. There are nine analog signals (along with eight digital signals) monitored by the microprocessor. The analog signals are:

- Engine Speed
- Four Temperatures
- Voltage Phase 1-3
- Voltage Phase 2-3
- Current Phase 1
- Current Phase 2

The engine speed signal is generated by a magnetic pickup sensing the passage of each tooth of a 168-tooth flywheel. This signal is digitized and sent to a MC6840 Programmable Timer Module (PTM).

Four temperature signals are sensed by thermistors connected to an operational amplifier network. The four signals produced are inputs to an 8 to 1 analog multiplexer. This analog multiplexer is also shared by the two current and two voltage signals.

The current and voltage signals are generated by 500:1 current transformers and 96:1 potential transformers located within the Electrical Interface Submodule. These signals first enter into an adjustable gain operational amplifier allowing field calibration of each signal. Two circuit networks are then used for conditioning. One network is a full wave rectifying and integrator circuit producing a dc voltage proportional to the respective ac current and voltage magnitudes. These four signals are entered into the analog multiplexer whose output is connected to a Voltage to Frequency (V to F) Converter. The output of the V to F converter is then entered into the PTM.

The other network involved in the current and voltage conditioning is a squaring circuit which digitizes each signal at its respective zero crossings. These signals are used for frequency and phase angle measurements and are sent directly to the MPU through a digital multiplexer.

The engine frequency is measured and stored within the PTM every 1/10 second. The V to F output is also measured and stored within this device. A different V to F signal is selected every 1/10 second. It is from these binary numbers that the MPU can calculate engine speed, RMS current and voltage, and temperatures.

The phase angle and frequency measurements are performed differently. The digitized V13 signal not only goes to the digital multiplexer but also goes to a count by six circuit which produces a 10 Hz pulse. This pulse is used to reset the Microprocessor Unit and the Programmable Timer Module. When the MPU encounters a rising edge of one of the digitized current or voltage signals it reads the binary count of the PTM. From these values the MPU calculates the appropriate phase angles.

In all it takes the microprocessor one second to select and analyze all analog and digital inputs. For this reason, the minimum response time is one second, although in some circumstances the time could be less, depending upon when the parameter actually changes.

**COGENERATION PLANT**

OPERATIONAL OVERVIEW

The cogeneration plant shall be controlled by a Direct Digital Control (DDC) System in concert with the Tecogen® control system *TecoNet*™ to provide electric power and thermal energy to the facility based upon three controllable criteria: 1) Schedule, 2) Facility electric demand, 3) Facility thermal demand. The control system for the cogeneration plant shall be capable of controlling the plant under each of these criteria and prioritizing plant operation according to 1), 2), and 3), in that order. Provided that the defined operational schedule (criteria 1) enables the plant for operation, operation under criteria 2) or 3) is contingent upon outdoor air temperature where operation under criteria 3) is allowed only above a user adjustable set point for outdoor air temperature.

For this application, the plant consists of four cogeneration units, each using an induction generator requiring utility power to generate electricity. The plant is therefore in parallel with the utility electric supply and requires utility power to energize. When in operation, the units produce electricity that is used to meet electrical loads within the facility. In doing so, the engines develop heat that is removed by water circulating in a loop around the plant.

Heat from the cogeneration plant cooling water loop is first directed to a heat exchanger that pre-heats building hydronic return water prior to entering the building boilers, thereby displacing boiler load and boiler fuel consumption. Hot water from the boilers is used for building heating, and is also supplied to three shell-and-tube heat exchangers for the production of domestic hot water at 110°F, 140°F and 180°F. If heat is developed by the cogeneration units in excess of building needs, it is removed in a second heat exchanger which transfers this heat to a glycol loop that rejects the heat to atmosphere through a dry cooler (radiator) on the boiler room roof.

The cogeneration plant is designed and programmed to operate automatically, with owner intervention necessary only when a particular component fails, operates improperly, or the desired sequence of operation is to be changed within defined limits.

GENERAL CONDITIONS

Under each of the three operating criteria, one or more units shall be base-loaded and operating at 100% output with the last unit in the variable staging sequence designated as the "trim" unit. The controls sequences described below apply primarily to the trim unit. As additional units are brought on-line, the trim unit designation shifts to the most recent unit started and the previously designated trim unit shall subsequently become base-loaded.

Prerequisites to the operation of any cogeneration unit are the following:

1. All component hand-off-auto switches are in the auto position
2. One of the two secondary loop cooling pumps, P-6 or P-7 is running and flow is present in the main cooling loop
3. One of the two boiler preheat pumps, P-8 or P-9 is running and flow is present in the boiler preheat loop.

OPERATION BASED ON SCHEDULE (Operational criteria 1)

The cogeneration plant shall be available to operate based on a user defined, 365 day per year, calendar schedule.

OPERATION BASED ON ELECTRICAL DEMAND (Operational criteria 2)

Operation of the plant shall be automatically controlled based on electrical demand of the building, as measured by the Utility Import Watt Transducer (UIWT). Under this method the cogeneration units enable and come on line to provide electric power. The operational plan for this type of plant is to always maintain a pre-determined minimum utility import level (in kW), thus not allowing any back-feeding to the utility grid. To do this the control system must measure and monitor the electrical power coming into the building (the electric demand in kW), and compare this value to set points established in the controls. Based on the measured power and established set points, the last unit is enabled, ramped-up, ramped-down and disabled as necessary. System set points and monitored parameters are as follows:

A = Actual kW demand from UIWT (measured parameter)
B = UIWT kW set point (user adjustable set point)
C = kW increment for enabling unit (user adjustable set point)
D = Modulation window for ramp-up/ramp-down of unit (user adjustable set point)
E = UIWT minimum kW set point (user adjustable)

Startup

The unit is enabled when the building electrical demand exceeds limits set by the user. Referring to the variables defined above, the unit is enabled when "A >= (B + C)". The primary pump, cabinet supply blower and exhaust fans for the unit are started first. After these components are running, the cogeneration unit is started.

Initial Ramp-Up Operation

Following startup, a user adjustable warm-up delay period shall elapse prior to initial generation. The delay shall be in units of minutes. This warm-up period shall be a minimum of two minutes to permit the cogeneration unit to stabilize. Following the delay period, a 0 to 10 VDC signal sent from the control system determines output of each unit. For the Tecogen CM-75 unit, the "0 VDC" signal shall result in a user-adjustable minimum output, initially set to 40 kW. The "10 VDC" signal shall result in the maximum output of 75 kW. A signal of intermediate voltage shall result in a set point between the minimum and maximum, in linear proportion to the signal. Generation shall start at the minimum output and increase linearly to meet electrical demand for steady state operation, seeking an initial output level equivalent to (B + C).

Steady State Operation

Steady state operation is defined as continuously enabled operation with unit electrical output held constant at a level between minimum and maximum for the unit. For the Tecogen CM-75, the minimum electrical output shall be 40 kW and the maximum output shall be 75 kW. Steady state operation continues provided that building electrical demand (A), as measured from the UIWT, remains within a range specified by the user. Referring to the variables defined earlier, steady state operation continues when measured demand "A" is between "B – D" and "B + D" kilo-watts. Explained further, the electrical output of the unit shall remain constant when: (B – D) <= A <= (B + D). Therefore, the measured utility import kW, "A", is allowed to float within this range and the control input to the cogeneration unit remains constant.

Ramp-Up Operation

The control system shall ramp up output of the cogeneration unit when A > (B + D).  Ramp up shall be executed by increasing the control voltage in 1 volt increments, with a 1 minute delay between incremental increases.  At the end of each delay period, the control system shall compare the measured utility import kW, "A", to the steady state criteria.  Ramp-up shall stop when the unit is at maximum output (control signal 10 VDC), or if output meets the steady state criteria of (B –D <=A <= (B + D).

Ramp-Down Operation

The control system shall ramp down output of the cogeneration unit when A < (B - D).  Ramp down shall be executed by decreasing the control voltage in 1 volt increments, with a 1 minute delay between incremental decreases.  At the end of each delay period, the control system shall compare the measured utility import kW, "A", to the steady state criteria.  Ramp-down shall stop when the unit is at minimum output (control signal 0 VDC), or if output meets the steady state criteria of (B –D <=A <= (B + D).

Shutdown Operation

Shut down of units is done in reverse sequence from start-up.  The unit is shut down when building electrical demand drops off to a point where utility import kW "A", from the utility service falls below a pre-programmed, user selected kW level.  This value is defined as variable "E", above.  After the unit is shut down, its primary coolant pump, and cabinet supply and exhaust blowers are shut down.

OPERATION BASED ON THERMAL LOADS (Operational criteria 3)

The DDC system shall allow for automatic control of the plant based on usable thermal output from the plant, when the outdoor air temperature is above a user adjustable set point.  Under this method of operation, the cogeneration unit(s) is operated only to the extent that the recoverable heat is utilized by building systems.  The electrical output of the cogeneration unit is governed by the return water temperature to the unit from the main cogeneration hot water circulation loop.  As return water temperature decreases, the unit is allowed to ramp-up to provide more heat (and electricity) to building systems.  Operation under these criteria is subject to operating restrictions on utility demand described under "Operation Based on Electrical Demand".

As return water temperature T2 increases, the cogeneration unit ramps down and the amount of power and heat produced decreases. The cogeneration unit is started, stopped, and ramped up or down based on return water temperature to the cogeneration plant.  For the Tecogen CM-75 unit, the electrical output range has a user adjustable low limit set between 40 kW and 75 kW (full load).  Heat output from the unit roughly tracks kW output.  All temperature set points indicated may be adjusted to optimize plant performance.   The following variables are used in the examples provided:

$T2$ = Main return water temperature (°F) (measured parameter)
$T_{max}$ = Maximum return water temperature set point (°F) (user adjustable set point)
$T_{min}$ = Minimum return water temperature set point (°F) (user adjustable set point)
$T_{mod}$ = Modulation window (°F) for ramp-up/ramp-down of unit (user adjustable set point)

For a Tecogen CM-75 unit, typical initial values for user adjustable variables are: $T_{max}$ = 187°F, $T_{min}$ = 150°F, $T_{mod}$ = 3°F.

Startup (same as previous)

The unit is enabled when the building electrical demand exceeds limits set by the user. Referring to the variables defined above, the unit is enabled when "A >= (B + C)". The primary pump, cabinet supply blower and exhaust fans for the unit are started first. After these components are running, the cogeneration unit is started.

Initial Ramp-Up Operation (same as previous)

Following startup, a user adjustable warm-up delay period shall elapse prior to initial generation. The delay shall be in units of minutes. This warm-up period shall be a minimum of two minutes to permit the cogeneration unit to stabilize. Following the delay period, a 0 to 10 VDC signal sent from the DDC system determines output of each unit. For the Tecogen CM-75 unit, the "0 VDC" signal shall result in a user-adjustable minimum output, initially set to 40 kW. The "10 VDC" signal shall result in the maximum output of 75 kW. A signal of intermediate voltage shall result in a set point between the minimum and maximum, in linear proportion to the signal. Generation shall start at the minimum output and increase linearly to meet electrical demand for steady state operation, seeking an initial output level equivalent to (B + C).

Steady State Operation

Steady state operation is defined as continuously enabled operation with unit electrical output held constant at a level between minimum and maximum for the unit. For the Tecogen CM-75, the minimum electrical output shall be 40 kW and the maximum output shall be 75 kW. Steady state operation continues provided that electrical parameters are satisfied, and return water temperature T2 remains within the range specified by the user. The electrical output of the unit shall be held constant when $(T_{max} - T_{mod}) \leq T2 \leq (T_{max})$. In other words, the measured return water temperature, T2 shall be permitted to float within this range during which time the control input to the cogeneration unit is held steady.

Ramp-Up Operation

If the building thermal load increases such that $T2 \leq (T_{max} - T_{mod})$, the DDC system shall ramp up the output of the cogeneration unit provided that electric parameters are satisfied as described under "Operation Based on Electrical Demand". Ramp-up shall be executed by increasing the control voltage in 1 volt increments with a two-minute adjustable time delay between ramp-up increments. At the end of each time delay, the control system shall compare return water temperature T2 to the steady state criteria $(T_{max} - T_{mod})$. Ramp-up shall cease when the unit is at maximum output (10 VDC control signal), or if T2 again satisfies the steady state criteria of $(T_{max} - T_{mod}) \leq T2 \leq (T_{max})$. If the unit reaches maximum output and T2 is still less than $(T_{max} - T_{mod})$, and another unit is available in the staging sequence but is shut down, then the next unit shall be enabled for operation provided that electric parameters are satisfied as described under "Operation Based on Electrical Demand". Once enabled, this next unit shall be designated as the trim unit and ramp-up operations shall commence on it until T2 is satisfied.

Ramp-Down Operation

The DDC system shall ramp down output of the cogeneration unit when $T2 > T_{max}$. Ramp down shall be executed by decreasing the control voltage in 1 volt increments, with a 2 minute adjustable delay between incremental decreases. At the end of each delay period, the DDC system shall compare T2 to the steady state criteria. Ramp-down shall stop when the unit is at minimum output (control signal 0 VDC), or if return water temperature meets the steady state criteria of $(T_{max} - T_{mod}) \leq T2 \leq (T_{max})$. In the event that T2 has not fallen below $T_{max}$ and the unit's control signal is 0 VDC, the unit will be disabled and shut down and the previous unit in the staging sequence shall be designated as the trim unit.

Unit Temperature Control

A self-contained three-way valve in the primary circulation loop for the cogeneration unit maintains a minimum return water temperature to the unit. The valve protects the unit from shutting down on low water temperature.

## HEAT EXCHANGERS and DRY COOLER

The heat exchangers and dry cooler dissipate the waste heat from the cogeneration plant. HX-1 transfers heat from the cogeneration plant to the building heating loop. HX-2 transfers heat (in excess of that which is usable by building loads) from the cogeneration plant to the dry cooler glycol loop. The dry cooler operates to maintain coolant temperature T5 equal to or less than $T_{max}$, when the plant is being operated as described under Operational Criteria #2. Under Operational Criteria #3 and the plant ramps down on both electrical and thermal output if the return water temperature T2 rises above $T_{max}$ and the dry cooler will not normally be operated.

Facility Heat Exchanger (HX-1)

The facility heat exchanger operates to provide heat from the cogeneration plant to the boiler loop for building space heat and domestic water heating. Flow on both sides of HX-1 shall be constant. HX-1 serves to preheat facility hot water prior to entering the central boilers. During periods of low facility thermal load and high facility return water temperatures (T3), the cogeneration plant may reject enough heat to the facility loop to cause boiler entering water temperature T4 to exceed the maximum desirable value (operator defined). During these events, three-way control valve TCV-1 shall modulate to bypass a portion of the engine coolant around HX-1 in order to maintain T4 at or below the maximum permissible value.

Dry-cooler Sub-System

The dry-cooler, heat exchanger HX-2, pumps P-10 and P-11, P-12 and P-13, and three-way control valve TCV-2 shall operate as a sub-system in a coordinated manner to reject unusable waste heat from the cogeneration plant. Operations shall be as follows:

The DDC system shall monitor coolant return temperature T5 which shall be the same as T2 as long as all waste heat is being rejected to facility heat exchanger HX-1. When the facility heat exchanger cannot absorb all available waste heat and T5 exceeds $T_{max}$, the designated waste heat pump P-10 or P-11 shall start along with the designated glycol pump P-12 or P-13. TCV-2 shall modulate to maintain $(T_{max} - T_{mod}) \le T5 \le (T_{max})$. If after a pre-determined time period (adjustable), T5 is still above the acceptable temperature window, the control system shall energize the first dry cooler fan in the fan sequence and TCV-2 shall modulate to control T5. The remaining dry cooler fans shall stage in this manner until TCV-2 can successfully control T5 to within the acceptable window. The reverse shall occur if T5 is below the acceptable window until all dry cooler fans are off and TCV-2 is in the bull bypass position (all engine coolant is being bypassed around HX-2 by TCV-2), after which, the running glycol pump (P-12 or 13) and the running waste heat pump (P-10 or 11) is shut off.

## ELECTRICAL SYSTEM

Each cogeneration unit has its own microprocessor controller to check for a variety of alarm conditions and modulate the induction generator speed to control power output. The induction

generator automatically matches the voltage and frequency as supplied by the utility. Additional control sequences described below apply to the cogeneration plant:

Inputs are to be provided to the control system from the Beckwith power protection unit (refer to point schedule on drawing M-9). In addition, an RS232 connection from the Beckwith unit to the DDC system shall be installed for additional data interrogation using modbus protocol.

When the Beckwith unit senses power out of set specifications, it shall send a signal to the cogeneration system protective circuit breaker (CB5Z) which shall open. When this shunt opens and disconnects the cogeneration plant on the electrical side, the cogeneration units begin a shut down sequence that is independent of the building DDC system. After a programmed two minute delay, the DDC system shall close a contact in series with the Beckwith unit and, if the Beckwith senses proper power quality, it sends a signal to re-close the cogeneration system protective circuit breaker, enabling the cogeneration unit to restart. The building DDC system resumes operation of the plant at the previous settings.

AUTOMATIC RESTART

Through digital inputs, the controller will be notified if the Beckwith unit has signaled a power quality trip. When the controller senses that the Beckwith unit has re-closed the protection circuit breaker, the controller will begin a special cogeneration plant restart process.

If the cogeneration plant is shut down on a power quality trip, all running plant pumps and cabinet fans shall continue to run. In addition, individual unit coolant pumps are to be kept running to allow the cogeneration units to slowly cool down. Pumps and fans shall continue to operate until the coolant jacket temperature drops below 150 degrees F.

After the Beckwith unit re-closes the protection circuit breaker, the controller automatically and immediately restarts the first cogeneration unit. This unit shall generate power within two minutes. Once the unit is running, the plant ramps up according to the processes described above. If a particular cogeneration unit went into alarm during the two-minute trip period, then the control system immediately moves to the next cogeneration unit to obtain additional capacity. If the Beckwith unit shuts down the cogeneration plant three times in a ten minute period, the system "enable" contact remains open until manually reset at the system computer. During this time, status conditions shall be printed at the console to indicate the main sequence of events. This information shall also be recorded in an automatic restart log file.

**3**

## ATTACHMENT 3
## GENERATOR INFORMATION SHEET

### GENERATOR INFORMATION

DATE _1-24-05_    DEVELOPER _Atlantic Energy Services, Inc._
PROJECT NAME _Chemung County Gridley Health Center_

| | | | | | |
|---|---|---|---|---|---|
| UNIT NO. | _G1, G2, G3, G4_ | KVA | _89_ | Power Factor | _85%_ |
| MANUFACTURER | _Tecogen_ | KW | _76_ | VOLTAGE | _460 V_ |
| UNIT SERIAL NO. | | Hp | _128_ | CURRENT | _112 A_ |
| WINDING CONNECTION | _WYE_ | FREQUENCY | _60_ | No. of Phases | _3_ |
| DAMPER (Amortisseur) | | R.P.M. | _1820_ | Neutral Grounded? | _NO_ |
| WINDING? | _F-404452_ | GROUNDING RESISTANCE IN OHMS | | | |

GENERATOR MODEL TYPE:     ROUND ROTOR, ROUND ROTOR WITH DC OFFSET TORQUE
(Select One)                             COMPONENT, SALIENT POLE, TRANSIENT LEVEL, (INDUCTION),
                                                CLASSICAL, OTHER (please specify) _____

### IF INDUCTION GENERATOR:

| | | | |
|---|---|---|---|
| EFFICIENCY | _93_ % | EXCITING CURRENT | _31.5_ Amp |
| LOCKED ROTOR CURRENT | _630_ Amp | REACTIVE POWER REQUIRED: | |
| SYNCHRONOUS SPEED | _1800_ RPM | a) _0.025_ KVAR @ No Load | |
| MAGNETIZING INRUSH CURRENT | | b) _0.048_ KVAR @ Rated Load | |
| IF ENERGIZED AT | | | |
| SYNCHRONOUS SPEED | _____ Amp | FREQUENCY OF EXPECTED STARTS: | |

ROTOR RESISTANCE (Rr)     _0.0122_ *
ROTOR REACTANCE (Xr)     _0.125_ *
MAGNETIZING REACTANCE (Xm) _3.313_ *
STATOR RESISTANCE (Rs)     _0.0216_ *
STATOR REACTANCE (Xr)     _0.128_ *

|  |  |
|---|---|
| | Per Day |
| | Per Hour |
| T' | sec. |
| T'' | sec. |
| X' | _0.24_ |
| X'' | _0.153_ |

### IF SYNCHRONOUS GENERATOR:

Xd (SYNCHRONOUS)     _____ *
X'd (TRANSIENT)     _____ *
X''d (SUBTRANSIENT)     _____ *
X₂ (NEGATIVE SEQUENCE)     _____ *
X₀ (ZERO SEQUENCE)     _____ *
Xq (SYNCHRONOUS)     _____ *
X'q (TRANSIENT)     _____ *
X''q (SUBTRANSIENT)     _____ *
X (LEAKAGE)     _____ *

T'd (SHORT CIRCUIT, Transient)     _____
T''d (SHORT CIRCUIT, Subtransient)     _____
T'do (OPEN CIRCUIT, Transient)     _____
T''do (OPEN CIRCUIT, Subtransient)     _____
T'q (OPEN CIRCUIT, Transient)     _____
T''q (OPEN CIRCUIT, Subtransient)     _____
Tα (WITH FIELD SHORTED)     _____

INERTIA H     _____ *
SPEED DAMPING D     _____
ACCELERATION FACTOR     _____

MAXIMUM NUMBER OF UNITS ON BUS     _4_
MINIMUM NUMBER OF UNITS ON BUS     _0_
AVERAGE NUMBER OF UNITS ON BUS

GENERATOR WR² IN POUND-FEET SQUARED     _____
FLYWHEEL WR² IN POUND-FEET SQUARED     _____
PRIME MOVER WR² IN POUND-FEET SQUARED     _____
TOTAL WR² IN POUND-FEET SQUARED     _____

* VALUES ARE IN p.u., MACHINE KVA BASE

**ATTACHMENT 4**
**EXCITER INFORMATION SHEET**

**EXCITER INFORMATION**

DATE *1-24-05*          DEVELOPER *Atlantic Energy Services, Inc*
PROJECT NAME *Chemung County Gridely Health Center*

UNIT NO.                                              *G1, G2, G3, G4*
MANUFACTURER                                         *Tecogen*
REGULATOR TYPE
MINIMUM DESIGN RESPONSE RATIO
$E_{FD}$ NOMINAL FIELD VOLTAGE                                      VDC

**EXCITATION SYSTEM MODEL:** (Select One)

| | | |
|---|---|---|
| 1981 IEEE TYPE AC1 | 1981 IEEE TYPE ST2 | Modified 1968 TYPE 1 |
| Modified TYPE AC1 | Modified 1981 TYPE ST2 | Modified 1968 TYPE 4 |
| 1981 IEEE TYPE AC2 | 1981 IEEE TYPE ST3 | 1968 IEEE TYPE 1S |
| 1981 IEEE TYPE AC3 | 1968 IEEE TYPE 1 | 1979 IEEE TYPE 2 |
| 1981 IEEE TYPE AC4 | 1968 IEEE TYPE 2 | 1979 IEEE TYPE 2A |
| 1981 IEEE TYPE DC2 | 1968 IEEE TYPE 3 | 1979 IEEE TYPE 3 |
| 1981 IEEE TYPE ST1 | 1968 IEEE TYPE 4 | |

1979 IEEE TYPE 1 AND 1981 IEEE TYPE DC1
1979 IEEE TYPE 4 AND 1981 IEEE TYPE DC3
BUS OR SOLID FED SCR BRIDGE
SIMPLIFIED EXCITATION SYSTEM MODEL
OTHER (please specify)

**GAIN CONSTANTS AND FACTORS:**

$X_A$    REGULATOR GAIN
$X_B$    GAIN
$X_L$    EXCITER FIELD CURRENT LIMIT GAIN
$X_C$    RECTIFIER LOADING FACTOR
$X_D$    DEMAGNETIZATION FACTOR
$X_E$    SELF-EXCITED FIELD CONSTANT
$X_F$    EXCITER FIELD CURRENT RATE COMPENSATION
$X_H$    EXCITER FIELD CURRENT COMPENSATION

**TIME CONSTANTS:**

$T_A$    REGULATOR                                        sec.
$T_B$    REGULATOR LAG                                    sec.
$T_C$    REGULATOR LEAD                                   sec.
$T_E$    EXCITER                                          sec.
$T_F$    STABILIZING                                      sec.
$T_R$    REGULATOR INPUT FILTER                           sec.

**VOLTAGE CONSTANTS AND SATURATION FACTORS:**

$V_{LR}$          EXCITER FIELD CURRENT LIMIT VOLTAGE                  p.u.
$V_{RMAX}$        MAXIMUM INTERNAL REGUALTOR OUTPUT VOLTAGE            p.u.
$V_{RMIN}$        MINIMUM INTERNAL REGULATOR OUTPUT VOLTAGE            p.u.
$E_{FD}max$       VOLTAGE AT SATURATION POINT                         p.u.
$S(E_{FD}max)$    SATURATION FACTOR AT SATURATION POINT               p.u.
$E_{FD}(0.75)$    VOLTAGE AT 0.75 OF SATURATION POINT                 p.u.
$S(0.75 E_{FD}max)$   SATURATION FACTOR AT 0.75 OF SATURATION POINT   p.u.

**ATTACHMENT 5**
**GOVERNOR INFORMATION SHEET**

**GOVERNOR INFORMATION**

DATE _1-24-05_    DEVELOPER _Atlantic Energy Services, Inc_
PROJECT NAME _Chemung County Gridley Health Center_

UNIT NO.    _G1, G2, G3 G4_
MANUFACTURER    _Tecogen_

**TURBINE GOVERNOR MODEL TYPE:** (Select One)
GAS _____    STEAM _____
HYDRO _____    1973 IEEE STANDARD _____
OTHER (please specify): _____

**GAS TURBINE GOVERNOR:**
| | | | |
|---|---|---|---|
| W (Governor gain, 1/Droop) | | $X$ (Governor Time Constant) | sec. |
| Z (Governor mode, 1-Droop, | | $Y$ (Governor Time Constant) | sec. |
| D-ISO) | | $E_{TD}$ | sec. |
| $T_{RATE}$ (Turbine Rating) | MW | $T_{CD}$ | sec. |
| MAX (Limit) | p.u. | $t$ | sec. |
| MIN (Limit) | p.u. | $E_{GR}$ | sec. |
| $K_3$ | | b (valve positions) | sec. |
| a (valve positions) | | $r_f$ | sec. |
| c (valve positions) | | $T_3$ | sec. |
| $K_r$ | | $T_4$ | sec. |
| $K_5$ | | $x_1$ | sec. |
| $a_{f1}$ | | $T_5$ | sec. |
| $b_{f1}$ | | $T_R$ (Rated Temperature) | °F |
| $a_{f2}$ | | $K_{sf}$ (Minimum fuel flow) | p.u. |
| $b_{f2}$ | | | |
| $c_d$ | | | |

**HYDRO TURBINE GOVERNOR:**
| | | | |
|---|---|---|---|
| R (Permanent droop) | | $G_{MAX}$ (Maximum gate limit) | |
| r (Temporary droop) | | $G_{MIN}$ (Minimum gate limit) | |
| $T_r$ (Governor time constant) | | $T_W$ (Water time constant) | |
| $T_f$ (Filter time constant) | | $A_t$ (Turbine gain) | |
| $T_g$ (Servo time constant) | | $D_{TURB}$ (Turbine damping) | |
| $\pm$ VELM (Gate velocity limit) | | $q_{NL}$ (No-load flow) | |

**STEAM TURBINE GOVERNOR:**
| | | | |
|---|---|---|---|
| R | | $T_1$ | sec. |
| $V_{MAX}$ | * | $T_2$ | sec. |
| $V_{MIN}$ | * | $T_3$ | sec. |
| $D_t$ | * | | |

*Values are in p.u. on generator base

**1973 IEEE STANDARD TURBINE GOVERNOR:**
| | | | |
|---|---|---|---|
| $T_1$ (Controller lag) | sec. | $K_1$ | †/p.u. regulation |
| $T_2$ (Controller lead compensation) | sec. | $K_2$ | |
| $T_3$ (Governor lag) | sec. | $K_3$ | |
| $T_4$ (Delay due to steam inlet volumes) | sec. | $P_{MAX}$ (Upper power limit) | |
| $T_5$ (Reheater delay) | sec. | $P_{MIN}$ (Lower power limit) | |
| $T_6$ (Delay due to IP-LP turbine, cross-over pipes and LP end hoods) | sec. | | |

4

# TECOGEN®

## CM-60/CM-75
### Cogeneration Module

IEEE P1547/D07
Compliant



# Installation Manual
## October 2002

## TECOGEN, Inc.

## 1.  Unit Component Specifications

The TECOGEN® is a packaged, indoor, cogeneration module that produces both electricity and hot water. It is available at power outputs of 60 kW and 75 kW. The general specifications are presented below.

The TECOGEN® is available with an emissions control option. Detailed specifications on this option are presented in Appendix 1.

The following sections identify the specifications of the primary components of the TECOGEN®.

### TECOGEN® Cogeneration Module General Specifications

| Model | CM-60 *Standard* | CM-60 *Low Emissions[1]* | CM-75 *Standard* | CM-75 *Low Emissions[1]* |
|---|---|---|---|---|
| **Electrical Output (kW)** | 60 kW | | 75 kW | |
| **Thermal Output (Btu/hr)** | 440,000 | 458,000 | 490,000 | 511,000 |
| Engine Jacket/Exhaust Manifolds Remote Exhaust Gas Heat Exchanger | | 301,000 157,000 | | 336,000 175,000 |
| **Gas Input** | 760 scfh | 782 scfh | 900 scfh | 927 scfh |
| **Overall Efficiency** @LHV of 905 Btu/scf @HHV of 1020 Btu/scf | 93.8% 83.2% | 93.6% 83.1% | 91.6% 81.3% | 91.4% 81.1% |
| **Required Gas Pressure** *(when operating at full load)* | 10-14" wc | 10-28 " wc | 10-14" wc | 10-28 " wc |
| **Hot Water Flow** | 22 gpm | | | |
| **Maximum Leaving Water Temperature** | 230 °F | | | |
| **Maximum Entering Water Temperature** | 180 °F | | | |
| **Electrical Service** | 208V/230V/460 V, 3 PH, 3 – wire | | | |
| **Acoustic Level** | 70 dBa @ 20' | | | |
| **Dimensions** | 7' 2" L x 3' 8" W x 3' 10"H | | | |
| **Weight** | 3000 lb | | | |
| **Compliance List** | ETL Listed— Labeled for compliance with the AGA Standard for Gas-Fired Engine Driven Cogeneration Appliances (2-89). IEEE P1547/D07— Certified by Intertek Testing Services to be in compliance with this Draft Standard for Interconnecting Distributed Resources with Electric Power Systems. See Section 1.5.1 for further information. | | | |

Notes
1. *The Emission Control Option is available to meet air quality standards as stringent as Southern California's. Refer to Appendix 1*
2. *Above performance data is valid up to 100 °F ambient temperature.*
3. *All specifications are +/- 5% and are subject to change without notice.*

## 1.1  Engine

The TECOGEN® is equipped with one (1) TecoDrive 7400 engine. Table 1.2 presents the detailed engine specifications. The following sections describe the subsystems of the engine.

### 1.1.1  Fuel and Exhaust System

The TECOGEN® natural gas fuel system includes a manual shut-off valve, two(2) electric solenoid shut-off valves for redundant safety, a gas regulator, a carburetor, and a throttle body assembly. For units equipped with emission controls, the engine fuel components are slightly different (refer to Appendix 1).

It is the responsibility of the installing contractor to design and construct a low pressure gas supply line to the TECOGEN®. Tecogen provides recommendations and guidelines in Section 3.4.

The combustion air inlet for the engine is equipped with an air filter. The pressurized gas is mixed with the naturally aspirated – filtered air within the carburetor. The TECOGEN® precisely controls the engine throttle to modulate the fuel/air flow to the engine cylinders. On standard units, the exhaust from the cylinders is first directed through two water-cooled manifolds, and then through the exhaust gas heat recovery heat exchangers to a common outlet pipe. It is the responsibility of the installing contractor to design and construct an exhaust system from the TECOGEN® unit to the outside. Tecogen provides recommendations and guidelines in Section 2.5.

On units equipped with emission controls, once the exhaust leaves the water-cooled manifolds, it is joined together to a common outlet pipe. The heat recovery for the exhaust must be done remotely after the exhaust is treated through a catalytic converter. The catalytic converter is a factory-supplied component that must be field-installed. The remote exhaust gas heat recovery heat exchanger may also be factory-supplied (or obtained by others), and must be field-installed. Again, it is the responsibility of the installing contractor to design and construct an exhaust system using the recommendations and guidelines provided in Section 2.4.

The engine is also equipped with a Positive Crankcase Ventilation system that removes corrosive gases from the engine crankcase and directs them back into the intake manifold to be burned along with the regular fuel charge.

**Table 1.2  Engine Specifications**

| Model | CM-60 | CM-75 |
|---|---|---|
| Type | Spark Ignition, Gaseous Fueled | |
| Manufacturer | GM, Configuration by Tecogen | |
| Model | TecoDrive 7400 | |
| Nominal Rated RPM | 1820 | |
| BHP at Rated RPM | 85 | 108 |
| Aspiration | Natural | |
| Configuration | V-8 (90°) | |
| Displacement | 454 Cu. Inches | |
| Bore and Stroke (Inches) | 4.251 x 4.00 | |
| Compression Ratio | 9.2 to 1 | |
| Weight | 1100 lbs | |
| Ignition System | Electronic | |
| Firing Order | 1-8-4-3-6-5-7-2 | |
| Air/Fuel Mixture (Std) | 2% Oxygen[1] | |
| Lubrication System | | |
| - Type | Full Pressure, Full Flow, Cooled by Engine Coolant | |
| - Oil Type | Exxon XD-3 Extra SAE 30 (Consult Factory For Substitutes)[2] | |
| - Oil Capacity | 32 quarts | |
| Cooling System | | |
| - Type | Direct Jacket Cooling, Closed Loop | |
| - Expansion Tank | Precharged Bladder Type , Externally Mounted (provided by others) | |
| - Cooling Fluid | Water or Propylene Glycol Mixture (Where Required for Freeze Protection) | |
| Starting System | | |
| - Type | 12 Volts DC | |
| - Battery | Delco Freedom II 87a-60 or Equivalent rated to 485 Cold Cranking Amps | |
| - Starter | Delco Automotive Special Heavy Duty | |
| - Battery Charger | | |
| * Type | Electronic - Constant Voltage Supply | |
| * Rating | 3.5 Amp DC | |

*Notes:*

*1. Engines equipped with emission control option will operate at approximately 0.5% Oxygen.*

*2. Engines equipped with emission control option use a low ash oil; Exxon Estor Super 15W-40*

### A1.5.  Exhaust Expansion Joints *(Available from Tecogen)*

The exhaust expansion joints have a stainless steel bellows with carbon steel flanges.  They are available with either 4" or 6" flanges.  It is the responsibility of the installing contractor to determine how many expansion joints are required, and their location within the exhaust piping.  However, guidelines on thermal expansion and anchoring locations are presented below.

Listed below are the expansion joint specifications:

| Type | Flange Size | Axial Compres. (inches) | Axial Extension (inches) | Lateral Offset From C/L (inches) | Axial Spring Rate (lbs/per inch) | Overall Length (inches) | Wt [lb] |
|------|-------------|-------------------------|--------------------------|----------------------------------|----------------------------------|-------------------------|---------|
| 1    | 4"          | 3                       | 1.5                      | .75                              | 617                              | 16                      | 23      |
| 2    | 6"          | 3                       | 1.5                      | .75                              | 578                              | 16                      | 30      |

Presented below are guidelines for the number of joints required for a piping system:

| Pipe Material | # of Expansion Joints Per 100 Feet |
|---------------|-------------------------------------|
| Low Carbon Steel | 4 (1 every 25') |
| Stainless Steel | 6 (1 every 18') |

It is also important to properly anchor and guide the pipes to ensure the expansion joint absorbs the motion for which it was designed.  Inadequate anchoring and improper guiding can cause stresses that reduce the expansion joint's life, cause pipe buckling, and system failure.  Anchors in a piping system are generally of two kinds, main anchors to absorb full pressure thrust forces generated by the expansion joint, and intermediate anchors to absorb forces generated by the expansion joint bellows spring forces.  Figure A1.7 presents the recommendations for anchoring when there is a span of pipe between two main anchors, as well as when there is an intermediate anchor.

> *Important*
>
> *Failure of an exhaust expansion joint can cause leakage of CO into the mechanical room or present a fire hazard.  It is important that these joints are installed as per manufacturer's guidelines, the guidelines listed above, and local codes.  Provisions should be made to allow for periodic inspection of the joints (i.e. removable insulation).*



**Figure A1.7   Expansion Joint Anchoring Guide**

**5**



PLUMBING PLAN
SCALE 1/4"=1'-0"

# COGENERATION PLANT

1.0.0 OPERATIONAL OVERVIEW

5.1.0 STEADY STATE OPERATION

5.2.0 RAMP-UP OPERATION

5.3.0 RAMP-DOWN OPERATION

6.0.0 HEAT TEMPERATURE CONTROL

7.0.0 HEAT EXCHANGERS

7.1.0 FACILITY HEAT EXCHANGERS

8.0.0 DRY-COOLED SUB-SYSTEM

9.0.0 ELECTRICAL SYSTEM

5.1.0 AUTOMATIC RESTART

CLOUGH HARBOUR & ASSOCIATES LLP
92 CONGRESS STREET
SARATOGA SPRINGS, NY 12866

ATLANTIC ENERGY

CHEMUNG COUNTY
COMBINED HEAT & POWER PROJECT
MECHANICAL SEQUENCE OF OPERATION
AND CONTROL

SCALE: AS NOTED          DATE: JANUARY 2005

SHEET
M-8

# Tecogen Ex. 30

APPENDIX C

*Ex. 234*

NEW YORK STATE STANDARIZED APPLICATION
FOR ATTACHMENT OF PARALLEL GENERATION
EQUIPMENT 2 MW OR SMALLER
TO THE ELECTRIC SYSTEM OF

Utility: *NEW YORK STATE ELECTRIC AND GAS CORP.*

**Customer:**
Name: *CHEMUNG COUNTY HEALTH CENTER* Phone: *(607) 737-2001*

Address: *103 WASHINGTON ST*        Municipality: _____

  *ELMIRA, NY 14901*

**Consulting Engineer or Contractor:**
Name: *CLOUGH HARBOUR & ASSOCIATES*   Phone: *(585) 262-2640*

Address: *16 MAIN STREET WEST, SUITE 830*

  *ROCHESTER, NY 14614*

**Estimated In-Service Date:** *JUNE 1, 2005*

**Existing Electric Service:**
  Capacity: *400*     Amperes        Voltage: *12/70* Volts
  Service Character: ( )Single Phase (X)Three Phase
  Secondary 3 Phase Transformer Connection (X)Wye ( )Delta

**Location of Protective Interface Equipment on Property:**
(include address if different from customer address)

_____

**Energy Producing Equipment/Inverter Information:**
  Manufacturer: *TECOGEN*
  Model No. *CM-75*     Version No. _____
  ( )Synchronous (X)Induction ( )Inverter ( )Other_____
  Rating: *75*  kW   Rating: *89*  kVA
  Rated Output: ____VA  Rated Voltage: *460* Volts
  Rate Frequency: *60* Hertz Rated Speed: *1820* RPM
  Efficiency: *93* %  Power Factor: *85* %
  Rated Current: *112* Amps  Locked Rotor Current: *630* Amps
  Synchronous Speed: *1800* RPM  Winding Connection: *WYE*
  Min. Operating Freq./Time:
  Generator Connection: ( )Delta (X)Wye ( )Wye Grounded
  System Type Tested (Total System): (X)Yes ( )No; attach product literature
  Equipment Type Tested (i.e. Inverter, Protection System):
      (X)Yes ( )No; attach product literature
  One Line Diagram attached: (X)Yes
  Installation Test Plan attached: (X)Yes

- 27 -

**For Synchronous Machines:**

Submit copies of the Saturation Curve and the Vee Curve

( )Salient ( )Non-Salient

Torque: _____ lb-ft        Rated RPM: _____

Field Amperes: _____ at rated generator voltage and current

and _____ % PF over-excited

Type of Exciter: _____

Output Power of Exciter: _____

Type of Voltage Regulator: _____

Direct-axis Synchronous Reactance    $(X_d)$ _____ ohms

Direct-axis Transient Reactance    $(X'_d)$ _____ ohms

Direct-axis Sub-transient Reactance $(X''_d)$ _____ ohms

**For Induction Machines:**

Rotor Resistance        $(R_r)$ .0122 ohms      Exciting Current 31.5 Amps

Rotor Reactance        $(X_r)$ .0125 ohms      Reactive Power Required:

Magnetizing Reactance  $(X_m)$ _____ ohms      25 VARs (No Load)

Stator Resistance      $(R_s)$ 3.313 ohms      48 VARs (Full Load)

Stator Reactance       $(X_s)$ .0216 ohms

Short Circuit Reactance $(X''_d)$ _____ ohms Phases:

Frame Size: _____        Design Letter: _____      ( )Single

Temp. Rise: 80 °C.                                (X)Three-Phase

**For Inverters:**

Manufacturer: _____ Model: _____

Type: _____ ( )Forced Commutated ( )Line Commutated

Rated Output: _____ Amps _____ Volts

Efficiency: _____ %

Signature:

| _Robert E Page_ | _Health Center Director_ | 2/3/05 |
|---|---|---|
| CUSTOMER SIGNATURE | TITLE | DATE |

NOTE: COGENERATION EQUIPMENT WILL BE INSTALLED, MAINTAINED AND OWNED BY ATLANTIC ENERGY SERVICES, INC., 92 CONGRESS STREET, SARATOGA SPRINGS, NY 12866.

COGENERATION EQUIPMENT WILL BE INSTALLED AT THE CHEMUNG COUNTY HEALTH CENTER NURSING FACILITY, 103 WASHINGTON STREET, ELMIRA, NY 14910, AND CONNECTED IN PARALLEL WITH NYSE & G DISTRIBUTION SYSTEM, SERVING THIS FACILITY.

## TESTS TO BE PERFORMED

The following tests shall be performed for the initial and periodic tests:

1. <u>Current Transformer Test:</u> (Initial test only) Field verify that the CT ratio and polarity are correct. Verify the integrity of the CT insulation and secondary circuit using a 500 volt megger, and check for proper secondary ground connection.

2. <u>Voltage Transformer Test:</u> (Initial tests only) Field verify that the PT ratio is correct. Verify that correct voltages are present at the switchboard locations. Verify the integrity of the PT insulation and secondary circuit using a 500 volt megger and check for proper grounding connection.

3. <u>Calibration Test:</u> (Periodic test four-year basis) Relay testing shall verify the relay will respond to the appropriate inputs in the required manner as determined by the settings. The actual input quantities must be applied to the relay in accordance with the manufacturer's instruction book. The input quantities shall be determined by the relay settings. The settings must meet those submitted and accepted by the utility. The calibration data shall be documented in legible format and contain all pertinent relay data. Utility test forms shall be used if available.

4. <u>Functional Test:</u> (Periodic test four-year basis) The functional test shall verify the overall operation of the relay and associated equipment in accordance with the intended design. The functional tests shall include as a minimum:
   a. Verify that the end devices from each protective scheme operate from every possible source of trip potential.
   b. Verify the end device contacts complete the trip circuit to the intertie circuit breaker, actually trip the breaker, and operate all associated auxiliary relays in the close and trip circuit.
   c. AC Control Circuit – Verify intertie circuit breaker trips upon loss of ac control power.

# Tecogen Ex. 31

# TECOGEN
Natural Gas Engine-Driven Products

TECOCHILL™
TecoFROST™
COGENERATION

# LETTER OF TRANSMITTAL

45 First Avenue
WALTHAM, MA 02451
ph: 781.466.6400  fax: 781.466.6466
www.tecogen.com

TO Clough, Harbour & Associates
Powers Building
16 West Main Street, Suite 830
Rochester, NY 14614

DATE 10/25/04   JOB NO.

ATTENTION Troy McClure

RE: Chemung County Health
585-232-5610 ext

SHIPPING INFO 296

SENT VIA ☐ Fed Ex   ☐ UPS   ☑ US Mail

CHARGE NO:

TRACKING NO: Tmcclure@cha-LLP.com

**WE ARE SENDING YOU**  ☐ Attached   ☐ Under separate cover via _____ the following items:

☐ Shop drawings   ☐ Prints   ☐ Plans   ☐ Samples   ☐ Specifications
☐ Copy of letter   ☐ Change Order   ☐ O & M Manuals   ☐ Sales Literature   ☐ Other_____

| COPIES | DATE | NO. | DESCRIPTION |
|--------|------|-----|-------------|
| 1 | | | Tecogen Literature Package |
| 1 | | | CM-75 Installation Manual |
| 1 | | | Tecogen - Master/Slave Note |
| | | | |
| | | | |

**THESE ARE TRANSMITTED as checked below:**

☐ For approval   ☐ Approved as submitted   ☐ Resubmit _____ copies for approval
☐ For your use   ☐ Approved as noted   ☐ Submit _____ copies for distribution
☐ As requested   ☐ Returned for corrections   ☐ Return _____ corrected prints
☐ For review and comment   ☐ _____
☐ FOR BIDS DUE _____ 20_____   ☐ PRINTS RETURNED AFTER LOAN TO US

REMARKS  Troy,
Here is the information on our CM-75
modules.

The local rep in Rochester is Brian Wilkerson from
R.L. Kistler (585) - 464-6307. If you have
any questions, please don't hesitate to call me

Regards,
Jeff Glick

COPY TO _____

SIGNED: Jeff Glick

*If enclosures are not as noted, kindly notify us at once.*

T 0217

**Glick, Jeffrey**

| | |
|---|---|
| **From:** | Glick, Jeffrey |
| **Sent:** | Wednesday, November 10, 2004 3:40 PM |
| **To:** | 'McClure, Troy' |
| **Subject:** | RE: Chemung County - CHP Emissions Information |



EmissionControlSystem
.pdf



Tecogen cogen.pdf

Troy,

Here are the answers to the questions raised by Ruth Yeomans:

| | |
|---|---|
| Manufacturer of Cogeneration Module / Engine: | Tecogen Inc. / General Motors |
| Model Number: | TecoDrive 7400 |
| Maximum Horsepower: | 108 |
| Emissions Control System Manufacturer: | Tecogen |
| Model Number of Emission Control System: | Tecogen CM-75 Emission Control System |

Outlet Emissions with Emissions Control System:

| | | |
|---|---|---|
| NOx: | 0.75 gm/bhp-hr | 2.33 lb/MW-hr |
| CO: | 0.75 gm/bhp-hr | 2.33 lb/MW-hr |
| NMHC: | 1.0 gm/bhp-hr | 3.10 lb/MW-hr |

Assume zero PM or SO2 (natural gas combustion).

I have attached several documents for your files on these engines.

Let me know if you have any additional questions.

Regards,

Jeff Glick
Tecogen Regional Sales Manager

> ----Original Message-----
> From: McClure, Troy [mailto:TMCCLURE@CHA-LLP.COM]
> Sent: Wednesday, November 10, 2004 11:57 AM
> To: Jeffrey Glick
> Subject: FW: Chemung County - CHP Emissions Information
>
>
> Jeff
>
>
> Here is the request for information we discussed earlier this morning.
>
>
> Troy

**From:** Yeomans, Ruth
**Sent:** Wednesday, November 10, 2004 8:21 AM

1

T 0209

**To:** McClure, Troy
**Subject:** RE: Chemung County - CHP Emissions Information

I will need the manufacturer, model number and max hp rating for the engines and the manufacturer, model number and emission specs ($NO_x$, $CO$, $PM$, $SO_2$.) for the emission control equipment.

---

**From:** McClure, Troy
**Sent:** Tuesday, November 09, 2004 3:19 PM
**To:** Yeomans, Ruth
**Cc:** Lawas, Adam; Rappa, Rich
**Subject:** Chemung County - CHP Emissions Information

Ruth

Could you please forward me a list of the information you require to complete the emissions permitting? I will forward this list to the manufacturer in order to obtain the correct information for the equipment we are designing around. Thank you.

Respectfully,

Troy A. McClure

Mechanical Engineer

Clough Harbour & Associates

16 Main Street West

Rochester, NY 14614-1607

direct - 585.232.5610 x296

fax - 585.262.2642

www.cloughharbour.com <http://www.cloughharbour.com/>

---

This email and any files transmitted with it are confidential and intended solely for the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender and your system manager. The recipient should check this email and any attachments for the presence of viruses. Clough, Harbour & Associates LLP accepts no responsibility for any damage caused by any virus transmitted by this email or for any non-business related contents.

T 0210

**Glick, Jeff**

| | |
|---|---|
| **From:** | McClure, Troy [TMCCLURE@CHA-LLP.COM] |
| **Sent:** | Wednesday, November 10, 2004 11:57 AM |
| **To:** | Jeffrey Glick |
| **Subject:** | FW: Chemung County - CHP Emissions Information |

Jeff

Here is the request for information we discussed earlier this morning.

Troy

---

**From:** Yeomans, Ruth
**Sent:** Wednesday, November 10, 2004 8:21 AM
**To:** McClure, Troy
**Subject:** RE: Chemung County - CHP Emissions Information

I will need the manufacturer, model number and max hp rating for the engines and the manufacturer, model number and emission specs ($NO_x$, CO, PM, $SO_2$.) for the emission control equipment.

---

**From:** McClure, Troy
**Sent:** Tuesday, November 09, 2004 3:19 PM
**To:** Yeomans, Ruth
**Cc:** Lawas, Adam; Rappa, Rich
**Subject:** Chemung County - CHP Emissions Information

Ruth

Could you please forward me a list of the information you require to complete the emissions permitting?  I will forward this list to the manufacturer in order to obtain the correct information for the equipment we are designing around.  Thank you.

Respectfully,
Troy A. McClure
Mechanical Engineer
Clough Harbour & Associates
16 Main Street West
Rochester, NY 14614-1607
direct - 585.232.5610 x296
fax - 585.262.2642
www.cloughharbour.com

*Tim Carrol*

---------------------------------------------------

This email and any files transmitted with it are confidential and intended solely for the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender and your system manager. The recipient should check this email and any attachments for the presence of viruses. Clough, Harbour & Associates LLP accepts no responsibility for any damage caused by any virus transmitted by this email or for any non-business related contents.

T 0211

11/10/2004

# 1  Module Specifications

## 1.  Module Specifications

The TECOGEN® is a packaged, indoor, cogeneration module that produces both electricity and hot water. It is available at power outputs of 60 kW and 75 kW. The general specifications are presented below.

The TECOGEN® is available with an emissions control option. Detailed specifications on this option are presented in Appendix 1.

The following sections identify the specifications of the primary components of the TECOGEN®.

### TECOGEN® Cogeneration Module General Specifications

| Model | CM60 | CM60 | CM75 | CM75 |
|---|---|---|---|---|
| Electrical Output (kW) | 60 kW | | 75 kW | |
| Thermal Output (Btu/hr) | 440,000 | 458,000 | 490,000 | 511,000 |
|    Engine Jacket/Exhaust Manifolds | | 301,000 | | 336,000 |
|    Remote Exhaust Gas Heat Exchanger | | 157,000 | | 175,000 |
| Gas Input | 760 scfh | 782 scfh | 900 scfh | 927 scfh |
| Overall Efficiency | | | | |
|   @LHV of 905 Btu/scf | 93.8% | 93.6% | 91.6% | 91.4% |
|   @HHV of 1020 Btu/scf | 83.2% | 83.1% | 81.3% | 81.1% |
| Required Gas Pressure *(when operating at full load)* | 10-14" wc | 10-28 " wc | 10-14" wc | 10-28 " wc |
| Design Hot Water Flow | 22 gpm  *(24 gpm max)* | | | |
| Maximum Leaving Water Temperature | 230 °F | | | |
| Maximum Entering Water Temperature | 180 °F | | | |
| Electrical Service | 208V/230V/460 V, 3 PH, 3 – wire | | | |
| Acoustic Level | 70 dBa @ 20' | | | |
| Dimensions | 7' 2" L x 3' 8" W x 3' 10"H | | | |
| Weight | 3000 lb | | | |

**Safety Compliance**

*ETL Listed*—Labeled for compliance with the AGA Standard for Gas-Fired Engine Driven Cogeneration Appliances (2-89).

*IPX4 Certified*—Control and switchgear enclosures have been certified to IPX4 in accordance with IEC 60529. IPX denotes ingress protection against water. IPX4 rating indicates that the enclosures are protected against water splashed from any direction and water sprayed at an angle up to 60° on either side of the vertical.

**Interconnection Compliance**

*IEEE P1547/D07*— Certified by Intertek Testing Services to be in compliance with this Draft Standard for Interconnecting Distributed Resources with Electric Power Systems. See Section 1.5.1 for further information.

*California Rule 21*— Certified to meet the Type Testing and Production Testing requirements of California Rule 21. Also certified as Non-Islanding.

*NYSIR*—Accepted as Type Tested and Approved Equipment by the New York State Public Service Commission Standard Interconnect Requirements.

*Notes*
*1. The Emission Control Option is available to meet air quality standards as stringent as Southern California's. Refer to Appendix 1*
*2. Above performance data is valid up to 100 °F ambient temperature.*
*3. All specifications are +/- 5% and are subject to change without notice.*

T 0212

# Module Specifications 1

## 1.1 Engine

The TECOGEN® is equipped with one (1) TecoDrive 7400 engine. Table 1.2 presents the detailed engine specifications. The following sections describe the subsystems of the engine.

### 1.1.1 Fuel and Exhaust System

The TECOGEN® natural gas fuel system includes a manual shut-off valve, two(2) electric solenoid shut-off valves for redundant safety, a gas regulator, a carburetor, and a throttle body assembly. For units equipped with emission controls, the engine fuel components are slightly different (refer to Appendix 1).

It is the responsibility of the installing contractor to design and construct a low pressure gas supply line to the TECOGEN®. Tecogen provides recommendations and guidelines in Section 3.4.

The combustion air inlet for the engine is equipped with an air filter. The pressurized gas is mixed with the naturally aspirated – filtered air within the carburetor. The TECOGEN® precisely controls the engine throttle to modulate the fuel/air flow to the engine cylinders. On standard units, the exhaust from the cylinders is first directed through two water-cooled manifolds, and then

through the exhaust gas heat recovery heat exchangers to a common outlet pipe. It is the responsibility of the installing contractor to design and construct an exhaust system from the TECOGEN® unit to the outside. Tecogen provides recommendations and guidelines in Section 2.5.

On units equipped with emission controls, once the exhaust leaves the water-cooled manifolds, it is joined together to a common outlet pipe. The heat recovery for the exhaust must be done after the exhaust is treated through a catalytic converter. The catalytic converter is a factory-supplied component that must be field-installed. The remote exhaust gas heat recovery heat exchanger may also be factory-supplied (or obtained by others), and must be field-installed. Again, it is the responsibility of the installing contractor to design and construct an exhaust system using the recommendations and guidelines provided in Section 2.4.

The engine is also equipped with a Positive Crankcase Ventilation system that removes corrosive gases from the engine crankcase and directs them back into the intake manifold to be burned along with the regular fuel charge.

**Table 1.2 Engine Specifications**

| Model | CM-60 | CM-75 |
|---|---|---|
| Type | Spark Ignition, Gaseous Fueled | |
| Manufacturer | GM, Configuration by Tecogen | |
| Model | TecoDrive 7400 | |
| Nominal Rated RPM | 1820 | |
| BHP at Rated RPM | 85 | 108 |
| Aspiration | Natural | |
| Configuration | V-8 (90°) | |
| Displacement | 454 Cu. Inches | |
| Bore and Stroke (Inches) | 4.251 x 4.00 | |
| Compression Ratio | 9.2 to 1 | |
| Weight | 1100 lbs | |
| Ignition System | Electronic | |
| Firing Order | 1-8-4-3-6-5-7-2 | |
| Air/Fuel Mixture (Std) | 2% Oxygen[1] | |
| Lubrication System | | |
| - Type | Full Pressure, Full Flow, Cooled by Engine Coolant | |
| - Oil Type | ExxonMobil XD-3 SAE 30 (Consult Factory For Substitutes)[2] | |
| - Oil Capacity | 32 quarts | |
| Cooling System | | |
| - Type | Direct Jacket Cooling, Closed Loop | |
| - Expansion Tank | Precharged Bladder Type , Externally Mounted (provided by others) | |
| - Cooling Fluid | Water or Propylene Glycol Mixture (Where Required for Freeze Protection) | |
| Starting System | | |
| - Type | 12 Volts DC | |
| - Battery | Delco Freedom II 87a-60 or Equivalent rated to 485 Cold Cranking Amps | |
| - Starter | Delco Automotive Special Heavy Duty | |
| - Battery Charger | | |
| * Type | Electronic - Constant Voltage Supply | |
| * Rating | 3.5 Amp DC | |

*Notes:*

*1. Engines equipped with emission control option will operate at approximately 0.5% Oxygen.*

*2. Engines equipped with emission control option use a low ash oil: ExxonMobil Busguard GEO 15W-40.*

T 0213



**CHEMUNG COUNTY HEALTH CENTER**

103 Washington Street
Elmira, New York 14901

ex. 231

Nursing Facility
(607) 737-2001
FAX (607) 734-3021

Health Department
(607) 737-2028
FAX (607) 737-2016

December 10, 2004

Mr. Bob Walsh
NYSEG account representative
PO Box 250
Hourseheads, New York 14845

**SUBJECT:** <u>Request for one-time election to be permanently exempt from standby service rates of Service Classification NO.11</u>

Dear Mr. Walsh,

I like to thank you for taking the time to attend our November, 30<sup>th</sup> 2004 meeting. During this meeting we discussed that the Chemung County Nursing Facility would like to elect to make a one time election to be permanently exempt from the standby service rates (PSC No: 120-Electricity Service Classification No.11).

The county has established itself as an existing customer with an onsite generator ("OSG") specifically using Combined Heat and Power ("CHP"), (Leaf No. 284 Paragraph 1. Existing Customer, part c). The Chemung County Nursing Facility has been named by NYSERDA as a OSG feasibility study grant recipient, as listed in the Commission Order Establishing Electric Standby Rates, issued effective July 30, 2003, (Attachment A, paragraph 4; part c).

To receive this one time permanent exemption from the standby service rates the Chemung County Nursing Facility will also meet the criteria set forth in the definition of a Designated Technology Customer (Leaf No. 285 paragraph 2, part b, i-vi). In conjunction with Atlantic Energy Services Inc., Chemung County Nursing Facility has asked the engineer of record, Clough, Harbour & Associates LLP to help us respond to the following.

2. A Designated Technology Customer is defined as:

   b) Uses small, efficient types of combined heat and power ("CHP") generation that do not exceed 1 MW of capacity.

   Response: The ("CHP") is sized with a maximum capacity of 300 kW.

   i. Sized to serve no more than 100% of the customers maximum potential demand.

   Response: The CHP has been designed to maximize efficiency; with this in mind a 300kW plant was selected, the existing facility has approximately a 500 kW total demand requirement.

ii. Annual overall efficiency should not be less than 60% based on the higher heating value (HHV) of fuel input;

Response: The Tecogen natural gas cogenerators, model CM-75 has an (HHV) energy efficiency of 81.1%. These units have a thermal efficiency of 54% with electrical efficiency of 27.1% (see attached Tecogen emissions and efficiency statement). A major component of system efficiency is the waste heat rejected. Wasted thermal energy for this project is minimal due to the facilities large existing thermal requirements. Reviewing the attached engineering analysis spreadsheet labeled Table B-2: CHP System Operation - Interactive Analysis, of the 121,207 therms estimated to be produced annually by the cogenerators only 20,861 therms will be rejected through the dry coolers. Overall system efficiency is calculated with the sum of electrical and thermal outputs minus waste heat rejected divided by the total generator fuel used. Based on this, the overall system efficiency of this installation will be 71.1%.

iii. The usable thermal component should absorb a minimum of 20% of the CHP facility's total usable energy of the period;

Response: 62.3% of the usable thermal component will be absorbed by the CHP facility's total usable energy per year. See spreadsheet labeled Table B-2: CHP System Operation - Interactive Analysis. This is calculated by dividing the usable thermal component divided by the total thermal energy of the CHP facility.

iv. The size limits shall be determined aggregating the nameplate ratings of the generation units, installed at its location, excluding emergency generation units used only during a utility distribution system failure or in response to the NYISO Emergency Demand Response Program;

Response: The total nameplate rating of the each of the cogeneration units is 75 kW. This installation will have 4 units with the total aggregate rating of 300 kW. Emergency generation will only be utilized during scheduled testing or in case of utility distribution system failure.

v. An eligible CHP facility should demonstrate to the utility that its generation installation meets environmental standard of no more than 4.4 lbs/MWh of $No_x$ emissions, based on its electrical and mechanical output or its rated capacity, or as updated by the Department of Environmental Conservation (DEC);

Response: These units will be purchased with the manufacturer's emission control systems package; the $No_x$ emissions for these units will be 2.33 lb/MWh as stated in the attached Tecogen emissions and efficiency statement.

vi. Customer shall comply with the above criteria and;

1. Monitor and record efficiency data, which shall include the annual quantity of fuel fired, the annual quantity of generated electricity and the annual quantity of the thermal heat recovered in the heat recovery process.

Response: Atlantic Energy Services Inc. will be monitoring and verifying all of the above required records in conjunction with an energy performance contract.

2. Have records available for utility inspection,

    Response: Records will be available for utility inspection.

3. Retain the records for a three year period.

    Response: In conjunction with the above mentioned performance contract and Tecogen maintenance contract all records will be retained for a three year period.

If there are any questions or concerns, please feel free to contact me. We look forward to receiving permanent exemption from the standby service rates under PSC No: 120-Electricity Service Classification No. 11.

Very truly yours,

**Chemung County Health Center**

Robert E. Page, LNHA, CHE
Nursing Facility Administrator
Public Health Director

Cc:     Tim Brock – Atlantic Energy Services, Inc.
        Rich Rappa – Clough, Harbour & Associates LLP

Attachments:     Tecogen Emission Data and Module Efficiency – Tecogen CN-75 Modules, dated December 7, 2004
                 Table B-2: CHP System Operation – Interactive Analysis

**Input Assumptions (HHV)**

| | |
|---|---|
| 75 | kW Per unit |
| 4 | Number of Units |
| 225 | kW Capacity-Demand |
| 285 | kW Capacity-Energy |
| 27.1% | Electrical Efficiency |
| 54.0% | Thermal Efficiency |
| 81.1% | Total Efficiency |
| 80% | Boiler Efficiency |
| 0.1261 | therms/kWh |
| 2.8% | Parasitic Loads |
| 326 | On Peak hours/month |
| 404 | Off Peak hours/month |

**Cogen System Efficiency**

| | | |
|---|---|---|
| Total Generator Fuel used | 224,278 | therms/yr |
| Thermal output @ 54.0% | 121,207 | therms/yr |
| Waste Heat Rejected | 20,861 | therms/yr |
| Usable Thermal Component | 100,346 | therms/yr |
| Electricity Produced | 1,778,970 | kWh/year |
| Thermal Value of Elecricity | 60,716 | therms/yr |
| Total Usable Energy | 161,062 | therms/yr |

Usable thermal component = thermal output -waste heat

Usable thermal energy absorbed — 62.3%

Note: 62.3% of the usable thermal component will be absorbed by the CHP facility's total usable energy per year.

Overall System Efficiency — 71.8%

Note: Overall system efficiency is calculated with the sum of electrical and thermal outputs minus waste heat rejected divided by total generator fuel used.

**Table B-2: CHP System Operation - Interactive Analysis**

| Month | Generator Capacity - Energy | Utility Provided Demand Used | Total Requirement On Peak Energy Used | Total Requirement Off Peak Energy Used | On-Site Generation On Peak Generation | On-Site Generation Off Peak Generation | Utility Provided On Peak Purchased | Utility Provided Off Peak Purchased | Thermal Deficiency | Generator Fuel Used | Waste Heat Rejected |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | kW | kW | kWh | kWh | kWh | kWh | kWh | kWh | Therms | Therms | Therms |
| JAN | 285 | 61 | 73,383 | 66,367 | 73,291 | 66,367 | 92 | - | 12,002 | 17,607 | - |
| FEB | 285 | 52 | 73,245 | 63,567 | 73,245 | 63,567 | - | - | 7,664 | 17,248 | - |
| MAR | 285 | 52 | 66,658 | 68,468 | 66,658 | 68,468 | - | - | 4,473 | 17,036 | - |
| APR | 285 | 61 | 74,051 | 61,890 | 73,959 | 61,890 | 92 | - | 2,222 | 17,127 | 197 |
| MAY | 285 | 182 | 81,535 | 72,180 | 73,601 | 72,180 | 7,934 | - | - | 18,379 | 2,315 |
| JUN | 285 | 191 | 91,101 | 86,574 | 82,564 | 86,574 | 8,537 | - | - | 21,324 | 5,022 |
| JUL | 285 | 229 | 96,502 | 83,406 | 92,910 | 83,406 | 3,592 | - | - | 22,228 | 5,616 |
| AUG | 285 | 200 | 104,212 | 76,148 | 92,910 | 76,148 | 11,302 | - | - | 21,313 | 5,036 |
| SEP | 285 | 209 | 79,021 | 86,914 | 69,277 | 86,914 | 9,744 | - | - | 19,691 | 2,254 |
| OCT | 285 | 61 | 75,180 | 65,503 | 75,088 | 65,503 | 92 | - | 1,831 | 17,725 | 421 |
| NOV | 285 | 71 | 68,548 | 68,548 | 67,853 | 68,548 | 695 | - | 4,672 | 17,196 | - |
| DEC | 285 | 71 | 70,279 | 68,468 | 69,584 | 68,468 | 695 | - | 8,149 | 17,404 | - |
| | | | 953,714 | 888,032 | 910,938 | 888,032 | 42,776 | - | 41,014 | 224,278 | 20,861 |

# TECOGEN

*Natural Gas Engine-Driven Products*



*TECOCHILL®*
*TECOFROST™*
*COGENERATION*

December 7, 2004

Robert Page
Chemung County Health Center
103 Washington Street
Elmira, NY 14901

Subject:  Emission Data and Module Efficiency – Tecogen CM-75 Modules

Dear Mr Page:

Based on your request I am sending you information on the typical emission levels for a Tecogen CM-75 cogeneration module equipped with our Emissions Control System.  The modules we are proposing for your facility would be delivered with this system.  Below I have listed the expected exhaust emissions from a unit operating with Tecogen Emissions Control System.

| | | |
|---|---|---|
| NOx – 0.75 gm/bhp-hr | 2.33 lb/MW-hr | |
| CO – 0.75 gm/bhp-hr | 2.33 lb/MW-hr | |
| NMHC – 0.1 gm/bhp-hr | 0.31 lb/MW-hr | |

The Tecogen natural gas fired CM-75 modules installed at your facility will have an Overall Efficiency of 81.1% and a thermal efficiency of 54% both based on a HHV of 1020 Btu/scf.

I hope this information is helpful to your efforts.  Please contact me if you need any additional information.

Regards,

*Jeffrey Glick*

Jeffrey Glick
Tecogen Regional Sales Manager

*45 First Avenue*
*Waltham, MA 02451*
*781.622.1400  (fax) 781.622.1002*

# Cogeneration Analysis Update for Saranac Central School District

## Saranac Junior-Senior High School & Saranac Elementary School

### Table of Contents

SUMMARY .............................................................................................................................. 2

BACKGROUND ...................................................................................................................... 4

    Baseline Energy Use ........................................................................................................ 4

    Energy Costs .................................................................................................................... 4

    Calculation Methodology ................................................................................................. 5

FACTORS IMPACTING THE ECONOMICS OF COGENERATION .......................................... 7

    Project Cost ..................................................................................................................... 7

    Operational Savings ........................................................................................................ 7

        The NYSEG Tariff ...................................................................................................... 7

        Cogeneration Plant Reliability .................................................................................... 9

        Cost of Cogeneration Fuel ........................................................................................ 10

        Need for Thermal Energy .......................................................................................... 10

        Fuel Efficiency of Cogeneration Plant ....................................................................... 10

        Energy (kWh) Costs .................................................................................................. 10

DISCUSSION OF COGENERATION CALCULATIONS ........................................................... 12

    Saranac Junior-Senior High School ................................................................................ 12

    Saranac Elementary School ............................................................................................ 16

*2 - 200 hp Boilers*

# Tecogen Ex. 32

# ADVANCED COMFORT SYSTEMS

January 26, 2005

Atlantic Energy Services, Inc.
92 Congress Street
Suite #4
Saratoga Springs, NY 12866

Attention: Tim Casabonne, Project Manager

**REFERENCE: CHEMUNG COUNTY NURSING HOME**

QUOTATION: Q05-021

Advanced Comfort Systems, Inc., as the representative for *TECOGEN, INC.*, offers the following co-generation modules for use on the above referenced project.

Quantity four (4) *TECOGEN, INC.*, model CM-75 (integrated) co-generation modules listed in the specification and drawing documents as G-1 through G-4, with the following features and / or accessories:

- Packaged engine/generator set with enclosure
- 460-3-60 power
- Exhaust silencer, hospital grade, <u>mounted</u>
- Catalytic converter, <u>mounted</u>
- External hot water exhaust heat exchanger, <u>mounted</u>
- Hot water pump rated at 22 gpm @ 68 feet HD, <u>mounted</u>
- Associated exhaust, hot water and heat recovery piping, <u>mounted</u>
- Microprocessor control, <u>mounted</u>
- Skid support system for above, as per the attached drawing
- Dial-up modem. Required dedicated phone line by Customer
- Start-up service provided by *TECOGEN SERVICE*

**FOB FACTORY FREIGHT ALLOWED .........$344,660.00**          $= \, \overset{\text{†}}{86,165}$ ea.
**Terms Net 30 Days No Taxes Included**
**Tecogen will not accept any terms for retainage of monies**

Unit weight: 4,000 lbs
Unit dimensions: 98"L X 61"W X 82"H

*TECOGEN, Inc.*, will provide first year labor warranty for any part(s) that are deemed defective per the *TECOGEN* warranty.

*TECOGEN, INC.,* has provided Atlantic Energy Services, Inc., an all inclusive service cost for the four (4) CM-75 (integrated) units in their letter to you dated October 28, 2004, for the first year after start-up. This cost was $1.15 per operating hour per unit. This cost includes all expendables and all parts initially provided by *TECOGEN, INC.*

It shall be the responsibility of Atlantic Energy Services, Inc., to obtain service for these four (4) units after the initial year's operation.

Lead time for these units is ten (10) weeks ARO.

Ray Hickey
Sales Engineer

CC:  Brian Willemsen  -  R.L. Kistler, Inc.  585-436-6606
        Tecogen, Inc.  -  Jeff Glick   781-466-6466

01/28/2005 19:00    5108040411                    ACS/TBS                    PAGE 03



# Tecogen Ex. 33



# CONFIDENTIAL

March 1, 2005

Atlantic Energy Services, Inc.
92 Congress Street
Suite #4
Saratoga Springs, NY 12866

**EXHIBIT #89**
8/8/67 J3

Attention: Tim Casabonne, Project Manager

**REFERENCE: CHEMUNG COUNTY NURSING HOME**

QUOTATION: Q05-021

Advanced Comfort Systems, Inc., as the representative for *TECOGEN, INC.,* offers the
following co-generation modules for use on the above referenced project.

Quantity four (4) *TECOGEN, INC.,* model CM-75 (integrated) co-generation modules
listed in the specification and drawing documents as G-1 through G-4, with the following
features and / or accessories:

- Packaged engine/generator set with enclosure
- 450-3-60 power
- Exhaust silencer, hospital grade, <u>mounted</u>
- Catalytic converter, <u>mounted</u>
- External hot water exhaust heat exchanger, <u>mounted</u>
- Hot water pump rated at 22 gpm @ 68 feet HD, <u>mounted</u>
- Associated exhaust, hot water and heat recovery piping, <u>mounted</u>
- Microprocessor control, <u>mounted</u>
- Skid support system for above, as per the attached drawing
- Dial-up modem. Required dedicated phone line by Customer
- Start-up service provided by *TECOGEN SERVICE*

**FOB FACTORY FREIGHT ALLOWED .........**~~$335,000.00~~ $220,000

Tim Casabonne
8/1/05

**Terms Net 30 Days No Taxes Included**
**Tecogen will not accept any terms for retainage of monies**

Unit weight:  4,000 lbs
Unit dimensions:  98"L X 61"W X 82"H

*TECOGEN, Inc.,* will provide first year labor warranty for any part(s) that are deemed
defective per the *TECOGEN* warranty.

---

T 0183

**CONFIDENTIAL**

Page 2

*TECOGEN, INC.,* has provided Atlantic Energy Services, Inc., an all inclusive service cost for the four (4) CM-75 (integrated) units in their letter to you dated October 28, 2004, for the first year after start-up.  This cost was $1.15 per operating hour per unit. This cost includes all expendables and all parts initially provided by *TECOGEN, INC.*

It shall be the responsibility of Atlantic Energy Services, Inc., to obtain service for these four (4) units after the initial year's operation.

Lead time for these units is ten (10) weeks ARO.

Ray Hickey
Sales Engineer

CC:  Brian Willemsen - R.L. Kistler, Inc. 585-436-6606
        Tecogen, Inc.  - Jeff Glick  781-466-6466

# Tecogen Ex. 34

*Ex. 164*

# Tim Casabonne

**From:** Tim Casabonne [tcasabonne@atlanticenergyservices.com]
**Sent:** Tuesday, April 12, 2005 11:36 AM
**To:** 'Robert Page'
**Cc:** Tim Brock
**Subject:** RE: Cogen Project

Bob,

The cogeneration and emergency generator project is $249,402 over budget. We feel that the project is over budget because the budget #'s that we are working with are over three years old.

The cogen equipment budget was based on Tecogen units at $60,000 each. The units, which are no longer available, were field assembled and did not have any emissions control. The current quote from Tecogen is $86,165 each for an integrated unit that has the emissions control equipment required to meet NYS regulations/code and the NYSEG exemption.

Our budget for the 600 kW emergency generator with (2) basic transfer switches was $80,145 (Generac). The current low bid for the generator and (2) by-pass isolation transfer switches (not in budget) is for $141,000 (CAT).

The cogen units and emergency generator account for $165,515 of the budget overrun. The engineering and design cost and labor and material prices (steel, wire, etc.) have also increased.

We went back to Clough Harbour and the bidders for cost savings / value engineering options to try and get the costs within budget. This process has only identified $51,627 in savings. We can not award contracts / order equipment until we find the additional funds to cover the budget overrun.

On a positive note, according to Conservation Solutions, the water savings is expected to be 10% greater than projected. Also the NYSERDA Monitoring and Verification Report for the lighting work indicates that we will save 15,742 kWh above the guarantee. Even without the benefit of having additional energy savings, adding $250,000 to the project to cover the budget overrun will only result in an additional net cost of $250 dollars a year.

Would you be available by phone later today or tomorrow to further discuss this with me and Tim Brock and determine how to proceed?

Thank you,
Tim Casabonne

-----Original Message-----
**From:** Robert Page [mailto:RPage@co.chemung.ny.us]
**Sent:** Friday, April 08, 2005 5:45 PM
**To:** Tim Casabonne
**Subject:** RE: Cogen Project

Tim,

Would you please explain the "Budget overrun" problem and impact?
Bob Page

4/15/2005



ENERGY
SERVICES
INC.

May 19, 2005

Mr. Robert Page
Health Center Director
Chemung County Health Center
103 Washington Street
Elmira, NY 14901

Re: Energy Performance Project

Dear Bob,

Due to New York State Electric and Gas Company (NYSEG) tariff requirements, the cogeneration system at the County Health Center needs to be equipped with emissions control equipment in order to qualify for the tariff exemption rate. This requirement was imposed after Atlantic Energy Services, Inc. had developed the original budget and the contract was signed. The additional cost to provide the required emissions control equipment is $181,030. The emergency generator had to be equipped with bypass isolation transfer switches to meet code and was specified with a 5-year extended warranty to ensure that the generator would be able to provide emergency power at any time. The additional cost of the emergency generator component is $45,000. The energy management system (EMS) was specified with additional control points and hardware/software to allow for remote access in order to qualify for the NYSEG tariff exemption. The additional cost of the EMS is $25,090. The total additional project cost is $251,120.

We apologize for this request but it is a result of the NYSEG tariff requirements and added specifications recommended by the engineers.

Very Truly Yours,

Timothy J. Brock
President

TJB/tnc/mjg

92 Congress Street, 2nd Floor, Saratoga Springs, New York 12866
(518) 587-3252 Phone (518) 587-4328 Fax (877) 237-4524 Toll Free

6/3/05        Chemung County NS.

Jim, Jno LaVelle, Bob Page, Tom Kemp, Dan Cook, John Nann

(1) ~~Handing Project~~

(2) <u>Cogen Update</u> := Budget Increase Approved)
- Ok to proceed w/ Project
- Story Bldg ok'd. Being done by County
* DOH Approval ?? Mike Macarthy ?
* Eng. ~~Has~~ Gen Plan ? County to Tell.
  Who Removes from existing Location ?
* Revise Budget for Removal of Gen. See Bob
- Kick off Meeting w/ Cons. Schedule . . . . .

<u>Possible Extras</u> : ① Elevator work to Pen @ Fullspeed. ± 10k ?
  See Copy of Quote from Schindler

Plumbing Project : ① Ozone system Running. O.K.
  ② Need to Shorten Ozone cycle by 10 mins
  ③ Get Savings update from Dan forward to County

  Savings 25% mc
          53% Hot    ④ 10 Toilet Left to Complete. 172 Aerators to Complete
                Use

<u>Lighting</u> - Get Letter from NYSERDA on M&V Savings
  ⑤ Isolation Valves Complete

BackFlow Prevention Valve : ① Dwgs Did not Specify By Pass in
  original Design
  ② County B&G would like By Pass valve.
  ③ Need to Revise Dwgs & Resubmit for DOH
  for Approval

Steps: Eng. to Review Dwgs + App to DON
DON Dan Cash to Submit T+M NTE
Proposal to AES for Approval. AES to charge
to Allowance.

JTK + County to Coordinate Scope
for extra of work together

- Sprinkler System to be done by County w/
other Funds.

This work will take +/- 24hrs and will
require a Shutdown of the BAS System
this must be coordinated in advance w/ Jim McBlane +
facility.

County would like  (1) extra Bed Pans
(2) extra Toilets

Present Scope + Savings update in Mid July

⊕ Ozone Service / Maintenance . See Dan Cash's Proposal.

# Tecogen Ex. 35

## Tim Casabonne

| | |
|---|---|
| **From:** | Glick, Jeffrey [Jeffrey.Glick@Tecogen.com] |
| **Sent:** | Monday, June 06, 2005 5:53 PM |
| **To:** | Tim Brock |
| **Cc:** | Tim Casabonne; Schuster, Wes; Brian Willemsen (E-mail); John Bailey (E-mail); Ray Hickey (E-mail) |
| **Subject:** | Special Tecogen Module Pricing for Atlantic Energy Services Projects |

  

CM-75 High           CM-75 Low
'oltage.pdf (11 KB). .Voltage.pdf (11 KB)

Tim,

Thanks for the opportunity for allowing Tecogen and our local representatives to provide you with direct pricing for your projects. Ray Hickey has forwarded your request for an equipment quotation that would cover a total of 25 completely integrated Tecogen CM-75 modules. If this pricing is acceptable to you, Tecogen would supply the units directly to Atlantic Energy Services based on each project's schedule. Atlantic Energy Services can then assign the units to the mechanical contractor you have selected for each project. By approaching these six projects in such a fashion, Atlantic Energy can be assured that they are receiving genuine Tecogen integrated modules at the best possible pricing and delivery. As a complete package, Atlantic Energy will also be able to receive a warranty directly from Tecogen on the cogeneration module and accessories.

Although we are not positive of the exact unit voltages, I am pretty confident the breakdown we have assumed is close to the correct mix. The final pricing will need to be adjusted based on the actual unit voltages.
The scope of supply for each of the units we are quoting here is identical.
Each module will be supplied with our fully integrated package which includes our emissions control system including a pump & valve module, exhaust heat exchanger, and exhaust muffler. The pricing also includes the costs for startup, freight and extended one-year warranty.

Equipment Pricing
Based on a total of 25 units (18 high voltage / 7 low voltage), the total price would be $1,934,440. I have attached a pricing page for both the high and low voltage units. The pricing pages provide the individual unit prices along with a list of the included options. A comparison of these new prices with what has already been quoted on the Auburn H.S. and Chemung County projects should highlight the savings we are offering. In addition to lower equipment price from Tecogen, additional savings will be generated by removing the cogeneration module supply from the mechanical contractor's scope.

Maintenance Contract Pricing
Tecogen has previously provided Atlantic Energy with several quotations for complete maintenance contracts. Below I have listed maintenance contract prices for your reference. These prices are based on the location of the site and the number of units at each individual location. The pricing discount Tecogen is presenting assumes the maintenance service would be
provided by Tecogen.

| | |
|---|---|
| Chemung County Health Center | $1.15/hr |
| Lakeland Central School District | $1.00/hr |
| Waterloo High School | $1.15/hr |
| Auburn Middle School | $1.35/hr |
| Mechanicville | $1.35/hr |
| Ellenville | $1.40/hr |

Notes on Pricing
The above quoted prices are based on delivery of all units before March 31, 2006. New pricing will apply for any units that are delivered after this date.

I hope these prices are acceptable to Atlantic Energy Services and that both Tecogen and Atlantic Energy can come to a swift agreement on the supply of this equipment. I am sure that with both our companies working together these projects will be complete successes.

Please let me know if you need any further clarifications on any of this information.

Regards,

Jeffrey Glick
Tecogen
Regional Sales Manager
781-466-6481
781-466-6466 Fax

&lt;&lt;CM-75 High Voltage.pdf&gt;&gt;  &lt;&lt;CM-75 Low Voltage.pdf&gt;&gt;

2

# ATLANTIC ENERGY SERVICES
# Price Quotation

**TECOGEN**
*Natural Gas Engine-Driven Products*

TECOCHILL®
TECOFROST®
COGENERATION

**Quote Number:**

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Tim Brock | Jeffrey Glick |
| Atlantic Energy Services, Inc. | Tecogen |
| 92 Congress Street, Suite #4 | 45 First Avenue |
| Saratoga Springs, NY 12866 | Waltham, MA 02451 |
| Phone: 518-587-3252 | Phone: 781-466-6481 |
| | FAX: 781-466-6466 |

| Item | Quantity Ordered |
|---|---|
| **TECOGEN® CM-75, 480V Cogeneration Unit** | |
| Base Unit | 1 |
| · Induction Generator (75 kW, 60 Hz, 480V, 3-phase) | |
| · Industrial Natural Gas Engine | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | |
| · Engine Heat Recovery (from engine oil, jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | |
| · Acoustic Enclosure (indoor-type) | |
| · Single Steel Base | |
| · Microprocessor-Based Controls | |
| · Standard Electrical Protective Switchgear | |
| · Open Protocol Interface (Modbus-based) | |
| · Remote Monitoring and Control System (RMCS), including Modem | |
| · Complete Factory Assembly | |
| · ETL Product Listing on Entire Cogen Module | |
| · IEEE P1547/D07 Compliance | |
| · Factory Run-Test at Full Capacity | |
| · O&M Manuals | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module  (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | |
| **Factory-Installed Options** | |
| · Emissions Control Level 1 | 1 |
| · Integrated Unit (Pump and Valve Module, Exhaust HX, Capacitors, Silencer) | 1 |
| **Ship-Loose Accessories** | |
| · Delete Power-Factor Correction Capacitors | 1 |
| **Freight and Start-up** | |
| · Freight, Zone 2 | |
| · Start-up, Zone 1 | |
| **Special Options** | |
| 1-Year Warranty | 1 |
| **Total Price** | $76,623 |

## ATLANTIC ENERGY SERVICES
## Price Quotation

 **TECOGEN** Natural Gas Engine-Driven Products
*TECOCHILL®*
*TECOFROST®*
*COGENERATION*

**Quote Number:**

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Tim Brock | Jeffrey Glick |
| Atlantic Energy Services, Inc. | Tecogen |
| 92 Congress Street, Suite #4 | 45 First Avenue |
| Saratoga Springs, NY 12866 | Waltham, MA 02451 |
| Phone: 518-587-3252 | Phone: 781-466-6481 |
| | FAX: 781-466-6466 |

| Item | Quantity Ordered |
|---|---|
| **TECOGEN® CM-75, 208V Cogeneration Unit** | |
| Base Unit | 1 |
| · Induction Generator (75 kW, 60 Hz, 208V, 3-phase) | |
| · Industrial Natural Gas Engine | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | |
| · Engine Heat Recovery (from engine oil, jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | |
| · Acoustic Enclosure (indoor-type) | |
| · Single Steel Base | |
| · Microprocessor-Based Controls | |
| · Standard Electrical Protective Switchgear | |
| · Open Protocol Interface (Modbus-based) | |
| · Remote Monitoring and Control System (RMCS), including Modem | |
| · Complete Factory Assembly | |
| · ETL Product Listing on Entire Cogen Module | |
| · IEEE P1547/D07 Compliance | |
| · Factory Run-Test at Full Capacity | |
| · O&M Manuals | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | |
| **Factory-Installed Options** | |
| · Emissions Control Level 1 | 1 |
| · Integrated Unit (Pump and Valve Module, Exhaust HX, Capacitors, Silencer) | 1 |
| **Ship-Loose Accessories** | |
| · Delete Power-Factor Correction Capacitors | 1 |
| **Freight and Start-up** | |
| · Freight, Zone 2 | |
| · Start-up, Zone 1 | |
| **Special Options** | |
| 1-Year Warranty | 1 |
| **Total Price** | $79,318 |

# ATLANTIC ENERGY SERVICES
## Price Quotation

**TECOGEN** 

TECOCHILL®
TECOFROST®
COGENERATION

*Natural Gas Engine-Driven Products*

**Quote Number:**

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Tim Brock | Jeffrey Glick |
| Atlantic Energy Services, Inc. | Tecogen |
| 92 Congress Street, Suite #4 | 45 First Avenue |
| Saratoga Springs, NY  12866 | Waltham, MA  02451 |
| Phone: 518-587-3252 | Phone: 781-466-6481 |
| | FAX: 781-466-6466 |

| Item | Quantity Ordered |
|---|---|
| **TECOGEN® CM-75, 480V Cogeneration Unit** | |
| Base Unit | 1 |
| · Induction Generator (75 kW, 60 Hz, 480V, 3-phase) | |
| · Industrial Natural Gas Engine | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | |
| · Engine Heat Recovery (from engine oil, jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | |
| · Acoustic Enclosure (indoor-type) | |
| · Single Steel Base | |
| · Microprocessor-Based Controls | |
| · Standard Electrical Protective Switchgear | |
| · Open Protocol Interface (Modbus-based) | |
| · Remote Monitoring and Control System (RMCS), including Modem | |
| · Complete Factory Assembly | |
| · ETL Product Listing on Entire Cogen Module | |
| · IEEE P1547/D07 Compliance | |
| · Factory Run-Test at Full Capacity | |
| · O&M Manuals | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module  (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | |
| **Factory-Installed Options** | |
| · Emissions Control Level 1 | 1 |
| · Integrated Unit (Pump and Valve Module, Exhaust HX, Capacitors, Silencer) | 1 |
| **Ship-Loose Accessories** | |
| · Delete Power-Factor Correction Capacitors | 1 |
| **Freight and Start-up** | |
| · Freight, Zone 2 | |
| · Start-up, Zone 1 | |
| **Special Options** | |
| 1-Year Warranty | 1 |
| **Total Price** | **$76,623** |

Chenney = 4 units   $306,492   AES Price

# Tecogen Ex. 36




413/746-5400 • FAX 413/746-3242
WWW.AEGISENERGYSERVICES.COM

**AEGIS ENERGY SERVICES INC.**

2097 RIVERDALE STREET, WEST SPRINGFIELD, MA 01089 • PO BOX 2511, SPRINGFIELD, MA 01101-2511

## PRICE QUOTATION FOR ATLANTIC ENERGY SERVICES

| Prepared for: | Prepared by: |
|---|---|
| Atlantic Energy Services, Inc.<br>92 Congress Street, Suite 4<br>Saratoga Springs, NY 12866<br>(518) 587-3252 | Lee Vardakas<br>AEGENCO, Inc.<br>2085 Riverdale Street<br>West Springfield, MA 01089<br>(413) 746-1146 |

**Date: June 14, 2005**

## ITEMIZED DESCRIPTION FOR CHEMUNG COUNTY NURSING HOME

Four (4) AEGEN ThermoPower TP-75LE Cogeneration Modules (75 kW, 60 Hz, 208 V, 3-phase). Each module will include:

- Industrial Natural Gas Engine (V-8, 454 Cid)
- Engine Jacket, Oil, and Exhaust Heat Recovery
- 3-Way NSCR Emissions Package
- Acoustical Enclosure (Indoor Type)
- Intelisys Microprocessor Controls
- Open Protocol Interface (Modbus-Based)
- Remote Monitoring and Control System Including Modem
- Standard Electrical Protective Switchgear Panel Plus Integrated Utility Grade Relay Package
- Steel Skid and Vibration Isolators
- Complete Factory Assembly
- Factory Full-Load Run Test
- UL Approved Panel
- Installation Manual and Training
- Integrated Pump and Valve Module with Pump, Isolation Valve, Thermostatic Mixing Valve, Expansion Tank, and Pressure Relief Valve
- Silencer
- Start-up Assistance for AEGEN TP-75LE Modules by a Factory-Certified Technician.

1

## TOTAL COST



This price is contingent on delivery of 20 total AEGEN modules on all Atlantic Energy Service projects by 1/1/2006.

Standard parts and labor warranty are included on each module (covers defects in parts for 12 months from date of start-up). For best and broadest coverage, AEGENCO recommends that owner enter into separate maintenance agreement with factory authorized service provider.

## ITEMIZED DESCRIPTION FOR ADDITIONAL MODULES

Five (5) AEGEN ThermoPower TP-75LE Cogeneration Modules (75 kW, 60 Hz, 480 V, 3 phase). Each module will include:

- Industrial Natural Gas Engine (V-8, 454 Cid)
- Engine Jacket, Oil and Exhaust Heat Recovery
- 3-Way NSCR Emissions Package
- Acoustical Enclosure (Indoor Type)
- Intelisys Microprocessor Controls
- Open Protocol Interface (Modbus-Based)
- Remote Monitoring and Control System Including Modem
- Standard Electrical Protective Switchgear Panel Plus Integrated Utility Grade Relay Package
- Steel Skid and Vibration Isolators
- Complete Factory Assembly
- Factory Full-Load Run Test
- UL Approved Panel
- Installation Manual and Training
- Integrated Pump and Valve Module with Pump, Isolation Valve, Thermostatic Mixing Valve, Expansion Tank, and Pressure Relief Valve
- Silencer
- Start-up Assistance for AEGEN TP-75LE Modules by a Factory-Certified Technician.

Standard parts and labor warranty are included on each module (covers defects in parts for 12 months from date of start-up). For best and broadest coverage, AEGENCO recommends that owner enter into separate maintenance agreement with factory authorized service provider.

## TOTAL COST



This price is contingent on delivery of 20 total AEGEN modules on all Atlantic Energy Service projects by 1/1/2006.

**Notes:**

1. Delivery: 10 to 12 weeks after receipt of order.
2. Price excludes any applicable sales or use tax.
3. FOB: West Springfield, MA
4. Terms: 15% with order, balance within 30 days of delivery (subject to credit approval).
5. Quotation valid for 90 days.

Lee Vardakas
General Manager

3

# Tecogen Ex. 37

WES S
781-466-6466



**AEGIS ENERGY SERVICES INC.**

413/746-5400 • FAX 413/746-3242
WWW.AEGISENERGYSERVICES.COM

2097 RIVERDALE STREET, WEST SPRINGFIELD, MA 01089 • P.O. BOX 2511, SPRINGFIELD, MA 01101-2511

# PRICE QUOTATION FOR ATLANTIC ENERGY SERVICES

| Prepared for: | Prepared by: |
|---|---|
| Atlantic Energy Services, Inc. | Lee Vardakas |
| 92 Congress Street, Suite 4 | AEGENCO∞, Inc. |
| Saratoga Springs, NY 12866 | 2085 Riverdale Street |
| (518) 587-3252 | West Springfield, MA 01089 |
| | (413) 746-1146 |

**Date: June 16, 2005**

**ITEMIZED DESCRIPTION FOR CHEMUNG COUNTY NURSING HOME**

Four (4) AEGEN ThermoPower TP-75 LE Cogeneration Modules  (75 kW, 60 Hz, 480 V, 3-phase).  Each module will include:

- ξ  Industrial Natural Gas Engine (V-8, 454 Cid)
- ξ  Engine Jacket, Oil, and Exhaust Heat Recovery
- ξ  3-Way NSCR Emissions Package
- ξ  Acoustical Enclosure (Indoor Type)
- ξ  Intelisys Microprocessor Controls
- ξ  Open Protocol Interface (Modbus-Based)
- ξ  Remote Monitoring and Control System Including Modem
- ξ  Standard Electrical Protective Switchgear Panel Plus Integrated Utility Grade Relay Package
- ξ  Steel Skid and Vibration Isolators
- ξ  Complete Factory Assembly
- ξ  Factory Full-Load Run Test
- ξ  UL Approved Panel
- ξ  Installation Manual and Training
- ξ  Integrated Pump and Valve Module with Pump, Isolation Valve, Thermostatic Mixing Valve, Expansion Tank, and Pressure Relief Valve
- ξ  Silencer
- ξ  Start-up Assistance for AEGEN TP-75 LE Modules by a Factory-Certified Technician.



EXHIBIT
#3a
8/03/04

1

T 0076

Standard parts and labor warranty are included on each module (covers defects in parts for 12 months from date of start-up). For best and broadest coverage, AEGENCO∞ recommends that owner enter into separate maintenance agreement with factory authorized service provider.

## ITEMIZED DESCRIPTION FOR ADDITIONAL MODULES

Five (5) AEGEN ThermoPower TP-75 LE Cogeneration Modules (75 kW, 60 Hz, 3 phase, voltage to be determined). Each module will include:

- ξ   Industrial Natural Gas Engine (V-8, 454 Cid)
- ξ   Engine Jacket, Oil and Exhaust Heat Recovery
- ξ   3-Way NSCR Emissions Package
- ξ   Acoustical Enclosure (Indoor Type)
- ξ   Intelisys Microprocessor Controls
- ξ   Open Protocol Interface (Modbus-Based)
- ξ   Remote Monitoring and Control System Including Modem
- ξ   Standard Electrical Protective Switchgear Panel Plus Integrated Utility Grade Relay Package
- ξ   Steel Skid and Vibration Isolators
- ξ   Complete Factory Assembly
- ξ   Factory Full-Load Run Test
- ξ   UL Approved Panel
- ξ   Installation Manual and Training
- ξ   Integrated Pump and Valve Module with Pump, Isolation Valve, Thermostatic Mixing Valve, Expansion Tank, and Pressure Relief Valve
- ξ   Silencer
- ξ   Start-up Assistance for AEGEN TP-75 LE Modules by a Factory-Certified Technician.

Standard parts and labor warranty are included on each module (covers defects in parts for 12 months from date of start-up). For best and broadest coverage, AEGENCO∞ recommends that owner enter into separate maintenance agreement with factory authorized service provider.

2

**Notes:**

1. Delivery: 10 to 12 weeks after receipt of order.
2. Price excludes any applicable sales or use tax.
3. FOB: West Springfield, MA
4. Terms: 15% with order, balance within 30 days of delivery (subject to credit approval).
5. Quotation valid for 90 days.

Lee Vardakas
General Manager

T 0078

# Tecogen Ex. 38





**CONFIDENTIAL**
**ATTORNEYS ONLY**

# Purchase Order

| Order Date: | | PO No: | | Job: |
|---|---|---|---|---|
| June 16, 2005 | | 05AES001 | | Chemung County Health Center |

**Seller:** Aegis Energy Services, Inc.
2097 Riverdale Street
West Springfield, MA 01089
413-746-5400

**Ship To:** Chemung County Health Center
103 Washington Street
Elmira, NY 14901
607-737-2028

Delivery date of goods: (on or before): 10-12 Weeks from date of order

Per Our Attached Specification dated: NA

Completion of services date (on or before): NA

Per your quote dated: June 16, 2005

| Item No. | Quantity | Vendor Catalog No. | Description of Goods or Services | Price per Item | Extended Price |
|---|---|---|---|---|---|
| 1 | 4 | AEGEN ThermoPower TP-75LE | Cogeneration Module (75kW, 60 Hz, 480 V, 3-phase) | NA | $119,000.00 |

Misc. Notes:  1. Units to be equipped with the logo "ATLANTICGEN".

2. PO is contingent upon the design engineer's approval of the AEGEN unit as an acceptable substitute to the TECOGEN, INC CM-75 Integrated module listed in the project plans and Specifications.

Sub-total:  $119,000.00

Sales Tax:  Exempt

**Total: $119,000.00**

** Send all invoices to the attention of Accounts Payable to the address listed below.**

**Our Purchase Order No. <u>MUST</u> appear on all invoices, shipping labels and packages.**

NOTE: This order expressly limits acceptance to the terms stated on the face and back of this form and on any Purchase order supplement attached hereto.  Any additional or different terms, whether or not materially different, set forth in any communication from the seller are objected to and hereby rejected.

Approved By AES:  *Timothy J. Brock, President*

Accepted By:

Dated: 6/16/05     0411318

Dated:

92 Congress Street • Suite 4 • Saratoga Springs, NY • 12866 • (518) 587-3252 • (518) 587-4328 fax

# Tecogen Ex. 39

*Ex-* 2335

## CHEMUNG COUNTY NURSING FACILITY
103 Washington Street
Elmira, NY 14901
Phone (607-737-2867    FAX (607) 734-3021

# Fax

| To: | Tim Casabonne | From: | Bob Page |
|-----|---------------|-------|----------|
| Fax: | (518) 587-4328 | Pages: | 3 |
| Phone: | | Date: | 6/27/05 |
| Re: | NYSEG Letter | CC: | |

☐ Urgent    ☑ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● This transmission is private and confidential and is intended only for the use of the individual(s) named above. If you are not the intended recipient, be advised that unauthorized use, disclosure, copying, or distribution of this information is strictly prohibited. If you have received this transmission in error, please notify us immediately to arrange for return of this material.

Tim,

Enclosed is letter received today from NYSEG. Will payment be made by AES on behalf of the County as part of the project budget?

Bob

Take from
CONtgcay
per Tim B.



June 24, 2005

**VIA FAX AND MAIL**

Thomas F. Ferreri
Clough, Harbour & Associates
16 Main Street West, Suite 830
Rochester, New York 14614
Fax: (585) 262-2642

        SUBJECT:    Chemung Gridley Health Care Center 300 kW Cogeneration
                      Facility (the "Project") Preliminary Review

Dear Mr. Ferreri:

        NYSEG has conducted a Preliminary Review of the proposed Project and offers
the following comments:

**NYSEG System Modifications**

        NYSEG's Preliminary Review has determined that no NYSEG system
modifications are required.

        The Technical Review of this Project will be completed upon receipt of the
advance payment as discussed below.

**Project Costs**

        Pursuant to the terms and conditions of the Agreement and Bulletin 86-01,
Chemung Gridley Health Care Center will be responsible for all costs incurred by
NYSEG related to the Project. NYSEG estimates its costs to be approximately $5000
which must be paid in advance. This estimate includes NYSEG's costs for

An equal opportunity employer

James A. Carrigg Center | 18 Link Drive | P.O. Box 5224 | Binghamton, NY 13902-5224
www.nyseg.com

TOTAL P.03

Mr. Ferreri
Page 2
June 24, 2005

administration, engineering review, metering and on-site verification and checkout, including customary overheads. Please note that this is only an estimate and Chemung Gridley Health Care Center will be responsible for actual costs incurred by NYSEG related to the Project. NYSEG will not commence with any additional review of this Project until the advance payment is received.

Sincerely,

Carol L. Muessigbrodt
CF

Carol L. Muessigbrodt
NUG Interconnection Coordinator
NYSEG and RGE

CLM:File 497:060501.doc

xc:    R. A. Brown- Substation & Protection Engineer
       E. Krizauskas -- Substation & Protection Engineering
       T. Bernardo - Corporate Metering
       C. Tschang-- Electric Distribution Engineering
       J. Zdimal -- Elmira Engineer
       R. Soucy -- Elmira SP&C Supervisor
       Robert Page -- Chemung Gridley Health Care Center

# Tecogen Ex. 40

**Tim Casabonne**

| | |
|---|---|
| **From:** | Tim Casabonne |
| **Sent:** | Monday, June 27, 2005 4:14 PM |
| **To:** | 'Ferreri, Thomas' |
| **Cc:** | Conrad, Michael; Rappa, Rich; Tim Brock; Bill Marzano |
| **Subject:** | RE: Chemung Gridley Health Center |

Tom,

We will hold on the final review fee we receive until further from your office.

Thanks,
Tim

---

**From:** Ferreri, Thomas [mailto:TFerreri@CHA-LLP.COM]
**Sent:** Monday, June 27, 2005 4:03 PM
**To:** Tim Casabonne
**Cc:** Conrad, Michael; Rappa, Rich
**Subject:** RE: Chemung Gridley Health Center

Tim,

Mike Conrad forwarded today, the new cogen unit technical information for our review. Perhaps, you may want to hold off on the utility final review fee, because with a change of this magnitude, the utility may require another full preliminary review and preliminary review fee also. We are currently reviewing the Aegenco technical information to gauge the impact on our original design that has been approved by the utility preliminary review.

Tom

---

**From:** Tim Casabonne [mailto:tcasabonne@atlanticenergyservices.com]
**Sent:** Monday, June 27, 2005 12:01 PM
**To:** Ferreri, Thomas
**Cc:** Conrad, Michael; Rappa, Rich
**Subject:** RE: Chemung Gridley Health Center

Thanks Tom. I will forward a copy to the County, who will be making payment to NYSEG.

---

**From:** Ferreri, Thomas [mailto:TFerreri@CHA-LLP.COM]
**Sent:** Monday, June 27, 2005 7:42 AM
**To:** Tim Casabonne
**Cc:** Conrad, Michael; Rappa, Rich
**Subject:** Chemung Gridley Health Center

Tim,

Attached is a letter from NYSE&G faxed to us on 6-24-05. The preliminary review is complete, but final review will not be started until NYSE&G receives their estimated cost of $5,000.00. The letter states payment, however, I didn't know if Chemung Health Center or Atlantic Energy will be making the payment. If you wish, please let me know who will be making the payment and I can notify NYSE&G.

If you have any questions, don't hesitate to contact me.

11/1/2007

Tom

Thomas F. Ferreri
Clough, Harbour & Associates
16 Main Street West, Suite 830
Rochester, New York 14614
Ph: (585) 262-2640
Fx: (585) 262-2642
Direct: (585) 262-5610 x223
E-mail: tferreri@cha-llp.com

----------------------------------------------------
This email and any files transmitted with it are confidential and intended solely for the individual or entity to wh
business related contents.



----------------------------------------------------
This email and any files transmitted with it are confidential and intended solely for the individual or entity to wh
business related contents.

11/1/2007

# Tecogen Ex. 41



### Chemung County Health Center
**Energy Performance Project – Cogen / Emergency Generator Project Kick-off Meeting Minutes**
**6/28/05**

**Attendees:**

| | |
|---|---|
| Bob Page | Health Center Director |
| Jim MacBlane, Pete Shaffer | Maintenance Dept. |
| Gary Morenus, John Harris | Buildings and Grounds |
| Tim Hugg, Joe Lavelle | Buildings and Grounds |
| Pat Bonnell | Kimble |
| Steve Maybeck | Day Automation Systems |
| Steve Micknich | Micknich Electrical Systems |
| Tim Casabonne | Atlantic Energy Services |

The purpose of this meeting was to review the project scope, time line and logistics prior to the start of work.

1. Bob Page requested that Mike McCarthy request written approval for the project budget increase from the Department of Health. Bob Page and AES will follow up with Mike McCarthy.

2. Tim Casabonne advised that they have issued a purchase order for AEGEN Thermo Power 75LE cogen units. This is a change for the originally specified Tecogen unit but AES feels that AEGEN is equal or superior to the Tecogen. Clough Harbour is reviewing the formal submittal and will advise of any potential issues or if modifications to the design are required.

3. Tim Casabonne asked the contractors to submit their proposed work schedule (tasks and durations) to him to be incorporated into a master schedule. Tim advised that the lead time on the cogen units is approx. 12 weeks. Steve Micknich advised that the lead time on the backup generator is approx. 16 weeks.

4. Steve Micknich advised that his proposal included a CAT backup generator vs. the specified Cummins generator and that Clough Harbour feels the CAT unit is an acceptable equal. The buildings and grounds department approved the CAT generator.

5. Steve Micknich advised that he is looking at GE or Square D for the electrical equipment package. The buildings and grounds department would prefer Square D if possible.

6. Steve Micknich advised that there would be 3-4 electrical shutdowns lasting approx. 8 hours each during the project. The shutdowns will be scheduled to minimize disruptions to the Health Center. The existing backup generator will be used during the shutdowns. The existing generator will remain in service until the all new systems are in operation.



7. Tim Casabonne asked Kimble to submit equipment/pad layouts for approval.

8. Tim Casabonne advised contractors to send (4) copies, plus the qty. they want returned, of submittals to him.

9. There was some discussion about the backflow / bypass valve work to be preformed. This work can not take place until we receive Department of Health approval, a final price from Conservation Solutions and the County plumbers are clear as to the County's responsibility and scope of work.

10. The next project meeting is scheduled for Tuesday July 19th at 10:00 am.


Respectfully Submitted,

Tim Casabonne
Project Manager

Cc: Tim Brock, AES
    Rich Rappa, CHA

Ex 193

6/28/05    Cheung trip Off Cayey Meeting

✓Bob Page
✓John Harris
✓Tim Hogg
✓Tim MacBlane
✓Pete Sheffer
✓Joe Lacelle

1) Need written approval from DOH from Mike McCarthy
   Bob Page to call. AES to follow up. also.
2) AES to provide ABGEN unit
3) Schedule to be developed by AES w/ Contractors.
4) CAF vs. Cummins. CAT is ok w/ County
5) County Prefers Square D package.
6) Will perform meeting cabinet vs. Pedestals
7) 12-14 weeks on S&C Meeting ⎤
   16 weeks on Generator ⎬ Material
   6-8 on MCC ⎦
8) 3-4 journeymen expected - 8hrs ± to be Done @ Nite
9) Kimple to provide Pad Layout for New Equipment
10) Conduit by AES
11) Next meeting 7/19  10am
12) ok.
13) Dan Cook   Price, Plan (County), DOH approval
    ⑬ No work until this is approved.

    Joe Lacelle cell 607-426-4888   Fax to B+G
14) Hold on Elevator                  607-737-2848
15) N.T.E. - $3,100
    2" Back Flow Prevent
    — Don't Have DOH or Scope or Price. Don't Do any
      work w/out written approval

# Tecogen Ex. 42

# Tim Casabonne

**From:**   Tim Casabonne
**Sent:**   Thursday, June 30, 2005 4:36 PM
**To:**     Lee Vardakas (leev@aegisenergyservices.com)
**Subject:** FW: Preliminary Review of Aegenco Units for Chemung County

Lee,

For your review/comment.  I will be out of the office tomorrow and Tuesday and will plan on speaking with you next Wednesday.

Tim

---

**From:** Rappa, Rich [mailto:RRAPPA@CHA-LLP.COM]
**Sent:** Thursday, June 30, 2005 4:20 PM
**To:** Tim Casabonne
**Cc:** Conrad, Michael; Lawas, Adam; McClure, Troy; Ferreri, Thomas
**Subject:** Preliminary Review of Aegenco Units for Chemung County

Tim,

Based on a preliminary review of the Aegenco units, the following additional info is required to determine the extent of changes, resubmissions, etc.:

1. Emissions data is required for the Low Emissions unit
2. The information provided only address their standard 75kW unit. Technical information for the Low Emissions unit is needed.
3. Does the low emissions unit utilize an exhaust heat recovery system?
4. Does Aegenco suggest any dump radiator design strategies?
5. What size is the natural gas connection?
6. Are the water pressure drops different through the low emissions unit?
7. There is no statement of compliance with IEEE 1547. This is important, as it covers issues, such as: grounding, effects on utility distribution systems, reconnection, monitoring, voltage & frequency disturbances, feeder re-closing coordination, flicker, harmonics, surge capability, etc.
8. Additional information is required for utility submission on the integral circuit breaker.
9. It is not clear which Beckwith relay is being used.  The label on the "typical" control schematic is "Generator Protection Relay."  Depending on the exact model, this may not meet the inter-tie requirements.  Additional information is required on the Beckwith Relay.
10. It is not clear how multiple units are connected in parallel.  All the "typical" diagrams show only 1 unit.  Per our conversation, each unit has its own Beckwith Relay and there is one "master" for all units connected in parallel.
11. It appears the inter-tie control circuit is integral with the unit.  If this is true, the manufacturer must provide specific, detailed drawings and relay settings for submission to the utility.  There may be a question of liability (or at least finger pointing) if the manufacturer's control has to be modified to meet utility requirements or establish settings.
12. Generator and circuit breaker information for a 480 volt unit is missing.  The information provided is for a 208 volt unit.

It may be worth a teleconference with our team, AES, and Aegenco to clarify information required.  Would you like to set this up?

Rich

Richard F. Rappa, P.E.
Partner
Clough, Harbour & Associates LLP

11/1/2007

rrappa@cha-llp.com
(585) 262-2640 (phone)
(585) 262-2642 (fax)

------------------------------------------------------------

This email and any files transmitted with it are confidential and intended solely for the individual or entity to wh
business related contents.

11/1/2007

# Tecogen Ex. 43

**ITS** Intertek Testing Services
ETL SEMKO

April 30, 2003

Ms. Jean P. Roy
Tecogen, Incorporated
45 First Avenue
Waltham, MA 02451
USA

Dear Jean:

Enclosed is Update #2 of EMC Technical Construction File (TCF) #1 to cover the Tecogen product line of Cogeneration Systems. This Update includes Anti-Islanding. This TCF contains all of the test data and supporting documentation to certify that these products are in compliance with the applicable sections of the standards listed below. The applicable sections are those relating to an induction generator. The standards are as follows:

IEEE P1547/D07:2001                 NYSIR November 9, 2000
California Rule 21 January 5, 2001        UL 1741 May 7, 1999

The products included are the CM-75 H (75 kW, 480 V), CM-75L (75 kW, 208/230 V), CM-60H (60 kW, 480 V) and CM-60L (60 kW, 208/230 V).

If you have any questions, please do not hesitate to call me.

Sincerely yours,

Michael F. Murphy
Staff Engineer, EMC
ITS-Boxborough

MFM/mfm

Enclosure



**Intertek Testing Services NA Inc.**
70 Codman Hill Road, Boxborough, MA 01719
Telephone 978-263-2562  Fax 978-264-9403  Home Page www.etlsemko.com


Warnock Hersey



## Department of Public Service
### Certified Interconnection Equipment

Note: All equipment included on this list is approved to operate only at its designated phase and voltage level. Use on any other system configuration may require supplemental equipment to ensure compliance with the SIR.

Utility grade relays need not be certified per the requirements of the SIR, Section I.H.

| Manufacturer | Ascension Technology |
|---|---|
| Model No. | SS01-MP |
| Date of Approval | 8/18/00 |
| Firmware Version | 2.09 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E184515-00NK25412 |
| Date of Report | 7/13/00 |
| Device Description | 300W, 120/240 Single Phase Inverter |

| Manufacturer | Trace Engineering |
|---|---|
| Model No. | ST1000, ST1500, ST2000, ST2500 |
| Date of Approval | 8/18/00 |
| Firmware Version | 2.9 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E187916-00NK02576 |
| Date of Report | 6/27/00 |
| Device Description | 1000W, 1500W, 2000W, 2500W Single Phase 120/240V Inverters |

| Manufacturer | Trace Engineering |
|---|---|
| Model No. | ST1000, ST1500, ST2000, ST2500 |
| Date of Approval | 12/7/00 |
| Firmware Version | 3.0, 5.0 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E187916-00NK37316 |
| Date of Report | 10/24/00 |
| Device Description | 1000W, 1500W, 2000W, 2500W Single Phase 120/240V Inverters |

| Manufacturer | Advanced Energy Inc. |
|---|---|
| Model No. | GC1000 |
| Date of Approval | 4/26/00 |
| Firmware Version | 2.47 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E182866-00NK12026 |
| Date of Report | 4/24/00 |
| Device Description | 1000W, 120/240 Single Phase Inverter |

| Manufacturer | Capstone Turbine |
|---|---|
| Model No. | (330) 30 MicroTurbine |
| Date of Approval | 6/26/00 |
| Firmware Version | 4.52 through 4.99, 5.2 |
| Testing Agency | Underwriter's Laboratories, Nemko EESI, Inc. |
| Test Report | 310102-AU2687B, 20200402 |
| Date of Report | 1/31/02, 5/4/00 |
| Device Description | 30kW, 480V, Three Phase Microturbine |

| Manufacturer | Schweitzer Engineering Labs |
|---|---|
| Model No. | SEL-351A00H24552XX |
| Date of Approval | 11/11/00 |
| Firmware Version | SEL-351A-R101-V0-Z001001-D19990908 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E202915-00NK41853 |
| Date of Report | 10/25/00 |
| Device Description | Utility Interactive Relay, Single Phase and Three Phase |

| Manufacturer | Plug Power |
|---|---|
| Model No. | SU1PCM-059622 |
| Date of Approval | 11/14//01 |
| Firmware Version | 3.21 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E206704-01NK16753 |
| Date of Report | 10/30/01 |
| Device Description | 6500 W, 240V Single Phase Fuel Cell Inverter |

| Manufacturer | Beckwith Electric |
|---|---|
| Model No. | M-3410 |
| Date of Approval | 10/22/03 |
| Firmware Version | D0091V01.05.07 to D0091V01.99.99 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E128716-03CA33157 |
| Date of Report | 9/24/03 |
| Device Description | Intertie/Generator Protection Relay |

| Manufacturer | Advanced Energy Inc. |
|---|---|
| Model No. | MM-3000 |
| Date of Approval | 1/28/02 |
| Firmware Version | 3.21 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E182866-01NK10139 |
| Date of Report | 9/06/01 |
| Device Description | 3000W, 120V Single Phase Inverter |

| Manufacturer | Advanced Energy Inc. |
|---|---|
| Model No. | MM-5000 |
| Date of Approval | 1/28/02 |
| Firmware Version | 3.21 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E182866-01NK10139 |
| Date of Report | 9/06/01 |
| Device Description | 5000W, 120V Single Phase Inverter |

| Manufacturer | Capstone Turbine |
|---|---|
| Model No. | C60 Microturbine |
| Date of Approval | 2/28/02 |
| Firmware Version | 3.10 through 3.99 |
| Testing Agency | Underwriter's Laboratories, Nemko EESI, Inc. |
| Test Report | 180102-AU2867F, 21-296 |
| Date of Report | 1/18/02, 12/26/01 |
| Device Description | 60kW, 480V, Three Phase Microturbine |

| Manufacturer | Xantrex Technology |
|---|---|
| Model No. | SW4024 Series 2, SW4048 Series 2, SW5548 Series 2 (All with Grid Tie Interface accessory) |
| Date of Approval | 8/1/02 |
| Firmware Version | 4.20 |
| Testing Agency | Underwriter's Laboratories, CKC Laboratories |
| Test Report | E187916-02NK33060, GE02-027 |
| Date of Report | 7/26/02, 6/04/02 |
| Device Description | 4000W, 5500W, 120V, Single Phase Inverters |

| Manufacturer | Xantrex Technology |
|---|---|
| Model No. | SW4024 Series 2, SW4048 Series 2, SW5548 Series 2 (All with Grid Tie Interface accessory) |
| Date of Approval | 12/2/04 |
| Firmware Version | 4.3 |
| Testing Agency | Underwriter's Laboratories, CKC Laboratories |
| Date of Report | 10/26/04, 11/16/04 |
| Device Description | 4000W, 5500W, 120V, Single Phase Inverters |

| Manufacturer | Advanced Energy Inc. |
|---|---|
| Model No. | GC-1000-SA |
| Date of Approval | 9/18/02 |
| Firmware Version | 300.120, 300.140 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E182866-02NK08125 |
| Date of Report | 9/10/02 |
| Device Description | 1000W, 120V Single Phase Inverter |

| Manufacturer | Xantrex Technologies |
|---|---|
| Model No. | STXR1500, STXR2000, STXR2500 |
| Date of Approval | 9/18/02 |
| Firmware Version | 3.2, 5.0 |
| Testing Agency | Underwriter's Laboratories, CKC Laboratories |
| Test Report | E187916-02NK33060, GE02-035 |
| Date of Report | 7/26/02, 9/9/02 |
| Device Description | 1500W, 2000W, 2500 W 240V Single Phase Inverters |

| Manufacturer | Tecogen, Inc. |
|---|---|
| Model No. | CM-60, CM-75 |
| Date of Approval | 10/7/02 |
| Firmware Version | US002 |
| Testing Agency | ITS-ETL Semko |
| Test Report | TCF-1 |
| Date of Report | 8/5/02 |
| Device Description | 60 kW, 75 kW 460V or 208/230V Cogeneration Systems |

| Manufacturer | SMA America |
|---|---|
| Model No. | SWR-1800U |
| Date of Approval | 9/8/04 |
| Firmware Versions | 8.30, 8.32, 8.64, 8.65, 8.66, 8.90, 8.92, 8.94 |
| Testing Agency | Underwriter's Laboratories |
| Date of Report | 7/19/04 |
| Device Description | 1800 W, 120 V Single Phase Inverter |

| Manufacturer | Xantrex Technology |
|---|---|
| Model No. | BWT-10240 |
| Date of Approval | 12/3/02 |
| Firmware Version | 3.2.5.1 |
| Testing Agency | CSA International |
| Test Report | 216481-1338805 |
| Date of Report | 8/19/02 |
| Device Description | 10 kW, 240 V Single Phase Inverter |

| Manufacturer | SMA America |
|---|---|
| Model No. | SWR-2500U |
| Date of Approval | 9/8/04 |
| Firmware Versions | 8.30, 8.32, 8.64, 8.65, 8.66, 8.90, 8.92, 8.94 |
| Testing Agency | Underwriter's Laboratories |
| Date of Report | 7/19/04 |
| Device Description | 2500 W, 208/240 V Single Phase Inverter |

| Manufacturer | Plug Power |
|---|---|
| Model No. | MP-5000 |
| Date of Approval | 4/1/03 |
| Firmware Version | MP5C3.3 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E206704-03NK18292 |
| Date of Report | 1/30/03 |
| Device Description | 5000 W, 120V Single Phase Inverter |

| Manufacturer | Sharp Corporation |
|---|---|
| Model No. | JH-3500U |
| Date of Approval | 8/27/03 |
| Firmware Version | SMJ04 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 3500 W, 240V Single Phase Inverter |

| Manufacturer | Beckwith Electric |
|---|---|
| Model No. | M-3410A |
| Date of Approval | 10/22/03 |
| Firmware Version | D0110V01.01.08 to D0110V01.99.99 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E128716-03CA33157 |
| Date of Report | 9/24/03 |
| Device Description | Intertie/Generator Protection Relay |

| Manufacturer | Beckwith Electric |
|---|---|
| Model No. | M-3520 |
| Date of Approval | 10/22/03 |
| Firmware Version | D0060V03.00.06 to D0060V03.99.99 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E128716-03CA33157 |
| Date of Report | 9/24/03 |
| Device Description | Intertie/Generator Protection Relay |

| Manufacturer | Magnetek |
|---|---|
| Model No. | PVI-3000-I-OUTD-US |
| Date of Approval | 11/5/04 |
| Firmware Version | 3E14.C.1.0.6, 3D52.A.0.0.1, 3D52.B.0.5.4 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 3 kW, 240 V Single Phase Inverter |

| Manufacturer | Beacon Power Corp. |
|---|---|
| Model No. | M5 |
| Date of Approval | 12/17/03 |
| Firmware Version | M5V4-109 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 5 kW, 120V Single Phase Power Conversion System |

| Manufacturer | Fronius USA |
|---|---|
| Model No. | IG 2000, IG 3000 |
| Date of Approval | 3/3/04 |
| Firmware Version | V2.00.01 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 2 kW, 3 kW 240 V Single Phase Inverters |

| Manufacturer | Fronius USA |
|---|---|
| Model No. | IG 2500-LV |
| Date of Approval | 3/3/04 |
| Firmware Version | V2.00.01 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 2.5 kW, 208 V Single Phase Inverter |

| Manufacturer | PV Powered, LLC |
|---|---|
| Model No. | PVP 2800-240 |
| Date of Approval | 5/5/04 |
| Firmware Version | 1400 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 2.8 kW, 240 V Single Phase Inverter |

| Manufacturer | Ballard Power Systems |
|---|---|
| Model No. | EPC-PV-208-30KW, EPC-PV-480-30KW |
| Date of Approval | 8/19/04 |
| Firmware Version | 1447, 4705 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 30 kW, 208V and 480V Three Phase Inverters |

| Manufacturer | Capstone Turbine Corp. |
|---|---|
| Model No. | 60, C60, 60 SA, C60 SA, C60 ICHP |
| Date of Approval | 11/5/04 |
| Firmware Version | 4.24 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 60kW, 480V, Three Phase Microturbine |

| Manufacturer | SMA America |
|---|---|
| Model No. | SB 6000U |
| Date of Approval | 11/17/04 |
| Firmware Version | 2.59/2.56/2.54 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 6 kW, 208, 240 V, 277 V Single Phase Inverter |

| Manufacturer | Outback Power Systems |
|---|---|
| Model No. | GTFX2524, GTFX3048, GVFX3524, GVFX3648 |
| Date of Approval | 11/23/04 |
| Testing Agency | Intertek Testing Services |
| Device Description | 2.5 kW, 3 kW, 3.5 kW, 3.6 kW 120 V Single Phase Inverters |

| Manufacturer | Solectria |
|---|---|
| Model No. | PVI13KW |
| Date of Approval | 1/6/05 |
| Testing Agency | Intertek Testing Services |
| Device Description | 208/480 V, Three Phase Inverter |

| Manufacturer | Xantrex Technology |
|---|---|
| Model No. | GT 3.0 |
| Date of Approval | 2/1/05 |
| Testing Agency | CSA International |
| Device Description | 3000 W, 240 V, Single Phase Inverter |

| Manufacturer | Fronius |
|---|---|
| Model No. | IG 4000, IG 5100 |
| Date of Approval | 2/2/05 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 4 kW, 5.1 kW 240 V Single Phase Inverters |

| Manufacturer | Fronius |
|---|---|
| Model No. | IG 4500-LV |
| Date of Approval | 2/2/05 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 4.5 kW 208 V Single Phase Inverter |

| Manufacturer | Alpha Technologies |
|---|---|
| Model No. | Solaris 3500 |
| Date of Approval | 2/22/05 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 3.5 kW 240 V Single Phase Inverter |

| Manufacturer | PV Powered |
|---|---|
| Model No. | PVP2000-120, PVP2900, PVP2800-XV, PVP3200 |
| Date of Approval | 9/14/05 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 120V, 208V, 240V Single Phase Inverters |

| Manufacturer | Sunpower Corp. |
|---|---|
| Model No. | SPR-2000-120, SPR-2900, SPR-3200 |
| Date of Approval | 9/14/05 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 120V, 208V, 240V Single Phase Inverters |

| Manufacturer | SMA America |
|---|---|
| Model No. | SB 3800U |
| Date of Approval | 10/13/05 |
| Testing Agency | Intertek Testing Services |
| Device Description | 3.8 kW, 208/240 V Single Phase Inverter |

| Manufacturer | Xantrex Technology |
|---|---|
| Model No. | GT2.5-NA-DS-240, GT2.5-NA-DS-240-POS, GT3.3-NA-DS-240, GT3.3-NA-DS-240-POS, GT3.3-NA-DS-208, GT3.3-NA-DS-208-POS |
| Date of Approval | 10/13/05 |
| Testing Agency | CSA |
| Device Description | 208, 240 Single Phase Inverters |

| Manufacturer | Solectria |
|---|---|
| Model No. | PVI60kW, PVI77kW, PVI90kW |
| Date of Approval | 11/8/05 |
| Testing Agency | Intertek Testing Services |
| Device Description | 208/480V Three Phase Inverters |

| Manufacturer | Inverters Unlimited |
|---|---|
| Model No. | Sun-AC 3000 |
| Date of Approval | 11/28/05 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 3 kW, 240 V Single Phase Inverter |

| Manufacturer | Solectria |
|---|---|
| Model No. | PVI1800, PVI2500 |
| Date of Approval | 12/22/05 |
| Testing Agency | CSA |
| Device Description | 208/240 Three Phase Inverters |

| Manufacturer | PV Powered |
|---|---|
| Model No. | PVP5200-240, PVP4600-208 |
| Date of Approval | 1/23/06 |
| Testing Agency | Underwriter's Laboratories, CSA |
| Device Description | 208V, 240V Single Phase Inverters |

| Manufacturer | Sunpower Corp. |
|---|---|
| Model No. | SPR5200-240, SPR4600-208 |
| Date of Approval | 1/23/06 |
| Testing Agency | Underwriter's Laboratories, CSA |
| Device Description | 208V, 240V Single Phase Inverters |

| Manufacturer | Xantrex |
|---|---|
| Model No. | PV20-208, PV30-208, PV45-208 |
| Date of Approval | 3/14/06 |
| Testing Agency | Underwriter's Laboratories, CSA |
| Device Description | 208/480 V Three Phase Inverters |

| Manufacturer | Xantrex |
|---|---|
| Model No. | PV100S-480, PV225S-480P |
| Date of Approval | 3/14/06 |
| Testing Agency | Underwriter's Laboratories, CSA |
| Device Description | 480V Three Phase Inverters |

| Manufacturer | Beacon Power |
|---|---|
| Model No. | M4, M4 Plus, M5 Plus |
| Date of Approval | 5/30/06 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 120V Single Phase Inverters |

| Manufacturer | Xantrex |
|---|---|
| Model No. | GT 3.8-NA-DS-240 |
| Date of Approval | 6/21/06 |
| Testing Agency | CSA |
| Device Description | 240V Single Phase Inverter |

| Manufacturer | GE Energy |
|---|---|
| Model No. | GEPVb-2500-240-01, GEPVb-3000-240-01, GEPVb-3300-240-01, GEPVb-3300-208-01, GEPVb-3800-240-01 |
| Date of Approval | 6/21/06 |
| Testing Agency | CSA |
| Device Description | 208V, 240V Single Phase Inverters |

| Manufacturer | SunPower Corp. |
|---|---|
| Model No. | SPR-3300x, SPR-3300x-208, SPR-4000x |
| Date of Approval | 6/21/06 |
| Testing Agency | CSA |
| Device Description | 208V, 240V Single Phase Inverters |

| Manufacturer | SMA America |
|---|---|
| Model No. | SB2100U |
| Date of Approval | 7/19/06 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 240V Single Phase Inverter |

| Manufacturer | SMA America |
|---|---|
| Model No. | SB3300U |
| Date of Approval | 7/19/06 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 208V/240V Single Phase Inverter |

| Manufacturer | Capstone Turbine |
|---|---|
| Model No. | 65 |
| Date of Approval | 7/26/06 |
| Testing Agency | Underwriter's Laboratories, Nemko |
| Device Description | 65kW, 480V, Three Phase Microturbine |

| Manufacturer | Southwest Windpower |
|---|---|
| Model No. | Skystream 3.7 |
| Date of Approval | 1/11/07 |
| Testing Agency | Underwriter's Laboratories |
| Device Description | 120/240 V Single Phase Inverter |

# Tecogen Ex. 44

# Tim Casabonne

| | |
|---|---|
| **From:** | Tim Casabonne |
| **Sent:** | Friday, July 08, 2005 1:37 PM |
| **To:** | 'Robert Page' |
| **Cc:** | Gary Morenus; Michael Belosky; Tim Brock |
| **Subject:** | RE: Re: Co-Gen Project |

Bob,

I left a message for Gary to call me so that I can attempt to address his concerns. I have requested information brochures and a list of operating sites from the manufacture and will forward them to Gary as soon as I receive them.

The AEGEN units are almost identical in appearance, specifications and cost to the Tecogen unit. They will also be equipped with the emissions control equipment required by NYSEG. I will suggest to Gary that we have a conference call with the manufacture to answer any technical questions that he may have.

Clough Harbour is also reviewing the technical submittal for the unit and will advise of any issues.

Tim

**From:** Robert Page [mailto:RPage@co.chemung.ny.us]
**Sent:** Wednesday, July 06, 2005 5:21 PM
**To:** Tim Casabonne
**Cc:** Gary Morenus; Michael Belosky
**Subject:** Fw: Re: Co-Gen Project

Tim,

I am not able to answer Gary's questions. I believe you addressed some of his concerns at the last meeting, but perhaps it was before he came into the meeting. Would you please call him directly (607) 737-2833 and discuss this? It would be helpful if you could provide Buildings and Grounds with information brochures about the new units as well as places where the units have been installed for a period of time.

It is also my understanding that the basic new co-gen units selected are about the same price as the original Tecogen models and that the emission controls required by NYSEG are the reason for the higher cost. I believe you also said that the new units were a newer generation with certain features that were beneficial that Tecogen did not have like accessibility for maintenance.

Please take the time to address any of the concerns that Gary may have and let me know if we should have another meeting with all parties to go over the co-gen specifications.
Bob Page
Chemung County Health Center
(607) 737-2068
rpage@co.chemung.ny.us

-----Forwarded by Robert Page/Chemung_County on 07/06/2005 05:15PM -----

To: Robert Page/Chemung_County@Chemung_County
From: Gary Morenus/Chemung_County
Date: 07/06/2005 01:29PM

cc: mbelosky@CO.CHEMUNG.NY.US
Subject: Re: Co-Gen Project

Bob,
I bring to you a concern that I have regarding the co-gen Project.
It was my understanding that the county was adding additional funding to the project so that the project would proceed as originally planned. On 6/28/05 at the job meeting most of us heard for the first time that the supplier for the co-gen units had been changed to a manufacturer that has been in business less than a couple of years.
Tecogen has been a major player in co-gen designs for the last 20 years. Are we going to get the same level of support and service with this other manufacturer ? How reliable are they compared to the Tecogen units ? Did anyone look into references of projects that have used these units ? Thanks Bob for your time.
Gary Morenus

Confidentiality Notice:

This transmission, including any attachments, is for the sole use of the intended recipient(s) or entity named above and may contain confidential and privileged information. If you received this and are not the intended recipient(s), you are hereby notified that any disclosure, copying, unauthorized distribution or the taking of any action in reliance on the contents of this information is prohibited. If you have received this transmission in error, please immediately contact the sender as indicated above to arrange the proper handling of the information.

# Tecogen Ex. 45

**Tim Casabonne**

| | |
|---|---|
| From: | Chris Cafer [CCafer@nrg-concepts.com] |
| Sent: | Monday, July 11, 2005 8:46 AM |
| To: | Daniel Westbrook; Tim Casabonne; mweber@dclw.com |
| Cc: | Martin Doyle |
| Subject: | RE: FW: LSCD cogen substitute |

Dan

The Aegen unit is UL listed. The ETL Listed Mark is an alternative to the CSA and UL marks.

Aegen related that the unit does not have an AGA label however components with the gas train are AGA labeled.

Chris

Christopher P. Cafer
Energy Concepts Engineering
3445 Winton Place, Suite 102
Rochester, NY 14623
office: 585-272-4650
fax: 585-272-4676
cell: 585-455-7332

-----Original Message-----
From: Daniel Westbrook [mailto:DWESTBRO@MAIL.NYSED.GOV]
Sent: Friday, July 08, 2005 4:08 PM
To: tcasabonne@atlanticenergyservices.com; mweber@dclw.com; Chris Cafer
Cc: Martin Doyle
Subject: RE: FW: LSCD cogen substitute

Chris,

Is the Aegen Thermo Power 75 LE Cogeneration Module (packaged unit) ETL Listed - Labeled for compliance with the The ETL Listed Mark is an alternative to the CSA and UL marks?

Thanks,
Dan

>>> "Chris Cafer" <CCafer@nrg-concepts.com> 07/08 12:24 PM >>>
Dan

The Aegen Thermo Power 75 LE is a "packaged unit" in that the engine/generator/enclosure in a packaged piece of equipment. The pump/control module is "packaged" as well and is mated to the cogen unit in the field. Together, Aegenco, Inc. represents the entire unit as the "Aegen Thermo Power 75 Cogeneration Module".

I am unclear as to your statement regarding listing/labeling and standards. Our specification requires the cogeneration unit to be in compliance with NFPA, AGA, and NEC. Typically we do not request a listing breakout of individual components.

Chris

Christopher P. Cafer
Energy Concepts Engineering
3445 Winton Place, Suite 102

ATL 0077

Rochester, NY 14623
office: 585-272-4650
fax: 585-272-4676
cell: 585-455-7332

-----Original Message-----
From: Daniel Westbrook [mailto:DWESTBRO@MAIL.NYSED.GOV]
Sent: Tuesday, July 05, 2005 1:43 PM
To: tcasabonne@atlanticenergyservices.com; mweber@dclw.com; Chris Cafer
Cc: Martin Doyle
Subject: Re: FW: LSCD cogen substitute

Mr. Weber,

Do the project specifications indicate that the Tecogen CM-75LE is listed/labeled as a packaged unit?  If so, what is the listing/labeling agency and what is the standard?

Is the Aegen ThermoPower 75LE listed/labeled as a packaged unit?  If so, what is the listing/labeling agency and what is the standard?  If not, are each of the individual components in the package listed/labeled and what are the standards?

Thanks,
Dan Westbrook

>>> "Martin Weber" <mweber@dclw.com> 06/30 12:40 PM >>>
FYI and per your request. This analysis indicates that the substituted product is superior in all respects to the originally designed and specified cogen units. The complaint that was filed by Teco-Gen is completely without merit.

Martin Weber, RA, AIA
rtner
DODGE CHAMBERLIN LUZINE WEBER ASSOCIATES ARCHITECTS
73 Troy Road
East Greenbush, New York 12061
(518) 479-4000 Extension 411
(518) 477-1356 Facsimile
mweber@dclw.com
http://www.dclw.com <http://www.dclw.com/>

-----Original Message-----
From: Chris Cafer [mailto:CCafer@nrg-concepts.com]
Sent: Thursday, June 30, 2005 9:22 AM
To: Martin Weber
Subject: LSCD cogen substitute


Marty


Attached is a copy of our letter. The original is on the way to you.


Have a good holiday.

2

ATL 0078

Chris

Christopher P. Cafer

Energy Concepts Engineering

3445 Winton Place, Suite 102

Rochester, NY 14623

office: 585-272-4650

fax: 585-272-4676

cell: 585-455-7332

ATL 0079

# Tecogen Ex. 46

**Tim Casabonne**

| | |
|---|---|
| **From:** | John DaSilva [JDaSilva@aegisenergyservices.com] |
| **Sent:** | Monday, July 11, 2005 11:21 AM |
| **To:** | Tim Casabonne |
| **Cc:** | Lee Vardakas |
| **Subject:** | RE: Chemung County |

Tim:

Below are several references you requested. Let me know if there is anything else you need.

John

Augustana Lutheran Home for the Aged
5434 Second Avenue
Brooklyn, NY 11220
Richie Eisenbraum, Director Engineering
(718) 630-6000


JML Care Center
184 Ter Heun Drive
Falmouth, MA 02540
Bill Monty, Director Maintenance
(508) 457-4621

>>> "Tim Casabonne" <tcasabonne@atlanticenergyservices.com> 7/8/2005
>>> 1:02 PM >>>
12 would be great.  How about the list of sites where the units are currently installed and operating?

-----Original Message-----
From: John DaSilva [mailto:jdasilva@aegisenergyservices.com]
Sent: Friday, July 08, 2005 12:15 PM
To: Tim Casabonne
Subject: RE: Chemung County

Tim:

I can send you some brochures and spec sheets. How many would you like?

John

>>> "Tim Casabonne" <tcasabonne@atlanticenergyservices.com> 07/08/05
>>> 11:44 AM >>>
John,

I received the Fedx but have not had a chance to look at it yet.  Will
do so soon and get back to you.

Do you have any brochures or literature on the AEGEN unit that I could
give to our customer?

I also need a list of sites/references where the units are installed.

Thanks,
Tim

1

-----Original Message-----
From: John DaSilva [mailto:JDaSilva@aegisenergyservices.com]
Sent: Tuesday, July 05, 2005 4:54 PM
To: Tim Casabonne
Cc: Lee Vardakas
Subject: Re: Chemung County

Tim:

Attached is the emissions letter you requested. Response to questions on
the engineering submittal for Chemung is being sent by FedX tomorrow.
Let's talk once you have a chance to review the materials to make sure
we answered all the questions to your satisfaction.


Please let me know if you need anything else.

John

>>> "Tim Casabonne" <tcasabonne@atlanticenergyservices.com> 6/27/2005
>>> 2:56 PM >>>
Lee,

In order to remain qualified for the utility tariff exemption, we will
need to provide NYSEG with emissions and efficiency data for the AEGEN
unit similar to the attached letter from Tecogen.    Please contact me
w/ any questions.

Thank you,
Tim


Timothy Casabonne

Operations Manager



 <outbind://54/Signature1_files/image001.gif>


Atlantic Energy Services, Inc.

92 Congress Street, Saratoga Springs, NY 12866

Phone: (518) 587.3252

Toll Free: (877) 237.4524

Fax: (518) 587.4328

# Tecogen Ex. 47

**Tim Casabonne**

| | |
|---|---|
| **From:** | Panora, Robert [Robert.Panora@Tecogen.com] |
| **Sent:** | Monday, July 18, 2005 2:06 PM |
| **To:** | rpage@co.chemung.ny.us |
| **Cc:** | tmcclure@CHA-LLP.com; Tim Casabonne |
| **Subject:** | Chemung County Heath Center - Nursing Facility |



Chemung County -
 Robert Page J...

Enclosed please find the pdf file of the letter we discussed this morning.
Please let me know if you have any questions or be of further assistance.

Robert A. Panora
President and COO
TECOGEN Inc.
45 First Avenue ~ Waltham, MA 02451
phone: 781.466.6401 ~ fax: 781.466.6466
email:robert.panora@tecogen.com

<<Chemung County - Robert Page Jul 17 2005.pdf>>

1



**TECOGEN**
*Natural Gas Engine-Driven Products*

TECOCHILL®
TECOGEN®
TecoFROST™

July 18, 2005

Mr. Robert Page
Chemung County Health Center – Nursing Facility
103 Washington Street
PO Box 588
Elmira, NY, 14902

Dear Mr. Page:

As you are aware, we at Tecogen were surprised and dismayed to learn that the planned purchase of the four Tecogen CM-75 cogeneration units for the Chemung Project was revised in favor of a new product – one of unequal engineering specifications – manufactured by Aegis Energy Services. We feel this to be severe misjudgment given that the Aegis product is new, untested in the marketplace, unsupported by a local/experienced service organization, and is a product with limited certifications, if any. To purchase and install the Aegis system in the Chemung Nursing Facility would be an unwise and irresponsible act.

Tecogen, as you know, has manufactured its cogeneration module for over twenty years, having produced and installed approximately 800 CM-60/75 modules in that period. The Tecogen product is the standard for small packaged cogen modules in this country, having been successfully used in many applications, including dozens of sites in Upstate New York alone. I believe some members of your staff may have visited several of these local sites (Geneva General Hospital and the Clifton Springs Hospital and Clinic). As such you are likely aware that the Tecogen product is supported by a factory service center based in Newark, NY (four service technians/129 CM-75's) with the closest serviceman within a one hour drive of the Chemung facility. The Aegis unit, by comparison, has only recently been introduced to the market and has a very limited track record. To our knowledge they have no service operation in your area. We feel strongly that this substitution should not be made without a careful and impartial product comparison, especially in the areas of product track record, product safety certifications, and local service infrastructure.

Relative to the product certifications, please understand that cogeneration modules such as those manufactured by Tecogen or Aegis are natural gas/electrical appliances for which certification is a fundamental requirement, especially in a public elder-care facility. Tecogen, at great expense and engineering time, has obtained full certifications for its products. I wish to elaborate on what true certification means as it is often misunderstood. The specific certifications for the CM-75 are listed in Table 1 (attached) along with web links confirming the listing. As shown, the overall product – *in total, as a complete device* – has been certified by ETL/Intertek, a Nationally Recognized Testing Laboratory (or NRTL) to the *AGA (American Gas Assoc.) Standard for Gas-Fired Engine Driven Cogeneration Appliances (2-89)*. This certification requires that the entire machine design be reviewed by the NRTL engineers for properly listed electrical and fuel supply components and that the components themselves are correctly installed and applied. The entire product, in its final design configuration, is then tested by the NRTL to confirm the published performance specifications, as well as to ensure that the required alarms safely stop the machine when these events are simulated. Also, and as shown in Table 1, the Tecogen manufacturing facility is inspected quarterly by an ETL/Intertek engineer for continued design compliance and to confirm that the mandated processes required to maintain certification are still being conducted on each unit (i.e., quality control steps, specialized shop tests for voltage surge, etc.). Our most recent inspection was on May 10, 2005.

The Tecogen CM-75 has also been certified for safe interconnection to utility electric system by three standards: (a) The Institute for Electric and Electronic Engineers (IEEE) P1547/D07, (b) The New York State Interconnect Requirement (NYSIR), and (c) The California Electric Rule 21. These interconnection certifications generally require the same format as the product safety certification above; the units are reviewed and tested by an NRTL (see Table 2 for the tests) after which quarterly inspections are conducted for design and QC compliance. In this case, ETL/Intertek was used for most tests, although Underwriters Laboratories was used for the anti-islanding

*45 First Avenue*
*Waltham, MA 02451*
*781.466.6400   (fax) 781.466.6466*

– 2 –                                                                July 18, 2005

certification, a safety that protects utility workers if an outage occurs. These certifications are important as they impact the facility's liability relative to the electric company's property and workers.

It is worth mentioning also that Tecogen has also obtained certification of its switchgear against water spray to IPX4 (an international electrical certification) by ETL/Intertek. This was necessary because our integrated design locates the plumbing module above this high voltage switchgear, a location which many inspectors would disallow unless the cabinet was certified against water ingress. The Chemung County project had planned to use this plumbing module in the Tecogen design and if the Aegis machine is likewise to use the Aegis version of this accessory then switchgear water spray certification is an important and valid requirement.

At Tecogen, we take great pride in these certifications. For our customers, the certifications and quarterly inspection serve as essential "third-party" checks of our product designs, manufacturing procedures, and QC systems. They also impact favorably our company's ability to obtain the normally required levels of product liability insurance. Moreover, we learned early on in this business that few building inspectors and careful facility managers would accept the installation of an uncertified appliance that generates pressurized hot water and high voltage electricity, so most projects simply could not proceed without such certifications. In the case of Chemung and the new Aegis product, we are not certain of its certification status. However, given the information available on Aegis' web site and in checking the various agency web sites for listed products, it would appear doubtful that the Aegis product has any certifications except on the component level (not applicable to the entire unit).

Several weeks ago, when we learned of the change, Wes Schuster (Tecogen Sales VP) immediately placed a call to Mr. Brock (Atlantic Energy's President) asking for the opportunity to re-quote and better the Aegis price. Our call was not returned. As we discussed, our offer remains on the table.

I urge you to be wary of accepting an uncertified appliance for installation into its facility, especially where there is no economic incentive to do so. Thank you for your thoughtful consideration of this matter and please contact me if you have any questions (781-466-6401, Robert.Panora@Tecogen.com).

Sincerely,

*Robert A. Panora*

Robert A. Panora
President & COO


CC:     Troy McClure – Clough Harbour Associates (tmcclure@CHA-LLP.com)
        Tim Casabonne – Atlantic Energy Services, Inc. (tcasabonne@atlanticenergyservices.com)

## Table 1 – Tecogen CM-75 Product Safety Certifications

| Product Safety Certification | | |
|---|---|---|
| **Name** | **Description** | **Requirements for Maintaining Compliance** |
| ETL Listed Marking – Report #484603 http://etlwhidirectory.etlsemko.com/WebClients/ITS/DLP/products.nsf/6a421efeead6f216852568d4005862af/fee54098eef089da85256a69004853bc?OpenDocument&ExpandSection=2&Highlight=2,Tecogen - _Section2 | Labeled for compliance with the AGA Standard for Gas-Fired Engine Driven Cogeneration Appliances (2-89) | • Third party (ITS) Quarterly Inspections to ensure quality control<br>• 100% Production Line Testing – Dielectric Withstand Test<br>• Third party authorization required to use alternate parts |
| IPX4 | Control and switchgear enclosures have been certified to IPX4 (International classification system per IEC 60529 for ingress protection against water) | N/A |
| Interconnection Compliance | | |
| **Name** | **Description** | **Requirements for Maintaining Compliance** |
| IEEE P1547/D07 | Certified by Intertek Testing Services to be in compliance with this Draft Standard for Interconnecting Distributed Resources with Electric Power Systems. *(See Type Testing Summary Below)* | • Third party (ITS) Quarterly Inspections to ensure firmware revision control<br>• 100% Production Line Testing – Voltage/Frequency Variation Test |
| NYSIR http://www.dps.state.ny.us/SIRDevices.PDF | Accepted as Type Tested and Approved Equipment by the New York State Public Service Commission Standard Interconnect Requirements. *(See Type Testing Summary Below)* | • Website listing of most current firmware version<br>• 100% Production Line Testing – Voltage/Frequency Variation Test |
| California Rule 21 http://www.energy.ca.gov/distgen/interconnection/certification.html | Certified to meet the Type Testing and Production Testing requirements of California Rule 21. Also certified as Non-Islanding. *(See Type Testing Summary Below)* | • Third party (ITS) Quarterly Inspections to ensure firmware revision control<br>• 100% Production Line Testing – Voltage/Frequency Variation Test |

– 4 –                                                    July 18, 2005

**Table 2 – Tecogen CM-75 Electric Interconnection Tests Required for Interconnection Certification to P1547, NSIR, and Rule 21 (all passed)**

| Standard | Section | Description | Reference Standard |
|---|---|---|---|
| IEEE P1547/D07 | 4.2.1 | Voltage Disturbances | |
| | 4.2.2 | Frequency Disturbances | |
| | 4.3.2 | Limitation to Flicker | |
| | 4.3.3 | Harmonics | |
| | 4.3.4 | Immunity Protection (Radiated RFI) | IEEE C37.90.2 |
| | 4.3.5 | Surge Immunity | IEEE C37.90.1, IEEE C62.45 |
| | 4.3.5 | Electrical Fast Transient Immunity | IEEE C37.90.1, IEEE C62.45 |
| | 4.3.5 | 100 kHz, 500A Ringwave | IEEE C62.41, IEEE C62.45 |
| | 4.3.5 | 1.2 x 50 uS Surge | IEEE C62.41, IEEE C62.45 |
| UL1741 | 44 | Dielectric Voltage-Withstand | |
| | 45.2.2 | Power Factor | |
| | 45.4 | Harmonic Distortion | Same as P1547/D07 Section 4.3.3 |
| | 46.2 | Voltage and Frequency Variation | Same as P1547/D07 Section 4.2.1 & 4.2.2 |
| | 46.2.3 | Automatic Restart, 5 minutes | |
| | 46.4 | Power Loss, Control Circuitry | |
| | 47.3 | Short Circuit Test | |
| | 46.3 | Anti-Islanding | |

# Tecogen Ex. 48

**Tim Casabonne**

| | |
|---|---|
| **From:** | Robert Page [RPage@co.chemung.ny.us] |
| **Sent:** | Monday, July 18, 2005 10:54 AM |
| **To:** | Tim Casabonne |
| **Cc:** | Gary Morenus; Michael Belosky |
| **Subject:** | Meeting Tomorrow |

Tim,

I wanted to give you a heads up that I have been contacted a couple of times by Tecogen, and they have raised some serious concerns about the replacement units that AES has recommended.  Similar concerns have been raised by the County's Building and Grounds Dept, and if the information is accurate, I believe there will be serious concerns from State Health Dept and NYSERDA as well.

Tecogen is sending us a letter, and I have asked that copies go to AES and Clough Harbour.  This will be a major issue tomorrow, and I want you to know that we will not proceed with the project until our concerns have been addressed as to the certifications, quality, maintenance support and other technical pros and cons between the Tecogen and replacement units.  I am particularly concerned that the State Health Dept and NYSERDA approved this project with Tecogen units, and without their approval of the new units we cannot proceed--otherwise the County risks losing all reimbursement for this project.
Bob Page
Chemung County Health Center
(607) 737-2068
rpage@co.chemung.ny.us


Confidentiality Notice:

This transmission, including any attachments, is for the sole use of
the intended recipient(s) or entity named above and may contain
confidential and privileged information.  If you received this and
are not the intended recipient(s), you are hereby notified that
any disclosure, copying, unauthorized distribution or the taking
of any action in reliance on the contents of this information is
prohibited. If you have received this transmission in error, please
immediately contact the sender as indicated above to arrange the
proper handling of the information.

# Tecogen Ex. 49

## Erin Mahoney

**From:**        Tim Casabonne
**Sent:**        Thursday, November 01, 2007 2:22 PM
**To:**          Erin Mahoney
**Subject:**     FW: Chemung County Health Center 7/19 Performance Project Meeting Minutes
**Attachments:** 71905 Cogen project meeting minutes.doc


*Timothy Casabonne*
*Operations Manager*

*Atlantic Energy*
*92 Congress Street*
*Saratoga Springs, NY 12866*
*518-587-3252*
*518-587-4328 fax*

*tcasabonne@atlanticenergy.net*

---

**From:** Tim Casabonne
**Sent:** Monday, August 01, 2005 4:23 PM
**To:** Robert Page; Michael Belosky; gmorenus@co.chemung.ny.us; Conrad, Michael; Bill Allington
(allingtonw@kimbleinc.com); Steve Micknich (mickncelec@aol.com); Steve Maybeck (semaybeck@dayasi.com)
**Subject:** Chemung County Health Center 7/19 Performance Project Meeting Minutes

Attached please find minutes from the 7/19 planning meeting.

Timothy Casabonne
Operations Manager



**Atlantic Energy Services, Inc.**
92 Congress Street, Saratoga Springs, NY 12866
Phone: (518) 587.3252
Toll Free: (877) 237.4524
Fax: (518) 587.4328

11/1/2007



**Chemung County Health Center**
**Energy Performance Project – Co-gen / Emergency Generator Project Meeting Minutes**
**7/19/05**

**Attendees:**

| | |
|---|---|
| Bob Page | Health Center Director |
| Mike Belosky, Gary Morenus | Buildings and Grounds |
| Troy McClure, Michael Conrad | Clough Harbour and Associates |
| Tom Ferreri | Clough Harbour and Associates |
| Lee Vardakas | Aegenco |
| Bill Allington | Kimble, Inc. |
| Joe Haile | Day Automation Systems |
| Steve Micknich | Micknich Electrical Systems |
| Tim Casabonne | Atlantic Energy Services |

1. Originally intended to be a planning meeting, this meeting focused on Atlantic Energy Services decision to purchase AEGEN co-generation units instead of Tecogen units.

2. Atlantic Energy Services, Inc. advised that they decided to change co-gen units because they felt that the AEGEN product improved on some of the Tecogen shortcomings and because the annual maintenance cost was less. AES advised that there was no financial gain to AES or the County by making the change.

3. Lee Vardakas of Aegenco gave a presentation on the AEGEN product.

4. The County's major questions and concerns about the AEGEN product were related to certifications, quality, references and maintenance support. Another major concern was that NYSERDA, the Department of Health and NYSEG approved the project based on Tecogen and that the project can not proceed without their approval of the new unit. Re-submission and approval could cause significant delays.

5. Clough Harbour advised that a change in the co-gen unit would require a re-submission of the preliminary application to NYSEG and that it could take several months for review and approval.

6. Atlantic Energy Services, Inc. and Clough Harbour were asked to prepare a list of pros and cons for changing co-gen units.



7.  Since this meeting, Atlantic Energy Services, Inc. has determined that changing co-gen units at this stage of the project would cause unnecessary delays and have decided to stay with the Tecogen units.

8.  The next project meeting will be Tuesday Aug, 9th at 10:00 am.


Respectfully Submitted,

Tim Casabonne
Project Manager

Cc: Tim Brock, AES

Ex 183

7/19/05     Chemung County Health Center
Performance Project    Sign-IN Sheet

| | |
|---|---|
| Tim Casabonne | Atlantic Energy Saving |
| Mike Belosky | Chemung County Buildings + Grounds |
| GARY MORENUS | CHEMUNG COUNTY B&G |
| TROY MCCLURE | CLOUGH HARBOUR & ASSOCIATES |
| Michael Conrad | Clough Harbour + Associates |
| TOM FERRERI | CLOUGH HARBOUR & ASSOCIATES |
| BILL ALLINGTON | KIMBLE, INC. |
| Bob Page | County Health Ctr |
| Lee Vardakles | Aegenco |
| JOE HAILE | DAY AUTOMATION SYSTEMS |
| STEPHAN MICKUICH | MICKUICH ELECTRICAL SYSTEMS INC. |

7/19/05                Chemy County Health Center PC Meeting

1) Tecogen vs. Aegis topic of discussion

2) CHA advised that Preliminary App NYSERC will have to be resubmitted.

3) Gary M. asked if there is no financial gain in using Aegis then would AES proceed Tecogen if required?

4) Lee Vandikes gave presentation to Group.
       3 yrs in production
       2 yrs in Service
       Lee to provide List of references for ±12 sites using Aegis

5) What is required by NYDOH, NYSERDA, NYSEG?
    Additional Review Approvals??

6) Project Schedule / Time Frame   Important??

7) Aegis Certification. Need documentation from Aegis Packaged unit must be Type Tested in NYS

8) Maintenance Cost by Aegis lower than Tecogen. Need Language of Proposed Contract.

9) If Aegis unit goes down due to utility problem then unit must be manually reset to be brought back on line.

10) AES to provide Pros + Cons of why Aegis was Selected IF $ is not an issue. Need to justify why we could possibly delay Project for Aegis unit.

11) Service by AEGIS to come out of Binghamton N. Need track record references....

12) CHA has concern about PreSchmatt to NYSEG. CHA to prepare List of Pros & Cons

13) AES decision to use Aegis must meet County's Needs not AES's.

14. AES to review energy savings w/ Aeger #'s (efficiency) vs. Teager

15. Mitsui Elec. is concerned w/ schedule for perspective shutdowns in the middle winter.

16. Messig Section Lead time 7s ± 8 wks

17. EMO. Submittal on the way. Lead time Gen + 9 wks

18. Electrical work CAN proceed with the final selection of Cogen Unit

16. Dry Cooler May Change

17. Next Meeting to be Aug 9th.

18. Give list of Follow up Items to be provided by each party. These items must be distributed by prince to next meeting.

7/27/05

Aegis / CHA   Technical Review Meeting

① Mechanical / Electrical Review Comments:
- CHA to provide Proposal for Re-Submission for NYSEG (AES)
- Unit must be Type Tested. This could take 1 month (Aegis)
- AEGis to Respond to the 'list' of CHA Questions.
-

# Tecogen Ex. 50



Ex. 90



ATLANTIC
ENERGY
SERVICES
INC.

"The Power to Perform"

**Atlantic Energy Services, Inc.**
92 Congress Street, Saratoga Springs, NY 12866
Phone: (518) 587.3252 • Toll Free: (877) 237.4524 • Fax: (518) 587.4328

Brian
→ Willemsen

# FAX TRANSMITTAL

To: Ray Hickey, Advanced Comfort Systems     From: Tim Casabonne

Fax #: 884-8411        Date: 7/20/05

Pages including cover: 4

Re: Cogen Pricing for Chemung County Project

☐ For your signature        ☐ For your review

☐ As requested        ☒ For your use

Hardcopy to follow via mail:   ☐ Yes    ☒ No

Comments:

Ray,

Following please find a copy of AES PO's for (9) AEGEN units and Aegis confirmation letter. AES paid $47,666 each for the AEGEN units. Please advise if ACS will match this unit price for (4) Tecogen units to be installed at the Chemung County Health Center.

Thanks,
Tim Casabonne
Project Manager



**AEGIS ENERGY SERVICES INC.**

413/746-5400 • FAX 413/746-3242
WWW.AEGISENERGYSERVICES.COM

2097 RIVERDALE STREET, WEST SPRINGFIELD, MA 01089 • P.O. BOX 2511, SPRINGFIELD, MA 01101-2511

23 June 2005

Mr. Tim Casabonne
Atlantic Energy Services, Inc.
92 Congress Street, Suite 4
Saratoga Springs, NY 12866

Dear Tim:

Thank you for your two purchase orders for 9 cogeneration modules:

- PO # 05ABS001    4 modules – Chemung Health Center
- PO # 05AES002    5 modules – Later Project

This letter serves as confirmation of our receipt and acceptance of both orders.

Enclosed are 4 copies of the submittals for the Chemung Health Center project. Please feel free to give Lee or me a call if you have any questions on the submittals.

Sincerely,

*John P. da Silva*

John da Silva
Marketing Manager

Enclosures

T 0194



**ATLANTIC**
ENERGY
SERVICES
INC.

# Purchase Order

| Order Date: | PO No: | Job: |
|---|---|---|
| June 17, 2005 | 05AES002 | Atlantic Energy Services, Inc. |

**Seller:** Aegis Energy Services, Inc.
2097 Riverdale Street
West Springfield, MA 01089
413-746-5400

**Ship To:** Atlantic Energy Services, Inc.
92 Congress Street
Saratoga Springs, NY 12866
518-587-3252

Delivery date of goods: (on or before): To be Determined

Per Our Attached Specification dated: NA

Completion of services date: (on or before): To be Determined

Per your quote dated: June 16, 2005

| Item No. | Quantity | Vendor Catalog No. | Description of Goods or Services | Price per Item | Extended Price |
|---|---|---|---|---|---|
| 1 | 5 | AEGEN ThermoPower TP-75LE | Cogeneration Module (75kW, 60 Hz, 3-phase) Voltage to be determined | NA | $310,000.00 |

Misc. Notes:  1. Units to be equipped with the logo "ATLANTICGEN".
2. Delivery dates and locations will be determined at a later date.

Sub-total:  $310,000.00
Sales Tax:  Exempt
**Total: $310,000.00**

#62K each

**\*\* Send all invoices to the attention of Accounts Payable to the address listed below.\*\***

**\*\*Our Purchase Order No. MUST appear on all invoices, shipping labels and packages.\*\***

NOTE: This order expressly limits acceptance to the terms stated on the face and back of this form and on any Purchase order supplement attached hereto. Any additional or different terms, whether or not materially different, set forth in any communication from the seller are objected to and hereby rejected.

Approved By AES: *Timothy J. Brock, President*          Dated: 6/17/05

Accepted By:          Dated:

92 Congress Street ◆ Suite 4 ◆ Saratoga Springs, NY ◆ 12866 ◆ (518) 587-3252 ◆ (518) 587-4328 fax

T 0195



# Purchase Order

| Order Date:<br>June 16, 2005 | PO No:<br>05AES001 | Job:<br>Chemung County Health Center |
| --- | --- | --- |

**Seller:** Aegis Energy Services, Inc.
2097 Riverdale Street
West Springfield, MA 01089
413-746-5400

**Ship To:** Chemung County Health Center
103 Washington Street
Elmira, NY 14901
607-737-2028

Delivery date of goods: (on or before): 10-12 Weeks from date of order

Per Our Attached Specification dated: NA

Completion of services date (on or before): NA

Per your quote dated: June 16, 2005

| Item No. | Quantity | Vendor Catalog No. | Description of Goods or Services | Price per Item | Extended Price |
| --- | --- | --- | --- | --- | --- |
| 1 | 4 | AEGEN ThermoPower TP-75LE | Cogeneration Module (75kW, 60 Hz, 480 V, 3-phase) | NA | $119,000.00 |

Misc. Notes: 1. Units to be equipped with the logo "ATLANTICGEN".
2. PO is contingent upon the design engineer's approval of the AEGEN unit as an acceptable substitute to the TECOGEN, INC CM-75 integrated module listed in the project plans and Specifications.

Sub-total: $119,000.00
Sales Tax: Exempt
**Total: $119,000.00**

*$29K each*

**\*\* Send all invoices to the attention of Accounts Payable to the address listed below.\*\***

**\*\*Our Purchase Order No. MUST appear on all invoices, shipping labels and packages.\*\***

NOTE: This order expressly limits acceptance to the terms stated on the face and back of this form and on any Purchase order supplement attached hereto. Any additional or different terms, whether or not materially different, set forth in any communication from the seller are objected to and hereby rejected.

Approved By AES: *Timothy J. Brock, President*          Dated: 6/16/05

Accepted By:          Dated:

92 Congress Street • Suite 4 • Saratoga Springs, NY • 12866 • (518) 587-3252 • (518) 587-4328 fax

**Hickey, Ray**

# CONFIDENTIAL

| | |
|---|---|
| **From:** | Tim Casabonne [tcasabonne@atlanticenergyservices.com] |
| **Sent:** | Friday, July 22, 2005 11:11 AM |
| **To:** | Hickey, Ray |
| **Cc:** | Tim Brook |

WES S

**Subject:** RE: Tecogen Pricing

Ray,

I am faxing you a copy of the Aegis quote. At this time we are only considering the purchase of (4) Tecogen units for Chemung, assuming they are in the same price range ($47,000 +/-) as the Aegis units. There is a possibility that we will also consider Tecogen for the (5) additional units, price pending. The purchase of (25) Tecogen units is not an option.

Tim

---

**From:** Hickey, Ray [mailto:rhickey@advancedcomfortsys.com]
**Sent:** Friday, July 22, 2005 9:47 AM
**To:** Tim Casabonne
**Subject:** Tecogen Pricing

Tim,

Tecogen is working on pricing for the Chemung County Nursing facility.

You provided me copies of two purchase orders, one for Four (4) units and one for five (5) units. The net cost per unit was $29.75K and $62.2K respectively.

As I stated, this was confusing. I can tell you that the requested price of $47,000 per integrated, low emission unit is below the cost of Tecogen's production cost.

I had asked for the quotations from Aegen Generator Company, you gave me copies of your POs. In order to meet competition, seemingly in a commodity market, and in order to protect all parties, The Aegen quotations would allow us to make sure we were quoting the exact same accessories and prevent anyone claiming foul according to the Robinson-Pattman anti-trust law pertaining to third party injury.

This allows us to meet or beat the price as long as all accessories, certification and required labor are equal.

This bidding war started with a total of twenty-five unit for six separate projects.

I feel strongly that Tecogen will not give you a 25 lot price if you're only going to purchase four units for Chemung. However, I would think they would provide a one time 25 lot price for all projects at a significantly reduced price.

But we would like to see the quotation.

Best regards,

Ray Hickey



EXHIBIT
#91

8/28/07

Jul. 22. 2005 10:17AM    518 884 8411                    No.2415   p. 1/1 p. 1
Case 1:05-cv-11823-RCL    Document 43-51    Filed 07/16/2008   Page 7 of 15
EX. 93

**Hickey, Ray**

From:     Hickey, Ray
Sent:     Friday, July 22, 2005 9:47 AM
To:       'tcasabonne@atlanticenergyservices.com'
Subject:  Tecogen Pricing

**CONFIDENTIAL**

Tim,

Tecogen is working on pricing for the Chemung County Nursing facility.

You provided me copies of two purchase orders, one for Four (4) units and one for five (5) units.
The net cost per unit was $29.75K and $62.2K respectively.

As I stated, this was confusing. I can tell you that the requested price of $47,000 per integrated, low emission unit is below the cost of Tecogen's production cost.

I had asked for the quotations from Aegen Generator Company, you gave me copies of your POs.
In order to meet competition, seemingly in a commodity market, and in order to protect all parties, The Aegen quotations would allow us to make sure we were quoting the exact same accessories and prevent anyone claiming foul according to the Robinson-Pattman anti-trust law pertaining to third party injury.

This allows us to meet or beat the price as long as all accessories, certification and required labor are equal.

This bidding war started with a total of twenty-five unit for six separate projects.

I feel strongly that Tecogen will not give you a 25 lot price if you're only going to purchase four units for Chemung. However, I would think they would provide a one time 25 lot price for all projects at a significantly reduced price.

But we would like to see the quotation.

Best regards,

Ray Hickey

Brian Williamsen  585-436-6006
Wes Schuster  781-466 0466

T 0064

Ex. 172

**Glick, Jeffrey**

| | |
|---|---|
| **From:** | Brian Willemsen [bwillemsen@rlkistler.com] |
| **Sent:** | Tuesday, July 26, 2005 4:11 PM |
| **To:** | rhickey@advancedcomfortsys.com |
| **Cc:** | w.schuster@tecogen.com; Jeff Glick (E-mail) |
| **Subject:** | FW: [SPAM]Tecogen Pricing |

## CONFIDENTIAL

Guys,
    I just talked to Troy & Michael Conrad from clough harbor engineering. They said they have spent some mechanical and electrical engineering time to review how the change to Aegis units would impact the project. Atlantic energy has asked Clough Harbor to put hold on project until this is sorted out. CHA did mention that Chemung county  warned Atlantic Energy that the county will not pay anymore engineering cost and this evaluation would come out of Atlantic Energy's pocket. Clough Harbor will have to send out a proposal to reengineer this or do comparison of two units. CHA did admitt they are in a tough situation with Atlantic energy because they are paying the bill. Looks like the county maybe the only hope to put an end to this. Lets see if Atlantic energy bites on this latest proposal.
    Lets see if we can get this off the street.
-----Original Message-----
**From:** Hickey, Ray [mailto:rhickey@advancedcomfortsys.com]
**Sent:** Tuesday, July 26, 2005 3:56 PM
**To:** tcasabonne@atlanticenergyservices.com
**Cc:** w.schuster@tecogen.com; Glick, Jeffrey; Brian Willemsen
**Subject:** [SPAM]Tecogen Pricing

Tim,

Tecogen offers their CM-75 low emissions integrated unit as specified for the Chemung County Nursing Facility for the sum of Sixty-Six Thousand Dollars ($66,000) EACH, which includes freight and start-up by Tecogen.

If Atlantic Energy Services, Inc., would plan to bundle the additional five (5) future units previously discussed, this plan will then be offered at an additional discount.

Best regards,

Ray Hickey
Advanced Comfort Systems, Inc.

T 0185

8/8/2005

**Tim Casabonne**

| | |
|---|---|
| **From:** | Hickey, Ray [rhickey@advancedcomfortsys.com] |
| **Sent:** | Friday, July 29, 2005 2:22 PM |
| **To:** | Tim Casabonne |
| **Cc:** | Glick, Jeffrey; Jannicelli, Gerald; bwillemsen@rlkistler.com |
| **Subject:** | Tecogen Quotation |

Tim,
Attached is the quotation for the four Tecogen units scheduled for Chemung County Nursing Facility.
Thank you,
Ray

# ADVANCED COMFORT SYSTEMS

11B Commerce Drive   Ballston Spa, NY 12020   (518)884-8444   Fax:884-8411

July 29, 2005

Atlantic Energy Services, Inc.
92 Congress Street,
Suite #4
Saratoga Springs, NY 12866

Attention:  Tim Casabonne, Project Manager

**REFERENCE: CHEMUNG COUNTY NURSING FACILITY**

QUOTATION: Q05-021R1

Advanced Comfort Systems, Inc., as the representative for ***TECOGEN, INC.,*** offers the following model CM-75-LC, integrated as listed in the specifications and documents as G-1 through G-4, with the following features and / or accessories:

- Packaged engine/generator set with enclosure
- 460-3-60 power requirement
- Exhaust silencer, hospital grade, mounted
- Catalytic converter, mounted
- External hot water exhaust heat exchanger, mounted
- Associated exhaust, hot water and heat recovery piping, mounted
- Microprocessor control
- Skid support system for above
- Start-up service by TECOGEN SERVICE
- First year parts warranty

**FOB FACTORY FREIGHT ALLOWED TO JOB SITE...............$220,000.00**
**Terms Net 30 Days No Taxes Included**

Ray Hickey
Sales Engineer

**Your Purchase Order is to be addresses to:**

**TECOGEN, Inc.**
**45 First Avenue**
**P.O. Box 9046**
**Waltham, MA 02454-9046**

# ADVANCED
# COMFORT
# SYSTEMS

11B Commerce Drive   Ballston Spa, NY 12020   (518)884-8444   Fax:884-8411

FAX  781-466-6466

**Tim Casabonne**

| | |
|---|---|
| **From:** | Hickey, Ray [rhickey@advancedcomfortsys.com] |
| **Sent:** | Friday, July 29, 2005 11:35 AM |
| **To:** | Tim Casabonne |
| **Subject:** | RE: Tecogen Pricing |

Tim,
I'll get it to you in the next couple of hours.
Ray

---

**From:** Tim Casabonne [mailto:tcasabonne@atlanticenergyservices.com]
**Sent:** Friday, July 29, 2005 11:25 AM
**To:** Hickey, Ray
**Cc:** Tim Brock
**Subject:** RE: Tecogen Pricing

Ray,

Please send me your quote to so that I can issue a PO.

Thanks,
Tim

---

**From:** Hickey, Ray [mailto:rhickey@advancedcomfortsys.com]
**Sent:** Wednesday, July 27, 2005 5:15 PM
**To:** Tim Casabonne
**Cc:** Glick, Jeffrey; bwillemsen@rlkistler.com
**Subject:** RE: Tecogen Pricing

Tim,

The first year price is $1.15 per run hour per unit, the following years will increase at a 3% inflation cost. We would like to provide this comprehensive service for five years. I understand that the units for Chemung are required immediately and so we would like to obtain a PO ASAP. Please advise.

Best Regards,

Ray Hickey

---

**From:** Tim Casabonne [mailto:tcasabonne@atlanticenergyservices.com]
**Sent:** Wednesday, July 27, 2005 5:06 PM
**To:** Hickey, Ray
**Cc:** Tim Brock
**Subject:** RE: Tecogen Pricing

Ray,

I will be on the road tomorrow. Please call my mobile phone at 852-1403.

Thanks,
Tim

**From:** Hickey, Ray [mailto:rhickey@advancedcomfortsys.com]
**Sent:** Wednesday, July 27, 2005 4:55 PM
**To:** Tim Casabonne
**Subject:** RE: Tecogen Pricing

Tim,

Referencing the proposed maintenance agreement e-mailed by Jeff Glick for Chemung County Nursing Facility, the 1st year cost shall be $1.15 per run hour each unit. I will e-mail the proposed cost for the second year maintenance agreement tomorrow.

Best Regards,

Ray Hickey

---

**From:** Tim Casabonne [mailto:tcasabonne@atlanticenergyservices.com]
**Sent:** Wednesday, July 27, 2005 3:21 PM
**To:** Hickey, Ray
**Cc:** Tim Brock
**Subject:** RE: Tecogen Pricing

Ray,

On 10/28/04 Jeff Glick e-mailed me a proposed maintenance agreement for Chemung with a 1st year cost of $1.15 per hour. Is this still accurate? Also what is the proposed cost for year 2...?

Thanks,
Tim Casabonne
Project Manager

---

**From:** Hickey, Ray [mailto:rhickey@advancedcomfortsys.com]
**Sent:** Wednesday, July 27, 2005 3:01 PM
**To:** Tim Casabonne
**Cc:** Glick, Jeffrey
**Subject:** RE: Tecogen Pricing

Tim,

Tecogen has agreed to accept a purchase order from AES for the four (4) Tecogen units slated for the Chemung County Nursing Facility for $55,000 each. The PO is contingent upon also receiving the service contract for the Tecogen units as discussed with AES several months ago.

Best Regards,

Ray Hickey

---

**From:** Tim Casabonne [mailto:tcasabonne@atlanticenergyservices.com]
**Sent:** Wednesday, July 27, 2005 1:27 PM
**To:** Hickey, Ray
**Cc:** Tim Brock
**Subject:** RE: Tecogen Pricing

Ray,

11/1/2007

We were willing to consider the Tecogen units for Chemung under the premise that they would match the Aegis price. $60,000 each exceeds the Aegis price and is not acceptable.

Tim Casabonne
Project Manager

---

**From:** Hickey, Ray [mailto:rhickey@advancedcomfortsys.com]
**Sent:** Wednesday, July 27, 2005 11:44 AM
**To:** Tim Casabonne
**Cc:** Glick, Jeffrey; bwillemsen@rlkistler.com
**Subject:** RE: Tecogen Pricing

Tim,
Tecogen counter offers $60,000 EACH to include start-up by Tecogen, freight, and first year parts warranty.
The $55,000 is too painful to accept.
Please advise,
Ray Hickey

---

**From:** Tim Casabonne [mailto:tcasabonne@atlanticenergyservices.com]
**Sent:** Wednesday, July 27, 2005 10:12 AM
**To:** Hickey, Ray
**Cc:** Tim Brock
**Subject:** RE: Tecogen Pricing

Ray,

AES will not accept the Tecogen offer of $66,000 per unit for the Chemung project.

AES will accept an offer of $55,000 per unit. If Tecogen can not meet this price then AES will proceed with installing the AEGEN units.

I will be out of the office Thursday and Friday of this week and hope this matter resolved today.

Sincerely,
Tim Casabonne
Project Manager

---

**From:** Hickey, Ray [mailto:rhickey@advancedcomfortsys.com]
**Sent:** Tuesday, July 26, 2005 3:56 PM
**To:** Tim Casabonne
**Cc:** w.schuster@tecogen.com; Glick, Jeffrey; bwillemsen@rlkistler.com
**Subject:** Tecogen Pricing

Tim,

Tecogen offers their CM-75 low emissions integrated unit as specified for the Chemung County Nursing Facility for the sum of Sixty-Six Thousand Dollars ($66,000) EACH, which includes freight and start-up by Tecogen.

If Atlantic Energy Services, Inc., would plan to bundle the additional five (5) future units previously discussed, this plan will then be offered at an additional discount.

Best regards,

11/1/2007

Ray Hickey
Advanced Comfort Systems, Inc.

11/1/2007

# Tecogen Ex. 51

Jeff —

Here is the P.O. for Chemung

# ADVANCED COMFORT SYSTEMS

11B Commerce Drive   Ballston Spa, NY 12020   (518) 884-8444  Fax 884-8411

Wtr 8/2/05

**To:** WES SCHUSTER

**Date:** 8.1.05

**From:** DON MERCK

1 of 5 pages.

**Subject:** ATLANTIC ENERGY P.O.

ON RAY ASKED THAT I FORWARD THESE
ON TO YOU.

Don

T 0180




ENERGY
SERVICES
INC.

*"The Power to Perform"*

**Atlantic Energy Services, Inc.**
92 Congress Street, Saratoga Springs, NY 12866
Phone: (518) 587.3252 • Toll Free: (877) 237.4524 • Fax: (518) 587.4328

# FAX TRANSMITTAL

To: Ray Hickey, Advanced Comfort Systems         From: Tim Casabonne

Fax #: 884-8411                                   Date: 8/1/05

Pages including cover: 4

Re: Cogen Pricing for Chemung County Project

☐ For your signature          ☐ For your review

☐ As requested                ☒ For your use

Hardcopy to follow via mail:  ☐ Yes      ☒ No

Comments:

Ray,

Following please find our Purchase Order for (4) Tecogen units for the Chemung County project.

Tim Casabonne
Project Manager

*www.atlanticenergyservices.com*

T 0181



**ATLANTIC** ENERGY SERVICES INC.

# CONFIDENTIAL

## Purchase Order

| Order Date: | PO No: | Job: |
|---|---|---|
| August 1, 2005 | 05AES003 | Chemung County Health Center |

**Seller:** Tecogen, Inc.
45 First Avenue
Waltham, MA 02454
518-884-8444
518-884-8411 fax

**Ship To:** Chemung County Health Center
c/o Kimble Mechanical Contractor
1004 Sullivan Street
Elmira, NY 14901
607-734-4123, 607-734-4199 fax

Delivery date of goods: (on or before): 10 Weeks from date of order

Completion of services date (on or before): NA

Per Our Attached Specification dated: Per CHA Project No. 13744.
Chemung County Gridley Health Center Combined Heat & Power Project.

Per your quote dated: March 1, 2005, Q05-021, attached.

| Item No. | Quantity | Vendor Catalog No. | Description of Goods or Services | Price per Item | Extended Price |
|---|---|---|---|---|---|
| 1 | 4 | Tecogen CM-75-LE Intergrated Co-generation Module | Tecogen CM-75-LE Intergrated Co-generation Module, per your attached quote of March 1, 2005, as revised by Tim Casabonne on August 1, 2005. | $55,000.00 | $220,000.00 |

Misc. Notes:

Sub-total: $220,000.00
Sales Tax: Exempt
**Total: $220,000.00**

**\*\* Send all invoices to the attention of Accounts Payable to the address listed below.\*\***

**\*\*Our Purchase Order No. MUST appear on all invoices, shipping labels and packages.\*\***

NOTE: This order expressly limits acceptance to the terms stated on the face and back of this form and on any Purchase order supplement attached hereto. Any additional or different terms, whether or not materially different, set forth in any communication from the seller are objected to and hereby rejected.

Approved By AES: *Timothy J. Brock, President*

Dated: 8/1/05

Accepted By:

Dated:

92 Congress Street ● Suite 4 ● Saratoga Springs, NY ● 12866 ● (518) 587-3252 ● (518) 587-4328 fax

T 0182



# CONFIDENTIAL

March 1, 2005

Atlantic Energy Services, Inc.
92 Congress Street
Suite #4
Saratoga Springs, NY 12866

Attention: Tim Casabonne, Project Manager

**REFERENCE: CHEMUNG COUNTY NURSING HOME**

QUOTATION: Q05-021

Advanced Comfort Systems, Inc., as the representative for *TECOGEN, INC.,* offers the following co-generation modules for use on the above referenced project.

Quantity four (4) *TECOGEN, INC.,* model CM-75 (integrated) co-generation modules listed in the specification and drawing documents as G-1 through G-4, with the following features and / or accessories:

- Packaged engine/generator set with enclosure
- 480-3-60 power
- Exhaust silencer, hospital grade, mounted
- Catalytic converter, mounted
- External hot water exhaust heat exchanger, mounted
- Hot water pump rated at 22 gpm @ 68 feet HD, mounted
- Associated exhaust, hot water and heat recovery piping, mounted
- Microprocessor control, mounted
- Skid support system for above, as per the attached drawing
- Dial-up modem. Required dedicated phone line by Customer
- Start-up service provided by *TECOGEN SERVICE*

**FOB FACTORY FREIGHT ALLOWED** ..........$330,000.00 $220,000
**Terms Net 30 Days No Taxes Included**
**Tecogen will not accept any terms for retainage of monies**

*Tim Casabonne*
*8/1/05*

Unit weight: 4,000 lbs
Unit dimensions: 98"L X 61"W X 82"H

*TECOGEN, Inc.,* will provide first year labor warranty for any part(s) that are deemed defective per the *TECOGEN* warranty.

**CONFIDENTIAL**

Page 2

*TECOGEN, INC.*, has provided Atlantic Energy Services, Inc., an all inclusive service cost for the four (4) CM-75 (integrated) units in their letter to you dated October 28, 2004, for the first year after start-up. This cost was $1.15 per operating hour per unit. This cost includes all expendables and all parts initially provided by *TECOGEN, INC.*

It shall be the responsibility of Atlantic Energy Services, Inc., to obtain service for these four (4) units after the initial year's operation.

Lead time for these units is ten (10) weeks ARO.

Ray Hickey
Sales Engineer

CC: Brian Willemsen - R.L. Kistler, Inc. 585-436-6606
Tecogen, Inc. - Jeff Glick 781-466-6466

T 0184

# Tecogen Ex. 52

## Erin Mahoney

**From:**  Tim Casabonne
**Sent:**  Thursday, November 01, 2007 2:19 PM
**To:**  Erin Mahoney
**Subject:** FW: Chemung County Health Center

*Timothy Casabonne*
*Operations Manager*

*Atlantic Energy*
*92 Congress Street*
*Saratoga Springs, NY 12866*
*518-587-3252*
*518-587-4328 fax*

*tcasabonne@atlanticenergy.net*

---

**From:** Tim Casabonne
**Sent:** Friday, July 29, 2005 10:13 AM
**To:** Lee Vardakas (leev@aegisenergyservices.com)
**Cc:** Tim Brock
**Subject:** Chemung County Health Center

Lee,

As you know from attending the 7/19/05 project meeting, our customer, Chemung County, was (and still is) greatly concerned with Atlantic Energy's decision to purchase and install the AEGEN cogen units instead of the Tecogen units.

From day one, the cogeneration component of this project was based on the Tecogen product. The County visited a a few Tecogen installations, talked to several references and gained a comfort level with the Tecogen product which ultimately helped AES sell the project. In addition, the design, project costs, NYSEG and NYDOH approvals are all based on the Tecogen product. It has taken 3 years to get to the point where we are ready and able to build the cogen component of this project and the County feels that changing the cogen units at this stage of the project will cause delays and is not acceptable.

As you know, we have and will continue to support the installation of the AEGEN product on other AES projects but for the Chemung County project we must use the Tecogen product.

Please feel free to contact me or Tim Brock with any questions or to further discuss this matter.

Sincerely,
Tim

11/1/2007

Timothy Casabonne
Operations Manager



**Atlantic Energy Services, Inc.**
92 Congress Street, Saratoga Springs, NY 12866
Phone: (518) 587.3252
Toll Free: (877) 237.4524
Fax: (518) 587.4328

11/1/2007

# Tecogen Ex. 53

**Glick, Jeff**

**From:** Brian Willemsen [bwillemsen@rlkistler.com]
**Sent:** Friday, December 19, 2003 2:54 PM
**To:** JGlick@tecogen.com
**Subject:** RE: Sinclairville, NY High School Cogeneration Interest

Jeff,
    I will follow up with him.
    Bill Cristofaro is doing project at Lakeland High School on the Hudson near Peaksville NY. Aegis Energy will be doing turnkey project.according to Bill C. I know we talked about this issue in the past regarding Engineering Credit. We should discuss this upfront before Aegis starts quoting the jobs ( 4 sites). I would expect Tecogen to build some commissions into Aegis price to cover us. Thank, Brian

-----Original Message-----
From: Glick, Jeff [mailto:JGlick@tecogen.com]
Sent: Friday, December 19, 2003 2:36 PM
To: Brian Willemsen; Tim Blackburn
Subject: Sinclairville, NY High School Cogeneration Interest

Brian / Tim,

I got a call from Tom Zanghi who is head of buildings and grounds for the Cassadaga Valley Central School District.  Tom has interest in adding cogeneration to his high school.  Here are some of the specifics:

750 students
150,000 sq.. ft school
NiMo Electric
National Fuels Gas

He recently saw an article on the Waverly High School project.  He asked me for the name of an engineer who has installed our units.  I gave him Bill Cristofaro's name and number.  Tom was looking for someone to call him and schedule a site visit after the first of the year.  I mailed him a set of our cogeneration literature.

Tom's information is as follows:
Cassadago Valley Central Schools
P.O. Box 540
5937 Sylvester Road
Sinclairville, NY 14782
716962-8581
tj_zanghi@yahoo.com <mailto:tj_zanghi@yahoo.com>

Give me a call if you have any questions.

Jeffrey Glick
Tecogen
Regional Sales Manager
781-466-6481
781-466-6466 Fax

*[handwritten: 11 Units to Ed]*

*[handwritten: Per Ray Hickey 5/12/04 Bidding Next week. Tim Brock will most likely be buying these units.]*

*[handwritten: Mike Wilson want Coast Intelligen]*

1

T 0385

# Tecogen Ex. 54

Tab 140

Ex 197

# TECOGEN

Natural Gas Engine-Driven Products

TECOCHILL™
TECOFROST™
COGENERATION

## LETTER OF TRANSMITTAL

45 First Avenue
WALTHAM, MA 02451
ph: 781.622.1400  fax: 781.622.1002
www.tecogen.com

| DATE 6/30/04 | JOB NO |
|---|---|
| ATTENTION Timothy Brock | |
| RE: | |

TO *Atlantic Energy Services, Inc.*
*92 Congress Street*
*Suite 4*
*Saratoga Springs, NY 12866*

| SHIPPING INFO | | |
|---|---|---|
| SENT VIA ☐ Fed Ex | ☐ UPS | ☐ US Mail |
| CHARGE NO: | | |
| TRACKING NO: | | |

**WE ARE SENDING YOU**  ☐ Attached  ☐ Under separate cover via _____ the following items:

☐ Shop drawings  ☐ Prints  ☐ Plans  ☐ Samples  ☐ Specifications
☐ Copy of letter  ☐ Change Order  ☐ O & M Manuals  ☐ Sales Literature  ☐ Other_____

| COPIES | DATE | NO. | DESCRIPTION |
|---|---|---|---|
| 1 | | | Tecogen Cm-75 Installation Manual |
| 1 | | | + Photos of Recent Integrated Installation |
| 1 | | | Newest Tecogen Cogen Brochures |
| | | | Newest Tecochill Chiller Brochures |
| | | | |
| | | | |
| | | | |
| | | | |

**THESE ARE TRANSMITTED as checked below.**

☐ For approval  ☐ Approved as submitted  ☐ Resubmit _____ copies for approval
☐ For your use  ☐ Approved as noted  ☐ Submit _____ copies for distribution
☐ As requested  ☐ Returned for corrections  ☐ Return _____ corrected prints
☐ For review and comment  ☐ _____  ☐ _____
☐ FOR BIDS DUE _____ 20____  ☐ PRINTS RETURNED AFTER LOAN TO US

REMARKS  *Tim,*
*Wes Schuster from Tecogen suggested I*
*send you this information.*
*I have included a set of photos showing our Cm-75*
*with the entire integrated package.*

*Wes also suggested I visit with your group sometime*
*in early August to discuss any future projects*
*you may be working on. Let me know if you need*
COPY TO *anything from me.* Regards

SIGNED: _____

*If enclosures are not as noted, kindly notify us at once.*

T 0384

**Glick, Jeff**

| | |
|---|---|
| **From:** | Glick, Jeff |
| **Sent:** | Wednesday, June 30, 2004 4:53 PM |
| **To:** | Lee Vardakas (E-mail) |
| **Cc:** | Schuster, Wes |
| **Subject:** | Lakeland Central School District Module Pricing |

Lee,

As we discussed in our telephone conversation today, the Lakeland CSD cogeneration project will involve a number of our Cogeneration representatives. Since the scope of the project will cross into different territories, commission will need to be paid to our representatives involved. As a result, the cogeneration module pricing will have to be determined based on a commissionable sale rather than a buy/resell sale. Below is the pricing we discussed earlier:

| | |
|---|---|
| Base CM-75 module: | $77,970 |
| Emissions Control Option: | $9,375 |
| | |
| Equipment Multiplier (10% Comm.) | x 0.75 |
| Selling Price: | $65,509 |

| | |
|---|---|
| Commission Payment: R.L. Kistler (Engineering credit): | $2,620 |
| Commission Payment: ACS (Owner credit): | $2,620 |

Please keep this information in mind when you are supplying pricing on this project to Bill Cristofaro.

Thanks,

Jeffrey Glick
Tecogen
Regional Sales Manager
781-466-6481
781-466-6466 Fax

T 0382

# Tecogen Ex. 55

## PERFORMANCE CONTRACTING WORK AT SCHOOL DISTRICT FACILITIES
# LAKELAND CENTRAL SCHOOL DISTRICT

### APN 0311.1

| SED Control No: | | |
|---|---|---|
| | Ben Franklin | 66-24-01-06-0-014-008 |
| | George Washington | 66-24-01-06-0-008-014 |
| | Lincoln-Titus | 66-24-01-06-0-009-012 |
| | Thomas Jefferson | 66-24-01-06-0-002-012 |
| | Van Cortlandtville | 66-24-01-06-0-001-015 |
| | Lakeland High School | 66-24-01-06-0-011-012 |
| | Copper Beech MS | 66-24-01-06-0-012-010 |
| | Walter Panas HS | 66-24-01-06-0-015-013 |

## CONTENTS

NOTICE TO BIDDERS            B1 – B2

INFORMATION FOR BIDDERS      C1 – C7

BID FORMS AND CERTIFICATIONS     D1 – D3 /BC-1

AGREEMENT            E1 – E6

GENERAL CONDITIONS           G1 – G20

HAZARDOUS MATERIALS          HM1 – HM2

SPECIAL CONDITIONS           H1 – H6

UNIFORM SAFETY STANDARDS     USS-1 – USS-4

TECHNICAL SPECIFICATIONS     See Index

RECEIVED

MAY – 4 2005

J & M Heating and A/C, Inc.



# DODGE CHAMBERLIN LUZINE WEBER ASSOCIATES ARCHITECTS, LLP
### 73 TROY ROAD, EAST GREEN BUSH, NEW YORK 12061
### (518) 479-4000

## ENERGY CONCEPTS ENGINEERING, P.C.

### ADDRESS ALL COMMUNICATIONS REGARDING THIS PROJECT TO ARCHITECT AT THE ABOVE ADDRESS

To the best of my knowledge, information and belief, the plans and specifications are in accordance with applicable requirements of the New York State Uniform Fire Prevention and Building Code, the State Energy Conservation Construction Code, and State Education Department Building Standards.  Work will not involve known or suspected (ACBM/LM) as evidenced by bulk or destruct testing

Architect _____

EXHIBIT

150 I₅

GM 9-25-07

ADDITIONS AND ALTERATIONS                              COGENERATION UNITS
LAKELAND CSD                                                        15A601-1

# PART 1 – GENERAL

1.1   RELATED DOCUMENTS

   A.   Drawings and general provisions of Contract, including General and
         Supplementary Conditions and Division 1 Specification sections, apply to work of
         this section.

1.2   DESCRIPTION OF WORK

   A.   Extent of cogeneration system and number of units is indicated by drawings and
         schedules and their requirements in this section.

   B.   Refer to Division 16 sections for electrical work required in conjunction with
         cogeneration units.

1.3   QUALITY ASSURANCE

   A.   Units to be NFPA, AGA and NEC compliant.

   B.   Acceptable Manufacturers:

         1.   Tecogen
         2.   WA Kraft

1.4   SUBMITTALS

   A.   Product data – Submit manufacturers specifications for cogeneration units
         showing dimensions, capacities, ratings, performance characteristics, finishes of
         materials and installation instructions.

   B.   Shop drawings – Submit manufacturers cuts or assembly type shop drawings
         showing unit dimensions, construction details and field connection details.

   C.   Wiring diagrams – Submit ladder type wiring diagrams indicating factory and field
         wiring.

# PART 2 – PRODUCTS

2.1   COGENERATION UNITS

   A.   General – Provide natural gas cogeneration units in locations as indicated and of
         capacity, styles and having accessories indicated.

B.    Equipment shall consist of preassembled cogeneration system consisting of a reciprocating, naturally aspirated, natural gas fueled engine, induction generator, heat recovery equipment, sound attenuating enclosure, and electrical switchgear, and solid state controls for automatic, unattended operation, and interfacing with the electric utility, and such other equipment as set forth in these specifications.

C.    Unit mounted controls:

The cogeneration unit shall be provided with the following unit mounted controls and indicators.

1.    Unit mounted hand/off/auto switch.

2.    Unit mounted push button type emergency shutoff switch.

3.    Unit mounted microprocessor controller as described later in this section. For larger units the controller may be mounted near the unit but be vibration isolated from the unit.

4.    Counter meters indicating total run hours and total unit number of starts.

5.    Unit mounted display device indicating at a minimum (upon user selection).

    a)    Unit status
    b)    Power level in kW
    c)    Voltage (average 3 phase)
    d)    Alarm indication
    e)    Engine RPM
    f)    Engine coolant temperature

D.    The electrical output shall be supplied at 480 or 208 volts per drawing, to a 3 phase, 4 wire distribution system.  The system shall have an electrical switchgear panel, integrally mounted to the cogeneration system, providing utility protection device.

E.    The heat recovery equipment shall transfer thermal energy from the engine fluids to a process water stream.  The cogeneration system shall be provided with vibration isolation and thermal expansion connections for the plumbing, fuel, electrical and exhaust.

F.    The noise level of the cogeneration system with its sound attenuating enclosure in place shall not exceed 70Ba at 6 feet.

G.    The cogeneration equipment shall be capable of being moved through a 36" opening without significant disassembly.  The units shall be no larger than 4 feet wide, 6 feet high and 6 feet long, and shall be able to be comfortably maintained in an enclosed space.

H.    The cogeneration system shall be supplied with an integrally or remotely mounted microprocessor based control system for automatic, unattended operation including starting and stopping in response to a thermal load. The control system shall display the equipment status in the start-up. Run and shut-down sequences, shall display:

**Variable**

Power
Reactive Power
KVA
Voltage (Avg.)
Voltage (Phase 1-3)
Voltage (Phase 2-3)
Voltage (Phase 1-2)
Current (Avg.)
Current (Line 1)
Current (Line 2)
Current (Line 3)
Power Factor
Current (1) Phase Angle
Current (2) Phase Angle
Current (3) Phase Angle
Voltage (1-3) Phase Angle
Voltage (2-3) Phase Angle
Voltage (1-2) Phase Angle
Engine Speed
Line Frequency
Water Outlet Temperature
Coolant Outlet Temperature
Oil Sump Temperature
Air Temperature Inside Enclosure
Overlimit Alarms

I.    Microprocessor shall shut down cogeneration system to protect against the following faults:

**Electricity Related**

Voltage Phase Sequence
Overvoltage
Undervoltage
Over Frequency
Under Frequency
Contractor Fault
Low Power Output
Excessive Generator Connect Time

### Thermal Load Related

High Water Pressure
Low Water Pressure
Low Water Flow
High Water Temperature
Excessive Time to Minimum Coolant
Temperature

### Engine Related

Starting Failure
Low Oil Pressure/Low Oil Level
Low Coolant Flow
Low Coolant Temperature
High Coolant Temperature
High Oil Temperature
High Air Temperature
Overspeed
Underspeed

J.    The control system shall display the fault responsible for any shut down. The control system shall also have provision for remotely showing that the system is available for operation or if a fault has occurred.

K.    The cogeneration system shall have a track record of:

At least 250 similar operating units in the U.S., successful interconnection with at least 10 electric utilities, and at least 10 sites in the U.S. which have been operating for four or more years.

L.    The cogeneration system manufacturer shall offer a comprehensive maintenance program for a price per operating-hour. All scheduled and unscheduled service shall be included, as well as engine replacement.

M.    System shall be provided with microprocessor system for operation of unit as a packaged system. System shall perform protective relay functions for the following:

Under Voltage
Over Voltage
Under Frequency
Over Frequency
Under Power
Single Phase Detection
Voltage Phase Sequence

Units shall include integral current transformers to provide signals to microprocessor controller. Microprocessor shall constantly monitor unit operation and perform the various protective functions.

N.    Cogeneration Unit Modulation

Energy management system interface shall be included to allow unit electrical power output to be modulated from 10 kW to 75 kW in 1 kW increments. The electrical power and modulated heat output from the unit shall vary proportionally.

O.    Battery Components

1.    Provide Battery Charger and Regulator as Follows:

a)    Automatic battery charge sensing device.

b)    Automatic charging at rate necessary to maintain battery at full charge; with full charge in 24 hours after 5 minutes of cranking.

c)    Automatically disconnects from battery during engine starting.

d)    Test switch to allow manual sensing of battery charge.

e)    Alarm relays for low DC voltage, high DC voltage, AC power failure and a summary contact for charger failure.

f)    Sheet steel NEMA 1 enclosure for wall mounting. Battery charger shall be mounted and wired inside enclosure.

g)    Charger shall operate on 120 volts AC.

2.    Provide Batteries as Follows:

a)    Lead acid type

b)    Shipped dry, with electrolyte in·separate container.

c)    Provide corrosion-resistant battery mounting rack, battery interconnecting cables and terminals, hydrometer, etc.


**PART 3 – EXECUTION**

3.1    GENERAL REQUIREMENTS:

A.    Completely coordinate installation, assure that elements of the system are compatible, operational and correct.

**ADDITIONS AND ALTERATIONS
LAKELAND CSD**

**COGENERATION UNITS
15A601-6**

B.    Provide rigging to unload, move, and set in place engine-generator.

C.    Provide miscellaneous bolts, washers, nuts, clips, lockwashers, small hardware, etc., of durium or equal rust resistant material, to make installation complete.

D.    Connect gas piping to cogeneration equipment and comply with manufacturer's instructions.

E.    Refer to "Grounding" section of specifications.

F.    Install equipment plumb, level, and true.

G.    Leave maximum space available in front, along side, etc., all items of equipment, to allow easy access and servicing of serviceable components.  Meet NEC requirements.

## 3.2    FIELD SUPERVISION

A.    Provide field supervision/service at no additional cost to cover inspection, test, and start-up of this equipment.

B.    Submittal shall state the amount of field supervision/service recommended by vendor to cover critical points of installation, inspection, test, and start-up.

C.    The complete installation shall be checked for procedural and operational compliance by a representative of the system manufacturer's authorized local dealer.  The engine lubricating oil and antifreeze, as recommended by the system manufacturer, shall be provided by the generator set dealer.  If switchgear and generator sets are furnished by different manufacturers, technical representatives of both manufacturers' authorized dealers shall verify the installation meets requirements.  Any deficiencies shall be noted and corrected by the Contractor.

D.    The system manufacturer's dealer representative shall be present to assist the Contractor during start-up, systems check, adjusting, and any site testing required after the installation is complete.

## 3.3    WARRANTY

A.    The Cogeneration Unit system components, complete electric plant, and controls shall be warranted by the manufacturer against defects in materials and factory workmanship for a period of (1) year.  Such defective parts shall be repaired or replaced at manufacturer's option, free of charge for a period of (1) year with travel time and mileage free of charge for the first year of operation.  The warranty period shall commence when the standby power system is first placed in service.

3.4    INSTRUCTION & TRAINING

    A.    Provide verbal and written instructions to Owner appointed personnel in the proper and safe manner of operating equipment.

    B.    Instruction shall include proper maintenance, testing and trouble shooting techniques and methods.

    C.    Instruction shall be given by a manufacturer certified technicians or mechanics.

    D.    Provide representatives for each piece of equipment in the system.

3.5    LOAD COORDINATION

    A.    Provide load analysis demonstrating generator set will properly start, operate and provide power levels as specified.

    B.    The DDC system provided by the Division 15 contractor will provide sequence for control. The system supplier shall coordinate control requirements with the division 15 contractor and DDC system supplier.

3.6    ENGINE-GENERATOR INSTALLATION

    A.    Install where shown on plans. Provide an equipment pad and foundation. The construction shall be like the transformer pad shown on the drawings. The approximate pad dimensions are shown on the plans. The contractor shall obtain the approval of the engine-generator manufacturer for the pad and foundation prior to installation.

    B.    Provide necessary anchor bolts at proper locations, place by templates if required, for proper setting of engine-generator.

    C.    Perform full operational test of complete system. Provide notification of tests to be conducted in presence of Owner's Representative, in accordance with manufacturer's instructions.

    D.    Determine exact requirements, verify locations, and comply with applicable regulations in installing equipment.

    E.    Provide the services of the manufacturer's representative to check out the system and instruct the Owner in the operation of the system. Furnish written statement to the Owner's Representative that the check-out and instruction service has been provided. Include statement that system operates properly, as called for. Submit statement as a submittal for review.

3.7    FUEL PIPING GAS

    A.    Plumbing trade shall provide complete fuel piping to engine-generator and make final connection.

B.    Furnish fuel filter, fuel solenoid valve, secondary regulator, gas shutoff cock, flexible fuel piping and fuel piping diagram.

C.    Coordinate fuel piping size with these items. The division 15 contractor and system manufacturer are responsible for determining the final size of the fuel piping.

3.8    VENTILATION

A.    HVAC trade shall provide exhaust fans, flexible duct connector, all louvers, dampers and operators necessary for cooling.

B.    Provide all wiring to fans, starters, controls, electric solenoid for pneumatic operators, or electric motor for electric operators, including all breakers, switches, transformers, etc., as required.

C.    Coordinate all work with the HVAC contractor.

3.9    ENGINE COOLING WATER PIPING (FOR HEAT EXCHANGER COOLING ONLY)

A.    Provide complete cooling water piping system, make water connections to engines, and install valves furnished by engine manufacturer.

B.    Furnish complete cooling water piping diagram as required.

C.    Coordinate all work

3.10    EXHAUST SYSTEM

A.    Provide complete exhaust piping system, including stack supports to floor or structure, except flexible connection at engine and muffler.

B.    Install mufflers, flexible exhaust connections, and provide condensate trap with valve on exhaust piping system and on muffler, in accordance with manufacturer's recommendations.

C.    Provide necessary insulation, wall and/or roof thimbles, including openings, flashing, etc., where exhaust system penetrates roof.

D.    Install thermal insulation products in accordance with manufacturer's written instructions and in compliance with recognized industry practices to ensure that insulation serves its intended purpose.

E.    Install insulation materials with smooth and even surfaces and on clean and dry surfaces. Redo poorly fitted joints. Do not use mastic or joint sealer as filler for gapping joints and excessive voids resulting from poor workmanship.

F.    Do not apply insulation to hot equipment.

G.   Apply insulation using the staggered joint method for both single and double layer construction, where feasible.  Apply each layer of insulation separately.

H.   Coat insulated surfaces with layer of insulating cement, troweled in workmanlike manner, leaving smooth continuous surface.  Fill in scored block, seams, chipped edges and depressions, and cover over wire netting and joints with cement of sufficient thickness to remove surface irregularities.

I.   Cover exterior insulated surfaces with aluminum jacketing neatly fitted and firmly secured. Lap seams at least two inches.  Provide neatly beveled edge at interruptions of insulation.

J.   Replace damaged insulation which cannot be repaired satisfactorily, including units with vapor barrier damage and moisture saturated units.

K.   Protection - insulation Installer shall advise Contractor of required protection for insulation work during remainder of construction period to avoid damage and deterioration.

## 3.11   GROUNDING

A.   Provide equipment grounding connections, sufficiently tight to assure a permanent and effective ground, for system components as indicated.

## 3.12   EQUIPMENT PROTECTION

A.   Provide repair or replacement for all damage and defacement, whether functional or nonfunctional, to all equipment from the time it is unloaded, during installation, and during period of beneficial use, and until installation is accepted.

## 3.13   ACCEPTANCE TESTING

A.   After substantial completion punch list items have been finished,  the contractor and manufacturers representative will provide the following tests, in the presence of the Owner's head of facilities and engineer:

1.   Prestart Checks:

a)   oil level
b)   water level
c)   day tank fuel level (if No. 2 fuel oil)
d)   battery connection and charge condition
e)   air start supply pressure (if so equipped)
f)   engine to control interconnects
g)   engine generator intake/exhaust obstructions
h)   engine room ventilation obstructions
i)   removal of all packing materials

2.    Operation tests:

    a)    Power - Four-hour operation at 50% of full power rating.  Eight hours operation at 100% of full power rating.  After the first half-hour stabilization period at full load, the following shall be recorded at fifteen minute intervals:

        (1)    Voltage and amperage (3 phase), frequency

        (2)    Fuel pressure, oil pressure and water temperature

        (3)    Exhaust gas temperature at engine exhaust outlet ,Ambient temperature

        (4)    Kilowatts, Power Factor, Kvars

        (5)    Generator Coolant Temperature

        (6)    Proper operation of controls, engine shutdown, and safety devices shall be demonstrated.

        (7)    Should these tests indicate that the equipment does not meet the specified performance requirements, National Electric Code and Local codes, the cost of all corrective measures shall be borne by the contractor.

B.    Cogeneration unit vendor shall provide assistance and coordination with EMS controls installer for complete operation of cogeneration unit.

3.14    OWNER TRAINING

A.    The system manufacturer's representative(s) shall provide a complete orientation for the owner's engineering and maintenance personnel.  Orientation shall include both classroom and hands-on instruction of a total of not less than 24 hours.  Topics covered shall include control operation, schematics, microprocessor controller, meters, indicators, warning lights, shutdown system and routine maintenance.

B.    Provide an additional 4 hours of training 6 months after the system acceptance.

**END OF SECTION**

# PROJECT MANUAL FOR:

# LAKELAND CENTRAL SCHOOL DISTRICT

## ENERGY PERFORMANCE PROJECT

### MECHANICAL AND ELECTRICAL WORK

LAKELAND, NEW YORK

DATE: March 17, 2004

### NOTICE

IT IS A VIOLATION OF LAW FOR ANY PERSON, UNLESS ACTING UNDER THE DIRECTION OF A LICENSED ARCHITECT TO ALTER ANY ITEM ON THIS DOCUMENT IN ANY WAY. ANY LICENSEE WHO ALTERS THIS DOCUMENT IS REQUIRED BY LAW TO AFFIX HIS OR HER SEAL AND THE NOTATION "ALTERED BY" FOLLOWED BY HIS OR HER SIGNATURE AND A SPECIFIC DESCRIPTION OF ALTERATIONS WHICH WERE MADE.

**ENGINEER:**





EXHIBIT
#67

ENERGY CONCEPTS ENGINEERING, P.C.
3445 WINTON PLACE – SUITE 102
ROCHESTER, NEW YORK 14623
(585) 272-4650, FAX (585) 272-4676

PROJECT # 03208

# PART 1 – GENERAL

## 1.1    RELATED DOCUMENTS

A.    Drawings and general provisions of Contract, including General and Supplementary Conditions and Division 1 Specification sections, apply to work of this section.

## 1.2    DESCRIPTION OF WORK

A.    Extent of cogeneration system and number of units is indicated by drawings and schedules and their requirements in this section.

B.    Refer to Division 16 sections for electrical work required in conjunction with cogeneration units.

## 1.3    QUALITY ASSURANCE

A.    Units to be NFPA, AGA and NEC compliant.    ←——

B.    Acceptable Manufacturers:

1.    Tecogen
2.    WA Kraft

## 1.4    SUBMITTALS

A.    Product data – Submit manufacturers specifications for cogeneration units showing dimensions, capacities, ratings, performance characteristics, finishes of materials and installation instructions.

B.    Shop drawings – Submit manufacturers cuts or assembly type shop drawings showing unit dimensions, construction details and field connection details.

C.    Wiring diagrams – Submit ladder type wiring diagrams indicating factory and field wiring.

# PART 2 – PRODUCTS

## 2.1    COGENERATION UNITS

A.    General – Provide natural gas cogeneration units in locations as indicated and of capacity, styles and having accessories indicated.

T  0253

ADDITIONS AND ALTERATIONS
LAKELAND CSD

COGENERATION UNITS
15A601-2

B. Equipment shall consist of preassembled cogeneration system consisting of a reciprocating, naturally aspirated, natural gas fueled engine, induction generator, heat recovery equipment, sound attenuating enclosure, and electrical switchgear, and solid state controls for automatic, unattended operation, and interfacing with the electric utility, and such other equipment as set forth in these specifications.

C. Unit mounted controls:

The cogeneration unit shall be provided with the following unit mounted controls and indicators.

1. Unit mounted hand/off/auto switch.

2. Unit mounted push button type emergency shutoff switch.

3. Unit mounted microprocessor controller as described later in this section. For larger units the controller may be mounted near the unit but be vibration isolated from the unit.

4. Counter meters indicating total run hours and total unit number of starts.

5. Unit mounted display device indicating at a minimum (upon user selection).

   a) Unit status
   b) Power level in kW
   c) Voltage (average 3 phase)
   d) Alarm indication
   e) Engine RPM
   f) Engine coolant temperature

D. The electrical output shall be supplied at 480 or 208 volts per drawing, to a 3 phase, 4 wire distribution system. The system shall have an electrical switchgear panel, integrally mounted to the cogeneration system, providing utility protection device.

E. The heat recovery equipment shall transfer thermal energy from the engine fluids to a process water stream. The cogeneration system shall be provided with vibration isolation and thermal expansion connections for the plumbing, fuel, electrical and exhaust.

F. The noise level of the cogeneration system with its sound attenuating enclosure in place shall not exceed 70Ba at 6 feet.

G. The cogeneration equipment shall be capable of being moved through a 36" opening without significant disassembly. The units shall be no larger than 4 feet wide, 6 feet high and 6 feet long, and shall be able to be comfortably maintained in an enclosed space.

H.   The cogeneration system shall be supplied with an integrally or remotely
     mounted microprocessor based control system for automatic, unattended
     operation including starting and stopping in response to a thermal load.  The
     control system shall display the equipment status in the start-up.  Run and shut-
     down sequences, shall display:

**Variable**

Power
Reactive Power
KVA
Voltage (Avg.)
Voltage (Phase 1-3)
Voltage (Phase 2-3)
Voltage (Phase 1-2)
Current (Avg.)
Current (Line 1)
Current (Line 2)
Current (Line 3)
Power Factor
Current (1) Phase Angle
Current (2) Phase Angle
Current (3) Phase Angle
Voltage (1-3) Phase Angle
Voltage (2-3) Phase Angle
Voltage (1-2) Phase Angle
Engine Speed
Line Frequency
Water Outlet Temperature
Coolant Outlet Temperature
Oil Sump Temperature
Air Temperature Inside Enclosure
Overlimit Alarms

I.   Microprocessor shall shut down cogeneration system to protect against the
     following faults:

**Electricity Related**

Voltage Phase Sequence
Overvoltage
Undervoltage
Over Frequency
Under Frequency
Contractor Fault
Low Power Output
Excessive Generator Connect Time

### Thermal Load Related

High Water Pressure
Low Water Pressure
Low Water Flow
High Water Temperature
Excessive Time to Minimum Coolant
Temperature

### Engine Related

Starting Failure
Low Oil Pressure/Low Oil Level
Low Coolant Flow
Low Coolant Temperature
High Coolant Temperature
High Oil Temperature
High Air Temperature
Overspeed
Underspeed

J.    The control system shall display the fault responsible for any shut down. The control system shall also have provision for remotely showing that the system is available for operation or if a fault has occurred.

K.    The cogeneration system shall have a track record of:

At least 250 similar operating units in the U.S., successful interconnection with at least 10 electric utilities, and at least 10 sites in the U.S. which have been operating for four or more years.

L.    The cogeneration system manufacturer shall offer a comprehensive maintenance program for a price per operating-hour. All scheduled and unscheduled service shall be included, as well as engine replacement.

M.    System shall be provided with microprocessor system for operation of unit as a packaged system. System shall perform protective relay functions for the following:

Under Voltage
Over Voltage
Under Frequency
Over Frequency
Under Power
Single Phase Detection
Voltage Phase Sequence

Units shall include integral current transformers to provide signals to microprocessor controller. Microprocessor shall constantly monitor unit operation and perform the various protective functions.

N.    Cogeneration Unit Modulation

Energy management system interface shall be included to allow unit electrical power output to be modulated from 10 kW to 75 kW in 1 kW increments. The electrical power and modulated heat output from the unit shall vary proportionally.

O.    Battery Components

1.    Provide Battery Charger and Regulator as Follows:

a)    Automatic battery charge sensing device.

b)    Automatic charging at rate necessary to maintain battery at full charge; with full charge in 24 hours after 5 minutes of cranking.

c)    Automatically disconnects from battery during engine starting.

d)    Test switch to allow manual sensing of battery charge.

e)    Alarm relays for low DC voltage, high DC voltage, AC power failure and a summary contact for charger failure.

f)    Sheet steel NEMA 1 enclosure for wall mounting. Battery charger shall be mounted and wired inside enclosure.

g)    Charger shall operate on 120 volts AC.

2.    Provide Batteries as Follows:

a)    Lead acid type

b)    Shipped dry, with electrolyte in separate container.

c)    Provide corrosion-resistant battery mounting rack, battery interconnecting cables and terminals, hydrometer, etc.

## PART 3 -- EXECUTION

3.1    GENERAL REQUIREMENTS:

A.    Completely coordinate installation, assure that elements of the system are compatible, operational and correct.

ADDITIONS AND ALTERATIONS
LAKELAND CSD

COGENERATION UNITS
15A601-6

---

B.    Provide rigging to unload, move, and set in place engine-generator.

C.    Provide miscellaneous bolts, washers, nuts, clips, lockwashers, small hardware, etc., of durium or equal rust resistant material, to make installation complete.

D.    Connect gas piping to cogeneration equipment and comply with manufacturer's instructions.

E.    Refer to "Grounding" section of specifications.

F.    Install equipment plumb, level, and true.

G.    Leave maximum space available in front, along side, etc., all items of equipment, to allow easy access and servicing of serviceable components. Meet NEC requirements.

3.2    FIELD SUPERVISION

A.    Provide field supervision/service at no additional cost to cover inspection, test, and start-up of this equipment.

B.    Submittal shall state the amount of field supervision/service recommended by vendor to cover critical points of installation, inspection, test, and start-up.

C.    The complete installation shall be checked for procedural and operational compliance by a representative of the system manufacturer's authorized local dealer. The engine lubricating oil and antifreeze, as recommended by the system manufacturer, shall be provided by the generator set dealer. If switchgear and generator sets are furnished by different manufacturers, technical representatives of both manufacturers' authorized dealers shall verify the installation meets requirements. Any deficiencies shall be noted and corrected by the Contractor.

D.    The system manufacturer's dealer representative shall be present to assist the Contractor during start-up, systems check, adjusting, and any site testing required after the installation is complete.

3.3    WARRANTY

A.    The Cogeneration Unit system components, complete electric plant, and controls shall be warranted by the manufacturer against defects in materials and factory workmanship for a period of (1) year. Such defective parts shall be repaired or replaced at manufacturer's option, free of charge for a period of (1) year with travel time and mileage free of charge for the first year of operation. The warranty period shall commence when the standby power system is first placed in service.

T  0258

3.4    INSTRUCTION & TRAINING

A.    Provide verbal and written instructions to Owner appointed personnel in the proper and safe manner of operating equipment.

B.    Instruction shall include proper maintenance, testing and trouble shooting techniques and methods.

C.    Instruction shall be given by a manufacturer certified technicians or mechanics.

D.    Provide representatives for each piece of equipment in the system.

3.5    LOAD COORDINATION

A.    Provide load analysis demonstrating generator set will properly start, operate and provide power levels as specified.

B.    The DDC system provided by the Division 15 contractor will provide sequence for control. The system supplier shall coordinate control requirements with the division 15 contractor and DDC system supplier.

3.6    ENGINE-GENERATOR INSTALLATION

A.    Install where shown on plans. Provide an equipment pad and foundation. The construction shall be like the transformer pad shown on the drawings. The approximate pad dimensions are shown on the plans. The contractor shall obtain the approval of the engine-generator manufacturer for the pad and foundation prior to installation.

B.    Provide necessary anchor bolts at proper locations, place by templates if required, for proper setting of engine-generator.

C.    Perform full operational test of complete system. Provide notification of tests to be conducted in presence of Owner's Representative, in accordance with manufacturer's instructions.

D.    Determine exact requirements, verify locations, and comply with applicable regulations in installing equipment.

E.    Provide the services of the manufacturer's representative to check out the system and instruct the Owner in the operation of the system. Furnish written statement to the Owner's Representative that the check-out and instruction service has been provided. Include statement that system operates properly, as called for. Submit statement as a submittal for review.

3.7    FUEL PIPING GAS

A.    Plumbing trade shall provide complete fuel piping to engine-generator and make final connection.

B.   Furnish fuel filter, fuel solenoid valve, secondary regulator, gas shutoff cock, flexible fuel piping and fuel piping diagram.

C.   Coordinate fuel piping size with these items. The division 15 contractor and system manufacturer are responsible for determining the final size of the fuel piping.

## 3.8   VENTILATION

A.   HVAC trade shall provide exhaust fans, flexible duct connector, all louvers, dampers and operators necessary for cooling.

B.   Provide all wiring to fans, starters, controls, electric solenoid for pneumatic operators, or electric motor for electric operators, including all breakers, switches, transformers, etc., as required.

C.   Coordinate all work with the HVAC contractor.

## 3.9   ENGINE COOLING WATER PIPING (FOR HEAT EXCHANGER COOLING ONLY)

A.   Provide complete cooling water piping system, make water connections to engines, and install valves furnished by engine manufacturer.

B.   Furnish complete cooling water piping diagram as required.

C.   Coordinate all work

## 3.10   EXHAUST SYSTEM

A.   Provide complete exhaust piping system, including stack supports to floor or structure, except flexible connection at engine and muffler.

B.   Install mufflers, flexible exhaust connections, and provide condensate trap with valve on exhaust piping system and on muffler, in accordance with manufacturer's recommendations.

C.   Provide necessary insulation, wall and/or roof thimbles, including openings, flashing, etc., where exhaust system penetrates roof.

D.   Install thermal insulation products in accordance with manufacturer's written instructions and in compliance with recognized industry practices to ensure that insulation serves its intended purpose.

E.   Install insulation materials with smooth and even surfaces and on clean and dry surfaces. Redo poorly fitted joints. Do not use mastic or joint sealer as filler for gapping joints and excessive voids resulting from poor workmanship.

F.   Do not apply insulation to hot equipment.

G.    Apply insulation using the staggered joint method for both single and double layer construction, where feasible.  Apply each layer of insulation separately.

H.    Coat insulated surfaces with layer of insulating cement, troweled in workmanlike manner, leaving smooth continuous surface.  Fill in scored block, seams, chipped edges and depressions, and cover over wire netting and joints with cement of sufficient thickness to remove surface irregularities.

I.    Cover exterior insulated surfaces with aluminum jacketing neatly fitted and firmly secured. Lap seams at least two inches.  Provide neatly beveled edge at interruptions of insulation.

J.    Replace damaged insulation which cannot be repaired satisfactorily, including units with vapor barrier damage and moisture saturated units.

K.    Protection – insulation Installer shall advise Contractor of required protection for insulation work during remainder of construction period to avoid damage and deterioration.

## 3.11    GROUNDING

A.    Provide equipment grounding connections, sufficiently tight to assure a permanent and effective ground, for system components as indicated.

## 3.12    EQUIPMENT PROTECTION

A.    Provide repair or replacement for all damage and defacement, whether functional or nonfunctional, to all equipment from the time it is unloaded, during installation, and during period of beneficial use, and until installation is accepted.

## 3.13    ACCEPTANCE TESTING

A.    After substantial completion punch list items have been finished,  the contractor and manufacturers representative will provide the following tests, in the presence of the Owner's head of facilities and engineer:

    1.    Prestart Checks:

        a)    oil level
        b)    water level
        c)    day tank fuel level (if No. 2 fuel oil)
        d)    battery connection and charge condition
        e)    air start supply pressure (if so equipped)
        f)    engine to control interconnects
        g)    engine generator intake/exhaust obstructions
        h)    engine room ventilation obstructions
        i)    removal of all packing materials

2.      Operation tests:

a)      Power - Four-hour operation at 50% of full power rating.  Eight hours operation at 100% of full power rating.  After the first half-hour stabilization period at full load, the following shall be recorded at fifteen minute intervals:

(1)     Voltage and amperage (3 phase), frequency

(2)     Fuel pressure, oil pressure and water temperature

(3)     Exhaust gas temperature at engine exhaust outlet ,Ambient temperature

(4)     Kilowatts, Power Factor, Kvars

(5)     Generator Coolant Temperature

(6)     Proper operation of controls, engine shutdown, and safety devices shall be demonstrated.

(7)     Should these tests indicate that the equipment does not meet the specified performance requirements, National Electric Code and Local codes, the cost of all corrective measures shall be borne by the contractor.

B.      Cogeneration unit vendor shall provide assistance and coordination with EMS controls installer for complete operation of cogeneration unit.

3.14    OWNER TRAINING

A.      The system manufacturer's representative(s) shall provide a complete orientation for the owner's engineering and maintenance personnel.  Orientation shall include both classroom and hands-on instruction of a total of not less than 24 hours.  Topics covered shall include control operation, schematics, microprocessor controller, meters, indicators, warning lights, shutdown system and routine maintenance.

B.      Provide an additional 4 hours of training 6 months after the system acceptance.

**END OF SECTION**

# Tecogen Ex. 56

Tecogen Ex. 56 comprises three over-sized drawings filed with the Court in hardcopy form.

# Tecogen Ex. 57

# TECOGEN

Natural Gas Engine-Driven Products

TECOFROST™
COGENERATION

# LETTER OF TRANSMITTAL

45 First Avenue
WALTHAM, MA 02451
ph: 781.622.1400  fax: 781.622.1002
www.tecogen.com

| DATE 6/30/04 | JOB NO |
| --- | --- |
| ATTENTION Timothy Brooks | |
| RE: | |

TO *Atlantic Energy Services, Inc.*
*92 Congress Street*
*Suite 4*
*Saratoga Springs, NY 12866*

SHIPPING INFO

SENT VIA: ☐ Fed Ex   ☐ UPS   ☐ US Mail

CHARGE NO:

TRACKING NO:

WE ARE SENDING YOU   ☐ Attached   ☐ Under separate cover via _____ the following items:

☐ Shop drawings   ☐ Prints   ☐ Plans   ☐ Samples   ☐ Specifications
☐ Copy of letter   ☐ Change Order   ☐ O & M Manuals   ☐ Sales Literature   ☐ Other_____

| COPIES | DATE | NO. | DESCRIPTION |
| --- | --- | --- | --- |
| 1 | | | Tecogen CM-75 Installation Manual |
| 1 | | | Photos of Recent Integrated Installation |
| 1 | | | Newest Tecogen Cogen Brochures |
| | | | Newest Tecochill Chiller Brochures |
| | | | |
| | | | |
| | | | |
| | | | |

THESE ARE TRANSMITTED as checked below:

☐ For approval   ☐ Approved as submitted   ☐ Resubmit _____ copies for approval
☐ For your use   ☐ Approved as noted   ☐ Submit _____ copies for distribution
☐ As requested   ☐ Returned for corrections   ☐ Return _____ corrected prints
☐ For review and comment   ☐ _____

☐ FOR BIDS DUE _____ 20_____   ☐ PRINTS RETURNED AFTER LOAN TO US

REMARKS _____
*Tim,*
*Wes Schuster from Tecogen suggested I*
*send you this information.*
*I have included a set of photos showing a CM-75*
*with the entire integrated package.*

*Wes also suggested I visit with you your people*
*in early August to discuss any future service for*
*you might be working on. Let me know if you need*

COPY TO *anything from me.   Regards*

SIGNED: _____

If enclosures are not as noted, kindly notify us at once.

T 0384

# TECOGEN

45 First Ave.
Waltham, MA 02451

# FAX COVER S

Post-it® Fax Note    7671    Date 8/26    # of pages ▸ 3
To Brian Willemsen    From Jeff Glick
Co./Dept. R.L.Kistler    Co. Tecogen
Phone #    Phone #
Fax # 585-436-6666    Fax #

Post-it® Fax Note    7671    Date 8/25    # of pages ▸ 3
To Ray Hickey    From Jeff Glick
Co./Dept.    Co. Tecogen
Phone # 518-    Phone #
Fax # 884-8411    Fax #

**DATE:**  8/24/04

**TO:**  CHRIS CAFER

**COMPANY:**  ENERGY CONCEPTS

**FAX:**  585-272-4676

**FROM:**  JEFFREY GLICK

**PHONE:**  781-466-6481

**FAX:**  781-466-6466

**RE:**  LAKELAND CSD UNITS

**CC:**

Number of pages including cover sheet: 3



EXHIBIT #68
8/8/07 LB

Chris,

I wanted to provide you with some additional information on the Fully Integrated Tecogen CM-75 modules. I have been very interested in getting your support to allow Tecogen to supply this fully packaged CM-75 module on the Lakeland CSD project.

The fully packaged CM-75 would be delivered with the emission control system, plumbing module, remote exhaust heat exchanger, and exhaust muffler completely piped and supported

The benefits of using the integrated unit are numerous. The most import benefit would be the money savings to the overall project. If Tecogen supplies the integrated module, the cost per CM-75 would be increased by approximately $▮▮▮▮ However the reduced scope would significantly simplify the amount of field piping done by the installing contractor.

I have attached a section of your M6.4 drawing with a dotted line indicating the scope of supply that Tecogen would be responsible for by supplying the integrated unit. Below I have identified specific items from your drawing which differ from our standard supply.

**Stainless Steel Exhaust Flex Connector**
The flex connector located directly above the cogen module and below the catalytic converter would not be required on the integrated unit.

**Exhaust Test Ports**

The two exhaust gas test ports would not be included on the integrated package piping. On existing integrated modules operating in the field, the test ports are located in the exhaust piping downstream of the exhaust muffler.

**Exhaust Silencer**
The exhaust silencer supplied by Tecogen on our integrated modules is not a stainless steel muffler. Instead Tecogen would supply a carbon steel hospital grade silencer.

**Exhaust Pipe Material**
The exhaust pipe material selection on the integrated modules is as follows:
Stainless steel from the engine outlet to the exhaust silencer inlet.
Carbon steel from the muffler inlet to the stack connection.

**Cogeneration Module Pump**
The pump, which Tecogen supplies with the integrated module, is a single-phase ¾ hp pump. The pump will supply 25 gpm at 68 ft. This leaves a total of 9 psi for external piping.

**Flow Gauge**
The water flow meter would have to be installed outside the integrated module piping.

**EMS Flow Switch**
The EMS Flow switches would also have to be installed outside the integrated module piping.

**Thermostatic Valve**
Tecogen uses an "AMOT" style thermostatic three-way valve in our modules.

After you have taken a look at this information, I would be glad to discuss this with you.

Give me a call anytime.

Regards,

Jeffrey Glick
Tecogen



TECOGEN ENGINE INSTALLATION DETAIL

TECOGEN CM-75
COGENERATION MODULE

# Tecogen Ex. 58

# TECOGEN

### TECOCHILL ™ ▆▆▆
### *The Driving Force in Cooling*

45 First Ave.
Waltham, MA 02451

# F A X   C O V E R   S H E E T

| | | | |
|---|---|---|---|
| **DATE:** | 9/10/04 | **FROM:** | JEFFREY GLICK |
| | | **PHONE:** | 781-466-6481 |
| **TO:** | RAY HICKEY | **FAX:** | 781-466-6466 |
| **COMPANY:** | ADVANCED COMFORT SYSTEMS | **RE:** | |
| **FAX:** | 518-884-8411 | **CC:** | |

Number of pages including cover sheet: 4

Ray,

Attached are the pricing calculations for the Lakeland CSD units. The pricing I have put together is based on a ▆▆▆ commission level to the representatives. It looks like there are seven high voltage (480 volts) units and four low voltage (208 volts) units. Tecogen recently instituted a small price increase on the low voltage units due to the additional cost of all the electrical components. The pricing includes the cogen unit plus integrated option, freight, startup, and full one-year warranty. I have not included the Power Factor Correction System in this pricing. The two module prices are as follows:

CM-75HE Integrated - $▆▆▆
CM-75LE Integrated - $▆▆▆   

Here is a description of the Integrated Unit that I have lifted from Appendix 3 of the Installation Manual:

The Integrated is a Tecogen cogeneration module with a fully packaged emission control system, and plumbing module for the heat recovery system. The purpose of the Integrated unit is to streamline the installation of the modules equipped with the emission control option since this option contains major components, specifically the catalytic converter and exhaust heat exchanger, that are otherwise field-installed.

The scope of the exhaust piping and heat recovery piping that is included with the Integrated Unit is shown inside the dotted box on the attached drawing. For comparison, the acoustic enclosure shown

---

*Visit our HomePage at "www.tecogen.com"*

around the engine/generator marks the module boundaries.  As indicated, the Integrated Unit significantly simplifies the amount of piping done by the installer.

The descriptions of the Heat Recovery Piping and Exhaust System Piping can be used from page 70 of the Installation Manual.

I also have available a Guide Specification on Word that we may want to use.  Let me know next week if you want me to email it to you.

Jeff Glick

# Appendix 3



**Drawing A3.1   CM-60/CM-75 Integrated Unit — Piping Schematic**

## Glick, Jeff

**From:** Hickey, Ray [rhickey@advancedcomfortsys.com]
**Sent:** Monday, October 11, 2004 10:24 AM
**To:** jglick@tecogen.com
**Subject:** Lakeland

Jeff.
Can we use an IP address instead of the dial up??
Ray
-----Original Message-----
**From:** Volney, Chris
**Sent:** Monday, October 11, 2004 10:19 AM
**To:** Hickey, Ray
**Cc:** Thurber, John
**Subject:** FW: LCSD

Ray,
Please se below.  Can we get an IP communications as an option?
-----Original Message-----
**From:** Thurber, John
**Sent:** Monday, October 11, 2004 8:46 AM
**To:** Volney, Chris; 'Chris Cafer'
**Subject:** RE: LCSD

Chris.

Tecogen uses modem connection for remote site access.  We would need to check with Ray Hickey to see if IP communications is an option

John

---

**From:** Volney, Chris
**Sent:** Friday, October 08, 2004 11:24 AM
**To:** Thurber, John; 'Chris Cafer'
**Subject:** RE: LCSD

We have IP addresses for the capital project so I'm sure we can get these for the performance contract.

-----Original Message-----
**From:** Thurber, John
**Sent:** Thursday, October 07, 2004 11:52 AM
**To:** Chris Cafer; Volney, Chris
**Subject:** RE: LCSD

Chris.

Just like Fonda, I will include DDC controls and control points for the Cogen portion, including the DDC controls wiring, communications bus for the Tecogen remote access (I think they use a dial up modem...Bruce knows he has to supply a phone line?), and interlock wiring for EF's or ventilation dampers etc..

John

---

**From:** Chris Cafer [mailto:CCafer@nrg-concepts.com]

10/15/2004

T  0371

**Sent:** Thursday, October 07, 2004 11:31 AM
**To:** Thurber, John; Volney, Chris
**Subject:** LCSD

John

Just a thought I didn't voice yesterday. On jobs such as these I prefer the Controls Contractor to carry a number for the actual wiring of the DDC points <u>including</u> the cogen work. This gets a little funky sometimes because our drawings cannot encompass an exact conductor count because we don't get to see the switchgear manufacturers control schematics until they provide their equipment submittals. Using the point count and looking at the drawings should help you carry a safe number.

In past cases if the controls folks couldn't actually do the wiring (conduit and conductors) they carried a number to insure that it was accounted for in the project and then negotiated a sub-contractor agreement with the EC on site.

Chris

*Christopher P. Cafer*
Energy Concepts Engineering
3445 Winton Place, Suite 102
Rochester, NY 14623
office: 585-272-4650
fax: 585-272-4676
cell: 585-455-7332

10/15/2004

T 0372

| | |
|---|---|
| **From:** | Glick, Jeffrey |
| **Sent:** | Wednesday, December 22, 2004 9:14 AM |
| **To:** | 'Joe Narodetsky' |
| **Subject:** | RE: lakeland cogen plants |


04-12-15 APPENDIX C
208v.doc


04-12-15 APPENDIX C
460v.doc

Joe,

Here are the completed sheets you asked about.  I have completed all of the information we have available.  Hopefully this will satisfy the people at ConEdison.

Call me if you need anything else.

Jeff Glick

-----Original Message-----
From: Joe Narodetsky [mailto:JNarodetsky@nrg-concepts.com]
Sent: Tuesday, December 21, 2004 9:56 AM
To: JGlick@tecogen.com
Subject: lakeland cogen plants

Jeff, could fill info for tecogen unit for Lakeland schools for submission to Coned. Happy Holidays!

Regards,

Joe Narodetsky

Energy Concepts Engineering, P.C.
3445 Winton Place Suite 102
Rochester, NY 14623
Tel: (585) 272-4650
Fax:(585) 272-4676
jnarodetsky@nrg-concepts.com

T 0368

# TECOGEN



**TECOCHILL** ™

*The Driving Force in Cooling*

45 First Ave.
Waltham, MA 02451

# F A X   C O V E R   S H E E T

| | | | |
|---|---|---|---|
| **DATE:** | 12/21/04 | **FROM:** | JEFFREY GLICK |
| | | **PHONE:** | 781-466-6481 |
| **TO:** | JOE NARODETSKY | **FAX:** | 781-466-6466 |
| **COMPANY:** | ENERGY CONCEPTS | **RE:** | LAKELAND CSD |
| **FAX:** | 585-272-4676 | **CC:** | |

Number of pages including cover sheet: 8

Joe,

Here are the completed Appendix C forms for the Lakeland CSD project. I sent you one for the 208-volt units and one for the 460-volt units. I have attached some of the supporting documentation for your reference. Give me a call if you need anything else.

Regards,

Jeff Glick

APPENDIX C

NEW YORK STATE STANDARIZED APPLICATION
FOR ATTACHMENT OF PARALLEL GENERATION
EQUIPMENT 2 MW OR SMALLER
TO THE ELECTRIC SYSTEM OF

Utility: _____

**Customer:**
Name: _Lakeland  CSD_____    Phone: ( ) _____

Address: _____    Municipality: _____

_____

**Consulting Engineer or Contractor:**

Name: _____    Phone: ( ) _____

Address: _____    Municipality: _____

_____

**Estimated In-Service Date:** _____

**Existing Electrical Service:**

Capacity: _____ Amperes    Voltage: _____ Volts
Service Character: ( ) Single Phase   ( ) Three Phase
Secondary 3 Phase Transformer Connection ( )Wye ( )Delta

**Location of Protective Interface Equipment on Property:**
(include address if different from customer address)

_____

**Energy Producing Equipment/Inverter Information:**

Manufacturer: _Tecogen_____
Model No. _CM-75 L___ Version No. _____
( )Synchronous ( ✓)Induction ( )Inverter ( )Other _____
Rating: _75_ kW Rating: _88_ kVA
Rated Output:_50760_VA    Rated Voltage:_208_ Volts
Rate Frequency:_60_ Hertz Rated Speed:_1820_ RPM
Efficiency:_93_% Power Factor: _85_%
Rated Current:_245_ Amps Locked Rotor Current: _1393_Amps
Synchronous Speed:_1820_ RPM  Winding Connection:_____
Min. Operating Freq./Time:_____
Generator Connection: ( )Delta (✓)Wye ( )Wye Grounded
System Type Tested (Total System): (✓)Yes ( )No; attach product literature
Equipment Type Tested (i.e. Inverter, Protection System): (✓)Yes ( )No; attach product literature
One Line Diagram attached: ( )Yes
Installation Test Plan attached: ( )Yes

T 0357

**For Synchronous Machines:**

Submit copies of the Saturation Curve and the Vee Curve
( )Salient  ( )Non-Salient
Torque: _____ lb-ft          Rated RPM: _____
Field Amperes: _____ at rated generator voltage and current
and _____ % PF over-excited
Type of Exciter: _____
Output Power of Exciter: _____
Type of Voltage Regulator: _____
Direct-axis Synchronous Reactance ($X_d$) _____ohms
Direct-axis Transient Reactance ($X_d$) _____ohms
Direct-axis Sub-transient Reactance ($X_d$) _____ohms

*N/A*

**For Induction Machines:**

Rotor Resistance ($R_r$) .0122 ohms       Exciting Current 69.7 Amps
Rotor Reactance ($X_r$) .125 ohms          Reactive Power Required: _____
Magnetizing Reactance ($X_m$) 3.313 ohms   25 VARs (No Load)
Stator Resistance ($R_s$) .0216 ohms       48 VARs (Full Load)
Stator Reactance ($X_s$) .128 ohms
Short Circuit Reactance ($X''_d$) N/A ohms  Phases:
Frame Size: 404T   Design Letter: H        ( )Single
Temp. Rise: 80 °C                          (x)Three-Phase

**For Inverters:**

Manufacturer: _____ Model: ____
Type: _____ ( )Forced Commutated  ( )Line Commutated
Rated Output: _____Amps _____Volts
Efficiency: _____%

*N/A*

**Signature:**

_____    _____    _____
CUSTOMER SIGNATURE              TITLE                DATE

T 0358

APPENDIX C

NEW YORK STATE STANDARIZED APPLICATION
FOR ATTACHMENT OF PARALLEL GENERATION
EQUIPMENT 2 MW OR SMALLER
TO THE ELECTRIC SYSTEM OF

**Utility:** _____

**Customer:**
Name: _Lakeland CSD_____    Phone: ( ) _____
Address: _____    Municipality: _____
_____

**Consulting Engineer or Contractor:**
Name: _____    Phone: ( ) _____
Address: _____    Municipality: _____

**Estimated In-Service Date:** _____

**Existing Electrical Service:**

    Capacity: _____ Amperes        Voltage: _____ Volts
    Service Character: ( ) Single Phase  ( ) Three Phase
    Secondary 3 Phase Transformer Connection ( )Wye ( )Delta

**Location of Protective Interface Equipment on Property:**
(include address if different from customer address)
_____

**Energy Producing Equipment/Inverter Information:**
    Manufacturer: _Tecogen_____
    Model No. _Cm-75H_ Version No. _____
    ( )Synchronous (✓)Induction ( )Inverter ( )Other _____
    Rating: _75_ kW Rating: _88_ kVA
    Rated Output: _51520_ VA    Rated Voltage: _460_ Volts
    Rate Frequency: _60_ Hertz Rated Speed: _1820_ RPM
    Efficiency: _93_ % Power Factor: _85_ %
    Rated Current: _112_ Amps Locked Rotor Current: _630_ Amps
    Synchronous Speed: _1820_ RPM  Winding Connection: _WYe_
Min. Operating Freq./Time: _____
Generator Connection: ( )Delta (✓)Wye ( )Wye Grounded
System Type Tested (Total System): (✓)Yes ( )No; attach product literature — _See Attached_
Equipment Type Tested (i.e. Inverter, Protection System): (✓)Yes ( )No; attach product literature
One Line Diagram attached: ( )Yes
Installation Test Plan attached: ( )Yes

**T 0359**

460 V

**For Synchronous Machines:**

Submit copies of the Saturation Curve and the Vee Curve

( )Salient  ( )Non-Salient

Torque: _____ lb-ft          Rated RPM: _____

Field Amperes: _____ at rated generator voltage and current

and _____ % PF over-excited

Type of Exciter: _____

Output Power of Exciter: _____

Type of Voltage Regulator: _____

Direct-axis Synchronous Reactance ($X_d$) _____ ohms

Direct-axis Transient Reactance ($X_d$) _____ ohms

Direct-axis Sub-transient Reactance ($X_d$) _____ ohms

N/A

**For Induction Machines:**

Rotor Resistance ($R_r$) .0122 ohms          Exciting Current 7.5 Amps

Rotor Reactance ($X_r$) .125 ohms          Reactive Power Required: _____

Magnetizing Reactance ($X_m$) 3.313 ohms          25 VARs (No Load)

Stator Resistance ($R_s$) .0216 ohms          48 VARs (Full Load)

Stator Reactance ($X_s$) .128 ohms

Short Circuit Reactance ($X"_d$) N/A ohms    Phases:

Frame Size: 404T    Design Letter: H          ( )Single

Temp. Rise: 80 °C          (X)Three-Phase

**For Inverters:**

Manufacturer: _____ Model: _____

Type: _____ ( )Forced Commutated ( )Line Commutated

Rated Output: _____ Amps _____ Volts

Efficiency: _____ %

N/A

**Signature:**

_____     _____     _____
CUSTOMER SIGNATURE                        TITLE                              DATE

# 1    Module Specifications

Table 1.2b   Generator Specifications CM-75



**Prepared for Tecogen Company**
**Typical Characteristics for 75 kW Generators**
**(REF: 404TSTDS6053, 404TSTDS6048)**

| No. | Description | Unit | 208V | 230V | 460V |
|---|---|---|---|---|---|
| 1 | Winding T-404452 | --- | | | |
| 2 | Type: Induction Generator | --- | | | |
| 3 | Connection | --- | WYE | WYE | WYE |
| 4 | Frame: 404T | --- | | | |
| 5 | Insulation: H | --- | H | H | H |
| 6 | Temperature Rise ①: 80 | °C | 80C | 80C | 80C |
| 7 | Rotor Inertia: | LB-FT | 19 | 19 | 19 |
| 8 | Rated Voltage | V | 208 | 230 | 460 |
| 9 | Rated Frequency: 60 | Hz | 60 | 60 | 60 |
| 10 | Rated Current | AMP | 245 | 224 | 112 |
| 11 | Rated Speed | RPM | 1820 | 1820 | 1820 |
| 12 | Power Factor | % | 85 | 85 | 85 |
| 13 | Efficiency | % | 93 | 93 | 93 |
| 14 | Synchronous Speed | RPM | 1800 | 1800 | 1800 |
| 15 | Locked Rotor Current | AMP | 1393 | 1260 | 630 |
| 16 | Locked Rotor Torque | LB-FT | 495 | 495 | 495 |
| 17 | Breakaway Power | kVAR | 300 | 300 | 300 |
| 18 | Breakaway Speed | RPM | 1910 | 1910 | 1910 |
| 19 | No Load Current | AMP | 69.7 | 63 | 31.5 |
| 20 | No Load VARs | | 25 | 25 | 25 |
| 21 | Rated Load VARs | | 48 | 48 | 48 |
| 22 | Stator Resistance | pu | .0216 | .0216 | .0216 |
| 23 | Stator Reactance | pu | .128 | .128 | .128 |
| 24 | Magnetizing Reactance | pu | 3.313 | 3.313 | 3.313 |
| 25 | Rotor Resistance | pu | .0122 | .0122 | .0122 |
| 26 | Rotor Reactance | pu | .125 | .125 | .125 |
| 27 | Reference Impedance | OHMS | 2.848 | 2.848 | 2.848 |
| 28 | Open Circuit AC Time C | SEC | .780 | .780 | .780 |
| 29 | Short Circuit AC Time C | SEC | .033 | .033 | .033 |
| 30 | Transient Reactance ② | pu | .23 | .24 | .24 |
| 31 | Subtransient Reactance ② | pu | .153 | .153 | .153 |

① 50°C ambient and less than 1000 meters above sea level
② Not an industry referenced standard

New York State

# *Public Service Commission*

## New York State Standardized/Interconnection Requirements

### For Distributed Generators 300 Kilovolt-Amperes or Less Connected In Parallel With Radial Distribution Lines

- Standardized Interconnection Requirements (123 kb)
- Type Tested and Approved Equipment (20 kb)

**Type Testing Certification Checklist**

- MS Word Format
- Editable - PDF Format (103 kb) **(Please fill in the form fields before printing)**

**Staff Contact**
Charles Puglisi **(518) 486-2899**

**Alternate Contact**
Michael Worden **(518) 486-2498**



This page (http://www.dps.state.ny.us/distgen.htm)
was last modified: **August 20, 2003**
Questions regarding this service? web_questions.html
Need info on filing a complaint against a utility? Complaint Dept.
Want to comment on utility issues? PSC Comment Form
PSC Home Page

**T 0362**

| Manufacturer | Advanced Energy Inc. |
|---|---|
| Model No. | GC-1000-SA |
| Date of Approval | 9/18/02 |
| Firmware Version | 300.120, 300.140 |
| Testing Agency | Underwriter's Laboratories |
| Test Report | E182866-02NK08125 |
| Date of Report | 9/10/02 |
| Device Description | 1000W, 120V Single Phase Inverter |

| Manufacturer | Xantrex Technologies |
|---|---|
| Model No. | STXR1500, STXR2000, STXR2500 |
| Date of Approval | 9/18/02 |
| Firmware Version | 3.2, 5.0 |
| Testing Agency | Underwriter's Laboratories, CKC Laboratories |
| Test Report | E187916-02NK33060, GE02-035 |
| Date of Report | 7/26/02, 9/9/02 |
| Device Description | 1500W, 2000W, 2500 W 240V Single Phase Inverters |

| Manufacturer | Tecogen, Inc. |
|---|---|
| Model No. | CM-60, CM-75 |
| Date of Approval | 10/7/02 |
| Firmware Version | US001 |
| Testing Agency | ITS-ETL Semko |
| Test Report | TCF-1 |
| Date of Report | 8/5/02 |
| Device Description | 60 kW, 75 kW 460V or 208/230V Cogeneration Systems |

*NYS Type Testing*

APPENDIX C

NEW YORK STATE STANDARDIZED APPLICATION
FOR ATTACHMENT OF PARALLEL GENERATION
EQUIPMENT 2 MW OR SMALLER
TO THE ELECTRIC SYSTEM OF

**Utility:** _____

**Customer:**

Name: _Lakeland CSD_____    Phone: ( ) _____

Address: _____    Municipality: _____

_____

**Consulting Engineer or Contractor:**

Name: _____    Phone: ( ) _____

Address: _____    Municipality: _____

_____

**Estimated In-Service Date:** _____

**Existing Electrical Service:**

     Capacity: _____ Amperes    Voltage: _____ Volts

     Service Character: ( ) Single Phase    ( ) Three Phase

     Secondary 3 Phase Transformer Connection ( )Wye ( )Delta

**Location of Protective Interface Equipment on Property:**
(include address if different from customer address)

_____

**Energy Producing Equipment/Inverter Information:**

     Manufacturer:_____Tecogen_____

     Model No. ___CM-75H_____ Version No. _____

     ( )Synchronous (X )Induction ( )Inverter ( )Other _____

     Rating: _____75____ kW Rating: _____88____ kVA

     Rated Output: 51520 VA    Rated Voltage:460___ Volts

     Rate Frequency:60___ Hertz Rated Speed:_1820__ RPM

     Efficiency:__93___% Power Factor:__85___%

     Rated Current:112___Amps Locked Rotor Current: 630___Amps

     Synchronous Speed:_1820__RPM Winding Connection:_Wye__

Min. Operating Freq./Time:_____

Generator Connection: ( )Delta (X )Wye ( )Wye Grounded

System Type Tested (Total System): (X )Yes ( )No; attach product literature

Equipment Type Tested (i.e. Inverter, Protection System): (X )Yes ( )No; attach product literature

One Line Diagram attached: ( )Yes

Installation Test Plan attached: ( )Yes

T 0364

**For Synchronous Machines:**

    Submit copies of the Saturation Curve and the Vee Curve

    ( )Salient  ( )Non-Salient

    Torque: _____lb-ft      Rated RPM: _____

    Field Amperes: _____ at rated generator voltage and current

        and _____ % PF over-excited

    Type of Exciter: _____

    Output Power of Exciter: _____

    Type of Voltage Regulator: _____

    Direct-axis Synchronous Reactance ($X_d$) _____ohms

    Direct-axis Transient Reactance ($X_d$) _____ohms

    Direct-axis Sub-transient Reactance ($X_d$) _____ohms

**For Induction Machines:**

    Rotor Resistance ($R_r$) _.0122__ohms    Exciting Current 31.5 Amps

    Rotor Reactance ($X_r$) _.125__ohms    Reactive Power Required: 46.4_ KVAR

    Magnetizing Reactance ($X_m$) 3.313ohms    25____VARs (No Load)

    Stator Resistance ($R_s$) _____.0216__ohms    48____VARs (Full Load)

    Stator Reactance ($X_s$) .128__ohms

    Short Circuit Reactance ($X"_d$) _____N/A__ohms  Phases:

    Frame Size: __404T__  Design Letter: ___H____    ( )Single

    Temp. Rise: __80____°C              (X )Three-Phase

**For Inverters:**

    Manufacturer: _____ Model:

    Type: _____ ( )Forced Commutated ( )Line Commutated

    Rated Output: _____Amps _____Volts

    Efficiency: _____%

**Signature:**

| _____ | _____ | _____ |
|---|---|---|
| CUSTOMER SIGNATURE | TITLE | DATE |

**T 0365**

APPENDIX C

## NEW YORK STATE STANDARDIZED APPLICATION
## FOR ATTACHMENT OF PARALLEL GENERATION
## EQUIPMENT 2 MW OR SMALLER
## TO THE ELECTRIC SYSTEM OF

Utility: _____

**Customer:**
Name: <u>Lakeland CSD</u> _____  Phone: ( ) _____
Address: _____  Municipality: _____

_____

**Consulting Engineer or Contractor:**
Name: _____  Phone: ( ) _____
Address: _____  Municipality: _____

_____

**Estimated In-Service Date:** _____

**Existing Electrical Service:**

    Capacity: _____ Amperes    Voltage: _____ Volts
    Service Character: ( ) Single Phase  ( ) Three Phase
    Secondary 3 Phase Transformer Connection ( )Wye ( )Delta

**Location of Protective Interface Equipment on Property:**
(include address if different from customer address)

_____

**Energy Producing Equipment/Inverter Information:**

    Manufacturer: _____<u>Tecogen</u>_____
    Model No. __<u>CM-75L</u>___ Version No. _____
    ( )Synchronous (X )Induction ( )Inverter  ( )Other _____
    Rating: _____<u>75</u>___ kW Rating: _____<u>88</u>____ kVA
    Rated Output: <u>50960</u> VA   Rated Voltage:<u>208</u>___ Volts
    Rate Frequency:<u>60</u>___ Hertz Rated Speed:_<u>1820</u>__ RPM
    Efficiency:__<u>93</u>___% Power Factor:__<u>85</u>___%
    Rated Current:<u>245</u>__ Amps Locked Rotor Current: <u>1393</u>__Amps
    Synchronous Speed:_<u>1820</u>__ RPM Winding Connection:_<u>Wye</u>__
Min. Operating Freq./Time:_____
Generator Connection: ( )Delta ( X )Wye ( )Wye Grounded
System Type Tested (Total System): (X )Yes ( )No; attach product literature
Equipment Type Tested (i.e. Inverter, Protection System): (X )Yes ( )No; attach product literature
One Line Diagram attached: ( )Yes
Installation Test Plan attached: ( )Yes

**T 0366**

**For Synchronous Machines:**
Submit copies of the Saturation Curve and the Vee Curve
( )Salient  ( )Non-Salient
Torque: _____ lb-ft          Rated RPM: _____
Field Amperes: _____ at rated generator voltage and current
          and _____ % PF over-excited
Type of Exciter: _____
Output Power of Exciter: _____
Type of Voltage Regulator: _____
Direct-axis Synchronous Reactance ($X_d$) _____ohms
Direct-axis Transient Reactance ($X_d$) _____ohms
Direct-axis Sub-transient Reactance ($X_d$) _____ohms

**For Induction Machines:**
Rotor Resistance ($R_r$) .0122  ohms          Exciting Current 69.7 Amps
Rotor Reactance ($X_r$) .125  ohms          Reactive Power Required: 46.4  KVAR
Magnetizing Reactance ($X_m$) 3.313ohms          25  VARs (No Load)
Stator Resistance ($R_s$) _____ .0216  ohms          48  VARs (Full Load)
Stator Reactance ($X_s$) .128  ohms
Short Circuit Reactance ($X''_d$) _____ N/A  ohms  Phases:
Frame Size: __404T__    Design Letter: __H__      ( )Single
Temp. Rise: __80__ °C                          (X )Three-Phase

**For Inverters:**
Manufacturer: _____ Model:
Type: _____ ( )Forced Commutated  ( )Line Commutated
Rated Output: _____Amps _____Volts
Efficiency: _____%

**Signature:**

_____          _____          _____
CUSTOMER SIGNATURE                    TITLE                    DATE

T 0367

**Tim Casabonne**

| From: | Glick, Jeffrey [Jeffrey.Glick@Tecogen.com] |
|---|---|
| Sent: | Friday, January 28, 2005 12:02 PM |
| To: | tcasabonne@atlanticenergyservices.com |
| Subject: | FW: Tecogen Website Request |

 

Cogen Service          CogenTimeline.pdf
Intervals.pdf (3...        (213 KB)

Tim,

Here is what I sent to Dan Westbrook.

Jeff Glick

-----Original Message-----
From: Glick, Jeffrey
Sent: Thursday, January 20, 2005 10:38 AM
To: 'DWESTBRO@MAIL.NYSED.GOV'
Subject: FW: Tecogen Website Request


Dan,

I was forwarded your email yesterday afternoon. The majority of your
questions I will answer below. I believe you and I should speak later today
to make sure you have a good understanding of what the Tecogen Maintenance
contract includes.

The maintenance required on our Tecogen CM-75 and CM-60 modules is detailed
in the attached Service Interval Guidelines. When a customer contracts with
Tecogen to supply complete maintenance on their modules, a fixed price per
operating hour is charged. The scope of the service provided is as follows:

Tecogen will perform all scheduled and unscheduled work on their units.
This work includes all oil changes, tune-ups, inspections, control system
components, generator work, and engine replacements. The contract also
covers all components that are supplied by Tecogen with the units. This
could include circulation pumps and remote exhaust heat exchangers. The
contract also includes any unscheduled visits that would result from alarms
or breakdowns. I generally characterize the service contract as a "bumper
to bumper" fully inclusive contract. The structure of the contract
guarantees that the owner will only have to pay for the natural gas supplied
to the units and everything else will be covered by the contract. This is
an important feature since to accurately calculate the operating costs and
annual savings, all future maintenance costs need to be fixed. The only
variable in the maintenance equation is the number of operating hours for
the equipment.

Since I am currently working on numerous school projects in the state of New
York, I will need to speak in general terms regarding the quoted maintenance
contract prices. Typically we charge between $1.00 and $1.50 per run hour
for the contact. The exact price for each site depends on location, number
of units at that particular site, scope of Tecogen supply (fully integrated
unit vs bare unit), and whether or not the units are supplied with our

1

ATL 0088

optional emissions control system.

Obviously if there are multiple units being installed at a particular site, I will discount the hourly rate because of the travel time savings. Built into each contract is an inflation factor of 3% annual increase.

Components that were not supplied by Tecogen such as the boilers, absorption chillers, cooling towers, primary loop circulation pumps, and radiators are not covered by our maintenance contracts. Our Tecogen servicemen are trained to take care of a very specific piece of equipment and we feel they do an excellent job. However we don't want them getting involved too heavily with the building's mechanical systems. These other components are generally left for the host site to contract with other goops.

Regarding you questions about engine service I will quickly describe our philosophy. The TecoDrive engines that power our cogeneration modules will operate between 20,000 and 25,000 run hours before needing to be replaced. An engine with a life of 20,000 run hours is equivalent to an automobile that has over 1,100,000 miles on it's engine. Rather than rebuild the engine, Tecogen will remove the old engine and replace it with a new engine. This replacement will generally take about 8 hours to accomplish. In most cases the engine replacement is actually scheduled and not necessitated by a catastrophic failure. By replacing instead of rebuilding in place, we can get the unit up and running the same next day.

Life expectancy for a Tecogen CM-75 is really unknown. Our very first units were installed in the early 1980's. Most of the original units are still operating with run hours in excess of 100,000 hours. Unlike an automobile which is usually discarded after too many components fail, comfort is compromised or performance decreases. The Tecogen CM-75 modules will continue to produce the specified electrical and thermal outputs at the original efficiency after over 20 years of operation. The module will probably not have very many original components, however the upgrades and replacements will all have been done by Tecogen under the maintenance contract.

I hope this information is helpful. I would look forward to speaking with you about any specifics you need. I can be reached at 781-466-6481 if you would like to speak.

Regards,

Jeffrey Glick
Tecogen Regional Sales Manager
781-466-6481



-----Original Message-----
From: Daniel Westbrook [mailto:DWESTBRO@MAIL.NYSED.GOV]
Sent: Wednesday, January 19, 2005 2:29 PM
To: products@tecogen.com
Subject: Tecogen Website Request


Tecogen Service,

2

ATL 0089

We are currently reviewing construction projects that incorporate TECOGEN CM-75 Cogeneration Modules.

We must evaluate the payback time period to determine if the projects are acceptable.

One aspect of the payback we are unsure about is the cost of maintenance for the cogeneration modules and the associated/ancillary equipment (pumps, chillers, cooling towers, dry coolers, controls, etc).

What is an appropriate estimate of maintenance costs?
What equipment is covered in the estimated maintenance cost?
What maintenance tasks are covered in the estimated maintenance cost?
What is the frequency of maintenance covered in the estimated maintenance cost?

Approximately how often are cogeneration module top and bottom end overhauls required?
Typically how much would a cogeneration module top end overhaul cost?
Typically how much would a cogeneration module bottom end overhaul cost?

What is the estimated life (years) of the controls (electrical/electronic) associated with the cogeneration modules?
Typically how much would a controls replacement cost?

Thanks,
Dan Westbrook
NYS Education Department
(518) 408-1552

3

ATL 0090

# Routine Service

## Table 5.1 TECOGEN® CM/60/CM75
## Scheduled Service Interval Guidelines

| Category | Interval | Item | Action |
|---|---|---|---|
| **A** | 750 Operating Hours | Engine Lube Oil<br>Engine Oil Filter<br>Air Filter[1]<br>Air Inlet Louver<br>Enclosure Fan<br>PCV Valve<br>Battery<br>Timing<br>Carburetor<br>Spark Plugs<br>Coupling<br>Engine Mounts<br>Condensate Trap<br>General<br><br>Safety Circuit [2]<br>Catalyst [4] | Replace<br>Replace<br>Replace<br>Clean<br>Inspect and Clean<br>Inspect<br>Inspect and Clean Terminals<br>Check & Adjust if Necessary<br>Check & Adjust if Necessary<br>Replace<br>Inspect<br>Inspect<br>Clean<br>Check for Leaks, Check Electrical Connectors<br>Verify Operation (DSHT, PSHT, EXHT)<br>Monitor & Record Temperature Rise |
| **B** | 2250 Operating Hours | A Items<br>Distributor Cap<br>Rotor<br>Distributor<br>Ignition Wires<br>PCV Valve<br>Engine Evaluation<br><br>Engine Valves<br>$O_2$ Sensor [4] | Replace<br>Replace<br>Check for Shaft Bushing Wear<br>Replace<br>Replace<br>Blowby & Compression Test (Omit on First "B" Service)<br>Adjust<br>Replace |
| **C** | 6000 Operating Hours or Annually | Generator<br>Cylinder Heads<br>Catalyst [4]<br><br>"A" & "B" Items | Grease Bearings<br>Replace (if necessary)<br>Inspect, Wash or Replace every other interval (ie.12,000 hrs)<br>See Above |
| **D** | Typical Life[3] | Engine, Partial | Replace as indicated by Blowby and Compression Tests |

Notes:
1. *A dusty environment may require more frequent service for air filter.*
2. *The Safety Circuit acts as a redundant safety to ensure safe shutdown in the event of a microprocessor failure.*
3. *Typical engine life with proper service is 20,000-25,000 operating hours.*
4. *Applies only to units equipped with the TecoDrive Emission Control System.*

ATL 0091

# ● TECOGEN® ≣ COGENERATION MODULES

*~ More than 700 TECOGEN® cogeneration modules shipped and installed worldwide ~*

## *Pioneers of Proven Technology ...*

⇒ **1977:**  Initial design of CM-60, 60kW TECOGEN® unit

⇒ **1978:**  Public Utility Regulatory Policies Act (PURPA) establishes ground rules for cogeneration

⇒ **1979:**  Development of prototype 60kW unit initiated

⇒ **1981:**  First 60kW Tecogen laboratory unit placed on life test

⇒ **1983:**  First commercial sale of unit to Southern California Gas Co.

⇒ **1985:**  Specialized synchronous product developed for US and Japanese Markets
[CM-30S, CM-70S,   CM-200S, CM-280S (diesel), CM-600S, CM-850S (dual fuel)]

⇒ **1986:**  First TECOGEN field unit reached 20,000 hours of operation in field

⇒ **1987:**  First CM-200S, CM-280S, CM-600S units shipped

⇒ **1987:**  1 million total run hours logged on Tecogen units at actual customer sites

⇒ **1988:**  CM-75 High Output unit introduced

⇒ **1990:**  First low-emissions units sold in Southern California

⇒ **1992:**  Tecogen focuses product line exclusively on 60kW and 75kW induction modules to best serve
the cogeneration market up to 700kW, using multiple modules

⇒ **1993:**  First two-stage catalyst units sold in Southern California

## *... Setting The Pace With The Latest Innovations*

### *State-of-the-Art TecoNet™ Remote Monitoring & Control System Simplifies Building Management System*

⇒ **1998:**  Original microprocessor replaced by *TecoNet*™ state-of-the-art control system

⇒ **2001:**  *TecoNet*™ networking capabilities expanded to fully integrate numerous additional
control functions

### *Ultra-Clean Emission Control System Meets Most Stringent Air Quality Standards*

⇒ **1994-99:** Ultra clean "Level 2" catalyst system developed to meet current SCAQMD standards

⇒ **1999:**  First Level 2 units permitted and source-tested

⇒ **2001:**  "Level 2" emissions controller with remote access and control/diagnostics introduced

### *Simplified Interconnection Process Significantly Reduces Complex Review Time*

⇒ **2002:**  Cogeneration modules certified by ETL to be in compliance with national
IEEE P1547/D07 standard

⇒ **2002:**  Tecogen units "type-tested and approved" under NY State Interconnection Requirement

⇒ **2002:**  Applied for and completed testing of Rule 21—California type-testing

### *New Integrated Packaging Modules and Installation Services*

⇒ **2002:**  Innovative "plug-and-play" design reduces complexity of installation

## TECOGEN

45 First Avenue
Waltham, MA 02451
ph: 781.466.6400
fax: 781.466.6466

www.tecogen.com

*Service locations
throughout the US*

ATL 0092

# Strong Industry Support & Company Background

The Tecogen distributed generation product line was developed through a series of joint programs with the major natural gas industry research organizations in the United States. These programs were carried out at Tecogen's facility from the years 1981 through 2002 and totaled over $15M in external funds. The most prominent of these are: *The Southern California Gas Co.* (CM-60), *San Diego Gas and Electric Co.* (CM-70S), *Southern California Edison* (CM-225), *The Gas Research Institute* – a consortium of major U.S. natural gas companies, now merged with IGT into the Gas Technology Institute (CM-75, CM-30, CM-600, Level 2 emissions systems, numerous engine and engine product development projects, the latest concluded in May 2002).

⇒ **1981:**   Tecogen product developed by Thermo Electron R&D Center as part of GRI-funded research

⇒ **1985:**   Tecogen, Inc. formed as a separate subsidiary of Thermo Electron Corporation

⇒ **2000:**   Tecogen purchased as a private entity by original founders of Thermo Electron

# Dedicated Service Organization

Tecogen's extensive network of factory-trained technicians offers local service for key regions in the United States.

⇒ **1983:**   Tecogen Service started as a four-man operation

⇒ **2002:**   Service department has expanded to 25+ factory-trained technicians stationed throughout the US

  

## Specifications

| | | |
|---|---|---|
| **Electrical Output (kW)** | 60 | 75 |
| **Thermal Output** | 440,000 Btu/hr | 490,000 Btu/hr |
| **Gas Input:** | 760 scfh | 900 scfh |
| **Efficiency:** | | |
| @ LHV of 905 BTU/scf | 93.7% | 91.6% |
| @ HHV of 1020 BTU/scf | 83.1% | 81.3% |
| **Required Gas Pressure** | 4-14"wc | |
| **Hot Water Flow** | 22 gpm | |
| **Maximum Water Temperature** | 230°F | |
| **Electrical Service** | 208V or 460V, 3-wire | |
| **Emissions Option** | Can meet air quality standards as strict as California's | |
| **Acoustic Level** | 70 dBa @ 20 | |
| **Dimensions:** | 6'10"L x 3'8"W x 3'10"H | |
| **Weight:** | 3,000 lbs | |

*Note: Above performance data is valid up to 100°F ambient temperature, for standard units without optional emissions controls*

ATL 0093

## Glick, Jeffrey

**From:**     Chris Cafer [CCafer@nrg-concepts.com]
**Sent:**     Thursday, February 10, 2005 10:00 AM
**To:**       Jeffrey.Glick@Tecogen.com
**Subject:** Relay protection in ConEd territory

Jeff

Keith Hargrave has told me that you have a number of installations within ConEd territory that did not require relay protection. As you know this is where the Lakeland CSD project is.

What is your feeling regarding the ability of this project to omit relay protection? As you know they are in a real budget crunch and if NYS type testing allows us to omit this there would be an obvious benefit to the budget.

Thanks

Chris

*Christopher P. Cafer*
Energy Concepts Engineering
3445 Winton Place, Suite 102
Rochester, NY 14623
office: 585-272-4650
fax: 585-272-4676
cell: 585-455-7332

2/10/2005



# TECOGEN

**TECOCHILL** ™
*The Driving Force in Cooling*

45 First Ave.
Waltham, MA 02451

# F A X   C O V E R   S H E E T

**DATE:** 2/10/05

**TO:** CHRIS CAFER
**COMPANY:** ENERGY CONCEPTS
**FAX:** 585-272-4676

**FROM:** JEFFREY GLICK
**PHONE:** 781-466-6481
**FAX:** 781-466-6466
**RE:** Lakeland CSD Project
**CC:**

Number of pages including cover sheet: 11

Chris,

Here is a bunch of information that I typically supply to the engineer or contractor prior to the unit startup and Con Edison site interconnect relay test.

- Voltage and Frequency Test -- P1547 completed at Tecogen's facility
- Dielectric Withstand Test completed at Tecogen's facility
- Intertek Testing Services certification letters
- New York State PSC website snapshots showing Type Tested Approvals
- Interconnect compliance pages from Tecogen's Installation Manual

I have also attached an email that was sent to me last year. The email contains a discussion between an engineer in Con Edison's Distribution Engineering department and an engineer working on a Tecogen installation. The "Pre-Operation Test Procedure" that he attached seems to be customized for the Tecogen CM-75 equipment.

Hopefully this same package will be enough to allow the Lakeland CSD units to be installed without the additional utility relay protection packages. This was really the intent to get our equipment NYS Type Tested.

Let me know how you make out with Brian Cronin.

Regards,

Jeff Glick

Glick, Jeffrey

| | |
|---|---|
| **From:** | Glick, Jeffrey |
| **Sent:** | Monday, March 14, 2005 4:43 PM |
| **To:** | 'Tim Casabonne' |
| **Cc:** | Ray Hickey (E-mail) |
| **Subject:** | RE: Lakeland |



CH-75 Clearances.pdf

Tim,

The attached drawing from our Installation Manual is probably the best thing to pass along to the guys at J&M.  Note 2 on the drawing gives the clearance requirement of 3' all around unit.  In addition to the 3' requirement, one of the shaded areas must be kept open for engine and generator removal.

Let me know if they need anything else.

Jeff Glick

-----Original Message-----
From: Tim Casabonne [mailto:tcasabonne@atlanticenergyservices.com]
Sent: Monday, March 14, 2005 3:35 PM
To: Glick, Jeff
Subject: Lakeland

Jeff,

The Mechanical Contractor, J&M Heating and Air Conditioning, has asked me to find out the minimum acceptable/allowable clearances(s) for servicing the units.  Can you provide this?

Thank you,

Timothy Casabonne

Atlantic Energy Services, Inc.

92 Congress Street

Saratoga Springs, NY 12866

518-587-3252 x102

518-587-4328 fax

tcasabonne@atlanticenergyservices.com

T 0349



FROM DRAWING CM-75-01, REV.C

FIGURE 1
(SEE NOTE 2)

NOTES:

1 APPROXIMATE RIGGING WEIGHT: 3000 lbs. THE BASE OF THE UNIT IS EQUIPPED WITH FORKLIFT ACCESS HOLES.

2. ALLOW 3' CLEARANCE ALL AROUND UNIT FOR ROUTINE MAINTAINANCE. ONE OF THE THREE SHADED AREAS, AS SHOWN IN FIGURE 1, SHOULD ALSO BE LEFT CLEAR IN ORDER TO REMOVE THE ENGINE.

3 MAXIMUM ALLOWABLE ROOM TEMPERATURE 100°F. TECOGEN UNIT HEAT REJECTION TO AMBIENT SPACE= 30,000 BTU/HR. ENCLOSURE VENTILATION TO OUTSIDE IS RECOMMENDED WHEN ROOM VENTILATION IS NOT ADEQUATE LOUVERS ON ENCLOSURE SHOULD BE REMOVED BEFORE MAKING DUCT CONNECTION.

4. A CONCRETE HOUSEKEEPING PAD IS RECOMMENDED: 6'X 4'X 8'

| CONN | CONNECTION TABLE DESCRIPTION | SIZE | TYPE |
|---|---|---|---|
| A | GAS INLET | 1" | FPT |
| B | HOT WATER IN | 1" | FPT |
| C | HOT WATER OUT | 1" | FPT |
| D | EXHAUST OUT | 3" | TUBE |
| E(2) | GENERATOR VENTILATION CONNECTIONS (under louver) | 4"X 10" | DUCT |
| F | ELECTRICAL POWER (3-PHASE) | 3" | CONDUIT |
| G | ELECTRICAL CONNECTIONS (CONTROL AND 120 VAC) | 3/4" | CONDUIT |
| H | ENGINE COOLANT RELIEF VALVE | 3/4" | FPT |

**Drawing 1e    CM-60/CM-75 Installation Drawing - View 5**
*(see Appendix 1 for units with the Emission Control System Option)*

# Tecogen Ex. 59



73 Troy Road
East Greenbush, New York 12061
(518) 479-4000     (518) 477-1356 – Facsimile

## ENERGY PERFORMANCE PROJECTS
## LAKELAND CENTRAL SCHOOL DISTRICT

*Ex. 198*

### APN 0311.1

| | | |
|---|---|---|
| SED CONTROL NO. | Ben Franklin | 66-24-01-06-0-014-008 |
| SED CONTROL NO. | George Washington | 66-24-01-06-0-008-014 |
| SED CONTROL NO. | Lincoln-Titus | 66-24-01-06-0-009-012 |
| SED CONTROL NO. | Thomas Jefferson | 66-24-01-06-0-002-012 |
| SED CONTROL NO. | Van Cortlandtville | 66-24-01-06-0-001-015 |
| SED CONTROL NO. | Lakeland HS | 66-24-01-06-0-011-012 |
| SED CONTROL NO. | Copper Beech MS | 66-24-01-06-0-012-010 |
| SED CONTROL NO. | Walter Panas HS | 66-24-01-06-0-015-013 |

### October 29, 2004

### Addendum No. H-5, E-5, TC-5

Bidders shall acknowledge receipt of this addendum by notation on the bid sheets.

The following addition, changes or deletions shall be included in the preparation of proposals and are part of the contract work. This addendum shall take precedence over the drawings and specifications for the items mentioned. Any addition, change, deletions, etc., shall include all adjustments in other work as necessary and shall include the work of all trades involved.

## TO ALL CONTRACTORS:

*Specifications*

Notice to Bidders, Page B-1

The Bid Date for all contracts shall be changed as follows:

"Sealed Bid Proposals will be received until 2PM prevailing time on Wednesday, November 10th at the Offices of **DODGE CHAMBERLIN LUZINE WEBER ASSOCIATES ARCHITECTS,** 73 Troy Road, East Greenbush, New York 12061, at which time and place the bids will be privately opened."

DELETE "No bidder may withdraw his bid within 45 days after the date of the opening of bids."
ADD "No bidder may withdraw his bid within 60 days after the date of the opening of bids."

Information for Bidders, Page C-1

1. Submission of Bids, A.

1

DELETE "No bidder may withdraw a bid within forty-five (45) days after the actual date of the bid opening."
ADD "No bidder may withdraw a bid within sixty (60) days after the actual date of the bid opening."

3. Bid Proposals and Bidders, B.
  DELETE "Bidders may not withdraw proposals within forty-five (45) days following date of opening of bids."
  ADD "Bidders may not withdraw proposals within sixty (60) days following date of opening of bids."

Page C-2

5. Bid Security, B.

  DELETE "If no contract has been so executed within 45 days after the opening of bids,"
  ADD "If no contract has been so executed within 60 days after the opening of bids,"

Bid Forms

  DELETE Bid forms Page D-1 to D-3
  ADD Bid form Pages D-1 to D-6, dated 10/27/04, attached

Attached please find Base Bid/Alternate worksheet to clarify scope items.

ADD Special Provisions, Pages 1 to 16, dated 10/29/04, attached.

ADD Information for Addendum #5, Clarifications, Pages 1 and 2, and five Tecogen drawings, attached.

ADD Project Schedule, Pages 1A to 4A, dated 10/26/04, attached.

ADD Submittal Log supplement 8A, attached.

## HVAC:

*Drawings*

DELETE 24" x 36" Drawings

BF 1.1, CB M1.1, CB M2.1, CB M2.2, CB M2.3, CB M2.4, CB M3.1, CB M3.2, CB M4.1, CB M4.2, CB M5.1, CB M6.3, CB M6.5, LH M1.1, LH M2.1, LH M2.2, LH M2.3, LH M2.4, LH M2.5, LH M3.1, LH M4.1, LH M4.2, LH M5.1, LH M6.3, LH M6.5, VC M1.1, VC M2.1, VC M2.2, VC M2.3, VC M3.1, VC M4.1, VC M4.2, VC M5.1, VC M6.3, VC M6.5, WP M2.1, WP M2.2, WP M2.4, WP M5.1

ADD 24" x 36" Drawings dated 10/26/04, attached.

BF 1.1, CB M1.1, CB M2.1, CB M2.2, CB M2.3, CB M2.4, CB M3.1, CB M3.2, CB M4.1, CB M4.2, CB M5.1, CB M6.3, CB M6.5, LH M1.1, LH M2.1, LH M2.2, LH M2.3, LH M2.4, LH M2.5, LH M3.1, LH M4.1, LH M4.2, LH M5.1, LH M6.3, LH M6.5, VC M1.1, VC M2.1, VC M2.2, VC M2.3, VC M3.1, VC M4.1, VC M4.2, VC M5.1, VC M6.3, VC M6.5, WP M2.1, WP M2.2, WP M2.4, WP M5.1

2

ADD: "HVAC Contractor to remove and replace the entire gymnasium ceilings in the George Washington, Thomas Jefferson, Lincoln-Titus, Van Cortlandtville Elementary Schools as part of the Alternate 1-H bid." See specification 09500, attached.

ADD " Mechanical Contractor to abate the asbestos containing expansion tank in Benjamin Franklin Elementary School."

## ELECTRICAL:

*Specifications*

ADD: "The Electrical Contractor shall include in their proposal an allowance of $23,000 per building to provide and install measurement and verification automation equipment."

*Drawings*

DELETE 24" x 36" Drawings

BF E1.1, BF E3.1, CB E1.1, CB E1.2, CB E1.3, CB E3.1, CB E3.3, CB E3.4, GW E1.1, LH E1.1, LH E1.2, LH E3.1, LH E3.3, LT E1.1, TJ E1.1, VC E1.1, VC E1.2, VC E3.1, VC E3.3, WP E1.1, WP E1.2, WP E3.1, WP E3.3

ADD 24" x 36" Drawings dated 10/26/04, attached.

BF E1.1, BF E3.1, CB E1.1, CB E1.2, CB E1.3, CB E3.1, CB E3.3, CB E3.4, GW E1.1, LH E1.1, LH E1.2, LH E3.1, LH E3.3, LT E1.1, TJ E1.1, VC E1.1, VC E1.2, VC E3.1, VC E3.3, WP E1.1, WP E1.2, WP E3.1, WP E3.3

## TEMPERATURE CONTROLS:

END OF ADDENDUM

ALL QUESTIONS REGARDING THIS PROJECT SHOULD BE DIRECTED TO THE PROJECT ARCHITECT, JOHN ONDERDONK R.A. AT OUR OFFICE – 73 TROY ROAD, EAST GREENBUSH, NEW YORK 12061 (518) 479-4000, EXT. 427, (518) 477-1356 FAX.

LAKELAND CENTRAL SCHOOL DISTRICT
ADDTIOIONS AND ALTERATIONS TO SCHOOL DISTRICT FACILITIES
BOILER ROOM RENOVATIONS

Information for Addendum #5

## Clarifications

*Fees for applications, service, inspections.*

Any work, by any discipline, that requires fees paid for permits, and required inspections, is to be borne by the contractor and made part of the bid.

*Control Schematic: DWG'S CB E3.5, LH E3.4, VC E3.4, WP E3.4*

This detail is included for the use of the manufacturer of the paralleling switchgear as well as demonstration of interconnection for the local utility. Any associated wiring in this detail is the responsibility of the Controls Contractor.

*Alternates for break-out pricing*

Contractors to break out pricing for bidding purposes for the items indicated on the attached drawings as "Alternate #2". In addition the electrical contractor shall provide separate break outs for bidding purposes for the work indicated on the Emergency Lighting/Exit Lights drawings and Lighting Retrofit Spreadsheets

*Scope of work for Emergency Lighting/Exit Lights*

All emergency wall packs are new fixtures and do not replace an existing unit. All exits signs are new and replace an existing exit sign in each location.

*Energy Savings Proposal – Lighting Retrofit Spreadsheets*

The purpose of these documents is to indicate required areas of work. The spreadsheets are not "fixture schedules". The scope of work is indicated in the "Proposed" column. Acceptable manufactures are indicated in specification section 16500 – Lighting. The contractor is required to make the necessary retrofits as indicated which includes all aspects of the change i.e. wiring, ballast and bulbs. It is the responsibility of the EC to insure compatibility of the recommendation with a proper equipment submittal.

*Lighting Scope – Lakeland High School Gym*

Within the Performance Contract there is no lighting retrofit scope of work within the gymnasium. Work required is indicated on DWG LH E2.1, emergency lighting and exit signage.

### *Lighting Scope of Work*

All required lighting efforts within the Performance Contract are captured within the Lighting Retrofit Spreadsheets and the Emergency Lighting/Exit Sign drawings. In addition, specification section 16500 – Lighting supports these efforts.

### *Mechanical*

Refer to the attached sketches A3.1, A3.2a-c and A3.3 for clarification of the cogeneration equipment procured from Tecogen. Equipment provided as an Integrated Unit from Tecogen is the equipment indicated within the "by Tecogen" boundary.



FROM DRAWING 210-04-000 REV.C

Drawing A3.2a    CM-60/CM-75 Integrated Unit — Installation Drawing-View 1

# Appendix 3



Drawing A3.2b   CM-60/CM-75 Integrated Unit — Installation Drawing-View 2

# Appendix 3



**Drawing A3.1    CM-60/CM-75 Integrated Unit — Piping Schematic**

# Appendix 3

NOTES:

1. APPROXIMATE RIGGING WEIGHT: 4000 lbs. THE BASE OF THE UNIT IS EQUIPPED WITH FORKLIFT ACCESS HOLES.

2. ALLOW 3' CLEARANCE ALL AROUND UNIT FOR ROUTINE MAINTANANCE. ONE OF THE TWO SHADED AREAS, AS SHOWN IN FIGURE 1, SHOULD ALSO BE LEFT CLEAR IN ORDER TO REMOVE THE ENGINE.

3. MAXIMUM ALLOWABLE ROOM TEMPERATURE 100°F. TECOGEN UNIT HEAT REJECTION TO AMBIENT SPACE= 30,000 BTU/HR. ENCLOSURE VENTILATION TO OUTSIDE IS RECOMMENDED SINCE MOST ROOM VENTILATION IS NOT ADEQUATE. LOUVERS ON ENCLOSURE SHOULD BE REMOVED BEFORE MAKING DUCT CONNECTION.

4. A CONCRETE HOUSEKEEPING PAD IS RECOMMENDED: 6'X 4'X 8'

5. EXPANSION TANK AND MAKE-UP WATER CONNECTIONS ARE NOT INCLUDE ON MULTIPLE UNIT INSTALLATIONS BECAUSE ONE COMMON EXPANSION TANK AND MAKE-UP WATER CONNECTION SHOULD BE USED. REFER TO THE TECOGEN INSTALLATION MANUAL.

| CONN. | CONNECTION TABLE | SIZE | TYPE |
|-------|------------------|------|------|
| | DESCRIPTION | | |
| A | GAS INLET | 1" | FPT |
| B | HOT WATER IN | 1 1/2" | COPPER SWEAT |
| C | HOT WATER OUT | 1 1/2" | COPPER SWEAT |
| D | EXHAUST OUT | 3" | 125/150 lb ANSI FLANGE |
| E(2) | GENERATOR VENTILATION CONNECTIONS (under louver) | 4"X 10" | DUCT |
| F | ELECTRICAL POWER (3-PHASE) | 3" | CONDUIT |
| G | ELECTRICAL CONNECTIONS (CONTROL AND 120 VAC.) | 3/4" | CONDUIT |
| H | ENGINE COOLANT RELIEF VALVE | 3/4" | FPT |
| J | DRIP PAN DRAIN | 1/2" | FPT |
| K | MAKE-UP WATER (SEE NOTE 5) | 1/2" | FPT |

FROM DRAWING 210-04-000 REV.C



FIGURE 1
(SEE NOTE 2)

**Drawing A3.2c** · CM-60/CM-75 Integrated Unit — Installation Drawing - View 3

# Appendix 3



**Drawing A3.3    CM-60/CM-75 Integrated Unit— Exhaust Piping**

# Tecogen Ex. 60



*CoAst*

November 5, 2004

**CONFIDENTIAL**
**ATTORNEYS ONLY**

J &M Heating and Air Conditioning, Inc.
48 Grand Street
New Rochelle, NY 10801

Attention: Ed Horvath

### REFERENCE: LAKELAND CSD ADDITIONS AND ALTERATIONS

QUOTATION: Q04-140

Advanced Comfort Systems, Inc., representative for Tecogen, Inc., is pleased to offer the following specified cogeneration equipment for use on the above referenced project.

### Lakeland High School

Quantity three (3) *TECOGEN, INC.* integrated model CM-75-LE listed as CG-1, CG-2, and CG-3 with the following features and /or accessories:

- 208-3-60 power requirements
- Engine / Generator set
- Exhaust silencer, carbon steel hospital grade
- Acoustic enclosure
- Catalytic converter
- External hot water heat exchanger
- Hot water pump rated at 22 gpm @ 68 feet HD
- Microprocessor control module
- Skid and support system for above (see attached drawing)

**FOB FACTORY FREIGHT ALLOWED TO FIRST DESTINATION...$256,038.00**
**Terms Net 30 Days No Taxes Included**
**Tecogen and ACS will not accept any terms for retainage of monies**

### Van Cortlandtville Elementary School

Quantity one (1) *TECOGEN, INC.* integrated model CM-75-LE, listed as CG-1, with the following features and / or accessories:

- 208-3-60 power requirements
- Engine / Generator set
- Exhaust silencer, carbon steel hospital grade
- Acoustic enclosure



EXHIBIT
138 FO
ZM 9.25.07

0006'75

*11B Commerce Drive        Ballston Spa, New York  12020        Phone: (518)884-8444        Fax: (518)884-8411*

PAGE 2

CONFIDENTIAL
ATTORNEYS ONLY

- Catalytic converter
- External hot water heat exchanger
- Hot water pump rated at 22gpm @ 68 feet HD
- Microprocessor control module
- Skid and support system for above (see attached drawing)

**FOB FACTORY FREIGHT ALLOWED TO FIRST DESTINATION...$85,581.00**
Terms Net 30 Days No Taxes Included
Tecogen and ACS will not accept any terms for retainage of monies

### Walter Panas High School
Quantity four (4) *TECOGEN, INC.* integrated model CM-75-HE, listed as CG-1,
CG-2, CG-3, and CG-4, with the following features and / or accessories:
- 460-3-60 power requirements
- Engine / Generator set
- Exhaust silencer, carbon steel hospital grade
- Acoustic enclosure
- Catalytic converter
- Hot water pump rated at 22 gpm @ 68 feet HD
- Microprocessor control module
- Skid and support system for above (see attached drawing)

**FOB FACTORY FREIGHT ALLOWED TO FIRST DESTINATION...$329,760.00**
Terms Net 30 Days No Taxes Included
Tecogen and ACS will not accept any terms for retainage of monies

### Copper Beech Middle School
Quantity three (3) *TECOGEN, INC.* integrated model CM-75-HE, listed as CGG-1,
CG-2 and CG-3, with the following features and / or accessories:
- 460-3-60 power requirements
- Engine / Generator set
- Exhaust silencer, carbon steel hospital grade
- Acoustic enclosure
- Catalytic converter
- Hot water pump rated at 22 gpm @ 68 feet HD
- Microprocessor control module
- Skid and support for above (see attached drawing)

**FOB FACTORY FREIGHT ALLOWED TO FIRST DESTINATION...$247,329.00**
Terms Net 30 Days No Taxes Included
Tecogen and ACS will not accept any terms for retainage of monies

Page 3

CONFIDENTIAL ATTORNEYS ONLY

Tecogen Service will provide start-up service for initial operation.

Tecogen will provide first year labor warranty for any part that is deemed defective per the Tecogen warranty policy.

Each Tecogen cogeneration unit will be provided with dial-up modem. Phone line to be provided by Lakeland CSD. One dedicated phone line per site required.

**Unit weight: 4,000 pounds**
**Unit dimensions: 98"L X 61"W X 82"H**

*Ray Hickey*

Ray Hickey
Sales Engineer

*Total: $ 918,708 —*

000677

CONFIDENTIAL
ATTORNEYS ONLY

# Tecogen Ex. 61

# TECOGEN

**TECOCHILL** ™
*The Driving Force in Cooling*

45 First Ave.
Waltham, MA 02451

CONFIDENTIAL

# FAX COVER SHEET

| | | | |
|---|---|---|---|
| **DATE:** | 2/10/05 | **FROM:** | **JEFFREY GLICK** |
| | | **PHONE:** | **781-466-6481** |
| **TO:** | **RAY HICKEY** | **FAX:** | **781-466-6466** |
| **COMPANY:** | ADVANCED COMFORT SYSTEMS | **RE:** | |
| **FAX:** | **518-884-8411** | **CC:** | |

Number of pages including cover sheet: 4

Ray,

I quickly revised my pricing to reflect the quotes you provided. Here is what I just got from you:

Seven high voltage (480 volts) units for a total of $577,109 ⇒ $82,444
Four low voltage (208 volts) units for a total of $341,619 ⇒ $85,405

The attached pricing worksheets show that these prices are at around a 7.8 – 7.9% commission level.

Lets discuss how low we actually want to drop the prices.

Jeff

T 0111

# Tecogen Ex. 62

# ADVANCED COMFORT SYSTEMS

February 11, 2005

J &M Heating and Air Conditioning, Inc.
48 Grand Street
New Rochelle, NY 10801

Attention: Ed Horvath

**REFERENCE: LAKELAND CSD ADDITIONS AND ALTERATIONS**

QUOTATION: Q04-140R1

Advanced Comfort Systems, Inc., representative for Tecogen, Inc., is pleased to offer the
following specified cogeneration equipment for use on the above referenced project.

**Lakeland High School**
Quantity three (3) *TECOGEN, INC.* integrated model CM-75-LE, listed as CG-1,
CG-2, and CG-3 with the following features and /or accessories:
* 208-3-60 power requirements
* Engine / Generator set
* Exhaust silencer, carbon steel hospital grade
* Acoustic enclosure
* Catalytic converter
* External hot water heat exchanger
* Hot water pump rated at 22 gpm @ 68 feet HD
* Microprocessor control module
* Skid and support system for above (see attached drawing)

**FOB FACTORY FREIGHT ALLOWED TO FIRST DESTINATION...$245,069.00**
**Terms Net 30 Days No Taxes Included**
Tecogen and ACS will not accept any terms for retainage of monies

**Van Cortlandtville Elementary School**
Quantity one (1) *TECOGEN, INC.* integrated model CM-75-LE, listed as CG-1, with the
following features and / or accessories:
* 208-3-60 power requirements
* Engine / Generator set
* Exhaust silencer, carbon steel hospital grade
* Acoustic enclosure

PAGE 2

- Catalytic converter
- External hot water heat exchanger
- Hot water pump rated at 22gpm @ 68 feet HD
- Microprocessor control module
- Skid and support system for above (see attached drawing)

**FOB FACTORY FREIGHT ALLOWED TO FIRST DESTINATION...$81,802.00**      / 85,591
**Terms Net 30 Days No Taxes Included**
**Tecogen and ACS will not accept any terms for retainage of monies**

**Walter Panas High School**
Quantity four (4) *TECOGEN, INC.* integrated model CM-75-HE, listed as CG-1,
CG-2, CG-3, and CG-4, with the following features and / or accessories:
- 460-3-60 power requirements
- Engine / Generator set
- Exhaust silencer, carbon steel hospital grade
- Acoustic enclosure
- Catalytic converter
- Hot water pump rated at 22 gpm @ 68 feet HD
- Microprocessor control module
- Skid and support system for above (see attached drawing)

**FOB FACTORY FREIGHT ALLOWED TO FIRST DESTINATION...$313,217.00**    / 329,760
**Terms Net 30 Days No Taxes Included**
**Tecogen and ACS will not accept any terms for retainage of monies**

**Copper Beech Middle School**
Quantity three (3) *TECOGEN, INC.* integrated model CM-75-HE, listed as CG-1,
CG-2 and CG-3, with the following features and / or accessories:
- 460-3-60 power requirements
- Engine / Generator set
- Exhaust silencer, carbon steel hospital grade
- Acoustic enclosure
- Catalytic converter
- Hot water pump rated at 22 gpm @ 68 feet HD
- Microprocessor control module
- Skid and support for above (see attached drawing)

**FOB FACTORY FREIGHT ALLOWED TO FIRST DESTINATION...$235,163.00**    / 247,327
**Terms Net 30 Days No Taxes Included**
**Tecogen and ACS will not accept any terms for retainage of monies**

$ 875,251          $ 918,708

Dif $ 43,457

Page 3

Tecogen Service will provide start-up service for initial operation.

Tecogen will provide first year labor warranty for any part that is deemed defective per the Tecogen warranty policy.

Each Tecogen cogeneration unit will be provided with dial-up modem. Phone line to be provided by Lakeland CSD. One dedicated phone line per site required.

**Unit weight: 4,000 pounds**
**Unit dimensions: 98"L X 61"W X 82"H**

Ray Hickey
Sales Engineer

# Tecogen Ex. 63



**AEGIS ENERGY SERVICES INC.**

413 748-8400 • FAX 413 748-3242
WWW.AEGISENERGYSERVICES.COM

2097 RIVERDALE STREET WEST SPRINGFIELD MA 01089 • PO BOX 2511 SPRINGFIELD MA 01101-2511

**April 18, 2005**

# PROPOSAL FOR SUPPLY OF TECOGEN COGENERATION UNITS FOR LAKELAND SCHOOL DISTRICT

## Itemized Description

Four (4) TECOGEN CM-75LE Cogeneration Modules  (75 kW, 60 Hz, 208 V, 3-phase):

- TECODRIVE Natural Gas Marine Engine (V-8, 454 Cid)
- Engine Jacket, Oil, and Exhaust Heat Recovery
- 3-Way NSCR Emissions Package  (Emissions Control Level 1)
- Acoustical Enclosure (Indoor Type)
- Microprocessor Controls
- Open Protocol Interface (Modbus-Based)
- Remote Monitoring and Control System Including Modem
- Standard Electrical Protective Switchgear Panel.
- Steel Skid and Vibration Isolators
- Complete Factory Assembly
- Factory Full-Load Run Test
- ETL Approved
- O & M Manuals and Training
- Integrated Unit (Pump And Valve Module, Exhaust HX, Silencer)

Seven (7) TECOGEN CM-75LE Cogeneration Modules  (75 kW, 60 Hz, 480 V, 3-phase):

- TECODRIVE Natural Gas Marine Engine (V-8, 454 Cid)
- Engine Jacket, Oil, And Exhaust Heat Recovery
- 3-Way NSCR Emissions Package (Emissions Control Level 1)
- Acoustical Enclosure (Indoor Type)

- Microprocessor Controls
- Open Protocol Interface (Modbus-Based)
- Remote Monitoring and Control System Including Modem
- Standard Electrical Protective Switchgear Panel.
- Steel Skid and Vibration Isolators
- Complete Factory Assembly
- Factory Full-Load Run Test
- ETL Approved
- O & M Manuals and Training
- Integrated Unit (Pump and Valve Module, Exhaust HX, Silencer)

Start-Up Assistance For All CM-75 Units by Factory-Certified Technician.

Standard Tecogen parts and labor warranty on module (covers defects in parts for 6 months from date of start-up, 12 months from date of shipment, or 1,500 hours of operation, whichever occurs earliest). For best and broadest coverage, Tecogen recommends that owner enter into separate full maintenance agreement with factory authorized service provider.

**Total Cost**                                                    $ 825,000.00

*Spoke w/ Lee V.*
*4/26/05*

**Notes:**

1. Delivery: 10 to 12 weeks after receipt of order.
2. Price excludes any applicable sales or use tax.
3. FOB: Waltham, MA (freight included).
4. Terms: 15% with order, balance due within 30 days of delivery (subject to credit approval).
5. Quotation valid for 90 days.

Lee Vardakas
General Manager

JM 0015

# Tecogen Ex. 64

EXHIBIT
# 15
8/23/07 LB



**AEGIS ENERGY SERVICES INC.**

413. 746-6400 • FAX 413. 746-3242
WWW.AEGISENERGYSERVICES.COM

2007 RIVERDALE STREET WEST SPRINGFIELD, MA 01089 • P.O. BOX 2511 SPRINGFIELD, MA 01101-2511

April 18, 2005

# PROPOSAL FOR SUPPLY OF AEGEN THERMOPOWER COGENERATION UNITS FOR LAKELAND SCHOOL DISTRICT

<u>**Itemized Description**</u>

Four (4) AEGEN ThermoPower TP-75LE Cogeneration Modules  (75 kW, 60 Hz, 208 V, 3-phase):

- Industrial Natural Gas Engine (V-8, 454 Cid)
- Engine Jacket, Oil, and Exhaust Heat Recovery
- 3-Way NSCR Emissions Package  (Emissions Control Level 1)
- Acoustical Enclosure (Indoor Type)
- Intellisys Microprocessor Controls
- Open Protocol Interface (Modbus-Based)
- Remote Monitoring and Control System Including Modem
- Standard Electrical Protective Switchgear Panel Plus Integrated Utility Grade Relay Package Required By Con Edison For Interconnection.
- Steel Skid and Vibration Isolators
- Complete Factory Assembly
- Factory Full-Load Run Test
- UL Approved
- O & M Manuals and Training
- Integrated Unit (Pump and Valve Module, Exhaust HX, Silencer)

Seven (7) AEGEN ThermoPower TP-75LE Cogeneration Modules  (75 kW, 60 Hz, 480 V, 3 phase):

- Industrial Natural Gas Engine (V-8, 454 Cid)
- Engine Jacket, Oil and Exhaust Heat Recovery
- 3-Way NSCR Emissions Package (Emissions Control Level 1)
- Acoustical Enclosure (Indoor Type)

- Intellisys Microprocessor Controls
- Open Protocol Interface (Modbus-Based)
- Remote Monitoring and Control System Including Modem
- Standard Electrical Protective Switchgear Panel Plus Integrated Utility Grade Relay Package Required By Con Edison For Interconnection.
- Steel Skid and Vibration Isolators
- Complete Factory Assembly
- Factory Full-Load Run Test
- UL Approved
- O & M Manuals and Training
- Integrated Unit (Pump and Valve Module, Exhaust HX, Silencer)

Start-up Assistance for all CM-75 units by a Factory-Certified Technician.

Standard AEGEN parts and labor warranty on module (covers defects in parts for 12 months from date of start-up, 16 months from date of shipment, or 5,000 hours of operation, whichever occurs earliest). For best and broadest coverage, AEGEN recommends that owner enter into separate full maintenance agreement with factory authorized service provider.

**Total Cost**                                            **$ 770,000.00**

**Notes:**
1. Delivery: 10 to 12 weeks after receipt of order.
2. Price excludes any applicable sales or use tax.
3. FOB: West Springfield, MA (freight included).
4. Terms: 15% with order, balance within 30 days of delivery (subject to credit approval).
5. Quotation valid for 90 days.

_____
Lee Vardakas
General Manager

# Tecogen Ex. 65

# Purchase Order

**J & M HEATING AND**
48 GRAND STREET
NEW ROCHELLE, NY 1[...]

Show this Purchase Order Number
on all correspondence, invoices,
shipping papers and packages.

**16229**

TEL. (914) 632-4433
FAX. (914) 632-4772

| DATE | REQUISITION NO. |
|---|---|
| 4/27/05 | 2070 |

TO:
*Aegis Energy Services, inc.*
*2097 Riverdale Street*
*West Springfield, MA. 01089*
FAX: 413-746-3242

SHIP TO
*Lakeland Schools*
*Energy Performance Contract*
*Lakeland CSD.*

| REQUISITIONED BY | WHEN SHIP | SHIP VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|
| | | | FAXED | |

attn.: *Lee Vardakas*

| QTY. ORDERED | QTY. RECEIVED | STOCK NO. DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|---|

*Lakeland HS.*
(3) Tecogen CM-75 LE Cogen Units
    (75 KW, 60 HZ, 208 V, 3-phase)

*Copper Beech MS.*
(3) Tecogen CM-75 LE Cogen Units
    (75 KW, 60 HZ, 460 V, 3-phase)

*Walter Panas HS.*
(4) Tecogen CM-75 LE Cogen Units
    (75 KW, 60 HZ, 460 V, 3-phase)

VOID

*Van Cortlandville E.S.*
(1) Tecogen CM-75 LE Cogen Unit
    (75 KW, 60 HZ, 208 V, 3-phase)

$ 825,000

EXHIBIT
#16
863 B67 LB

All as per plans & specifications
All as per AES proposal dated 4/18/05
submit (10) copies equip. specifications
release pending approved submittals
tax exempt   freight allowed
Complete Startup of equip. included

. Please send _____ copies of your invoice.
!. Order is to be entered in accordance with prices, delivery and specifications shown above.
!. Notify us immediately if you are unable to ship as specified.

**Thank You!**

AUTHORIZED BY

JM 0035

# Tecogen Ex. 66

# ADVANCED COMFORT SYSTEMS

11B Commerce Drive   Ballston Spa, NY 12020   (518) 884-8444   Fax 884-8411

TO:        Ed Horvath                          FROM:   Ray Hickey

PHONE:   914-632-4433                      DATE:   05-02-05

FAX:       914-632-4772                        PAGES:      2

REFERENCE:   Tecogen Pricing

Ed,

At your request I went back to Tecogen to see if there was anyway they could move on the price.

I just received their response.

The February 11, 2005 quotation will be honored through the end of this month.

Obviously, there is no room to give you a better price.

Best regards,

*Ray Hickey*

EXHIBIT

147 ES

am 9-25-07

JM 0033

# TECOGEN

*Natural Gas Engine-Driven Products*

TECOCHILL®
TECOFROST™
COGENERATION

---

## INTEROFFICE MEMORANDUM

**TO:**       SALES REPRESENTATIVES AND DEALERS
**FROM:**   WES SCHUSTER
**SUBJECT:** TECOGEN 2005 PRICING
**DATE:**    5/2/2005
**CC:**        JEFF GLICK, BILL MARTINI

---

In the past few months, we have experienced material price increases at a rate that has been unprecedented and unanticipated.  We have seen dramatic increases in our cost of materials in just about everything that goes into our product.

Up to this point we have been absorbing these cost increases and have been focused on actions to minimize price increases.  We now must pass along a portion of these increases.

We will honor current pricing on existing orders and provide price protection on our quotations through May 31, 2005.  However, effective June 1, 2005 a 5% increase will become effective on all new orders for TECOGEN cogeneration modules.

We regret that we must implement this increase.  Your past support and interest in TECOGEN is important to us and we appreciate your understanding in this matter.

*45 First Avenue*
*Waltham, MA 02451*
*781.466.6400  (fax) 781.466.6466*

JM 0034

# Tecogen Ex. 67

# TECOGEN

*Natural Gas Engine-Driven Products*

*TECOCHILL®*
*TECOFROST™*
*COGENERATION*

---

### INTEROFFICE MEMORANDUM

---

**TO:**        SALES REPRESENTATIVES AND DEALERS

**FROM:**    WES SCHUSTER

**SUBJECT:**  TECOGEN 2005 PRICING

**DATE:**      04/28/05

**CC:**         JEFF GLICK, BILL MARTINI



---

In the past few months, we have experienced material price increases at a rate that has been unprecedented and unanticipated.  We have seen dramatic increases in our cost of materials in just about everything that goes into our product.

Up to this point we have been absorbing these cost increases and have been focused on actions to minimize price increases.  We now must pass along a portion of these increases.

We will honor current pricing on existing orders and provide price protection on our quotations through May 31, 2005.  However, effective June 1, 2005 a 5% increase will become effective on all new orders for TECOGEN cogeneration modules.

We regret that we must implement this increase.  Your past support and interest in TECOGEN is important to us and we appreciate your understanding in this matter.

T 0338

*45 First Avenue*
*Waltham, MA 02451*
*781.466.6400  (fax) 781.466.6466*

# Tecogen Ex. 68

| From: | "Glick, Jeffrey" <Jeffrey.Glick@Tecogen.com> |
|-------|-----------------------------------------------|
| To: | "Lee Vardakas (E-mail)" <leev@aegisenergyservices.com> |
| Date: | 5/2/2005 1:21:35 PM |
| Subject: | Pricing for Aegis Energy NYC Projects |

Lee,



Attached are the pricing pages for the high and low voltage CM-75 modules.
Both of these pricing pages includes the Level 1 low emissions control
option and freight to NYC. Let me know if you have any questions.

Jeffrey Glick
Tecogen
Regional Sales Manager
781-466-6481
781-466-6466 Fax

<<AEGIS CM-75 480V.pdf>>  <<AEGIS CM-75 208V.pdf>>

002309

# AEGIS ENERGY NY PROJECTS
# CONFIDENTIAL TURN-IN

**TECOGEN**
*Natural Gas Engine-Driven Products*

TECOCHILL®
TECOFROST®
COGENERATION

Quote Number:

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Lee Vardakas | Jeffrey Glick |
| Aegis Energy Services | Tecogen |
| | 45 First Avenue |
| | Waltham, MA  02451 |
| | Phone: 781-466-6481 |
| | FAX: 781-466-6466 |

| Item | Quantity Ordered | List Price | Quote Price Mult.: 0.640 |
|---|---|---|---|
| **TECOGEN® CM-75, 208V Cogeneration Unit** | | | |
| Base Unit | 1 | $ | $ |
| · Induction Generator (75 kW, 60 Hz, 208V, 3-phase) | | | |
| · Industrial Natural Gas Engine | | | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | | | |
| · Engine Heat Recovery (from engine oil, jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | | | |
| · Acoustic Enclosure (indoor-type) | | | |
| · Single Steel Base | | | |
| · Microprocessor-Based Controls | | | |
| · Standard Electrical Protective Switchgear | | | |
| · Open Protocol Interface (Modbus-based) | | | |
| · Remote Monitoring and Control System (RMCS), including Modem | | | |
| · Complete Factory Assembly | | | |
| · ETL Product Listing on Entire Cogen Module | | | |
| · IEEE P1547/D07 Compliance | | | |
| · Factory Run-Test at Full Capacity | | | |
| · O&M Manuals | | | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module  (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | | | |
| **Factory-Installed Options** | | | |
| · Emissions Control Level 1 | 1 | $ | |
| **Freight** | | | |
| · Freight, Zone 2 | | $750 | $750 |
| **Special Options** | | | |
| Aegis Competitive Discount | 1 | | ( ) |
| **Totals** | | | |
| Total Price | | $ | $ |
| Commission: 0.0% | | | $0 |
| Net to Tecogen | | | $ |

# CONFIDENTIAL - REP USE ONLY

002310

## AEGIS ENERGY NY PROJECTS
## CONFIDENTIAL TURN-IN

**TECOGEN**
*Natural Gas Engine-Driven Products*

*TECOCHILL®*
*TecoFROST®*
*COGENERATION*

**Quote Number:**

**Pricing and Terms**

1. Based on pricing released in January, 2005. Pricing subject to change without notice.
2. Prices are good for 60 days and are FOB Factory, First Destination.
3. Tecogen's standard Terms & Conditions and payment terms apply.
4. Unless otherwise specified, pricing is for the equipment and services specifically listed above only. The pricing does not include the following: taxes, insurance, rigging, installation, disassembly and re-assembly (if required), permitting, service/maintenance or extended warranties (unless listed), training, or any other item or service not listed above.

# CONFIDENTIAL - REP USE ONLY

002311

# AEGIS ENERGY NY PROJECTS
# CONFIDENTIAL TURN-IN

**TECOGEN**
*Natural Gas Engine-Driven Products*

TECOCHILL®
TecoFROST®
COGENERATION

Quote Number:

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Lee Vardakas | Jeffrey Glick |
| Aegis Energy Services | Tecogen |
| | 45 First Avenue |
| | Waltham, MA  02451 |
| | Phone: 781-466-6481 |
| | FAX: 781-466-6466 |

| Item | Quantity Ordered | List Price | Quote Price Mult.: 0.640 |
|---|---|---|---|
| **TECOGEN® CM-75, 480V Cogeneration Unit** | | | |
| Base Unit | 1 | $ | $ |
| · Induction Generator (75 kW, 60 Hz, 480V, 3-phase) | | | |
| · Industrial Natural Gas Engine | | | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | | | |
| · Engine Heat Recovery (from engine oil, jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | | | |
| · Acoustic Enclosure (indoor-type) | | | |
| · Single Steel Base | | | |
| · Microprocessor-Based Controls | | | |
| · Standard Electrical Protective Switchgear | | | |
| · Open Protocol Interface (Modbus-based) | | | |
| · Remote Monitoring and Control System (RMCS), including Modem | | | |
| · Complete Factory Assembly | | | |
| · ETL Product Listing on Entire Cogen Module | | | |
| · IEEE P1547/D07 Compliance | | | |
| · Factory Run-Test at Full Capacity | | | |
| · O&M Manuals | | | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module  (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | | | |
| **Factory-Installed Options** | | | |
| · Emissions Control Level 1 | 1 | $ | $ |
| **Freight** | | | |
| · Freight, Zone 2 | | $750 | $750 |
| **Special Options** | | | |
| Aegis Competitive Discount | 1 | | |
| **Totals** | | | |
| Total Price | | $ | $ |
| Commission: 0.0% | | | $0 |
| Net to Tecogen | | | $5 |

# CONFIDENTIAL - REP USE ONLY

002312

**AEGIS ENERGY NY PROJECTS**
**CONFIDENTIAL TURN-IN**

**TECOGEN**
*Natural Gas Engine-Driven Products*

*TECOCHILL®*
*TECOFROST®*
*COGENERATION*

**Quote Number:**

**Pricing and Terms**
1. Based on pricing released in January, 2005. Pricing subject to change without notice.
2. Prices are good for 60 days and are FOB Factory, First Destination.
3. Tecogen's standard Terms & Conditions and payment terms apply.
4. Unless otherwise specified, pricing is for the equipment and services specifically listed above only. The pricing does not include the following: taxes, insurance, rigging, installation, disassembly and re-assembly (if required), permitting, service/maintenance or extended warranties (unless listed), training, or any other item or service not listed above.

# CONFIDENTIAL - REP USE ONLY

002313

# Tecogen Ex. 69



**AEGIS ENERGY SERVICES INC.**

413/746-5400 • FAX 413/746-3242
WWW.AEGISENERGYSERVICES.COM

2097 RIVERDALE STREET, WEST SPRINGFIELD, MA 01089 • P.O. BOX 2511, SPRINGFIELD, MA 01101-2511

# PURCHASE ORDER

| DATE: 5/2/2005 JOB NAME: NY | P.O. # 05-475LV |
|---|---|

| TO: TECOGEN<br>45 FIRST AVENUE<br>P.O. BOX 9046<br>WALTHAM, MA 02454-9046<br><br>ATTN.: JEFF<br>PHONE: 781-466-6481<br>FAX: 781-466-6466 | SHIP TO:   CUSTOMER PICKUP<br><br><br>BILL TO:   AEGIS ENERGY SERVICES INC.<br>P.O. BOX 2511<br>SPRINGFIELD, MA 01101-2511 |
|---|---|

PURCHASE ORDER NUMBER MUST APPEAR ON
ALL INVOICES, BILLS AND PACKING LISTS.

| QUANTITY | DESCRIPTION | PRICE EACH | PRICE TOTAL |
|---|---|---|---|
| 8 | TECOGEN CM-75LE COGENERATION MODULE<br>480 V, 3-PHASE | $51,397.00 | $411,176.00 |
| 8 | LEVEL 1 EMISSIONS SHIPPED LOOSE | $6,976.00 | $55,808.00 |
| 4 | TECOGEN CM-75 COGENERATION MODULE<br>208 V, 3-PHASE | $53,809.00 | $215,236.00 |
| 4 | LEVEL 1 EMISSIONS SHIPPED LOOSE | $6,976.00 | $27,904.00 |
| | | | $0.00 |

DELIVERY:   STARTING JULY 1, 2005 THRU AUGUST 15TH, 2005

TERMS:   NET 30 DAYS

| | TOTAL | $710,124.00 |
|---|---|---|

ATTN.: JEFF GLICK

LEE VARDAKAS
PURCHASER



# AEGIS ENERGY SERVICES

P.O. Box 2511
Springfield, MA 01101-2511

2097 Riverdale Street
West Springfield, MA 01089

# F A X   C O V E R   S H E E T

**DATE:**   **May 2, 2005**                      **PAGE 1 OF 2**

**TO:**   **JEFF/ TECOGEN**

PHONE:   <u>781-466-6481</u>
FAX:   <u>781-466-6466</u>

**FROM:**   **LEE VARDAKAS**

PHONE:   (413) 746-5400
FAX:   (413) 746-3242

**RE:**   <u>PO for NY</u>
CC:   ____

### MESSAGE

| URGENT ☐ | For your review ☒ | Reply ASAP ☐ | Please comment ☐ |

T 0320

# Tecogen Ex. 70

Ex. 103

**TECOGEN A/R AT 4/25/05**

4/25/2005  U:Drive \ Acctg Tec \ AR \ AR as of 4-25-05.xls

CONFIDENTIAL

| Acct. # | Acct. Name | Inv. Date | Inv. # | Amount | Customer Balance | Outstanding 0 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | >120 | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SERVICE AND PARTS | | | | | | | | | | |
| 1070 | AEGIS Energy Service | Various | Various | $ 121,183.24 | $121,183.24 | | | | 49,901.00 | 71,282.24 | |
| 2092 | AES-NJ Cogen Cogen Co., Inc. | Various | Various | $ 44,697.72 | $ 44,697.72 | 32,377.45 | | | | 12,320.27 | Tameka left msg 4/22 |

# Tecogen Ex. 71

# TECOGEN

## TECOCHILL™
*The Driving Force in Cooling*

45 First Ave.
Waltham, MA 02254-9046



EXHIBIT
#60
8/23/07  WB

# F A X   C O V E R   S H E E T

| | | | |
|---|---|---|---|
| **DATE:** | 5/6/05 | **FROM:** | **JEFFREY GLICK** |
| | | **PHONE:** | **781-466-6481** |
| **TO:** | **LEE VARDAKAS** | **FAX:** | **781-466-6466** |
| **COMPANY:** | AEGIS ENERGY SERVICES | **RE:** | **LAKELAND CSD PROJECT** |
| **FAX:** | **413-746-3242** | **CC:** | |

Number of pages including cover sheet: 7

Lee,

I have attached pricing pages with several different pricing scenarios for the Lakeland CSD CM-75 modules. The scope of supply for all of the pricing models includes the CM-75 module, emissions control system shipped loose, extended one-year warranty on all equipment supplied by Tecogen, and a commission to the Tecogen representative who were involved in the presale activities.

The added cost to each CM-75 supplied for this project is around $6,000.

One set of pricing pages is based on what I am calling "Discounted Terms". These prices are based on the current (pre June 1ˢᵗ) prices. Particular attention must be paid to the Terms section I have sent along. Tecogen will not honor these prices if the payment terms are not met. If Aegis Energy is not able to meet these terms, the higher prices shown on the "Post June 1, 2005" pricing page will have to apply.

Management here at Tecogen is very serious about managing our cash position going forward. As a result, we will not put more than four units into production without full payment for all previous shipments.

I will be in the office next week to discuss any questions you might have regarding these prices.

Regards,

Jeff Glick

*Visit our HomePage at "www.tecogen.com"*

002314

# LAKELAND CSD
## Price Quotation

**TECOGEN**
Natural Gas Engine-Driven Products
COGENHILL®
TRIGEN®
COGENERATION

Quote Number: Discounted Terms

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Lee Vardakas<br>Aegis Energy Services | Jeffrey Glick<br>Tecogen<br>45 First Avenue<br>Waltham, MA 02451<br>Phone: 781-466-6481<br>FAX: 781-466-6466 |

| Item | Quantity<br>Ordered | |
|---|---|---|
| **TECOGEN® CM-75, 208V Cogeneration Unit** | 1 | |
| Base Unit | | |
| · Induction Generator (75 KW, 60 Hz, 208V, 3-phase) | | |
| · Industrial Natural Gas Engine | | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | | |
| · Engine Heat Recovery (from engine oil, jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | | |
| · Acoustic Enclosure (indoor-type) | | |
| · Single Steel Base | | |
| · Microprocessor-Based Controls | | |
| · Standard Electrical Protective Switchgear | | |
| · Open Protocol Interface (Modbus-based) | | |
| · Remote Monitoring and Control System (RMCS), including Modem | | |
| · Complete Factory Assembly | | |
| · ETL Product Listing on Entire Cogen Module | | |
| · IEEE P1547/D07 Compliance | | |
| · Factory Run-Test at Full Capacity | | |
| · O&M Manuals | | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | | |
| **Factory-Installed Options** | | |
| · Emissions Control Level 1 | 1 | |
| **Special Options** | | |
| Full One-Year Warranty | 1 | |
| Pre June 1, 2005 Correction | 1 | |
| NY State Commission Due | 1 | $67,240 |
| **Total Price** | | |

002315

# LAKELAND CSD
## Price Quotation



TECOGEN
*Natural Gas Engine-Driven Products*

**Quote Number: Discounted Terms**

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Lee Vardakas | Jeffrey Glick |
| Aegis Energy Services | Tecogen |
| | 45 First Avenue |
| | Waltham, MA 02451 |
| | Phone: 781-466-6481 |
| | FAX: 781-466-6466 |

| Item | Quantity Ordered |
|---|---|
| **TECOGEN® CM-75, 480V Cogeneration Unit** | |
| Base Unit | 1 |
| · Induction Generator (75 kW, 60 Hz, 480V, 3-phase) | |
| · Industrial Natural Gas Engine | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | |
| · Engine Heat Recovery (from engine oil, jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | |
| · Acoustic Enclosure (indoor-type) | |
| · Single Steel Base | |
| · Microprocessor-Based Controls | |
| · Standard Electrical Protective Switchgear | |
| · Open Protocol Interface (Modbus-based) | |
| · Remote Monitoring and Control System (RMCS), including Modem | |
| · Complete Factory Assembly | |
| · ETL Product Listing on Entire Cogen Module | |
| · IEEE P1547/D07 Compliance | |
| · Factory Run-Test at Full Capacity | |
| · O&M Manuals | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module  (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | |
| **Factory-Installed Options** | |
| · Emissions Control Level 1 | 1 |
| **Special Options** | |
| Full One-Year Warranty | 1 |
| Pre June 1, 2005 Correction | 1 |
| NY State Commission Due | 1 |
| **Total Price** | $64,504 |

002316

# LAKELAND CSD
## Price Quotation (Discounted Terms)

Pricing and Terms
1. Based on pricing released in January, 2005. Pricing subject to change without notice.
2. Prices are good for 60 days and are FOB Factory.
3. Unless otherwise specified, pricing is for the equipment and services specifically listed above only. The pricing does not include the following: taxes, insurance, rigging, installation, disassembly and re-assembly (if required), permitting, service/maintenance or extended warranties (unless listed), training, or any other item or service not listed above.
4. Payment terms are Net 15 days. Tecogen will release for production a maximum of 4 units at a time. If payment terms are not met, prices will revert to the higher Post June 1, 2005 prices.

Last Revision: Jeffrey Glick, Tecogen on 05/06/05          page 2/2          Printed 05/06/05  (Version 2005.0.5)

002317

# LAKELAND CSD
## Price Quotation



**TECOGEN**
Natural Gas Engine-Driven Products

Quote Number: Post June 1, 2005 Prices

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Lee Vardakas | Jeffrey Glick |
| Aegis Energy Services | Tecogen |
| | 45 First Avenue |
| | Waltham, MA  02451 |
| | Phone: 781-466-6481 |
| | FAX: 781-466-6466 |

| Item | Quantity Ordered | |
|---|---|---|
| **TECOGEN® CM-75, 208V Cogeneration Unit** | | |
| Base Unit | 1 | |
| · Induction Generator (75 kW, 60 Hz, 208V, 3-phase) | | |
| · Industrial Natural Gas Engine | | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | | |
| · Engine Heat Recovery (from engine oil, jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | | |
| · Acoustic Enclosure (indoor-type) | | |
| · Single Steel Base | | |
| · Microprocessor-Based Controls | | |
| · Standard Electrical Protective Switchgear | | |
| · Open Protocol Interface (Modbus-based) | | |
| · Remote Monitoring and Control System (RMCS), including Modem | | |
| · Complete Factory Assembly | | |
| · ETL Product Listing on Entire Cogen Module | | |
| · IEEE P1547/D07 Compliance | | |
| · Factory Run-Test at Full Capacity | | |
| · O&M Manuals | | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module  (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | | |
| **Factory-Installed Options** | | |
| · Emissions Control Level 1 | 1 | |
| **Special Options** | | |
| Full One-Year Warranty | 1 | |
| NY State Commission Due | 1 | $69,937 |
| **Total Price** | | |

# LAKELAND CSD
## Price Quotation

 

Quote Number: Post June 1, 2005 Prices

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Lee Vardakas | Jeffrey Glick |
| Aegis Energy Services | Tecogen |
| | 45 First Avenue |
| | Waltham, MA 02451 |
| | Phone: 781-466-6481 |
| | FAX: 781-466-6466 |

| Item | Quantity Ordered |
|---|---|
| **TECOGEN® CM-75, 480V Cogeneration Unit** | |
| Base Unit | 1 |
| · Induction Generator (75 kW, 60 Hz, 480V, 3-phase) | |
| · Industrial Natural Gas Engine | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | |
| · Engine Heat Recovery (from engine oil, jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | |
| · Acoustic Enclosure (indoor-type) | |
| · Single Steel Base | |
| · Microprocessor-Based Controls | |
| · Standard Electrical Protective Switchgear | |
| · Open Protocol Interface (Modbus-based) | |
| · Remote Monitoring and Control System (RMCS), including Modem | |
| · Complete Factory Assembly | |
| · ETL Product Listing on Entire Cogen Module | |
| · IEEE P1547/D07 Compliance | |
| · Factory Run-Test at Full Capacity | |
| · O&M Manuals | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | |
| **Factory-Installed Options** | |
| - Emissions Control Level 1 | 1 |
| **Special Options** | |
| Full One-Year Warranty | 1 |
| NY State Commission Due | 1 |
| **Total Price** | $67,076 |

002319

# LAKELAND CSD
## Price Quotation (Full Price Terms)

Pricing and Terms
1. Based on pricing released in January, 2005. Pricing subject to change without notice.
2. Prices are good for 60 days and are FOB Factory.
3. Unless otherwise specified, pricing is for the equipment and services specifically listed above only. The pricing does not include the following: taxes, insurance, rigging, installation, disassembly and re-assembly (if required), permitting, service/maintenance or extended warranties (unless listed), training, or any other item or service not listed above.
4. Payment terms are Net 30 days.  Tecogen will release for production a maximum of 2 units at a time.  Tecogen will not release additional units for production until all previous shipments have been paid in full.

Last Revision: Jeffrey Glick, Tecogen on 05/06/05          page: 2/2          Printed 05/06/05 (Version 2005.0.5)

002320

# Tecogen Ex. 72

# TECOGEN

45 First Ave.
Waltham, MA 02254-9046



TECOCHILL ™
*The Driving Force in Cooling*



# F A X   C O V E R   S H E E T

| | | | |
|---|---|---|---|
| **DATE:** | 5/17/05 | **FROM:** | **JEFFREY GLICK** |
| | | **PHONE:** | **781-466-6481** |
| **TO:** | **LEE VARDAKAS** | **FAX:** | **781-466-6466** |
| **COMPANY:** | AEGIS ENERGY SERVICES | **RE:** | LAKELAND CSD PROJECT |
| **FAX:** | **413-746-3242** | **CC:** | |

Number of pages including cover sheet: 4

Lee,

Based on our telephone conversation on Monday I wanted to provide you with an updated price quotation along with potential shipping schedule for the eleven CM-75 units you requested. The pricing has been modified to reflect two changes, first the removal of the one-year warranty and second, a reduction in the overall price to minimize the impact the commission payment has on Aegis. Based on these two changes the revised pricing would be as follows:

CM-75HE:    $61,092
CM-75LE:    $63,759

If these prices are acceptable to Aegis Energy Systems, the proposed shipping schedule for the eleven units would be as follows:

First three high voltage units: July 22nd.
Remaining eight units (four high voltage and four low voltage): August 19th.

To meet these dates Tecogen would need a purchase order before this Friday (5/20/05). In addition, Tecogen will require payment for these units to be made with a two-party check. This payment method is to assure timely payment.

I should be in the office all day today if you have any questions on this information.

Regards,

Jeff Glick

*Visit our HomePage at "www.tecogen.com"*

002324

# LAKELAND CSD
## Price Quotation

**TECOGEN**
Natural Gas Engine-Driver Products

TECOCHILL*
TECOFROST*
COGENERATION

Quote Number: Discounted Terms

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Lee Vardakas | Jeffrey Glick |
| Aegis Energy Services | Tecogen |
| | 45 First Avenue |
| | Waltham, MA  02451 |
| | Phone: 781-466-6481 |
| | FAX: 781-466-6466 |

| Item | Quantity Ordered |
|---|---|
| **TECOGEN® CM-75, 480V Cogeneration Unit** | |
| Base Unit | 1 |
| · Induction Generator (75 kW, 60 Hz, 480V, 3-phase) | |
| · Industrial Natural Gas Engine | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | |
| · Engine Heat Recovery (from engine oil, jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | |
| · Acoustic Enclosure (indoor-type) | |
| · Single Steel Base | |
| · Microprocessor-Based Controls | |
| · Standard Electrical Protective Switchgear | |
| · Open Protocol Interface (Modbus-based) | |
| · Remote Monitoring and Control System (RMCS), including Modem | |
| · Complete Factory Assembly | |
| · ETL Product Listing on Entire Cogen Module | |
| · IEEE P1547/D07 Compliance | |
| · Factory Run-Test at Full Capacity | |
| · O&M Manuals | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module  (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | |
| **Factory-Installed Options** | |
| · Emissions Control Level 1 | 1 |
| **Special Options** | |
| Quantity Discount | 1 |
| Pre June 1, 2005 Correction | 1 |
| NY State Commission Due | 1 |
| **Total Price** | **$61,092** |

002325

## LAKELAND CSD
## Price Quotation

**TECOGEN**
Natural Gas Engine-Driven Products



Quote Number: Discounted Terms

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Lee Vardakas<br>Aegis Energy Services | Jeffrey Glick<br>Tecogen<br>45 First Avenue<br>Waltham, MA 02451<br>Phone: 781-466-6481<br>FAX: 781-466-6466 |

| Item | Quantity Ordered |
|---|---|
| **TECOGEN® CM-75, 208V Cogeneration Unit** | |
| Base Unit | 1 |
| · Induction Generator (75 kW, 60 Hz, 208V, 3-phase) | |
| · Industrial Natural Gas Engine | |
| · Emissions Controls Option (Level 1 type, including fully packaged emission control system and microprocessor-based air/fuel ratio controller) | |
| · Engine Heat Recovery (from engine oil jacket, and exhaust manifolds using direct jacket cooling and exhaust heat recovery) | |
| · Acoustic Enclosure (indoor-type) | |
| · Single Steel Base | |
| · Microprocessor-Based Controls | |
| · Standard Electrical Protective Switchgear | |
| · Open Protocol Interface (Modbus-based) | |
| · Remote Monitoring and Control System (RMCS), including Modem | |
| · Complete Factory Assembly | |
| · ETL Product Listing on Entire Cogen Module | |
| · IEEE P1547/D07 Compliance | |
| · Factory Run-Test at Full Capacity | |
| · O&M Manuals | |
| · Standard TECOGEN® Cogeneration Parts and labor Warranty on Module  (Covers defects in parts for 6 months from date of start-up, 12 months from the date of shipment, or 1500 hours of operation, whichever occurs earliest. For best, broadest coverage TECOGEN recommends that Owner enter into separate full maintenance agreement with Tecogen) | |
| **Factory-Installed Options** | |
| · Emissions Control Level 1 | 1 |
| **Special Options** | |
| Quantity Discount | 1 |
| Pre June 1, 2005 Correction | 1 |
| NY State Commission Due | 1 |
| **Total Price** | $63,759 |

002326

# LAKELAND CSD
## Price Quotation (Discounted Terms)

Pricing and Terms

1. Based on pricing released in January, 2005. Pricing subject to change without notice.
2. Prices are good for 60 days and are FOB Factory.
3. Unless otherwise specified, pricing is for the equipment and services specifically listed above only. The pricing does not include the following: taxes, insurance, rigging, installation, disassembly and re-assembly (if required), permitting, service/maintenance or extended warranties (unless listed), training, or any other item or service not listed above.
4. Payment terms are Net 30 days.

Last Revision: Jeffrey Glick, Tecogen on 05/17/05          page 2/2          Printed 05/17/05 (Version 2005.0.5)

002327