UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
TECOGEN, INC.,                          )
Plaintiff/Counterclaim Defendant,       )
                                        )
v.                                      )          C.A. No. 05-11823 RCL
                                        )
AEGIS ENERGY SERVICES, INC.,            )
AEGENCO, INC. and                       )
AEGIS GENERATION COMPANY,               )
Defendants/Counterclaim Plaintiffs.     )
_____)

**TECOGEN, INC.'s MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff/Counterclaim Defendant Tecogen, Inc. ("Tecogen") respectfully submits this

Memorandum in Opposition to Defendants' Motion For Summary Judgment filed by Aegis

Energy Services, Inc. ("Aegis Energy") and Aegenco, Inc. ("Aegenco") (collectively,

"Defendants" or "Aegis") on Count V of the Complaint (Unfair and Deceptive Acts in violation of

Chapter 93A) and Counts I and III (respectively, Statutory and Common Law Copyright

Infringement of Tecogen's Installation Manual).

As shown below, Defendants have not addressed the Chapter 93A claim that Tecogen

disclosed to them in discovery over one year ago.  Indeed, the evidence Tecogen has mustered in

this Opposition clearly shows that Aegis engaged in multiple bad faith, unfair and/or deceptive

acts and omissions to disclose material facts involving Aegis' development and sale of

cogeneration modules ("Aegen Modules") competitive with Tecogen's cogeneration modules

("Tecogen Modules").

Similarly, on the copyright claims, Defendants have avoided the central issue - the

significant amount of original text and content from Tecogen's Installation Manuals that appears

verbatim, or nearly so, in their Aegen Module Installation Manual. Instead, they rely on three highly technical arguments, all of which fail.

For the reasons discussed below, given that all the evidence supporting Tecogen's claims is undisputed, the Court should deny Defendants' motion for summary judgment in its entirety. In fact, if summary judgment enters for anyone on Tecogen's Chapter 93A claim, it should be for Tecogen.

## ARGUMENT

**I.      TECOGEN'S CHAPTER 93A CLAIM IS BASED ON MULTIPLE UNFAIR AND DECEPTIVE ACTS AND MATERIAL MISREPRESENTATIONS, VIRTUALLY ALL OF WHICH AEGIS COMPLETELY IGNORES IN ITS MOTION PAPERS.**

On April 24, 2007, Tecogen served its "Supplemental Response to RFP No. 51" ("Supplemental Response") on Aegis (*See* Tecogen Ex. 83). The Supplemental Response provided Aegis with a five and a half page outline of Tecogen's Chapter 93A claim based on the evidence known to Tecogen at that time. In depositions that started three months after the Supplemental Response was served on Aegis, Tecogen's counsel extensively questioned Aegis' principals, Spiro and Lee Vardakas, and three third parties on the factual theories outlined in the Supplemental Response. The resulting deposition testimony greatly amplified the evidence supporting the factual theory outlined in Tecogen's Supplemental Response.

As foreshadowed in the Supplemental Response (Tecogen Ex. 83 at 6-7), Tecogen's Chapter 93A claim centers on the following cluster of acts and non-disclosures by Aegis:

1. *secretly* building substantially similar modules competitive with Tecogen Modules;

2. intentionally ***failing to disclose*** the Aegen Module development program to Tecogen;

3. *secretly* selling and/or installing its own Aegen Modules at four sites beginning in 2004;

4. intentionally ***failing to disclose*** those four early transactions to Tecogen;

5. jumping into the Lakeland, Chemung and Auburn projects at the 11th hour and, using its insider knowledge of Tecogen's confidential pricing information, (a) switching Lakeland

and Auburn from Tecogen Module projects to projects that instead used Aegen Modules by introducing the contractor to the Aegen Module and submitting lower prices on the Aegen Modules, undercutting the Tecogen Module prices, and (b) forcing Tecogen to lower its module prices at Chemung in order to hold onto that project; and

6. committing all the foregoing acts and omissions while simultaneously being a longtime authorized and exclusive distributor of Tecogen Modules and understanding its responsibilities as such included promoting the sale of Tecogen Modules and using its best efforts to maximize the number of sales of Tecogen Modules.

Defendants' motion papers ignore virtually all of these acts and omissions, and the uncontroverted evidence supporting the same, as discussed below.

> **A.     Fact - Aegis had a long history as an authorized, and exclusive, distributor of Tecogen Modules and was responsible for maximizing Tecogen Modules sales, not undermining their sales with its own competing modules.**

This fact is supported by the following evidence and subsidiary facts:

1. From 1985 until June 24, 2005, Aegis was an authorized distributor for Tecogen Modules. (SMF, ¶¶ 11-15).

2. Defendants admit that from 1995 through June 2005, "Aegis Energy was an exclusive distributor of Tecogen cogeneration systems and parts for the States of Massachusetts and Connecticut." (Counterclaim, ¶ 15; Statement of Undisputed Material Facts in Support of Tecogen, Inc.'s Motion for Partial Summary Judgment ("SMF"), ¶ 13). In his deposition, Lee Vardakas, who is a longtime Aegis executive and son of Aegis' CEO, CFO and Chairman, Spiro Vardakas, testified: "We were exclusive because we had an understanding of, we had been the only supplier of product throughout the years in those two markets." (SMF, ¶ 10; Deposition Transcript of Lee Vardakas, ("L. Vardakas Depo. Trans.") (Tecogen Ex. 16) at 12).

3. In 1993 and 2003, Tecogen sent Aegis a written sales representative/distributor agreement, both of which contained exclusivity and non-compete terms. (Tecogen Exs. 9 and 10).

3

- Both agreements gave Aegis the right to exclusively represent Tecogen in Massachusetts and Connecticut, which territory was subject to amendment from time to time.  (*See* Tecogen Ex. 9 at 14 and Tecogen Ex. 10 at 5).

- The exclusivity term in the 2003 agreement also expressly stated that "American DG projects are excluded from this agreement."  (Tecogen Ex. 10 at 5).

- Both agreements also contained terms governing "Competing Products", which expressly provided that Aegis **<u>shall not</u>** sell, distribute, advertise or deal in or with any products that are, in Tecogen's opinion, competitive with Tecogen's cogeneration modules.  (Tecogen Ex. 9 at 9 and Tecogen Ex. 10 at 5).

- Even though Aegis did not sign either agreement, the documents nevertheless clearly put Aegis on notice that Tecogen did not want Aegis to be selling, distributing, advertising or dealing in or with other cogeneration module product lines that were competitive with Tecogen Modules at the same time Aegis was handling Tecogen's products.  (SMF, ¶¶ 17 and 21).

- As such, the agreements reveal the motive for Aegis' conscious and intentional decision not to disclose the Aegen Modules to Tecogen:  the agreements strongly indicated that Aegis' Tecogen dealership probably would be terminated if Aegis began handling someone else's competing cogeneration modules.  This is, of course, exactly what happened when Tecogen learned about Aegis' competing modules.

4. Aegis' conduct over the years was consistent with the non-compete terms in these 1993 and 2003 agreements.

- Lee Vardakas has testified that for twenty years Aegis did not offer to sell other manufacturers' cogeneration modules in competition with Tecogen, as follows:

      Q.  In that same time period, this is 1985 to June 24, 2005, did Aegis ever offer to sell or install new cogeneration modules manufactured by anyone other than Tecogen?

4

> A. No.  We did offer to sell other generators, not cogeneration modules. (L. Vardakas Depo. Trans. (Tecogen Ex. 100) at 39).[1]

- Defendants' Answer also states:  "Defendants admit that for over twenty years, Aegis Energy had designed, installed and serviced cogeneration systems in Massachusetts and Connecticut that used Tecogen Modules."  (Answer at ¶ 13; SMF, ¶ 14).

5. Aegis admits that being an exclusive distributor conferred considerable value on Aegis:

> Q. Did being an exclusive distributor have any value or benefit for Aegis?
>
> A. Yes…It provided less competition in promoting the product. (L. Vardakas Depo. Trans. (Tecogen Ex. 100) at 14).

6. The uncontroverted evidence also shows that Aegis understood that its responsibilities as a Tecogen sales representative included promoting the sale of Tecogen Modules and using its best efforts to maximize the sale of Tecogen Modules:

> Q. As of September 1993, did Aegis believe its responsibilities as Tecogen sales representative included promoting the sale of Tecogen cogeneration modules?
>
> A. Yes.  (S. Vardakas Depo. Trans. (Tecogen Ex. 8) at 15).
>
> *      *      *
>
> Q. [As of April 2003], did Aegis understand that its responsibility, as a Tecogen, its responsibilities were to use its best efforts to promote the maximum number of sales of Tecogen modules in Connecticut and Massachusetts?
>
> A. Yes.  (L. Vardakas Depo. Trans. (Tecogen Ex. 16) at 32-33).
>
> *      *      *
>
> Q. Between April 2003 and June 25, 2005, did Aegis devote its best efforts to promoting the maximum number of sales of Tecogen modules in Connecticut and Massachusetts?
>
> A. Yes.  (L. Vardakas Depo. Trans. (Tecogen Ex. 16) at 33).

---

[1]      Lee Vardakas' deposition testimony is directly contradicted by the Affidavit of Lee Vardakas In Support of Defendants' Motion for Summary Judgment ("Vardakas Affidavit"), which states in part that Aegis "did offer, with Tecogen's knowledge, other manufacturers' competing products during Aegis' tenure as a reseller of Tecogen products" (Vardakas Affidavit, ¶ 22; *see also* Aegis Brief at 18).  At the very least, this contradiction between Mr. Vardakas' affidavit and his deposition testimony creates a triable issue.  Additionally, Defendants have produced no evidence indicating that Aegis handled other manufacturers' cogeneration products.  *See* Affidavit of Julie A. Frohlich in Support of Tecogen, Inc.'s Opposition to Defendants' Motion for Summary Judgment at ¶ 6.

Defendants' motion papers do not address, let alone dispute, any of the foregoing facts or evidence.

**B.     Fact - Aegis secretly developed of its own cogeneration modules, which are competitive with, and substantially similar to, the Tecogen Modules, and consciously decided not to tell Tecogen about it.**

This fact is supported by the following evidence and subsidiary facts:

1.  Notwithstanding that it was at the time an authorized and exclusive distributor of Tecogen Modules, in 2002 Aegis launched a program to develop its own cogeneration modules. (SMF, ¶ 11-14 and 31).

2.  Defendants admit that their cogeneration modules "are commercially competitive with modules built by other manufacturers, including [Tecogen]."  (Answer, ¶ 18).

3.  Moreover, in the opinion of at least one knowledgeable third party witness, who had an opportunity to carefully review and compare the modules, the Aegen Module is "almost identical in appearance, specifications and cost to the Tecogen units." (Deposition Transcript of Tim Casabonne ("Casabonne Depo. Trans.") (Tecogen Ex. 14) at 11).

4.  Aegis consciously decided not to disclose to Tecogen anything about Aegis' development of the Aegen Module.  (SMF, ¶¶ 32-33).

Again, Defendants do not address or dispute any of these facts or this evidence in their motion papers seeking summary judgment on this claim.

**C.     Fact - Aegis sold or installed four Aegen Modules at JML Care Center, Whitney Place, Muhlenberg, and Augustana, and failed to disclose any of these transactions to Tecogen.**

A full discussion of the evidence demonstrating Aegis's secret and undisclosed sales and installations of Aegen Modules to customers in Massachusetts and New York while engaged as Tecogen's authorized distributor is provided at SMF, ¶¶ 36-40 (JML), ¶¶ 41-43 (Whitney Place), ¶¶ 44-47 (Augustana Lutheran Home), and ¶¶ 48-49 (Muhlenberg).  Defendants do not address or dispute any of these facts in their motion papers.  This is not surprising.  There is no dispute that

Defendants made these secret sales while representing Tecogen, no dispute that Aegis failed to disclose these transactions to Tecogen, and no dispute that, at least with respect to JML and Whitney Place, defendants employed "bait-and-switch" type tactics to sell Aegen Modules in place of Tecogen Modules.

These facts and evidence provide ample support for Tecogen's Chapter 93A claim. And yet, Defendants do not address or dispute any of these facts or this evidence on their motion.

> **D.    Fact - Aegis engaged in eleventh hour efforts to convert the Lakeland, Auburn and Chemung projects from longstanding Tecogen Module projects into Aegen Module projects.**

Tecogen's SMF and its Statement of Facts in Support of Tecogen's Opposition to Defendants' Motion for Summary Judgment ("OSMF") provide a detailed discussion of the evidence demonstrating Aegis's eleventh hour efforts to convert long time Tecogen Module projects to Aegen Module projects. (*See* SMF, ¶¶ 50-101 (Chemung), ¶¶ 102-144 (Lakeland), and OSMF ¶¶ 1-20 (Auburn)). This evidence is summarized as follows:

1. For years, Tecogen and Tecogen sales representatives other than Aegis had worked hard to get Tecogen Modules specified for the Lakeland, Chemung and Auburn projects and to sell Tecogen Modules to the relevant contractor for installation at those projects. (SMF, ¶¶ 50-52, 55, 59-62, 65-67, 69-70, 103-104, 107-109 and 113-114; OSMF, ¶¶ 1-12).

2. For at least one year, approximately, each of the Chemung, Lakeland, and Auburn projects had been planning to use Tecogen Modules. (SMF, ¶¶ 53-54, 56-59, 63-64, 68, 75-85, 106-112; OSMF, ¶¶ 1-6, 9-10 and 12).

3. On April 18, 2005, Aegis simultaneously submitted two offers on the Lakeland project to the cogeneration contractor. One offer was for 11 Tecogen Modules at a total price of $825,000. (Tecogen Ex. 63 at 3; SMF, ¶ 116). The other offer was for 11 Aegen Modules at $770,000. (Tecogen Ex. 64 at 3; SMF, ¶ 117). Aegis did **not** disclose to Tecogen that it submitted this Aegen Module offer or that it was bidding on the Lakeland project in competition with

Tecogen's other sales representative, Advanced Comfort, even though Aegis knew of Advanced Comfort's prior bids and involvement in the project. (SMF, ¶¶ 104, 115 and 118).

4. On May 2, 2005, Lee Vardakas at Aegis asked Tecogen to give him Tecogen's then current confidential pricing pages for Tecogen Modules, and Tecogen emailed the requested information to Lee Vardakas. Those pricing pages are titled, "Aegis Energy NY Projects Confidential Turn In." The largest text on the pricing pages states, in all caps, "CONFIDENTIAL - REP USE ONLY." Aegis did not inform Tecogen that it had bid on the Lakeland project nor did it inform Tecogen that Aegis would be using Tecogen's confidential pricing information for the Lakeland project. (SMF, ¶ 122 and Tecogen Ex. 68).

5. Aegis subsequently underbid Tecogen's other sales representative, Advanced Comfort, and received a purchase order for 11 Tecogen Modules from the Lakeland contractor. Aegis then turned to negotiating with Tecogen for the purchase of those Tecogen Modules from Tecogen. Aegis disagreed with Tecogen's payment terms for this large order. (SMF, ¶¶123-128).

6. On May 23, 2005, Tecogen and Aegis still had not agreed to payment terms. That day, Tecogen learned from another Tecogen sales representative that Aegis had developed its own competing cogeneration modules. (SMF, ¶ 129).

7. Instead of patching things up with Tecogen, Aegis proposed and then attended a meeting with the main Lakeland project consultant, Atlantic Energy Services ("Atlantic"), at which Aegis introduced its own Aegen Modules to Atlantic, <u>which had not known of these modules before the meeting</u>. Aegis also proposed to sell Aegen Modules to Atlantic for use at Atlantic's projects at Lakeland and, for the first time, Aegis also made offers to sell modules (Aegen Modules) for the Chemung and Auburn projects. (SMF, ¶¶ 71 and 135; OSMF, ¶ 14).

8. Within days of that meeting, Atlantic accepted Aegis's proposal to substitute Aegen Modules for Tecogen Modules for those three projects. (SMF, ¶¶ 72-74, 136-138; OSMF, ¶¶ 15-18).

9. Aegis did all of the foregoing while it was an authorized and exclusive distributor of Tecogen Modules for Tecogen. (SMF, ¶¶ 10-15).

8

10. Tecogen terminated Aegis as a Tecogen Module distributor *only after* Aegis: agreed to sell Aegen Modules to the Lakeland, Auburn and Chemung projects; and refused Tecogen's request to stop handling competitive modules and work with Tecogen on these projects. (SMF, ¶¶ 139-141).

11. Tecogen Modules were specified for the Chemung, Lakeland and Auburn projects, and Tecogen Modules most likely would have been used in the Lakeland and Auburn projects (per the testimony of Tem Casabonne of Atlantic) had Aegis not (1) brought its own modules to Atlantic's attention and (2) sold Aegen Modules to both of those projects. (SMF, ¶¶ 106 and 144; OSMF, ¶¶ 19-20).

Defendants do not address, let alone dispute, any of these facts or supporting evidence in their motion papers. This undisputed evidence supports Tecogen's argument that Aegis engaged in unfair and deceptive acts and bad faith in violation of Chapter 93A when, among other things:

• Aegis made a competing (and lower priced) offer on April 18, 2005, to sell Aegen Modules for use at Lakeland at the same time it offered to sell Tecogen Modules and did not, at any relevant time, disclose this Aegen Module offer to Tecogen;

• Aegis asked for and received Tecogen's confidential pricing information and did not, at any relevant time, disclose to Tecogen that it was making and selling its own competing module; [2]

• Aegis converted Lakeland and Auburn, from long time Tecogen Module projects certain to go forward as Tecogen projects but for Aegis' acts, into Aegen Module projects; and

• Aegis interfered in Chemung sufficiently to require Tecogen to lower the price on its modules in order to match the price Aegis had offered on its Aegen Modules. (SMF, ¶¶ 71-74, 77-84 and 92-99).

---

[2]     With Tecogen's current pricing information in hand, Aegis knew exactly where it needed to price its own Aegen Modules to underbid Tecogen Modules on the Lakeland, Auburn and Chemung projects. Indeed, Lee Vardakas admits he took Tecogen Module pricing into consideration in thinking about Aegen Module prices. (L. Vardakas Depo. Trans. (Tecogen Ex. 100) at 123-124).

## II.    AEGIS' ACTS AND NON-DISCLOSURES VIOLATED CHAPTER 93A

As shown above, Tecogen has adduced ample evidence of unfair and deceptive acts, which Defendants' Brief fails to address, let alone dispute or rebut. Thus, Defendants have failed to show that they are entitled to judgment on Tecogen's Chapter 93A claim as a matter of law. To the contrary, Tecogen's Opposition has proven it is entitled to summary judgment on this claim.

Under M.G.L. 93A, §§ 2 and 11, "unfair methods of competition and unfair and deceptive acts or practices" are unlawful. Even sophisticated business persons must deal with each other honestly. A business person may not induce another to act by material misrepresentations. *See* VMark Software, Inc. v. EMC Corp., 37 Mass.App.Ct. 610, 619 n. 11 (1994).

A "deceptive" act or practice is simply one that has the capacity to deceive. An act or practice is deceptive if it could reasonably cause a company to act differently from the way it would have acted if it knew the truth of the matter. *See* Sargent v. Koulisas, 29 Mass.App.Ct. 956, 958 (1990).

The facts and supporting evidence summarized above establish that over a long period of time, Aegis deceived Tecogen into continuing its distributor relationship with Aegis by intentionally concealing and failing to disclose (1) its development of a competitive module and (2) numerous instances of sales and installations of that competitive module instead of Tecogen Modules. It is undisputed that, within weeks of learning that Aegis was building cogeneration modules that were competitive with Tecogen Modules, and within days of Aegis declining Tecogen's request to stop the production and sale of its competing modules, Tecogen terminated Aegis as an authorized distributor of Tecogen Modules.

Thus, the evidence establishes that Aegis' failure to disclose to Tecogen the development and sale of its competing modules reasonably caused Tecogen to act differently from the way it would have acted had it known the truth of the matter. Indeed, if Aegis had timely disclosed its secret module development and/or its earlier sales efforts at Whitney Place, JML, Augustana and Muhlenberg, as they happened, Tecogen would have ended its relationship with Aegis at those

earlier times, long before Aegis was able to use its position as a Tecogen distributor to get its foot in the door at Lakeland, Chemung and Auburn.

Similarly, the test of whether an act or practice is "unfair" is generally held to be whether it falls "within, at least, the penumbra of some common-law statutory, or other established concept of unfairness." Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986). A material misrepresentation falls within an established basis of unfairness. VMark Software, 37 Mass.App.Ct. at 620. So, too, does a willful and deceptive breach of one's obligations as an exclusive authorized distributor. RGJ Assoc., Inc. v. Williamsville Products, 338 F. Supp. 2d 215, 236, fn. 45 (D. Mass. 2004).

As such, Aegis' development of the Aegen Module and each offer, sale and installation of Aegen Modules at Augustana, Whitney Place, JML, Muhlenberg and Lakeland are material facts that should have been disclosed to Tecogen. Aegis' failure to make these disclosures constitutes a violation of Chapter 93A. Moreover, Aegis' acts in undercutting Tecogen's efforts to sell its modules at projects that had long been designed and specified around Tecogen Modules violated its obligations as a Tecogen dealer and constitute bad faith and unfair dealing.

In conclusion, Tecogen submits that taking together all of the acts and omissions and the supporting evidence described above, any reasonable finder of fact will conclude that Aegis knowingly and intentionally committed unfair and/or deceptive acts in violation of Chapter 93A.

**III.    TO THE LIMITED EXTENT IT ADDRESSES EVIDENCE RELEVANT TO THE CHAPTER 93A CLAIM, AEGIS' MISCHARACTERIZES THAT EVIDENCE**

As shown above, Aegis' motion papers ignore practically all of the acts and omissions described above and first outlined to Aegis in Tecogen's April 2007 Supplemental Response. For this reason alone, Aegis' motion must be denied. Moreover, the only arguments Aegis does make in its motion rely on mischaracterizations of the evidence. For this reason also, the motion fails.

A.     **Tecogen and Aegis were Parties to an Agreement**
       **that Obligated Aegis to Sell Only Tecogen Modules.**

Defendants first argue that there was no agreement between the parties regarding exclusivity and non-competition, and "there was never an agreement for Aegis to sell only Tecogen products." (Aegis Brief at 17). Aegis states that it "specifically refused to sign any agreement that would, inter alia, prohibit it from competing with Tecogen." (*Id.*).

Tecogen does not dispute that the parties did not sign a written agreement containing exclusivity and/or non-competition terms. However, agreements can be created by means other than a signed writing. Here, Tecogen argues that the uncontroverted evidence summarized above at pages 3 to 6 proves that from 1995 until June 24, 2005, there was an agreement - either implied, oral or created through a twenty year course of conduct - whereby Aegis agreed to serve as an authorized and exclusive Tecogen distributor and to sell only Tecogen Modules using its best efforts to maximize those sales.

By definition, Aegis' understanding that its obligations as an authorized and exclusive Tecogen distributor included promoting the sale of Tecogen Modules and using its best efforts to promote the maximum number of sales of Tecogen Modules, means it could not, at the same time, also be selling its own or another manufacturer's products in competition with Tecogen's Modules.

Accordingly, although Defendants' argument focuses on the absence of a signed written agreement, their own testimony and other evidence makes clear that Defendants understood the exclusive nature of their relationship with Tecogen, the privilege and benefit of exclusive dealing, and the corresponding obligation to sell Tecogen Modules. Their 20 year course of performance in selling only Tecogen Modules confirms this understanding and agreement. Thus, prior to the termination of Aegis' Tecogen distributorship on June 24, 2005, Defendants were not free to secretly engage in simultaneous efforts to **build and sell** their own competing product.

Lastly, Defendants' own Counterclaims establish that some sort of agreement or contractual type arrangement existed between the parties. In this regard, Defendants assert in Count II of their Counterclaims that Tecogen "improperly terminated Aegis Energy as an authorized dealer of Tecogen cogeneration modules" and thereby disrupted Aegis Energy's contract with a Lakeland contractor. (Answer at Counterclaim ¶¶ 24-26). Some type of agreement had to exist in order for Tecogen to allegedly "improperly terminate[ ]" it.[3]

In conclusion, the factual lynchpin of Defendants' argument regarding Tecogen's Chapter 93A claim is without support in the evidence.

### B.    American DG Does Not Excuse Aegis from its Acts and Omissions.

Next, Aegis asserts that Tecogen allowed its affiliate, American DG, to compete directly with Aegis at a time when Aegis was a buyer and reseller of Tecogen modules, and at a time when Tecogen claimed Aegis had exclusivity for the Massachusetts and Connecticut markets. (Aegis Brief at 18). It then argues that "Tecogen has no basis for asserting that Aegis had some form of exclusivity to the Massachusetts or Connecticut markets when Tecogen deliberately competed with Aegis in this territory." (*Id.* at 19). This argument fails for at least the following reasons.

First, the evidence shows that, unlike Aegis's secret and undisclosed program of competition with Tecogen, Tecogen kept Aegis fully and timely informed of the creation of American DG and that company's plans.[4]

---

[3]    Furthermore, pursuant to M.G.L. c. 106, § 2-201(3), no writing is required "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made." "This provision has been found sufficient to allow the enforcement of an oral agreement to be an exclusive distributor despite the lack of specific quantities of goods." Boyle v. Douglas Dynamics, LLC, 292 F. Supp. 2d 198, 211 (D.Mass. 2003). *See* Defendants' Answer at Counterclaim ¶¶ 15, 24-26).

[4]    In this regard:
- Spiro Vardakas admits that in late 2001, Aegis had been informed about American DG by Tecogen and, by the end of 2002, "we really got the sense of where they were going" with American DG through "a number of discussions with Tecogen regarding Aegis and [American DG]." (SMF, ¶ 24).
- Spiro Vardakas also admits that Aegis "learned quite a bit about American DG during the end of '02 in discussions with Tecogen and its principals." (SMF, ¶ 25).

Furthermore, although Aegis now argues that American DG competed directly against Aegis in the "shared energy services" segment of the market, evidence in the form of Aegis' contemporaneous inconsistent statements shows that shared energy savings arrangements were not a substantial part of Aegis' business through at least March of 2004.[5]  Rather, it appears that, for purposes of this suit, Aegis is exaggerating the competitive threat American DG presented in 2002 through at least March 2004.

Lastly, like many agreements, the one between Tecogen and Aegis was subject to amendment.  American DG was expressly excluded from the exclusivity term in the April 2003 agreement that Tecogen offered to Aegis and discussed above at page 4.  With full knowledge of American DG and Tecogen's exclusion of American DG projects from Aegis' exclusive territory, Aegis continued for approximately two more years as an authorized and exclusive Tecogen Module distributor, thereby leading Tecogen reasonably to believe Aegis had accepted this modification to its exclusive territory.

In summary, Aegis' argument that American DG's fully disclosed activities and plans somehow justified Aegis' secret and undisclosed activities is unsupported by the evidence, unpersuasive and irrelevant to Tecogen's Chapter 93A claim against Aegis.

    **C.**    **Tecogen's Chapter 93A Claim Relies on More Than**
            **Aegis' Development of the "Knock Off" Aegen Module.**

Lastly, Defendants argue there is no basis to claim that the Aegen Modules are a "knock-off" of the Tecogen Modules for the reason that Tecogen has "dropped" its patent and software copyright infringement claims.  Therefore, they conclude, Tecogen's unfair competition claim

---

- Moreover, in a press release dated November 20, 2002, American DG publicly announced entering into its first agreement for a project.  (SMF, ¶ 26).

[5]    *See* Spiro Vardakas August 1, 2002 letter to Massachusetts Department of Telecommunications and Energy ("DTE") (Ex. 12) at p. 1 (in 2002, stating, "We provide economic analyses, engineering, system installation, service, and **occasionally** ownership with shared savings agreements as a financing vehicle") (emphasis added); Prefiled Direct Testimony of Spiro Vardakas to DTE (Tecogen Ex. 13) at 3 (in 2004, stating, "We develop, install, service and **sometimes** own through a shared savings program, small, modular, combined heat and power systems (CHP)") (emphasis added); and SMF, ¶¶ 28-29.

relies on an unsupported allegation that Aegis exploited Tecogen's intellectual property. (Aegis Brief at 19-22). As shown above, Tecogen's unfair competition claim relies on far more than the fact that the Aegen Module is a "knock off" of the Tecogen Module.

Defendants' argument fails to distinguish between claims of infringement of statutory intellectual property rights, and claims of unfair and deceptive acts in taking advantage of one's position as the authorized dealer of a manufacturer's product to secretly build a remarkably similar competitive product to sell at the same time the dealer is supposed to be using its best efforts to sell the manufacturer's product. More specifically, the claim here is broad and includes allegations that Aegis made a module that looks and performs just like the Tecogen Module, and it did so in order to more easily switch its own module into a customer's project after first getting the customer's business through the offer of Tecogen Modules. Therefore, that Tecogen does not own statutory intellectual property rights in its own modules is quite beside the point.

Lastly, the evidence shows that the Aegen Modules are almost identical in appearance, specifications and cost to the Tecogen Modules. (SMF, ¶ 34). Significantly, the project manager for the shared energy savings consultant that reviewed the Aegen Modules for use as an alternative to Tecogen Modules on the Lakeland, Chemung and Auburn projects testified that, in his opinion, the Aegen Modules "were almost identical in appearance, specifications and cost to the Tecogen units." (Casabonne Depo. Trans. (Tecogen Ex. 14) at 11).

## IV. AEGIS' COPYRIGHT ARGUMENTS ARE PERIPHERAL TO THE CENTRAL ISSUE - THE STRIKING SIMILARITIES BETWEEN AEGIS' MANUAL AND TECOGEN'S MANUAL - AND FAIL FOR FACTUAL AND LEGAL REASONS

Aegis also moves for summary judgment on Counts I and III of the Complaint, which state claims, respectively, for statutory and common law copyright infringement of the Tecogen Installation Manual dated February 2005 (the "February 2005 Manual"). Aegis' motion is not based on the defense that it did not copy substantial portions of Tecogen's installation manual. This undoubtedly is because the uncontradicted evidence proves that Aegis copied substantial

portions of Tecogen's work.[6]  Ignoring the foregoing, Aegis instead raises three highly technical

arguments, all of which fail for the reasons discussed below.

### A.    All Versions of Tecogen's Manuals are Now Registered

In its first point of attack, Aegis argues that: copyright registration of a derivative work

provides limited copyright protection beyond which infringement cannot be asserted; Aegis does

not infringe any portion of the material protected by Tecogen's registration of the February 2005

Manual; and, therefore, absent a copyright registration to the preexisting work contained in the

February 2005 Manual, the Court lacks subject matter jurisdiction to hear Tecogen's infringement

claims involving that preexisting material.  (Aegis Brief at 5-9).

Assuming arguendo that Aegis was correct about the copyright registration for Tecogen's

February 2005 Manual, which Tecogen does not concede, this argument is now moot.  In footnote

2 of Aegis' brief, "Aegis acknowledges that Tecogen could apply for copyright registration for the

preexisting material at any time…"  As of July 25, 2008, Tecogen *has* submitted complete

copyright registration applications for all original text, drawings, edits and other original work

contained in its November 2002, January 2003, and April 2003 versions of its Installation Manual.

(OSMF, ¶¶ 53-54).  As such, all original preexisting material in Tecogen's February 2005

---

[6]    That evidence is summarized as follows:

- Tecogen employees authored the February 2005 Manual, and all prior versions of that manual, which are dated November 2002, January 2003 and April 2003 (collectively, the "Tecogen Manuals"). (OSMF, ¶¶ 35 and 38-45).

- Virtually every page of text, drawings/diagrams, tables and other content in the Tecogen Manuals was written exclusively by the Tecogen employees. (OSMF, ¶ 40)

- The selection, coordination and/or arrangement of the contents of the Tecogen Manuals was created exclusively by Tecogen's employees. (OSMF, ¶ 40).

- Aegis admits it had access to the Tecogen Manuals.  (OSMF, ¶ 46).

- A comparison of the first 25 pages of Aegis' June 2005 Manual (Tecogen Ex. 86) with Tecogen's February 2005 Manual (Tecogen Ex. 85) shows at least 72 different examples of text, drawings or elements involving selection and order in Aegis' Manual that are virtually identical or substantially similar to the Tecogen Manual.  (OSMF, ¶¶ 48-52).

Installation Manual is now considered registered.  *See* 17 U.S.C. §§ 408(a) and (b), 409 and 410(d).

**B.     Because Aegis' Infringing Manual was the Indispensable Submittal Required to Get Aegen Modules Approved for Use at Lakeland, Tecogen's Actual Damages and Aegis' Additional Profits Attributable to the Infringement are <u>Substantial, Equaling Tecogen's Loses, and Aegis' Profits, on that Project</u>.**

In its second point, Aegis argues that Tecogen's actual damages or any additional profits of Aegis that may be associated with Tecogen's copyright infringement claim are *de minimis*.[7] (Aegis Brief at 9-11).  In support of this argument, Aegis first notes that Tecogen gives its installation manuals to customers for free.  (Id. at 10-11).  Tecogen does not dispute this fact.

Tecogen does dispute Aegis' second point.  In this regard, in reliance on the Vardakas Affidavit, Aegis generally states that "public contract awards are not predicted on the submission of the manual.  Architects and mechanical engineers require some limited specifications of the cogeneration manuals, but not the installation instructions, and not the installation manual in its entirety."  (Aegis Brief at 10).  As such, Aegis' main argument on copyright damages appears to be that, because Aegis also gave its infringing Aegen Module Installation Manual to the Lakeland contractor (J&M Heating) for free, and this occurred after the contractor already had issued Aegis a purchase order for 11 Aegen Modules for the Lakeland project, Tecogen's actual damages could only be *de minimis* and Aegis could have no additional profits attributable to the infringement.

Aegis' argument ignores, and is contrary to, highly relevant deposition testimony of Christopher Cafer ("Cafer"), as follows:

- Cafer was the lead engineer who worked on Lakeland for Energy Concepts Engineering PC ("Energy Concepts"), which was the cogeneration design engineer on Lakeland. (OSMF, ¶ 21).

- Cafer and Energy Concepts created the specifications for the cogeneration modules used at Lakeland ("Lakeland Specs").  (OSMF, ¶ 22).

---

[7]     Aegis also argues that Tecogen is not entitled to statutory damages or attorneys fees on this claim. Because Tecogen is not seeking statutory damages or attorneys fees on a recovery under this claim, Tecogen is not addressing this argument.

- The Lakeland Specs identify Tecogen as one of two "Acceptable Manufacturers", which means that Cafer and Energy Concepts had vetted and approved Tecogen Modules for use on the project. (OSMF, ¶ 23). The Lakeland Specs did not identify Aegis as an "Acceptable Manufacturer" of modules for the Lakeland project. (OSMF, ¶ 24).

- The Lakeland Specs did, however, prescribe a procedure for the review and approval of proposed substitute or alternative cogeneration equipment for use on the project. (OSMF, ¶ 25). This procedure required that Energy Concepts receive and review a "submittal" to ensure that proposed alternative equipment complied with the Lakeland Specs. (OSMF, ¶ 26).

- Section 1.4 of the Lakeland Specs is entitled "Submittals" and, under the sub-heading, "product data," it expressly requires submittal of a cogeneration manufacturer's specifications and installation instructions. (OSMF, ¶ 27).

- In explaining Section 1.4, Cafer testified that an installation manual was required for the submittal "because we wrote it in this specification. It would be required -- if we stated we wanted to see installation instructions as part of the submittal, that would be a document that would be required at the official submittal phase." (OSMF, ¶ 28).

- On June 17, 2005, J&M Heating issued a purchase order to Defendants, which ordered 11 Aegen Modules for use at Lakeland. (OSMF, ¶ 29).

- Because the Lakeland Specs did not identify Aegis as an "Acceptable Manufacturer", Aegen Modules were considered a proposed alternative piece of equipment that had to go through the review and approval procedure with Energy Concepts described above. (OSMF, ¶ 30).

- Accordingly, _after_ the Aegen Module purchase order had issued to Aegis, Aegis submitted the "Aegen Installation Manual" dated June 2005 to J&M Heating, which on June 23, 2005, submitted the same manual for review by the Lakeland project cogeneration engineers - Cafer and Energy Concepts. (OSMF, ¶ 31).

- Consistent with the terms of Section 1.4 of the Lakeland Specs requiring that a submittal provide a manufacturer's specifications and installation instructions, the Aegen Installation

Manual's first section, entitled "Module Specifications", provides detailed information about the Aegen Modules' specifications and its second section, entitled "Installations", provides detailed installation instructions for those modules.  (OSMF, ¶ 32).

- Cafer testified that, in connection with the proposed Aegen Module substitution, "[a]n installation manual would have been provided because <u>I would have required that</u>…"  (OSMF, ¶ 33) (emphasis added).

- Lastly, Cafer testified that he could not have approved the Aegen Module without being provided with the Aegen Installation Manual in its entirety.  (OSMF, ¶ 34).

In summary, the relevant evidence ignored by Aegis proves that Aegis could not have succeeded in substituting eleven Aegen Modules for eleven Tecogen Modules at Lakeland without submitting the infringing Aegen Installation Manual.  As such, the damages Tecogen is seeking as a result of this infringement are its lost profits on the Lakeland project, which are its actual damages, and any Aegis' additional profits on the project. 17 U.S.C. § 504(a)(1) and (b).  These damages are hardly *de minimis*.

       **C.**     <u>**The "Unclean Hands" Doctrine Does Not Bar Tecogen's Copyright Claims**</u>.

Finally, Aegis raises - for the first time in this lawsuit - the defense of "unclean hands."  In this regard, Aegis asserts that Tecogen has used preexisting materials owned by third party manufacturers in its manuals and, because Tecogen did not have the manufacturers' permission to use those materials, Tecogen's copyright infringement claims against Aegis are barred by its unclean hands.  This argument fails for at least three reasons.

First, unclean hands is an affirmative defense. *See* <u>Donoghue v. IBC USA (Publications) Inc.</u>, 70 F.3d 206, 218 (1st Cir. 1995).  Aegis did not raise this defense in response to Tecogen's copyright infringement claims in Aegis's Answer to the Complaint.  Therefore, it is waived.  *See* <u>Knapp Shoes v Sylvania Shoe Mfg. Corp.</u> 15 F.3d 1222 (1st Cir. 1994) (stating an affirmative

defense must be pleaded specifically in the first responsive pleading or it is deemed waived and excluded as an issue in the case).

Second, Jean Roy, who is a mechanical engineer with years of experience in the cogeneration industry, testified that it is an understood and accepted practice in the industry for an original equipment manufacturer ("OEM") to include a component manufacturer's informational materials in the OEM's literature for equipment that includes the manufacturer's component. (OSMF, ¶¶ 36-37; Tecogen Ex. 102 at 59-60).  Indeed, Aegis' own Installation Manual also appears to include at least one component manufacturer's materials.  (Tecogen Ex. 86 at 8).

Lastly, Aegis cites to no legal authority to support the argument that an OEM's use of a component manufacturer's information in the OEM's literature amounts to unclean hands.

## CONCLUSION

For the reasons set forth above and in Tecogen's Motion for Partial Summary Judgment and related submissions, Tecogen respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.

TECOGEN, INC.,
By its attorneys,


 /s/ *Julie A. Frohlich*
Julie A. Frohlich (BBO# 554707)
Derek B. Domian (BBO# 660568)
Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, MA  02110-3333
Dated:  July 28, 2008                          (617) 482-1776

**<u>Certificate of Service</u>**

I, Derek B. Domian, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

   <u>/s/ *Derek B. Domian*     </u>

GSDOCS\1846277