UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TECOGEN, INC., ) | |
| ) | |
| Plaintiff/Counterclaim Defendant, ) | |
| ) | |
| v. ) | C.A. No. 05-11823 RCL |
| ) | |
| AEGIS ENERGY SERVICES, INC., ) | |
| AEGENCO, INC. and ) | |
| AEGIS GENERATION COMPANY, ) | |
| ) | |
| Defendants/Counterclaim Plaintiffs. ) | |

**TECOGEN, INC.'s STATEMENT OF DISPUTED AND ADDITIONAL
MATERIAL FACTS IN SUPPORT OF OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff/Counterclaim Defendant Tecogen, Inc. ("Tecogen") respectfully submits the following Statement of (1) Disputed Material Facts and (2) Additional Material Facts in Support of its Opposition to Defendants' Motion For Summary Judgment filed by Aegis Energy Services, Inc. ("Aegis Energy") and Aegenco, Inc. ("Aegenco") (collectively, "Defendants" or "Aegis"):

I. **DISPUTED MATERIAL FACTS**

Tecogen does not dispute the statements of fact set forth in paragraphs numbered 1-11, 13-15, 19-20 and 22-23 in Defendants' Statement of Material Facts in Support of Defendants' Motion for Summary Judgment ("Defendants' SMF").

Tecogen does dispute the statements of fact set forth in Paragraphs 12, 16-18, 21, 24-26 of Defendants' SMF, as follows:

12.     Tecogen disputes **Defendants' SMF ¶ 12**, which states: "During Aegis' involvement with Tecogen, prior to June 24, 2005, Aegis offered for sale other manufacturers'

1

cogeneration modules, including cogeneration modules of DTE of Detroit, Michigan, and Capstone Corp., of Chatsworth, California. Lee Vardakas Affidavit, ¶ 3."

<u>Grounds for Dispute of this Fact:</u>

Defendants' SMF ¶ 12, which is based solely upon paragraph 3 of Lee Vardakas' Affidavit, is directly contradicted by Lee Vardakas' deposition testimony, in which he testified to the opposite of what he now says in his affidavit, as follows:

> Q. At any time prior to June 24, 2005, did Aegis offer to sell or install cogeneration modules manufactured by any person or entity other than Tecogen?
>
> A. Yes.
>
> Q. Please name the names of those other manufacturers.
>
> A. Well, there was surplus equipment that had Tecogen's name on it. It was Tecogen equipment, but it was surplus equipment. Tecogen actually referred that equipment to us because they knew we used surplus equipment for our own and operate agreements. So over the years we picked up, we purchased many surplus machines from all over the country for use in our own and operate agreements.
>
> Q. From 1985 until June 24, 2005, other than Tecogen brand cogeneration modules, did Aegis ever buy another manufacturer's modules?
>
> A. We didn't purchase, we were given other products to use, other surplus equipment that we used.
>
> Q. In that --
>
> A. We did not purchase any.
>
> Q. In that same time period, this is 1985 to June 24, 2005, did Aegis ever offer to sell or install new cogeneration modules manufactured by anyone other than Tecogen?
>
> A. No. We did offer to sell other generators, not cogeneration modules.

(L. Vardakas Depo. Trans. (Tecogen Ex. 100) at 38-39).

Spiro Vardakas' deposition testimony also directly contradicts Defendants' SMF ¶ 12. He testified that in the late 1990's and early 2000's, Aegis looked at other products, including Capstone and DTE products; that Capstone and DTE both offered to give Aegis a machine; that Aegis did not accept either a Capstone or DTE machine; and that Aegis never bought cogeneration modules that were manufactured by any company other than Tecogen. (Deposition Transcript of Spiro Vardakas ("S. Vardakas Depo. Trans") (Tecogen Ex. 99) at 23-30). Spiro Vardakas also testified that Aegis never actually dealt with another manufacturer's modules because "We like Tecogen's products. We standardized on it. Anything we looked at, we saw it as having to fit our business plan." (*Id*. at 30-31).

Lastly, Defendants have not produced a single piece of paper in this action evidencing that prior to June 24, 2005, Aegis offered for sale other manufacturers' cogeneration modules, including cogeneration modules of DTE of Detroit, Michigan, and Capstone Corp., of Chatsworth, California. (Affidavit of Julie A. Frohlich in Support of Tecogen's Opposition to Defendants' Motion for Summary Judgment at ¶ 6).

**16.** Tecogen disputes **Defendants' SMF ¶ 16**, which states: "Aegis requested confirmation from Tecogen for the May 2, 2005 purchase order. Lee Vardakas, ¶ 10."

Grounds for Dispute of this Fact:

Defendants' SMF ¶ 16 and Mr. Vardakas' Affidavit appear to be confusing Aegis' May 2, 2005 purchase order with Aegis' May 17, 2005 purchase. The actual sequence of events, as evidenced by the parties' battling forms and Mr. Vardakas' deposition testimony, is as follows:

- After receiving Aegis's May 2nd purchase order, Tecogen sent Aegis a price quote dated May 6, 2005 (Tecogen Ex. 71), which proposed payment terms intended to ensure Aegis's timely payment on this large order. (SMF, ¶¶ 124-125).

3

- Approximately two weeks later, Tecogen sent Aegis a re-negotiated price quote dated May 17, 2005 (Tecogen Ex. 72), which proposed different payment terms. (SMF, ¶ 126).
- On May 18, 2005, Aegis faxed a new purchase order to Tecogen dated May 17, 2005 (Tecogen Ex. 73), which proposed materially different payment terms. (SMF, ¶ 127).
- The second page of this May 17th dated purchase order contains the handwritten note: "Please send written confirmation of acceptance of this PO - Lee." Lee Vardakas testified at his deposition that he wrote that note on the purchase order. (L. Vardakas Depo. Trans. (Tecogen Ex. 100) at 79-80). He explained that they had been "going back and forth with Tecogen over pricing" and he wrote than note because "I needed some confirmation to be able to move ahead on this project." (Id. at 80).

**17.** Tecogen disputes **Defendants' SMF ¶ 17**, which states: "Tecogen never provided written confirmation to Aegis for the Tecogen cogeneration modules requested in Aegis' May 2, 2005 purchase order. Lee Vardakas Affidavit, ¶ 10."

<u>Grounds for Dispute of this Fact:</u>

As shown above, Tecogen was asked to confirm Aegis' purchase order dated May 17, 2005, and not the May 2, 2005 purchase order. Three business days after the May 17th purchase order was faxed to Tecogen, Tecogen discovered that Aegis was manufacturing and advertising its own cogeneration module competitive with Tecogen Modules. For this reason, Tecogen did never provided the written confirmation requested by Aegis' May 17th order. (SMF, ¶¶ 128-132).

**18.** Tecogen disputes **Defendants' SMF ¶ 18**, which states: "During the time Tecogen was in possession of Aegis' May 2, 2005 purchase order, Tecogen solicited the developer of the Lakeland Project, Atlantic Energy Services, Inc., of Saratoga, New York, to sell

4

cogeneration modules directly from Tecogen for the Lakeland Project.  Lee Vardakas Affidavit, ¶ 11."

Grounds for Dispute of this Fact:

As an initial matter, Mr. Vardakas' Affidavit does not state, anywhere, that the statements contained therein are based upon his personal knowledge.  Along the same lines, Tecogen questions how Mr. Vardakas could have personal knowledge of communications and contacts that involved Tecogen and Atlantic but not Aegis or Mr. Vardakas.

On the merits, Tecogen did not solicit Atlantic to sell cogeneration modules directly to Atlantic for the Lakeland Project; rather, it was the other way around, Atlantic solicited Tecogen.  In this regard, Jeff Glick, a Tecogen employee who was personally involved in the discussions with Atlantic, testified that in a meeting with Atlantic to discuss cogeneration service, Tim Brock of Atlantic "asked us to provide him a price for future projects, this project and future ones directly.  Tim Brock asked us to give him a 25 unit price, which we did."  J. Glick Depo. Trans. (Tecogen Ex. 97) at 113-114.


**21.**     Tecogen disputes **Defendants' SMF ¶ 21**, which states: "The installation manual was not a necessary document to secure the purchase order from J&M for the Lakeland Project.  Lee Vardakas Affidavit, ¶ 15."

Grounds for Dispute of this Fact:

Tecogen does not dispute that Aegis' installation manual was not a necessary document to get J&M *to issue* a purchase order to Aegis for 11 Aegen Modules.  Based on the evidence discussed below in Tecogen's Additional New Facts numbered 21-34, however, that purchase never would have *closed* without the installation manual.

5

  **24-26.**  Tecogen disputes **Defendants' SMF ¶¶ 24-26** only on the grounds that the testimony of Mr. Olmstead is not clear that he encountered American DG competing with Aegis in the years 2001 and 2002.

## II. ADDITIONAL MATERIAL FACTS

  Tecogen adds Additional Undisputed Material Fact in support of its Opposition to Defendants' Motion for Summary Judgment as follows:

**Aegis Converts "Auburn" from a Tecogen Module Project to an Aegen Module Project**

  1.  By March 2004, at the latest, Jeff Glick of Tecogen and a Tecogen sales representative named R.L. Kistler were working on a Tecogen Module sale to the Auburn Enlarged City School District ("Auburn") in Auburn, New York.

Supporting Evidence: Tecogen Billing Forecast dated March 3, 2004 (Tecogen Ex. 87)

  2.  In October 2004, Atlantic Energy Services, Inc. ("Atlantic"), the shared energy savings consultant, and Auburn signed an agreement in which Atlantic agreed to install a cogeneration system at the Auburn Middle School. The agreement states that "the cogeneration system will consist of one Tecogen model."

Supporting Evidence: Signed Agreement between Atlantic and Auburn dated October 27, 2004 (Tecogen Ex. 88) at 3; Casabonne Depo. Trans. (Tecogen Ex. 89) at 176.

  3.  The design engineer on the Auburn project, Energy Concepts Engineering ("Energy Concepts"), prepared drawings for the project. A drawing dated January 25, 2005, depicts the boiler room cogeneration plan at the Auburn East Middle School and expressly states that the cogeneration unit to be put in that room will be provided "by Tecogen."

6

<u>Supporting Evidence</u>:   Plan for Auburn Project dated January 25, 2005 (Tecogen Ex. 90); Casabonne Depo. Trans. (Tecogen Ex. 89) at 177-178.

      4.      In late January 2005, Atlantic and Auburn signed a Shared Energy Agreement, which expressly states that Atlantic will "install one Tecogen CM-75 cogeneration unit" in the East Middle School Boiler Room."

<u>Supporting Evidence</u>:   Signed Shared Energy Agreement between Atlantic and Auburn dated January 30, 2005 (Tecogen Ex. 91) at 3, 4 and 19; Casabonne Depo. Trans. (Tecogen Ex. 89) at 178-179.

      5.      In March 2005, NYSEG approved the Auburn cogeneration system based upon the use of a Tecogen Module in that system.

<u>Supporting Evidence</u>:   3-7-05 NYSEG application for Auburn and 3-22-05 NYSEG approval letter to Auburn (Tecogen Ex. 92); Casabonne Depo. Trans. (Tecogen Ex. 89) at 188-189).

      6.      In early May 2005, approvals were sought from the NYSSED for the Auburn project based on use of Tecogen Modules.

<u>Supporting Evidence</u>:   5-4-05 submittal to NYSSED for Auburn (Tecogen Ex. 93) at 2-3.

      7.      In May 2005, Tecogen and R.L. Kistler worked on pricing for the sale of one Tecogen Module to the Auburn project.

<u>Supporting Evidence</u>:   5-11-05 email and 5-18-05 Tecogen Confidential Price Turn-In (Tecogen Ex. 94).

      8.      R.L. Kistler then sent a price quote dated May 18, 2005 to mechanical contractors bidding on the Auburn job.

<u>Supporting Evidence</u>:   5-18-05 Price Quote, Bailey at Kistler to Mechanical Contractors (Tecogen Ex. 95).

9. R.L. Kistler followed up with Atlantic on its May bid and, on June 6, 2005, Tim Casabonne ("Casabonne") of Atlantic R.L. Kistler that Atlantic was considering purchasing the cogeneration unit for Auburn directly from Tecogen.

Supporting Evidence:   Email thread between R.L. Kistler and Atlantic (Tecogen Ex. 96).

10. In early June 2005, Tecogen employees met with Atlantic employees and discussed pricing for the direct sale of a Tecogen Module to Atlantic for the Auburn project.

Supporting Evidence:  Glick Depo. Trans. (Tecogen Ex. 97) at 113-118.

11. In a detailed email with attached price quotes sent on June 6, 2005, as requested by Atlantic, Tecogen directly provided Atlantic with a price quote for the sale and maintenance of 25 Tecogen Modules, including the one Auburn project module.

Supporting Evidence:  Glick Depo. Trans. (Tecogen Ex. 97) at 113-118; 6-6-05 email from Glick to Brock and Casabonne at Atlantic regarding pricing for 25 Integrated Modules for Lakeland, Chemung, Auburn and Maintenance at projects (Tecogen Ex. 35).

12. As of June 9, 2005, Atlantic's internal modeling still showed a Tecogen Module in use for the Auburn project.

Supporting Evidence:   6-9-05 Atlantic Input/Output Model (Tecogen Ex. 98).

13. Aegis first learned of the Auburn project in June 2005.

Supporting Evidence:  S. Vardakas Depo. Trans. (Tecogen Ex. 99) at 102.

14. On June 13, 2005, Lee Vardakas of Aegis met with Casabonne and several other Atlantic employees. Mr. Vardakas proposed this meeting. At it, he made a presentation to the Atlantic employees about the Aegen Modules. Prior to this meeting, Casabonne never had heard of the Aegen Modules.

Supporting Evidence:  Casabonne Depo. Trans. (Tecogen Ex. 14) at 94-96.

15. On June 14, 2005, Aegis sent a Price Quote to Atlantic with proposed prices for the sale of numerous Aegen Modules.

8

Supporting Evidence:   Casabonne Depo. Trans. (Tecogen Ex. 14) at 133; 6-14-05 Price Quote, Aegis to Atlantic (Tecogen Ex. 36).

16.     On or about June 13, 2005, Aegenco was incorporated.  On June 16, 2005, instead of Aegis sending a price quote, Aegenco sent a price quote to Atlantic with prices for 4 Aegen Modules for Chemung and 5 Aegen Modules for "additional projects."

17.     Supporting Evidence:   Answer (Tecogen Ex. 1) at ¶ 16; 6-16-05 Price Quote from Aegis to Atlantic for Chemung and Additional Projects (Tecogen Ex. 37).

18.     An Aegen Module subsequently was purchased by Atlantic and installed at the Auburn East Middle School.

Supporting Evidence:   S. Vardakas Depo. Trans. (Tecogen Ex. 99) at 99.

19.     The Auburn project specifications and drawings were designed around Tecogen Modules.

Supporting Evidence:   Casabonne Depo. Trans. (Tecogen Ex. 89) at 186-187; email thread (Tecogen Ex. 101) at 4.

20.     Casabonne  testified that if Aegen Modules had not been brought to Atlantic's attention in 2005, a Tecogen Module "most likely" would have been used in the Auburn project.
Supporting Evidence:   Casabonne Depo. Trans. (Tecogen Ex. 89) at 187.

**The Aegen Module Installation Manual**

21.     Christopher Cafer ("Cafer") was the lead engineer who worked on Lakeland for Energy Concepts Engineering PC ("Energy Concepts"), which was the design engineer for the cogeneration portion of that project.

Supporting Evidence:   Deposition Transcript of Christopher Cafer ("Cafer Depo. Trans.") (Tecogen Ex. 84) at 7 and 9-11.

9

22.     Cafer and Energy Concepts created the specifications for the cogeneration modules used at Lakeland ("Lakeland Specs").

<u>Supporting Evidence:</u>   Cafer Depo. Trans. (Tecogen Ex. 84) at 11-13; Tecogen Ex. 55; SMF, ¶ 106.

23.     The Lakeland Specs identify Tecogen as one of two "Acceptable Manufacturers", which means that Cafer and Energy Concepts had vetted and approved Tecogen Modules for use on the project.

<u>Supporting Evidence:</u>   Cafer Depo. Trans. (Tecogen Ex. 84) at 25-27, 34; Tecogen Ex. 55 at 2; SMF, ¶ 106.

24.     The Lakeland Specs did not identify Aegis as an "Acceptable Manufacturer" of modules for the Lakeland project.

<u>Supporting Evidence:</u>   Tecogen Ex. 55 at 2.

25.     The Lakeland Specs did, however, prescribe a procedure for the review and approval of substitute or alternative cogeneration equipment for use on the project.

<u>Supporting Evidence:</u>   Cafer Depo. Trans. (Tecogen Ex. 84) at 26-27, 33-34, 156.

26.     This procedure required that Energy Concepts receive and review a "submittal" to ensure that proposed alternative equipment complied with the Lakeland Specs they had drafted.

<u>Supporting Evidence:</u>   Cafer Depo. Trans. (Tecogen Ex. 84) at 29-30 and 33-34.

27.     Section 1.4 of the Lakeland Specs is entitled "Submittals" and, under the sub-heading, "product data," it expressly requires submittal of a cogeneration manufacturer's specifications and installation instructions.

<u>Supporting Evidence:</u>   Tecogen Ex. 55, at 2.

28.     In explaining Section 1.4, Cafer testified that an installation manual was required for the submittal "because we wrote it in this specification.  It would be required -- if we stated

10

we wanted to see installation instructions as part of the submittal, that would be a document that would be required at the official submittal phase."

Supporting Evidence:   Cafer Depo. Trans. (Tecogen Ex. 84) at 34.

29.    On June 17, 2005, J&M Heating issued a purchase order to Defendants, which ordered 11 Aegen Modules for use at Lakeland.

Supporting Evidence:  SMF, ¶ 138.

30.    Because the Lakeland Specs did not identify Aegis as an "Acceptable Manufacturer", Aegen Modules were a proposed alternative piece of equipment that had to go through the review and approval procedure described above with Energy Concepts to ensure that those modules complied with the Lakeland Spec's requirements for cogeneration modules and, therefore, could be used on that project.

Supporting Evidence:   Cafer Depo. Trans. (Tecogen Ex. 84) at 27-28, 33; L. Vardakas Depo. Trans. (Tecogen Ex. 100) at 115-116.

31.    Accordingly, <u>after</u> the Aegen Module purchase order had issued to Aegis, Aegis submitted the "Aegen Installation Manual" dated June 2005 to J&M Heating, which on June 23, 2005, submitted the same manual for review by the Lakeland project cogeneration engineers - Cafer and Energy Concepts.

Supporting Evidence:   Aegen Installation Manual dated June 2005 (Tecogen Ex. 86); L. Vardakas Depo. Trans. (Tecogen Ex. 100) at 115-116.

32.    Consistent with the terms of Section 1.4 of the Lakeland Specs requiring that a submittal provide detailed information about a manufacturer's specifications and installation instructions, the Aegen Installation Manual's first section, entitled "Modules Specifications", provides detailed information about the Aegen Modules' specifications and its section, entitled "Installations", provides detailed installation instructions for those modules.

Supporting Evidence:   Aegen Installation Manual dated June 2005 (Tecogen Ex. 86) at 4-29.

11

33. Cafer testified that, in connection with the proposed Aegen Module substitution, "[a]n installation manual would have been provided because I would have required that…"

Supporting Evidence: Cafer Depo. Trans. (Tecogen Ex. 84) at 157.

34. Lastly, Cafer testified that he could not have approved the Aegen Module without being provided with the Aegen Installation Manual in its entirety.

Supporting Evidence: Cafer Depo. Trans. (Tecogen Ex. 84) at 157.

**The Tecogen Installation Manuals Were Authored and Created Exclusively by Tecogen's Employees**

35. Jean Roy ("Roy") is the primary author of the Tecogen Installation Manual dated February 2005 (the "February 2005 Manual"), and all prior versions of that manual, which are dated November 2002, January 2003 and April 2003 (collectively, the "Tecogen Manuals").

Supporting Evidence: Deposition Transcript of Jean Roy ("Roy Depo. Trans.") (Tecogen Ex. 102) at 14-15, 20.

36. Roy is a mechanical engineer with a master's degree in mechanical engineering who began working for Tecogen in 1985.

Supporting Evidence: Roy Depo. Trans. (Tecogen Ex. 102) at 8 and 10-12.

37. At the time of her deposition in July 2007, Roy was Operations Manager at Tecogen and oversaw the manufacturing operation, product development and was program manager on R&D contracts. From 2004 until approximately July 2006, she was Program Manager directly overseeing R&D contracts for product development. From approximately 1999/2000 to 2004, Roy was a Project Engineer providing project support and overseeing the designs, technical documentation, safety certifications, sales technical support and engineering submittals for Tecogen's cogeneration module and chiller product lines.

Supporting Evidence: Roy Depo. Trans. (Tecogen Ex. 102) at 9-11.

12

38.     Another Tecogen employee, Robert Panora ("Panora"), authored the initial draft of the text in Section 2.6 (pages 22-34) of the Tecogen Manuals, designed a lot of the content in that section, and constructed diagrams in that section. Roy then arranged and edited that content into the rest of the manual.

<u>Supporting Evidence:</u>   Roy Depo. Trans. (Tecogen Ex. 102) at 14-15, 20-21.

39.     John Freeman ("Freeman") was a Tecogen mechanical design engineer. Freeman and a Tecogen draftsman named Jim Iacobucci ("Iacobucci ") created drawings and diagrams used in the Tecogen Manuals.

<u>Supporting Evidence:</u>   Roy Depo. Trans. (Tecogen Ex. 102) at 14-15, 21-22, 24.

40.     The selection, coordination and/or arrangement of the contents of the Tecogen Manuals was created exclusively by Tecogen's employees, and every page of text, drawings/diagrams, tables and other content in the Tecogen Manuals was written exclusively by the Tecogen employees (Roy, Panora, Freeman and Iacobucci), except the following:

- All of pages 9, 10, 13, 14, 66, 67, 68, 69, which came from manufacturers of components used in Tecogen Modules. <u>Supporting Evidence:</u>   Roy Depo. Trans. (Tecogen Ex. 102) at 53-54.

- Portions of pages 11, 12, 25, 35, 36, 52, 54, 55 and 56 came from some of the Tecogen Module's component manufacturers but Roy constructed the layout on those pages for the third party information that she inserted into the layout, and she also wrote notes and created  graphics and/or tables on some of those pages. <u>Supporting Evidence:</u>  Roy Depo. Trans. (Tecogen Ex. 102) at 53-54.

41.     It took significant time and effort for Tecogen's employees to create the Tecogen Manual. Roy began work on the first version of the manual in late 2000 or early 2001. She spent 70 to 80 percent of her time over six to nine months authoring the first version.

<u>Supporting Evidence:</u>   Roy Depo. Trans. (Tecogen Ex. 102) at 22-23.

42.     To create the first version of the Tecogen Manuals, in addition to actually drafting and typing the document, Roy also put a lot of time and effort into gathering information and reviewing and discussing content with other Tecogen employees.

Supporting Evidence:   Roy Depo. Trans. (Tecogen Ex. 102) at 36-37.

43.     A lot of the content of the Tecogen Manuals consists of lessons learned from previous installations of Tecogen cogeneration modules.  In this regard, one purpose of the manual was to protect Tecogen from liability involving the installation of cogeneration manuals. Accordingly, Roy conferred with Tecogen engineers and sales people and "all the know-how from all these various people from within [the Tecogen] organization made it into different disclaimers or warnings in the drawings of what not to do, reminding installers of various things, and this, again, was based on historical experience."

Supporting Evidence:   Roy Depo. Trans. (Tecogen Ex. 102) at 38 and 39-41.

44.     The first version of the manual is dated November 2002.

Supporting Evidence:   Roy Depo. Trans. (Tecogen Ex. 102) at 34.

45.     After the first version was created, Tecogen employees (primarily Roy) continued to update and revise the manual over the ensuing years, creating versions date January 2003 and April 2003.

Supporting Evidence:   Roy Depo. Trans. (Tecogen Ex. 102) at 22, 31, 23-35.

**Aegis Had Access to Tecogen's Manual**

46.     Aegis had access to Tecogen installation manuals.

Supporting Evidence:   Answer at ¶ 22.

47.     In fact, in May 2005, Aegis submitted a copy of Tecogen's February 2005 Manual to J&M Heating in connection with the Lakeland project.

Supporting Evidence:  5-23-05 J&M Heating, Aegis Lakeland Project Submittal of Tecogen Installation Manual (Tecogen Ex. 85); Deposition Transcript of Edward Horvath (Tecogen Ex. 103) at 127-130.

**Substantial Portions of Defendants' Installation Manual
are Virtually Identical or Substantially Similar to Tecogen's Manuals**

48.     A comparison of the Specification sections in the Aegen Installation Manual dated June 2005 and Tecogen's February 2005 Manual shows many striking similarities in the text authored by the Tecogen employees, and in the selection, order and/or arrangement of the contents.

Supporting Evidence:   Aegen Installation Manual dated June 2005 (Tecogen Ex. 86); Tecogen Installation Manual dated February 2005 (Tecogen Ex. 85).[1]

49.     For example, the Aegis Installation Manual employs the same organizational structure as the Tecogen Installation Manual, using virtually the same section headings and sub-headings, in the same order.

Supporting Evidence:   *Compare* Table of Contents of Aegen Installation Manual dated June 2005 (Tecogen Ex. 86) at 2-3 *with* Table of Contents of Tecogen Installation Manual dated February 2005 (Tecogen Ex. 85) at 4-5.

50.     Furthermore, in numerous sections and sub-sections, the text of the Aegis Installation Manual is verbatim, almost identical or substantially similar to text of the Tecogen Installation Manual.

Supporting Evidence:   *See* Numbered comparison between Tecogen Ex.'s 85 and 86: verbatim (numbers 27, 37, and 41); almost identical (numbers 9-14, 16-18, 26, 40, 42, and 45); and

---

[1]     These copies have been highlighted and numbered to help show the identical and similar corresponding text and elements as between each manual.

substantially similar (2, 4, 6-8, 15, 19-22, 25, 28, 30-31, 34-36, 38, 46-49, 51-52, 54, 56, 58-61, 63-65, 70, and 72).

51.     In places, the Aegis Installation Manual contains whole sentences and, in some cases, paragraphs, that are identical to those in the Tecogen Installation Manual.

Supporting Evidence:   *See, e.g.*, Numbered comparison between Tecogen Ex's 85 and 86 (numbers 27, 37, and 41).

52.     Some information is in the Tecogen Manual not because it was required or even necessary for inclusion but for the simple and arbitrary reason that Tecogen had the information on hand so Roy decided to include it.  For example, Table 1.2 on page 7 lists Engine Specifications for Tecogen Modules.  One specification in that list is "cold cranking amps" for Starting Systems using batteries.  Roy testified that this information is not necessary for inclusion in an installation manual but she arbitrarily decided to include it in Tecogen's Manual because "the information was available."  The Aegen Installation Manual's table of Engine Specifications also includes this battery/cold cranking amps specification.

Supporting Evidence:   Roy Depo. Trans. (Tecogen Ex. 102) at 70-71; Tecogen Installation Manual dated February 2005 (Tecogen Ex. 85) at 7; Aegen Installation Manual dated June 2005 (Tecogen Ex. 86) at 6.

**All Versions of the Tecogen Manuals have been Registered with the U.S. Copyright Office**

53.     Tecogen has applied for and received a Certificate of Copyright Registration from the Register of Copyrights for the Tecogen Installation Manual dated February 2005.

Supporting Evidence:   Application for Registration (Aegis Ex. B); Certificate of Copyright Registration (Tecogen Ex. 104).

54.     Tecogen has submitted to the U.S. Copyright Office complete registration applications for each version of the Tecogen Installation Manual dated November 2002, January 2003 and April 2003.

<u>Supporting Evidence:</u>   Affidavit of Julie A. Frohlich at ¶¶ 2-5 and Tecogen Ex. 105.

                                  TECOGEN, INC.,
                                  By its attorneys,

                                  /s/ *Julie A. Frohlich*
                                  Julie A. Frohlich (BBO# 554707)
                                  Derek B. Domian (BBO# 660568)
                                  Goulston & Storrs, P.C.
                                  400 Atlantic Avenue
                                  Boston, MA  02110-3333
Dated:  July 28, 2008                (617) 482-1776

**Certificate of Service**

    I, Derek B. Domian, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


                                           /s/ *Derek B. Domian*