# Tecogen Ex. 84

IN THE UNITED STATES DISTRICT COURT 09:57
FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x
TECOGEN, INC., :
Plaintiff, :
:
vs. :
: CV 05-11823 RCL
AEGIS ENERGY SERVICES, :
INC., and AEGIS GENERATION :
COMPANY, :
Defendants. :
- - - - - - - - - - - - - - - - x

Deposition of CHRISTOPHER P. CAFER, taken pursuant to the Connecticut Practice Book, before Corinne T. Thomas, LSR, Licensed Shorthand Reporter #00439, and Notary Public within and for the State of Connecticut, held at the offices of DeLio & Peterson, LLC, 121 Whitney Avenue, 3rd Floor, New Haven, Connecticut, on September 27, 2007, at 10:03 a.m.

on-the-record comments. Right now we're on the 10:08
record. That means she takes down everything I 10:08
say, and off the record, of course, means she's not 10:08
taking down any conversation. You can't go off the 10:08
record unless we say we're off the record, so, 10:08
obviously, if you need a break, we'll give you a 10:08
break. We'll try to have a break once an hour or 10:08
thereabouts. If you want to break sooner than 10:08
that, I'll finish my question, and after you answer 10:08
my question, we'll take the break. 10:08
Any questions as to what's expected of you 10:08
today? 10:08
A. No. 10:08
Q. Now, you were made aware of this deposition 10:08
by subpoena, correct? 10:08
A. That's correct. 10:08
Q. And in a conversation with myself asking 10:08
you, too, if you wouldn't mind being in a 10:08
deposition, correct? 10:08
A. Yes. 10:08
Q. Now, we talked before regarding this case, 10:08
correct? 10:08
A. We have. 10:08
Q. My records show it to be about October 10:09
2006, and I'll be honest with you, I didn't write 10:09

the date down. Could it have been November 2006; 10:09
is that your recollection? 10:09
A. It was earlier and it was last year, 10:09
initially, I believe. 10:09
Q. And I'm going to ask you, as I did then, 10:09
questions regarding Energy Concepts role in the 10:09
Lakeland project and my notes show it to be a 10:09
14-minute conversation. So I don't think there's a 10:09
lot that will be repetitive. We'll be looking at 10:09
documents that we never discussed, obviously. 10:09
A. Okay. 10:09
Q. Can you explain for me your current 10:09
occupation and your title? 10:09
A. Yes. I'm a mechanical engineer and 10:09
associate in the firm Energy Concepts Engineering, 10:09
PC. Our primary role is that of design consultant, 10:09
professional consultant, and we do an awful lot of 10:09
work with the cogeneration and energy industry and 10:10
that was the nature of the project with the 10:10
Lakeland Central School District. We continue to 10:10
do the same scope of work, the same mission, in the 10:10
engineering field and I continue on as an associate 10:10
in the firm and lead project manager and contact 10:10
with -- typically, a primary source of contact with 10:10
the client. 10:10

Q. How long have you been with 10:10
Energy Concepts? 10:10
A. We started the firm in June of 1999. 10:10
Q. Before Energy Concepts, what did you do? 10:10
A. Same role, same duties. I was with a firm 10:10
called Sear-Brown, S-E-A-R, from the years of 1996 10:10
to 1999. 10:10
Q. How big is Energy Concepts? How many 10:10
people? 10:10
A. Right now, 26 people spread amongst three 10:10
offices, the home office being in Rochester, 10:11
New York, the other office in Brooklyn, New York, 10:11
and the other in Fort Myers, Florida. The bulk of 10:11
the personnel are in the Rochester office, which is 10:11
where I report to. 10:11
Q. You said you're a mechanical engineer. 10:11
What's your highest educational degree? 10:11
A. University of South Carolina. 10:11
Q. Is that a BS? 10:11
A. A BT. 10:11
Q. South Carolina, is that like in Aiken? 10:11
A. It is. 10:11
Q. Obviously, you were aware of this lawsuit 10:11
at least from my conversation over a year ago? 10:11
A. Yes. 10:11

Q. Have you made any prior statements 10:11
regarding this lawsuit, other than the conversation 10:11
that you had with me? 10:11
A. No. 10:11
Q. Have you discussed this lawsuit with other 10:11
people, specifically with other people at Aegis or 10:12
other people at Tecogen? 10:12
A. The only discussions I had were with my own 10:12
business partners. The subject did come up with 10:12
Jeff Glick from Tecogen who I've known for a number 10:12
of years and had a successful business 10:12
relationship, and it did come up with him during 10:12
the course of a telephone conversation probably 10:12
about two or three months ago. 10:12
Q. Can you tell me a little bit more about 10:12
that conversation. Do you remember? 10:12
A. It came up -- I've always had a good 10:12
working relationship with Jeff, so this 10:12
conversation came with up with work as it related 10:12
to Aegis Energy, their product line, and, quite 10:12
frankly, as a courtesy, I said, "I suppose you 10:12
probably know that I've been deposed in a case 10:12
that's involved Tecogen." And he said, "yes," and 10:12
I stated, "You realize that I'm in a neutral 10:12
position as the design engineer of the record. I 10:12

would certainly hope the deposition didn't affect our ongoing business relations with both Tecogen and Aegis," and he was very gracious and he said he understood that and that they were deposing people on their own side and it was a positive conversation amongst two people who've worked together for a number of years.

Q. Any conversation of substance about your deposition?

A. No. Quite frankly, I didn't know what to expect from this deposition, so I had no details to share.

Q. Any other conversations with anybody else?

A. No, just business partners and Jeff.

Q. Let's talk bout the Lakeland project, that was the main project of concern here. What were the responsibilities of Energy Concepts on the Lakeland project?

A. We were retained by the architectural firm, DCLW, out of Troy, New York, and in that retainage, it was our responsibility to be the professional engineers of design for the cogen portion, cogen being, cogeneration. You'll hear that term a lot, C-O-G-E-N.

At the heart of that design, there were

four plants, four specific school locations that involved that design and at the heart of that design is typically a cogeneration piece of equipment and that is typically an engine generator device that produces electricity and you also recover waste heat from it.

It's our design task to implement that product as well as a host of other components that make that a system, and that is what we were retained to do on a project called a performance contract in which Atlantic Energy was the performance contractor of record. We did not work for them. We worked for the architect, which was DCLW.

Q. You predisposed me to my next question. So you reported essentially to DCLW and not to Atlantic?

A. Completely to DCLW and not to Atlantic. We work in tandem and coordination with Atlantic since they essentially determine the scope of work, the budgets associated with it; however, we are charged with the responsibility of the ultimate design and the coordination of commission of that solution.

Q. Did Energy Concepts have any input into the specifications for the cogen for the Lakeland

project?

A. Absolutely. The specification is typically driven by us as the design engineer of record. That is really one of the heavier reliances upon us is not only the detailed design drawings but the specification, which is that book that's right next to the drawings. That incorporates essentially all components of the design.

The support that is not shown on the drawings, that is the manufacturer's product acceptance, very detailed verbiage that speaks to the acceptable manufacturers and product selection that support what's illustrated on the drawings.

Q. Just for the record, you pointed to the book. The book is identified at Exhibit 150 and we'll talk about that, I'm sure, later on. Mr. Cafer, I'm going to show you what's been previously marked as Exhibit 67 and ask that you take a look at it, review it and identify it.

A. I do recognize this document. The document you're showing me is a copy of our cover page to the specification book and then Section 15A601 which specifically speaks to the cogeneration units that I spoke of earlier.

Q. Did Energy Concepts create this document?

A. We did.

Q. And just for clarity, were you involved in the creation of this document?

A. I was involved with the creation of this document. In the design tasks, there are individuals that have specific responsibilities. Simply, that means by mechanical engineering in any background, I would more than likely cover, and probably did cover, all the mechanical spec sections in here.

This is considered an electrical spec section, albeit it's Section 15 -- forgive me, Division 15, which is the prefix to that specification number. Fifteen is mechanical, 16 is electrical. Much of this is written by an electrical engineer of record, whoever would have been assigned to that project.

Q. That would be Energy Concepts?

A. That still would be Energy Concepts. This would be a combination of a couple people writing the spec. So yes, it came from our office and yes, I was involved in it. There would have been another individual that would have helped me with the specification on a great level.

Q. Do you recall who?

A. Yes, Joe Narodetsky, and I'll spell it, N-A-R-O-D-E-T-S-K-Y, who has since retired from our firm.
Q. I'm going to bounce around and I apologize for that, but this is a new document to us. I'm going to show you what's been previously marked as Exhibit 150 and I'm opening up the exhibit to the 15A601 section, entitled "cogeneration units." I'm going to ask that you review it and my question is really to compare it to this drawing, which is Exhibit 67.
A. I don't see any deviations between what you've shown me in the book and the separate document.
Q. Looking at this book, Exhibit 150, explain to me what this book is and what it's used for.
A. This book is typically called a "bid document." It's part of the bid documents, the lion's share of that is a set of design drawings and a set of design specifications. That becomes what's commonly known as a "bid package." The primary use in that specification book and the drawings, for that matter, is to be able to demonstrate the scope of the work, the nature of the work and very specific design attributes and

selections for the work. That package is typically put out to contractors that are capable of performing the work. They use these documents as a guide for pricing the project, for bidding the project and for constructing the project.
Q. Okay. So we have the architect and the professional engineering firm, Energy Concepts, creating this specification drawing package, correct?
A. Correct.
Q. And that would be put out to bid for contractors, and in this particular case, the Lakeland project. Is Atlantic the kind of contractor that would bid on this? What kinds of contractors, other than Atlantic?
A. Atlantic Energy would be considered the performance contractor. They are not a constructor of the project. They facilitated the initiation of the project, if you will. They sell the project, the energy performance project to a client. They do not actually physically build it. The type of client -- the type of contractor that would address this would be a mechanical contractor, electrical, plumbing, there may be some other various trades in there, a controls contractor would be part of this

particular project.
Q. Are you familiar with the mechanical contractor J&M?
A. I am familiar with them.
Q. Did you have any relationship with them with regard to the Lakeland project?
A. Yes. They were the mechanical contractor in the Lakeland project.
Q. Is J&M the kind of contractor that would bid to the specification delineated by Exhibit 150?
A. Yes, they would be.
Q. Now, Exhibit 67 is entitled "Project Manual For the Lakeland Central School District."
Do you see that?
A. Yes.
Q. And it has, from your review, pretty much the cogeneration portion of the specification taken out of Exhibit 150, correct?
A. That's correct.
Q. Why was that created as a separate document?
A. Are you speaking about the document here or the document within --
Q. The document 67 -- Exhibit 67, why was that given its own title page and made as its own

document?
A. Typically, we generate a cover page that goes to whomever our client is, in this particular case DCLW, because that is the only document that we're generating, are those documents that are coming from Energy Concepts, so that comes out as a separate package. That then gets incorporated into a much larger package in the case of DCLW, because it's additive to their effort as well. So to my knowledge, the cogeneration portion as a bid document was not issued separately. It was bid as part of the performance contract document.
Q. So does this document, Exhibit 67, get created by Energy Concepts and then submitted to the architect to be inputted into a larger specification document?
A. That's correct. And as a matter of fact, I believe they did it by color codes, as you can see. They did mechanical in one color, they did electrical in another color, but ours, once again, is additive to the rest of the specification sections that that firm will want to put together and issue as a master document. We would not have issued just a separate cogeneration spec unless someone asked us, for the sake of simplicity, to

18

provide one to someone who was bidding only the 10:24
cogeneration. 10:24
In the scenario where perhaps you didn't 10:24
have a mechanical contractor, an owner was looking 10:24
to buy a cogeneration piece of equipment, but that 10:25
was not the case in this project. The cogeneration 10:25
spec, as well as a number of other division 15 10:25
specs, division 16 specs, would have been issued by 10:25
Energy Concepts as a document, its own book, and 10:25
that's where this cover page generates from. This 10:25
gets sent to, who was in this case DCLW, and they 10:25
package it all together into a larger document. If 10:25
you look in the table of contents, you'll see all 10:25
those other specifications listed. Exhibit 67 is 10:25
one of them. 10:25
Q. It appears from your review, and just a 10:25
cursory review of the document, that the architect 10:25
took the Energy Concepts project manual for the 10:25
cogeneration unit verbatim and put it into their 10:25
specification document. Did you see any -- 10:25
A. No. I don't see any significant changes 10:25
and that is not atypical, because they're relying 10:25
on us to be the cogen experts and providers. 10:26
Q. When you're creating a document such as the 10:26
specification for the cogeneration units, to what 10:26

19

extent are some of the requirements the same from 10:26
project to project so that you piggyback, if you 10:26
will, knowledge from an older project onto a newer 10:26
project? 10:26
A. There can be a measurable amount of that 10:26
and that's the positive component of having 10:26
successful projects in the past in which you used a 10:26
successful product selection. Piggyback is one 10:26
word, being able to bring that into the next 10:26
project with the confidence that it was a 10:26
successful project previously allows you to do 10:26
that; however, every project is looked at 10:26
individually for its application of that project 10:26
and it's not just a general understanding that 10:26
you'll be able to take that product and put it into 10:26
the next project and say, yup, it's a good spec. 10:27
That's not the case. 10:27
Every one has to be individually considered 10:27
for its merit, for its approach, its application, 10:27
for its fit into the project. You may have one 10:27
that worked in the last project, but in this 10:27
particular project, it does not suit the 10:27
application. Not that it's inferior, it's just the 10:27
wrong fit for that. It then gets edited, either in 10:27
or part of the spec or just deleted from it 10:27

20

entirely. 10:27
Q. In creating this cogeneration 10:27
specification, and I'll refer to either one, the 10:27
one in Exhibit 67 or 150, they seem to be the same. 10:27
Did you have any conversations with cogen 10:27
manufacturers to help you create this specification 10:27
document? 10:27
A. We did. There were conversations with 10:27
Tecogen. W.A. Kraft, as you see them listed there. 10:28
I don't recall any specific conversations with them 10:28
because they did not at the time have a product 10:28
that was as applicable without some substantive 10:28
changes on their part to fit the project. It was 10:28
rather evident very early on that from an initial 10:28
writing of the specification of the cogen vendors 10:28
available at the time, that Tecogen was a very 10:28
viable source for that. So in my recollection of 10:28
any conversations I had, it would have been with 10:28
personnel of Tecogen probably, and most likely Jeff 10:28
Glick, just to ensure their interest in bidding the 10:28
project and a verification of the products to 10:28
ensure that it didn't -- it didn't vary at all from 10:28
what our specification would have been. 10:28
Basically, you go back and touch base and 10:28
make sure that they're still interested in the 10:29

21

project, they do support a project such as this and 10:29
there are no glaring changes in what we're familiar 10:29
with in our specification table. 10:29
Q. Is it common in your specification writing 10:29
to have equipment manufacturers want to communicate 10:29
with you to help tailor the specifications for 10:29
their equipment? 10:29
A. I would say yes from the standpoint that 10:29
exercise in assuring that the specification is 10:29
current and doesn't have errors in it is where that 10:29
interest comes from. That contact is typically 10:29
instigated by Energy Concepts to ensure that the 10:29
document is a viable and correct document. The 10:29
calls that I'll get will be from a cogen vendor or 10:29
from a vendor of any product in that entire book 10:29
where everything was specified stating, geeze, I'd 10:29
really like to participate in your project. May I 10:30
be I allowed to specify or provide you with a 10:30
specification? 10:30
In that instance, we can look at it and 10:30
decide whether or not it's a viable option to do 10:30
that. 10:30
Q. Looking at the specification, even though 10:30
you stated that W.A. Kraft might require 10:30
substantive changes to be implemented in the 10:30

Lakeland project, you still listed them in this specification. Why is that? 10:30

A. Because they could provide a product that would have handled the application. It would have required certain design changes on our part to make that fit as viably as a Tecogen unit. 10:31

Specifically, what I mean by that is that that Tecogen neck unit is based on a 75 kilowatt generator size. Individually, each unit is capable of 75 KW, kilowatt production of electricity. At the time, W.A. Kraft, and I don't believe they still don't, but at the time, W.A. Kraft did not have a generator of that size. They had one that's larger, a 150. Being a multiple of 75, they could therefore be considered as a viable supplier of cogen should we as a design engineer have decided to take the multiplicity of the units from 75 to 150. 10:31

In a cogen plant that is a 150 cogen -- excuse me, 150 KW cogen plant, I could elect to have made that 475 KW units or two 150s. That decision is ultimately left to myself from a design standpoint in does that suit or is that the best suit for the electrical profile that the facility may have and the waste tape recovery profile that 10:32

they may have. Sometimes there's a very fine line that says yeah, it could go either way. Sometimes there's a very distinct line that says, no, this particular engine is of the best fit. Lakeland was of the more fine line. It could have gone either way, but in my professional opinion and based upon the profilers there, the 75 KW unit size was a better marriage to the scope of work than the 150; therefore, W.A. Kraft, although they can do it and should not have been excluded and we did not exclude them, it simply wasn't as good a fit, and you'll have that typically in a specification. 10:32

In many projects, if it's publically funded or State funded, you have a mandatory responsibility to bid three vendors in there and in most cases you'll find very full well that out of the three vendors, one of them is going to be superior for some reason in its nature, its size, its operating performance, its efficiency. There's a number of different things that may fall in there. So when you list a manufacturer in a specification, it's understood that one will have potential advantages over the other, based upon the absolute and ultimate fit into the project. That doesn't mean that the other product is a detriment 10:33

in any way or inferior in a major way. 10:33

Q. You had said "three vendors," but yet you only listed two. Does that mean that this specification is open to more than these two vendors? 10:33

A. Could be, yes. It could be because there was a project being a performance contractor and through the state education laws, this did not have to publically bid because the public bid portion of that was the letting of the contract to the performance contractor; therefore those laws, and I'm not intimately completely familiar with all of them, but those laws have been satisfied in the selection of the performance contractor itself. So after that, it becomes a process between the design engineer, in our case subconsultant to the architect and the performance contractor. 10:34

There is a constant conversation as to who a viable entity would be for the selection of products. There doesn't have to be a minimum quantity of selections at that point. It becomes the most appropriate selections at that point and that's a discussion with the performance contractor. They will typically look to us and say who fits this application. We initially dictate 10:34

that and then they look at it from a standpoint of yes, we would like to work with them, no; we would not like to work with them; we had experiences, good, bad or indifferent; budget considerations, whatever. That backs their decision, but we satisfy our responsibilities to the design integrity of the project by initially selecting those people that we think can do the work. 10:35

Q. Does the architect rely on Energy Concepts to make the decision as to which manufacturer best meets the specification? 10:35

A. Yes. And that's almost solely because their qualifications and their experience, this is not what they do, this is what we do. So they rely on us for the cogen input to that. 10:35

Q. So I'm going to refer you to -- we'll use Exhibit 67, the second page, Section 1.3. 10:36

Do you see that, "quality assurance"? 10:36

A. Uh-huh. 10:36

Q. Under "quality assurance," we have two sections. Section A talks about NFPA, AGA and NEC complaints. 10:36

Do you see that? And B talks about acceptable manufactures? 10:36

A. I see this. 10:36

Q. Are mechanical contractors that are bidding, such as J&M, bound to the absolute adherence of these provisions in Section 1.3? 10:36

A. They are bound -- they are more bound to the performance portion of the specification. They are bound to this, yes, but, obviously, they're going to rely on the fact that if we've listed them as viable manufacturers, we've already qualified their assurance with the things we require assurance with. 10:37

So what practically happens in the field is on this and really any other product in the product manual, the contractor will feel assured that the engineer has performed his due diligence to assure what he's already specifying is in compliance with those assurances. Are they legally bound? I don't know if I'm qualified to be able to answer that as it relates to contractual liability and that sort of thing. 10:37

I can tell you practically, they'll look at that and say the engineer has already prequalified and made that decision for us. 10:37

Q. Is it safe to say that if they choose one of the acceptable manufacturers listed in 1.3B, their approval would be an easier road than if they 10:38

don't? 10:38

A. If I understand your question, I would say yes, because, once again, they're relying on the fact that when they read this, they said Tecogen, W.A. Kraft, Energy Concepts must have performed due diligence and assured that all those compliances were in place. I would have to picture them saying we're good on this product and then they'll move to the next level of their selection criteria. 10:38

Q. But isn't it true it doesn't preclude them from offering to Energy Concepts another manufacturer? 10:38

A. It does not preclude them, no, and on other cases than this and other pieces of equipment, we are asked to entertain an alternative piece of equipment. 10:38

Q. Obviously, as you know, in this case another piece of equipment was an -- alternative piece of equipment was offered to Energy Concepts for review, an Aegin cogen. 10:38

A. Yes. 10:38

Q. What were some of Energy Concepts considerations when asked to approve an Aegin cogen? 10:39

A. Some of the major components of review 10:39

would have been the products ability to perform as per the scope of the work. The specification manual and the design drawings dictate what that performance criteria is. Not listed in order, but some of the major considerations would be that -- would be the cogen vendors or the vendors', in general, ability to support the equipment, to service it, support it, maintain it, certainly one looks at warrantees, guarantees, without a doubt the compliances to those things that the other vendors are held to and those are, as you see here, NFPA, AGA and NEC. 10:39

Those requirements that are held as a standard for everyone else, they have to meet or exceed those in that. It's a quality assurance exercise as well as an engineering exercise to evaluate that this product is as equal to or greater than, and you'll see that sort of language in specifications, equal to or greater than that which was originally specified and that can take a very detailed process. 10:40

The electrical engineer and the mechanical engineer are going to go through their specific routines and assure they're getting what they need, what they want and what fulfills the intent of the 10:40

specification. That was performed when the Aegis unit was brought to our attention. 10:40

Q. How was the -- strike that. 10:40

When the mechanical contractor selects a cogen manufacturer and then wants Energy Concepts to approve the manufacturer, the mechanical contractor would submit a document package directly to Energy Concepts or to Atlantic for Energy Concepts approval. How would that work? 10:41

A. The protocol of that would be to whomever had hired them, and in this case and which is typical, that would be the performance contractor which would be Atlantic Energy in this case. So if it was an alternative selection generating from the contractor, they would have provided that to Atlantic Energy. Atlantic Energy, in turn, would provide it to us and ask us to review that document. 10:41

The term "submittal document" comes into play because that is typically the most illustrative piece of information. It's not just a sales brochure or a four-colored multicolor marketing piece of information. It's what's called a "submittal." A submittal is usually along the lines of far more detailed information. It's the 10:42

information the engineer uses both on the product 10:42
that either has already been specified or has been 10:42
considered to use as the information for comparison 10:42
or for verification, but it would not come directly 10:42
to us from a contractor. It would go through 10:42
whomever they're contractually obligated to. 10:42
Q. Who did Energy Concepts receive the 10:42
submittal from, Atlantic on this particular case? 10:42
A. We've received it from Atlantic. 10:42
Q. From Atlantic? 10:42
A. Yes, from Atlantic. 10:42
Q. Now, for this project, it's my 10:42
understanding there were two submittals for the 10:43
cogen. The first submittal, and I'll ask and you 10:43
can correct me if I'm wrong, was from four 10:43
manufacturer Tecogen units supplied by Aegis; is 10:43
that your recollection? 10:43
A. Correct. 10:43
Q. The second submittal was -- 10:43
A. No. Forgive me. It's been a while, but I 10:43
don't recollect Aegis being part of the project on 10:43
a Tecogen solution. Tecogen was a submittal that 10:43
came to us that would have been generated by the 10:43
mechanical contractors. I recall that being in 10:43
their scope of work. I don't recall Aegis' 10:43

involvement until we were asked to consider Aegis 10:43
as a cogen vendor. And there is some, to my 10:44
recollection, and I don't recall the exact timing, 10:44
there was, at the time, if I recall, some 10:44
dissolution between Aegis, who used to be a service 10:44
provider and vendor of Tecogen equipment, and the 10:44
Lakeland project. 10:44
We were actually -- I believe, I was 10:44
actually seeing multiple vendors at that time of 10:44
the bidding phase of this project. I don't recall 10:44
Aegis actually submitting a bid. They very well 10:44
may have. Part of Tecogen's approach to the 10:44
projects in the past was territorially there were 10:44
one or more vendors that could be bid on a 10:44
particular project. There was actually a 10:44
contractor or a vendor out of Albany bidding on 10:44
this project as well. So there were multiple 10:45
people bidding. At the point of official 10:45
submittal, I got the Tecogen submittals from 10:45
Atlantic. The vendor would have been -- excuse me, 10:45
the contractor would have been getting those from 10:45
the vendor of choice, and at the moment, I can't 10:45
recall who J&M, the mechanical contractor, obtained 10:45
their submittals from. 10:45
Q. When you received the submittals from 10:45

Atlantic, the first set of submittals, there was 11 10:45
Tecogen cogens specified, correct? 10:45
A. I would have to go back and do a count over 10:45
four plants. I believe 11 was correct, four 10:45
separate schools within that district of which a 10:45
cogen plant went into each one. 10:45
Q. And there were Tecogen cogens being 10:45
submitted in the first submittal package, correct? 10:45
A. Correct. 10:46
Q. And to your knowledge, to be clear, that 10:46
submittal package came from J&M? 10:46
A. It came from Atlantic. 10:46
Q. From Atlantic through J&M? 10:46
A. Right. J&M would be tasked, as with all 10:46
submittals, to generate the submittal, provide that 10:46
to their contract with Atlantic and then provide it 10:46
to us. There may have been some, just 10:46
procedurally, just to make things more efficient 10:46
from a paperwork handling, sometimes the 10:46
performance contractor will ask that seven of the 10:46
copies -- if I remember, we usually call for a 10:46
quantity of how many submittals there are because 10:46
of the distribution involved. There are cases, 10:46
just to make the process efficient, where the 10:46
contractor, the mechanical contractor, will submit 10:46

of the eight, if eight is the number, seven of 10:46
those directly to us with a transmittal copy, one 10:46
to Atlantic Energy in this case, so they saw what 10:46
was submitted. It's just so that a box of 10:47
documents isn't floating all over the place. The 10:47
paper path is supposed to be to whom they report 10:47
to. 10:47
Q. As the engineer for the Lakeland project, 10:47
was Energy Concepts responsible for ensuring that 10:47
submittals offered equipment that met the 10:47
specifications? 10:47
A. Yes. 10:47
Q. And would it be Energy Concepts decision 10:47
and approval as to whether that equipment met the 10:47
specification? 10:47
A. Both on what would be an official submittal 10:47
and what was submitted, and, yes, if we were asked 10:47
to evaluate a comparable piece of equipment. 10:47
Q. Is a functional equivalent cogen acceptable 10:47
under these contract provisions? 10:48
A. Yes. If we've been asked and had the 10:48
opportunity to evaluate it through that criteria 10:48
that I gave you earlier, of which that's certainly 10:48
all of the items, yes. 10:48
Q. So you did not have to use a Tecogen cogen 10:48

34

for this project? That wasn't an absolute criteria? 10:48

A. No, it wasn't absolute. Tecogen was certainly used an as acceptable product. 10:48

Q. If I could point your attention to Section 1.4 on the same page of the Exhibit No. 67. Do you see under "product data," Section A, it says "submit manufacturer specifications for cogen units," et cetera. At the end it says, "and installations instructions." 10:49

Do you see that? 10:49

A. Yes, I do see that. 10:49

Q. Was an installation manual required for the submittal? 10:49

A. Yes, because we wrote it in this specification. It would be required -- if we stated we wanted to see installation instructions as part of the submittal, that would be a document that would be required at the official submittal phase. 10:49

Q. Are installation instructions the same as a manual? Let me rephrase that. 10:49

Can you provide information on installation without having to provide an installation manual? 10:49

A. Yes. 10:49

35

Q. Would that have been acceptable? 10:49

A. Yes. So long as in my estimation it provided clear and concise directions as to how that product was going to be installed, whether it fits the terminology manual or binder or document. What I look for is evidence and very clear documentation of what supports the installation of the product. 10:50

Q. If a submittal had installation instructions but was not the entire installation manual, would it still be considered? 10:50

A. If I understand your question, an entire installation manual, to me, is complete enough, in my professional opinion, if it has answered all the questions and has demonstrated what I need to see competently provided in the installation of the product. We don't dictate what a manual is and what it should include. What is understood is that it is clear and concise enough for me to be able to evaluate how the product gets installed. As long as that information is comprehensive enough, I don't know whether you call that a complete manual or not. 10:50

Q. We're going to get back to these documents, but for now, I'm going to move on. I'm going to 10:51

36

call your attention to what's been previously marked as Exhibit No. 66 and just ask that you review it. 10:51

A. I have reviewed the document. 10:52

Q. Have you ever seen this document before today? 10:52

A. Yes. 10:52

Q. Can you identify it for us? 10:52

A. I can. This is what's typically called an "addendum." An addendum issued to the contract is typically for a change or a clarification to what the original documents in the form of a specification would have indicated. 10:53

I specifically remember myself being involved in that which you've identified on the third page as the "mechanical paragraph." The addendum can be a document that's a combination of a number of different person's involvement. In this case specifically, our involvement and Atlantic. 10:53

DCLW, from a standpoint of design responsibility, I don't think had much if any at all input on any one of these items. We would not have -- Energy Concepts would not have had an impact, as an example, on the lighting scope. 10:53

37

There would have been input by Atlantic Energy as to something that they may have been involved in, specifically a very detailed portion of something that looked at the mechanical or electrical control items of cogen certainly would have been identified by us or provided by us. My familiarity, my greatest familiarity is that which is spoken in the mechanical paragraph. 10:54

Q. What we see in Exhibit 67, which I'll call an "addendum," is this additional information to the specification identified in Exhibit 150? 10:54

A. Yes. 10:54

Q. Does it go together with Exhibit 150 to form a more complete specification package? 10:54

A. Yes. It becomes a binding document to it. It is a formal document that is an addendum to that book, to that specification. 10:54

Q. So when it says the word "addendum," it really does mean it is an addition to the specification of Exhibit 150? 10:54

A. It does, and to the point this would be a bid addendum, therefore the contractor within the bid documents, the actual bid documents by which when he submits, actually has to sign off that he has received however many addendums were issued. 10:55


Q. Let's refer to the third page of this Exhibit 66, which is Bates stamped at the bottom right-hand corner as T0251.
Do you see that number?
A. I do.
Q. We might refer in general to Bates stamped numbers and that's what we mean, and the bottom right-hand corner is usually where they're located.
So the mechanical portion, as you can see, reads, "Refer to the attached sketches, A3.1, A3.2, a through c, and A3.3 for clarification of the cogeneration equipment procured from Tecogen." I will finish the sentence, the paragraph, "Equipment provided as an integrated unit from Tecogen is the equipment indicated within the, quote, by Tecogen, unquote, boundary.
Do you see that paragraph?
A. I do.
Q. Did I read it correctly?
A. I do see that.
Q. I want to talk a little bit about this paragraph and first is in the first sentence it refers to clarification of the cogen equipment procured from Tecogen?
A. Uh-huh.

Q. At this time, October 29, 2004, which is the date of the addendum, was it known that a Tecogen cogen would be the cogen used for this project?
A. At that point, it was rather evident that it was the only cogen product that was going to be specified by a potential contractor. The W.A. Kraft potential solution was, at that point, clearly evident that they were not going to get involved, that they weren't going to bid the project, that vendors weren't going to use them as a specification. So regardless of the language, what was evident at that point was that Tecogen was really becoming the preeminent manufacturer of the cogen equipment.
Q. Did this paragraph preclude a mechanical contractor from offering up an alternative to the Tecogen unit?
A. No, not all. Not in my estimation. What it did was speak specifically to a detail that's within our drawing -- and I can't recall the drawing number -- that specifically shows Tecogen as the reference for a detail and that's the detail that the, quote, unquote, by Tecogen phrase is speaking to. That detail shows in a schematic

viewport the cogen engine and a number of support pieces of equipment. It has a boundary drawn around it that said "by Tecogen," since they're a viable vendor of that equipment.
This is the package by which Tecogen would bid to you, that's what they would provide. The essence of the three sketches was to assure that there was clarification of what was on that detail. Addendums, as I said earlier, can serve three different purposes and that is to clarify, to add or to delete something from what was originally intended. This was a clarification of that detail.
Q. I'm going to get to that drawing now, but I think I'm going to go off the record so she can mark them.
(Off the record.)
(Defendant's Exhibit Nos. 151A through 151I: Marked for identification.)
BY MR. CURCIO:
Q. Mr. Cafer, I want to ask that you review what's been previously marked as Exhibit 151, Drawings A through I, and identify them for us.
A. I will. The documents you're showing me are Energy Concepts' documents that depict the cogeneration plants at two of the four sites,

Lakeland High School and Van Cortlandville Elementary. It would appear that wherever these were submitted from or whomever got these to you was looking at specific things and highlighting them at some point and they're highlighting cogen components, presumably to ensure that they have an entire cogen package for what's involved, for what's included. There are highlighted notes on hydronic schematic.
It appears it was someone's effort to go through our drawing and identify specific groups of equipment within each drawing.
Q. Are you familiar with these drawings, other than from looking at them today?
A. I am familiar with them. The initials CPC on the "checked by" are my initials.
Q. I'm going to ask that you first look at what's been previously marked as Exhibit 151F. The first thing I'm going to ask that you do is identify the date of this drawing for us.
A. The origination date would be 2/27/04. That would be a date of release from our office to, in this case, DCLW.
Q. Okay. In this drawing, there's a cogen system, correct?


A. Correct. 11:05
Q. And this is for the Lakeland High School? 11:05
A. Correct. 11:05
Q. Is it typical -- is it a typical drawing of 11:05 the other schools involved in the Lakeland project? 11:05
A. Yes. 11:05
Q. Okay. I want to point your attention to 11:05 the dashed line around the cogen with the 11:06 nomenclature "by Tecogen" as an identifier. 11:06
Do you see that? 11:06
A. I do. 11:06
Q. I want to refer you back to our Exhibit 11:06 No. 66. On the third page of Exhibit 66, Bates 11:06 number T0251 under the subtitle "mechanical," it 11:06 talks about equipment indicated within the quote, 11:06 by Tecogen, unquote, boundary. 11:06
Do you see that? 11:06
A. I do. 11:06
Q. Was this an addendum, a clarification to a 11:06 drawing which had a dashed line that said "by 11:06 Tecogen" on it? 11:06
A. I would say that it was a clarification, 11:06 but I'm also going to say there was probably edited 11:06 information on the sketches. Do you have those 11:06 available here? 11:07

Q. We'll get to at least one of those 11:07 sketches. 11:07
A. Because my recollection is that I believe 11:07 the sketches provided some change to this as well 11:07 to include some other specific pieces of equipment 11:07 to assure that those were pieces of equipment that 11:07 would be supplied by Tecogen, quote, unquote, by 11:07 Tecogen. 11:07
Q. When you say, "quote, unquote, by Tecogen," 11:07 do you really mean at the stage of this drawing and 11:07 at the stage of the addendum by the cogen 11:07 manufacturer or by the cogen engineer supplying the 11:07 cogen? 11:07
A. Being nonpublically bid, being that we have 11:07 this opportunity to be able to not have to make a 11:07 detail that's generic enough to fit everybody's 11:07 product so that multiple vendors can bid very 11:07 specifically to it. 11:07
It's of no secret that we used Tecogen as a 11:07 basis of design and that's well within our ability 11:07 to do that and not compromising anyone else in the 11:07 fact that if Tecogen is used as the basis of 11:07 design, there are specific components to their 11:08 design that show up in the detail. That's the 11:08 detail that you see here. 11:08

There was some evolution to Tecogen's 11:08 product as well in that, if my memory serves me. 11:08 The drawings that you have that you're going to 11:08 show me hold in such items like the catalytic 11:08 converter and the heat recovery silencer -- excuse 11:08 me, the boiler that you see there, the remote 11:08 exhaust gas heat exchanger and the silencer. There 11:08 was also an item called the "pump package," which 11:08 was a water hydronic pump, water pump, that serves 11:08 the unit. 11:08
Tecogen was in the midst of developing what 11:08 I believe they called their "integrated package," 11:08 too, which was brought to our attention. What that 11:08 simply means to this, in what would have been the 11:08 effort in the sketches, would be that we would have 11:08 used the sketches as a clarification and perhaps 11:08 even as a modification for this. They would say, 11:08 "Based upon the Tecogen design, ensure you included 11:09 everything within the boundary," and my 11:09 recollection is -- it was, at least, those three 11:09 items that Tecogen was now providing as a package. 11:09
Q. Would that allow the mechanical contractor 11:09 not to have to bid manpower for installing and 11:09 purchasing the additional components and relying on 11:09 the cogen manufacturer to supply them? 11:09

A. It would effectively, and I believe that 11:09 would be an impetus to do that on the cogen vendor 11:09 side as it makes a more efficient package as it's 11:09 produced. 11:09
Jeff Glick made it quite clear to me that 11:09 their product evolution at that point was to kind 11:09 of pull that into a package so things were not 11:09 separated, like the catalytic converter and the 11:09 silencer and so forth. 11:09
Q. So just to be clear, it is your 11:09 understanding that what's meant by integrated 11:09 package is it's not just the cogen but also the 11:09 additional equipment that is delineated as part of 11:09 a cogen system, such as the catalytic converter, in 11:10 a package supplied by the cogen manufacturer? 11:10
A. Yes. We would not have dictated what those 11:10 components are. That would have been generated 11:10 from the vendor, from the equipment manufacturer. 11:10 They would have alerted us or made us aware of an 11:10 improvement or modification to their equipment that 11:10 would have rendered it changed to our detail. 11:10
Q. At the time of this original specification 11:10 drawing, I see the dashed line with the "by 11:10 Tecogen" around the cogen and not around the other 11:10 components, like the catalytic converter. Was it 11:10

150

forth paragraph in that at the time it was our intent as Energy Concepts not to enter any ambiguity as it related to the addendum that we issued. That if all parties were clearly to be staying at least in conformance with that, without either before, during or after asking permission to evaluate an alternate approach, that it needed to be the CM-75LE integrated energy package purchased from Tecogen, and I believe it was my intent to try to remain neutral in this situation as a firm that said, "It's going to be that unit, it needs to be that unit procured from Tecogen." 15:25 15:25 15:25 15:25 15:25 15:25 15:25 15:25 15:26 15:26 15:26 15:26

That Aegis needed to understand that, that any alternative approach from that, and I speak to submittal not being technically deficient or suggesting as an alternate, they fully, within their right, have the ability to propose something different that would then have to be clearly stated as here's our approach and here's the way we're going to do it. 15:26 15:26 15:26 15:26 15:26 15:26 15:26 15:26

The submittal that I got from J&M, being an Aegis' submittal, indicated -- did not indicate anything greater or further, that it was a deviance, please accept this. It was our effort, once again, to assure that the intent of the 15:26 15:26 15:26 15:26 15:26

151

purchase from Tecogen of that unit specified as an integrated emissions package was fair to every one. 15:26 15:26

That, once again, did not preclude anyone from saying, would you consider this as a viable different approach? I identified that we had an issue on some switch gear in which, same thing, we wanted a package, people. Delivering different solutions but not calling it a different solution leads you to ambiguity and I did not want to go there. 15:27 15:27 15:27 15:27 15:27 15:27 15:27 15:27

Q. Did you have any discussions with Lee Vardakas or anyone else at Aegis in which you communicated your interpretation of the intent of the bid addendum? 15:27 15:27 15:27 15:27

A. Yes. 15:27

Q. What do you recall saying to him and what did he say to you? 15:27 15:27

A. Specifically with Lee, and that was Energy Concepts' task, was to ensure that there was a level playing field amongst everyone and that the addendum clearly identifies a particular solution and that solution was the Tecogen CM-75LE integrated engine package identified in the addendum. 15:27 15:27 15:27 15:27 15:28 15:28 15:28

In the same conversation, I said, if you 15:28

152

elect not to do it that way, if there is extraneous issues between Aegis and Tecogen, I am not part nor want to be part, that, if you offer a solution that's different, it will be identified as such and that's fine because we all had the wherewithal to consider that. There might be a benefit to that, but if you are going to submit an CM-75LE integrated energy package, it must be equivalent to everyone else in fairness to everyone on the playing field. 15:28 15:28 15:28 15:28 15:28 15:28 15:28 15:28 15:28 15:28

Q. Do you recall what he said to you, if anything? 15:28 15:28

A. I don't, and I wouldn't want to make the insinuation of something I don't recall because it didn't continue on the path. 15:28 15:28 15:28

Q. Could we find Exhibit 142? This is, I believe, the acceptance. It has the architect's front page. There it is. 15:29 15:29 15:29

Now, on the second page of Exhibit 142, you've already had some questions about this comment. My only follow-up is: Why did you include that comment on this document? 15:29 15:30 15:30 15:30

A. This would have been at the -- this would have been at the tail end of Atlantic Energy asking us to review the technical merit of the Aegen 15:30 15:30 15:30

153

Thermal Power 75LE, which I did. And I was asked if I could find -- well, for comparison for it to be an equal or greater than product for which I did, it suited -- forgive me, it satisfied the approach and the intent of the design drawings and the addenda to make an integrated package out of it. 15:30 15:30 15:30 15:30 15:31 15:31 15:31

I don't know that, as directed, was the proper terminology for that statement. The original, where it was rejected by me on June 22nd, would have been based upon what we talked about earlier and that was the noncompliance of buying strictly a Tecogen CM-75LE integrated package from Tecogen and this comment would have been included. 15:31 15:31 15:31 15:31 15:31 15:31 15:31

So it was to support the fact that I had received Aegen Thermal Power and found it comparable. Keeping in mind, you can't approve two manufacturers on the same project. A choice has to be made. 15:31 15:31 15:31 15:31 15:31

One would be rejected and one would have been accepted, and based upon the history of what was going to be submitted and the review of Aegen, I approved Aegen and rejected the other submittal which was not the standard package. 15:31 15:31 15:32 15:32 15:32

Q. I don't want to trip you up on dates so I 15:32

154

want to put in front of you Exhibit 30. Now, Exhibit 30 on the front cover page states, "Vendor Aegis Energy Services, date submitted 06/23/05." 15:32
Do you see that about in the middle portion of the cover page to the right? 15:33
A. June 23, '05, okay. 15:33
Q. And then there's the contractor's review stamp. 15:33
Do you see that? 15:33
A. I do. 15:33
Q. And above that in handwriting it reads, "Resubmittal number 0162305 for approval." 15:33
A. Yes. 15:33
Q. Again, knowing you don't have your log with you and the benefit of reviewing that, is it your best recollection that the submittal marked as Exhibit 30 was made on or after June 23, 2005? 15:33
A. It would be and without that log, I would assume that resubmittal on their behalf -- forgive me, it's an assumption -- would be because their initial one was rejected. When I get a rejection on any submittal -- forgive me. When I issue a rejection on a submittal, typically the next effort brought forth by the contractor is called "resubmittal of that first effort." So yes, on 15:34

155

that date and I believe that's what would motivate this as the resubmittal. 15:34
Q. So referring you back to Exhibit 142, the second page, where we've got the rejection of the first submittal and then the comment. 15:34
A. Yes. 15:34
Q. At that point in time, had you already seen the submittal? 15:34
A. I would have seen the supporting information that would have allowed me to make the determination that the thermal power wasn't equivalent, yes. And without the benefit of having it in front of me, it probably took the from of this information right here. 15:34
Q. When you say "this information right here," you're referring to? 15:35
A. Excuse me, your Exhibit 30. I would not have called it a submittal, though, because a submittal can only be called a submittal when its actually been submitted as such. It would have been an offer. 15:35
Q. To the best of your recollection, the Aegen Co. installation manual dated June 2005 was provided to you before June 23, 2005? 15:35
A. Once again, I'd have to look and see what 15:35

156

was submitted. The installation manual, I certainly typically would have required that as part of the review process for those things that I mentioned earlier and that was compatibility and installation of the layout plans and so forth. 15:35
Q. The contract documents, specifically Exhibit 150, sets forth a procedure for the approval of substitute or alternative products, correct? 15:36
A. Correct. 15:36
Q. And part of that procedure requires the submission of information to the architect, correct? 15:36
A. Correct. 15:36
Q. And then that information, if it involved cogeneration units, would have been provided or was provided to Energy Concepts, correct? 15:36
A. Yes. 15:36
Q. Do you recall receiving information about the Aegen modules other than the installation module that's included within Exhibit 30? 15:36
A. Yes. There would have been a minimum of -- I can't recall exactly what they call it. There's a data sheet that speaks very specifically to the performance criteria of the unit, both 15:36

157

mechanically, it's consumption electrically and I believe it's essentially the information you see here in the early part your Exhibit 30. 15:37
Q. Perhaps pages 5 and 6? 15:37
A. Yes. 15:37
Q. Of the installation manual? 15:37
A. Yes. An installation manual would have been provided because I would have required that for a demonstration of the interval package itself as shown in that document and the alternative approach that they used in order for me to be able to evaluate it. 15:37
Q. Could you have approved the Aegen Thermal Power cogeneration module without being provided what's marked as Exhibit 30? 15:38
A. In its entirety? 15:38
Q. Correct. 15:38
A. No. 15:38
MS. FROHLICH: Exhibit 160, please. 15:39
(Defendant's Exhibit No. 160: Marked for identification.) 15:39
BY MS. FROHLICH: 15:39
Q. Mr. Cafer, I'm handing you Exhibit 160. Take as long as you need to review it and just let me know when you're finished with your review. 15:39