# Tecogen Ex. 100

Case 1:05-cv-11823-RCL    Document 80    Filed 07/28/2008    Page 2 of 9

Lee Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

```
               UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

     ----------------------------------------x

     TECOGEN, INC.,

                       Plaintiff,

     v.                            No. 05-11823 RCL

     AEGIS ENERGY SERVICES, INC.,

     AEGENCO, INC. AND AEGIS GENERATION COMPANY,

                       Defendant.

     ----------------------------------------x
```

DEPOSITION OF LEE VARDAKAS, a witness called on behalf of the Plaintiff, taken pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Linda Bernis, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Goulston & Storrs, 400 Atlantic Avenue, Boston, Massachusetts, on Thursday, August 23, 2007, commencing at 10:00 a.m.

Case 1:05-cv-11823-RCL    Document 80    Filed 07/28/2008    Page 3 of 9
Lee Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

10

1 Q. What is your educational background?
2 A. I graduated in 1986 from the University of
3    Rochester with a degree in economics and
4    minor in political science.
5 Q. Are you currently employed?
6 A. I am.
7 Q. Who is your employer?
8 A. Aegis Energy Services.
9 Q. How long have you been with Aegis Energy
10    Services?
11 A. Since 1986.
12 Q. For shorthand, at times I will refer to
13    Aegis Energy Services as simply Aegis.
14    What is your current job title?
15 A. I'm the general manager.
16 Q. What are your current job responsibilities,
17    very generally?
18 A. Overseeing operations. You might even call
19    me the operations manager.
20 Q. Have you held past job titles while employed
21    by Aegis?
22 A. I would say, operations manager and then
23    general manager.
24 Q. In what year did Aegis get into the

11

1    cogeneration business?
2 A. 1985.
3 Q. Would you very briefly describe Aegis'
4    business at the time it first began in the
5    cogeneration industry?
6 A. When it first began in 1985, Aegis was
7    providing market development services for
8    Tecogen placing some new cogeneration
9    modulars along the east coast. We placed
10    approximately four or five machines.
11 Q. When you say placing machines, what do you
12    mean by that?
13 A. Helping to sell; marketing some.
14 Q. At that time, were there any written
15    agreements between Aegis and Tecogen?
16 A. Not that I'm aware of.
17 Q. Are you aware of any oral agreements that
18    exist between Aegis and Tecogen?
19 A. No.
20    MS. FROHLICH: Exhibit 6, please.
21    (Exhibit 6 marked
22    for identification.)
23 Q. Mr. Vardakas, I'm showing you what has been
24    marked as Exhibit 6. This is the answer in

12

1    counterclaim filed in this lawsuit.
2    Have you seen this document before
3    today?
4 A. Yes.
5 Q. You're free to look at any part of it. I'm
6    going to direct you for the moment to one
7    paragraph. It's on page 3. I'm sorry.
8    Page 11, paragraph 15.
9    The first sentence, paragraph 15 on
10    page 11 states, "Aegis Energy was an
11    exclusive distributor of Tecogen
12    cogeneration systems and part for the states
13    of Massachusetts and Connecticut."
14    Did I read that correctly?
15 A. Yes.
16 Q. Now, why does Aegis allege in that paragraph
17    that it was an exclusive distributor of
18    Tecogen cogeneration symptoms and parts for
19    the states of Massachusetts and Connecticut?
20 A. We were exclusive because we had an
21    understanding of, we had been the only
22    supplier of product throughout the years in
23    those two markets.
24 Q. Was that based on -- strike that.

13

1    Is the allegation in that sentence
2    based on the course of dealings between the
3    parties over the years?
4 A. Describe what you mean by "course of
5    dealing."
6 Q. Let me try it differently.
7    Did Aegis and Tecogen ever have a
8    written agreement concerning an exclusive
9    distributorship?
10 A. No.
11 Q. To your knowledge, was there ever an oral
12    agreement?
13 A. No.
14 Q. For which years was Aegis an exclusive
15    distributor of Tecogen cogeneration systems
16    and parts?
17 A. I would say, from 1990 through '05.
18 Q. Did being an exclusive distributor have any
19    value or benefit for Aegis?
20 A. Yes.
21 Q. What value or benefit did it have for Aegis?
22 A. It provided less competition in promoting
23    the product.
24 Q. Did being an exclusive distributor impose

Case 1:05-cv-11823-RCL   Document 80   Filed 07/28/2008   Page 4 of 9
Lee Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

                                                                14
1    any obligations or responsibilities on Aegis
2    for Massachusetts or Connecticut?
3  A. Not that I can think of.
4  Q. Look at the second sentence in paragraph 15,
5    it refers to a nonexclusive distributorship
6    for the State of New York.
7        Do you see that allegation?
8  A. Yes.
9  Q. What does Aegis mean that it was a
10   nonexclusive distributor of Tecogen
11   cogeneration systems and parts for the State
12   of New York?
13 A. Tecogen had other dealers selling their
14   systems in that market in New York.
15 Q. So if other -- strike that.
16       If Aegis did not sell a Tecogen
17   system in New York there was a possibility
18   that another distributor would sell a
19   Tecogen module?
20       MR. CURCIO: Objection.
21 A. Yes.
22       MS. FROHLICH: Mark this.
23       (Exhibit 7 marked
24       for identification.)

                                                                15
1  Q. Mr. Vardakas, did Aegis ever receive a copy
2    of what we have marked as Exhibit 7?
3  A. I don't believe so.
4  Q. Have you seen this document before today?
5  A. No.
6  Q. If you would look at the first page. Almost
7    exactly in the middle there's a second
8    whereas clause which states, "Whereas,
9    representative desires to promote and to
10   solicit the sale of certain of said
11   products."
12       Do you see that clause?
13 A. I do.
14 Q. As of 1993, separate from this document, did
15   Aegis desire to promote and solicit the sale
16   of Tecogen cogeneration modules?
17 A. We did.
18 Q. As of September 1993, did Aegis believe its
19   responsibilities as a Tecogen sales
20   representative included promoting the sale
21   of Tecogen cogeneration modules?
22 A. Yes.
23 Q. As of September 1993, did Aegis devote its
24   best efforts to promote the maximum sale of

                                                                16
1    Tecogen modules?
2  A. We devoted our efforts to maximize the sale
3    of products to maximize our revenue, not
4    necessarily maximum Tecogen revenue.
5  Q. To maximize Aegis' revenue, did it devote
6    its best efforts to promoting the sale of
7    Tecogen modules?
8  A. Ask the question again.
9        MS. FROHLICH: Can you read it
10   back.
11       (Court Reporter read back
12       last question.)
13 A. Yes.
14 Q. If you would turn to page 2 of Exhibit 7.
15   Section 5 is entitled Determination and
16   Payment of Commissions to the
17   Representative. I want to direct your
18   attention to the paragraph immediately under
19   that heading. It's got the smaller A in
20   front of it.
21       Do you see that paragraph?
22 A. I do.
23 Q. The first sentence references the
24   representatives entitlement to payment of a

                                                                17
1    full commission on each order in which three
2    conditions occurred, correct?
3  A. Okay. Yes.
4  Q. And the next sentence references a
5    distributed condition when one or more of
6    the three functions occurs in more than one
7    territory, correct?
8        MR. CURCIO: Objection.
9  A. Yes.
10 Q. As of September 1993, Tecogen paid a full
11   commission to Aegis when product
12   specification issuance of an order and
13   installation of a product occurred in Aegis'
14   exclusive territory, correct?
15 A. No.
16 Q. Let me ask you this. In 1993, were
17   commissions paid by Tecogen to Aegis?
18 A. No.
19 Q. In 1993, did Aegis purchase modules from
20   Tecogen?
21 A. Yes. We did not use a commission schedule
22   for procurement of our equipment.
23 Q. At any time, did Aegis and Tecogen begin to
24   use a commission schedule?

5 (Pages 14 to 17)

Case 1:05-cv-11823-RCL   Document 80   Filed 07/28/2008   Page 5 of 9
Lee Vardakas 5-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

Page 38

1  (Court Reporter read back
2  last question.)
3  A. No, they never specifically mentioned that.
4  Q. Even though not specifically mentioned, did
5     Aegis have an understanding that Tecogen did
6     not want Aegis to be handling competing
7     cogeneration modules?
8        MR. CURCIO: Objection.
9  Q. Let me rephrase that. Strike that.
10       At any time prior to June 24, 2005,
11    did Aegis offer to sell or install
12    cogeneration modules manufactured by any
13    person or entity other than Tecogen?
14 A. Yes.
15 Q. Please name the names of those other
16    manufacturers.
17 A. Well, there was surplus equipment that had
18    Tecogen's name on it. It was Tecogen
19    equipment, but it was surplus equipment.
20    Tecogen actually referred that equipment to
21    us because they knew we used surplus
22    equipment for our own and operate
23    agreements. So over the years we picked up,
24    we purchased many surplus machines from all

Page 39

1     over the country for use in our own and
2     operate agreements.
3  Q. From 1985 until June 24, 2005, other than
4     Tecogen brand cogeneration modules, did
5     Aegis ever buy another manufacturer's
6     modules?
7  A. We didn't purchase, we were given other
8     products to use, other surplus equipment
9     that we used.
10 Q. In that --
11 A. We did not purchase any.
12 Q. In that same time period, this is 1985 to
13    June 24, 2005, did Aegis ever offer to sell
14    or install new cogeneration modules
15    manufactured by anyone other than Tecogen?
16 A. No. We did offer to sell other generators,
17    not cogeneration modules.
18 Q. Now, Aegis bid on a project involving
19    schools in the Lakeland School District,
20    correct?
21 A. Yes.
22 Q. You're familiar with a company named Energy
23    Concepts Engineering, correct? For
24    shorthand, I may refer to that company as

Page 40

1     Energy Concepts.
2  A. That's fine.
3  Q. Energy Concepts was an engineer on the
4     Lakeland project, correct?
5  A. Correct.
6  Q. And you're also familiar with a company
7     named Atlantic Energy Services, Inc.,
8     correct?
9  A. Yes.
10 Q. Again, for shorthand, I may frequently refer
11    to Atlantic Energy Services, Inc. as
12    Atlantic. Okay?
13 A. Yes.
14 Q. Atlantic was involved in the Lakeland
15    project, correct?
16 A. Yes.
17 Q. What was Atlantic's role, very briefly?
18 A. They were the performance contractor on the
19    project. They developed the energy
20    conservation project and they were
21    responsible for its implementation.
22 Q. What does performance contractor mean?
23 A. Performance contractor is an entity that
24    will install energy conservation measures in

Page 41

1     commercial buildings and guarantee the
2     economic results from the operation.
3        By guaranteeing the economic
4     results, that's what pays for the capital
5     that was used to install the systems, but
6     the measures they would implement would be
7     not just cogeneration, they would be
8     cogeneration, it could be more efficient
9     lighting, more efficient pump motors.
10    There's a variety of measures.
11 Q. Atlantic Energy put together a proposal for
12    the Lakeland schools, correct?
13 A. They did. Well, I don't know that. I
14    really don't know that.
15 Q. When did Aegis first learn about the
16    Lakeland school project?
17 A. It was in January, I want to say, '04.
18 Q. How did Aegis learn about the project?
19 A. Energy Concepts sent us a set of drawings
20    and bid package to provide them budget
21    pricing for the installation of cogeneration
22    at that location.
23       MS. FROHLICH: Mark that.
24

11 (Pages 38 to 41)

Case 1:05-cv-11823-RCL    Document 80    Filed 07/28/2008    Page 6 of 9
Loen Vardakas 8-28-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

78

1 receiving this notice there was no
2 commission provided to a dealer for ADG
3 installations. That was confirmed in our
4 earlier conversations.
5 Q. What earlier discussions are you referring
6 to?
7 A. Some of the ones we had talked about earlier
8 today in regard to the formation of ADG and
9 how it was going to be structured if it was
10 not commissions.
11 Q. So in the earlier conversations that we
12 discussed in this deposition -- strike that.
13 Earlier in this deposition when we
14 discussed conversations, and those involved
15 American DG and its formation, at that time,
16 were there discussions about commissions
17 being paid to Tecogen sales representatives
18 when American DG was involved in a project?
19 A. Yes. I'm not sure they called it
20 commission, but some benefit to the dealer
21 who may have been in that market.
22 Q. Did Tecogen indicate whether a commission or
23 some sort of a payment would be made to a
24 dealer when an American DG project occurred

79

1 in its territory?
2 A. In the earlier times, it would not be a
3 commission.
4 Q. Did Aegis ever receive a payment when an
5 American DG transaction took place within
6 Aegis' territory?
7 A. No.
8 Q. To your knowledge, as of May 6, 2005, had
9 American DG actually closed any transactions
10 in Massachusetts or Connecticut?
11 A. To the best of my knowledge, I don't think
12 so. I don't know. I couldn't tell you with
13 any definitive.
14    MS. FROHLICH: This will be 22.
15    (Exhibit 22 marked
16    for identification.)
17 Q. Mr. Vardakas, Exhibit 22 is a purchase order
18 from Aegis to Tecogen dated May 17, 2005,
19 correct?
20 A. That's correct.
21 Q. Did you send this order to Jeff Glick at
22 Tecogen?
23 A. Yes.
24 Q. If you look on the second page, there's

80

1 handwriting that says, "please send written
2 confirmation of acceptance of this PO-Lee."
3 Is that your handwriting?
4 A. Unfortunately, yes.
5 Q. Why did you write that?
6 A. Because we were going back and forth with
7 Tecogen over terms. We were going back and
8 forth with Tecogen over pricing. And I
9 needed some confirmation to be able to move
10 ahead on this project. That's why I was
11 asking them to confirm the order.
12 Q. Who were you going back and forth with at
13 Tecogen?
14 A. Jeff Glick.
15 Q. What was Jeff Glick telling you about terms?
16 A. They were concerned about the payments from
17 the contractor to us. They were concerned
18 about -- leading up to this, they were
19 concerned about making sure they had enough
20 money in the project to pay a dealer out in
21 New York state. So they asked for us to
22 revise our order, to increase the amount to
23 compensate for some of those commissions and
24 other terms. And that's what we did.

81

1 Q. If you look at the prices in this May 17th
2 purchase order and compare them to the
3 earlier purchase order that explains the
4 increase?
5 A. That's correct. We negotiated an
6 arrangement so that Tecogen could pay some
7 level of commission to their dealer out in
8 Worcester.
9 Q. Do you recall what dealer that was?
10 A. I believe that was R.L. Kistler, as we saw
11 earlier.
12 Q. Did Jeff Glick tell you why R.L. Kistler
13 needed to be paid a commission?
14 A. Yes, he explained it, because the engineer
15 of record on the project who drew up the
16 drawings was out of Rochester. That was out
17 in Kistler's territory, he was entitled to
18 some form of commission.
19    MS. FROHLICH: This is Exhibit 23.
20    (Exhibit 23 marked
21    for identification.)
22 Q. Mr. Vardakas, we marked as Exhibit 23, a fax
23 from Tecogen to Aegis dated May 17, 2005.
24 My first question for you is, did

21 (Pages 78 to 81)

Case 1:05-cv-11823-RCL   Document 80   Filed 07/28/2008   Page 7 of 9
Lee Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

114

1   Do you see that?
2   A. No, I don't.
3   Q. Yes.
4   A. I thought you meant under the signature.
5   Q. I'm sorry.
6   A. Yes.
7   Q. Aegenco was organized on June 13, 2005, correct?
8   
9   A. Yes.
10  Q. At that time, you were an officer of Aegenco; is that correct?
11  
12  A. Yes.
13  Q. Why was Aegenco, Inc. organized?
14  A. To engage in the production of cogeneration modules.
15  
16  Q. Why were the Articles of Organization filed on June 13, 2005 as opposed to prior to that date?
17  
18  
19  A. As I indicated earlier, we had multiple prongs in our business strategy and we were not sure what road we were going to go down. The events of Lakeland pushed us down that road into the production of our own machinery.
20  
21  
22  
23  
24  

115

1        MS. FROHLICH: Exhibit 30.
2        (Exhibit 30 marked
3        for identification.)
4   Q. Mr. Vardakas, do you see the Aegenco, Inc. Agent ThermoPower Cogeneration Module Installation Manual dated June 2005, that's included within Exhibit 30?
5   
6   
7   
8   A. I do.
9   Q. Did Aegis provide that document to J&M Heating?
10  
11  A. We did.
12  Q. When was that provided to J&M Heating?
13  A. I think it was around, right around June 20th, 22nd, 23rd.
14  
15  Q. Why did Aegis provide this installation manual to J&M Heating?
16  
17  A. We sent them an engineering submittal. Towards the back of the document you will see it's kind of reversed. The submittal is towards the back here. The submittal documents included an installation manual. It was the submittal itself that we gave J&M.
18  
19  
20  
21  
22  
23  
24  Q. What was the purpose of the submittal?

116

1   A. To give J&M a package to provide the engineer to ensure that the equipment was consistent with the specifications provided by Energy Concepts.
2   
3   
4   
5        MS. FROHLICH: 31.
6        (Exhibit 31 marked
7        for identification.)
8   Q. Mr. Vardakas, Exhibit 31 is a price quotation for Atlantic Energy Services dated June 14, 2005, correct?
9   
10  
11  A. Yes.
12  Q. And did you send this price quotation to Atlantic?
13  
14  A. I did.
15  Q. If you look on the first page of Exhibit 31, the first itemized description is for Chemung County Nursing Home, correct?
16  
17  
18  A. Yes.
19  Q. It specifies four Aegen cogeneration modules plus other included equipment and services.
20  
21  A. Yes.
22  Q. Do you recall what price Aegis quoted to Atlantic for those four modules?
23  
24  A. All the machines were quoted at the same

117

1   price, and, I believe, the number was $62,000.
2   
3   Q. Was this first price quotation that Aegis or Aegenco submitted to Atlantic in connection with the Chemung project?
4   
5   
6   A. Yes.
7   Q. If you look on the second page, there's a heading, Itemized Description For Additional Modules.
8   
9   
10       Do you see that?
11  A. Yes.
12  Q. That shows five Aegen modules, correct?
13  A. Yes.
14  Q. Were those additional modules for any specific project?
15  
16  A. They had projects that they told me about, they meaning Atlantic Energy, told me about during my visit on the 14th, but they did not name them by location but they named them by various school districts they had. They needed a total of 20 machines.
17  
18  
19  
20  
21  
22  Q. Were those also $62,000 a unit?
23  A. They were.
24  Q. This proposal does not include, by this

Case 1:05-cv-11823-RCL    Document 80    Filed 07/28/2008    Page 8 of 9
Lee Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

118
1  proposal I mean Exhibit 31, does not include
2  services or maintenance, does it?
3  A. No, it does not.
4  Q. Was March 13, 2005 the date that Aegis or
5     Aegenco first learned about a project
6     involving the Chemung County Nursing Home?
7  A. We learned of it when -- I think, we learned
8     of it when J&M called us after contacting
9     our website. I lost track of the date now
10    of that event.
11 Q. But that was before June 13th?
12 A. Yes. I think it was April. I forgot the
13    date, the sequence of the dates here.
14 Q. I'm not going to try and trip you up. We'll
15    say it was the earlier time. It does --
16    admittedly that's the problem with long
17    depositions, in the afternoon you will not
18    only get tripped up, I will start even
19    getting more tripped up than I've already
20    been.
21 A. He initiated contact is what I want to
22    explain to you after contacting our website.
23 Q. After that first contact by Ed Horvath and
24    in the time in between then and the June 14,

119
1     2005 proposal or price quotation, I should
2     say, did Aegis have any conversations with
3     anyone about the Chemung project?
4  A. No. I didn't know about the Chemung
5     project.
6  Q. I'm sorry. I thought that you had said you
7     learned about Chemung from Ed Horvath.
8  A. No.
9  Q. Let me ask this.
10       When did you first learn about the
11    Chemung project?
12 A. June 13th meeting with Atlantic Energy.
13    That was the first time.
14 Q. As of June 14, 2005, did you know whether
15    Tecogen or Tecogen modules had any
16    connection with the Chemung project?
17 A. I did not know.
18 Q. As of June 14, 2005, did you know whether
19    any of Tecogen's other sales reps had any
20    connection with the Chemung project?
21 A. No, I did not know.
22 Q. Why did Aegis and Aegenco decide to submit a
23    price quotation for Aegen modules on the
24    Chemung project instead of Tecogen modules?

120
1  A. Because, based on my June 13th meeting, and
2     after seeing the product offering that Aegis
3     had presented to Atlantic, Atlantic asked
4     for us to provide a quote for the Aegen for
5     these other projects including Chemung.
6         MS. FROHLICH: Exhibit 32.
7         (Exhibit 32 marked
8         for identification.)
9  Q. Exhibit 32 is a price quotation dated
10    June 16, 2005 to Atlantic Energy, correct?
11 A. Yes.
12 Q. It's also for the Chemung project, correct?
13 A. Yes.
14 Q. Did you actually send this price quotation
15    to Atlantic?
16 A. Yes.
17 Q. What was the purpose of sending this
18    quotation two days after the June 14th
19    quotation?
20 A. That's a good question. The reason for
21    sending it was, the original pricing I gave
22    you was based on $62,000 per unit sale. The
23    second quote on the 14th was to reflect the
24    fact that the $129,000 excess from the other

121
1     component order was going to be applied
2     against the Chemung order. The revised
3     price had to reflect excess payment through
4     the Lakeland project to be applied to the
5     Chemung project.
6  Q. Between the June 14th quotation and this
7     June 16th price quote, did Aegis or Aegenco
8     discuss the Chemung project with anyone?
9  A. Just Atlantic Energy. Just Atlantic Energy.
10 Q. Who at Atlantic Energy did you discuss the
11    project?
12 A. Tim Casabonne.
13 Q. How many times did you discuss it in that
14    two day period?
15 A. I don't recall. A couple of times.
16 Q. What was said in the conversations?
17 A. He was looking for the revised price quotes
18    and a submittal package so they could submit
19    our units for those projects.
20 Q. Did he tell you anything else about the
21    projects?
22 A. No.
23       MS. FROHLICH: 33.
24       (Exhibit 33 marked

31 (Pages 118 to 121)

Case 1:05-cv-11823-RCL   Document 80   Filed 07/28/2008   Page 9 of 9
Lee Vardakas 8-23-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

122
1      for identification.)
2  Q.  Mr. Vardakas, Exhibit 33 is a purchase order
3      from Atlantic to Aegis dated June 16, 2005,
4      correct?
5  A.  Yes.
6  Q.  If you look in the upper right hand corner,
7      under job, it says, Chemung County Health
8      Center. Do you see that?
9  A.  Yes.
10         MS. FROHLICH: Let me also show you
11     -- this will be Exhibit 34.
12         (Exhibit 34 marked
13         for identification.)
14 Q.  On Exhibit 34, I'm only going to ask you
15     about the third page. You're free to review
16     any other pages within the document. I'm
17     going to be talking about the one in the
18     right hand bottom corner is T0195.
19 A.  Yes.
20 Q.  That page is a purchase order from Atlantic
21     to Aegis dated June 17, 2005, correct?
22 A.  Yes.
23 Q.  Was this purchase order actually received by
24     Aegis?

123
1  A.  Yes.
2  Q.  Now, with respect to both of these purchase
3      orders, Exhibit 33 and the third page of
4      Exhibit 34, did Aegis or Aegenco engage in
5      any negotiation of the prices on these
6      purchase orders with Atlantic?
7  A.  In what time frame?
8  Q.  At any time, were the prices actually
9      negotiated by those two parties?
10 A.  Aegis and Atlantic had negotiated the price
11     between the 13th and the 14th, if that's
12     what you're referring to. The 14th, the
13     $62,000 was the price that was submitted and
14     it was never negotiated again.
15 Q.  In the course of the negotiations, was there
16     any discussion or consideration inside Aegis
17     or Aegenco regarding the price that Tecogen
18     might charge for its modules on either of
19     these projects?
20 A.  No, it was not discussed.
21 Q.  Did you negotiate the prices with Atlantic?
22 A.  I did.
23 Q.  Did you think about the prices that Tecogen
24     could charge for its modules on either of

124
1      these projects?
2          MR. CURCIO: Objection.
3  A.  I took many factors into consideration when
4      pricing the cogeneration modules, including
5      our cost to produce them, our margin and
6      pricing from competitive product.
7  Q.  Were the Tecogen modules competitive
8      products that you took into consideration in
9      thinking about your own prices?
10 A.  Yes.
11         MS. FROHLICH: Exhibit 35.
12         (Exhibit 35 marked
13         for identification.)
14 Q.  Exhibit 35 is a letter from Aegis to
15     Atlantic dated June 23, 2005; is that
16     correct?
17 A.  Yes.
18 Q.  Was this letter actually sent to Atlantic?
19 A.  I believe so.
20 Q.  Who was John DaSilva?
21 A.  My sales and marketing manager.
22 Q.  Is he still with -- strike that.
23         Was he an employee in June of 2005
24     of Aegis?

125
1  A.  Aegis, that is correct.
2  Q.  Is he still with Aegis?
3  A.  Yes.
4          MS. FROHLICH: Exhibit 36.
5          (Exhibit 36 marked
6          for identification.)
7  Q.  Exhibit 36 is dated August 1, 2005, correct?
8  A.  Yes.
9  Q.  This letter is addressed to you; is that
10     right?
11 A.  Yes.
12 Q.  Did you actually receive this letter?
13 A.  Yes.
14 Q.  At any time either before or after your
15     receipt of this letter, did you discuss the
16     cancellation of the purchase order that's
17     referenced in this letter with either Mr.
18     Casabonne or Mr. Brock?
19 A.  I discussed it with Tim Casabonne.
20 Q.  How many discussions did you have with Mr.
21     Casabonne about the cancellation of the
22     Chemung order?
23 A.  Several conversations.
24 Q.  Do you remember any specific conversation?