# Tecogen Ex. 102

Case 1:05-cv-11823-RCL    Document 82    Filed 07/28/2008    Page 2 of 13
Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3

4         ---------------------------------x

5     TECOGEN, INC.,

6                              Plaintiff,

7                                              Civil Action No.

8     vs.                                      05-11823(RCL)

9

10    AEGIS ENERGY SERVICES, INC.,

11    AEGENCO, INC., and AEGIS

12    GENERATION COMPANY,

13                              Defendants.

14    ---------------------------------x

15

16

17             DEPOSITION OF JEAN ROY, a witness called by and

18    on behalf of the Defendants, taken pursuant to the

19    applicable provisions of the Federal Rules of Civil

20    Procedure, before James A. Scally, RMR, CRR, a Notary

21    Public in and for the Commonwealth of Massachusetts,

22    at the offices of McCarter & English, 265 Franklin

23    Street, Boston, Massachusetts, on Friday, July 27,

24    2007, commencing at 9:28 a.m.

1

Case 1:05-cv-11823-RCL    Document 82    Filed 07/28/2008    Page 3 of 13

Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

**6**

1    A.  Okay.

2    Q.  -- because he'll need to hear a yes or a no.  Hand

3   gestures are okay, but he won't capture them.

4        This is a lawsuit that's stylized as Tecogen

5   versus Aegis Energy Services, et al, and it deals with

6   copyright infringement and unfair competition and tortious

7   interference with business practices.  You're here for the

8   issue of copyright infringement.  You understand that?

9    A.  Yes.

10    Q.  For the installation manual.

11    A.  Yes.

12    Q.  Okay.  Did you take any medications or anything

13   before you came here today?

14    A.  No.

15    Q.  Are you on any medications that would prohibit you

16   from thinking clearly and speaking clearly?

17    A.  No.

18    Q.  Okay.  Are you in any pain or discomfort?

19    A.  No.

20    Q.  Have you had any prior deposition testimony?

21    A.  No.

22    Q.  Have you ever been to trial, had testimony at

23   trial?

24    A.  No.

**7**

1    Q.  Okay.  So a deposition, then, I'm sure your

2   attorney explained it to you, but I'm going to ask you

3   questions on the record, and you'll answer as truthfully as

4   you can.  If there's objections, she'll -- she'll utter an

5   objection and you'll wait until her objection is done, and

6   we'll go forward from there.  It's a pretty straightforward

7   procedure.

8        You're under oath; if you lie, it's perjury.  So

9   I'm sure you're aware of that, but I mention it anyway.

10        And the stenographer here will take all, you know,

11   everything we say down.  There will be points where we'll

12   say "off the record," he'll stop taking transcripts, we

13   will talk, but right now we're on the record.  So

14   everything we say is being taken down.

15    A.  Okay.

16    Q.  I like to do a break about once an hour, five

17   minutes, and we will talk about lunch when we get to that

18   point.  So if you want to break sooner, you know, by all

19   means.  I just wouldn't want to upset too much of the flow

20   of my questions, but I'm certainly amenable if you need a

21   break; just say you need a break.

22    A.  Okay.

23    Q.  So you understand everything I said?

24    A.  Yes.

**8**

1    Q.  Do you have any questions about what I said?

2    A.  No.

3    Q.  Okay.  Okay.  So you said your name, your full

4   name, is Jean Roy, correct?

5    A.  Yes.

6    Q.  Are you known by any other names?

7    A.  Oh, my maiden name is Pagliarini.

8    Q.  Can you spell that for him?

9    A.  P-a-g-l-i-a-r-i-n-i.

10    Q.  And your current address?

11    A.  26 Ogden, O-g-d-e-n, Lane, in Middleton,

12   Massachusetts.

13    Q.  Okay.  That would be your mailing address as well?

14    A.  Yes.

15    Q.  Okay.

16    A.  ZIP code is 01949.

17    Q.  And I won't ask for your residence phone number.

18   Can you give your business phone number?

19    A.  (781) 466-6431.

20    Q.  Are you employed by Tecogen?

21    A.  Yes.

22    Q.  When did you start that employment?

23    A.  1985.

24    Q.  '85, okay.  And have you been with Tecogen since

**9**

1   1985?

2    A.  Yes.

3    Q.  Have we ever met before?

4    A.  No.

5    Q.  Have we ever talked before?

6    A.  No.

7    Q.  Okay.  What's your title at Tecogen?

8    A.  Operations manager.

9    Q.  That's your current title?

10    A.  My current title, yes.

11    Q.  Okay.  What's that consist of?

12    A.  I oversee the manufacturing operation; I also

13   oversee the product development.  We have some R&D

14   contracts, so I'm the program manager on those contracts.

15    Q.  So you're also a manager, just so I get it

16   straight, manager on project development contract as well?

17    A.  Yes.

18    Q.  And what are some of your tasks or

19   responsibilities when you oversee manufacturing?

20    A.  There's a staff of, let's see, three people that

21   work directly for me, a production supervisor who has seven

22   production workers working for him, a purchasing person,

23   and a manufacturing coordinator.  So I oversee the three of

24   them to make sure we produce our equipment, you know, on

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Case 1:05-cv-11823-RCL    Document 82    Filed 07/28/2008    Page 4 of 13
Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

**10**

1  time, and meet all our deadlines, and there's all the
2  engineering, bill of materials, that have to be managed,
3  engineering drawings, materials management. So I'm
4  responsible for all of that.
5      Q. How long have you held the position operations
6  manager?
7      A. Just a year.
8      Q. What were you before that?
9      A. I'm just trying to think of my exact title.
10 Program manager. Since 2004 I was directly overseeing R&D
11 contracts for product development.
12     Q. Explain to me what you mean by R&D contracts for
13 product development.
14     A. We get funding or we did get funding from the
15 California Energy Commission to develop the next generation
16 of our cogeneration model, module. So that was one of the
17 projects I was overseeing.
18     Q. You said California Energy Systems?
19     A. California Energy Commission.
20     Q. Commission.
21     A. Also, you know, we have two major product lines
22 with several different versions, so I was overseeing any
23 changes in the designs. We have a staff of three
24 engineers, myself being one of them. So in addition to the

**11**

1  engineering, I was just coordinating all the design efforts
2  and design changes.
3      Q. And that was since 2004. Prior to 2004, what were
4  you doing?
5      A. There were no direct R&D contracts prior to that.
6  So I was a project engineer.
7      Q. And what did you do as a project engineer?
8      A. Same thing: Project support, overseeing the
9  designs, technical documentation, the safety certifications
10 of our products, sales technical support, engineering
11 submittals.
12     Q. And that was -- let me ask you, was that from '85
13 to 2004, essentially as project engineer, or were there
14 other titles/tasks, responsibilities that you did? That's
15 a long time frame, I realize.
16     A. Yeah. If I start back at '85, I worked in
17 industrial R&D specifically as an entry level engineer.
18 In '89, I worked directly for the product group for the
19 Tecogen products, cogeneration and chillers. In the '90s I
20 was mainly working on chiller product development, and then
21 in '99, 2000, I was involved in both product lines.
22     Q. Any history in the military?
23     A. No.
24     Q. Your education, what's the highest level of

**12**

1  education?
2      A. I have a master's degree from Northeastern in
3  mechanical engineering.
4      Q. Any extra study beyond the normal coursework for a
5  master's?
6      A. No.
7      Q. Any seminars or something that would add to your
8  education that you might want to put on your resume?
9      A. No.
10     Q. Have you made any prior statements concerning this
11 lawsuit to anybody?
12         MS. FROHLICH: Objection.
13         MR. CURCIO: Can you say what you're
14     objecting to?
15         MS. FROHLICH: Prior statements, do
16     you mean oral, written?
17     Q. Let's start with oral, but I'm going to mean all
18 communications. So any oral statements to people regarding
19 this lawsuit.
20     A. Can you clarify people?
21     Q. Obviously you probably told friends, "I have a
22 deposition." I don't mean that. But did you talk at all
23 in substance about the lawsuit with anybody?
24     A. Other than our own company employees?

**13**

1      Q. No.
2      A. No.
3      Q. Inclusive of your company employees.
4      A. Yes.
5      Q. And who would they be?
6      A. Employees within our company. Do you want the
7  names?
8      Q. Yes.
9      A. Robert Panora, Jeff Glick, Wes Schuster, John
10 Freeman, Joe Gehret.
11     Q. Any conversations with any of these individuals
12 without Julie present or without an attorney present?
13     A. Yes.
14     Q. Okay. What did you speak with Mr. Panora about
15 when your counsel wasn't present?
16         MS. FROHLICH: May I also remind the
17     witness that Derek Domian is also a lawyer,
18     so his presence, either in person or on the
19     phone during conversations, is something to
20     bear in mind. You're not to talk about
21     statements that were made with either Derek
22     Domian or myself also being involved.
23     Those are attorney-client privileged
24     communications.

4 (Pages 10 to 13)

Case 1:05-cv-11823-RCL    Document 82-7    Filed 07/28/2008    Page 5 of 13
Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

14

1    THE WITNESS:  I see.
2    Can you repeat the question again?
3    MR. CURCIO:  Why don't you read it
4  back so we have it.
5    (Question read.)
6    A.   In the course of the lawsuit, we've had to gather
7  documents, answer interrogatories, so we just had
8  discussions about our answers, you know, where to get the
9  documents, things of that nature.
10  BY MR. CURCIO:
11    Q.   Did you talk about the installation manual?
12    A.   Yes.
13    Q.   Did you talk about the contents of the
14  installation manual?
15    A.   Yes.
16    Q.   Did you talk at all with regard to Tecogen's claim
17  of copyright infringement of the installation manual?
18    A.   Yes.
19    Q.   And what were those conversations?
20    A.   Basically the nature of the complaint and just
21  reviewing amongst ourselves the actual history of that
22  manual.
23    Q.   Okay.  What was the actual history of the manual
24  that you reviewed?

16

1    Q.   Okay.  And how did you relay your comparison, the
2  results of your comparison?  How did you relay that
3  information?
4    A.   Verbally at first, you know.
5    Q.   Did you write anything down?
6    A.   No.  Initially?
7    Q.   At any time.
8    A.   I guess I'm a little confused on what you mean.
9  Did you write a dissertation of the comparison, what each
10  of the manuals --
11    Q.   How did you convey to another person in-house that
12  you did a comparison and "these are my results"?
13    A.   Simply by looking at the two of them, you could,
14  you know --
15    Q.   So orally?
16    A.   Orally, okay, yes.
17    Q.   Okay.  So there was nothing written for your
18  comparison?
19    A.   Not at that time, no.  Later we were asked by our
20  lawyers to compare side by side and for me to write down
21  not necessarily what was similar, but what things weren't
22  original, what items in that manual were not original.
23    Q.   So --
24    A.   That was the only written interaction I had on the

15

1    A.   I wrote the manual in the beginning in about 2000;
2  you know, Bob Panora had a lot of input to certain
3  sections; John Freeman had input to a lot of sections,
4  drawings mainly.  But just discussions on the evolution of
5  that manual, just --
6    Q.   Did they ask you to compare the manual to an Aegis
7  manual?
8    A.   I think we were asked by an interrogatory about
9  the manual.
10    Q.   Did you compare it?
11    A.   Oh, yeah.
12    Q.   How did you convey your comparison?  Who did you
13  answer to?
14    A.   Internally, do you mean?  Because I'm a little --
15  or --
16    Q.   You were asked to compare the manuals, correct?
17    A.   Yes.
18    Q.   Who asked you?
19    A.   I mean I don't recall, you know.  This lawsuit
20  came up a couple, two years ago.  I don't recall exactly
21  the course of the conversation, but I was given a copy of
22  the manual from Aegis's version of the manual.  Since I
23  wrote this manual, it was my natural inclination to compare
24  the two.

17

1  manual.
2    Q.   So the written interaction dealt with the items
3  that were not original?
4    A.   Correct.
5    Q.   There are no written correspondence regarding what
6  was similar?
7    A.   Correct.  Yes.
8    Q.   We were -- we received a highlighted version of a
9  manual showing similarities, alleged similarities.  Were
10  you aware of creating that highlighted version?
11    A.   Showing similarities?
12    Q.   Yes.
13    A.   No.
14    Q.   Did you see that highlighted version?
15    A.   I saw it a couple of days ago for the first time.
16    Q.   For the first time?
17    A.   Uh-huh.
18    Q.   Did you prepare for this deposition?
19    A.   Yes.
20    Q.   How did you prepare?
21    A.   I met with Julie, and I also reviewed both manuals
22  again just because I wrote that manual, you know, seven
23  years ago.  Just wanted to refamiliarize myself with a lot
24  of the content.

5 (Pages 14 to 17)

18

1     Q.   Anybody else that you talked to about your
2    preparation other than Julie?
3     A.   Bob Panora.
4     Q.   Okay.  And what was your conversation with him
5    about?
6     A.   It was -- well, I guess he was involved with the
7    conversations with Julie.  So it was just general
8    preparation for the deposition.
9     Q.   So he was present during your conversation with
10   Julie?
11    A.   Yes.
12    Q.   Okay.  Any other documents you reviewed in
13   preparation?
14    A.   The complaint, I saw the complaint that we
15   supplied.  And the interrogatories, at least one of the
16   interrogatories.  I don't know if there was more than one.
17    Q.   Was that the first time you saw the
18   interrogatories?
19    A.   In this final format, you know, as I said, I was
20   involved in answering some of the questions, so I was
21   familiar with the content, but I never saw the final
22   version.
23    Q.   What documents have you written, authored, or co-
24   authored at Tecogen?

19

1     A.   Well, dating back to the early '90s, the operation
2    and maintenance manual for the ST chiller, then it later
3    went on to our DT chiller.  A product manual for the
4    chillers.  A mission control manual for the engine.  In the
5    late '90s, I developed engineering submittals for the
6    chiller product line.  An installation manual for the
7    chillers, actually prior to those submittals, and then the
8    installation manual for the cogeneration product.  And I've
9    been involved in various sections of all of our product-
10   line manuals because one evolves from the other.  And we're
11   constantly having to update them because of design changes
12   or other errors we might have found.
13    Q.   I'm going to show you an exhibit which we will
14   mark Defense Exhibit number 1.
15           (Exhibit 1, notice of deposition,
16       marked.)
17    Q.   Were you given -- do you recognize this document?
18    A.   No.
19    Q.   Were you given this document?
20    A.   No.
21    Q.   Normally at this point I'd say were you asked to
22   appear predicated on what's requested in this document, but
23   I will withdraw that statement.  Okay.  We'll just leave it
24   as Exhibit No. 1.

20

1           (Exhibit 2, 2/05 cogeneration module
2        installation manual, marked.)
3     Q.   Look at what we've marked as Defense Exhibit No.
4    2.  Do you recognize this document?
5     A.   Yes.
6     Q.   Can you identify it for us?
7     A.   It's a Tecogen cogeneration module installation
8    manual.
9     Q.   And how do you know that?
10    A.   I created it.
11    Q.   Okay.  I know you said before that Mr. Panora had
12   input.
13    A.   Yes.
14    Q.   Can you tell me if he is a co-author of this
15   document with you or is it just that he gave you some
16   technical input?
17         MS. FROHLICH:  Objection.  You can
18      answer.
19    A.   He wrote a specific section and designed a lot of
20   the content of that section.
21    Q.   Okay.
22    A.   So I guess --
23    Q.   Can you identify that section for me?
24    A.   Sure.  That would be section 2.6, the "External

21

1    Water Piping For Heat Recovery."
2     Q.   Beginning on page 22?
3     A.   Yes.
4     Q.   And going through page -- I guess I will ask you.
5     A.   34.
6     Q.   Thank you.  So you had no input in that section?
7     A.   I wouldn't say I had no input.  He did the
8    baseline writing and the, you know, the construction of the
9    diagrams, but I actually put them in the document and, you
10   know, arranged them, edited them, made it flow with what we
11   had already.
12    Q.   Did Mr. Panora have input in any other section?
13    A.   He reviewed the whole document, made comments.
14    Q.   As a writer, did he write any other section?
15    A.   No, I don't think so.  No.  Just in terms of
16   editing.
17    Q.   You also mentioned Mr. John Freeman had input or
18   at least helped extensively in writing this.  What was his
19   responsibilities in this -- in the construction of this
20   manual?
21    A.   Well, his responsibility wasn't as much in the
22   writing.  It was in the design drawings.  He was our lead
23   mechanical design engineer.  We also had a draftsman as
24   well that made a lot of the editorial changes.  What I -- I

6 (Pages 18 to 21)

Case 1:05-cv-11823-RCL    Document 82    Filed 07/28/2008    Page 7 of 13
Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

22

1    determined what drawings made sense to go in here, what
2    format, you know, the notes and so forth, but the actual
3    machine design is not my work, you know, the AutoCAD work
4    is not my work.
5        Q.  So John did the AutoCAD for the drawings based on
6    your request?
7        A.  Well, some of them already existed, so he would
8    modify to fit the manual, and, like I said, we had a
9    draftsman as well doing that.
10       Q.  When did you write this document?
11       A.  I believe it was late 2000 when I started, 2001,
12   that time frame, for the first version.  However, over the
13   last seven years, we continued to make updates.  So I've
14   been interacting with it, you know, updating it all along.
15       Q.  Let's start with the first version.
16       A.  Yes.
17       Q.  On this manual, it says "Installation Manual
18   February 2005."
19       A.  Yes.
20       Q.  What would the first version say?  "Installation
21   Manual," what would be the date of the first version?
22       A.  I don't recall the exact date, but it would be
23   something, I think, 2002, maybe February 2002, or April.
24       Q.  So when you referred to your efforts to create the

24

1    portions of the machine have been taken from a
2    manufacturing drawing.  That's where you start with the
3    base design, and you, you know, cut and paste, so to speak,
4    to get the main picture in the drawing, but the
5    installation drawings are very different in what you
6    highlight of that piece of equipment.
7        Q.  Okay.  So Mr. Freeman would take an existing
8    drawing and highlight or emphasize certain portions to help
9    the installation description?
10       A.  Right.  And the notes, you know, based on -- I
11   think I constructed most of the notes by putting those in
12   there.  And I just want to reiterate there was another
13   gentleman who helped with that, another draftsman.
14       Q.  Who was that?
15       A.  His name was Jim Iacobucci.
16       Q.  Can you spell that?
17       A.  Jim, I-a-c-o-b-u-c-c-i.
18       Q.  After the first version was created, there were
19   other versions, correct?
20       A.  Correct.
21       Q.  Were you involved in updating the other versions?
22       A.  Yes.
23       Q.  Can you walk me through the versions and how much
24   work entailed the -- the updates entailed?

23

1    manual, you're including not just the efforts to update
2    this February 2005 manual, but also the work to create the
3    original?
4        A.  Yes.
5        Q.  Let's start with the original manual, your first
6    initial effort.  How long did it take you to create that
7    first document?
8        A.  It took over the course of six to nine months.
9        Q.  Were you working full-time on it over the course
10   of six to nine months?
11       A.  I would say mainly probably, you know, 70 to 80
12   percent of the time on it.
13       Q.  Was Mr. Freeman at that time working with you on
14   it?
15       A.  Not at that level.  You know, a lot of the design
16   drawings were already -- the base machine design was
17   already created, so, but, yeah, he would be working as I
18   needed things, working with me along those times.
19       Q.  When you say the base machine design was already
20   created, was Mr. Freeman creating documents for -- drawings
21   for matters other than just to put in the installation
22   manual?
23       A.  The drawings that are specifically in the
24   installation manual are for the installation manuals, but

25

1        A.  It would be difficult to extract each update
2    without really studying them, but I can say, you know, in
3    general we've added appendices in each updated version and
4    made corrections.  So, for example, I think we're up to
5    four appendices now.  I think the original version only had
6    one or maybe two.  So we've added two more since then.  If
7    I went through page by page, side by side, I could -- I
8    could tell you what's been changed, but I haven't done that
9    exercise.
10       Q.  Okay.  In the course of your work at Tecogen, are
11   you required to fill out time sheets?
12       A.  Yes.
13       Q.  And on those time sheets, they delineate what you
14   did for that day, week, or month?
15       A.  Yes.  Yes.
16       Q.  By a project number or a code number or otherwise?
17       A.  Project number, account number.
18       Q.  Did you fill out time sheets with respect to your
19   work in preparing the first version of the installation
20   manual?
21       A.  Yes.
22       Q.  Are they reviewed by a supervisor, a manager above
23   you?
24       A.  Yes.

7 (Pages 22 to 25)

Case 1:05-cv-11823-RCL    Document 82    Filed 07/28/2008    Page 8 of 13

Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

26

1    Q.  Who would that be?
2    A.  Robert Panora.
3    Q.  And that would be Robert Panora at the time of the
4    first installation manual?
5    A.  Yes.
6    Q.  And it would be Mr. Panora at the time of the
7    revisions as well?
8    A.  Yes.
9    Q.  How were the time sheets prepared?  Daily, weekly?
10   A.  Usually weekly.
11   Q.  How would you designate on the time sheet that you
12   were preparing an installation manual?
13   A.  Well, the installation manual isn't a billable
14   project.  You know, it's overhead.  So it would be captured
15   under an overhead number.  That wouldn't necessarily
16   separate it from other tasks.
17   Q.  So it's -- you could have done non-installation
18   manual-related work and put it under the same overhead
19   project number?
20   A.  I guess what I'm saying is if you looked at a time
21   sheet, there wouldn't be a specific number for installation
22   manual.  There are specific numbers for other things,
23   mainly billable jobs, billable to outside --
24   Q.  Is there any way for a third-party reviewer to

27

1    look at your time sheet and say "That's where she worked on
2    the installation manual"?
3    A.  Probably not.
4    Q.  Were you ever asked to present your time sheets in
5    response to this litigation?
6    A.  No.
7    Q.  Would you keep the time sheets or would someone
8    else keep the time sheets?
9    A.  Our accounting group would keep them.
10   Q.  Accounting.  Were you asked to determine how long
11   you worked on the creation of the installation manual?
12   A.  Yes.
13   Q.  And what was your response?
14   A.  It was a difficult number to come up with.  200
15   hours was the estimate, but in thinking about it and
16   looking at all these versions, that was probably
17   conservative.
18   Q.  How did you come up with the 200-hour number?
19   A.  Just an estimate based on the content of this
20   manual and the writing involved, and it was an estimate.
21   Q.  Were you asked to estimate anybody else's hours or
22   were they individually asked?
23   A.  Individually asked.
24   Q.  Did you corroborate with them, Mr. Freeman in

28

1    particular, just to figure out, help him figure out how
2    many hours he came up with?
3    A.  No.
4    Q.  How many hours do you think Mr. Panora spent on
5    this installation manual writing?
6    A.  Probably in the order of 100 to 200.
7    Q.  Are there any documents or documentation,
8    accounting, at Tecogen that would help corroborate your
9    statement that it took you approximately 200 hours to write
10   the installation manual?
11   A.  I don't know.  You know, I don't recall exactly
12   what the timecard said back in 2000, how we filled it out.
13   My guess is, though, if it's an overhead number, that's not
14   going to delineate this versus something else.
15   Q.  Is it the same overhead number over the course of
16   the years?
17   A.  Yes.
18   Q.  Or would it be a different overhead number?
19   A.  It's the same.
20   Q.  What is that?
21   A.  Engineering overhead.  Do you want the number
22   itself?
23   Q.  If I saw a time sheet, how would I know it was the
24   overhead?

29

1    A.  It's 7010460.
2    Q.  Does Tecogen have a document control procedure?
3        MS. FROHLICH:  Objection.
4        THE WITNESS:  So I answer?
5        MS. FROHLICH:  If you can.
6    A.  Specifically regarding this, no.
7    Q.  Regarding the control of documents that the
8    company creates, does Tecogen have an in-house --
9    A.  A written procedure?
10   Q.  Yes.
11   A.  No.
12   Q.  Do they have a procedure that's known, written or
13   otherwise?
14   A.  Yes.
15   Q.  Can you explain to the best of your knowledge how
16   that procedure would work?
17   A.  Specifically on a document revision, is that what
18   you're referring to?
19   Q.  Well, I'll break it into two.
20   A.  Okay.
21   Q.  The first is a procedure for creating a document,
22   if there is one understood in the company, written or
23   otherwise; and then a procedure or methodology the company
24   follows to revise the document.

8 (Pages 26 to 29)

Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

30

1    A.   There's no specific procedure for creating a
2    document. It was left up to, you know, my discretion as to
3    how I wanted to lay it out, what content we needed. Of
4    course, there was some internal discussions amongst
5    salespeople, other engineers to the general nature of what
6    should be in it. But when I set out to write it, it was
7    purely my, you know, own creative license, so to speak, to
8    write it and lay it out, organize it.
9         As far as revisions, what typically happens is
10   different people within the company may pick up an error or
11   something that's changed or we know of a design change, we
12   create new drawings. We capture those all at one time. In
13   other words, we wait a certain amount of time to do a
14   revision; we won't just do it once we see one mistake or
15   one change. We will probably wait until we have a
16   reasonable amount. So we will do it all at once, make the
17   changes, and change the date on the manual so we know that
18   we have a revision. And then we let the relevant people
19   know, our salespeople, customers that are in the process of
20   installing a unit.
21        Q.   Who accumulates the changes?
22        A.   Me. I do.
23        Q.   For the installation manual?
24        A.   Uh-huh.

31

1         Q.   In essence, is it the author of a document that
2    would accumulate the changes for that document?
3         A.   Typically. We're a small company, and there's
4    three engineers, so on other manuals any one of us have
5    done updates, so, you know, it's somewhat -- it's not that
6    rigid as to who actually does the update. But I know on
7    this manual I happen to be the one that has done all the
8    updates.
9         Q.   Is there a set revision -- I'm sorry -- a set
10   review of the manual before it's considered finished?
11        A.   With each revision, do you mean? No. There's no
12   committee or formal review. And I'm --
13        Q.   That's all right. Are there any documents with
14   signature that say, "I reviewed the document and it's good
15   to go; it's good to be used"?
16        A.   No.
17        Q.   So how do you know when you've gotten the
18   requisite approval to send this document out of the house?
19        A.   It's -- it's, you know, my judgment that it's
20   suitable, suitably revised and can -- you know, I'm
21   responsible for it.
22        Q.   Is there any document history performed by Tecogen
23   with respect to the installation manual so that they
24   archive older versions?

32

1         A.   We have a copy of older versions in the event that
2    someone has an older version and refers to it.
3         Q.   Does Tecogen have a document controller or
4    configuration control department or person that's
5    responsible for making sure that the documents are archived
6    correctly?
7         A.   No.
8         Q.   And maintained?
9         A.   No.
10            (Exhibit 3, 4/03 cogeneration module
11            installation manual, marked.)
12        Q.   I'm going to give you what we've marked as Defense
13   Exhibit No. 3. Do you recognize this document?
14        A.   Yes.
15        Q.   What is it? Can you identify it?
16        A.   It's a Tecogen installation manual for the
17   cogeneration module.
18        Q.   Were you an author of that document?
19        A.   Yes.
20        Q.   Were you a co-author of that document?
21        A.   Yes.
22        Q.   Was Mr. Panora, I assume, was the other author?
23        A.   Yes.
24        Q.   Anybody else help you write that document?

33

1         A.   Write it, no.
2         Q.   Did you receive technical input from others in
3    writing that document?
4         A.   Yes.
5         Q.   How long did it take you approximately time wise
6    to update Exhibit No. 3, the installation manual of April
7    2003, to the installation manual of February 2005, Exhibit
8    No. 2?
9         A.   Do you mean create this revision from this?
10        Q.   Yes.
11        A.   I'm not sure exactly. I don't see any major
12   sections added. So I would assume this is probably a small
13   time, you know, 16 hours, 8 to 16 hours, in total time to,
14   in comparison, to go through it.
15        Q.   And you would log that time as overhead --
16        A.   Yes.
17        Q.   -- on your time sheet when you did that effort?
18        A.   Yes.
19        Q.   Are there any revisions between the April 2003
20   manual and the February 2005 manual that are not here in
21   front of you?
22        A.   I don't know. I don't know all the -- I don't
23   have it in my memory what each revision date was.
24        Q.   To your knowledge, there was a 2002 document?

9 (Pages 30 to 33)

Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

34

1    A.  Uh-huh.
2    Q.  Do you know if the April 2003 was the next
3  revision of the 2002 document?
4    A.  I'm not sure.  It probably was.  You know, I'd say
5  on average we updated it once a year.
6         (Exhibit 4, 11/02 cogeneration module
7         installation manual, marked.)
8    Q.  I'm going to give you what's been marked Defense
9  Exhibit No. 4.  Can you identify it for me?
10    A.  Tecogen installation manual.
11    Q.  Okay.
12    A.  Cogeneration module.
13    Q.  That's the November 2002 issue, correct?
14    A.  Right.
15    Q.  Was that the first manual -- the first version of
16  the manual that you wrote?
17    A.  I'm not 100 percent sure.  It seems to be the
18  first one we have remaining copies of, but I may have
19  issued it in a draft form prior to that, you know, to
20  specific customers.  But I can't say that for sure.
21    Q.  Now having in front of you Exhibit 3 and Exhibit
22  4, can you tell me if the April 2003 version was indeed the
23  next version that you came out with to update the November
24  2002 version?

35

1    A.  I would say it is because of the short time in
2  between.  I don't think we would put out versions much
3  quicker than that.  So, yes.
4    Q.  And just to finish my thought, is the -- is the
5  February 2005 version the next version after the April 2003
6  version?
7    A.  I'm not sure.
8    Q.  Would there be anybody else at Tecogen who would
9  know?
10    A.  Probably not for sure, you know.  We -- like I
11  said, if this is what we have for hard copies, probably it
12  is the case.  But we don't -- we don't have -- I can't say
13  that for sure.
14    Q.  Are these generated on a word processing system?
15    A.  Yes.
16    Q.  Did anyone search the word processing system to
17  come up with the hard copies that were made available for
18  this litigation?
19    A.  The way the file is updated -- it's updated each
20  time, so older copies aren't kept.  We just -- I just
21  update the file, and I imagine if you went -- you know, the
22  date listed on the file is the latest revision date.
23    Q.  So unless there's a hard copy of an older version,
24  you don't have an electronic copy of an older version; is

36

1  that correct?
2    A.  I have one electronic copy of 2002 that I had
3  given it a different name, you know, it was more of a
4  draft, but it was pretty close to the final version, but it
5  was, you know, it had a different suffix on it to make it
6  stand alone.  That's why it's still being saved.
7    Q.  Did you make that available as part of the
8  litigation documents that you prepared?
9    A.  Yes.
10    Q.  You mentioned that it took you a small amount of
11  time to go from the 2003 manual to the 2005 manual.  Can
12  you give me an estimate of how long it took you to go from
13  the 2002 manual to the 2003 manual?
14    A.  We added a whole section there.  So that was more
15  extensive with all the drawings that had to go in it and
16  drawing review.  So I would say it's more in the order of
17  probably 80 to 120 hours.
18    Q.  So when you said it took you 200 hours to write
19  the manual, you were not including the revision times, or
20  were you?
21    A.  No.  I think in that I was thinking of mainly the
22  actual desktop publishing part of it.  But in thinking
23  about it, you know, there was a lot more that went into
24  gathering the information, the drawings specifically, all

37

1  the notes, so forth, the back-and-forth with the different
2  people involved, the internal reviews; you know, I had our
3  salespeople review it, integrated their comments.  You
4  know, I'm sure, you know, we had meetings discussing
5  different things about the content.  So I guess I didn't
6  really consider all the other extraneous time.  I was
7  looking more at the actual sitting at my computer typing,
8  which is really only a portion of the time.
9    Q.  Aside from Mr. Panora's contribution, did anybody
10  else contribute written portions to any one of the
11  revisions that you have in front of you?
12    A.  No.  No one wrote a paragraph or a sentence, if
13  that's what you mean.  Like I said, there -- people would
14  find a mistake or a correction needed and would flag it for
15  me.  But I would be the one to actually change the document
16  and fit it in properly and so forth.
17    Q.  Is it safe to say that you conferred with a number
18  of people in house in the process of writing the manual?
19    A.  Yes.
20    Q.  What kind of -- what kind of people, engineering
21  versus mechanical draftsmen; can you give me an idea of the
22  type of person you would confer with?
23    A.  Engineering, and our sales engineers, who really
24  have a sense of the installation side of things, and

10 (Pages 34 to 37)

Case 1:05-cv-11823-RCL    Document 82    Filed 07/28/2008    Page 11 of 13
Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

38

1  customers' needs and history. A lot of what went into this
2  manual was all the lessons learned from prior issues we
3  have had in installations. So our objective in creating
4  this manual was not only to provide information to our
5  customer, but an insurance policy to protect us from
6  liability from different things with the installations. So
7  all the know-how from all these various people from within
8  our organization made it into different disclaimers or
9  warnings in the drawings of what not to do, reminding
10  installers of various things, and this, again, was based on
11  historical experience. So our salespeople had a lot to
12  offer in that sense.
13      Q. Who were some of the salespeople that you
14  conferred with?
15      A. Jeff Glick and Bill Martini, and our service
16  department as well, which is Dave Pidgeon.
17      Q. When you conferred with these people such as Mr.
18  Glick, Mr. Martini, Mr. Pidgeon, Mr. Panora, and others,
19  were there any documents that relate to discussions,
20  whether it be notes that you took, e-mails, any of the
21  correspondence that you can point to to show that you had
22  meetings on this date and this is what you talked about?
23      A. I would have gotten -- I know for a fact I got a
24  mark-up from Bill Martini with comments, but I didn't keep

39

1  it. So I don't have anything at this point, no. But that
2  would be the type of thing, although internally in our
3  Waltham office, it was mainly verbal interaction because we
4  were all in the same office. Bill Martini is on the West
5  Coast.
6      Q. Can you give me an example of some input that Jeff
7  Glick or Bill Martini would have given you that you would
8  have incorporated into the installation manual?
9      A. Sure. For example, I'm looking at version
10  February 2005, page 75, the notes, item 10, "Never operate
11  the Tecogen unit without coolant flow through the exhaust
12  gas heat exchanger. Operating under this condition will
13  destroy the heat exchanger."
14      That was feedback based on an actual event, so
15  that was -- we experienced that, had a problem, and, you
16  know, their feedback -- I can't specifically say which one
17  would have told me that -- but, you know, "Put that in
18  there so people don't do that, and if they do, then we're
19  covered."
20      "Properly and safely support the exhaust pipe
21  along its length while allowing for thermal expansion,"
22  again, we've had experience with mis-installed exhaust
23  systems where, you know, the piping would break and emit
24  gas into the room, which is a big safety hazard. So who

40

1  gets blamed for that; we're trying to cover ourselves so we
2  don't get blamed for that. And that kind of feedback we
3  would get both from our sales force and from our service
4  department.
5      Q. Any other item you can point to that sales force
6  service would have given you input to incorporate?
7      A. Let's see. If you look at page 63 of the same
8  manual, note 2, "Schematic is a simplified guideline and
9  not for construction. Details of the piping design should
10  accommodate site requirements and local and national
11  codes."
12      Again, this would be to delineate what's our
13  responsibility versus the installer. There were sites that
14  would have disputed that or they weren't clear on what they
15  were responsible for, and it caused problems and -- at
16  start-up, and, you know, who pays for what, that kind of
17  thing. So, again, this would establish clearly to the
18  customer or the installer what they're responsible for so
19  there were no disputes after the job has already begun or
20  after it's already begun installation.
21      Item 14, "It is necessary to remove the exhaust
22  heat exchanger for service, do not -- if it is necessary to
23  remove the exhaust heat exchanger for service, do not
24  operate the Tecogen," again, the service experience of that

41

1  nature would have prompted someone to make sure we tell
2  people not to do that kind of thing.
3      Q. So service and sales input were giving you
4  information regarding safety matters that you wanted to
5  acknowledge in your report, correct?
6      A. Safety, but also issues that could cause us
7  financial penalties later if we weren't -- if it wasn't
8  clear as to the scope of work for Tecogen versus the
9  installer, and, you know, it came down to an argument or,
10  you know, a negotiation, we had much firmer ground if
11  things were well documented.
12      Q. They would relay this to you in what fashion?
13      A. Mainly orally, verbally. I learned a lot of all
14  this in just my job experience with the chiller product,
15  which is very similar. So some of it was my own know-how
16  as well.
17      MR. CURCIO: Would you like a five-
18  minute break?
19      (Discussion off the record.)
20      (Recess: 10:36 a.m. to 10:43 a.m.)
21  BY MR. CURCIO:
22      Q. Jean, I just want to remind you you're still under
23  oath.
24      A. Yes.

11 (Pages 38 to 41)

Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

50

1    A.   You know, I don't think Jeff got any information
2    other than what I would have gotten back.
3    Q.   Okay.
4    A.   Or maybe Lee communicated through Jeff.  I don't
5    know exactly how I got the mark-up back, but I don't think,
6    you know, whatever Lee had to say, I think he put in the
7    mark-up or he -- you know, I don't remember exactly how the
8    chain of communication went.
9    Q.   Did you talk with Lee?
10   A.   I think I may have.
11   Q.   More than once?
12   A.   Perhaps.  But I don't -- I don't remember exactly
13   how many conversations, but --
14   Q.   Did you visit sites where cogeneration systems
15   were installed during your preparation of the installation
16   manual?
17   A.   Not specifically for that purpose, no.  I didn't
18   visit any sites during that time, but I had been to sites
19   in the past.
20   Q.   To your knowledge, did anybody else at Tecogen
21   ever visit a site having an installed cogeneration module
22   to help understand the installation process?
23   A.   I'm not quite sure of the question.  Can you
24   rephrase that a little?

51

1    Q.   Did -- to your knowledge, did anyone from Tecogen
2    visit a site to observe how it's being installed or witness
3    how it was installed to gather knowledge for the
4    installation process?
5    A.   People from Tecogen, such as Jeff Glick, visit
6    sites to review the installation and gather knowledge.  It
7    wasn't specifically for feedback for this particular
8    manual.  He already had that knowledge when I was writing
9    this.
10   Q.   Okay.  Are you aware of any visits to the Francis
11   Cabot Lowell Waltham site by anyone from Tecogen to review
12   the installation of a Tecogen cogeneration module?
13   A.   Various people have been there, yes.
14   Q.   Did any of their visits to that site have feedback
15   into the installation process that would have been
16   reflected in the writing of your manual?
17   A.   I don't know of that specifically.  I never -- no
18   one ever said to me, "Based on this visit, you should do
19   this," you know, X, Y, Z.
20   Q.   Have you ever installed a cogeneration module?
21   A.   No.
22   Q.   Do you have any responsibilities during the
23   installation process of any cogeneration module, whether
24   either today or back in 2002?

52

1    A.   No.
2    Q.   Are you aware of any unique installation
3    procedures performed by Aegis in the installation of a
4    Tecogen cogeneration module?
5         MS. FROHLICH:  Objection.
6    A.   Procedures, no.
7    Q.   Are you aware if Tecogen adopted any of Aegis's
8    unique installation procedures in the installation of a
9    Tecogen cogeneration module?
10   A.   No.
11   Q.   Do you recall an early Tecogen design of having
12   the loads in parallel?
13   A.   No.
14   Q.   Do you recall when Tecogen changed from a parallel
15   load to a series load?
16   A.   You're talking about heat loads now?
17   Q.   Yes.  You have stated that you were asked to
18   identify things in the manual that weren't original to you.
19   A.   Yes.
20   Q.   And at the risk of being repetitious, I'm going to
21   ask that you go through the installation manual dated
22   February 2005, which we call Exhibit No. 2, and identify
23   for me those items that are not original to you or, for
24   that matter, that you are aware of, that are not original

53

1    to anyone inside Tecogen.
2    A.   Page 9, page 9 and 10 is from the generator
3    manufacturer.  You see it was prepared for Tecogen, but we
4    had to ask for that particular data.
5         On page 11, I constructed the layout of those
6    tables, but the information within them is just
7    manufacturer's specs which I obtained from the manufacturer
8    of those components.  These graphs also I got from the
9    manufacturer of the components.
10        Same with page 12.  I constructed the layout and
11   determined what information, excuse me, I needed, but got
12   the information from the manufacturer.
13        Page 13 is manufacturer's info, page 14.  Page 25
14   has pictures of an expansion tank which I got from the
15   manufacturer, and some of the data.  But the -- the graphic
16   itself I, you know, wrote the notes and put the tables in
17   there.  But, again, a lot of the information is from the
18   manufacturer's data.
19        Page 35, more of the manufacturer's data, figure
20   2.8b, and the table, the data is from the manufacturer, the
21   same as page 36.
22   Q.   I'm sorry, go back to 35.  The figure is from the
23   manufacturer?
24   A.   Yes.

14 (Pages 50 to 53)

Case 1:05-cv-11823-RCL    Document 82    Filed 07/28/2008    Page 13 of 13
Jean Roy 7-27-2007
Tecogen, Inc. v. Aegis Energy Services, Inc., et al.

54

1   Q.  The table's yours?
2   A.  Yes. I constructed the table. They would have
3   given me the specs on those two sizes.
4        On appendix 1, page 52, more manufacturer's, you
5   know, the graphic of a catalytic converter is from a
6   manufacturer. The same with page 54. Page 55, the graphic
7   of the silencer, and figure A1.4 was from the manufacturer.
8   Page 56, figure A1.6 was from the manufacturer. And some
9   of the words from this -- words written in here might have
10  been gotten from the literature of the manufacturer.
11  Q.  I'm sorry, can you identify which words we're
12  talking about?
13  A.  Let me see. I think the second paragraph might
14  have been from the manufacturer.
15       Page 66, 67, 68, 69, manufacturers' data.
16       I think that's about it.
17  Q.  Let's refer to page 13 in the February 2005 manual
18  which is Exhibit 2, I believe.
19  A.  Yes.
20  Q.  This is a manufacturing spec that's not original
21  to you, correct?
22  A.  Correct.
23  Q.  Why did you put this -- this specification in the
24  manual?

55

1   A.  Because it's asked for by installers when they're
2   trying to get, you know, electrical approval.
3   Q.  Okay. So the installer would need to see this
4   graph and the information contained on it?
5   A.  Yes, someone going to get the electrical permit is
6   typically asked for that.
7   Q.  Okay. And did you receive any permission from GE
8   to copy this schematic?
9   A.  Not formally, no.
10  Q.  You say not formally. Did you receive any
11  informal permission?
12  A.  No.
13  Q.  Page 14, this appears to be another GE schematic.
14  A.  Yes.
15  Q.  Again, is this for the installer?
16  A.  Yes.
17  Q.  Information to be conveyed to the installer?
18  A.  Yes.
19  Q.  So my understanding is the installer needs to see
20  the information on this chart as part of the installation
21  process?
22  A.  Yes.
23  Q.  Did you receive any express or implied permission
24  from GE to copy this drawing into your installation manual?

56

1   A.  No.
2   Q.  What made you decide to copy this particular
3   drawing on page 14 and not try to create one of your own?
4   A.  Well, it's -- it wouldn't be really accurate to
5   create one of my own. It's manufacturer's data. There's
6   no -- nothing wrong with providing customers with
7   manufacturer's data. There would be no point to creating
8   my own. It's a very complex diagram anyway.
9   Q.  Does the installer need to know all the
10  information on this chart or just one curve or just a
11  portion of it?
12  A.  I'm not sure. You know, I know that we were
13  providing this information and faxing it to people in past
14  sales. So it made sense to incorporate it in a manual. I
15  didn't really go through the details of what it is. I
16  didn't analyze why not put it in in this fashion because we
17  were already supplying it to people via fax that way.
18  Q.  Can I refer you now to page 11. You said some of
19  the graphs were from manufacturers. Which graphs were from
20  the manufacturers?
21  A.  The ones on the bottom, the three on the bottom.
22  Q.  Okay. Do you know which manufacturer they came
23  from?
24  A.  Well, Sprecher & Schuh is the manufacturer of the

57

1   devices, so that's where I would have gotten them, out of
2   their literature.
3   Q.  Okay. Because they're together in this format,
4   did you cut and paste each graph out of its own context in
5   the manufacturer's manual and put it in this manual?
6   A.  That's correct. The specific information relating
7   to the model.
8   Q.  Does the installer need to know all the
9   information on each chart that's given or just a portion of
10  the information?
11  A.  Well, it would depend on which version machine
12  they have. You know, we list one for high voltage versus
13  low voltage. So an installer of a low-voltage machine
14  would need the low-voltage information and not the high
15  voltage, and for a low voltage and vice versa.
16  Q.  Did you think it would be easier to copy than
17  provide your own information than what's listed on the
18  chart?
19  A.  It would be more accurate, yes, easier.
20  Q.  Referring to page 56, can you identify again for
21  me what's non-original to you on this page?
22  A.  The graphics on the bottom, the anchoring guides,
23  guidelines, and I believe the second paragraph had some
24  language from the manufacturer's data.

15 (Pages 54 to 57)